**Condensed Transcript**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

JAMON T. BRIM,

    Plaintiff(s),

vs.

DELL FINANCIAL SERVICES, LLC,
MIDLAND CREDIT MANAGEMENT,
INC.,
MIDLAND FUNDING, LLC,

    Defendant(s).

Civil No.
5:10-CV-369-IPJ

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION OF

ANGELIQUE D. ROSS

September 16, 2010
9:09 a.m.

402 West Broadway
16th Floor
San Diego, California

Reported by: Denise T. Johnson



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego CA 92101
www.esquiresolutions.com

Angelique D. Ross                                           September 16, 2010

---

**Page 1**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

------------------------------

JAMON T. BRIM,

    Plaintiffs,

vs.                                Civil No.
                                   5:10-CV-369-IPJ

DELL FINANCIAL SERVICES, LLC,
MIDLAND CREDIT MANAGEMENT, INC.,
MIDLAND FUNDING, LLC,

    Defendants.

------------------------------

DEPOSITION OF
PERSON MOST KNOWLEDGEABLE OF
MIDLAND CREDIT MANAGEMENT, INC.
ANGELIQUE DANIELLE ROSS

September 16, 2010
9:09 a.m.

402 West Broadway
16th Floor
San Diego, California

Reported by Denise T. Johnson, CSR No. 11902

---

**Page 2**

Appearances of Counsel

For Plaintiff:

HAYS CAULEY
BY: PENNY HAYS CAULEY
549 West Evans Street, Suite E
Florence, South Carolina 29501
E-mail: phc917@hayscauley.com

For Defendants:
BALCH & BINGHAM
BY: ERIK LANGLEY
P.O. Box 306
Birmingham, Alabama 35201-0306

Also Present: Brian L. Frary

---

**Page 3**

INDEX TO EXAMINATION

WITNESS: ANGELIQUE DANIELLE ROSS ANGELIQUE DANIELLE ROSS

| EXAMINATION | PAGE |
|---|---|
| BY MS. CAULEY | 5 |
| BY MR. LANGLEY | 124 |

QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER

| Page | Line |
|---|---|
| 54 | 6 |

---

**Page 4**

ANGELIQUE DANIELLE ROSS
Brim v. Dell Financial
Thursday, September 16, 2010
Denise T. Johnson, CSR No. 11902

INDEX TO EXHIBITS

| EXHIBITS | | MARKED |
|---|---|---|
| Exhibit 1 | Notice of Deposition | 6 |
| Exhibit 2 | Collection Detail | 75 |
| Exhibit 3 | Documents 14 through 17, production notes | 85 |
| Exhibit 4 | Defendant's Answers to Interrogatories | 107 |

(Original exhibits have been attached to the original transcript.)

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                September 16, 2010

**Page 5**

```
 1              PERSON MOST KNOWLEDGEABLE
 2        DEPOSITION OF ANGELIQUE DANIELLE ROSS
 3                  SEPTEMBER 16, 2010
 4
 5             ANGELIQUE DANIELLE ROSS,
 6     having been first duly sworn, testified as follows:
 7                       EXAMINATION
 8   BY MS. CAULEY:
 9     Q.  Please state your name for record.
10     A.  Angelique Danielle Ross.
11     Q.  My name is Penny Cauley.  I am here representing
12   Jamon Brim in a case that we filed against
13   Midland Funding.
14         We talked a little bit off the record.  If you
15   need a break at any time -- this is a very informal
16   setting.  If you need a break, let us know and we'll take
17   a break when you need it.  Okay?
18     A.  Yes.
19     Q.  Also, if I ask a question and you are not sure
20   about the meaning of the question, let me know that you
21   don't understand it so we can take care of it right then.
22     A.  Okay.
23     Q.  You are doing a great job of saying "okay" or
24   "yes" or "no."  In a deposition, it is very easy to get
25   caught up in head nodding.  She can't take that down.  If
```

