FILED
2010 Nov-10 PM 03:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

Angelique D. Ross                                              September 16, 2010

---

**65**

1   Q. And he disputed the debt because the debt was
2   paid on November 8th of 2004?
3   A. Yes.
4   Q. And indicated in his letter he was included a
5   detailed report from his bank statement showing the
6   payment and transaction number.
7   A. Yes.
8   Q. He also requested no further communication by
9   phone or in writing from Midland.
10  A. Yes.
11  Q. As a result of that cease and desist request, no
12  additional letters were ever sent to Mr. Brim?
13  A. Correct.
14  Q. Based on that cease and desist request, no
15  additional phone calls should have been made to him as
16  well, correct?
17  A. Not from Midland, no.
18  Q. If phone calls were made to Mr. Brim after
19  July 29, 2008, that would have been a violation of the
20  Fair Debt Collection Practices Act?
21  A. Yes.
22  Q. Did you know which employee received this letter?
23  A. According to the notes, Melanie Bloom. It's on
24  Page 53.
25  Q. Are you at the bottom where it says, "Received

**66**

1   certified letter"?
2   A. Yes.
3   Q. It is postmarked "July 30th."
4       How do you know who received it?
5   A. There is a code that's three columns over from
6   that notation.
7   Q. Is that the "YGC" or the "BU8"?
8   A. It's the "BU8."
9   Q. Who is represented by "BU8"?
10  A. Melanie Bloom.
11  Q. Is she in the St. Cloud office or San Diego?
12  A. San Diego.
13  Q. Is she a liaison or supervisor?
14  A. A liaison.
15  Q. Still employed?
16  A. Yes.
17  Q. Can you tell from Page 53 what action Ms. Bloom
18  took upon receipt of this letter?
19  A. Well, I know that she noted the account. I
20  believe she would have marked the account as "disputed"
21  and also marked it with a "cease and desist" which is
22  indicated by the "DISP" for dispute and "CND" for cease
23  and desist. And then the letter, it says to forward it
24  over to the firm handling it at the time.
25  Q. That was an outside attorney collection firm?

**67**

1   A. Yes.
2   Q. Page 53 it says, "Included copy of the bank
3   statement showing 954.12 to Dell Financial, 11/08."
4       Is that right?
5   A. Yes.
6   Q. Then it says "not proof"?
7   A. Yes.
8   Q. And then, "Forward to YGC." What does the "YGC"
9   stand for?
10  A. That just collectively means the firm, the
11  outside collection firm.
12  Q. The actual code doesn't refer to a specific firm?
13  A. That's right.
14  Q. Continuing on to Document 5, that is a letter
15  from Mr. Brim dated March 10, 2009 to Midland; is that
16  right?
17  A. Yes.
18  Q. It is disputing the debt?
19  A. Yes.
20  Q. He states, "He does not owe this debt and does
21  not owe any debt to Dell"; is that right?
22  A. Yes.
23  Q. He puts that the debt was paid in full on
24  November 8, 2004. And he encloses a copy of his bank
25  statement.

**68**

1   A. Yes.
2   Q. Also in this letter, Mr. Brim requests Midland
3   immediately correct his credit report with all three
4   agencies to show a zero balance and no derogatory or
5   negative information, correct?
6   A. Correct.
7   Q. If you go back to the collection detail, what was
8   done upon receipt of this letter?
9   A. The account is noted. It would have already had
10  cease and desists codes on there, so the information would
11  have been noted and then scanned.
12  Q. Who handled this letter that was received?
13  A. Melanie Bloom.
14  Q. I see it is on the 13th?
15  A. Yes.
16  Q. It has "BU8." Ms. Bloom got this second letter
17  from Mr. Brim?
18  A. Yes.
19  Q. Do you know if Ms. Bloom is the person who has
20  the handwritten notes on Page 5?
21  A. It looks like her handwriting.
22  Q. What does that represent?
23  A. The Midland account number.
24  Q. That was not on the letter? She would have had
25  to have looked that up in the system?