**Page 6**

```
 1   I remind you or say something like, "Is that a yes or is
 2   that a no," that is not to pick on you or make you
 3   uncomfortable.  It is just to make sure the answer was
 4   clear.
 5     A.  Okay.
 6         MR. LANGLEY:  Usual stipulations?
 7         MS. CAULEY:  That's fine with me, if that is fine
 8   with Midland.
 9         MR. LANGLEY:  Yes, that is good for us.  I think
10   the witness will read and sign.  But other than that, the
11   usual stipulations.
12         MS. CAULEY:  Pursuant to Alabama.
13         MR. LANGLEY:  Yes.
14   BY MS. CAULEY:
15     Q.  Have you had a chance, Angelique, to review the
16   Notice of Deposition?
17     A.  Yes.
18     Q.  We spoke off the record with your counsel.  Are
19   you the person who would be most knowledgeable regarding
20   the topics identified in the Notice of Deposition except
21   for Topic No. 5 and No. 8?
22     A.  Yes.
23     Q.  And we're going to mark that notice as
24   Plaintiff's Exhibit 1.
25         (Exhibit 1 was marked.)
```

**Page 7**

```
 1         MR. LANGLEY:  The one nuance to that is Grant
 2   will be the witness for No. 7 as it relates to FDCPA.
 3         MS. CAULEY:  Okay.
 4   BY MS. CAULEY:
 5     Q.  The reason you've been put up for the deposition
 6   is the experience and the duties you have for the FCRA?
 7     A.  Yes.
 8     Q.  Do you understand that you are testifying here on
 9   behalf of Midland Credit Management?
10     A.  Yes.
11     Q.  And also on behalf of Midland Funding?
12     A.  Yes.
13     Q.  Do you hold any type of office or are you a
14   member of Midland Funding, LLC?
15     A.  No.
16     Q.  And you are not an employee of Midland Funding?
17     A.  No.
18     Q.  You do not get paid by Midland Funding?
19     A.  No.
20     Q.  You are an employee of Midland Credit Management?
21     A.  Yes.
22     Q.  And, in fact, is it true that Midland Funding has
23   no employees?
24     A.  That's true.
25     Q.  Midland Funding is the owner of the debt that was
```

**Page 8**

```
 1   purchased with respect to Mr. Brim?
 2     A.  Yes.
 3     Q.  And all accounts are actually purchased by
 4   Midland Funding, LLC; is that right?
 5     A.  Yes.
 6     Q.  But all employees who have any responsibility
 7   with respect to collecting or the handling of disputes
 8   through the credit bureau are employed by Midland Credit
 9   Management?
10     A.  Yes.
11     Q.  Can we agree for purposes of the deposition that
12   if I use the term "Midland," I'm referring to Midland
13   Credit Management?
14     A.  Yes.
15     Q.  And you are not a director or an officer of
16   Midland Funding?
17     A.  No.
18     Q.  You already gave us your name.  Will you give us
19   your address, please.
20     A.  My home address?
21     Q.  Yes, please.
22     A.  Will that be public record?
23     Q.  It will be in this deposition.
24     A.  I just don't want it to get out publicly with my
25   address on anything.
```



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                           September 16, 2010

**Page 9**

1  MR. LANGLEY: Can she give you her business
2  address?
3      MS. CAULEY: That would be fine.
4      THE WITNESS: Thank you.
5      8875 Aero Drive, Suite 200, San Diego,
6  California, 92123.
7  BY MS. CAULEY:
8      Q. And what position do you hold at Midland?
9      A. I am the consumer relations manager.
10     Q. How long have you held that position?
11     A. A little over four years.
12     Q. Have you held any other positions at Midland?
13     A. Yes.
14     Q. What were they?
15     A. Consumer relations liaison and consumer relations
16  lead.
17     Q. How long were you the liaison?
18     A. Approximately six months.
19     Q. And then I presume you were promoted to consumer
20  relations manager?
21     A. I was the consumer liaison first, then promoted
22  to lead, then promoted to manager.
23     Q. How long did you work as the lead?
24     A. About two-and-a-half years.
25     Q. Who is your supervisor at Midland?

**Page 10**

1   A. Juan Naves.
2   Q. Do you know how to spell that?
3   A. N-a-v-e-s.
4   Q. What is his title?
5   A. General counsel.
6   Q. Do you know how long he's been in that position?
7   A. A little over a year.
8   Q. Who was your supervisor prior to Ron Naves?
9   A. Lance Martin.
10  Q. Did Lance Martin also serve as general counsel?
11  A. No.
12  Q. What was his position?
13  A. He was VP of -- I think it is legal and
14 compliance or legal affairs and compliance. I'm not sure
15 of the exact title.
16  Q. How long has Ron Naves been your supervisor?
17  A. For about eight months.
18  Q. And then Mr. Martin, how long was he your
19 supervisor?
20  A. I would say two to two-and-a-half years.
21  Q. Do you recall who your supervisor was prior to
22 Lance Martin?
23  A. Yes.
24  Q. Who was that?
25  A. Sven Zabka, S-v-e-n, last name is Zabka.