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                                September 16, 2010

**Page 69**

1   A.   Yes.
2   Q.   The only action that would have been taken by
3   Ms. Bloom upon receipt of the second letter is to document
4   the receipt of it and then send it over to be scanned?
5   A.   Yes.
6   Q.   Look at the collection account detail. It notes
7   that Mr. Brim called in with a dispute as well.
8   A.   Yes.
9   Q.   What date was that?
10  A.   3/11/2009.
11  Q.   Which consumer relations employee received that
12  call?
13  A.   Sidney Barrett.
14  Q.   Is that a man or a woman?
15  A.   Woman.
16  Q.   Is she in San Diego?
17  A.   Yes.
18  Q.   Looking at Page 53, March 10th, 2009, it has,
19  "FAC Data called request authorization to release and to
20  have consumer fax cease and desist."
21       Do you know what the means?
22  A.   I believe so.
23  Q.   Okay. Can you tell us?
24  A.   I believe "FAC Data" is short for Factual Data,
25  which is a company.

**Page 70**

1   So Factual Data called in. Now it is referring
2   back to the person who requested the note. They request
3   information to release -- basically, to release
4   information and also to have the consumer fax a cease and
5   desist release.
6   Q.   What kind of company is Factual Data?
7   A.   I believe they are a credit verification company.
8   They do something verifying information on the credit
9   report.
10  Q.   And the employee at Midland told them Mr. Brim
11  would need to fax a cease and desist release?
12  A.   He told them that they would need an
13  authorization so that he could release information and to
14  have the consumer fax a cease and desist release.
15  Q.   What employee handled that?
16  A.   I believe that is Jonathan Harkless.
17  Q.   What is his position?
18  A.   He is an account manager.
19  Q.   He's not in consumer relations?
20  A.   No.
21  Q.   He just took the call in the collections
22  department?
23  A.   Correct.
24  Q.   Continuing up from the same date, it has, "CCI,
25  from blocked number."

**Page 71**

1   Do you know what that is?
2   A.   CCI is customer called in from a blocked number,
3   transferred to Extension 5034.
4   Q.   Who is "Extension 5034," if you know?
5   A.   I don't know.
6   Q.   Do you know who "Z76" is?
7   A.   Not off the top of my head.
8   Q.   That wouldn't be someone from your department?
9   A.   No.
10  Q.   Do you know if "Z76" is someone from the
11  collections department?
12  A.   I believe it is, yes.
13  Q.   "BC7." Do you know who that is?
14  A.   Sidney Barrett.
15  Q.   She is in consumer relations?
16  A.   Yes.
17  Q.   She took the call on March 11th, the next day?
18  A.   Yes.
19  Q.   Do you know why the account manager employee
20  indicated that Mr. Brim needed to fax a cease and desist
21  release?
22  A.   From what I know, the account managers can't
23  speak with or they don't speak with consumers who have a
24  cease and desist on their account. So they would request
25  to have something indicating that the consumer basically

**Page 72**

1   wanted to have communication again.
2   Q.   But that doesn't apply to consumer relations when
3   the consumer is calling in regarding a dispute?
4   A.   That's correct.
5   Q.   There is no information that Ms. Barrett told
6   Mr. Brim he needed to fax in a cease and desist release?
7   A.   Correct.
8   Q.   There is no notation that Ms. Barrett informed
9   Mr. Brim that the documentation he previously provided was
10  insufficient to resolve this dispute?
11  A.   Correct.
12  Q.   Following receipt of Mr. Brim's two letters and
13  his telephone call, Midland continued to report the
14  account with a past due balance and being owed by
15  Mr. Brim?
16  A.   Yes, it continued to report but was marked as
17  "disputed."
18  Q.   It was reporting with a balance due of over
19  $1,600. So we're clear, after March 2009, Midland
20  continued to report a balance due of over $1,600?
21  A.   Yes.
22  Q.   That amount changed monthly based on interest?
23  A.   Yes.
24  Q.   There is no information in the collection detail
25  that Midland ever contacted Dell to question or



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

**73**

1  investigate Mr. Brim's dispute?
2  A.  That's correct.
3  Q.  Let's go back to document No. 7. Can you tell me
4  what this is?
5  A.  This is the customer "Additional Data" screen.
6  It is a screen in our system.
7  Q.  There is a "Customer Data" screen and then a
8  customer "Additional Data" screen?
9  A.  There isn't a specific screen labeled "Customer
10 Data." But the "Customer Additional" screen would be the
11 main screen.
12 Q.  This contains additional information regarding
13 the account itself?
14 A.  Correct.
15 Q.  On Page 7, it indicates an interest rate of
16 six percent --
17 A.  Yes.
18 Q.  -- that Midland is adding to the account?
19 A.  Yes.
20 Q.  Do you have any information why Midland chose
21 that interest rate?
22 A.  No.
23 Q.  And also on this Document 7 on the customer
24 "Additional Data" screen, it indicates that the date of
25 occurrence was October 18, 2004?