**Page 11**

1   Q. Can you spell that?
2   A. Z-a-b-k-a.
3   Q. Is that a man or a woman?
4   A. Man.
5   Q. And what was his job title, position?
6   A. I'm not sure. I know it was corporate counsel.
7  But I'm not sure if there was anything in addition to
8  that.
9   Q. Any other supervisors that you've had while
10 you've been employed at Midland?
11  A. Yes, Christina Fudge.
12  Q. What was her position?
13  A. She was the consumer relations manager.
14  Q. Okay. That would have been while you were
15 working as the liaison?
16  A. Yes.
17  Q. I take it Mr. Naves is still employed at Midland?
18  A. Yes.
19  Q. Is Mr. Martin still employed at Midland?
20  A. No.
21  Q. What about Sven Zabka?
22  A. No.
23  Q. Christina Fudge?
24  A. No.
25  Q. Where did you work prior to Midland?

**Page 12**

1   A. Telespectrum.
2   Q. What did you do there?
3   A. I was a quality assurance manager.
4   Q. And what do they do?
5   A. It was a call center.
6   Q. Are they a creditor?
7   A. No.
8   Q. What kind of call center is it?
9   A. I worked in the telesales department.
10  Q. How long did you do that job?
11  A. Four-and-a-half years.
12  Q. Where did you work before that?
13  A. Service America.
14  Q. What type of a job was that?
15  A. It was actually retail.
16  Q. Do they sell goods and services?
17  A. Yeah, goods.
18  Q. Besides working at Midland, have you worked at
19 any other employer where you had any responsibilities with
20 respect to the Fair Credit Reporting Act?
21  A. No.
22  Q. Prior to being employed by Midland, had you ever
23 had any training regarding the Fair Credit Reporting Act?
24  A. No.
25  Q. Tell me approximately when you started at



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

**Page 21**

1  them. There are a few accounts that they may not have
2  access to. Those are the only ones that are responded to
3  by San Diego.
4     Q. So unless an account has been flagged for
5  San Diego, all other ACDVs are going to be handled by the
6  St. Cloud office?
7     A. Yes.
8     Q. What type of accounts would St. Cloud not have
9  access to?
10    A. Health care accounts.
11    Q. And in this case, Mr. Brim's account was related
12 to a computer purchase. So all his ACDVs would have been
13 handled by the St. Cloud site?
14    A. Either the St. Cloud site or our automated
15 system, yes.
16    Q. And what automated system does Midland use?
17    A. We use a batch interface.
18    Q. Batch interface?
19    A. Yes.
20    Q. How does that work?
21    A. When an ACDV comes in, we use the E-Oscar system.
22 And our automated system can look at the ACDV, match it,
23 compare it to our account system information and respond
24 to the majority of the ACDVs.
25    Q. Does that batch interface system have a name?

**Page 22**

1     A. No. We just call it the "batch interface."
2     Q. Is that a system or program that was designed by
3  Midland?
4     A. It wasn't designed by Midland. We had to adapt
5  it to work with our system. But it wasn't designed by
6  Midland, no.
7     Q. Do you know where it came from? Who designed it?
8     A. We purchased the basic program from the same
9  people that created the E-Oscar program.
10    Q. So the batch interface system was actually
11 initially developed by the same company that you purchased
12 E-Oscar program from; is that right?
13    A. Yes.
14    Q. It's been modified to work with Midland's own
15 internal system?
16    A. Yes.
17    Q. Can you give me your best judgment on what
18 percentage of ACDVs are handled exclusively by the batch
19 interface?
20    A. I would say maybe 95 percent.
21    Q. So I make sure that I understand, when an ACDV
22 comes in, the batch interface system can review the
23 computer codes on the ACDV and compare the information
24 contained on the ACDV with the information in Midland's
25 system and automatically verify that the information is