**75**

1  MS. CAULEY: We're going to mark that as
2  Plaintiff's Exhibit 2.
3  (Exhibit 2 was marked.)
4  BY MS. CAULEY:
5  Q.  Let's look at Plaintiff's Exhibit 2. The
6  collection detail for this account consists of two pages?
7  A.  Yes.
8  Q.  Does it contain all comments or collection notes
9  that would have been added on the account?
10 A.  I don't think it does.
11 Q.  Are collection calls kept separately?
12 A.  Not necessarily, but there are some older notes
13 that may be archives.
14 Q.  Is there a way to determine whether there are
15 older notes that would be archived?
16 A.  Not that you could determine from this screen,
17 but there should be a screen in here somewhere that
18 shows --
19 Q.  We'll get to that. When we get to it, if you
20 would just let me know.
21 A.  Okay.
22 Q.  It is the main screen that comes up?
23 A.  Yes.
24 Q.  It contains the most up-to-date information
25 regarding an account?

**74**

1  A.  Okay.
2  Q.  Do you see that?
3  A.  Yes.
4  Q.  To your knowledge, would that have been the
5  charge-off date or the delinquency date?
6  A.  It is the delinquency date.
7  Q.  Under that, it has the statute of limitations
8  expiration date as October 18, 2007.
9  A.  Yes.
10 Q.  And if you come down, it has, "Last work date,
11 February 25th, 2000 by DPB."
12     Did you know who that is?
13 A.  I don't.
14 Q.  Is that in the San Diego site?
15 A.  Yes, I believe so.
16 Q.  Turn to the next page, 8 through 10. It's
17 another collection detail. It was printed February 25,
18 2010. If you look at Page 52, it was printed June 7,
19 2010.
20 A.  Yes.
21 Q.  I believe they're exactly the same except for the
22 print date and the balance on the account.
23 A.  Yes, I believe so.
24 Q.  If you would go back to Page 52, we'll just look
25 at the most recent.

**76**

1  A.  Yes.
2  Q.  And should have the most up-to-date comments on
3  the account?
4  A.  Yes.
5  Q.  If you look down, it has the -- it has Mr. Brim's
6  name and the original account number from Dell Financial
7  services.
8     Do you see that?
9  A.  Yes.
10 Q.  It has the attorney's address?
11 A.  Correct.
12 Q.  It still has the six percent interest indicated?
13 A.  Yes.
14 Q.  And interest and fees, it has with those totaled.
15 It was printed.
16 A.  Yes.
17 Q.  If you come down, it has a balance due of $1,709?
18 A.  Yes.
19 Q.  It that's statute of limitations expiration of
20 October 18, 2007?
21 A.  Yes.
22 Q.  If letters are mailed out on an account, they
23 would be documented in the collection detail unless
24 they've been previously archived?
25 A.  Yes.



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Page 77

1  Q. If you look at an entry on Page 3, dated
2  January 21st, 2008, it is about midway down.
3     Do you see that?
4  A. Yes.
5  Q. It says, "Account eligible for recovery. Legal
6  letter mailed."
7  A. Yes.
8  Q. Going up to March 30th, 2008, the account was
9  referred to an attorney's office?
10 A. Yes.
11 Q. Going back to 2, if you look at the comments,
12 there is no indication that Mr. Brim was told, either in
13 writing or on the phone during his telephone call, that he
14 needed to send in additional documentation for his
15 dispute, correct?
16 A. Correct.
17 Q. And the payment of 954.12 was never added to the
18 account or credited to the account?
19 A. No.
20 Q. Midland did not consider the payment of 954.12 as
21 even a partial payment on the account?
22 A. Midland didn't -- well, we don't -- we wouldn't
23 necessarily credit that payment to the account or proof of
24 that payment, generally. But payments made like that, the
25 actual payment would be sent to Midland.