**Page 23**

1  accurate?
2     A. Yes.
3     Q. If an ACDV comes in claiming an account has been
4  paid in full, are those ACDVs also handled by the batch
5  interface system?
6     A. It would depend.
7     Q. What would it depend on?
8     A. It would depend on information on the actual
9  Midland account, not the ACDV itself.
10    Q. Tell me what information on the Midland system
11 would cause an ACDV claiming that its debt had been paid
12 in full to be handled by an individual versus the batch
13 interface system.
14    A. There may be specific codes on the account or the
15 account may reside in a specific location in our system.
16    Q. What would some of those codes on the account be?
17    A. For instance, if the account had a DIS dispute
18 code, the system could select that ACDV for manual review.
19    Q. What are the other codes where the system can
20 select an ACDV for manual review?
21    A. I don't know off -- I can't think of other ones
22 offhand. It may select or move the account for being in a
23 specific location in our system.
24    Q. What would those locations be?
25    A. It could be -- there are several. 45-G, 45-P,

**Page 24**

1  45-F.
2     Q. What does "45-G" mean?
3     A. It means the consumer disputed in writing within
4  45 days of the validation letter and the account is
5  currently under an investigation. And it was a general
6  dispute, nonspecific.
7     Q. What about "45-P"?
8     A. So it means all of the same things except this
9  dispute -- the dispute was that the account was paid
10 prior.
11    Q. Paid prior to Midland purchasing the account?
12    A. Yes.
13    Q. What about "F"?
14    A. All of the same -- the account -- or the dispute
15 is that the account is fraudulent.
16    Q. If a consumer sends in a letter within 45 days of
17 the validation letter that goes out on the account with a
18 general dispute, a code of 45-G is placed on that account;
19 is that right?
20    A. Yes. Well, that's actually the location it is
21 moved to. The code would be the DIS code.
22    Q. So the account itself is moved to a 45-G location
23 in the system?
24    A. Yes.
25    Q. Meaning the computer system?



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                                        September 16, 2010

### 29

1  to the consumer to ask them for more information to help
2  them locate their account.
3      Q. Any changes with respect to the handling of the
4  ACDVs?
5      A. No.
6      Q. So basically, now if a consumer sends in a letter
7  that does not contain any documentation but is just a
8  letter of dispute, even if it has the cease and desist
9  request, Midland has a new form letter that can go out
10 stating they need additional information regarding the
11 dispute and that no contact will be made with the
12 consumer; is that right?
13     A. Yes.
14     Q. Going back to 2008 and 2009, if a consumer sent
15 in a written dispute, regardless of what the dispute was,
16 and it did contain some documentation, how was that
17 dispute handled?
18     A. It would depend on the documentation that was
19 received.
20     Q. All right. What type of documentation does
21 Midland normally get?
22     A. Do you mean generally?
23     Q. With respect to a dispute.
24     A. It will vary depending on the type of dispute.
25     Q. What about with respect to a paid prior dispute?

### 30

1      A. We may receive paid letters.
2      Q. Like a paid-in-full letter?
3      A. Yes.
4      Q. Okay.
5      A. We may receive settlement offer letters with
6  copies of proof of payment. Sometimes we receive canceled
7  checks. We receive bank statements.
8      Q. Who reviews the documentation that is sent in
9  respect to a dispute? Is that the consumer relations
10 department?
11     A. Yes.
12     Q. What determines where the letter is sent,
13 San Diego versus St. Cloud?
14     A. There isn't a determination based on the mail
15 itself. It is just basically the date that the mail came
16 in. We know there is shipping time, so the mail generally
17 will go out to St. Cloud. Is it not based on the type of
18 mail.
19     Q. Does all mail come to San Diego?
20     A. Yes, most of it.
21     Q. Is it scanned? Does the department open the
22 letter and deal with the letter, or is it scanned and sent
23 electronically?
24     A. We get the hard copies of the correspondence, so
25 the letters are actually opened and read, the hard copies.