Page 78

1  Q. So the fact that Mr. Brim had sent in a bank
2  statement showing a payment to Dell Financial in the
3  amount of 954.12, Midland, first, did not consider that to
4  be proof of payment in full on the account, correct?
5  A. Correct.
6  Q. And Midland didn't consider it to be proof of at
7  least a partial payment, correct?
8  A. Correct.
9  Q. And Midland never contacted Dell to determine
10 what the status of that payment was?
11 A. That's correct.
12 Q. And then on August 6, 2008, there is an entry on
13 Plaintiff's Exhibit 2 that an ACDV was received from
14 Trans Union; is that correct?
15 A. Correct.
16 Q. And the fact that there are asterisks where an
17 employee ID would be contained, does that indicate to you
18 that that ACDV was handled electronically by the batch
19 interface system?
20 A. Yes.
21 Q. No actual documents were reviewed in responding
22 to the ACDV received on August 6, 2008 from Trans Union?
23 A. No. The system didn't review that. But if there
24 were a review of the documents happening at that time,
25 there would have been specific codes that the system could

Page 79

1  have recognized.
2  Q. So basically, the ACDV comes in from Trans Union.
3  The data matches. And it is verified as accurate by the
4  system?
5  A. It probably would have been verified, probably
6  modified to show that there was a dispute. And based on
7  the codes and the queue location, the information compared
8  and then responded to is modified.
9  Q. The notes do say, "Account dispute. Modified
10 E-Oscar. Dispute Type 12."
11    What is that?
12 A. I don't remember offhand. But it is the dispute
13 type that Mr. Brim would have selected when submitting his
14 dispute through the credit bureau.
15 Q. So it would have been -- the type would come
16 through the credit bureau itself? That's not a type that
17 Midland would have selected?
18 A. Correct.
19 Q. Trans Union, upon receipt of that ACDV Dell, was
20 not contacted?
21 A. No.
22 Q. Red Stone Federal Credit Union, where the bank
23 statement was from, was not contacted to verify whether
24 that bank statement was valid or whether a payment had
25 been made?

Page 80

1  A. No.
2  Q. Midland does not have a copy of that ACDV
3  response, do they?
4  A. I don't think so.
5  Q. They can print from the system but only for a
6  period of time; is that right?
7  A. Yes.
8  Q. Is it six months?
9  A. 120 days.
10 Q. So after 120 days, any ACDV responses would not
11 be available for print by Midland?
12 A. That's correct.
13 Q. There is an entry on August 12, 2008. An ACDV
14 was received from Experian; is that right?
15 A. Yes.
16 Q. And, again, the batch interface system handled
17 that dispute electronically?
18 A. That's right.
19 Q. Nothing was done differently in the handling of
20 that first ACDV than the first?
21 A. No.
22 Q. On March 19, 2009, a third ACDV was received
23 from -- this one was from Trans Union; is that right?
24 A. Yes.
25 Q. At that time, it states the dispute type was 109?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

### Page 81

1  A. Yes.
2  Q. Again, the batch interface system responded to
3  that ACDV?
4  A. Yes.
5  Q. It was the same response as to the previous two
6  ACDV?
7  A. Yes. It looks like it.
8  Q. No investigation was done by a consumer relations
9  employee into the dispute?
10 A. No.
11 Q. No documents were reviewed by any employee of
12 consumer relations in response to the ACDV?
13 A. No.
14 Q. No letters were sent to Mr. Brim regarding
15 receipt of that ACDV?
16 A. No. No letters could be sent regarding that
17 dispute because of the cease and desist.
18 Q. And Dell was not contacted?
19 A. That's correct.
20 Q. On March 20th, 2009, the very next day, an ACDV
21 is received from Equifax?
22 A. Yes.
23 Q. Same dispute type, 109, for this ACDV?
24 A. Yes.
25 Q. And this fourth ACDV was also handled by the

### Page 82

1  batch interface system?
2  A. That's correct.
3  Q. Nothing new was done in responding to that ACDV?
4  A. No.
5  Q. Then on February 25th, 2010, an ACDV was received
6  from Trans Union?
7  A. Yes.
8  Q. Dispute Type 112?
9  A. Yes.
10 Q. This fifth ACDV was handled by the batch
11 interface system?
12 A. Yes.
13 Q. With respect to all of the ACDVs that were
14 received by Midland regarding disputes by Mr. Brim, each
15 and every one of them was handled electronically by the
16 batch interface system?
17 A. Yes.
18 Q. No consumer relations employee ever reviewed the
19 ACDVs?
20 A. That is correct.
21 Q. If you'll look at Page 11, Midland Document 11,
22 this looks like a summary of when Midland started
23 reporting the account.
24 A. Yes.
25 Q. That would have been November 16, 2007?