### 31

1      Q. In consumer relations?
2      A. Yes.
3      Q. If all the mail comes into San Diego, how does
4  some of it get to St. Cloud?
5      A. It is shipped there.
6      Q. Do you just take, like, a stack of mail that
7  comes in and say, "This stack is going to go to
8  St. Cloud"?
9      A. Basically, yes.
10     Q. Trying to divide up the amount of mail that comes
11 in?
12     A. Yes.
13     Q. Regardless of whether it is in San Diego or
14 St. Cloud, a consumer relations employee will actually
15 open the mail and read the letter?
16     A. The mail is opened by our mailroom. But the
17 consumer relations team -- either site, they're
18 responsible for reading the letter.
19     Q. Does the letter go to consumer relations as the
20 actual letter or is it scanned?
21     A. It is the actual letter.
22     Q. What is done with it after consumer relations
23 sees it?
24     A. After it is received and reviewed, any dispute
25 letters will then be scanned after they have been

### 32

1  processed.
2      Q. Are there any policies or procedures that
3  instruct the consumer relations employees on how to review
4  the documentation that's supplied with respect to a
5  dispute?
6      A. Yes.
7      Q. Where are those policies maintained?
8      A. That would be in the consumer relations manual.
9          MS. CAULEY: We don't have that.
10         MR. LANGLEY: I think you do.
11         MS. CAULEY: It is two pages?
12         THE WITNESS: No.
13         MR. LANGLEY: I think it is about seven pages in
14 a chart format with designations in the upper left-hand
15 corner about the type of dispute and when it is received.
16 BY MS. CAULEY:
17     Q. Let me hand you that. Please tell me which parts
18 of that constitute the consumer relations manual.
19         MR. LANGLEY: Just to make sure the record is
20 clear, we're looking at Bates labeled Documents 163
21 through 169 and 202 through 204.
22         MS. CAULEY: The top page doesn't go with it.
23         THE WITNESS: This is part of the new hire
24 training manual.
25 BY MS. CAULEY:



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                              September 16, 2010

---

**37**

1  Q. So "GUI," "R2K" and "I series" all refer to the
2  same computer system?
3  A. Yes.
4  Q. The liaison is to look at the account, view the
5  account history and then add a warning code, 023, which is
6  just noting that a dispute was just received?
7  A. Yes.
8  Q. But that it is okay to continue to work on the
9  account?
10 A. Yes.
11 Q. Step 6 is, "Send the consumer a QCPP letter
12 requesting documentation."
13 A. Yes.
14 Q. And that is supposed to be done on all verbal
15 disputes claiming that an account was paid prior to
16 Midland purchasing it?
17 A. Unless the consumer is represented by an attorney
18 or they requested a cease and desist, then typically that
19 QCPP letter would go out once those conditions are there.
20 Q. I see that now under the "Comment" section. If
21 there is an attorney or a cease and desist request, then
22 no QCPP letter is sent?
23 A. Correct.
24 Q. Have you received an updated consumer relations
25 operation manual since July 2010?

**38**

1  A. No.
2  Q. So the employees in consumer relations are
3  continuing to handle verbal disputes the same way today as
4  they were in 2009?
5  A. Yes.
6  Q. Pages 168 through 169, that's the guidelines for
7  handling written disputes that it has been paid prior; is
8  that correct?
9  A. Correct.
10 Q. The liaison is to review the account and verify
11 that the social, name and address match?
12 A. Yes, if they can. Consumers don't always include
13 all the information on their correspondence.
14 Q. They're also looking for proof. Here it says it
15 could be the front and back of a cancelled check with a
16 settlement offer letter or paid letter with a matching
17 account number?
18 A. Yes.
19 Q. That matching account number matching Midland's
20 account number or the original creditor's account number?
21 A. It should be with the original creditor's account
22 number.
23 Q. Are there any other documents that help consumer
24 relations liaisons determine what is sufficient proof with
25 respect to the accounts with a paid prior?

**39**

1  A. Say that again.
2  Q. Sure.
3     It has two examples of what would constitute
4  proof of a paid prior dispute on Page 168, right?
5  A. Correct.
6  Q. Is there any other document or memo or guideline
7  that would help a liaison know what other proof would be
8  acceptable with respect to Midland?
9  A. No.
10    MR. LANGLEY: Object to the form.
11    THE WITNESS: No.
12 BY MS. CAULEY:
13 Q. There is no list of other documents that would be
14 accepted as proof that an account had been paid prior?
15 A. Not that I'm aware of.
16 Q. So according to Page 168, the only acceptable
17 proof is the front and back of a cancelled check with a
18 settlement offer or a paid letter?
19 A. Right. There isn't another document that gives a
20 list. But if someone provided a settlement offer letter
21 with a different proof of payment, that could be
22 considered proof even though it doesn't specifically say
23 that.
24 Q. Bank statement is not on there, is it?
25 A. No.