### Page 83

1  A. Correct.
2  Q. At the top it has "1,979 messages."
3     Do you see that?
4  A. Yes.
5  Q. Do you know what that means?
6  A. The account managers don't have access to
7  e-mails, so their managers can send them messages through
8  this system. Usually, it is when they want to send a
9  group message. It refers to all the messages that have
10 been sent.
11 Q. They're not messages regarding Mr. Brim's
12 account?
13 A. No.
14 Q. Or the reporting of this account?
15 A. No.
16 Q. It is just how many might have been in the system
17 at that time?
18 A. Correct.
19 Q. Are you familiar with the code on -- compliance
20 condition code it is Column 3? It has a status "XF"?
21 A. Yes.
22 Q. What does that mean?
23 A. I don't remember the exact verbiage. It's the
24 code that is added to indicate that the consumer has
25 disputed that trade line.

### Page 84

1  Q. So Midland did report that the account was
2  disputed by Mr. Brim --
3  A. Yes.
4  Q. -- once they got his written dispute?
5  A. Yes.
6  Q. Document No. 12, do you know what this is?
7  A. Yes.
8  Q. Can you tell us what it is, please?
9  A. It is a printout of payment history, "Payment
10 History" screen.
11 Q. Do you know what those payments would have been
12 from, why those credits were made?
13 A. I'm not positive because these are in relation to
14 transactions with the firm. So I don't know that they're
15 actually payments from a consumer.
16 Q. The collector code being "YGC," means these
17 payments would have been with respect to the outside
18 collection firm handling it?
19 A. Yes. I think it is more their transactions. I'm
20 not sure they're payments.
21 Q. So that would not represent a payment made by
22 Mr. Brim?
23 A. That's right.
24 Q. We already looked at documents there, the "Letter
25 History" screen?



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                                September 16, 2010

93
1  the account, something to indicate how much was owed and
2  that it belonged to that individual?
3     A.  Yes.
4     Q.  There were no documents obtained from Dell?
5     A.  Correct.
6     Q.  46 through 48, can you tell me what that is?
7     A.  It looks like it is just a search -- I'm not
8  sure.
9     Q.  Okay.
10        MR. LANGLEY:  We're at noon.
11        MS. CAULEY:  Why don't we stop with her and bring
12  in our other witness so we make sure we get him done and
13  I'll try and limit what I have to ask him.
14        MR. LANGLEY:  Shall we take 30 minutes to get
15  lunch?
16        MS. CAULEY:  Sure.  That is fine.
17        (A recess was taken.)
18  BY MS. CAULEY:
19     Q.  You understand you are still under oath from this
20  morning?
21     A.  Yes.
22     Q.  We'll start with Midland Document 49 through 51.
23  Please tell me what that document is?
24     A.  It is the customer "Additional Data" screen.
25     Q.  Is that just another view of the customer

94
1  additional data that we looked at earlier?  If you don't
2  remember, it's okay.
3     A.  I believe so.  Yeah, I believe it is just printed
4  on a different date.
5     Q.  What's the page you are looking at now?
6     A.  Page 7.
7     Q.  So Page 49, 351 is the same as what is
8  represented on Page 7 except the date printed?
9     A.  Yeah.  It is actually a different view.  It is
10  the same information.  But on Page 45, if you see in the
11  middle where it says, "click to view printable version,"
12  if you click on that, you get this Page 7.
13     Q.  Okay.  Then, if you'll go on to Page 55.
14        55 through 57 is the portfolio master
15  information.
16     A.  Yes.
17     Q.  Do you know what that is?
18     A.  Yes.  It is another screen in our system that
19  gives account information.
20     Q.  Does this information refer to the portfolio
21  within which Mr. Brim's account was obtained by Midland?
22     A.  Yes.
23     Q.  And it has a purchase date of October 10, 2007?
24     A.  Yes.
25     Q.  And account type.  Do you know what "CL"

95
1  represents?
2     A.  I don't know.
3     Q.  The seller is identified as Dell Financial
4  Services?
5     A.  Yes.
6     Q.  Number of accounts 63,346?
7     A.  Yes.
8     Q.  Mr. Brim's account was purchased in a portfolio
9  that contained 63,346 accounts?
10     A.  Yes.
11     Q.  Under that, it has some information with respect
12  to -- it looks like fees or settlement options, can you
13  tell, where it says under "media access"?
14     A.  That would be the cost of the documents.
15     Q.  To obtain the documents from Dell?
16     A.  Yes.
17     Q.  We looked earlier at the "Account Media" screen.
18  That did not contain any media, but this Document 55 would
19  indicate media could be purchased?
20     A.  Yes, probably after that 20 percent or after the
21  40 percent.
22     Q.  What does that percent represent?
23     A.  Typically, that number represents the amount of
24  documentation that doesn't have a cost initially or may
25  have a lower cost.