**40**

1  Q. Is a bank statement showing payment to the
2  original creditor sufficient proof that the account had
3  been paid prior?
4  A. No.
5  Q. Never?
6  A. Not by itself, no.
7  Q. On No. 5, it says, "If unable to determine if
8  proof is valid, account will be referred to ACQ."
9     What is "ACQ"?
10 A. It stand for "acquisitions."
11 Q. Where is acquisitions?
12 A. Where are they?
13 Q. Are they in the San Diego office?
14 A. Yes, in San Diego.
15 Q. Also in St. Cloud or just San Diego?
16 A. Just San Diego.
17 Q. Who is in charge of the acquisitions department?
18 A. The entire acquisitions department would be Amy
19 Anuk.
20 Q. How do you spell that?
21 A. A-n-u-k.
22 Q. What is her title?
23 A. I'm not sure. I know she is the VP.
24 Q. Do you have any knowledge what happens when an
25 account is assigned to the acquisitions department?



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

### Page 53

1  A. Yes.
2  Q. Meaning to mark the account as "disputed" or to
3  put it in the proper queue?
4  A. Right. Or if there is a cease and desist request
5  or attorney representation, to follow steps appropriately.
6  Q. The consumer relations department doesn't make
7  any attempts to collect the debt from a consumer, correct?
8  A. Correct.
9  Q. With respect to the FDCPA, the responsibilities
10 would come in with the handling of a cease and desist
11 request or reporting the account to the credit bureau?
12 A. Or processing written disputes that are received
13 from the consumer.
14 Q. Have you testified in a deposition before
15 regarding your responsibilities pursuant to the FDCPA?
16 A. Yes.
17 Q. In the depositions you've given before, have any
18 of those cases involved claims similar to those here under
19 the Fair Credit Reporting Act in the handling of an ACDV?
20 A. Yes.
21 Q. Were any of those depositions this year?
22 A. I do not believe so.
23 Q. Are there any other documents you reviewed in
24 preparation for the deposition that were not in the
25 documents I provided you, other than the two that we got

### Page 54

1  today?
2      MR. LANGLEY: To the extent it involves some
3  document that Brian or I may have shown you, I'm going to
4  object on the grounds of attorney-client privilege,
5  work-product doctrine and instruct the witness not to
6  answer.
7      THE WITNESS: I've seen the Notice of Deposition.
8  BY MS. CAULEY:
9  Q. Any other documents or screens or information
10 that you might have reviewed that was not shown to you by
11 your attorney?
12 A. Oh, that wasn't shown to me? No.
13 Q. The reporting of accounts is done by Midland
14 Credit Management; is that correct?
15 A. Correct.
16 Q. Is there any type of contract between Midland
17 Funding and Midland Credit Management regarding the
18 reporting of accounts by Midland Credit Management?
19 A. I don't know.
20 Q. Do you know if Midland Funding pays Midland
21 Credit Management any type of fee or payment for the
22 reporting and the handling of ACDV?
23 A. I don't know.
24 Q. I'm going back to "Midland" as referring to
25 Midland Credit Management.

### Page 55

1  With respect to Midland, Midland does not use any
2  type of outsource vendors for the handling of ACDV?
3  A. No.
4  Q. You would agree that Midland is responsible for
5  reporting accurate information to the credit reporting
6  agencies regarding specific accounts, correct?
7  A. Correct.
8  Q. Would you agree that Midland is responsible for
9  the accuracy of the information that it reports
10 specifically to the credit bureaus?
11 A. Correct.
12 Q. Midland is also responsible for the accuracy of
13 information that it provides to any other entity regarding
14 a specific account?
15 A. I'm not sure what you mean.
16 Q. If Midland were to send information on an account
17 to an attorney for collection or for a lawsuit or to any
18 other entity with respect to collection or to sell the
19 account, the information that Midland provides should be
20 accurate, right?
21 A. Yes.
22 Q. With respect to the Fair Debt Collection
23 Practices Act, it is a violation of that act for Midland
24 to communicate any information that it knows or which it
25 should know to be false, correct?