96
1     Q.  So anything less than 20 percent might be free?
2     A.  It may be, yes.
3     Q.  It also has some information about what type of
4  accounts these were that were purchased from Dell,
5  correct?
6     A.  Yes.
7     Q.  Go on to Pages 68 through 60.  This indicates it
8  is a "Consumer Information Maintenance" screen.  Are you
9  familiar with that screen?
10     A.  Yes.
11     Q.  What's the purpose of that screen?
12     A.  On this screen, you could -- for instance, if the
13  consumer was deceased, it is a location where you can add
14  a warning code if you forget to add it in another
15  location.
16     Q.  If a code is contained in the collection detail
17  account, which is marked as Plaintiff's Exhibit 2, would
18  it have been entered on the "Consumer Information
19  Maintenance" screen?
20     A.  It might have been.
21     Q.  It could also be entered on a different screen?
22     A.  Yes.
23     Q.  If a warning code is entered on a different
24  screen, does it automatically get placed on the "Consumer
25  Information Maintenance" screen?



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

**97**

1   A. Yes.
2   Q. If you enter it in one place, it will populate to
3   other places?
4   A. Yes.
5   Q. Page 61 looks like an "Address Maintenance"
6   screen.
7   A. Yes.
8   Q. Beginning on 64, we have some additional address
9   maintenance information?
10  A. Yes.
11  Q. Is that information that is generally received
12  from the original creditor?
13  A. Sometimes, yes.
14      MR. LANGLEY: You you are asking that question
15  with respect to 61 through 63 or 64?
16      MS. CAULEY: Both. It looks like 64, 65, 66 go
17  with the "Address Maintenance" screen. It looks like
18  they're printouts, addresses that are contained in the
19  "Address Maintenance" screen.
20  BY MS. CAULEY:
21  Q. If a new address is obtained by Midland, they
22  enter it. And the old address remains part of the record
23  as well as the new address?
24  A. Yes.
25  Q. Same with phone maintenance, phone numbers and

**98**

1   things that are obtained?
2   A. Yes.
3   Q. If you look at 73, we're back to the letter
4   history inquiry. It looks like a duplicate?
5   A. Yes.
6   Q. Page 85. Do you know what that screen is?
7   A. Yes.
8   Q. Can you tell us what it is?
9   A. WACH\SCNL list.
10  Q. Can you tell us what that means?
11  A. It is a screen that if a credit bureau notifies
12  Midland that a consumer is obtaining credit, to makes sure
13  it appears.
14  Q. If Mr. Brim had applied for credit at some point
15  during the time that Midland had the account, that may
16  have come up on this screen?
17  A. It may have, yes.
18  Q. If you'll go to Midland Document 91, these are
19  the bureau reports by the Reporting Data screens?
20  A. Yes.
21  Q. Is there a screen for each month that an account
22  is reported to the credit bureaus?
23  A. Yes.
24  Q. Does Midland report to all three of the major
25  credit reporting agencies?

**99**

1   A. Yes.
2   Q. Does it report to any credit reporting agencies
3   other than Equifax, Trans Union, Experian?
4   A. No.
5   Q. The same information would be reported to all
6   three; is that correct?
7   A. Yes.
8   Q. This shows that began reporting on November 16th,
9   2007?
10  A. Yes.
11  Q. It has an amount past due of 1,587?
12  A. Yes.
13  Q. At the top, it looks like a balance of $1,799.
14  A. Yes.
15  Q. Do you know which balance was reporting or were
16  both reporting on the credit report?
17  A. This screen was printed 6/7/10. The information
18  at the top would have been the balance at the time that
19  the screen was printed. Whereas, the information
20  underneath "bureau reports by reporting date" would have
21  been the information reported to the credit bureaus as of
22  November.
23  Q. November 16th, 2007, the balance reported as
24  unpaid and past due was $1,587.
25  A. Yes.

**100**

1   Q. Then the following month, the balance increased?
2   A. Yes.
3   Q. And in 2008, the information remained the same
4   except that the balance increased to $1,602?
5   A. Yes.
6   Q. If you will, just review it. It looks like each
7   month the information remains the same except the balance
8   increases for February to March 2008 and then to April of
9   2008; is that right?
10  A. Yes.
11  Q. March of 2008, it looks like there is an address
12  change?
13      MR. LANGLEY: May of 2008?
14      MS. CAULEY: I'm sorry. May 2008.
15      THE WITNESS: Yes.
16  BY MS. CAULEY:
17  Q. And the balance increased in May of 2008?
18  A. Yes.
19  Q. The June to July balanced remained the same. But
20  in August, the address goes back to an Alabama address but
21  has the same unpaid balance; is that right?
22  A. Yes.
23  Q. Do you know why for three months the balance
24  remained the same but then it increased again?
25  A. I don't.