### Page 56

1      MR. LANGLEY: Object to the form.
2      You can answer, if you can.
3      THE WITNESS: Yes.
4  BY MS. CAULEY:
5  Q. I believe you told me earlier that you are
6  familiar with the Fair Credit Reporting Act?
7  A. Yes.
8  Q. And in the new hire training manual, there are a
9  few pages that deal with the Fair Credit Reporting Act.
10 Did you receive a copy of the new hire training manual?
11 A. I don't have a hard copy. But there is a -- I do
12 have access to a copy.
13 Q. Were you provided a copy when you were hired or
14 is that something done electronically in the system?
15 A. I was not provided a copy when I was hired. This
16 is for the account managers. But all employees have
17 access to it on our system.
18 Q. So the consumer relations employees are not given
19 the new hire training manual that was provided?
20 A. No.
21 Q. How are the consumer relations employees trained
22 on the Fair Credit Reporting Act?
23 A. Well, it is not as specific -- or it wasn't a
24 specific training. It was just basically in relation to
25 the procedures they were doing in processing the disputes.



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

**57**

1  Q. The consumer relations employees are not provided
2  with a copy of the Fair Credit Reporting Act when they're
3  hired; is that correct?
4  A. That's correct. But they also have access to
5  this.
6  Q. They have access to the new hire training manual?
7  A. Yes.
8  Q. But the new hire training manual doesn't contain
9  the Fair Credit Reporting Act?
10 A. No, I don't think so.
11 Q. Are you aware that Midland is responsible for
12 investigating the disputes received on an account to the
13 credit reporting agencies?
14 A. Yes.
15 Q. And Midland is responsible for conducting that
16 investigation within 30 days?
17 A. Yes.
18 Q. Those disputes are all received via the ACDV
19 through the credit bureaus?
20 A. Yes.
21 Q. You told me 99 percent of ACDVs are handled
22 electronically through the batch; is that right?
23 A. Yes.
24 Q. If an ACDV is not handled automatically through
25 the batch system, are there steps contained in any type of

**58**

1  manual or policy, whether it is printed or just a note on
2  the system, that tells an individual in consumer relations
3  how to investigate that credit dispute?
4  A. Well, as far as using the actual system, there is
5  a tutorial that is available through the E-Oscar system to
6  show them how to actually put information in. Other than
7  that, we have just some screen prints that show the screen
8  in order to find the information on our system.
9  Q. You lost me just a little bit.
10    You have screen prints that tell the employees
11 where to find the information on your system. Can you
12 explain that more for me? Does consumer relations have
13 the same computer system that the collections department
14 might have?
15 A. Yes.
16 Q. They have access -- consumer relations has access
17 the same screens as the collections department?
18 A. Yes.
19 Q. So the information would be that there might be a
20 screen that would tell them where to find a payment
21 history or previous addresses or something of that nature?
22 A. Yes.
23 Q. There are quite a few screens in the system --
24 A. Right.
25 Q. -- judging from the documents that were produced.

**59**

1  To sort of make that easier for the person in
2  consumer relations to actually find which screen to go to?
3  A. Yes.
4  Q. Like a cheat-sheet, for lack of a better term?
5  A. Yes.
6  Q. Is the E-Oscar tutorial also something that can
7  be printed?
8  A. Yeah, you can print it.
9  Q. Do all employees in the consumer relations
10 department take the E-Oscar tutorial?
11 A. Yes.
12 Q. Does that E-Oscar tutorial help the employees
13 know how to perform or respond to an ACDV that is received
14 through E-Oscar?
15 A. No. Well, it shows them the choices they have to
16 respond. But it is more or less a user guide of how to
17 use and navigate through the E-Oscar system itself.
18 Q. So the tutorial doesn't explain to the consumer
19 relations employee how to actually conduct an
20 investigation with respect to an ACDV but basically gives
21 them the drop-down menus of what codes are available for
22 responding?
23    Would that be fair?
24 A. Yes.
25 Q. Since January of 2008, you have been in charge of

**60**

1  overseeing the handling of ACDVs?
2  A. Yes.
3  Q. Did you or the supervisors that are under you
4  conduct any type of review of responses to ACDV?
5  A. We may review non-submitted responses. But if
6  there a question about a response, we'll review the
7  account and the ACDV to look at the most appropriate
8  response.
9  Q. Once an ACDV is actually completed and returned
10 to the credit bureau, there is no internal monitoring of
11 whether those responses were correct?
12 A. No.
13 Q. You don't have any type of reports that you
14 compile on the number of disputes that were handled?
15 A. Well, I can see how many disputes came in through
16 the E-Oscar.
17 Q. How many disputes does Midland normally get, say,
18 per week for ACDV?
19 A. I would say maybe about 8,000.
20 Q. Would that be the same pretty much every week?
21 A. Yeah.
22 Q. And then if my math is right, five percent of
23 that would be about 400 are actually handled by an
24 individual in the consumer relations department per week?
25 A. Yeah, I guess that is about right.