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

**117**

1. debt?
2. A. Correct.
3. Q. Prior to July 2010, when you told me earlier
4. today some changes may have been made with respect to the
5. Fair Credit Reporting Act from October 2007 up through
6. July 1st, 2010, were Midland's policies and procedures for
7. the handling of ACDVs the same?
8.     MR. LANGLEY: Object to the form.
9.     THE WITNESS: I believe so, yes.
10. BY MS. CAULEY:
11. Q. As far as you are aware, there were no changes in
12. how ACDV are responded to from October 2007 to July 1st,
13. 2010?
14. A. No, not that I can recall.
15. Q. Are there any type of reports maintained on the
16. consumer relations liaisons with respect to the number of
17. ACDVs they review or the number of disputes they review on
18. a weekly or monthly or quarterly basis?
19. A. Yes.
20. Q. What are those reports?
21. A. They're a production report.
22. Q. How are they done? Monthly? Quarterly?
23. A. There is one report that is run daily. And
24. another that is -- I guess weekly.
25. Q. Are these production reports done by employee or

**118**

1. by the department?
2. A. By employee.
3. Q. And what do they contain? What type of
4. information?
5. A. How many accounts each person worked in a certain
6. timeframe.
7. Q. Are there goals for liaisons to meet with respect
8. to how many accounts they work?
9. A. Per day, yes.
10. Q. How many accounts is a liaison expected to work
11. per day?
12. A. About 70 accounts.
13. Q. Is there any type of incentive program or
14. compensation that is provided if they work more than 70?
15. A. No.
16. Q. Is there any type of discipline or do they
17. receive any type of write-up if they do not meet their
18. quota?
19. A. There could be. But generally, I would say no
20. because depending on the volume or the circumstances,
21. there may be times when they need to be lower than that
22. number because of whatever is going on at the time.
23. Q. If it is just one day here or there or a couple
24. of days during a particularly busy time, if an employee
25. falls below the 70, there wouldn't be disciplinary action

**119**

1. necessarily?
2. A. Correct.
3. Q. If it happened over a period of months, would
4. disciplinary action be taken?
5. A. There may be. If a manager spoke to that person
6. and tried to work with them and didn't necessarily see a
7. reason why that number would be low and maybe there wasn't
8. any improvement.
9. Q. Are those reports maintained? Do you maintain
10. those reports?
11. A. Yes.
12. Q. How long do you maintain those?
13. A. I don't know that we discarded any. I believe I
14. have them since I started managing.
15. Q. Are there any other type of reports that you keep
16. on the number of disputes that are received or how quickly
17. they're handled, anything like that, with respect to the
18. consumer relations department?
19. A. There's a report through E-Oscar that will show
20. how many disputes came through E-Oscar.
21. Q. Do you print those?
22. A. No. We don't usually print those. Just take the
23. information from the report.
24. Q. Is that how the daily and weekly production
25. reports are compiled?

**120**

1. A. It is a part of the daily production report.
2. Q. Is there any type of log that documents written
3. disputes from consumers versus ACDV disputes?
4. A. I'm not sure what you mean by "log."
5. Q. E-Oscar creates a record of how many disputes are
6. received by Midland daily?
7. A. Yes.
8. Q. Is there any type of report or document that
9. keeps count or a record of written disputes received
10. directly by Midland for the consumer?
11. A. No, not specifically written disputes. There is
12. a report that will state how much correspondence has come
13. into the department. But those are not all necessarily
14. disputes.
15. Q. So is there some type of report that maintains
16. the volume of correspondence that is received by the
17. consumer relations department?
18. A. Yes.
19. Q. What is that report called?
20. A. We call it the "daily mail count."
21. Q. And there is no distinction made on that report
22. whether there was a dispute or what the letter was versus
23. cease and desist, something like that?
24. A. No. It is the count of the mail as it comes in.
25. Q. Do the liaisons -- they work 8:00 to 5:00? 9:00


Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                          September 16, 2010