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                                September 16, 2010

61

1   Q. Have those numbers been the same from 2008 to
2   today?
3   A. I would say approximately the same.
4   Q. I understand they might go up slightly, but
5   overall they've been about the same since January of 2008?
6   A. Yes.
7   Q. You have actually been the manager of the
8   consumer relations department since January of 2008?
9   A. Yes.
10  Q. Do you have any knowledge regarding the
11  validation letter or how interest was calculated on the
12  account with respect to collecting this account from
13  Mr. Brim?
14  A. No.
15      MS. CAULEY: That would be our other witness most
16  likely.
17      MR. LANGLEY: I'm not sure if he can testify
18  about that since his thing is more related to FDCPA
19  training issues. He may. I guess we can find out.
20      MS. CAULEY: Off the record.
21      (A discussion off the record was held.)
22      MS. CAULEY: I'm not marking documents 163
23  through 169 --
24      MR. LANGLEY: Okay.
25      MS. CAULEY: -- since they're confidential.

62

1   BY MS. CAULEY:
2   Q. If you'll look at the top page, which is
3   Midland 1 and 2, this was provided as a letter sent to
4   Mr. Brim on January 22, 2008. Upon your reviewing of the
5   computer screens and the documents, are you aware of any
6   previous letter to this January 22, 2008 letter being sent
7   to Mr. Brim?
8   A. I would need to look at the production notes.
9   Yes.
10  Q. What page is that?
11  A. 73.
12  Q. This is the "Letter History" screen?
13  A. Yes.
14  Q. It says "Page 1 of 3." Page 2 and Page 3 are
15  blank. Do you know why they're blank?
16  A. I believe there is information that needs to fill
17  those pages.
18  Q. So that's the amount of space that is allotted to
19  enter information regarding letters, and it is just that
20  that space was not needed?
21  A. I believe so.
22  Q. If we look at Page 73, the "Letter History"
23  screen, it shows a letter was sent on October 20th of
24  2007?
25  A. I see October --

63

1   Q. I can't read. I'm sorry. October 26, 2007.
2   A. Yes.
3   Q. Then December 20th, 2007?
4   A. Yes.
5   Q. And then the letter that we have which is dated
6   January 22, 2008?
7   A. Yes.
8   Q. If a letter is sent by Midland, that letter is
9   documented in the letter history inquiry, correct?
10  A. Correct.
11  Q. Even if a letter is sent by the consume relations
12  department, it would be documented in the "Letter History"
13  screen?
14  A. Yes.
15  Q. Based on the "Letter History" screen, we know
16  only three letters were sent to Mr. Brim by Midland?
17  A. Yes.
18  Q. If you go back to Document No. 1, it indicates a
19  current balance of $1,603.15; is that right?
20  A. Yes.
21  Q. It indicates that Midland Funding owns the debt.
22  A. Yes.
23  Q. If you turn to Page 2, which would have been
24  attached to this letter, Page 1; is that right?
25  A. Yes.

64

1   Q. On the back, it has an interest rate of six
2   percent.
3       Did you see that?
4   A. Yes.
5   Q. Do you know how this interest rate was selected
6   for this account?
7   A. I do not.
8   Q. Do you have any knowledge of how interest rates
9   are selected for specific accounts by Midland?
10  A. No, I don't.
11  Q. Midland still owns this account?
12  A. Yes.
13  Q. If you go to the next letter, which is Page 3,
14  this is actually a letter that Mr. Brim sent in to
15  Midland. And it is dated July 29, 2008, correct?
16  A. Correct.
17  Q. It was received on August 5th, 2000 by your
18  department?
19  A. Correct.
20  Q. Attached to that letter was a bank statement from
21  Red Stone Federal Credit Union.
22  A. Correct.
23  Q. In this letter, Mr. Brim indicated that he
24  disputed the debt; is that right?
25  A. Yes.



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com