**121**

1  to 5:00?
2  A. Most of them work somewhere between -- some start
3  earlier, 6:00 to 2:30, 7:00 to 3:30, 8:00 to 4:30.
4  Q. Do they take a half hour lunch? An hour lunch?
5  A. Most of the time they take a half hour lunch.
6  Q. Do they get any other breaks during the day?
7  A. Yes. Standard, two 15-minute breaks.
8  Q. Are there any other standards?
9  A. You mean others besides production?
10 Q. Yes, besides the production?
11 A. Well, I mean, we want them to do things
12 accurately and follow the policies and procedures so there
13 isn't anything specific. But if somebody noticed
14 something, they would address that with that person.
15 There may be opportunity to revisit it with the whole team
16 if there's questions about policies and procedures.
17 Q. How do you find out or how does the supervisor
18 find out if the liaison is not following the policies and
19 procedures?
20 A. That may happen during account review. The
21 accounts are not assigned to any one specific person.
22 Different people may come across the same account or I may
23 end up talking to a consumer, something like that. So it
24 could be various ways.
25 Q. If they ran across something they felt was

**122**

1  incorrect or inaccurate, they might bring that to a
2  supervisor's attention or to your attention?
3  A. Yes.
4  Q. Do you document those issues like in an employee
5  file?
6  A. Some of them. Not all of them. Sometimes just
7  talking to someone and clarifying, finding out what is
8  going on. It may be very simple. Other times, it may
9  need to be documented.
10 Q. With respect to Mr. Brim's account, you are not
11 aware of anything that was done inaccurately by the
12 employees in consumer relations; is that correct?
13 A. Correct.
14 Q. None of the employees in consumer relations
15 actually ever responded to an ACDV with respect to
16 Mr. Brim?
17 A. Correct.
18 Q. Do you maintain employee files for your consumer
19 relations employees independently of their HR file?
20 A. Yes.
21 Q. Everything we've looked at with respect
22 to Mr. Brim's account was handled according to Midland's
23 policies and procedures at the time, correct?
24 A. Correct.
25 Q. Do you know if Midland had received other

**123**

1  disputes regarding paid prior to Midland purchasing it
2  with respect to the Dell portfolio?
3  A. I don't know.
4  Q. Does Midland keep any type of report on how many
5  disputes are received with respect to a particular
6  portfolio?
7  A. No, we don't. In my department, we don't. A
8  another department may.
9  Q. If ACDVs were received from other consumers
10 alleging the same thing that Mr. Brim was alleging, they
11 would have been handled the same way that Mr. Brim's ACDV
12 was handled; is that correct?
13 A. It would depend.
14 Q. If everything were the same as Mr. Brim's case,
15 then the response to the ACDV would be the same?
16 A. That's probably likely.
17 Q. Have you had any conversations other than with
18 counsel regarding Mr. Brim's case or his account with
19 anyone at Midland?
20 A. No.
21 Q. You haven't talked about any aspect of Mr. Brim's
22 account with any other employee of Midland?
23 A. I don't believe so, no. Actually, I may -- I
24 don't know which paralegal was assisting with this. I may
25 have spoken to the paralegal. But I just don't remember.

**124**

1  Q. No other employees that you recall specifically
2  talking with them about the Brim account or the response
3  to the ACDV?
4  A. Oh, no.
5  MS. CAULEY: Those are all the questions I have.
6  MR. LANGLEY: I might have one. Let me check.
7
8                        EXAMINATION
9  BY MR. LANGLEY:
10 Q. Will you look at Document 169. It's within the
11 consumer relations operations manual. Look at Box No. 5,
12 which is on Page 169.
13 A. Okay.
14 Q. In the Action column, it says, "If unable to
15 determine if proof is valid, account will be reported to
16 ACQ," which is acquisitions; is that right?
17 A. Yes.
18 Q. If consumer relations determines proof is
19 invalid, is the account referred to acquisitions?
20 A. No.
21 MR. LANGLEY: That's all.
22 MS. CAULEY: We're done.
23 (The proceedings concluded at 3:13 p.m.)
24                          * * *
25



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                              September 16, 2010

                                                                             125

# REPORTER'S CERTIFICATION

I, Denise T. Johnson, a Certified Shorthand Reporter in and for the State of California, do hereby certify:

That the foregoing witness was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenographically by me and later transcribed into typewriting under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.

IN WITNESS WHEREOF, I have subscribed my name this 23rd day of September, 2010.

/s/ Denise J. Johnson
Denise T. Johnson, CSR No. 11902



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company