FILED

2010 Nov-15  PM 04:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

*Jamon Brim v. Midland Credit Management, et al.*
**Case No. 5:10-cv-0369-IPJ**

# Exhibit B

**Deposition of Angelique Ross**

Angelique D. Ross                                    September 16, 2010

---

**Page 1**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
JAMON T. BRIM,

      Plaintiffs,

    vs.                          Civil No.
                    5:10-CV-369-IPJ

DELL FINANCIAL SERVICES, LLC,
MIDLAND CREDIT MANAGEMENT, INC.,
MIDLAND FUNDING, LLC,

      Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
DEPOSITION OF
PERSON MOST KNOWLEDGEABLE OF
MIDLAND CREDIT MANAGEMENT, INC.
ANGELIQUE DANIELLE ROSS

September 16, 2010
9:09 a.m.

402 West Broadway
16th Floor
San Diego, California

Reported by Denise T. Johnson, CSR No. 11902

---

**Page 2**

Appearances of Counsel

For Plaintiff:

HAYS CAULEY
BY:  PENNY HAYS CAULEY
549 West Evans Street, Suite E
Florence, South Carolina 29501
E-mail:  phc917@hayscauley.com

For Defendants:
BALCH & BINGHAM
BY:  ERIK LANGLEY
P.O. Box 306
Birmingham, Alabama 35201-0306

Also Present:  Brian L. Frary

---

**Page 3**

INDEX TO EXAMINATION

WITNESS:  ANGELIQUE DANIELLE ROSS ANGELIQUE DANIELLE ROSS

EXAMINATION                          PAGE
BY MS. CAULEY                          5
BY MR. LANGLEY                        124

QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER

Page    Line

54      6

---

**Page 4**

ANGELIQUE DANIELLE ROSS
Brim v. Dell Financial
Thursday, September 16, 2010
Denise T. Johnson, CSR No. 11902

INDEX TO EXHIBITS

EXHIBITS                          MARKED
Exhibit 1    Notice of Deposition        6
Exhibit 2    Collection Detail          75
Exhibit 3    Documents 14 through 17,   85
             production notes

Exhibit 4    Defendant's Answers to    107
             Interrogatories

(Original exhibits have been attached to the original transcript.)

---



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                    September 16, 2010

5

1           PERSON MOST KNOWLEDGEABLE
2       DEPOSITION OF ANGELIQUE DANIELLE ROSS
3              SEPTEMBER 16, 2010
4
5           ANGELIQUE DANIELLE ROSS,
6    having been first duly sworn, testified as follows:
7              EXAMINATION
8    BY MS. CAULEY:
9       Q.  Please state your name for record.
10      A.  Angelique Danielle Ross.
11      Q.  My name is Penny Cauley.  I am here representing
12   Jamon Brim in a case that we filed against
13   Midland Funding.
14          We talked a little bit off the record.  If you
15   need a break at any time -- this is a very informal
16   setting.  If you need a break, let us know and we'll take
17   a break when you need it.  Okay?
18      A.  Yes.
19      Q.  Also, if I ask a question and you are not sure
20   about the meaning of the question, let me know that you
21   don't understand it so we can take care of it right then.
22      A.  Okay.
23      Q.  You are doing a great job of saying "okay" or
24   "yes" or "no."  In a deposition, it is very easy to get
25   caught up in head nodding.  She can't take that down.  If

6

1    I remind you or say something like, "Is that a yes or is
2    that a no," that is not to pick on you or make you
3    uncomfortable.  It is just to make sure the answer was
4    clear.
5       A.  Okay.
6          MR. LANGLEY:  Usual stipulations?
7          MS. CAULEY:  That's fine with me, if that is fine
8    with Midland.
9          MR. LANGLEY:  Yes, that is good for us.  I think
10   the witness will read and sign.  But other than that, the
11   usual stipulations.
12         MS. CAULEY:  Pursuant to Alabama.
13         MR. LANGLEY:  Yes.
14   BY MS. CAULEY:
15      Q.  Have you had a chance, Angelique, to review the
16   Notice of Deposition?
17      A.  Yes.
18      Q.  We spoke off the record with your counsel.  Are
19   you the person who would be most knowledgeable regarding
20   the topics identified in the Notice of Deposition except
21   for Topic No. 5 and No. 8?
22      A.  Yes.
23      Q.  And we're going to mark that notice as
24   Plaintiff's Exhibit 1.
25         (Exhibit 1 was marked.)

7

1          MR. LANGLEY:  The one nuance to that is Grant
2    will be the witness for No. 7 as it relates to FDCPA.
3          MS. CAULEY:  Okay.
4    BY MS. CAULEY:
5       Q.  The reason you've been put up for the deposition
6    is the experience and the duties you have for the FCRA?
7       A.  Yes.
8       Q.  Do you understand that you are testifying here on
9    behalf of Midland Credit Management?
10      A.  Yes.
11      Q.  And also on behalf of Midland Funding?
12      A.  Yes.
13      Q.  Do you hold any type of office or are you a
14   member of Midland Funding, LLC?
15      A.  No.
16      Q.  And you are not an employee of Midland Funding?
17      A.  No.
18      Q.  You do not get paid by Midland Funding?
19      A.  No.
20      Q.  You are an employee of Midland Credit Management?
21      A.  Yes.
22      Q.  And, in fact, is it true that Midland Funding has
23   no employees?
24      A.  That's true.
25      Q.  Midland Funding is the owner of the debt that was

8

1    purchased with respect to Mr. Brim?
2       A.  Yes.
3       Q.  And all accounts are actually purchased by
4    Midland Funding, LLC; is that right?
5       A.  Yes.
6       Q.  But all employees who have any responsibility
7    with respect to collecting or the handling of disputes
8    through the credit bureau are employed by Midland Credit
9    Management?
10      A.  Yes.
11      Q.  Can we agree for purposes of the deposition that
12   if I use the term "Midland," I'm referring to Midland
13   Credit Management?
14      A.  Yes.
15      Q.  And you are not a director or an officer of
16   Midland Funding?
17      A.  No.
18      Q.  You already gave us your name.  Will you give us
19   your address, please.
20      A.  My home address?
21      Q.  Yes, please.
22      A.  Will that be public record?
23      Q.  It will be in this deposition.
24      A.  I just don't want it to get out publicly with my
25   address on anything.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                          September 16, 2010

9

1        MR. LANGLEY:  Can she give you her business
2    address?
3        MS. CAULEY:  That would be fine.
4        THE WITNESS:  Thank you.
5        8875 Aero Drive, Suite 200, San Diego,
6    California, 92123.
7    BY MS. CAULEY:
8        Q.  And what position do you hold at Midland?
9        A.  I am the consumer relations manager.
10       Q.  How long have you held that position?
11       A.  A little over four years.
12       Q.  Have you held any other positions at Midland?
13       A.  Yes.
14       Q.  What were they?
15       A.  Consumer relations liaison and consumer relations
16   lead.
17       Q.  How long were you the liaison?
18       A.  Approximately six months.
19       Q.  And then I presume you were promoted to consumer
20   relations manager?
21       A.  I was the consumer liaison first, then promoted
22   to lead, then promoted to manager.
23       Q.  How long did you work as the lead?
24       A.  About two-and-a-half years.
25       Q.  Who is your supervisor at Midland?

10

1        A.  Juan Naves.
2        Q.  Do you know how to spell that?
3        A.  N-a-v-e-s.
4        Q.  What is his title?
5        A.  General counsel.
6        Q.  Do you know how long he's been in that position?
7        A.  A little over a year.
8        Q.  Who was your supervisor prior to Ron Naves?
9        A.  Lance Martin.
10       Q.  Did Lance Martin also serve as general counsel?
11       A.  No.
12       Q.  What was his position?
13       A.  He was VP of -- I think it is legal and
14   compliance or legal affairs and compliance.  I'm not sure
15   of the exact title.
16       Q.  How long has Ron Naves been your supervisor?
17       A.  For about eight months.
18       Q.  And then Mr. Martin, how long was he your
19   supervisor?
20       A.  I would say two to two-and-a-half years.
21       Q.  Do you recall who your supervisor was prior to
22   Lance Martin?
23       A.  Yes.
24       Q.  Who was that?
25       A.  Sven Zabka, S-v-e-n, last name is Zabka.

11

1        Q.  Can you spell that?
2        A.  Z-a-b-k-a.
3        Q.  Is that a man or a woman?
4        A.  Man.
5        Q.  And what was his job title, position?
6        A.  I'm not sure.  I know it was corporate counsel.
7    But I'm not sure if there was anything in addition to
8    that.
9        Q.  Any other supervisors that you've had while
10   you've been employed at Midland?
11       A.  Yes, Christina Fudge.
12       Q.  What was her position?
13       A.  She was the consumer relations manager.
14       Q.  Okay.  That would have been while you were
15   working as the liaison?
16       A.  Yes.
17       Q.  I take it Mr. Naves is still employed at Midland?
18       A.  Yes.
19       Q.  Is Mr. Martin still employed at Midland?
20       A.  No.
21       Q.  What about Sven Zabka?
22       A.  No.
23       Q.  Christina Fudge?
24       A.  No.
25       Q.  Where did you work prior to Midland?

12

1        A.  Telespectrum.
2        Q.  What did you do there?
3        A.  I was a quality assurance manager.
4        Q.  And what do they do?
5        A.  It was a call center.
6        Q.  Are they a creditor?
7        A.  No.
8        Q.  What kind of call center is it?
9        A.  I worked in the telesales department.
10       Q.  How long did you do that job?
11       A.  Four-and-a-half years.
12       Q.  Where did you work before that?
13       A.  Service America.
14       Q.  What type of a job was that?
15       A.  It was actually retail.
16       Q.  Do they sell goods and services?
17       A.  Yeah, goods.
18       Q.  Besides working at Midland, have you worked at
19   any other employer where you had any responsibilities with
20   respect to the Fair Credit Reporting Act?
21       A.  No.
22       Q.  Prior to being employed by Midland, had you ever
23   had any training regarding the Fair Credit Reporting Act?
24       A.  No.
25       Q.  Tell me approximately when you started at



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                    September 16, 2010

13

1   Midland?
2        A.   It was March 17th, I believe, 2003.
3        Q.   As the consumer relations manager, did you
4   supervise other employees?
5        A.   Yes.
6        Q.   How many?
7        A.   I currently supervise -- directly supervise two.
8   I have supervised up to nine.
9        Q.   In your position for the past four years, have
10  you always had responsibilities for supervising employees
11  in that position?
12       A.   Yes.
13       Q.   That would range currently at two.  How many was
14  it in 2009?
15       A.   For most of 2009, it was between six and seven
16  employees.
17       Q.   Why the reduced number of employees?
18       A.   I managed two supervisors.  They manage the rest
19  of that number of people.  So those seven that I
20  previously managed, those two people only managed that
21  group.  And I managed the two supervisors.
22       Q.   Who were the two supervisors that you managed?
23       A.   Roque Faura, R-o-q-u-e.  The last name is
24  F-a-u-r-a.  And Michelle Lusk.
25       Q.   What are their job titles?

14

1        A.   Consumer relations supervisor.
2        Q.   Then the two of those consumer relations
3   supervisor managed approximately seven employees?
4        A.   Total.  Yes.
5        Q.   What are the positions of those employee?
6        A.   Consumer Relations Liaison 1 and
7   Consumer Relations Liaison 2.
8        Q.   Are there still consumer relations leads?
9        A.   No.
10       Q.   Has that become the consumer relations supervisor
11  position?
12       A.   Basically.  There is some difference, but yes.
13       Q.   The consumer relations department is the only
14  department at Midland that is responsible for the handing
15  consumer disputes, either directly through Midland or
16  through the credit bureaus?
17       A.   I'm not sure what you mean.
18       Q.   When a dispute comes in from a consumer to
19  Midland and it is a dispute regarding whether or not they
20  owe the account or owe the debt, what department would
21  that dispute go to for review?
22       A.   Any review of the dispute would come to consumer
23  relations.
24       Q.   Are you familiar with the term "ACDV"?
25       A.   Yes.

15

1        Q.   When ACDVs come into Midland, are those handled
2   by the consumer relations department?
3        A.   Yes.
4        Q.   No other department at Midland would be
5   responsible for responding to ACDVs?
6        A.   No.
7        Q.   Tell me what your duties are as the consumer
8   relations manager.
9        A.   I managed the consumer relations staff, which
10  includes managing workload and workload assignments, in
11  addition to responding to some escalated consumer issues.
12            (A discussion off the record was held.)
13  BY MS. CAULEY:
14       Q.   What other duties do you have?
15       A.   Basically, the overall overseeing of the
16  operations of consumer relations.
17       Q.   Have your duties changed at all during the four
18  years that you served as a consumer relations manager?
19       A.   Yes.
20       Q.   What is the different now?
21       A.   Initially, there were no consumer relations
22  supervisors.  So I would handle all of the escalated
23  issues.  Now that is split between several people.
24       Q.   Would any other employees be responsible other
25  than those three individuals for handling escalated

16

1   disputes?
2        A.   Not responsible.  There may be someone that could
3   take an escalated call if the managers and supervisors
4   were not there.
5        Q.   Ultimately, it would come to a supervisor or to
6   you?
7        A.   Yes.
8        Q.   Any other changes in your duties over the past
9   four years?
10       A.   No.
11       Q.   What are the duties for the consumer relations
12  supervisors?
13       A.   They first have to manage the consumer relations
14  liaisons directly.
15            They also respond to escalated consumer issues.
16            They also may answer questions from their team
17  members.
18       Q.   And that would be the liaisons?
19       A.   Yes.
20       Q.   Anything else?
21       A.   I'm responsible for the whole operation.  They
22  are partly responsible for the day-to-day operations of
23  consumer relations.
24       Q.   Then the liaisons.  Are those the individuals
25  responsible for handling the ACDVs?



Angelique D. Ross                                    September 16, 2010

17

1    A.  Yes.
2    Q.  Do they have any other duties?
3    A.  Yes.
4    Q.  What are those?
5    A.  They process consumer correspondence and answer
6    consumer phone calls.
7    Q.  The consumer correspondence that the liaisons
8    process, is that in response to correspondence received
9    directly from the consumer?
10   A.  Yes.
11   Q.  The liaisons are not responsible for the form
12   letters that are sent out as part of the collection
13   efforts by Midland?  Would that be right?
14   A.  I'm not sure what you mean by "responsible."
15   Q.  Midland has a lot of form letters that are
16   generated when they purchase accounts that are sent out in
17   an attempt to collect a debt that state, "We purchased
18   this debt.  This is your balance.  You owe this money.
19   Please pay by this debt."  Are the liaisons responsible
20   for making sure that all of those letters are sent out or
21   do they just handle specific correspondence to consumers?
22   A.  They do not handle any letters related to
23   collection of the debt.  They may use some form letters,
24   but those form letters are not related to collection of
25   the account.

18

1    Q.  So any time they're responding or sending out
2    correspondence to a consumer, it would be in response to
3    either a telephone call or a letter from that consumer
4    regarding some type of dispute?
5    A.  That's correct.
6    Q.  And that is how it came to the consumer relations
7    department in the first place?
8    A.  Correct.
9    Q.  So the liaisons actually answer the telephone
10   calls that come in from consumers?
11   A.  Yes.
12   Q.  And then they process mail that comes in from
13   consumers?
14   A.  Yes.
15   Q.  And they are responsible for sending
16   correspondence out to consumers?
17   A.  Yes.
18   Q.  And they also handle ACDVs?
19   A.  Yes.
20   Q.  And there are seven liaisons currently?
21   A.  In the San Diego site there are seven.
22   Q.  How many other sites for Midland have consumer
23   relations department?
24   A.  One.
25   Q.  What is that site?

19

1    A.  St. Cloud, Minnesota.
2    Q.  How many do they have?
3    A.  There are five full-time liaisons and one liaison
4    that splits her time between consumer relations and
5    another department.
6    Q.  Is there a consumer relations supervisor at the
7    St. Cloud site?
8    A.  Yes.
9    Q.  And then there is also someone who holds your
10   position there?
11   A.  No.
12   Q.  Are you responsible for overseeing and managing
13   the St. Cloud site as well as the San Diego site?
14   A.  I do manage St. Cloud's workload.  The supervisor
15   does not report directly to me.
16   Q.  Who does the supervisor report to?
17   A.  The operations manager.
18   Q.  Who is that?
19   A.  Bonnie Trigg.
20   Q.  T-r-i-g-g?
21   A.  Yes.
22   Q.  I take it Bonnie Trigg is in St. Cloud,
23   Minnesota?
24   A.  Yes.
25   Q.  Does the St. Cloud site also handle ACDVs that

20

1    come in?
2    A.  Yes.
3    Q.  So ACDVs are actually handled at two separate
4    sites, then?
5    A.  Yes, the majority are handled by the St. Cloud
6    team.
7    Q.  Why is it that the majority are handled by the
8    St. Cloud team?
9    A.  It is just a split of the workload.  The
10   St. Cloud team does not take phone calls.  And the
11   San Diego team does.  So it is just to even up the
12   workload.
13   Q.  What about correspondence?  Does the St. Cloud
14   team send out correspondence?
15   A.  Yes.
16   Q.  Basically, the difference between the two sites
17   is, St. Cloud does not take any telephone calls from
18   consumers?  Those are all routed to San Diego?
19   A.  Correct.
20   Q.  In return, St. Cloud handles the majority of the
21   ACDVs that come in?
22   A.  Correct.
23   Q.  How is it determined which site will handle an
24   ACDV?
25   A.  Generally, the St. Cloud team will handle most of



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                    September 16, 2010

21

1  them.  There are a few accounts that they may not have
2  access to.  Those are the only ones that are responded to
3  by San Diego.
4      Q.  So unless an account has been flagged for
5  San Diego, all other ACDVs are going to be handled by the
6  St. Cloud office?
7      A.  Yes.
8      Q.  What type of accounts would St. Cloud not have
9  access to?
10     A.  Health care accounts.
11     Q.  And in this case, Mr. Brim's account was related
12 to a computer purchase.  So all his ACDVs would have been
13 handled by the St. Cloud site?
14     A.  Either the St. Cloud site or our automated
15 system, yes.
16     Q.  And what automated system does Midland use?
17     A.  We use a batch interface.
18     Q.  Batch interface?
19     A.  Yes.
20     Q.  How does that work?
21     A.  When an ACDV comes in, we use the E-Oscar system.
22 And our automated system can look at the ACDV, match it,
23 compare it to our account system information and respond
24 to the majority of the ACDVs.
25     Q.  Does that batch interface system have a name?

22

1      A.  No.  We just call it the "batch interface."
2      Q.  Is that a system or program that was designed by
3  Midland?
4      A.  It wasn't designed by Midland.  We had to adapt
5  it to work with our system.  But it wasn't designed by
6  Midland, no.
7      Q.  Do you know where it came from?  Who designed it?
8      A.  We purchased the basic program from the same
9  people that created the E-Oscar program.
10     Q.  So the batch interface system was actually
11 initially developed by the same company that you purchased
12 E-Oscar program from; is that right?
13     A.  Yes.
14     Q.  It's been modified to work with Midland's own
15 internal system?
16     A.  Yes.
17     Q.  Can you give me your best judgment on what
18 percentage of ACDVs are handled exclusively by the batch
19 interface?
20     A.  I would say maybe 95 percent.
21     Q.  So I make sure that I understand, when an ACDV
22 comes in, the batch interface system can review the
23 computer codes on the ACDV and compare the information
24 contained on the ACDV with the information in Midland's
25 system and automatically verify that the information is

23

1  accurate?
2      A.  Yes.
3      Q.  If an ACDV comes in claiming an account has been
4  paid in full, are those ACDVs also handled by the batch
5  interface system?
6      A.  It would depend.
7      Q.  What would it depend on?
8      A.  It would depend on information on the actual
9  Midland account, not the ACDV itself.
10     Q.  Tell me what information on the Midland system
11 would cause an ACDV claiming that its debt had been paid
12 in full to be handled by an individual versus the batch
13 interface system.
14     A.  There may be specific codes on the account or the
15 account may reside in a specific location in our system.
16     Q.  What would some of those codes on the account be?
17     A.  For instance, if the account had a DIS dispute
18 code, the system could select that ACDV for manual review.
19     Q.  What are the other codes where the system can
20 select an ACDV for manual review?
21     A.  I don't know off -- I can't think of other ones
22 offhand.  It may select or move the account for being in a
23 specific location in our system.
24     Q.  What would those locations be?
25     A.  It could be -- there are several.  45-G, 45-P,

24

1  45-F.
2      Q.  What does "45-G" mean?
3      A.  It means the consumer disputed in writing within
4  45 days of the validation letter and the account is
5  currently under an investigation.  And it was a general
6  dispute, nonspecific.
7      Q.  What about "45-P"?
8      A.  So it means all of the same things except this
9  dispute -- the dispute was that the account was paid
10 prior.
11     Q.  Paid prior to Midland purchasing the account?
12     A.  Yes.
13     Q.  What about "F"?
14     A.  All of the same -- the account -- or the dispute
15 is that the account is fraudulent.
16     Q.  If a consumer sends in a letter within 45 days of
17 the validation letter that goes out on the account with a
18 general dispute, a code of 45-G is placed on that account;
19 is that right?
20     A.  Yes.  Well, that's actually the location it is
21 moved to.  The code would be the DIS code.
22     Q.  So the account itself is moved to a 45-G location
23 in the system?
24     A.  Yes.
25     Q.  Meaning the computer system?

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com



ESQUIRE
an Alexander Gallo Company

Angelique D. Ross                                September 16, 2010

25

1    A.  Yes.
2    Q.  And Midland doesn't have files of all these
3  accounts, right?  They're all computerized?
4    A.  That's right.
5    MR. LANGLEY:  Object to the form.
6  BY MS. CAULEY:
7    Q.  If a consumer sends in a dispute in writing
8  within the 45 days of the validation letter claiming that
9  the account was paid prior to it being purchased by
10  Midland, that would be placed in the location of 45-P?
11    A.  Correct.
12    Q.  What happens if a consumer sends in a dispute in
13  writing but it's not within 45 days of the validation
14  letter?
15    A.  It would depend on exactly what they sent in.
16    Q.  Can you tell me what the options are?
17    A.  If the consumer -- I'm sorry.  For general or
18  just --
19    Q.  Let's start with general.
20    A.  Okay.  If the consumer only sends in a letter
21  with their general dispute outside of the 45-day period,
22  the consumer would receive a letter stating that we need
23  additional information related to their dispute.
24    Q.  Does that letter have a code that is referred to
25  or refers to it?

26

1    A.  Yes.
2    Q.  What is the Code?
3    A.  QCPP.
4    Q.  Does that stand for something?
5    A.  "QC" stands for quality control.  I don't know
6  what the first "P" is, but the second "P" is for prove, so
7  I think it is "provide proof."
8    Q.  If a consumer sends in a letter disputing an
9  account but there is no documentation included with the
10  letter and it is outside the 45 days of the first letter
11  from Midland, Midland will send out a form letter, which
12  is the QCPP letter, stating to the consumer that
13  additional information is needed?
14    A.  That's correct, as long as the consumer has not
15  requested that we cease contact with them.
16    Q.  If a letter contains a dispute and also requests
17  that Midland cease contact, is that same form letter sent
18  out?
19    A.  No.
20    Q.  Is any form letter sent out?
21    A.  No.
22    Q.  What happens to the account?
23    A.  The account is marked as "disputed," annotated
24  with what was received from the consumer.  And another
25  code is placed on the account to indicate that the

27

1  consumer wants no further contact.
2    Q.  What is that code?
3    A.  026.
4    Q.  If the consumer's letter says "cease contact" or
5  there is a cease and desist letter as well as a dispute,
6  no request from Midland regarding additional documentation
7  is sent?
8    A.  Correct.
9    Q.  Is that the same whether it is a general dispute,
10  a paid prior dispute or a fraud dispute?
11    A.  Yes.
12    Q.  So that's Midland's policy with respect to any
13  dispute; if it is a writing outside the 45 days and it
14  includes a cease and desist contact, then the account is
15  simply marked as "disputed" and a no-contact code is
16  entered and no letter from Midland is ever sent to the
17  consumer?
18    A.  Yes, as long as the consumer is not -- does not
19  mention credit reporting.  As of the timeframe of this
20  account, that's what would have happened, yes.
21    Q.  During the time that Mr. Brim was sending his
22  letters, this is what would have happened?
23    A.  Yes.
24    Q.  Is that different now?
25    A.  Yeah.  As of July 1st, yes.

28

1    Q.  What is the procedure now?
2    A.  Now, if the consumer requests a cease and desist
3  and did not provide documentation, a letter will go out
4  stating that we need more information but also include
5  information that says, "Per your request, we will not
6  contact you any further."
7    Q.  Who was responsible for that change in policy?
8    A.  The compliance department.
9    Q.  Who is in charge of the compliance department?
10    A.  Tamara Yudenfreund.
11    Q.  Go ahead and spell that for me?
12    A.  Y-u-d-e-n-f-r-e-u-n-d.
13    Q.  What her title?
14    A.  Director of compliance and legal affairs.
15    Q.  Did you get a memo or new policies and procedures
16  handbook that talks about this policy changing?
17    A.  Yes.
18    Q.  What did you get?
19    A.  I guess it is a manual or packet of papers.
20    Q.  Were there other changes made July 1st, 2010?
21    A.  There were a few related to the same issue.
22    Q.  What were those other changes?
23    A.  There were some letters created.  For instance,
24  there was a letter created that if we were unable to
25  locate the account, we could generate this letter, send it



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                    September 16, 2010

29

1   to the consumer to ask them for more information to help
2   them locate their account.
3        Q.   Any changes with respect to the handling of the
4   ACDVs?
5        A.   No.
6        Q.   So basically, now if a consumer sends in a letter
7   that does not contain any documentation but is just a
8   letter of dispute, even if it has the cease and desist
9   request, Midland has a new form letter that can go out
10  stating they need additional information regarding the
11  dispute and that no contact will be made with the
12  consumer; is that right?
13       A.   Yes.
14       Q.   Going back to 2008 and 2009, if a consumer sent
15  in a written dispute, regardless of what the dispute was,
16  and it did contain some documentation, how was that
17  dispute handled?
18       A.   It would depend on the documentation that was
19  received.
20       Q.   All right.  What type of documentation does
21  Midland normally get?
22       A.   Do you mean generally?
23       Q.   With respect to a dispute.
24       A.   It will vary depending on the type of dispute.
25       Q.   What about with respect to a paid prior dispute?

30

1        A.   We may receive paid letters.
2        Q.   Like a paid-in-full letter?
3        A.   Yes.
4        Q.   Okay.
5        A.   We may receive settlement offer letters with
6   copies of proof of payment.  Sometimes we receive canceled
7   checks.  We receive bank statements.
8        Q.   Who reviews the documentation that is sent in
9   respect to a dispute?  Is that the consumer relations
10  department?
11       A.   Yes.
12       Q.   What determines where the letter is sent,
13  San Diego versus St. Cloud?
14       A.   There isn't a determination based on the mail
15  itself.  It is just basically the date that the mail came
16  in.  We know there is shipping time, so the mail generally
17  will go out to St. Cloud.  Is it not based on the type of
18  mail.
19       Q.   Does all mail come to San Diego?
20       A.   Yes, most of it.
21       Q.   Is it scanned?  Does the department open the
22  letter and deal with the letter, or is it scanned and sent
23  electronically?
24       A.   We get the hard copies of the correspondence, so
25  the letters are actually opened and read, the hard copies.

31

1        Q.   In consumer relations?
2        A.   Yes.
3        Q.   If all the mail comes into San Diego, how does
4   some of it get to St. Cloud?
5        A.   It is shipped there.
6        Q.   Do you just take, like, a stack of mail that
7   comes in and say, "This stack is going to go to
8   St. Cloud"?
9        A.   Basically, yes.
10       Q.   Trying to divide up the amount of mail that comes
11  in?
12       A.   Yes.
13       Q.   Regardless of whether it is in San Diego or
14  St. Cloud, a consumer relations employee will actually
15  open the mail and read the letter?
16       A.   The mail is opened by our mailroom.  But the
17  consumer relations team -- either site, they're
18  responsible for reading the letter.
19       Q.   Does the letter go to consumer relations as the
20  actual letter or is it scanned?
21       A.   It is the actual letter.
22       Q.   What is done with it after consumer relations
23  sees it?
24       A.   After it is received and reviewed, any dispute
25  letters will then be scanned after they have been

32

1   processed.
2        Q.   Are there any policies or procedures that
3   instruct the consumer relations employees on how to review
4   the documentation that's supplied with respect to a
5   dispute?
6        A.   Yes.
7        Q.   Where are those policies maintained?
8        A.   That would be in the consumer relations manual.
9            MS. CAULEY:  We don't have that.
10           MR. LANGLEY:  I think you do.
11           MS. CAULEY:  It is two pages?
12           THE WITNESS:  No.
13           MR. LANGLEY:  I think it is about seven pages in
14  a chart format with designations in the upper left-hand
15  corner about the type of dispute and when it is received.
16  BY MS. CAULEY:
17       Q.   Let me hand you that.  Please tell me which parts
18  of that constitute the consumer relations manual.
19           MR. LANGLEY:  Just to make sure the record is
20  clear, we're looking at Bates labeled Documents 163
21  through 169 and 202 through 204.
22           MS. CAULEY:  The top page doesn't go with it.
23           THE WITNESS:  This is part of the new hire
24  training manual.
25  BY MS. CAULEY:

Toll Free: 800.300.1214
Facsimile: 619.239.4117



ESQUIRE
an Alexander Gallo Company

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                    September 16, 2010

33

1    Q.  Okay.
2        MR. LANGLEY:  By "this," we're talking about
3    202 through 204?
4        MS. CAULEY:  Right, 204.
5    BY MS. CAULEY:
6    Q.  Pages 163 through 169 constitutes the entire
7    operations manual; is that correct?
8    A.  No.
9    Q.  Are there other materials that are contained
10   within the consumer relations operation manual?
11   A.  There are other pages, yes.
12   Q.  What's contained on those other pages we don't
13   have?
14   A.  The same procedures, but in relation to different
15   types of disputes.  So on this one (indicating), this is
16   the process for the dispute of paid prior.  The other
17   pages contain the process for general or fraud disputes.
18   Q.  Do you know when the consumer relations manual
19   was created?
20   A.  I believe this one was created in 2004.
21   Q.  Had there been any changes to the manual, this
22   consumer relations operation manual since 2004?
23   A.  No.
24   Q.  Is it contained on the system, the computer
25   system at Midland?

34

1    A.  No.
2    Q.  Do you see on the top left corner it has a date
3    that is printed?
4    A.  I'm sorry.  There are soft copies of this, yes,
5    electronic copies of the document.  But as far as people
6    looking at it, they look at a hard copy.
7    Q.  Actually, the employees who work in consumer
8    relations have an actual hard copy of Pages 163 through
9    169?
10   A.  Yes.
11   Q.  Also the pages that we're missing?
12   A.  Yes.
13   Q.  Are there any other policies or procedures,
14   guidelines or manuals that would instruct an employee on
15   how to review the documentation received along with the
16   dispute?
17   A.  No, I don't think so.
18   Q.  The first page, which is 163 through 164, deals
19   with 45-day verbal disputes.
20   A.  Yes.
21   Q.  That dispute would actually be where a customer
22   calls in disputing an account within 45 days of receipt of
23   the letter?
24   A.  Yes, receipt of the validation letter.
25   Q.  The next section is the 45-day written dispute.

35

1    That's where the consumer sends in a written dispute
2    within 45 days of receipt of the validation letter?
3    A.  Yes.
4        I want to clarify.  It is not the consumers'
5    receipt of the letter but when Midland sent out the
6    first -- 45 days from when Midland sent out the first
7    letter.
8    Q.  Thank you.
9        So the 45 days runs from the date Midland
10   generates the letter and it goes out?
11   A.  Yes.
12   Q.  Page 167 deals with the verbal dispute paid prior
13   outside 45 days from the date of the validation letter?
14   A.  Yes.
15   Q.  Then, if we look at No. 1, Step 1, upon receipt
16   of a verbal dispute, what is the consumer relations
17   employee supposed to do?
18   A.  Did you want me to --
19   Q.  Walk me through this chart that the employees
20   have for handling verbal disputes.
21   A.  So the liaison would review information on the
22   account that would include verifying social, the name, the
23   address, put in any commentary, check for comments on the
24   account already.  If the consumer has an attorney, they
25   would request that information, both in writing and then

36

1    also at the time of -- that they're on the phone.
2        In this case, they would ask the consumer to
3    provide written proof regarding their dispute.  They would
4    add a warning code onto the account 023.
5    Q.  023 is the dispute code for -- I think you told
6    me that was for disputes?
7    A.  I don't know if I mentioned it before.  It is one
8    of the dispute warning codes.  And that one says it is
9    okay to work the dispute outside of the validation period.
10   Q.  Then it has -- on the column, it has "point of
11   access."  Then it has an L series.
12   A.  It is actually the "I series."
13   Q.  What is that?
14   A.  It is the name of our computer system.
15   Q.  What is that?
16   A.  I'm sorry.  What is the computer system?
17   Q.  Yes.
18   A.  It is -- I don't -- I don't know.  It maintains
19   account information.
20   Q.  But it is referred to as "I series"?
21   A.  It is actually referred to as a couple of names,
22   but they're all the same.  "I series" or "R2K" or also
23   "GUI."
24   Q.  "R2K"?
25   A.  Yes.



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                        September 16, 2010

37

1    Q.  So "GUI," "R2K" and "I series" all refer to the
2    same computer system?
3    A.  Yes.
4    Q.  The liaison is to look at the account, view the
5    account history and then add a warning code, 023, which is
6    just noting that a dispute was just received?
7    A.  Yes.
8    Q.  But that it is okay to continue to work on the
9    account?
10   A.  Yes.
11   Q.  Step 6 is, "Send the consumer a QCPP letter
12   requesting documentation."
13   A.  Yes.
14   Q.  And that is supposed to be done on all verbal
15   disputes claiming that an account was paid prior to
16   Midland purchasing it?
17   A.  Unless the consumer is represented by an attorney
18   or they requested a cease and desist, then typically that
19   QCPP letter would go out once those conditions were met.
20   Q.  I see that now under the "Comment" section.  If
21   there is an attorney or a cease and desist request, then
22   no QCPP letter is sent?
23   A.  Correct.
24   Q.  Have you received an updated consumer relations
25   operation manual since July 2010?

38

1    A.  No.
2    Q.  So the employees in consumer relations are
3    continuing to handle verbal disputes the same way today as
4    they were in 2009?
5    A.  Yes.
6    Q.  Pages 168 through 169, that's the guidelines for
7    handling written disputes that it has been paid prior; is
8    that correct?
9    A.  Correct.
10   Q.  The liaison is to review the account and verify
11   that the social, name and address match?
12   A.  Yes, if they can.  Consumers don't always include
13   all the information on their correspondence.
14   Q.  They're also looking for proof.  Here it says it
15   could be the front and back of a cancelled check with a
16   settlement offer letter or paid letter with a matching
17   account number?
18   A.  Yes.
19   Q.  That matching account number matching Midland's
20   account number or the original creditor's account number?
21   A.  It should be with the original creditor's account
22   number.
23   Q.  Are there any other documents that help consumer
24   relations liaisons determine what is sufficient proof with
25   respect to the accounts with a paid prior?

39

1    A.  Say that again.
2    Q.  Sure.
3        It has two examples of what would constitute
4    proof of a paid prior dispute on Page 168, right?
5    A.  Correct.
6    Q.  Is there any other document or memo or guideline
7    that would help a liaison know what other proof would be
8    acceptable with respect to Midland?
9    A.  No.
10       MR. LANGLEY:  Object to the form.
11       THE WITNESS:  No.
12   BY MS. CAULEY:
13   Q.  There is no list of other documents that would be
14   accepted as proof that an account had been paid prior?
15   A.  Not that I'm aware of.
16   Q.  So according to Page 168, the only acceptable
17   proof is the front and back of a cancelled check with a
18   settlement offer or a paid letter?
19   A.  Right.  There isn't another document that gives a
20   list.  But if someone provided a settlement offer letter
21   with a different proof of payment, that could be
22   considered proof even though it doesn't specifically say
23   that.
24   Q.  Bank statement is not on there, is it?
25   A.  No.

40

1    Q.  Is a bank statement showing payment to the
2    original creditor sufficient proof that the account had
3    been paid prior?
4    A.  No.
5    Q.  Never?
6    A.  Not by itself, no.
7    Q.  On No. 5, it says, "If unable to determine if
8    proof is valid, account will be referred to ACQ."
9        What is "ACQ"?
10   A.  It stand for "acquisitions."
11   Q.  Where is acquisitions?
12   A.  Where are they?
13   Q.  Are they in the San Diego office?
14   A.  Yes, in San Diego.
15   Q.  Also in St. Cloud or just San Diego?
16   A.  Just San Diego.
17   Q.  Who is in charge of the acquisitions department?
18   A.  The entire acquisitions department would be Amy
19   Anuk.
20   Q.  How do you spell that?
21   A.  A-n-u-k.
22   Q.  What is her title?
23   A.  I'm not sure.  I know she is the VP.
24   Q.  Do you have any knowledge what happens when an
25   account is assigned to the acquisitions department?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                    September 16, 2010

41

1    A.  Yes.

2    Q.  What happens?

3    A.  Like in this case, if an account is assigned to

4  them, they may follow up, go back to the seller of the

5  account to ask questions related to whatever the issue is.

6    Q.  If the account is referred to ACQ, then a

7  different warning code, which is 286, is entered on the

8  account; is that right?

9    A.  That's actually when the account is deleted.  So

10  that would be where it says, "If proof is valid, update to

11  delete."  And then that code would be added.

12    Q.  If the proof is determined sufficient, then a

13  warning code, 286, is entered on the account; is that

14  correct?

15    A.  Correct.

16    Q.  Then the reporting of the account to the credit

17  bureaus would stop and the account would be deleted?

18    A.  Correct.

19    Q.  If the proof is determine insufficient, then

20  warning code of 130 is added to the account?

21    A.  It is actually the 286 and the 130 would be added

22  at the same time.  So the 130 is added when that consumer

23  is provided documentation and the account is being

24  deleted.

25    Q.  If the proof is deemed not sufficient and it is

42

1  assigned to acquisitions, then neither of those warning

2  codes would be entered on the account?

3    A.  That's correct.

4    MR. LANGLEY:  Object to the form.

5  BY MS. CAULEY:

6    Q.  In the comments on Page 169 for Step 5, it says,

7  "Assign account to the CPLQ."

8    What is "CPLQ"?

9    A.  It is a designated location in our system which

10  indicates the account should be deleted.

11    Q.  Is the account deleted from Midland's system all

12  together or just from the credit bureaus?

13    A.  From the credit bureaus.

14    Q.  It would only be assigned to the CPLQ if the

15  proof provided was deemed valid by Midland?

16    A.  Correct.

17    Q.  Let's go to the next comment.  It says, "Forward

18  proof to acquisitions for possible put-back."

19    Is that what happens if the proof is not

20  sufficient?

21    A.  That actually happens if the proof is sufficient.

22    Q.  What does that mean, "Forward proof for possible

23  put-back"?

24    A.  There is a period of time in which the account

25  can be sent back to the seller if Midland received proof

43

1  that it was valid and no longer collectible.  So the

2  information would be sent to acquisitions to see if they

3  could give that back to the seller.

4    Q.  Then the next comment, "Send the consumer a QCDT

5  letter," which is the deletion letter.

6    That's only done if the proof was determined to

7  be valid?

8    A.  Correct.

9    Q.  Are there any comments that tell you what happens

10  if the consumer relations liaison is unable to determine

11  if the proof is valid?

12    A.  Yes.  If the consumer relations liaison is unable

13  to determine that the proof is valid, then they would go

14  to Step 6 through 9.

15    Q.  So the account is not sent to acquisitions or it

16  is?

17    A.  It would be sent to acquisitions.  It is not the

18  actual account itself.  It is more the document is sent to

19  acquisitions.

20    Q.  And the account is also assigned the PDPQ?

21    A.  Correct.

22    Q.  And what does that stand for?

23    A.  It is a written dispute outside of the 45 days

24  where the consumer has disputed that the account has been

25  paid prior.

44

1    Q.  For any paid prior dispute that is received in

2  writing where the consumer relations department is unable

3  to determine if the proof is valid, the account should be

4  assigned to the PDPQ; is that correct?

5    A.  Yes, if they were unable to determine if it's

6  valid.  For example, if it was missing an account number

7  and it was a paid letter, that is something they would put

8  in that -- assign to that.

9    Q.  What if it is a bank statement received showing a

10  payment and they can't determine if that is valid?  Is it

11  also sent to the PDPQ?

12    A.  That document would be considered invalid, so

13  they would have made a determination that it was invalid.

14    Q.  So a dispute containing a bank statement showing

15  a payment is automatically deemed invalid?

16    A.  Yes.  Generally, I would say that is true, unless

17  there was something else with it or maybe something else

18  on the account that would add to the determination.

19    Q.  So any letters that are received from consumers

20  disputing an account as paid prior that contain a bank

21  statement would not be assigned to the PDPQ?

22    MR. LANGLEY:  Object to the form.

23    THE WITNESS:  Unless there was something else on

24  the account that would make the liaison believe it should

25  be, I would say 99.9 percent would not be assigned to the

Toll Free: 800.300.1214
Facsimile: 619.239.4117



Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                September 16, 2010

45

1   PDPQ.
2   BY MS. CAULEY:
3      Q.   If an account is assigned to the PDPQ, then it
4   stays in that queue until the dispute is resolved; is that
5   right?
6      A.   Yes.
7      Q.   If the dispute is not resolved in 120 days, the
8   account automatically moves through a process into the
9   PDRQ?
10     A.   Yes.
11     Q.   And all reporting on the account is stopped?
12     A.   Yes.
13     Q.   That was the policy that existed in 2008 and 2009
14  for Midland?
15     A.   Yes.
16     Q.   That's the same policy that exists today?
17     A.   Yes.
18     Q.   What is the process of the handling of a written
19  dispute outside the 45-day time period claiming that it
20  was a fraud account?
21     A.   The process itself is the same.  If the consumer
22  provided proof of the fraud, then the account would be
23  coded with those warning codes, 286 and 130, moved to the
24  CPO queue and the consumer would be sent a deletion
25  letter.  The account would be deleted.

46

1        If there was information that could be
2   investigated in terms of the documents provided by the
3   consumer with relation to fraud, that would follow the
4   same process except the account would go into a different
5   queue.
6      Q.   That queue would be for fraud disputes as opposed
7   to paid prior disputes?
8      A.   Right.
9      Q.   When someone is hired as a consumer relations
10  liaison, how are they trained to handle these types of
11  disputes?
12     A.   A specific person is assigned to train them so
13  they essentially shadow that person.  They are given an
14  overview of all this information, how to use the system,
15  the I series system and how to read and review the letters
16  and correspondence.
17        Initially, all of their -- they would start to
18  input work on accounts and all of their work is
19  double-checked by the person that is training.
20     Q.   How long do they actually shadow someone while
21  they're being trained?
22     A.   The entire process takes about six to eight
23  weeks.  They aren't necessarily sitting with that person
24  the entire time, but that person is always available for
25  questions.  The shadowing part takes the majority of the

47

1   first three weeks.
2      Q.   Any classes that are given to help update the
3   consumer relations employees on changes in the law or
4   things that might come up?
5      A.   We have had some classes, yes.
6      Q.   When were the classes?  Do you remember?  This
7   year?  Last year?
8      A.   We had a class this year.
9      Q.   When?
10     A.   June 2010.
11     Q.   Was it in San Diego?
12     A.   Yes.
13     Q.   Did people from St. Cloud come for the class?
14     A.   They didn't come, but they were conferenced in.
15     Q.   Was it just by phone or, like, a videoconference?
16     A.   It was by phone with the other site being able to
17  view the computer screen on the other end, but not a
18  videoconference.
19     Q.   Who taught that class?
20     A.   Jill Brown.
21     Q.   What is her position?
22     A.   She is one of the compliance attorneys.
23     Q.   You told me earlier there were materials.  Were
24  those presented to the class?
25     A.   Yes.

48

1      Q.   Any other classes that you remember?
2      A.   No.
3      Q.   Do you have any responsibility for holding
4   classes to train employees on specifics on how to handle
5   disputes?
6      A.   I do.
7      Q.   What are your duties with respect to training
8   classes?
9      A.   If there's a follow-up -- follow-up questions
10  that maybe came out of the initial class, I may, you know,
11  confer with Jill or another attorney and then present the
12  information to the group.  Or I may give information in
13  team meetings.  They're not formal classes.
14     Q.   How often do you have team meetings?
15     A.   Those are biweekly.
16     Q.   Is that just with the San Diego employees?
17     A.   No, St. Cloud and San Diego.
18     Q.   What do you talk about at the team meetings?
19     A.   Just normally the team will bring up any
20  questions they have.  So we'll review questions.  We may
21  talk about scheduling or different things that are going
22  on, workload.
23     Q.   As the manager, do you ever get memos from the
24  compliance department telling you about changes that you
25  have to discuss at these team meetings?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                    September 16, 2010

49

1      A.  I wouldn't say memos.  They may send information
2  to me in an e-mail that I'll discuss with the team.
3      Q.  Do you keep those e-mails?
4      A.  Yes.
5      Q.  I sort of took a long, off-the-beaten path.  Now
6  is a good time for a break.  Would you like a break?
7      A.  Yes.
8          (A recess was taken.)
9  BY MS. CAULEY:
10     Q.  Have you ever testified on behalf of Midland
11  before, either a deposition, an affidavit or in court?
12     A.  Yes.
13     Q.  How many times in court?
14     A.  Once.
15         Deposition, maybe ten times.
16     Q.  Do you remember when you testified in court?
17     A.  I believe it was June of 2008.
18     Q.  Do you remember what that case was about or the
19  name of the case or where it was?
20     A.  It was in Oklahoma.  And I don't remember the
21  name.  And it was about the FDCPA.
22     Q.  Do you have any responsibilities with respect to
23  FDCPA compliance?
24     A.  That's only time I testified in court, June of
25  2008, yes.

50

1      Q.  When was the last deposition prior to today that
2  you have given?
3      A.  I think about two weeks ago.
4      Q.  Do you recall what that was about?
5      A.  It believe it was related to FCRA.
6      Q.  Is that case pending here or somewhere else?
7      A.  Here.
8      Q.  The deposition was here?
9      A.  Yes.
10     Q.  Is the case pending in California?
11     A.  I believe it is California.
12     Q.  How many times have you testified by deposition
13  this year?
14     A.  Including today, I believe four.
15     Q.  Testifying on behalf of Midland is also part of
16  your job duties as well?
17     A.  Well, it is part of my job description, yes.
18     Q.  Do you work with the compliance department in
19  compiling the documents that are necessary to respond to
20  discovery requests in lawsuits?
21     A.  I don't actually work on gathering any of the
22  documents for any of the cases unless I'm asked for
23  something that I may have.  But generally, no.
24     Q.  Do you have a judgment as to what percentage of
25  your time is actually spent testifying by depositions or

51

1  in court versus consumer relations?
2          MR. LANGLEY:  Object to the form.
3          THE WITNESS:  Three to five percent, maybe.
4  BY MS. CAULEY:
5      Q.  Have you ever given an affidavit?
6      A.  Yes.
7      Q.  Do you have any idea how many times have you done
8  that?
9      A.  15 to 20.
10     Q.  Do you assist in any way on the lawsuits other
11  than giving deposition testimony?
12     A.  No, not other than, perhaps, signing a document
13  or giving testimony.
14     Q.  Are you familiar with the term "interrogatories"?
15     A.  Yes.
16     Q.  As part of your responsibilities as the manager
17  of consumer relations, have you signed interrogatories on
18  behalf of Midland?
19     A.  Yes.
20     Q.  Did you review the documents produced by us prior
21  to your deposition today?
22     A.  Yes.
23     Q.  I think they go from Document 1 to Document 204.
24         Do you know if you reviewed all those?
25         MR. LANGLEY:  Actually, 206.

52

1          THE WITNESS:  I don't know if I reviewed 18 and
2  19.  I'm not sure about 18 through 30.
3  BY MS. CAULEY:
4      Q.  Okay.
5      A.  I'm not sure about 35 to 37.  I don't know if
6  I've even seen 58 and 51 in the hard copy form, but I did
7  see the screen.
8      Q.  Okay.
9      A.  A lot of these I haven't seen the hard copies,
10  but I'm familiar with the screen itself.  I think I looked
11  at 154 or 158 through 160.
12     Q.  Other than the pages you've identified, you
13  either reviewed a hard copy of the documents produced or
14  reviewed the information within the computer screens on
15  the system, correct?
16     A.  Correct.
17     Q.  You mentioned that you have some duties with
18  respect to FDCPA compliance.  What are those duties?
19     A.  That would basically be to -- like with the
20  documents here, consumer relations training manual, to
21  make sure people are following these guidelines.
22     Q.  In order to be in compliance with FDCPA, your
23  responsibility is just to make sure that the employees in
24  consumer relations are following the guidelines set up in
25  the consumer relations manual?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                    September 16, 2010

53

1    A.  Yes.
2    Q.  Meaning to mark the account as "disputed" or to
3  put it in the proper queue?
4    A.  Right.  Or if there is a cease and desist request
5  or attorney representation, to follow steps appropriately.
6    Q.  The consumer relations department doesn't make
7  any attempts to collect the debt from a consumer, correct?
8    A.  Correct.
9    Q.  With respect to the FDCPA, the responsibilities
10  would come in with the handling of a cease and desist
11  request or reporting the account to the credit bureau?
12    A.  Or processing written disputes that are received
13  from the consumer.
14    Q.  Have you testified in a deposition before
15  regarding your responsibilities pursuant to the FDCPA?
16    A.  Yes.
17    Q.  In the depositions you've given before, have any
18  of those cases involved claims similar to those here under
19  the Fair Credit Reporting Act in the handling of an ACDV?
20    A.  Yes.
21    Q.  Were any of those depositions this year?
22    A.  I do not believe so.
23    Q.  Are there any other documents you reviewed in
24  preparation for the deposition that were not in the
25  documents I provided you, other than the two that we got

54

1  today?
2    MR. LANGLEY:  To the extent it involves some
3  document that Brian or I may have shown you, I'm going to
4  object on the grounds of attorney-client privilege,
5  work-product doctrine and instruct the witness not to
6  answer.
7    THE WITNESS:  I've seen the Notice of Deposition.
8  BY MS. CAULEY:
9    Q.  Any other documents or screens or information
10  that you might have reviewed that was not shown to you by
11  your attorney?
12    A.  Oh, that wasn't shown to me?  No.
13    Q.  The reporting of accounts is done by Midland
14  Credit Management; is that correct?
15    A.  Correct.
16    Q.  Is there any type of contract between Midland
17  Funding and Midland Credit Management regarding the
18  reporting of accounts by Midland Credit Management?
19    A.  I don't know.
20    Q.  Do you know if Midland Funding pays Midland
21  Credit Management any type of fee or payment for the
22  reporting and the handling of ACDV?
23    A.  I don't know.
24    Q.  I'm going back to "Midland" as referring to
25  Midland Credit Management.

55

1    With respect to Midland, Midland does not use any
2  type of outsource vendors for the handling of ACDV?
3    A.  No.
4    Q.  You would agree that Midland is responsible for
5  reporting accurate information to the credit reporting
6  agencies regarding specific accounts, correct?
7    A.  Correct.
8    Q.  Would you agree that Midland is responsible for
9  the accuracy of the information that it reports
10  specifically to the credit bureaus?
11    A.  Correct.
12    Q.  Midland is also responsible for the accuracy of
13  information that it provides to any other entity regarding
14  a specific account?
15    A.  I'm not sure what you mean.
16    Q.  If Midland were to send information on an account
17  to an attorney for collection or for a lawsuit or to any
18  other entity with respect to collection or to sell the
19  account, the information that Midland provides should be
20  accurate, right?
21    A.  Yes.
22    Q.  With respect to the Fair Debt Collection
23  Practices Act, it is a violation of that act for Midland
24  to communicate any information that it knows or which it
25  should know to be false, correct?

56

1    MR. LANGLEY:  Object to the form.
2    You can answer, if you can.
3    THE WITNESS:  Yes.
4  BY MS. CAULEY:
5    Q.  I believe you told me earlier that you are
6  familiar with the Fair Credit Reporting Act?
7    A.  Yes.
8    Q.  And in the new hire training manual, there are a
9  few pages that deal with the Fair Credit Reporting Act.
10  Did you receive a copy of the new hire training manual?
11    A.  I don't have a hard copy.  But there is a -- I do
12  have access to a copy.
13    Q.  Were you provided a copy when you were hired or
14  is that something done electronically in the system?
15    A.  I was not provided a copy when I was hired.  This
16  is for the account managers.  But all employees have
17  access to it on our system.
18    Q.  So the consumer relations employees are not given
19  the new hire training manual that was provided?
20    A.  No.
21    Q.  How are the consumer relations employees trained
22  on the Fair Credit Reporting Act?
23    A.  Well, it is not as specific -- or it wasn't a
24  specific training.  It was just basically in relation to
25  the procedures they were doing in processing the disputes.

Toll Free: 800.300.1214
Facsimile: 619.239.4117

ESQUIRE
an Alexander Gallo Company

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                    September 16, 2010

57

1   Q.  The consumer relations employees are not provided
2   with a copy of the Fair Credit Reporting Act when they're
3   hired; is that correct?
4   A.  That's correct.  But they also have access to
5   this.
6   Q.  They have access to the new hire training manual?
7   A.  Yes.
8   Q.  But the new hire training manual doesn't contain
9   the Fair Credit Reporting Act?
10  A.  No, I don't think so.
11  Q.  Are you aware that Midland is responsible for
12  investigating the disputes received on an account to the
13  credit reporting agencies?
14  A.  Yes.
15  Q.  And Midland is responsible for conducting that
16  investigation within 30 days?
17  A.  Yes.
18  Q.  Those disputes are all received via the ACDV
19  through the credit bureaus?
20  A.  Yes.
21  Q.  You told me 99 percent of ACDVs are handled
22  electronically through the batch; is that right?
23  A.  Yes.
24  Q.  If an ACDV is not handled automatically through
25  the batch system, are there steps contained in any type of

58

1   manual or policy, whether it is printed or just a note on
2   the system, that tells an individual in consumer relations
3   how to investigate that credit dispute?
4   A.  Well, as far as using the actual system, there is
5   a tutorial that is available through the E-Oscar system to
6   show them how to actually put information in.  Other than
7   that, we have just some screen prints that show the screen
8   in order to find the information on our system.
9   Q.  You lost me just a little bit.
10      You have screen prints that tell the employees
11  where to find the information on your system.  Can you
12  explain that more for me?  Does consumer relations have
13  the same computer system that the collections department
14  might have?
15  A.  Yes.
16  Q.  They have access -- consumer relations has access
17  the same screens as the collections department?
18  A.  Yes.
19  Q.  So the information would be that there might be a
20  screen that would tell them where to find a payment
21  history or previous addresses or something of that nature?
22  A.  Yes.
23  Q.  There are quite a few screens in the system --
24  A.  Right.
25  Q.  -- judging from the documents that were produced.

59

1       To sort of make that easier for the person in
2   consumer relations to actually find which screen to go to?
3   A.  Yes.
4   Q.  Like a cheat-sheet, for lack of a better term?
5   A.  Yes.
6   Q.  Is the E-Oscar tutorial also something that can
7   be printed?
8   A.  Yeah, you can print it.
9   Q.  Do all employees in the consumer relations
10  department take the E-Oscar tutorial?
11  A.  Yes.
12  Q.  Does that E-Oscar tutorial help the employees
13  know how to perform or respond to an ACDV that is received
14  through E-Oscar?
15  A.  No.  Well, it shows them the choices they have to
16  respond.  But it is more or less a user guide of how to
17  use and navigate through the E-Oscar system itself.
18  Q.  So the tutorial doesn't explain to the consumer
19  relations employee how to actually conduct an
20  investigation with respect to an ACDV but basically gives
21  them the drop-down menus of what codes are available for
22  responding?
23      Would that be fair?
24  A.  Yes.
25  Q.  Since January of 2008, you have been in charge of

60

1   overseeing the handling of ACDVs?
2   A.  Yes.
3   Q.  Did you or the supervisors that are under you
4   conduct any type of review of responses to ACDV?
5   A.  We may review non-submitted responses.  But if
6   there a question about a response, we'll review the
7   account and the ACDV to look at the most appropriate
8   response.
9   Q.  Once an ACDV is actually completed and returned
10  to the credit bureau, there is no internal monitoring of
11  whether those responses were correct?
12  A.  No.
13  Q.  You don't have any type of reports that you
14  compile on the number of disputes that were handled?
15  A.  Well, I can see how many disputes came in through
16  the E-Oscar.
17  Q.  How many disputes does Midland normally get, say,
18  per week for ACDV?
19  A.  I would say maybe about 8,000.
20  Q.  Would that be the same pretty much every week?
21  A.  Yeah.
22  Q.  And then if my math is right, five percent of
23  that would be about 400 are actually handled by an
24  individual in the consumer relations department per week?
25  A.  Yeah, I guess that is about right.



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                    September 16, 2010

61

1      Q.   Have those numbers been the same from 2008 to
2   today?
3      A.   I would say approximately the same.
4      Q.   I understand they might go up slightly, but
5   overall they've been about the same since January of 2008?
6      A.   Yes.
7      Q.   You have actually been the manager of the
8   consumer relations department since January of 2008?
9      A.   Yes.
10      Q.   Do you have any knowledge regarding the
11   validation letter or how interest was calculated on the
12   account with respect to collecting this account from
13   Mr. Brim?
14      A.   No.
15         MS. CAULEY:   That would be our other witness most
16   likely.
17         MR. LANGLEY:   I'm not sure if he can testify
18   about that since his thing is more related to FDCPA
19   training issues.  He may.  I guess we can find out.
20         MS. CAULEY:   Off the record.
21         (A discussion off the record was held.)
22         MS. CAULEY:   I'm not marking documents 163
23   through 169 --
24         MR. LANGLEY:   Okay.
25         MS. CAULEY:   -- since they're confidential.

62

1   BY MS. CAULEY:
2      Q.   If you'll look at the top page, which is
3   Midland 1 and 2, this was provided as a letter sent to
4   Mr. Brim on January 22, 2008.  Upon your reviewing of the
5   computer screens and the documents, are you aware of any
6   previous letter to this January 22, 2008 letter being sent
7   to Mr. Brim?
8      A.   I would need to look at the production notes.
9   Yes.
10      Q.   What page is that?
11      A.   73.
12      Q.   This is the "Letter History" screen?
13      A.   Yes.
14      Q.   It says "Page 1 of 3."  Page 2 and Page 3 are
15   blank.  Do you know why they're blank?
16      A.   I believe there is information that needs to fill
17   those pages.
18      Q.   So that's the amount of space that is allotted to
19   enter information regarding letters, and it is just that
20   that space was not needed?
21      A.   I believe so.
22      Q.   If we look at Page 73, the "Letter History"
23   screen, it shows a letter was sent on October 20th of
24   2007?
25      A.   I see October --

63

1      Q.   I can't read.  I'm sorry.  October 26, 2007.
2      A.   Yes.
3      Q.   Then December 20th, 2007?
4      A.   Yes.
5      Q.   And then the letter that we have which is dated
6   January 22, 2008?
7      A.   Yes.
8      Q.   If a letter is sent by Midland, that letter is
9   documented in the letter history inquiry, correct?
10      A.   Correct.
11      Q.   Even if a letter is sent by the consume relations
12   department, it would be documented in the "Letter History"
13   screen?
14      A.   Yes.
15      Q.   Based on the "Letter History" screen, we know
16   only three letters were sent to Mr. Brim by Midland?
17      A.   Yes.
18      Q.   If you go back to Document No. 1, it indicates a
19   current balance of $1,603.15; is that right?
20      A.   Yes.
21      Q.   It indicates that Midland Funding owns the debt.
22      A.   Yes.
23      Q.   If you turn to Page 2, which would have been
24   attached to this letter, Page 1; is that right?
25      A.   Yes.

64

1      Q.   On the back, it has an interest rate of six
2   percent.
3         Did you see that?
4      A.   Yes.
5      Q.   Do you know how this interest rate was selected
6   for this account?
7      A.   I do not.
8      Q.   Do you have any knowledge of how interest rates
9   are selected for specific accounts by Midland?
10      A.   No, I don't.
11      Q.   Midland still owns this account?
12      A.   Yes.
13      Q.   If you go to the next letter, which is Page 3,
14   this is actually a letter that Mr. Brim sent in to
15   Midland.  And it is dated July 29, 2008, correct?
16      A.   Correct.
17      Q.   It was received on August 5th, 2000 by your
18   department?
19      A.   Correct.
20      Q.   Attached to that letter was a bank statement from
21   Red Stone Federal Credit Union.
22      A.   Correct.
23      Q.   In this letter, Mr. Brim indicated that he
24   disputed the debt; is that right?
25      A.   Yes.

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                              September 16, 2010

65

1    Q.  And he disputed the debt because the debt was
2    paid on November 8th of 2004?
3    A.  Yes.
4    Q.  And indicated in his letter he was included a
5    detailed report from his bank statement showing the
6    payment and transaction number.
7    A.  Yes.
8    Q.  He also requested no further communication by
9    phone or in writing from Midland.
10   A.  Yes.
11   Q.  As a result of that cease and desist request, no
12   additional letters were ever sent to Mr. Brim?
13   A.  Correct.
14   Q.  Based on that cease and desist request, no
15   additional phone calls should have been made to him as
16   well, correct?
17   A.  Not from Midland, no.
18   Q.  If phone calls were made to Mr. Brim after
19   July 29, 2008, that would have been a violation of the
20   Fair Debt Collection Practices Act?
21   A.  Yes.
22   Q.  Did you know which employee received this letter?
23   A.  According to the notes, Melanie Bloom.  It's on
24   Page 53.
25   Q.  Are you at the bottom where it says, "Received

66

1    certified letter"?
2    A.  Yes.
3    Q.  It is postmarked "July 30th."
4    How do you know who received it?
5    A.  There is a code that's three columns over from
6    that notation.
7    Q.  Is that the "YGC" or the "BU8"?
8    A.  It's the "BU8."
9    Q.  Who is represented by "BU8"?
10   A.  Melanie Bloom.
11   Q.  Is she in the St. Cloud office or San Diego?
12   A.  San Diego.
13   Q.  Is she a liaison or supervisor?
14   A.  A liaison.
15   Q.  Still employed?
16   A.  Yes.
17   Q.  Can you tell from Page 53 what action Ms. Bloom
18   took upon receipt of this letter?
19   A.  Well, I know that she noted the account.  I
20   believe she would have marked the account as "disputed"
21   and also marked it with a "cease and desist" which is
22   indicated by the "DISP" for dispute and "CND" for cease
23   and desist.  And then the letter, it says to forward it
24   over to the firm handling it at the time.
25   Q.  That was an outside attorney collection firm?

67

1    A.  Yes.
2    Q.  Page 53 it says, "Included copy of the bank
3    statement showing 954.12 to Dell Financial, 11/08."
4    Is that right?
5    A.  Yes.
6    Q.  Then It says "not proof"?
7    A.  Yes.
8    Q.  And then, "Forward to YGC."  What does the "YGC"
9    stand for?
10   A.  That just collectively means the firm, the
11   outside collection firm.
12   Q.  The actual code doesn't refer to a specific firm?
13   A.  That's right.
14   Q.  Continuing on to Document 5, that is a letter
15   from Mr. Brim dated March 10, 2009 to Midland; is that
16   right?
17   A.  Yes.
18   Q.  It is disputing the debt?
19   A.  Yes.
20   Q.  He states, "He does not owe this debt and does
21   not owe any debt to Dell"; is that right?
22   A.  Yes.
23   Q.  He puts that the debt was paid in full on
24   November 8, 2004.  And he encloses a copy of his bank
25   statement.

68

1    A.  Yes.
2    Q.  Also in this letter, Mr. Brim requests Midland
3    immediately correct his credit report with all three
4    agencies to show a zero balance and no derogatory or
5    negative information, correct?
6    A.  Correct.
7    Q.  If you go back to the collection detail, what was
8    done upon receipt of this letter?
9    A.  The account is noted.  It would have already had
10   cease and desists codes on there, so the information would
11   have been noted and then scanned.
12   Q.  Who handled this letter that was received?
13   A.  Melanie Bloom.
14   Q.  I see it is on the 13th?
15   A.  Yes.
16   Q.  It has "BU8."  Ms. Bloom got this second letter
17   from Mr. Brim?
18   A.  Yes.
19   Q.  Do you know if Ms. Bloom is the person who has
20   the handwritten notes on Page 5?
21   A.  It looks like her handwriting.
22   Q.  What does that represent?
23   A.  The Midland account number.
24   Q.  That was not on the letter?  She would have had
25   to have looked that up in the system?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                    September 16, 2010

69

1    A.  Yes.
2    Q.  The only action that would have been taken by
3  Ms. Bloom upon receipt of the second letter is to document
4  the receipt of it and then send it over to be scanned?
5    A.  Yes.
6    Q.  Look at the collection account detail.  It notes
7  that Mr. Brim called in with a dispute as well.
8    A.  Yes.
9    Q.  What date was that?
10    A.  3/11/2009.
11    Q.  Which consumer relations employee received that
12  call?
13    A.  Sidney Barrett.
14    Q.  Is that a man or a woman?
15    A.  Woman.
16    Q.  Is she in San Diego?
17    A.  Yes.
18    Q.  Looking at Page 53, March 10th, 2009, it has,
19  "FAC Data called request authorization to release and to
20  have consumer fax cease and desist."
21       Do you know what the means?
22    A.  I believe so.
23    Q.  Okay.  Can you tell us?
24    A.  I believe "FAC Data" is short for Factual Data,
25  which is a company.

70

1       So Factual Data called in.  Now it is referring
2  back to the person who requested the note.  They request
3  information to release -- basically, to release
4  information and also to have the consumer fax a cease and
5  desist release.
6    Q.  What kind of company is Factual Data?
7    A.  I believe they are a credit verification company.
8  They do something verifying information on the credit
9  report.
10    Q.  And the employee at Midland told them Mr. Brim
11  would need to fax a cease and desist release?
12    A.  He told them that they would need an
13  authorization so that he could release information and to
14  have the consumer fax a cease and desist release.
15    Q.  What employee handled that?
16    A.  I believe that is Jonathan Harkless.
17    Q.  What is his position?
18    A.  He is an account manager.
19    Q.  He's not in consumer relations?
20    A.  No.
21    Q.  He just took the call in the collections
22  department?
23    A.  Correct.
24    Q.  Continuing up from the same date, it has, "CCI,
25  from blocked number."

71

1       Do you know what that is?
2    A.  CCI is customer called in from a blocked number,
3  transferred to Extension 5034.
4    Q.  Who is "Extension 5034," if you know?
5    A.  I don't know.
6    Q.  Do you know who "Z76" is?
7    A.  Not off the top of my head.
8    Q.  That wouldn't be someone from your department?
9    A.  No.
10    Q.  Do you know if "Z76" is someone from the
11  collections department?
12    A.  I believe it is, yes.
13    Q.  "BC7."  Do you know who that is?
14    A.  Sidney Barrett.
15    Q.  She is in consumer relations?
16    A.  Yes.
17    Q.  She took the call on March 11th, the next day?
18    A.  Yes.
19    Q.  Do you know why the account manager employee
20  indicated that Mr. Brim needed to fax a cease and desist
21  release?
22    A.  From what I know, the account managers can't
23  speak with or they don't speak with consumers who have a
24  cease and desist on their account.  So they would request
25  to have something indicating that the consumer basically

72

1  wanted to have communication again.
2    Q.  But that doesn't apply to consumer relations when
3  the consumer is calling in regarding a dispute?
4    A.  That's correct.
5    Q.  There is no information that Ms. Barrett told
6  Mr. Brim he needed to fax in a cease and desist release?
7    A.  Correct.
8    Q.  There is no notation that Ms. Barrett informed
9  Mr. Brim that the documentation he previously provided was
10  insufficient to resolve this dispute?
11    A.  Correct.
12    Q.  Following receipt of Mr. Brim's two letters and
13  his telephone call, Midland continued to report the
14  account with a past due balance and being owed by
15  Mr. Brim?
16    A.  Yes, it continued to report but was marked as
17  "disputed."
18    Q.  It was reporting with a balance due of over
19  $1,600.  So we're clear, after March 2009, Midland
20  continued to report a balance due of over $1,600?
21    A.  Yes.
22    Q.  That amount changed monthly based on interest?
23    A.  Yes.
24    Q.  There is no information in the collection detail
25  that Midland ever contacted Dell to question or



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                      September 16, 2010

73

1  investigate Mr. Brim's dispute?
2     A.  That's correct.
3     Q.  Let's go back to document No. 7.  Can you tell me
4  what this is?
5     A.  This is the customer "Additional Data" screen.
6  It is a screen in our system.
7     Q.  There is a "Customer Data" screen and then a
8  customer "Additional Data" screen?
9     A.  There isn't a specific screen labeled "Customer
10  Data."  But the "Customer Additional" screen would be the
11  main screen.
12     Q.  This contains additional information regarding
13  the account itself?
14     A.  Correct.
15     Q.  On Page 7, it indicates an interest rate of
16  six percent --
17     A.  Yes.
18     Q.  -- that Midland is adding to the account?
19     A.  Yes.
20     Q.  Do you have any information why Midland chose
21  that interest rate?
22     A.  No.
23     Q.  And also on this Document 7 on the customer
24  "Additional Data" screen, it indicates that the date of
25  occurrence was October 18, 2004?

74

1     A.  Okay.
2     Q.  Do you see that?
3     A.  Yes.
4     Q.  To your knowledge, would that have been the
5  charge-off date or the delinquency date?
6     A.  It is the delinquency date.
7     Q.  Under that, it has the statute of limitations
8  expiration date as October 18, 2007?
9     A.  Yes.
10     Q.  And if you come down, it has, "Last work date,
11  February 25th, 2000 by DPB."
12        Did you know who that is?
13     A.  I don't.
14     Q.  Is that in the San Diego site?
15     A.  Yes, I believe so.
16     Q.  Turn to the next page, 8 through 10.  It's
17  another collection detail.  It was printed February 25,
18  2010.  If you look at Page 52, it was printed June 7,
19  2010.
20     A.  Yes.
21     Q.  I believe they're exactly the same except for the
22  print date and the balance on the account.
23     A.  Yes, I believe so.
24     Q.  If you would go back to Page 52, we'll just look
25  at the most recent.

75

1        MS. CAULEY:  We're going to mark that as
2  Plaintiff's Exhibit 2.
3        (Exhibit 2 was marked.)
4  BY MS. CAULEY:
5     Q.  Let's look at Plaintiff's Exhibit 2.  The
6  collection detail for this account consists of two pages?
7     A.  Yes.
8     Q.  Does it contain all comments or collection notes
9  that would have been added on the account?
10     A.  I don't think it does.
11     Q.  Are collection calls kept separately?
12     A.  Not necessarily, but there are some older notes
13  that may be archives.
14     Q.  Is there a way to determine whether there are
15  older notes that would be archived?
16     A.  Not that you could determine from this screen,
17  but there should be a screen in here somewhere that
18  shows --
19     Q.  We'll get to that.  When we get to it, if you
20  would just let me know.
21     A.  Okay.
22     Q.  It is the main screen that comes up?
23     A.  Yes.
24     Q.  It contains the most up-to-date information
25  regarding an account?

76

1     A.  Yes.
2     Q.  And should have the most up-to-date comments on
3  the account?
4     A.  Yes.
5     Q.  If you look down, it has the -- it has Mr. Brim's
6  name and the original account number from Dell Financial
7  services.
8        Do you see that?
9     A.  Yes.
10     Q.  It has the attorney's address?
11     A.  Correct.
12     Q.  It still has the six percent interest indicated?
13     A.  Yes.
14     Q.  And interest and fees, it has with those totaled.
15  It was printed.
16     A.  Yes.
17     Q.  If you come down, it has a balance due of $1,709?
18     A.  Yes.
19     Q.  It that's statute of limitations expiration of
20  October 18, 2007?
21     A.  Yes.
22     Q.  If letters are mailed out on an account, they
23  would be documented in the collection detail unless
24  they've been previously archived?
25     A.  Yes.



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                     September 16, 2010

77

1   Q. If you look at an entry on Page 3, dated
2   January 21st, 2008, it is about midway down.
3      Do you see that?
4   A. Yes.
5   Q. It says, "Account eligible for recovery.  Legal
6   letter mailed."
7   A. Yes.
8   Q. Going up to March 30th, 2008, the account was
9   referred to an attorney's office?
10  A. Yes.
11  Q. Going back to 2, if you look at the comments,
12  there is no indication that Mr. Brim was told, either in
13  writing or on the phone during his telephone call, that he
14  needed to send in additional documentation for his
15  dispute, correct?
16  A. Correct.
17  Q. And the payment of 954.12 was never added to the
18  account or credited to the account?
19  A. No.
20  Q. Midland did not consider the payment of 954.12 as
21  even a partial payment on the account?
22  A. Midland didn't -- well, we don't -- we wouldn't
23  necessarily credit that payment to the account or proof of
24  that payment, generally.  But payments made like that, the
25  actual payment would be sent to Midland.

78

1   Q. So the fact that Mr. Brim had sent in a bank
2   statement showing a payment to Dell Financial in the
3   amount of 954.12, Midland, first, did not consider that to
4   be proof of payment in full on the account, correct?
5   A. Correct.
6   Q. And Midland didn't consider it to be proof of at
7   least a partial payment, correct?
8   A. Correct.
9   Q. And Midland never contacted Dell to determine
10  what the status of that payment was?
11  A. That's correct.
12  Q. And then on August 6, 2008, there is an entry on
13  Plaintiff's Exhibit 2 that an ACDV was received from
14  Trans Union; is that correct?
15  A. Correct.
16  Q. And the fact that there are asterisks where an
17  employee ID would be contained, does that indicate to you
18  that ACDV was handled electronically by the batch
19  interface system?
20  A. Yes.
21  Q. No actual documents were reviewed in responding
22  to the ACDV received on August 6, 2008 from Trans Union?
23  A. No.  The system didn't review that.  But if there
24  were a review of the documents happening at that time,
25  there would have been specific codes that the system could

79

1   have recognized.
2   Q. So basically, the ACDV comes in from Trans Union.
3   The data matches.  And it is verified as accurate by the
4   system?
5   A. It probably would have been verified, probably
6   modified to show that there was a dispute.  And based on
7   the codes and the queue location, the information compared
8   and then responded to is modified.
9   Q. The notes do say, "Account dispute.  Modified
10  E-Oscar.  Dispute Type 12."
11      What is that?
12  A. I don't remember offhand.  But it is the dispute
13  type that Mr. Brim would have selected when submitting his
14  dispute through the credit bureau.
15  Q. So it would have been -- the type would come
16  through the credit bureau itself?  That's not a type that
17  Midland would have selected?
18  A. Correct.
19  Q. Trans Union, upon receipt of that ACDV Dell, was
20  not contacted?
21  A. No.
22  Q. Red Stone Federal Credit Union, where the bank
23  statement was from, was not contacted to verify whether
24  that bank statement was valid or whether a payment had
25  been made?

80

1   A. No.
2   Q. Midland does not have a copy of that ACDV
3   response, do they?
4   A. I don't think so.
5   Q. They can print from the system but only for a
6   period of time; is that right?
7   A. Yes.
8   Q. Is it six months?
9   A. 120 days.
10  Q. So after 120 days, any ACDV responses would not
11  be available for print by Midland?
12  A. That's correct.
13  Q. There is an entry on August 12, 2008.  An ACDV
14  was received from Experian; is that right?
15  A. Yes.
16  Q. And, again, the batch interface system handled
17  that dispute electronically?
18  A. That's right.
19  Q. Nothing was done differently in the handling of
20  that first ACDV than the first?
21  A. No.
22  Q. On March 19, 2009, a third ACDV was received
23  from -- this one was from Trans Union; is that right?
24  A. Yes.
25  Q. At that time, it states the dispute type was 109?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                          September 16, 2010

81

1    A.  Yes.
2    Q.  Again, the batch interface system responded to
3    that ACDV?
4    A.  Yes.
5    Q.  It was the same response as to the previous two
6    ACDV?
7    A.  Yes.  It looks like it.
8    Q.  No investigation was done by a consumer relations
9    employee into the dispute?
10   A.  No.
11   Q.  No documents were reviewed by any employee of
12   consumer relations in response to the ACDV?
13   A.  No.
14   Q.  No letters were sent to Mr. Brim regarding
15   receipt of that ACDV?
16   A.  No.  No letters could be sent regarding that
17   dispute because of the cease and desist.
18   Q.  And Dell was not contacted?
19   A.  That's correct.
20   Q.  On March 20th, 2009, the very next day, an ACDV
21   is received from Equifax?
22   A.  Yes.
23   Q.  Same dispute type, 109, for this ACDV?
24   A.  Yes.
25   Q.  And this fourth ACDV was also handled by the

82

1    batch interface system?
2    A.  That's correct.
3    Q.  Nothing new was done in responding to that ACDV?
4    A.  No.
5    Q.  Then on February 25th, 2010, an ACDV was received
6    from Trans Union?
7    A.  Yes.
8    Q.  Dispute Type 112?
9    A.  Yes.
10   Q.  This fifth ACDV was handled by the batch
11   interface system?
12   A.  Yes.
13   Q.  With respect to all of the ACDVs that were
14   received by Midland regarding disputes by Mr. Brim, each
15   and every one of them was handled electronically by the
16   batch interface system?
17   A.  Yes.
18   Q.  No consumer relations employee ever reviewed the
19   ACDVs?
20   A.  That is correct.
21   Q.  If you'll look at Page 11, Midland Document 11,
22   this looks like a summary of when Midland started
23   reporting the account.
24   A.  Yes.
25   Q.  That would have been November 16, 2007?

83

1    A.  Correct.
2    Q.  At the top it has "1,979 messages."
3    Do you see that?
4    A.  Yes.
5    Q.  Do you know what that means?
6    A.  The account managers don't have access to
7    e-mails, so their managers can send them messages through
8    this system.  Usually, it is when they want to send a
9    group message.  It refers to all the messages that have
10   been sent.
11   Q.  They're not messages regarding Mr. Brim's
12   account?
13   A.  No.
14   Q.  Or the reporting of this account?
15   A.  No.
16   A.  It is just how many might have been in the system
17   at that time?
18   A.  Correct.
19   Q.  Are you familiar with the code on -- compliance
20   condition code it is Column 3?  It has a status "XF"?
21   A.  Yes.
22   Q.  What does that mean?
23   A.  I don't remember the exact verbiage.  It's the
24   code that is added to indicate that the consumer has
25   disputed that trade line.

84

1    Q.  So Midland did report that the account was
2    disputed by Mr. Brim --
3    A.  Yes.
4    Q.  -- once they got his written dispute?
5    A.  Yes.
6    Q.  Document No. 12, do you know what this is?
7    A.  Yes.
8    Q.  Can you tell us what it is, please?
9    A.  It is a printout of payment history, "Payment
10   History" screen.
11   Q.  Do you know what those payments would have been
12   from, why those credits were made?
13   A.  I'm not positive because these are in relation to
14   transactions with the firm.  So I don't know that they're
15   actually payments from a consumer.
16   Q.  The collector code being "YGC," means these
17   payments would have been with respect to the outside
18   collection firm handling it?
19   A.  Yes.  I think it is more their transactions.  I'm
20   not sure they're payments.
21   Q.  So that would not represent a payment made by
22   Mr. Brim?
23   A.  That's right.
24   Q.  We already looked at documents there, the "Letter
25   History" screen?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                    September 16, 2010

85

1     A.  Yes.

2     Q.  And if you will look at this document that is

3  stapled, it is Documents 14 through 17.

4        MS. CAULEY:  We'll mark that as Plaintiff's

5  Exhibit 3.

6        (Exhibit 3 was marked.)

7  BY MS. CAULEY:

8     Q.  Are you familiar with Plaintiff's Exhibit 3?

9     A.  Yes.

10    Q.  What is it?

11    A.  This is the production notes.  It is basically

12  the printed version of the notes on the account.

13    Q.  Are these notes the same as the collection detail

14  notes or are they different?

15    A.  The production notes are going to include the

16  information from parts of what is on the "Collection

17  Detail" screen.  So the notations themselves would be the

18  same, but on the collection detail, obviously, there is a

19  section at the top that is not printed on the production

20  notes here.

21    Q.  Do production notes also contain calls made on an

22  accounts from the collections department?

23    A.  Yes, they do.

24    Q.  Are you familiar with production notes?

25    A.  Yes.

86

1     Q.  Do you know how to read production notes?

2     A.  Yes.

3     Q.  Okay.  If we start at the very beginning, it

4  looks like a close date of December 29, 2007.  And it has

5  "CL." And it looks like "transfer."

6     A.  Yes.

7     Q.  Do you know if that is when Midland purchased the

8  account?

9     A.  Yes, it is actually -- the date that was entered

10  was 10/19/2007.  And that is when the account was actually

11  loaded into our system.

12    Q.  It indicates the letter was sent 10/26.

13    A.  Yes.

14    Q.  If you come down a little bit, it has, "Moved

15  from NRP to SIL by nightly refresh."

16        Do you know who those codes stands for?

17    A.  "NRP" is a location in our system.  And it stands

18  for "not right party."

19        "SIL," stands for "SILO."  And the nightly

20  refresh, that is just an automated process.

21    Q.  Does "SILO" stand for something?

22    A.  It stands for the dialer.  So it means it was

23  moved from that location to one that is on the automated

24  dialer.

25    Q.  Midland uses an autodialer in an attempt to reach

87

1  consumers?

2     A.  Yes.

3     Q.  Do they still use an autodialer?

4     A.  Yes.

5     Q.  There is the entry March 30th, 2008.  It is

6  further up.

7     A.  Yes.  It looks like that is January 21, 2008.

8     Q.  I see.

9        So that would have been on January 21st, 2008?

10    A.  Yes.

11    Q.  The dates above the entry?

12    A.  Yes.

13    Q.  It looks like there was a problem with address

14  information.

15    A.  Yes.

16    Q.  Come down.  And it looks like there was an

17  affidavit sent to the firm.

18    A.  Yes.

19    Q.  Do you know if you completed that affidavit?

20    A.  No.

21    Q.  Could you tell who would have completed the

22  affidavit?

23    A.  No.

24    Q.  Coming down a little bit, we've got the entry

25  August 5th, 2008 regarding the letter from Mr. Brim,

88

1  July 30th, 2008.

2     A.  Yes.

3     Q.  On Page 4, which is Midland Document 17, that

4  looks like telephone calls.

5     A.  Yes.

6     Q.  Some of those have a queue as "SIL."  That would

7  have been the autodialer?

8     A.  Yes.

9     Q.  Then "NRP."  Is that an individual?

10    A.  No.  That stands for "not right party."

11    Q.  And what about "LP3"?

12    A.  It is not a person.  It is another location in

13  the system.

14    Q.  What does that location stand for?

15    A.  I'm not sure what the "LP" stands for.  But it is

16  a recovery department queue.  It is a location that

17  belongs to a specific department.

18    Q.  That would have been where individuals were

19  making the calls rather than the autodialer?

20    A.  I don't know.  They do have an autodialer, but

21  only certain individuals within that department would be

22  assigned to make those calls or would be assigned to that

23  portion of the autodialer.

24    Q.  So do you know if these calls that are

25  represented by the LP3 queue were made by an autodialer or



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                    September 16, 2010

89

1   an individual?

2       A.  I don't.  But I believe because it is different

3   individuals that it's the part of the autodialer that is

4   only designated for that particular department.

5       Q.  And then you told me you had not looked at

6   documents 18 through 38?

7       A.  I may have.  I just don't recall looking at

8   these.

9       Q.  Are you aware that Midland Funding sued Mr. Brim

10  to collect this debt?

11      A.  I do know that it went to an outside firm.

12      Q.  Do you know that a lawsuit was actually filed

13  against Mr. Brim?

14      A.  I believe so.

15      Q.  Are you aware that the lawsuit was actually

16  dismissed by Midland?

17      A.  Yes.

18      Q.  Do you know why the lawsuit was dismissed?

19      A.  I know I've seen the reason, but I don't recall

20  specifically.

21      Q.  Would that reason have been contained on some

22  screen in Midland's system?

23      A.  I believe I saw the reason in the production

24  notes where it says -- where it says "efforts exhausted."

25  That is the only way I knew it was closed.

90

1       Q.  Do you know what efforts they're referring to,

2   like efforts to collect or -- do you have any information

3   as to what efforts were exhausted?

4       A.  I'm not sure, no.

5       Q.  Page 38, that's a copy of the actual ACDV

6   response on February 25th, 2010, correct?

7       A.  Correct.

8       Q.  And that was in response to an ACDV from

9   Trans Union?

10      A.  Yes.

11      Q.  This was handled by the batch interface system?

12      A.  Yes.

13      Q.  Which is why it is signed by Midland rather than

14  by an individual; is that correct?

15      A.  That's correct.

16      Q.  Does the production note say when the lawsuit was

17  filed?

18      A.  Yes.

19      Q.  And what date is that?

20      A.  The notation says the lawsuit was filed on

21  2/24/2010.

22      Q.  No.  That's the lawsuit Mr. Brim filed against

23  Midland.  Do you know when the lawsuit was filed by

24  Midland against Mr. Brim?

25      A.  No, I can't tell that from the production notes.

91

1       Q.  Go back to Page 27.  That's a copy of the

2   complaint.  Do you see where it says, "Midland sued to

3   collect the total sum of $1,344"?

4       A.  Yes.

5       Q.  And that is different from the amount that was

6   actually reported by Midland?

7       A.  Yes.

8       Q.  In fact, even if you look at the very earliest

9   time the account was reported in 2007, it was reported

10  with a balance due in excess of the $1,381, right?

11      A.  That's correct.

12      Q.  Look at Document 39.  Could you tell me what that

13  is?

14      A.  This is a summary page that shows all of the

15  queue changes -- the changes in location of the account

16  interface system.

17      Q.  We've talked about a lot of these queues.  Can

18  you tell me what Queue A8 is?

19      A.  A8 is used when there isn't a phone number on the

20  account.

21      Q.  Back to the autodialer queue.

22      A.  Yes.

23      Q.  Then another one we haven't seen before is "CDR."

24  Can you tell me what that represents?

25      A.  It is a cease and desist queue.

92

1       Q.  And "ACV"?

2       A.  That is a person's queue.  And I believe it is

3   Brian's queue.

4       Q.  Brian Frary's queue?

5       A.  Yes.

6       Q.  If you look at 40 through 42, they're stapled,

7   Multiple Account Summary.

8       A.  Yes.

9       Q.  Mr. Brim has one account?

10      A.  Yes.

11      Q.  This is called "Multiple Account Summary"?

12      A.  Yes.

13      Q.  Then the next stapled group starts on Page 33 and

14  goes to 45.  It is "Account Media"?

15      A.  Yes.

16      Q.  It says, "No documents available for this

17  account."

18      A.  Yes.

19      Q.  What type of documents would be contained in the

20  Account Media?

21      A.  Sometimes the seller will send over account

22  statements or they may send over an original application.

23  So they're generally documents that were obtained from the

24  seller of the account.

25      Q.  This would be, like you indicated, statements on



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                    September 16, 2010

93

1    the account, something to indicate how much was owed and
2    that it belonged to that individual?
3        A.  Yes.
4        Q.  There were no documents obtained from Dell?
5        A.  Correct.
6        Q.  46 through 48, can you tell me what that is?
7        A.  It looks like it is just a search -- I'm not
8    sure.
9        Q.  Okay.
10           MR. LANGLEY:  We're at noon.
11           MS. CAULEY:  Why don't we stop with her and bring
12   in our other witness so we make sure we get him done and
13   I'll try and limit what I have to ask him.
14           MR. LANGLEY:  Shall we take 30 minutes to get
15   lunch?
16           MS. CAULEY:  Sure.  That is fine.
17           (A recess was taken.)
18   BY MS. CAULEY:
19       Q.  You understand you are still under oath from this
20   morning?
21       A.  Yes.
22       Q.  We'll start with Midland Document 49 through 51.
23   Please tell me what that document is?
24       A.  It is the customer "Additional Data" screen.
25       Q.  Is that just another view of the customer

94

1    additional data that we looked at earlier?  If you don't
2    remember, it's okay.
3        A.  I believe so.  Yeah, I believe it is just printed
4    on a different date.
5        Q.  What's the page you are looking at now?
6        A.  Page 7.
7        Q.  So Page 49, 351 is the same as what is
8    represented on Page 7 except the date printed?
9        A.  Yeah.  It is actually a different view.  It is
10   the same information.  But on Page 45, if you see in the
11   middle where it says, "click to view printable version,"
12   if you click on that, you get this Page 7.
13       Q.  Okay.  Then, if you'll go on to Page 55.
14       55 through 57 is the portfolio master
15   information.
16       A.  Yes.
17       Q.  Do you know what that is?
18       A.  Yes.  It is another screen in our system that
19   gives account information.
20       Q.  Does this information refer to the portfolio
21   within which Mr. Brim's account was obtained by Midland?
22       A.  Yes.
23       Q.  And it has a purchase date of October 10, 2007?
24       A.  Yes.
25       Q.  And account type.  Do you know what "CL"

95

1    represents?
2        A.  I don't know.
3        Q.  The seller is identified as Dell Financial
4    Services?
5        A.  Yes.
6        Q.  Number of accounts 63,346?
7        A.  Yes.
8        Q.  Mr. Brim's account was purchased in a portfolio
9    that contained 63,346 accounts?
10       A.  Yes.
11       Q.  Under that, it has some information with respect
12   to -- it looks like fees or settlement options, can you
13   tell, where it says under "media access"?
14       A.  That would be the cost of the documents.
15       Q.  To obtain the documents from Dell?
16       A.  Yes.
17       Q.  We looked earlier at the "Account Media" screen.
18   That did not contain any media, but this Document 55 would
19   indicate media could be purchased?
20       A.  Yes, probably after that 20 percent or after the
21   40 percent.
22       Q.  What does that percent represent?
23       A.  Typically, that number represents the amount of
24   documentation that doesn't have a cost initially or may
25   have a lower cost.

96

1        Q.  So anything less than 20 percent might be free?
2        A.  It may be, yes.
3        Q.  It also has some information about what type of
4    accounts these were that were purchased from Dell,
5    correct?
6        A.  Yes.
7        Q.  Go on to Pages 68 through 60.  This indicates it
8    is a "Consumer Information Maintenance" screen.  Are you
9    familiar with that screen?
10       A.  Yes.
11       Q.  What's the purpose of that screen?
12       A.  On this screen, you could -- for instance, if the
13   consumer was deceased, it is a location where you can add
14   a warning code if you forget to add it in another
15   location.
16       Q.  If a code is contained in the collection detail
17   account, which is marked as Plaintiff's Exhibit 2, would
18   it have been entered on the "Consumer Information
19   Maintenance" screen?
20       A.  It might have been.
21       Q.  It could also be entered on a different screen?
22       A.  Yes.
23       Q.  If a warning code is entered on a different
24   screen, does it automatically get placed on the "Consumer
25   Information Maintenance" screen?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                    September 16, 2010

97

1   A.  Yes.
2   Q.  If you enter it in one place, it will populate to
3   other places?
4   A.  Yes.
5   Q.  Page 61 looks like an "Address Maintenance"
6   screen.
7   A.  Yes.
8   Q.  Beginning on 64, we have some additional address
9   maintenance information?
10  A.  Yes.
11  Q.  Is that information that is generally received
12  from the original creditor?
13  A.  Sometimes, yes.
14  MR. LANGLEY:  You you are asking that question
15  with respect to 61 through 63 or 64?
16  MS. CAULEY:  Both.  It looks like 64, 65, 66 go
17  with the "Address Maintenance" screen.  It looks like
18  they're printouts, addresses that are contained in the
19  "Address Maintenance" screen.
20  BY MS. CAULEY:
21  Q.  If a new address is obtained by Midland, they
22  enter it.  And the old address remains part of the record
23  as well as the new address?
24  A.  Yes.
25  Q.  Same with phone maintenance, phone numbers and

98

1   things that are obtained?
2   A.  Yes.
3   Q.  If you look at 73, we're back to the letter
4   history inquiry.  It looks like a duplicate?
5   A.  Yes.
6   Q.  Page 85.  Do you know what that screen is?
7   A.  Yes.
8   Q.  Can you tell us what it is?
9   A.  WACH\SCNL list.
10  Q.  Can you tell us what that means?
11  A.  It is a screen that if a credit bureau notifies
12  Midland that a consumer is obtaining credit, to makes sure
13  it appears.
14  Q.  If Mr. Brim had applied for credit at some point
15  during the time that Midland had the account, that may
16  have come up on this screen?
17  A.  It may have, yes.
18  Q.  If you'll go to Midland Document 91, these are
19  the bureau reports by the Reporting Data screens?
20  A.  Yes.
21  Q.  Is there a screen for each month that an account
22  is reported to the credit bureaus?
23  A.  Yes.
24  Q.  Does Midland report to all three of the major
25  credit reporting agencies?

99

1   A.  Yes.
2   Q.  Does it report to any credit reporting agencies
3   other than Equifax, Trans Union, Experian?
4   A.  No.
5   Q.  The same information would be reported to all
6   three; is that correct?
7   A.  Yes.
8   Q.  This shows that began reporting on November 16th,
9   2007?
10  A.  Yes.
11  Q.  It has an amount past due of 1,587?
12  A.  Yes.
13  Q.  At the top, it looks like a balance of $1,799.
14  A.  Yes.
15  Q.  Do you know which balance was reporting or were
16  both reporting on the credit report?
17  A.  This screen was printed 6/7/10.  The information
18  at the top would have been the balance at the time that
19  the screen was printed.  Whereas, the information
20  underneath "bureau reports by reporting date" would have
21  been the information reported to the credit bureaus as of
22  November.
23  Q.  November 16th, 2007, the balance reported as
24  unpaid and past due was $1,587.
25  A.  Yes.

100

1   Q.  Then the following month, the balance increased?
2   A.  Yes.
3   Q.  And in 2008, the information remained the same
4   except that the balance increased to $1,602?
5   A.  Yes.
6   Q.  If you will, just review it.  It looks like each
7   month the information remains the same except the balance
8   increases for February to March 2008 and then to April of
9   2008; is that right?
10  A.  Yes.
11  Q.  March of 2008, it looks like there is an address
12  change?
13  MR. LANGLEY:  May of 2008?
14  MS. CAULEY:  I'm sorry.  May 2008.
15  THE WITNESS:  Yes.
16  BY MS. CAULEY:
17  Q.  And the balance increased in May of 2008?
18  A.  Yes.
19  Q.  The June to July balanced remained the same.  But
20  in August, the address goes back to an Alabama address but
21  has the same unpaid balance; is that right?
22  A.  Yes.
23  Q.  Do you know why for three months the balance
24  remained the same but then it increased again?
25  A.  I don't.



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                    September 16, 2010

1    Q.   August of 2008 is also when the XF dispute code
2    was added?
3    A.   Yes.
4    Q.   For every month after August of 2008, it looks
5    like everything remains the same except the balance goes
6    up each month until February 2010?
7    A.   Yes.
8    Q.   And no monthly payments were ever reported on the
9    account?
10   A.   That's correct.
11   Q.   If you look at page -- at Document 119, it says,
12   "Credit Bureau Screen."
13   A.   Yes.
14   Q.   What information is generally contained on that
15   screen?
16   A.   This is a screen that if a credit report had been
17   requested, then the credit report would actually show up
18   on this screen.
19   Q.   As far as Midland's records are concerned,
20   Midland did not obtain that credit report on Mr. Brim?
21   A.   Correct.
22   Q.   There's the bankruptcy list screen, right?
23   A.   Yes.
24   Q.   That is where information would have been
25   obtained if Mr. Brim filed bankruptcy?

1    A.   Correct.
2    Q.   There is no information there?
3    A.   Correct.
4    Q.   Document 125, what is this?
5    A.   "NAN" was a previous name for accounts assigned
6    to firms, so similar to YGC.
7    Q.   If an account had been assigned to a YGC, would
8    it still be reflected on the NAN screen or is there a
9    separate YGC screen?
10   A.   It could be a different screen.  This would be
11   specifically for accounts that were assigned to the NAN
12   firms.
13   Q.   Did you know that "YGC" is "You've Got Claims"?
14   A.   Yes.
15   Q.   Do you know how a decision is made by Midland to
16   send an account out to an outside attorney for collection?
17   A.   No, I don't know what the criteria is.
18   Q.   Look at Document 128.
19   A.   Okay.
20   Q.   Do you see the "Account Resolution" screen?
21   A.   Yes.
22   Q.   What is that screen?
23   A.   This is a screen that is used when the consumer
24   states that they made a payment to the seller of the
25   account or, in this case, the issuer of the account during

1    the time that the account was being transferred over to
2    Midland.  So sometimes consumers make payments.  The
3    account has been sold.  But they make a payment somewhere
4    in a week or two when the account is being transferred
5    over.  So this is a screen that someone could use to find
6    out if that payment was going to be -- when that payment
7    would be transferred over to Midland.
8    Q.   It is assigned to Brian Frary?
9    A.   Yes.
10   Q.   Is that who it would be assigned to normally?
11   A.   Yeah.  That is an -- that is an auto-population
12   based on where the account is at the time that form -- in
13   this case, that the form is printed.
14   Q.   This might have changed over time as to who the
15   account was assigned to?
16   A.   Yes.
17   Q.   Currently, at the date it was printed, it was
18   assigned to Brian Frary and Tanya Flores?
19   A.   Yes.
20   Q.   Do you know who Tanya is?
21   A.   Yes.
22   Q.   Who is she?
23   A.   A paralegal.
24   Q.   Let's go on to Page 131, "Consumer Information."
25   Do you know why that information screen is blank except

1    for the balance?
2    A.   This is kind of like a worksheet for an account
3    manager.  In working with a consumer, the consumer may
4    give information that they may want to have for future
5    conversations with the consumer.
6    Q.   That would have been handled by a collector or
7    account manager?
8    A.   Yes.
9    Q.   And the next screen is "Payment Plan
10   Maintenance."  That is a screen that is handled by a
11   collector or account manager?
12   A.   Yes.
13   Q.   Do you know what the "Laser Draft" screen is,
14   144?
15       MR. LANGLEY:  What was the number?
16       MS. CAULEY:  144.
17       THE WITNESS:  Yes.
18   BY MS. CAULEY:
19   Q.   What is that?
20   A.   If a consumer makes a payment via a laser draft,
21   it would be on this screen.
22   Q.   "Credit Card" screen is next.  I assume that
23   would be if the consumer made a payment on a credit card,
24   that information would be contained on this screen?
25   A.   Yes.

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com



ESQUIRE
an Alexander Gallo Company

105

1    Q.   Document 154, the "Payment Review" screen.   Are
2  you familiar with that?
3    A.   I've seen it before.  I'm not real familiar with
4  it.
5    Q.   Do you know what "Team Code 954" is?
6    A.   Yes.
7    Q.   What's that?
8    A.   The team code for consumer relations and legal.
9    Q.   It represents both?
10   A.   Yeah.  And there may be other groups.  But it is
11 a non-account manager team.
12   Q.   "Division 09."  Do you know what that stands for?
13   A.   It is actually -- I'm sorry.  Let me clarify.
14 954 should be legal and consumer relations.
15        Division 09 may include other groups.  It is also
16 a non-account manager division.
17   Q.   So that means that the account is not in the
18 collections department for collection?
19   A.   Correct.
20   Q.   At least as of the date that it was printed?
21   A.   Correct.
22   Q.   Does Midland maintain archives of the screens or
23 any type of documentation in the system to learn what
24 information they obtained from the screen?
25   A.   Some of it, yes.

106

1    Q.   What information would be obtainable to learn
2  what changed or had been added to a screen?
3        MR. LANGLEY:  Object to the form.
4        THE WITNESS:  One of the screens we looked at
5  showed previous queues and warning codes that had been
6  added.  That information could have changed.  When you
7  print it out, it may be different.  But it would show the
8  previous information.
9  BY MS. CAULEY:
10   Q.   And what about the -- with respect to the screen
11 we just looked at, the "Payment Review" screen, is there a
12 way to determine when the account was put in 954?
13   A.   I don't know if there is any way to specifically
14 check for 954.  But he would be able to tell when the
15 queue movement happened and every queue belonged to a
16 certain division.
17   Q.   So that might be something on Plaintiff's
18 Exhibit 2 we can look at when it was assigned to a
19 specific queue, and that would tell us when it was
20 actually sent to Team 954?
21   A.   Yeah.  You'd have to know that that queue
22 belonged to 954.
23   Q.   Can you look at Plaintiff's Exhibit 2 and tell me
24 which queue belongs to 954?
25   A.   I don't know just from looking at the document.

107

1  I do know any consumer relations or legal team members
2  would be in 954.  If it was assigned to their queue, it
3  would show -- that means it is assigned to 954.
4    Q.   What could some of those queues be?
5    A.   Brian Frary, my own.
6    Q.   What is yours?
7    A.   BE3.
8    Q.   Any others queues?
9    A.   BU8 and BC7.
10   Q.   We talked about BC7 is Sidney Barrett and BU8 is
11 Melanie Bloom.
12   A.   Yes.
13   Q.   Did your name used to be Purvis?
14   A.   Yes.
15   Q.   And your current last name is?
16   A.   Ross.
17   Q.   Okay.  Let me hand you Defendant's Answers to
18 Interrogatories.  And we'll mark those as our next
19 exhibit.
20        (Exhibit 4 was marked.)
21 BY MS. CAULEY:
22   Q.   Prior to today, have you had a chance to review
23 Midland's responses to interrogatories?
24   A.   Yes.
25   Q.   Did you help compile the information that is

108

1  contained in these answers to interrogatories?
2    A.   I don't believe so, no.
3    Q.   Did you review the information to make sure that
4  it was accurate with respect to the information, not the
5  legal objections?
6    A.   I believe so.
7    Q.   The answer to Interrogatory No. 2, which begins
8  on Page 4, it indicates that a telephone call was received
9  from Mr. Brim by Midland on March 11, 2009.
10   A.   Yes.
11   Q.   If you need to refer to Plaintiff's Exhibit 2,
12 you can.  Do you have any information as to which
13 individual handled that call that would have been the call
14 received by Sidney Melanie Barrett?
15   A.   No.
16   Q.   Does Midland record calls that come in to the
17 collections department?
18   A.   Yes, some of them.
19   Q.   Are recordings done on a random basis?
20   A.   I believe so.
21   Q.   Do you know how long Midland maintains those
22 recordings?
23   A.   I'm not sure how long.
24   Q.   Are you aware if any recordings exist of
25 Mr. Brim's telephone call, either with Ms. Barrett or any



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Case 5:10-cv-00369-IPJ   Document 32-2   Filed 11/15/10   Page 28 of 60

Angelique D. Ross                              September 16, 2010

109

1  other employee he may have spoken with?
2      A.  I don't believe so.
3      Q.  If there was a recording of a conversation
4  involving Mr. Brim, would that be documented somewhere on
5  the screens that we've looked at?
6      A.  No.
7      Q.  It would not?
8      A.  No.
9      Q.  Is a recording documented anywhere in the system
10  there?
11      A.  There would be a system that would document or
12  allow for a retrieval of the recording, but not in this
13  particular system.
14      Q.  If there was a recording made, it would be
15  through a different computer system that logs them by
16  account number?
17      A.  I'm not exactly sure if it is by account number.
18  But I believe you can by account number, yes.
19      Q.  You are not aware of any recordings that exist
20  with respect to Mr. Brim?
21      A.  Right.
22      Q.  Question No. 3 asks for, "Any communications and
23  reports made by Midland to any other person or entity
24  other than Mr. Brim regarding the account or the credit
25  history."

110

1      Are you aware of -- you have already told me the
2  records indicate that Midland never communicated with Dell
3  regarding Mr. Brim's dispute, correct?
4      A.  Correct.
5      Q.  Midland never communicated with Red Stone
6  regarding it?
7      A.  Correct.
8      MR. LANGLEY:  Object to the form.
9  BY MS. CAULEY:
10      Q.  And the only communications with respect to
11  Mr. Brim's account with respect to the reporting agencies
12  are the ACDVs and the UDF responses?
13      A.  Those, and I guess the regular monthly reporting.
14      Q.  The regular reporting is done monthly and then
15  the ACDVs and the UDFs?
16      A.  Yes.
17      Q.  There's no indication that telephone calls were
18  made to the reporting agencies, correct?
19      A.  Correct.
20      Q.  There is no record in Mr. Brim's account notes
21  that indicate Midland contacted any other party regarding
22  Mr. Brim's dispute?
23      A.  Correct.
24      Q.  No. 5 says, "State the name, address and job
25  titles of all persons who performed a review, participated

111

1  in a review or supplied any information of the account and
2  its content and per plaintiff's assertion he had paid them
3  in full in November of 2004 and did not owe the amount
4  claimed by Midland."
5      And in response, several people were identified.
6  The first was Sonya Kay.  Do you know Ms. Kay?
7      A.  I don't know her personally.
8      Q.  Does she work in the San Diego branch?
9      A.  Yes.
10      Q.  Do you have any knowledge as to what information
11  she may have had regarding Mr. Brim's dispute?
12      A.  No.  I don't know that she had information
13  regarding his dispute.
14      Q.  Ms. Kay doesn't work in the consumer relations
15  department?
16      A.  No.
17      Q.  She would not have had responsibility for
18  reviewing Mr. Brim's letters or the documentation he
19  provided?
20      A.  Correct.
21      Q.  Jonathan Harkless.  Do you know him?
22      A.  Yes.
23      Q.  Does he work in the San Diego branch?
24      A.  Yes.
25      Q.  Have you had any conversation with Mr. Harkless?

112

1      A.  Not related to Mr. Brim's account.
2      Q.  Do you have any knowledge as to what information
3  he may have regarding Mr. Brim's disputes?
4      A.  I don't believe he had information related to his
5  dispute.
6      Q.  And then the other two, Sidney Barrett and
7  Melanie Bloom are the two consumer relations liaisons that
8  either received a letter or telephone call from Mr. Brim,
9  correct?
10      A.  Yes.
11      Q.  Have you had any conversations with Sidney
12  Barrett regarding Mr. Brim's account or dispute?
13      A.  No.
14      Q.  Have you had any conversations with Melanie Bloom
15  regarding Mr. Brim's account or his dispute?
16      A.  No.
17      Q.  Forgive me if I've asked this.  Ms. Barrett and
18  Ms. Bloom, they both work in San Diego, correct?
19      A.  Correct.
20      Q.  How many employees work in San Diego?
21      A.  I would say 250 to 300.
22      Q.  Look at Interrogatory No. 14.  It asks for the
23  name of the individual responsible for supervising the
24  investigations.  And it identifies you.
25      A.  Yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                    September 16, 2010

113

1   Q.  Did your name change recently?
2   A.  Yes.
3   Q.  If you'll turn to Interrogatory No. 24, it asks
4   for, "Every step taken to investigate the plaintiff's
5   dispute of the Midland account and credit data which was
6   reported to the national credit reporting agencies."
7        And Midland referred to documents Bates stamped 8
8   through 10 and 14 through 15.
9        8 through 10 we looked at earlier.  It is the
10  same as 52 through 54.  It is the collection detail.  And
11  you are welcome to look at it.
12  A.  Yes.
13  Q.  Documents 8 through 10 were printed earlier back
14  than.  Documents 52 through 54 were printed more recently.
15  A.  Yes.
16  Q.  Interrogatory 25 asks for, "The date, time
17  individuals responsible for each incident which Midland
18  obtained access to plaintiff's credit or credit report
19  associated with the plaintiff's Social Security number."
20       The response indicates that on two occasions
21  Midland made a soft hit.  Are you familiar with that term?
22  A.  Yes.
23  Q.  Those soft hits were not documented on the
24  "Credit Bureau" screens we looked at, correct?
25  A.  Correct.

114

1   Q.  Is there some other screen that would maintain
2   the soft hits that were made by Midland?
3   A.  I don't know if it is a screen.  I'm sure there
4   is someone who can find the soft hits because the dates
5   are there.  But I believe that might have been prior to
6   purchase of the account.  So the "Credit Bureau" screen
7   would basically show the hard pull of the credit report,
8   not the soft hits.
9   Q.  But there is a way for Midland to obtain a soft
10  hit and go back and research what dates those soft hits
11  were made?
12  A.  Yes.
13  Q.  Are you aware of any other litigation pending in
14  the state of Alabama that has claims arising under FDCPA
15  or FCRA?
16  A.  No, not that I can think of.
17       MS. CAULEY:  Off the record.
18       (A recess was taken.)
19  BY MS. CAULEY:
20  Q.  We've gone through all the screens that have been
21  produced.  Are you aware of any other screens other than
22  what we have looked at today that contain information
23  regarding Mr. Brim his account or his disputes?
24  A.  No.
25  Q.  To the best of your knowledge, you don't have

115

1   access to any other information that is maintained by
2   Midland separate from what is maintained by counsel?
3   A.  No.
4   Q.  Let me hand you that.  We're looking at
5   Document 206.  Are you familiar with what this document
6   is?
7   A.  Yes.
8   Q.  I'm not going to mark it as an exhibit because it
9   does have Mr. Brim's Social Security number on it.  Is
10  this a Universal Data Form?
11  A.  Yes.
12  Q.  This is a form Midland sent in to the credit
13  bureaus?
14  A.  Yes.
15  Q.  Instructing them to delete Midland's reporting of
16  an account?
17  A.  Yes.
18  Q.  What was the date of this Universal Data Form?
19  A.  9/9/10.
20  Q.  It is signed by Lauren Jones?
21  A.  Yes.
22  Q.  Do you know Lauren Jones?
23  A.  Yes.
24  Q.  Who is she?
25  A.  She's a paralegal.

116

1   Q.  Ms. Jones, has she ever worked in the consumer
2   relations department?
3   A.  No.
4   Q.  Have you ever worked with Mr. Jones with respect
5   to ACDVs or UDFs?
6   A.  Yes, I trained her on UDFs.
7   Q.  You actually trained her on how to send in the
8   Universal Data Form?
9   A.  Yes.
10  Q.  She has the authority on behalf of Midland to
11  delete the accounts from the credit bureaus?
12  A.  Yes.
13  Q.  If you look on the top right corner, it has
14  Equifax, Experian, then it has Innovis.  But there no
15  subscriber code.
16       Do you see that?
17  A.  Yes.
18  Q.  Does that mean nothing was ever reported to them?
19  A.  Correct.
20  Q.  As we sit here today, are you aware that through
21  documentation from Red Stone Federal Credit Union that
22  Dell did verify it did received Mr. Brim's payment?
23  A.  I am aware of that, yes.
24  Q.  So there is no longer any dispute that the
25  payment was made by Mr. Brim and that he did not owe this



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                    September 16, 2010

117

1  debt?
2     A.  Correct.
3     Q.  Prior to July 2010, when you told me earlier
4  today some changes may have been made with respect to the
5  Fair Credit Reporting Act from October 2007 up through
6  July 1st, 2010, were Midland's policies and procedures for
7  the handling of ACDVs the same?
8     MR. LANGLEY:  Object to the form.
9     THE WITNESS:  I believe so, yes.
10  BY MS. CAULEY:
11    Q.  As far as you are aware, there were no changes in
12  how ACDV are responded to from October 2007 to July 1st,
13  2010?
14    A.  No, not that I can recall.
15    Q.  Are there any type of reports maintained on the
16  consumer relations liaisons with respect to the number of
17  ACDVs they review or the number of disputes they review on
18  a weekly or monthly or quarterly basis?
19    A.  Yes.
20    Q.  What are those reports?
21    A.  They're a production report.
22    Q.  How are they done?  Monthly?  Quarterly?
23    A.  There is one report that is run daily.  And
24  another that is -- I guess weekly.
25    Q.  Are these production reports done by employee or

118

1  by the department?
2     A.  By employee.
3     Q.  And what do they contain?  What type of
4  information?
5     A.  How many accounts each person worked in a certain
6  timeframe.
7     Q.  Are there goals for liaisons to meet with respect
8  to how many accounts they work?
9     A.  Per day, yes.
10    Q.  How many accounts is a liaison expected to work
11  per day?
12    A.  About 70 accounts.
13    Q.  Is there any type of incentive program or
14  compensation that is provided if they work more than 70?
15    A.  No.
16    Q.  Is there any type of discipline or do they
17  receive any type of write-up if they do not meet their
18  quota?
19    A.  There could be.  But generally, I would say no
20  because depending on the volume or the circumstances,
21  there may be times when they need to be lower than that
22  number because of whatever is going on at the time.
23    Q.  If it is just one day here or there or a couple
24  of days during a particularly busy time, if an employee
25  falls below the 70, there wouldn't be disciplinary action

119

1  necessarily?
2     A.  Correct.
3     Q.  If it happened over a period of months, would
4  disciplinary action be taken?
5     A.  There may be.  If a manager spoke to that person
6  and tried to work with them and didn't necessarily see a
7  reason why that number would be low and maybe there wasn't
8  any improvement.
9     Q.  Are those reports maintained?  Do you maintain
10  those reports?
11    A.  Yes.
12    Q.  How long do you maintain those?
13    A.  I don't know that we discarded any.  I believe I
14  have them since I started managing.
15    Q.  Are there any other type of reports that you keep
16  on the number of disputes that are received or how quickly
17  they're handled, anything like that, with respect to the
18  consumer relations department?
19    A.  There's a report through E-Oscar that will show
20  how many disputes came through E-Oscar.
21    Q.  Do you print those?
22    A.  No.  We don't usually print those.  Just take the
23  information from the report.
24    Q.  Is that how the daily and weekly production
25  reports are compiled?

120

1     A.  It is a part of the daily production report.
2     Q.  Is there any type of log that documents written
3  disputes from consumers versus ACDV disputes?
4     A.  I'm not sure what you mean by "log."
5     Q.  E-Oscar creates a record of how many disputes are
6  received by Midland daily?
7     A.  Yes.
8     Q.  Is there any type of report or document that
9  keeps count or a record of written disputes received
10  directly by Midland for the consumer?
11    A.  No, not specifically written disputes.  There is
12  a report that will state how much correspondence has come
13  into the department.  But those are not all necessarily
14  disputes.
15    Q.  So is there some type of report that maintains
16  the volume of correspondence that is received by the
17  consumer relations department?
18    A.  Yes.
19    Q.  What is that report called?
20    A.  We call it the "daily mail count."
21    Q.  And there is no distinction made on that report
22  whether there was a dispute or what the letter was versus
23  cease and desist, something like that?
24    A.  No.  It is the count of the mail as it comes in.
25    Q.  Do the liaisons -- they work 8:00 to 5:00?  9:00



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                    September 16, 2010

121

1  to 5:00?
2      A.  Most of them work somewhere between -- some start
3  earlier, 6:00 to 2:30, 7:00 to 3:30, 8:00 to 4:30.
4      Q.  Do they take a half hour lunch?  An hour lunch?
5      A.  Most of the time they take a half hour lunch.
6      Q.  Do they get any other breaks during the day?
7      A.  Yes.  Standard, two 15-minute breaks.
8      Q.  Are there any other standards?
9      A.  You mean others besides production?
10     Q.  Yes, besides the production?
11     A.  Well, I mean, we want them to do things
12  accurately and follow the policies and procedures so there
13  isn't anything specific.  But if somebody noticed
14  something, they would address that with that person.
15  There may be opportunity to revisit it with the whole team
16  if there's questions about policies and procedures.
17     Q.  How do you find out or how does the supervisor
18  find out if the liaison is not following the policies and
19  procedures?
20     A.  That may happen during account review.  The
21  accounts are not assigned to any one specific person.
22  Different people may come across the same account or I may
23  end up talking to a consumer, something like that.  So it
24  could be various ways.
25     Q.  If they ran across something they felt was

122

1  incorrect or inaccurate, they might bring that to a
2  supervisor's attention or to your attention?
3      A.  Yes.
4      Q.  Do you document those issues like in an employee
5  file?
6      A.  Some of them.  Not all of them.  Sometimes just
7  talking to someone and clarifying, finding out what is
8  going on.  It may be very simple.  Other times, it may
9  need to be documented.
10     Q.  With respect to Mr. Brim's account, you are not
11  aware of anything that was done inaccurately by the
12  employees in consumer relations; is that correct?
13     A.  Correct.
14     Q.  None of the employees in consumer relations
15  actually ever responded to an ACDV with respect to
16  Mr. Brim?
17     A.  Correct.
18     Q.  Do you maintain employee files for your consumer
19  relations employees independently of their HR file?
20     A.  Yes.
21     Q.  Everything we've looked at with respect
22  to Mr. Brim's account was handled according to Midland's
23  policies and procedures at the time, correct?
24     A.  Correct.
25     Q.  Do you know if Midland had received other

123

1  disputes regarding paid prior to Midland purchasing it
2  with respect to the Dell portfolio?
3      A.  I don't know.
4      Q.  Does Midland keep any type of report on how many
5  disputes are received with respect to a particular
6  portfolio?
7      A.  No, we don't.  In my department, we don't.  A
8  another department may.
9      Q.  If ACDVs were received from other consumers
10  alleging the same thing that Mr. Brim was alleging, they
11  would have been handled the same way that Mr. Brim's ACDV
12  was handled; is that correct?
13     A.  It would depend.
14     Q.  If everything were the same as Mr. Brim's case,
15  then the response to the ACDV would be the same?
16     A.  That's probably likely.
17     Q.  Have you had any conversations other than with
18  counsel regarding Mr. Brim's case or his account with
19  anyone at Midland?
20     A.  No.
21     Q.  You haven't talked about any aspect of Mr. Brim's
22  account with any other employee of Midland?
23     A.  I don't believe so, no.  Actually, I may -- I
24  don't know which paralegal was assisting with this.  I may
25  have spoken to the paralegal.  But I just don't remember.

124

1      Q.  No other employees that you recall specifically
2  talking with them about the Brim account or the response
3  to the ACDV?
4      A.  Oh, no.
5          MS. CAULEY:  Those are all the questions I have.
6          MR. LANGLEY:  I might have one.  Let me check.
7
8              EXAMINATION
9  BY MR. LANGLEY:
10     Q.  Will you look at Document 169.  It's within the
11  consumer relations operations manual.  Look at Box No. 5,
12  which is on Page 169.
13     A.  Okay.
14     Q.  In the Action column, it says, "If unable to
15  determine if proof is valid, account will be reported to
16  ACQ," which is acquisitions; is that right?
17     A.  Yes.
18     Q.  If consumer relations determines proof is
19  invalid, is the account referred to acquisitions?
20     A.  No.
21         MR. LANGLEY:  That's all.
22         MS. CAULEY:  We're done.
23         (The proceedings concluded at 3:13 p.m.)
24              * * *
25



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                      September 16, 2010

125

1                REPORTER'S CERTIFICATION

2

3        I, Denise T. Johnson, a Certified Shorthand Reporter

4    in and for the State of California, do hereby certify:

5

6        That the foregoing witness was by me duly sworn; that

7    the deposition was then taken before me at the time and

8    place herein set forth; that the testimony and proceedings

9    were reported stenographically by me and later transcribed

10   into typewriting under my direction; that the foregoing is

11   a true record of the testimony and proceedings taken at

12   that time.

13

14       IN WITNESS WHEREOF, I have subscribed my name this

15   23rd day of September, 2010.

16

17

18

19       _____

20       Denise T. Johnson, CSR No. 11902

21

22

23

24

25

---

126

1                DEPOSITION ERRATA SHEET

2

3

4    Our Assignment No. 345156

5    Case Caption:  JAMON T. BRIM

6    vs. DELL FINANCIAL SERVICES, LLC

7

8        DECLARATION UNDER PENALTY OF PERJURY

9

10       I declare under penalty of perjury that I have

11   read the entire transcript of my Deposition taken in the

12   above captioned matter or the same has been read to me,

13   and the same is true and accurate, save and except for

14   changes and/or corrections, if any, as indicated by me on

15   the DEPOSITION ERRATA SHEET hereof, with the understanding

16   that I offer these changes as if still under oath.

17

18

19

20       Signed on the _____ day of _____, 20____.

21

22

23       _____

24           ANGELIQUE DANIELLE ROSS

25

---

127

1                DEPOSITION ERRATA SHEET

2    Page No._____Line No._____Change to:_____

3    _____

4    Reason for change: _____

5    Page No._____Line No._____Change to:_____

6    _____

7    Reason for change: _____

8    Page No._____Line No._____Change to:_____

9    _____

10   Reason for change: _____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change: _____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change: _____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change: _____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change: _____

23

24   SIGNATURE:_____DATE_____

25       ANGELIQUE DANIELLE ROSS

---

128

1                DEPOSITION ERRATA SHEET

2    Page No._____Line No._____Change to:_____

3    _____

4    Reason for change: _____

5    Page No._____Line No._____Change to:_____

6    _____

7    Reason for change: _____

8    Page No._____Line No._____Change to:_____

9    _____

10   Reason for change: _____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change: _____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change: _____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change: _____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change: _____

23

24   SIGNATURE:_____DATE_____

25       ANGELIQUE DANIELLE ROSS



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

---
**A**
---

**A8**
91:18,19

**able**
47:16 106:14

**acceptable**
39:8,16

**accepted**
39:14

**access**
21:2,9 36:11
56:12,17
57:4,6 58:16
83:6 95:13
113:18 115:1

**account**
14:20 17:25
21:4,11,23
23:3,9,14,15,
16,17,22
24:4,9,11,14,
15,17,18,22
25:9 26:9,22,
23,25 27:14,
20 28:25 29:2
34:22 35:22,
24 36:4,19
37:4,5,9,15
38:10,17,19,
20,21 39:14
40:2,8,25
41:3,5,6,8,9,
13,16,17,20,
23 42:2,7,10,
11,24 43:15,
18,20,24
44:3,6,18,20,
24 45:3,8,11,
20,22,25 46:4
53:2,11
55:14,16,19
56:16 57:12
60:7 61:12

64:6,11
66:19,20
68:9,23 69:6
70:18 71:19,
22,24 72:14
73:13,18
74:22 75:6,9,
25 76:3,6,22
77:5,8,18,21,
23 78:4 79:9
82:23 83:6,
12,14 84:1
85:12 86:8,10
91:9,15,20
92:7,9,11,14,
17,20,21,24
93:1 94:19,
21,25 95:8,17
96:17 98:15,
21 101:9
102:7,16,20,
25 103:1,3,4,
12,15 104:2,
7,11 105:17
106:12
109:16,17,18,
24 110:11,20
111:1 112:1,
12,15 113:5
114:6,23
115:16
121:20,22
122:10,22
123:18,22
124:2,15,19

**accounts**
8:3 17:16
21:1,8,10
25:3 38:25
46:18 54:13,
18 55:6 64:9
85:22 95:6,9
96:4 102:5,15
116:11 118:5,
8,10,12

121:21

**accuracy**
55:9,12

**accurate**
23:1 55:5,20
79:3 108:4
126:13

**accurately**
121:12

**ACDV**
14:24 20:24
21:21,22
22:21,23,24
23:3,9,11,18,
20 53:19
54:22 55:2
57:18,24
59:13,20
60:4,7,9,18
78:13,18,22
79:2,19 80:2,
10,13,20,22
81:3,6,12,15,
20,23,25
82:3,5,10
90:5,8 117:12
120:3 122:15
123:11,15
124:3

**ACDVs**
15:1,5 16:25
18:18 19:25
20:3,21 21:5,
12,24 22:18
23:4 29:4
57:21 60:1
82:13,19
110:12,15
116:5 117:7,
17 123:9

**ACQ**
40:8,9 41:6
124:16

**acquisitions**

40:10,11,17,
18,25 42:1,18
43:2,15,17,
19 124:16,19

**Act**
12:20,23
53:19 55:23
56:6,9,22
57:2,9 65:20
117:5

**action**
66:17 69:2
118:25 119:4
124:14

**actual**
23:8 31:20,21
34:8 43:18
58:4 67:12
77:25 78:21
90:5

**ACV**
92:1

**adapt**
22:4

**add**
36:4 37:5
44:18 96:13,
14

**added**
41:11,20,21,
22 75:9 77:17
83:24 101:2
106:2,6

**adding**
73:18

**addition**
11:7 15:11

**additional**
25:23 26:13
27:6 29:10
65:12,15
73:5,8,10,
12,24 77:14

93:24 94:1
97:8

**address**
8:19,20,25
9:2 35:23
38:11 76:10
87:13 97:5,8,
17,19,21,22,
23 100:11,20
110:24 121:14

**addresses**
58:21 97:18

**Aero**
9:5

**affairs**
10:14 28:14

**affidavit**
49:11 51:5
87:17,19,22

**agencies**
55:6 57:13
68:4 98:25
99:2 110:11,
18 113:6

**ago**
50:3

**agree**
8:11 55:4,8

**ahead**
28:11

**ALABAMA**
1:2 2:9 6:12
100:20 114:14

**alleging**
123:10

**allotted**
62:18

**allow**
109:12

**along**
34:15

**already**



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                      September 16, 2010

130

| | | | | |
|---|---|---|---|---|
| 8:18 35:24 68:9 84:24 110:1 | 39:19 48:11 74:17 88:12 91:23 93:25 94:18 96:14 117:24 123:8 | 75:13 105:22 | 78:16 | **y** 22:25 44:15 45:8 57:24 96:24 |

**Also**
2:10 5:19
7:11 10:10
16:15,16
18:18 19:9,25
23:4 26:16
28:4 34:11
36:1,22 38:14
40:15 43:20
44:11 50:15
55:12 57:4
59:6 65:8
66:21 68:2
70:4 73:23
81:25 85:21
96:3,21 101:1
105:15

**always**
13:10 38:12
46:24

**America**
12:13

**amount**
31:10 62:18
72:22 78:3
91:5 95:23
99:11 111:3

**Amy**
40:18

**and/or**
126:14

**ANGELIQUE**
1:16 3:3 4:1
5:2,5,10 6:15
126:23 127:25
128:25

**annotated**
26:23

**another**
19:5 26:14

**ANSWER**
3:12 6:3
16:16 17:5
18:9 54:6
56:2 108:7

**Answers**
4:10 107:17
108:1

**Anuk**
40:19

**A-n-u-k**
40:21

**anywhere**
109:9

**Appearances**
2:1

**appears**
98:13

**application**
92:22

**applied**
98:14

**apply**
72:2

**appropriate**
60:7

**appropriately**
53:5

**Approximately**
9:18 12:25
14:3 61:3

**April**
100:8

**archived**
75:15 76:24

**archives**

**arising**
114:14

**asked**
50:22 112:17

**asking**
97:14

**asks**
109:22 112:22
113:3,16

**aspect**
123:21

**assertion**
111:2

**Assign**
42:7 44:8

**assigned**
40:25 41:3
42:1,14 43:20
44:4,21,25
45:3 46:12
88:22 102:5,
7,11 103:8,
10,15,18
106:18 107:2,
3 121:21

**Assignment**
126:4

**assignments**
15:10

**assist**
51:10

**assisting**
123:24

**associated**
113:19

**assume**
104:22

**assurance**
12:3

**asterisks**

**attached**
4:15 63:24
64:20

**attempt**
17:17 86:25

**attempts**
53:7

**attention**
122:2

**attorney**
35:24 37:17,
21 48:11 53:5
54:11 55:17
66:25 102:16

**attorney-client**
54:4

**attorneys**
47:22

**attorney's**
76:10 77:9

**August**
64:17 78:12,
22 80:13
87:25 100:20
101:1,4

**authority**
116:10

**authorization**
69:19 70:13

**autodialer**
86:25 87:3
88:7,19,20,
23,25 89:3
91:21

**automated**
21:14,16,22
86:20,23

**automaticall**

**B**

**back**
29:14 38:15
39:17 41:4
42:25 43:3
54:24 63:18
64:1 68:7
70:2 73:3
74:24 77:11
91:1,21 98:3
100:20 113:13
114:10

**balance**
17:18 63:19
68:4 72:14,
18,20 74:22
76:17 91:10
99:13,15,18,
23 100:1,4,7,
17,21,23
101:5 104:1

**balanced**
100:19

**BALCH**
2:8



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

bank
30:7 39:24
40:1 44:9,14,
20 64:20 65:5
67:2,24 78:1
79:22,24

bankruptcy
101:22,25

Barrett
69:13 71:14
72:5,8 107:10
108:14,25
112:6,12,17

based
30:14,17
63:15 65:14
72:22 79:6
103:12

basic
22:8

Basically
14:12 15:15
20:16 29:6
30:15 31:9
52:19 56:24
59:20 70:3
71:25 79:2
85:11 114:7

basis
108:19 117:18

batch
21:17,18,25
22:1,10,18,22
23:4,12
57:22,25
78:18 80:16
81:2 82:1,10,
16 90:11

Bates
32:20 113:7

BC7
71:13 107:9,
10

BE3
107:7

began
99:8

beginning
86:3 97:8

begins
108:7

behalf
7:9,11 49:10
50:15 51:18
116:10

being
12:22 23:22
25:9 41:23
46:21 47:16
62:6 72:14
84:16 103:1,4

believe
13:2 33:20
44:24 49:17
50:5,11,14
53:22 56:5
62:16,21
66:20 69:22,
24 70:7,16
71:12 74:15,
21,23 89:2,
14,23 92:2
94:3 108:2,6,
20 109:2,18
112:4 114:5
117:9 119:13
123:23

belonged
93:2 106:15,
22

belongs
88:17 106:24

Besides
12:18 121:9,
10

best

22:17 114:25

better
59:4

between
13:15 15:23
19:4 20:16
54:16 121:2

BINGHAM
2:8

Birmingham
2:9

bit
5:14 58:9
86:14 87:24

biweekly
48:15

blank
62:15 103:25

blocked
70:25 71:2

Bloom
65:23 66:10,
17 68:13,16,
19 69:3
107:11 112:7,
14,18

Bonnie
19:19,22

both
35:25 97:16
99:16 105:9
112:18

bottom
65:25

Box
2:9 124:11

branch
111:8,23

break
5:15,16,17
49:6

breaks
121:6,7

Brian
2:10 54:3
92:4 103:8,18
107:5

Brian's
92:3

BRIM
1:4 4:1 5:12
8:1 27:21
61:13 62:4,7
63:16 64:14,
23 65:12,18
67:15 68:2,17
69:7 70:10
71:20 72:6,9,
15 77:12 78:1
79:13 81:14
82:14 84:2,22
87:25 89:9,13
90:22,24 92:9
98:14 101:20,
25 108:9
109:4,20,24
112:8 114:23
116:25 122:16
123:10 124:2
126:5

Brim's
21:11 72:12
73:1 76:5
83:11 94:21
95:8 108:25
110:3,11,20,
22 111:11,18
112:1,3,12,
15 115:9
116:22
122:10,22
123:11,14,
18,21

bring
48:19 93:11

122:1

Broadway
1:20

Brown
47:20

BU8
66:7,8,9
68:16 107:9,
10

bureau
8:8 53:11
60:10 79:14,
16 98:11,19
99:20 101:12
113:24 114:6

bureaus
14:16 41:17
42:12,13
55:10 57:19
98:22 99:21
115:13 116:11

business
9:1

busy
118:24

_____
          C
_____

calculated
61:11

California
1:21 9:6
50:10,11
125:4

call
12:5,8 16:3
18:3 22:1
69:12 70:21
71:17 72:13
77:13 108:8,
13,25 112:8
120:20

called
69:7,19 70:1



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

71:2 92:11
120:19
**calling**
72:3
**calls**
17:6 18:10
20:10,17
34:22 65:15,
18 75:11
85:21 88:4,
19,22,24
108:16 110:17
**came**
18:6 22:7
30:15 48:10
60:15 119:20
**canceled**
30:6
**cancelled**
38:15 39:17
**Caption**
126:5
**captioned**
126:12
**Card**
104:22,23
**care**
5:21 21:10
**Carolina**
2:5
**case**
5:12 21:11
36:2 41:3
49:18,19
50:6,10
102:25 103:13
123:14,18
126:5
**cases**
50:22 53:18
**caught**
5:25

**CAULEY**
2:3,4 3:7
5:8,11 6:7,
12,14 7:3,4
9:3,7 15:13
25:6 32:9,11,
16,22,25
33:4,5 39:12
42:5 45:2
49:9 51:4
52:3 54:8
56:4 61:15,
20,22,25 62:1
75:1,4 85:4,7
93:11,16,18
97:16,20
100:14,16
104:16,18
106:9 107:21
110:9 114:17,
19 117:10
124:5,22
**cause**
23:11
**CCI**
70:24 71:2
**CDR**
91:23
**cease**
26:15,17
27:4,5,14
28:2 29:8
37:18,21
53:4,10
65:11,14
66:21,22
68:10 69:20
70:4,11,14
71:20,24 72:6
81:17 91:25
120:23
**center**
12:5,8
**certain**

88:21 106:16
118:5
**CERTIFICATION**
125:1
**certified**
66:1 125:3
**certify**
125:4
**chance**
6:15 107:22
**change**
28:7 100:12
113:1 127:4,
7,10,13,16,
19,22 128:4,
7,10,13,16,
19,22
**changed**
15:17 72:22
103:14 106:2,
6
**changes**
16:8 28:20,22
29:3 33:21
47:3 48:24
91:15 117:4,
11 126:14,16
**changing**
28:16
**charge**
28:9 40:17
59:25
**charge-off**
74:5
**chart**
32:14 35:19
**cheat-sheet**
59:4
**check**
35:23 38:15
39:17 106:14
124:6

**checks**
30:7
**choices**
59:15
**chose**
73:20
**Christina**
11:11,23
**circumstances**
118:20
**Civil**
1:7
**CL**
86:5 94:25
**claimed**
111:4
**claiming**
23:3,11 25:8
37:15 45:19
**claims**
53:18 102:13
114:14
**clarify**
35:4 105:13
**clarifying**
122:7
**class**
47:8,13,19,
24 48:10
**classes**
47:2,5,6
48:1,4,8,13
**clear**
6:4 32:20
72:19
**click**
94:11,12
**close**
86:4

**closed**
89:25
**Cloud**
19:1,7,13,
22,25 20:5,8,
10,13,17,20,
25 21:6,8,13,
14 30:13,17
31:4,8,14
40:15 47:13
48:17 66:11
**Cloud's**
19:14
**CND**
66:22
**code**
23:18 24:18,
21 25:24
26:2,25 27:2,
15 36:4,5
37:5 41:7,11,
13,20 66:5
67:12 83:19,
20,24 84:16
96:14,16,23
101:1 105:5,8
116:15
**coded**
45:23
**codes**
22:23 23:14,
16,19 36:8
42:2 45:23
59:21 68:10
78:25 79:7
86:16 106:5
**collect**
17:17 53:7
89:10 90:2
91:3
**collectible**
43:1
**collecting**



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

8:7 61:12

**Collection**
4:8 17:12,23,
24 55:17,18,
22 65:20
66:25 67:11
68:7 69:6
72:24 74:17
75:6,8,11
76:23 84:18
85:13,16,18
96:16 102:16
105:18 113:10

**collections**
58:13,17
70:21 71:11
85:22 105:18
108:17

**collectively**
67:10

**collector**
84:16 104:6,
11

**column**
36:10 83:20
124:14

**columns**
66:5

**come**
14:22 15:1
16:5 18:10
20:1,21 30:19
47:4,13,14
53:10 74:10
76:17 79:15
86:14 87:16
98:16 108:16
120:12 121:22

**comes**
14:18 18:12
21:21 22:22
23:3 31:3,7,
10 75:22 79:2

120:24

**Coming**
87:24

**Comment**
37:20 42:17
43:4

**commentary**
35:23

**comments**
35:23 42:6
43:9 75:8
76:2 77:11

**communicate**
55:24

**communicated**
110:2,5

**communication**
65:8 72:1

**communications**
109:22 110:10

**company**
22:11 69:25
70:6,7

**compare**
21:23 22:23

**compared**
79:7

**compensation**
118:14

**compile**
60:14 107:25

**compiled**
119:25

**compiling**
50:19

**complaint**
91:2

**completed**
60:9 87:19,21

**compliance**
10:14 28:8,9,
14 47:22
48:24 49:23
50:18 52:18,
22 83:19

**computer**
21:12 22:23
24:25 33:24
36:14,16 37:2
47:17 52:14
58:13 62:5
109:15

**computerized**
25:3

**concerned**
101:19

**concluded**
124:23

**condition**
83:20

**conditions**
37:19

**conduct**
59:19 60:4

**conducting**
57:15

**confer**
48:11

**conferenced**
47:14

**confidential**
61:25

**consider**
77:20 78:3,6

**considered**
39:22 44:12

**consists**
75:6

**constitute**
32:18 39:3

**constitutes**
33:6

**consume**
63:11

**consumer**
9:9,15,19,21
11:13 13:3
14:1,2,6,7,
8,10,13,15,
18,22 15:2,7,
9,11,16,18,
21 16:11,13,
15,23 17:5,6,
7,9 18:2,3,6,
22 19:4,6
24:3,16 25:7,
12,17,20,22
26:8,12,14,
24 27:1,17,18
28:2 29:1,6,
12,14 30:9
31:1,14,17,
19,22 32:3,8,
18 33:10,18,
22 34:7 35:1,
16,24 36:2
37:11,17,24
38:2,23 41:22
43:4,10,12,
24 44:2
45:21,24
46:3,9 47:3
51:1,17
52:20,24,25
53:6,7,13
56:18,21 57:1
58:2,12,16
59:2,9,18
60:24 61:8
69:11,20
70:4,14,19
71:15,25
72:2,3 81:8,
12 82:18
83:24 84:15

96:8,13,18,
24 98:12
102:23 103:24
104:3,5,20,
23 105:8,14
107:1 111:14
112:7 116:1
117:16 119:18
120:10,17
121:23
122:12,14,18
124:11,18

**consumers**
17:21 18:10,
13,16 20:18
38:12 44:19
71:23 87:1
103:2 120:3
123:9

**consumer's**
27:4

**consumers'**
35:4

**contact**
26:15,17
27:1,4,14
28:6 29:11

**contacted**
72:25 78:9
79:20,23
81:18 110:21

**contain**
29:7,16 33:17
44:20 57:8
75:8 85:21
95:18 114:22
118:3

**contained**
22:24 33:9,
12,24 57:25
78:17 89:21
92:19 95:9
96:16 97:18
101:14 104:24



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

108:1

**containing**
44:14

**contains**
26:16 73:12
75:24

**content**
111:2

**continue**
37:8

**continued**
72:13,16,20

**continuing**
38:3 67:14
70:24

**contract**
54:16

**control**
26:5

**conversation**
109:3 111:25

**conversations**
104:5 112:11,
14 123:17

**copies**
30:6,24,25
34:4,5 52:9

**copy**
34:6,8 52:6,
13 56:10,11,
12,13,15 57:2
67:2,24 80:2
90:5 91:1

**corner**
32:15 34:2
116:13

**corporate**
11:6

**correct**
18:5,8 20:19,
22 25:11
26:14 27:8

33:7 37:23
38:8,9 39:5
41:14,15,18
42:3,16 43:8,
21 44:4
52:15,16
53:7,8 54:14,
15 55:6,7,11,
25 57:3,4
60:11 63:9,10
64:15,16,19,
22 65:13,16
68:3,5,6
70:23 72:4,7,
11 73:2,14
76:11 77:15,
16 78:4,5,7,
8,11,14,15
79:18 80:12
81:19 82:2,20
83:1,18 90:6,
7,14,15 91:11
93:5 96:5
99:6 101:10,
21 102:1,3
105:19,21
110:3,4,7,18,
19,23 111:20
112:9,18,19
113:24,25
116:19 117:2
119:2 122:12,
13,17,23,24
123:12

**corrections**
126:14

**correspondenc
e**
17:5,7,8,21
18:2,16
20:13,14
30:24 38:13
46:16 120:12,
16

**cost**
95:14,24,25

**Counsel**
2:1 6:18
10:5,10 11:6
115:2 123:18

**count**
120:9,20,24

**couple**
36:21 118:23

**COURT**
1:1 49:11,13,
16,24 51:1

**CPLQ**
42:7,8,14

**CPO**
45:24

**created**
22:9 28:23,24
33:19,20

**creates**
120:5

**CREDIT**
1:9,15 7:9,20
8:8,13 12:20,
23 14:16
27:19 41:16
42:12,13
53:11,19
54:14,17,18,
21,25 55:5,10
56:6,9,22
57:2,9,13,19
58:3 60:10
64:21 68:3
70:7,8 77:23
79:14,16,22
98:11,12,14,
22,25 99:2,
16,21 101:12,
16,17,20
104:22,23
109:24 113:5,

6,18,24
114:6,7
115:12
116:11,21
117:5

**credited**
77:18

**creditor**
12:6 40:2
97:12

**creditor's**
38:20,21

**credits**
84:12

**criteria**
102:17

**CSR**
1:23 4:2
125:20

**current**
63:19 107:15

**currently**
13:7,13 18:20
24:5 103:17

**customer**
34:21 71:2
73:5,7,8,9,
10,23 93:24,
25

————— **D** —————

**daily**
117:23 119:24
120:1,6,20

**DANIELLE**
1:16 3:3 4:1
5:2,5,10
126:23 127:25
128:25

**Data**
69:19,24
70:1,6 73:5,
7,8,10,24

79:3 93:24
94:1 98:19
113:5 115:10,
18 116:8

**date**
30:15 34:2
35:9,13 69:9
70:24 73:24
74:5,6,8,10,
22 86:4,9
90:19 94:4,8,
23 99:20
103:17 105:20
113:16 115:18

**dated**
63:5 64:15
67:15 77:1

**dates**
87:11 114:4,
10

**day**
71:17 81:20
118:9,11,23
121:6 125:15
126:20

**days**
24:4,16 25:8,
13 26:10
27:13 34:22
35:2,6,9,13
43:23 45:7
57:16 80:9,10
118:24

**day-to-day**
16:22

**deal**
30:22 56:9

**deals**
34:18 35:12

**debt**
7:25 14:20
17:17,18,19,
23 23:11 53:7



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

55:22 63:21
64:24 65:1,20
67:18,20,21,
23 89:10
117:1

**deceased**
96:13

**December**
63:3 86:4

**decision**
102:15

**DECLARATION**
126:8

**declare**
126:10

**deemed**
41:25 42:15
44:15

**Defendants**
1:11 2:7

**Defendant's**
4:10 107:17

**delete**
41:11 115:15
116:11

**deleted**
41:9,17,24
42:10,11
45:25

**deletion**
43:5 45:24

**delinquency**
74:5,6

**DELL**
1:9 4:1 67:3,
21 72:25 76:6
78:2,9 79:19
81:18 93:4
95:3,15 96:4
110:2 116:22
123:2 126:6

**Denise**

1:23 4:2
125:3,20

**department**
12:9 14:13,
14,20 15:2,4
18:7,23 19:5
28:8,9 30:10,
21 40:17,18,
25 44:2 48:24
50:18 53:6
58:13,17
59:10 60:24
61:8 63:12
64:18 70:22
71:8,11 85:22
88:16,17,21
89:4 105:18
108:17 111:15
116:2 118:1
119:18
120:13,17
123:7,8

**depend**
23:6,7,8
25:15 29:18
123:13

**depending**
29:24 118:20

**DEPOSITION**
1:13 4:7 5:2,
24 6:16,20
7:5 8:11,23
49:11,15
50:1,8,12
51:11,21
53:14,24 54:7
125:7 126:1,
11,15 127:1
128:1

**depositions**
50:25 53:17,
21

**derogatory**
68:4

**description**
50:17

**designated**
42:9 89:4

**designations**
32:14

**designed**
22:2,4,5,7

**desist**
27:5,14 28:2
29:8 37:18,21
53:4,10
65:11,14
66:21,23
69:20 70:5,
11,14 71:20,
24 72:6 81:17
91:25 120:23

**desists**
68:10

**Detail**
4:8 68:7 69:6
72:24 74:17
75:6 76:23
85:13,17,18
96:16 113:10

**detailed**
65:5

**determination**
30:14 44:13,
18

**determine**
38:24 40:7
41:19 43:10,
13 44:3,5,10
75:14,16 78:9
106:12 124:15

**determined**
20:23 41:12
43:6

**determines**
30:12 124:18

**developed**
22:11

**dialer**
86:22,24

**didn't**
47:14 77:22
78:6,23 119:6

**Diego**
1:21 9:5
18:21 19:13
20:11,18
21:3,5 30:13,
19 31:3,13
40:13,14,15,
16 47:11
48:16,17
66:11,12
69:16 74:14
111:8,23
112:18,20

**difference**
14:12 20:16

**different**
15:20 27:24
33:14 39:21
41:7 46:4
48:21 85:14
89:2 91:5
94:4,9 96:21,
23 102:10
106:7 109:15
121:22

**differently**
80:19

**direction**
125:10

**directly**
13:7 14:15
16:14 17:9
19:15 120:10

**director**
8:15 28:14

**DIS**

23:17 24:21

**discarded**
119:13

**disciplinary**
118:25 119:4

**discipline**
118:16

**discovery**
50:20

**discuss**
48:25 49:2

**discussion**
15:12 61:21

**dismissed**
89:16,18

**DISP**
66:22

**dispute**
14:18,19,21,
22 18:4 23:17
24:6,9,14,18
25:7,12,21,
23 26:16
27:5,9,10,13
29:8,11,15,
17,23,24,25
30:9 31:24
32:5,15 33:16
34:16,21,25
35:1,12,16
36:3,5,8,9
37:6 39:4
43:23 44:1,14
45:4,7,19
58:3 66:22
69:7 72:3,10
73:1 77:15
79:6,9,10,
12,14 80:17,
25 81:9,17,23
82:8 84:4
101:1 110:3,
22 111:11,13



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

112:5,12,15
113:5 116:24
120:22

**disputed**
24:3 26:23
27:15 43:24
53:2 64:24
65:1 66:20
72:17 83:25
84:2

**disputes**
8:7 14:15
16:1 33:15,17
34:19 35:20
36:6 37:15
38:3,7 46:6,
7,11 48:5
53:12 56:25
57:12,18
60:14,15,17
82:14 112:3
114:23 117:17
119:16,20
120:3,5,9,11,
14 123:1,5

**disputing**
26:8 34:22
44:20 67:18

**distinction**
120:21

**DISTRICT**
1:1,2

**divide**
31:10

**DIVISION**
1:3 105:12,
15,16 106:16

**doctrine**
54:5

**document**
34:5 39:6,19
43:18 44:12
51:12,23 54:3

63:18 67:14
69:3 73:3,23
82:21 84:6
85:2 88:3
91:12 93:22,
23 95:18
98:18 101:11
102:4,18
105:1 106:25
109:11 115:5
120:8 122:4
124:10

**documentation**
26:9 27:6
28:3 29:7,16,
18,20 30:8
32:4 34:15
37:12 41:23
72:9 77:14
95:24 105:23
111:18 116:21

**documented**
63:9,12 76:23
109:4,9
113:23 122:9

**Documents**
4:9 32:20
38:23 39:13
46:2 50:19,22
51:20 52:13,
20 53:23,25
54:9 58:25
61:22 62:5
78:21,24
81:11 84:24
85:3 89:6
92:16,19,23
93:4 95:14,15
113:7,13,14
120:2

**doesn't**
25:2 32:22
39:22 53:6
57:8 59:18

67:12 72:2
95:24 111:14

**doing**
5:23 56:25

**d o u b l e -
c h e c k e d**
46:19

**down**
5:25 74:10
76:5,17 77:2
86:14 87:16,
24

**DPB**
74:11

**Draft**
104:13,20

**Drive**
9:5

**drop-down**
59:21

**due**
72:14,18,20
76:17 91:10
99:11,24

**duly**
5:6 125:6

**duplicate**
98:4

**during**
15:17 27:21
77:13 98:15
102:25 118:24
121:6,20

**duties**
7:6 15:7,14,
17 16:8,11
17:2 48:7
50:16 52:17,
18

─────────
**E**
─────────

**E**

2:4

**each**
82:14 98:21
100:6 101:6
113:17 118:5

**earlier**
47:23 56:5
94:1 95:17
113:9,13
117:3 121:3

**earliest**
91:8

**easier**
59:1

**easy**
5:24

**efforts**
17:13 89:24
90:1,2,3

**eight**
10:17 46:22

**either**
14:15 18:3
21:14 31:17
49:11 52:13
77:12 108:25
112:8

**electronic**
34:5

**electronical
ly**
30:23 56:14
57:22 78:18
80:17 82:15

**eligible**
77:5

**E-mail**
2:5 49:2

**e-mails**
49:3 83:7

**employed**
8:8 11:10,17,

19 12:22
66:15

**employee**
7:16,20 14:5
31:14 34:14
35:17 59:19
65:22 69:11
70:10,15
71:19 78:17
81:9,11 82:18
109:1 117:25
118:2,24
122:4,18
123:22

**employees**
7:23 8:6
13:4,10,16,
17 14:3 15:24
32:3 34:7
35:19 38:2
47:3 48:4,16
52:23 56:16,
18,21 57:1
58:10 59:9,12
112:20
122:12,14,19
124:1

**employer**
12:19

**encloses**
67:24

**end**
47:17 121:23

**enter**
62:19 97:2,22

**entered**
27:16 41:7,13
42:2 86:9
96:18,21,23

**entire**
33:6 40:18
46:22,24
126:11

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com



ESQUIRE
an Alexander Gallo Company

**entity**
55:13,18
109:23

**entry**
77:1 78:12
80:13 87:5,
11,24

**E-Oscar**
21:21 22:9,12
58:5 59:6,10,
12,14,17
60:16 79:10
119:19,20
120:5

**Equifax**
81:21 99:3
116:14

**ERIK**
2:8

**ERRATA**
126:1,15
127:1 128:1

**escalated**
15:11,22,25
16:3,15

**essentially**
46:13

**Evans**
2:4

**exact**
10:15 83:23

**exactly**
25:15 74:21
109:17

**EXAMINATION**
3:1,6 5:7
124:8

**example**
44:6

**examples**
39:3

**excess**

91:10

**exclusively**
22:18

**exhausted**
89:24 90:3

**Exhibit**
4:7,8,9,10
6:24,25 75:2,
3,5 78:13
85:5,6,8
96:17 106:18,
23 107:19,20
108:11 115:8

**EXHIBITS**
4:4,6,15

**exist**
108:24 109:19

**existed**
45:13

**exists**
45:16

**expected**
118:10

**Experian**
80:14 99:3
116:14

**experience**
7:6

**expiration**
74:8 76:19

**explain**
58:12 59:18

**Extension**
71:3,4

**extent**
54:2

---
**F**
---

**F**
24:13

**FAC**
69:19,24

**fact**
7:22 78:1,16
91:8

**Factual**
69:24 70:1,6

**Fair**
12:20,23
53:19 55:22
56:6,9,22
57:2,9 59:23
65:20 117:5

**falls**
118:25

**false**
55:25

**familiar**
14:24 51:14
52:10 56:6
83:19 85:8,24
96:9 105:2,3
113:21 115:5

**far**
34:5 58:4
101:19 117:11

**Faura**
13:23

**F-a-u-r-a**
13:24

**fax**
69:20 70:4,
11,14 71:20
72:6

**FCRA**
7:6 50:5
114:15

**FDCPA**
7:2 49:21,23
52:18,22
53:9,15 61:18
114:14

**February**
74:11,17 82:5

**firms**

90:6 100:8
101:6

**Federal**
64:21 79:22
116:21

**fee**
54:21

**fees**
76:14 95:12

**felt**
121:25

**fifth**
82:10

**file**
122:5,19

**filed**
5:12 89:12
90:17,20,22,
23 101:25

**files**
25:2 122:18

**fill**
62:16

**FINANCIAL**
1:9 4:1 67:3
76:6 78:2
95:3 126:6

**find**
58:8,11,20
59:2 61:19
103:5 114:4
121:17,18

**finding**
122:7

**fine**
6:7 9:3 93:16

**firm**
66:24,25
67:10,11,12
84:14,18
87:17 89:11

**firms**

102:6,12

**first**
5:6 9:21
16:13 18:7
26:6,10 34:18
35:6 47:1
78:3 80:20
111:6

**five**
19:3 51:3
60:22

**flagged**
21:4

**Floor**
1:21

**Florence**
2:5

**Flores**
103:18

**follow**
41:4 46:3
53:5 121:12

**following**
52:21,24
72:12 100:1
121:18

**follows**
5:6

**follow-up**
48:9

**foregoing**
125:6,10

**forget**
96:14

**Forgive**
112:17

**form**
17:11,15,23,
24 25:5
26:11,17,20
29:9 39:10
42:4 44:22



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                    September 16, 2010
138

51:2 52:6
56:1 103:12,
13 106:3
110:8 115:10,
12,18 116:8
117:8

**formal**
48:13

**format**
32:14

**forth**
125:8

**Forward**
42:17,22
66:23 67:8

**four**
9:11 13:9
15:17 16:9
50:14

**Four-and-a-
half**
12:11

**fourth**
81:25

**Frary**
2:10 103:8,18
107:5

**Frary's**
92:4

**fraud**
27:10 33:17
45:20,22
46:3,6

**fraudulent**
24:15

**free**
96:1

**front**
38:15 39:17

**Fudge**
11:11,23

**full**
23:4,12 67:23
78:4 111:3

**full-time**
19:3

**FUNDING**
1:10 5:13
7:11,14,16,
18,22,25 8:4,
16 54:17,20
63:21 89:9

**further**
27:1 28:6
65:8 87:6

**future**
104:4

---
G
---

**gathering**
50:21

**gave**
8:18

**General**
10:5,10 24:5,
18 25:17,19,
21 27:9 33:17

**Generally**
20:25 29:22
30:16 44:16
50:23 77:24
92:23 97:11
101:14 118:19

**generate**
28:25

**generated**
17:16

**generates**
35:10

**give**
8:18 9:1
22:17 43:3
48:12 104:4

**given**
46:13 47:2
50:2 51:5
53:17 56:18

**gives**
39:19 59:20
94:19

**giving**
51:11,13

**go**
14:21 28:3,11
29:9 30:17
31:7,19 32:22
37:19 41:4
42:17 43:13
46:4 51:23
59:2 61:4
63:18 64:13
68:7 73:3
74:24 91:1
94:13 96:7
97:16 98:18
103:24 114:10

**goals**
118:7

**goes**
24:17 35:10
92:14 100:20
101:5

**going**
6:23 21:5
29:14 31:7
48:21 54:3,24
75:1 77:8,11
85:15 103:6
115:8 118:22
122:8

**gone**
114:20

**good**
6:9 49:6

**goods**
12:16,17

**Grant**
7:1

**great**
5:23

**grounds**
54:4

**group**
13:21 48:12
83:9 92:13

**groups**
105:10,15

**guess**
28:19 60:25
61:19 110:13
117:24

**GUI**
36:23 37:1

**guide**
59:16

**guideline**
39:6

**guidelines**
34:14 38:6
52:21,24

---
H
---

**half**
121:4,5

**hand**
32:17 107:17
115:4

**handbook**
28:16

**handing**
14:14

**handle**
15:22 17:21,
22 18:18
19:25 20:23,
25 38:3 46:10
48:4

**handled**

15:1 20:3,5,7
21:5,13 22:18
23:4,12 29:17
57:21,24
60:14,23
68:12 70:15
78:18 80:16
81:25 82:10,
15 90:11
104:6,10
108:13 119:17
122:22
123:11,12

**handles**
20:20

**handling**
8:7 15:25
16:25 29:3
35:20 38:7
45:18 53:10,
19 54:22 55:2
60:1 66:24
80:19 84:18
117:7

**handwriting**
68:21

**handwritten**
68:20

**happen**
121:20

**happened**
27:20,22
106:15 119:3

**happening**
78:24

**happens**
25:12 26:22
40:24 41:2
42:19,21 43:9

**hard**
30:24,25
34:6,8 52:6,
9,13 56:11



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

114:7
**Harkless**
70:16 111:21,
25
**haven't**
52:9 91:23
123:21
**HAYS**
2:3,4
**head**
5:25 71:7
**Health**
21:10
**held**
9:10,12 15:12
61:21
**help**
29:1 38:23
39:7 47:2
59:12 107:25
**her**
9:1 11:12
19:4 28:13
40:22 47:21
68:21 93:11
111:7 116:6,7
**hereby**
125:4
**herein**
125:8
**hereof**
126:15
**hire**
32:23 56:8,
10,19 57:6,8
**hired**
46:9 56:13,15
57:3
**history**
37:5 58:21
62:12,22
63:9,12,15

84:9,10,25
98:4 109:25
**hit**
113:21 114:10
**hits**
113:23 114:2,
4,8,10
**hold**
7:13 9:8
**holding**
48:3
**holds**
19:9
**home**
8:20
**hour**
121:4,5
**HR**
122:19

---
**I**
---

**ID**
78:17
**idea**
51:7
**identified**
6:20 52:12
95:3 111:5
**identifies**
112:24
**immediately**
68:3
**improvement**
119:8
**inaccurate**
122:1
**inaccurately**
122:11
**incentive**
118:13
**incident**

113:17
**include**
28:4 35:22
38:12 85:15
105:15
**included**
26:9 65:4
67:2
**includes**
15:10 27:14
**Including**
50:14
**incorrect**
122:1
**increased**
100:1,4,17,24
**increases**
100:8
**independently**
122:19
**INDEX**
3:1 4:4
**indicate**
26:25 78:17
83:24 93:1
95:19 110:2,
21
**indicated**
64:23 65:4
66:22 71:20
76:12 92:25
126:14
**indicates**
42:10 63:18,
21 73:15,24
86:12 96:7
108:8 113:20
**indicating**
33:15 71:25
**indication**
77:12 110:17
**individual**

23:12 58:2
60:24 88:9
89:1 90:14
93:2 108:13
112:23
**individuals**
15:25 16:24
88:18,21 89:3
113:17
**informal**
5:15
**information**
21:23 22:23,
24,25 23:8,10
25:23 26:13
28:4,5 29:1,
10 35:21,25
36:19 38:13
43:2 46:1,14
48:12 49:1
52:14 54:9
55:5,9,13,
16,19,24
58:6,8,11,19
62:16,19
68:5,10 70:3,
4,8,13 72:5,
24 73:12,20
75:24 79:7
85:16 87:14
90:2 94:10,
15,19,20
95:11 96:3,8,
18,25 97:9,11
99:5,17,19,
21 100:3,7
101:14,24
102:2 103:24,
25 104:4,24
105:24 106:1,
6,8 107:25
108:3,4,12
111:1,10,12
112:2,4
114:22 115:1

118:4 119:23
**informed**
72:8
**initial**
48:10
**Initially**
15:21 22:11
46:17 95:24
**Innovis**
116:14
**input**
46:18
**inquiry**
63:9 98:4
**instance**
23:17 28:23
96:12
**instruct**
32:3 34:14
54:5
**INSTRUCTED**
3:12
**Instructing**
115:15
**insufficient**
41:19 72:10
**interest**
61:11 64:1,5,
8 72:22
73:15,21
76:12,14
**interface**
21:17,18,25
22:1,10,19,
22 23:5,13
78:19 80:16
81:2 82:1,11,
16 90:11
91:16
**internal**
22:15 60:10
**Interrogator**



Toll Free: 800.300.1214
Facsimile: 619.239.4117

ESQUIRE
an Alexander Gallo Company

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

**ies**
4:11 51:14,17
107:18,23
108:1

**Interrogatory**
108:7 112:22
113:3,16

**invalid**
44:12,13,15
124:19

**investigate**
58:3 73:1
113:4

**investigated**
46:2

**investigating**
57:12

**investigation**
24:5 57:16
59:20 81:8

**investigations**
112:24

**involved**
53:18

**involves**
54:2

**involving**
109:4

**issue**
28:21 41:5

**issuer**
102:25

**issues**
15:11,23
16:15 61:19
122:4

─────── J ───────

**JAMON**
1:4 5:12
126:5

**January**
59:25 61:5,8
62:4,6 63:6
77:2 87:7,9

**Jill**
47:20 48:11

**job**
5:23 11:5
12:10,14
13:25 50:16,
17 110:24

**Johnson**
1:23 4:2
125:3,20

**Jonathan**
70:16 111:21

**Jones**
115:20,22
116:1,4

**Juan**
10:1

**judging**
58:25

**judgment**
22:17 50:24

**July**
27:25 28:20
37:25 64:15
65:19 66:3
88:1 100:19
117:3,6,12

**June**
47:10 49:17,
24 74:18
100:19

**just**
6:3 8:24
17:21 20:9,11
22:1 25:18
29:7 30:15
31:6 32:19
37:6 40:15,16

42:12 47:15
48:16,19
52:23 56:24
58:1,7,9
62:19 67:10
70:21 74:24
75:20 83:16
86:20 89:7
93:7,25 94:3
100:6 106:11,
25 118:23
119:22 122:6
123:25

─────── K ───────

**Kay**
111:6,14

**keep**
49:3 119:15
123:4

**keeps**
120:9

**kept**
75:11

**kind**
12:8 70:6
104:2

**knew**
89:25

**know**
5:16,20 10:2,
6 11:6 22:7
23:21 26:5
30:16 33:18
36:7,18 39:7
40:23 48:10
51:24 52:1,5
54:19,20,23
55:25 59:13
62:15 63:15
64:5 65:22
66:4,19 68:19
69:21 71:1,4,
5,6,10,13,19,

22 74:12
75:20 83:5
84:6,11,14
86:1,7,16
87:19 88:20,
24 89:11,12,
18,19 90:1,23
94:17,25 95:2
98:6 99:15
100:23
102:13,15,17
103:20,25
104:13 105:5,
12 106:13,21,
25 107:1
108:21 111:6,
7,12,21 114:3
115:22 119:13
122:25 123:3,
24

**knowledge**
40:24 61:10
64:8 74:4
111:10 112:2
114:25

**KNOWLEDGEABL
E**
1:14 5:1 6:19

**knows**
55:24

─────── L ───────

**L**
2:10 36:11

**labeled**
32:20 73:9

**lack**
59:4

**Lance**
10:9,10,22

**LANGLEY**
2:8 3:8 6:6,
9,13 7:1 9:1
25:5 32:10,

13,19 33:2
39:10 42:4
44:22 51:2,25
54:2 56:1
61:17,24
93:10,14
97:14 100:13
104:15 106:3
110:8 117:8
124:6,9,21

**Laser**
104:13,20

**last**
10:25 13:23
47:7 50:1
74:10 107:15

**later**
125:9

**Lauren**
115:20,22

**law**
47:3

**lawsuit**
55:17 89:12,
15,18 90:16,
20,22,23

**lawsuits**
50:20 51:10

**lead**
9:16,22,23

**leads**
14:8

**learn**
105:23 106:1

**least**
78:7 105:20

**left**
34:2

**left-hand**
32:14

**legal**
10:13,14



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

28:14 77:5
105:8,14
107:1 108:5
**less**
59:16 96:1
**Let's**
25:19 42:17
73:3 75:5
103:24
**letter**
18:3 24:4,16,
17 25:8,14,
20,22,24
26:8,10,11,
12,16,17,20
27:4,5,16
28:3,24,25
29:6,8,9
30:2,12,22
31:15,18,19,
20,21 34:23,
24 35:2,5,7,
10,13 37:11,
19,22 38:16
39:18,20 43:5
44:7 45:25
61:11 62:3,6,
12,22,23
63:5,8,9,11,
12,15,24
64:13,14,20,
23 65:4,22
66:1,18,23
67:14 68:2,8,
12,16,24 69:3
77:6 84:24
86:12 87:25
98:3 112:8
120:22
**letters**
17:12,15,20,
22,23,24
27:22 28:23
30:1,5,25

31:25 44:19
46:15 62:19
63:16 65:12
72:12 76:22
81:14,16
111:18
**liaison**
9:15,17,21
11:15 14:6,7
19:3 35:21
37:4 38:10
39:7 43:10,12
44:24 46:10
66:13,14
118:10 121:18
**liaisons**
16:14,18,24
17:7,11,19
18:9,20 19:3
38:24 112:7
117:16 118:7
120:25
**likely**
61:16 123:16
**limit**
93:13
**limitations**
74:7 76:19
**Line**
3:13 83:25
**list**
39:13,20 98:9
101:22
**litigation**
114:13
**little**
5:14 9:11
10:7 58:9
86:14 87:24
**LLC**
1:9,10 7:14
8:4 126:6
**loaded**

86:11
**locate**
28:25 29:2
**location**
23:15,23
24:20,22
25:10 42:9
79:7 86:17,23
88:12,14,16
91:15 96:13,
15
**locations**
23:24
**log**
120:2,4
**logs**
109:15
**long**
9:10,17,23
10:6,16,18
12:10 26:14
27:18 46:20
49:5 108:21,
23 119:12
**longer**
43:1 116:24
**look**
21:22 34:6
35:15 37:4
60:7 62:2,8,
22 69:6
74:18,24 75:5
76:5 77:1,11
82:21 85:2
91:8,12 92:6
98:3 101:11
102:18
106:18,23
112:22 113:11
116:13
124:10,11
**looked**
52:10 68:25

84:24 89:5
94:1 95:17
106:4,11
109:5 113:9,
24 114:22
122:21
**looking**
32:20 34:6
38:14 69:18
89:7 94:5
106:25 115:4
**looks**
68:21 81:7
82:22 86:4,5
87:7,13,16
88:4 93:7
95:12 97:5,
16,17 98:4
99:13 100:6,
11 101:4
**lost**
58:9
**lot**
17:15 52:9
91:17
**low**
119:7
**lower**
95:25 118:21
**LP**
88:15
**LP3**
88:11,25
**lunch**
93:15 121:4,5
**Lusk**
13:24
_____
            **M**
_____
**mail**
18:12 30:14,
15,16,18,19
31:3,6,10,

15,16 120:20,
24
**mailed**
76:22 77:6
**mailroom**
31:16
**main**
73:11 75:22
**maintain**
105:22 114:1
119:9,12
122:18
**maintained**
32:7 115:1,2
117:15 119:9
**maintains**
36:18 108:21
120:15
**Maintenance**
96:8,19,25
97:5,9,17,
19,25 104:10
**major**
98:24
**majority**
20:5,7,20
21:24 46:25
**making**
17:20 88:19
**man**
11:3,4 69:14
**manage**
13:18 16:13
19:14
**managed**
13:18,20,21,
22 14:3 15:9
**MANAGEMENT**
1:9,15 7:9,20
8:9,13 54:14,
17,18,21,25
**manager**



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

9:9,20,22
11:13 12:3
13:3 15:8,18
19:17 48:23
51:16 61:7
70:18 71:19
104:3,7,11
105:11,16
119:5

**managers**
16:3 56:16
71:22 83:6,7

**managing**
15:10 19:12
119:14

**manual**
23:18,20
28:19 32:8,
18,24 33:7,
10,18,21,22
37:25 52:20,
25 56:8,10,19
57:6,8 58:1
124:11

**manuals**
34:14

**March**
13:2 67:15
69:18 71:17
72:19 77:8
80:22 81:20
87:5 100:8,11
108:9

**mark**
6:23 53:2
75:1 85:4
107:18 115:8

**MARKED**
4:6 6:25
26:23 27:15
66:20,21
72:16 75:3
85:6 96:17
107:20

**marking**
61:22

**Martin**
10:9,10,18,22
11:19

**master**
94:14

**match**
21:22 38:11

**matches**
79:3

**matching**
38:16,19

**materials**
33:9 47:23

**math**
60:22

**matter**
126:12

**mean**
14:17 17:14
24:2 29:22
42:22 55:15
83:22 116:18
120:4 121:9,
11

**meaning**
5:20 24:25
53:2

**means**
24:3,8 67:10
69:21 83:5
84:16 86:22
98:10 105:17
107:3

**Media**
92:14,20
95:13,17,18,
19

**meet**
118:7,17

**meetings**

48:13,14,18,
25

**Melanie**
65:23 66:10
68:13 107:11
108:14 112:7,
14

**member**
7:14

**members**
16:17 107:1

**memo**
28:15 39:6

**memos**
48:23 49:1

**mention**
27:19

**mentioned**
36:7 52:17

**menus**
59:21

**message**
83:9

**messages**
83:2,7,9,11

**Michelle**
13:24

**middle**
94:11

**MIDLAND**
1:9,10,15
5:13 6:8 7:9,
11,14,16,18,
20,22,25 8:4,
8,12,16 9:8,
12,25 11:10,
17,19,25
12:18,22 13:1
14:14,15,19
15:1,4 17:13,
15 18:22
21:16 22:3,4,

6 23:9,10
24:11 25:2,10
26:11,17
27:6,16 29:9,
21 33:25
35:5,6,9
37:16 39:8
42:15,25
45:14 49:10
50:15 51:18
54:13,16,17,
18,20,24,25
55:1,4,8,12,
16,19,23
57:11,15
60:17 62:3
63:8,16,21
64:9,11,15
65:9,17 67:15
68:2,23 70:10
72:13,19,25
73:18,20
77:20,22,25
78:3,6,9
79:17 80:2,11
82:14,21,22
84:1 86:7,25
88:3 89:9,16
90:13,23,24
91:2,6 93:22
94:21 97:21
98:12,15,18,
24 101:20
102:15 103:2,
7 105:22
108:9,16,21
109:23 110:2,
5,21 111:4
113:5,7,17,
21 114:2,9
115:2,12
116:10 120:6,
10 122:25
123:1,4,19,
22

**Midland's**
22:14,24
27:12 38:19
42:11 89:22
101:19 107:23
115:15 117:6
122:22

**midway**
77:2

**Minnesota**
19:1,23

**minutes**
93:14

**missing**
34:11 44:6

**modified**
22:14 79:6,8,
9

**money**
17:18

**monitoring**
60:10

**month**
98:21 100:1,7
101:4,6

**monthly**
72:22 101:8
110:13,14
117:18,22

**months**
9:18 10:17
80:8 100:23
119:3

**morning**
93:20

**MOST**
1:14 5:1 6:19
13:15 20:25
30:20 60:7
61:15 74:25
75:24 76:2
121:2,5



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                        September 16, 2010
143

**move**
23:22

**moved**
24:21,22
45:23 86:14,
23

**movement**
106:15

**moves**
45:8

**Multiple**
92:7,11

**N**

**name**
5:9,11 8:18
10:25 13:23
21:25 35:22
36:14 38:11
49:19,21 76:6
102:5 107:13,
15 110:24
112:23 113:1
125:14

**names**
36:21

**NAN**
102:5,8,11

**national**
113:6

**nature**
58:21

**Naves**
10:1,8,16
11:17

**N-a-v-e-s**
10:3

**navigate**
59:17

**necessarily**
46:23 75:12
77:23 119:1,6

120:13

**necessary**
50:19

**need**
5:15,16,17
25:22 28:4
29:10 62:8
70:11,12
108:11 118:21
122:9

**needed**
26:13 62:20
71:20 72:6
77:14

**needs**
62:16

**negative**
68:5

**neither**
42:1

**Never**
40:5 77:17
78:9 110:2,5

**new**
28:15 29:9
32:23 56:8,
10,19 57:6,8
82:3 97:21,23

**nightly**
86:15,19

**nine**
13:8

**No.Change**
127:2,5,8,11,
14,17,20
128:2,5,8,11,
14,17,20

**No.Line**
127:2,5,8,11,
14,17,20
128:2,5,8,11,
14,17,20

**no-contact**
27:15

**nodding**
5:25

**non-account**
105:11,16

**nonspecific**
24:6

**non-submitted**
60:5

**noon**
93:10

**normally**
29:21 48:19
60:17 103:10

**NORTHEASTERN**
1:3

**NORTHERN**
1:2

**notation**
66:6 72:8
90:20

**notations**
85:17

**note**
58:1 70:2
90:16

**noted**
66:19 68:9,11

**notes**
4:9 62:8
65:23 68:20
69:6 75:8,12,
15 79:9
85:11,12,13,
14,15,20,21,
24 86:1 89:24
90:25 110:20

**Nothing**
80:19 82:3
116:18

**Notice**
4:7 6:16,20,
23 54:7

**noticed**
121:13

**notifies**
98:11

**noting**
37:6

**November**
65:2 67:24
82:25 99:8,
22,23 111:3

**NRP**
86:15,17 88:9

**nuance**
7:1

**number**
13:17,19
38:17,19,20,
22 44:6 60:14
65:6 68:23
70:25 71:2
76:6 91:19
95:6,23
104:15
109:16,17,18
113:19 115:9
117:16,17
118:22 119:7,
16

**numbers**
61:1 97:25

**O**

**oath**
93:19 126:16

**Object**
25:5 39:10
42:4 44:22
51:2 54:4
56:1 106:3
110:8 117:8

**objections**
108:5

**obtain**
95:15 101:20
114:9

**obtainable**
106:1

**obtained**
92:23 93:4
94:21 97:21
98:1 101:25
105:24 113:18

**obtaining**
98:12

**obviously**
85:18

**occasions**
113:20

**occurrence**
73:25

**October**
62:23,25 63:1
73:25 74:8
76:20 94:23
117:5,12

**offer**
30:5 38:16
39:18,20
126:16

**offhand**
23:22 79:12

**office**
7:13 21:6
40:13 66:11
77:9

**officer**
8:15

**off-the-
beaten**
49:5

**Oh**



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

54:12 124:4
**Okay**
5:17,22,23
6:5 7:3 11:14
25:20 30:4
33:1 36:9
37:8 52:4,8
61:24 69:23
74:1 75:21
86:3 93:9
94:2,13
102:19 107:17
124:13
**Oklahoma**
49:20
**old**
97:22
**older**
75:12,15
**once**
37:19 49:14
60:9 84:4
**ones**
21:2 23:21
**open**
30:21 31:15
**opened**
30:25 31:16
**operation**
16:21 33:10,
22 37:25
**operations**
15:16 16:22
19:17 33:7
124:11
**opportunity**
121:15
**opposed**
46:6
**options**
25:16 95:12
**order**

52:22 58:8
**Original**
4:15,16
38:20,21 40:2
76:6 92:22
97:12
**outside**
25:21 26:10
27:13 35:13
36:9 43:23
45:19 66:25
67:11 84:17
89:11 102:16
**outsource**
55:2
**over**
9:11 10:7
16:8 66:5,24
69:4 72:18,20
92:21,22
103:1,5,7,14
119:3
**overall**
15:15 61:5
**overseeing**
15:15 19:12
60:1
**overview**
46:14
**owe**
14:20 17:18
67:20,21
111:3 116:25
**owed**
72:14 93:1
**owner**
7:25
**owns**
63:21 64:11

———— P ————

**P**
26:6

**p.m**
124:23
**P.O**
2:9
**packet**
28:19
**PAGE**
3:6,13 32:22
34:18 35:12
39:4,16 42:6
62:2,10,14,22
63:23,24
64:13 65:24
66:17 67:2
68:20 69:18
73:15 74:16,
18,24 77:1
82:21 88:3
90:5 91:1,14
92:13 94:5,6,
7,8,10,12,13
97:5 98:6
101:11 103:24
108:8 124:12
127:2,5,8,11,
14,17,20
128:2,5,8,11,
14,17,20
**pages**
32:11,13
33:6,11,12,17
34:8,11 38:6
52:12 56:9
62:17 75:6
96:7
**paid**
7:18 23:4,11
24:9,11 25:9
27:10 29:25
30:1 33:16
35:12 37:15
38:7,16,25
39:4,14,18
40:3 43:25

44:1,7,20
46:7 65:2
67:23 111:2
123:1
**paid-in-full**
30:2
**papers**
28:19
**paralegal**
103:23 115:25
123:24,25
**part**
17:12 32:23
46:25 50:15,
17 51:16 89:3
97:22 120:1
**partial**
77:21 78:7
**participated**
110:25
**particular**
89:4 109:13
123:5
**particularly**
118:24
**partly**
16:22
**parts**
32:17 85:16
**party**
86:18 88:10
110:21
**path**
49:5
**pay**
17:19
**payment**
30:6 39:21
40:1 44:10,15
54:21 58:20
65:6 77:17,
20,21,23,24,

25 78:2,4,7,
10 79:24
84:9,21
102:24 103:3,
6 104:9,20,23
105:1 106:11
116:22,25
**payments**
77:24 84:11,
15,17,20
101:8 103:2
**pays**
54:20
**PDPQ**
43:20 44:4,
11,21 45:1,3
**PDRQ**
45:9
**PENALTY**
126:8,10
**pending**
50:6,10
114:13
**PENNY**
2:4 5:11
**people**
13:19,20
15:23 22:9
34:5 47:13
52:21 111:5
121:22
**percent**
22:20 44:25
51:3 57:21
60:22 64:2
73:16 76:12
95:20,21,22
96:1
**percentage**
22:18 50:24
**perform**
59:13



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                    September 16, 2010
                                                                    145

performed
110:25

period
25:21 36:9
42:24 45:19
80:6 119:3

PERJURY
126:8,10

PERSON
1:14 5:1 6:19
46:12,13,19,
23,24 59:1
68:19 70:2
88:12 109:23
118:5 119:5
121:14,21

personally
111:7

persons
110:25

person's
92:2

phc917@haysca
uley.com
2:5

phone
17:6 20:10
36:1 47:15,16
65:9,15,18
77:13 91:19
97:25

pick
6:2

place
18:7 97:2
125:8

placed
24:18 25:10
26:25 96:24

places
97:3

Plaintiff

2:2

Plaintiffs
1:5

Plaintiff's
6:24 75:2,5
78:13 85:4,8
96:17 106:17,
23 108:11
111:2 113:4,
18,19

Plan
104:9

Please
5:9 8:19,21
17:19 32:17
84:8 93:23

point
36:10 98:14

policies
28:15 32:2,7
34:13 117:6
121:12,16,18
122:23

policy
27:12 28:7,16
45:13,16 58:1

populate
97:2

portfolio
94:14,20 95:8
123:2,6

portion
88:23

position
9:8,10 10:6,
12 11:5,12
13:9,11 14:11
19:10 47:21
70:17

positions
9:12 14:5

positive

84:13

possible
42:18,22

postmarked
66:3

Practices
55:23 65:20

preparation
53:24

Present
2:10 48:11

presented
47:24

presume
9:19

pretty
60:20

previous
58:21 62:6
81:5 102:5
106:5,8

previously
13:20 72:9
76:24

print
59:8 74:22
80:5,11 106:7
119:21,22

printable
94:11

printed
34:3 58:1
59:7 74:17,18
76:15 85:12,
19 94:3,8
99:17,19
103:13,17
105:20
113:13,14

printout
84:9

printouts

97:18

prints
58:7,10

prior
10:8,21 11:25
12:22 24:10,
11 25:9 27:10
29:25 33:16
35:12 37:15
38:7,25 39:4,
14 40:3 43:25
44:1,20 46:7
50:1 51:20
107:22 114:5
117:3 123:1

privilege
54:4

probably
79:5 95:20
123:16

problem
87:13

procedure
28:1

procedures
28:15 32:2
33:14 34:13
56:25 117:6
121:12,16,19
122:23

proceedings
124:23 125:8,
11

process
17:5,8 18:12
33:16,17
45:8,18,21
46:4,22 86:20

processed
32:1

processing
53:12 56:25

produced
51:20 52:13
58:25 114:21

production
4:9 62:8
85:11,15,19,
21,24 86:1
89:23 90:16,
25 117:21,25
119:24 120:1
121:9,10

program
22:2,8,9,12
118:13

promoted
9:19,21,22

proof
26:7 30:6
36:3 38:14,24
39:4,7,14,
17,21,22
40:2,8 41:10,
12,19,25
42:15,18,19,
21,22,25
43:6,11,13
44:3 45:22
67:6 77:23
78:4,6
124:15,18

proper
53:3

prove
26:6

provide
26:7 28:3
36:3

provided
39:20 41:23
42:15 45:22
46:2 53:25
56:13,15,19
57:1 62:3



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

72:9 111:19
118:14

**provides**
55:13,19

**public**
8:22

**publicly**
8:24

**pull**
114:7

**purchase**
17:16 21:12
94:23 114:6

**purchased**
8:1,3 17:17
22:8,11 25:9
86:7 95:8,19
96:4

**purchasing**
24:11 37:16
123:1

**purpose**
96:11

**purposes**
8:11

**Pursuant**
6:12 53:15

**Purvis**
107:13

**put**
7:5 35:23
44:7 53:3
58:6 106:12

**put-back**
42:18,23

**puts**
67:23

― **Q** ―

**QC**
26:5

**QCDT**

43:4

**QCPP**
26:3,12
37:11,19,22

**quality**
12:3 26:5

**quarterly**
117:18,22

**question**
5:19,20 60:6
72:25 97:14
109:22

**QUESTIONS**
3:12 16:16
41:5 46:25
48:9,20
121:16 124:5

**queue**
45:4,24 46:5,
6 53:3 79:7
88:6,16,25
91:15,18,21,
25 92:2,3,4
106:15,19,21,
24 107:2

**queues**
91:17 106:5
107:4,8

**quickly**
119:16

**quite**
58:23

**quota**
118:18

― **R** ―

**R2K**
36:22,24 37:1

**ran**
121:25

**random**
108:19

**range**
13:13

**rate**
64:1,5 73:15,
21

**rates**
64:8

**reach**
86:25

**read**
6:10 30:25
31:15 46:15
63:1 86:1
126:11,12

**reading**
31:18

**real**
105:3

**reason**
7:5 89:19,21,
23 119:7
127:4,7,10,
13,16,19,22
128:4,7,10,
13,16,19,22

**recall**
10:21 50:4
89:7,19
117:14 124:1

**receipt**
34:22,24
35:2,5,15
66:18 68:8
69:3,4 72:12
79:19 81:15

**receive**
25:22 30:1,5,
6,7 56:10
118:17

**received**
17:8 26:24
29:19 31:24

32:15 34:15
37:6,24 42:25
44:1,9,19
53:12 57:12,
18 59:13
64:17 65:22,
25 66:4 68:12
69:11 78:13,
22 80:14,22
81:21 82:5,14
97:11 108:8,
14 112:8
116:22 119:16
120:6,9,16
122:25 123:5,
9

**recess**
49:8 93:17
114:18

**recognized**
79:1

**record**
5:9,14 6:18
8:22 15:12
32:19 61:20,
21 97:22
108:16 110:20
114:17 120:5,
9 125:11

**recording**
109:3,9,12,
14

**recordings**
108:19,22,24
109:19

**records**
101:19 110:2

**recovery**
77:5 88:16

**Red**
64:21 79:22
110:5 116:21

**reduced**

13:17

**refer**
37:1 67:12
94:20 108:11

**referred**
25:24 36:20,
21 40:8 41:6
77:9 113:7
124:19

**referring**
8:12 54:21
70:1 90:1

**refers**
25:25 83:9

**reflected**
102:8

**refresh**
86:15,20

**regarding**
6:19 12:23
14:19 18:4
27:6 29:10
36:3 53:15
54:17 55:6,13
61:10 62:19
72:3 73:12
75:25 81:14,
16 82:14
83:11 87:25
109:24 110:3,
6,21 111:11,
13 112:3,12,
15 114:23
123:1,18

**regardless**
29:15 31:13

**regular**
110:13,14

**related**
17:22,24
21:11 25:23
28:21 41:5
50:5 61:18



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

112:1,4

**relates**
7:2

**relation**
33:14 46:3
56:24 84:13

**relations**
9:9,15,20
11:13 13:3
14:1,2,6,7,8,
10,13,23
15:2,8,9,16,
18,21 16:11,
13,23 18:6,23
19:4,6 30:9
31:1,14,17,
19,22 32:3,8,
18 33:10,18,
22 34:8 35:16
37:24 38:2,24
43:10,12 44:2
46:9 47:3
51:1,17
52:20,24,25
53:6 56:18,21
57:1 58:2,12,
16 59:2,9,19
60:24 61:8
63:11 69:11
70:19 71:15
72:2 81:8,12
82:18 105:8,
14 107:1
111:14 112:7
116:2 117:16
119:18 120:17
122:12,14,19
124:11,18

**release**
69:19 70:3,5,
11,13,14
71:21 72:6

**remained**
100:3,19,24

**remains**
97:22 100:7
101:5

**remember**
47:6 48:1
49:16,18,20
79:12 83:23
94:2 123:25

**remind**
6:1

**report**
19:15,16 65:5
68:3 70:9
72:13,16,20
84:1 98:24
99:2,16
101:16,17,20
113:18 114:7
117:21,23
119:19,23
120:1,8,12,
15,19,21
123:4

**Reported**
1:23 91:6,9
98:22 99:5,
21,23 101:8
113:6 116:18
124:15 125:9

**Reporter**
125:3

**REPORTER'S**
125:1

**Reporting**
12:20,23
27:19 41:16
45:11 53:11,
19 54:13,18,
22 55:5 56:6,
9,22 57:2,9,
13 72:18
82:23 83:14
98:19,25

99:2,8,15,16,
20 110:11,13,
14,18 113:6
115:15 117:5

**reports**
55:9 60:13
98:19 99:20
109:23
117:15,20,25
119:9,10,15,
25

**represent**
68:22 84:21
95:22

**representatio
n**
53:5

**represented**
37:17 66:9
88:25 94:8

**representing**
5:11

**represents**
91:24 95:1,23
105:9

**request**
27:6 28:5
29:9 35:25
37:21 53:4,11
65:11,14
69:19 70:2
71:24

**requested**
26:15 37:18
65:8 70:2
101:17

**requesting**
37:12

**requests**
26:16 28:2
50:20 68:2

**research**

114:10

**reside**
23:15

**Resolution**
102:20

**resolve**
72:10

**resolved**
45:4,7

**respect**
8:1,7 12:20
27:12 29:3,
23,25 30:9
32:4 38:25
39:8 48:7
49:22 52:18
53:9 55:1,18,
22 59:20
61:12 82:13
84:17 95:11
97:15 106:10
108:4 109:20
110:10,11
116:4 117:4,
16 118:7
119:17
122:10,15,21
123:2,5

**respond**
16:15 21:23
50:19 59:13,
16

**responded**
21:2 79:8
81:2 117:12
122:15

**responding**
15:5,11 18:1
59:22 78:21
82:3

**response**
17:8 18:2
60:6,8 80:3

81:5,12 90:6,
8 111:5
113:20 123:15
124:2

**responses**
60:4,5,11
80:10 107:23
110:12

**responsibili
ties**
12:19 13:10
49:22 51:16
53:9,15

**responsibili
ty**
8:6 48:3
52:23 111:17

**responsible**
14:14 15:5,24
16:2,21,22,
25 17:11,14,
19 18:15
19:12 28:7
31:18 55:4,8,
12 57:11,15
112:23 113:17

**rest**
13:18

**result**
65:11

**retail**
12:15

**retrieval**
109:12

**return**
20:20

**returned**
60:9

**review**
6:15 14:21,22
22:22 23:18,
20 32:3 34:15



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross

September 16, 2010

148

35:21 38:10
46:15 48:20
51:20 60:4,5,
6 78:23,24
100:6 105:1
106:11 107:22
108:3 110:25
111:1 117:17
121:20

**reviewed**
31:24 51:24
52:1,13,14
53:23 54:10
78:21 81:11
82:18

**reviewing**
62:4 111:18

**reviews**
30:8

**revisit**
121:15

**right**
5:21 8:4
17:13 22:12
24:19 25:3,4
29:12,20 33:4
39:4,19 41:8
45:5 46:8
53:4 55:20
57:22 58:24
60:22,25
63:19,24
64:24 67:4,
13,16,21
80:6,14,18,23
84:23 86:18
88:10 91:10
100:9,21
101:22 109:21
116:13 124:16

**Ron**
10:8,16

**Roque**
13:23

**R-o-q-u-e**
13:23

**ROSS**
1:16 3:3,4
4:1 5:2,5,10
107:16 126:23
127:25 128:25

**routed**
20:18

**run**
117:23

**runs**
35:9

---
**S**

**San**
1:21 9:5
18:21 19:13
20:11,18
21:3,5 30:13,
19 31:3,13
40:13,14,15,
16 47:11
48:16,17
66:11,12
69:16 74:14
111:8,23
112:18,20

**save**
126:13

**saw**
89:23

**saying**
5:23

**says**
27:4 28:5
36:8 38:14
40:7 41:10
42:6,17 62:14
65:25 66:23
67:2,6 77:5
89:24 90:20
91:2 92:16

94:11 95:13
101:11 110:25
124:14

**scanned**
30:21,22
31:20,25
68:11 69:4

**scheduling**
48:21

**screen**
47:17 52:7,10
58:7,10,20
59:2 62:12,23
63:13,15
73:5,6,7,8,9,
10,11,24
75:16,17,22
84:10,25
85:17 89:22
93:24 94:18
95:17 96:8,9,
11,12,19,21,
24,25 97:6,
17,19 98:6,
11,16,21
99:17,19
101:12,15,16,
18,22 102:8,
9,10,20,22,23
103:5,25
104:9,10,13,
21,22,24
105:1,24
106:2,10,11
114:1,3,6

**screens**
52:14 54:9
58:17,23 62:5
98:19 105:22
106:4 109:5
113:24
114:20,21

**search**
93:7

**second**
26:6 68:16
69:3

**section**
34:25 37:20
85:19

**Security**
113:19 115:9

**see**
34:2 37:20
43:2 52:7
60:15 62:25
64:3 68:14
74:2 76:8
77:3 83:3
87:8 91:2
94:10 102:20
116:16 119:6

**seen**
52:6,9 54:7
89:19 91:23
105:3

**sees**
31:23

**select**
23:18,20,22

**selected**
64:5,9 79:13,
17

**sell**
12:16 55:18

**seller**
41:4 42:25
43:3 92:21,24
95:3 102:24

**send**
20:14 26:11
28:25 37:11
43:4 49:1
55:16 69:4
77:14 83:7,8
92:21,22
102:16 116:7

**sending**
18:1,15 27:21

**sends**
24:16 25:7,
12,20 26:8
29:6 35:1

**sent**
17:12,16,20
25:15 26:17,
20 27:7,16
29:14 30:8,
12,22 35:5,6
37:22 42:25
43:2,15,17,
18 44:11
45:24 62:3,6,
23 63:8,11,16
64:14 65:12
77:25 78:1
81:14,16
83:10 86:12
87:17 106:20
115:12

**separate**
20:3 102:9
115:2

**separately**
75:11

**September**
1:18 4:2 5:3
125:15

**series**
36:11,12,20,
22 37:1 46:15

**serve**
10:10

**served**
15:18

**Service**
12:13

**SERVICES**
1:9 12:16
76:7 95:4



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                    September 16, 2010
149

126:6

**set**
52:24 125:8

**setting**
5:16

**settlement**
30:5 38:16
39:18,20
95:12

**seven**
13:15,19 14:3
18:20,21
32:13

**shadow**
46:13,20

**shadowing**
46:25

**Shall**
93:14

**SHEET**
126:1,15
127:1 128:1

**shipped**
31:5

**shipping**
30:16

**short**
69:24

**Shorthand**
125:3

**show**
58:6,7 68:4
79:6 101:17
106:7 107:3
114:7 119:19

**showed**
106:5

**showing**
40:1 44:9,14
65:5 67:3
78:2

**shown**
54:3,10,12

**shows**
59:15 62:23
75:18 91:14
99:8

**Sidney**
69:13 71:14
107:10 108:14
112:6,11

**sign**
6:10

**SIGNATUREDATE**
127:24 128:24

**signed**
51:17 90:13
115:20 126:20

**signing**
51:12

**SIL**
86:15,19 88:6

**SILO**
86:19,21

**similar**
53:18 102:6

**simple**
122:8

**simply**
27:15

**sit**
116:20

**site**
18:21,25
19:7,13,25
20:23 21:13,
14 31:17
47:16 74:14

**sites**
18:22 20:4,16

**sitting**
46:23

**six**
9:18 13:15
46:22 64:1
73:16 76:12
80:8

**slightly**
61:4

**social**
35:22 38:11
113:19 115:9

**soft**
34:4 113:21,
23 114:2,4,8,
9,10

**sold**
103:3

**somebody**
121:13

**somewhere**
50:6 75:17
103:3 109:4
121:2

**Sonya**
111:6

**sorry**
25:17 34:4
36:16 63:1
100:14 105:13

**sort**
49:5 59:1

**South**
2:5

**space**
62:18,20

**speak**
71:23

**specific**
17:21 23:14,
15,23 46:12
55:6,14
56:23,24 64:9
67:12 73:9

78:25 88:17
106:19
121:13,21

**specifically**
39:22 55:10
89:20 102:11
106:13 120:11
124:1

**specifics**
48:4

**spell**
10:2 11:1
28:11 40:20

**spent**
50:25

**split**
15:23 20:9

**splits**
19:4

**spoke**
6:18 119:5

**spoken**
109:1 123:25

**St**
19:1,7,13,
14,22,25
20:5,8,10,
13,17,20,25
21:6,8,13,14
30:13,17
31:4,8,14
40:15 47:13
48:17 66:11

**stack**
31:6,7

**staff**
15:9

**stamped**
113:7

**stand**
26:4 40:10
43:22 67:9

86:21 88:14

**Standard**
121:7

**standards**
121:8

**stands**
26:5 86:16,
17,19,22
88:10,15
105:12

**stapled**
85:3 92:6,13

**start**
25:19 46:17
86:3 93:22
121:2

**started**
12:25 82:22
119:14

**starts**
92:13

**state**
5:9 17:17
110:24 114:14
120:12 125:4

**statement**
39:24 40:1
44:9,14,21
64:20 65:5
67:3,25 78:2
79:23,24

**statements**
30:7 92:22,25

**STATES**
1:1 67:20
80:25 102:24

**stating**
25:22 26:12
28:4 29:10

**status**
78:10 83:20

**statute**



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

74:7 76:19
**stays**
45:4
**stenographica
lly**
125:9
**Step**
35:15 37:11
42:6 43:14
113:4
**steps**
53:5 57:25
**stipulations**
6:6,11
**Stone**
64:21 79:22
110:5 116:21
**stop**
41:17 93:11
**stopped**
45:11
**Street**
2:4
**submitting**
79:13
**subscribed**
125:14
**subscriber**
116:15
**sued**
89:9 91:2
**sufficient**
38:24 40:2
41:12,25
42:20,21
**Suite**
2:4 9:5
**sum**
91:3
**summary**
82:22 91:14

92:7,11
**supervise**
13:4,7
**supervised**
13:8
**supervising**
13:10 112:23
**supervisor**
9:25 10:8,16,
19,21 14:1,3,
10 16:5 19:6,
14,16 66:13
121:17
**supervisors**
11:9 13:18,
21,22 15:22
16:3,12 60:3
**supervisor's**
122:2
**supplied**
32:4 111:1
**supposed**
35:17 37:14
**sure**
5:19 6:3
10:14 11:6,7
14:17 17:14,
20 22:21
32:19 39:2
40:23 52:2,5,
21,23 55:15
61:17 84:20
88:15 90:4
93:8,12,16
98:12 108:3,
23 109:17
114:3 120:4
**Sven**
10:25 11:21
**S-v-e-n**
10:25
**sworn**

5:6 125:6
**system**
21:15,16,21,
22,23,25
22:2,5,10,15,
22,25 23:5,
10,13,15,18,
19,23 24:23,
25 33:24,25
36:14,16 37:2
42:9,11
46:14,15
52:15 56:14,
17 57:25
58:2,4,5,8,
11,13,23
59:17 68:25
73:6 78:19,
23,25 79:4
80:5,16 81:2
82:1,11,16
83:8,16
86:11,17
88:13 89:22
90:11 91:16
94:18 105:23
109:9,11,13,
15
———— **T** ————
**T**
1:4,23 4:2
125:3,20
126:5
**take**
5:16,21,25
11:17 16:3
19:22 20:10,
17 31:6 59:10
93:14 119:22
121:4,5
**taken**
49:8 69:2
93:17 113:4
114:18 119:4

125:7,11
126:11
**takes**
46:22,25
**talk**
48:18,21
**talked**
5:14 91:17
107:10 123:21
**talking**
33:2 121:23
122:7 124:2
**talks**
28:16
**Tamara**
28:10
**Tanya**
103:18,20
**taught**
47:19
**team**
16:16 20:6,8,
10,11,14,25
31:17 48:13,
14,18,19,25
49:2 105:5,8,
11 106:20
107:1 121:15
**telephone**
18:3,9 20:17
72:13 77:13
88:4 108:8,25
110:17 112:8
**telesales**
12:9
**Telespectrum**
12:1
**Tell**
12:25 15:7
23:10 25:16
32:17 43:9
58:10,20

66:17 69:23
73:3 84:8
87:21 90:25
91:12,18,24
93:6,23 95:13
98:8,10
106:14,19,23
**telling**
48:24
**tells**
58:2
**ten**
49:15
**term**
8:12 14:24
51:14 59:4
113:21
**terms**
46:2
**testified**
5:6 49:10,16,
24 50:12
53:14
**testify**
61:17
**testifying**
7:8 50:15,25
**testimony**
51:11,13
125:8,11
**Thank**
9:4 35:8
**themselves**
85:17
**thing**
61:18 123:10
**things**
24:8 47:4
48:21 98:1
121:11
**think**
6:9 10:13



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

23:21 26:7
32:10,13
34:17 36:5
50:3 51:23
52:10 57:10
75:10 80:4
84:19 114:16

**third**
80:22

**three**
15:25 47:1
51:3 63:16
66:5 68:3
98:24 99:6
100:23

**Thursday**
4:2

**time**
5:15 18:1
19:4 27:21
30:16 36:1
41:22 42:24
45:19 46:24
49:6,24 50:25
66:24 78:24
80:6,25 83:17
91:9 98:15
99:18 103:1,
12,14 113:16
118:22,24
121:5 122:23
125:7,12

**timeframe**
27:19 118:6

**times**
49:13,15
50:12 51:7
118:21 122:8

**title**
10:4,15 11:5
28:13 40:22

**titles**
13:25 110:25

**today**
38:3 45:16
50:1,14 51:21
54:1 61:2
107:22 114:22
116:20 117:4

**together**
42:12

**told**
36:5 47:23
56:5 57:21
70:10,12 72:5
77:12 89:5
110:1 117:3

**top**
32:22 34:2
62:2 71:7
83:2 85:19
99:13,18
116:13

**Topic**
6:21

**topics**
6:20

**Total**
14:4 91:3

**totaled**
76:14

**trade**
83:25

**train**
46:12 48:4

**trained**
46:10,21
56:21 116:6,7

**training**
12:23 32:24
46:19 48:7
52:20 56:8,
10,19,24
57:6,8 61:19

**Trans**

78:14,22
79:2,19 80:23
82:6 90:9
99:3

**transaction**
65:6

**transactions**
84:14,19

**transcribed**
125:9

**transcript**
4:16 126:11

**transfer**
86:5

**transferred**
71:3 103:1,4,
7

**tried**
119:6

**Trigg**
19:19,22

**T-r-i-g-g**
19:20

**true**
7:22,24 44:16
125:11 126:13

**try**
93:13

**Trying**
31:10

**turn**
63:23 74:16
113:3

**tutorial**
58:5 59:6,10,
12,18

**two**
10:20 13:7,
13,18,20,21,
22 14:2 20:3,
16 32:11 39:3
50:3 53:25

72:12 75:6
81:5 103:4
112:6,7
113:20 121:7

**two-and-a-
half**
9:24 10:20

**type**
7:13 12:14
18:4 21:8
29:20,24
30:17 32:15
54:16,21 55:2
57:25 60:4,13
79:10,13,15,
16 80:25
81:23 82:8
92:19 94:25
96:3 105:23
117:15 118:3,
13,16,17
119:15 120:2,
8,15 123:4

**types**
33:15 46:10

**typewriting**
125:10

**typically**
37:18 95:23

---
**U**

**UDF**
110:12

**UDFs**
110:15 116:5,
6

**Ultimately**
16:5

**unable**
28:24 40:7
43:10,12
44:2,5 124:14

**uncomfortabl**

**e**
6:3

**under**
24:5 37:20
53:18 60:3
74:7 93:19
95:11,13
114:14 125:10
126:8,10,16

**underneath**
99:20

**understand**
5:21 7:8
22:21 61:4
93:19

**understandin
g**
126:15

**Union**
64:21 78:14,
22 79:2,19,22
80:23 82:6
90:9 99:3
116:21

**UNITED**
1:1

**Universal**
115:10,18
116:8

**unless**
21:4 37:17
44:16,23
50:22 76:23

**unpaid**
99:24 100:21

**update**
41:10 47:2

**updated**
37:24

**upper**
32:14

**up-to-date**



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

75:24 76:2
**use**
8:12 17:23
21:16,17,21
46:14 55:1
59:17 87:3
103:5
**user**
59:16
**uses**
86:25
**Usual**
6:6,11
**Usually**
83:8 119:22

───── V ─────

**v**
4:1
**valid**
40:8 41:10
42:15 43:1,7,
11,13 44:3,6,
10 79:24
124:15
**validation**
24:4,17 25:8,
13 34:24
35:2,13 36:9
61:11
**various**
121:24
**vary**
29:24
**vendors**
55:2
**verbal**
34:19 35:12,
16,20 37:14
38:3
**verbiage**
83:23

**verification**
70:7
**verified**
79:3,5
**verify**
22:25 38:10
79:23 116:22
**verifying**
35:22 70:8
**version**
85:12 94:11
**versus**
23:12 30:13
51:1 120:3,22
**via**
57:18 104:20
**videoconferen
ce**
47:15,18
**view**
37:4 47:17
93:25 94:9,11
**violation**
55:23 65:19
**volume**
118:20 120:16
**VP**
10:13 40:23
**vs**
1:7 126:6

───── W ─────

**WACHSCNL**
98:9
**Walk**
35:19
**want**
8:24 35:4,18
83:8 104:4
121:11
**wanted**

72:1
**wants**
27:1
**warning**
36:4,8 37:5
41:7,13,20
42:1 45:23
96:14,23
106:5
**wasn't**
22:4,5 54:12
56:23 119:7
**way**
38:3 51:10
75:14 89:25
106:12,13
114:9 123:11
**ways**
121:24
**week**
60:18,20,24
103:4
**weekly**
117:18,24
119:24
**weeks**
46:23 47:1
50:3
**welcome**
113:11
**we'll**
5:16 48:20
60:6 74:24
75:19 85:4
93:22 107:18
**went**
89:11
**we're**
6:23 32:20
33:2 34:11
72:19 75:1
93:10 98:3

115:4 124:22
**West**
1:20 2:4
**we've**
87:24 91:17
109:5 114:20
122:21
**whatever**
41:5 118:22
**Whereas**
99:19
**WHEREOF**
125:14
**whether**
14:19 27:9
31:13 58:1
60:11 75:14
79:23,24
120:22
**whole**
16:21 121:15
**within**
24:3,16 25:8,
13 33:10
34:22 35:2
52:14 57:16
88:21 94:21
124:10
**WITNESS**
3:3,12 6:10
7:2 9:4
32:12,23
39:11 44:23
51:3 52:1
54:5,7 56:3
61:15 93:12
100:15 104:17
106:4 117:9
125:6,14
**woman**
11:3 69:14,15
**work**
9:23 11:25

12:12 21:20
22:5,14 34:7
36:9 37:8
46:18 50:18,
21 74:10
111:8,14,23
112:18,20
118:8,10,14
119:6 120:25
121:2
**worked**
12:9,18
116:1,4 118:5
**working**
11:15 12:18
104:3
**workload**
15:10 19:14
20:9,12 48:22
**work-product**
54:5
**worksheet**
104:2
**wouldn't**
49:1 71:8
77:22 118:25
**write-up**
118:17
**writing**
24:3 25:7,13
27:13 35:25
44:2 65:9
77:13
**written**
29:15 34:25
35:1 36:3
38:7 43:23
45:18 53:12
84:4 120:2,9,
11

───── X ─────

**XF**



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

83:20 101:1

**Y**

**Yeah**
12:17 27:25
59:8 60:21,25
94:3,9 103:11
105:10 106:21
**year**
10:7 47:7,8
50:13 53:21
**years**
9:11,24 10:20
12:11 13:9
15:18 16:9
**YGC**
66:7 67:8
84:16 102:6,
7,9,13
**Yudenfreund**
28:10
**Y-u-d-e-n-f-r-e-u-n-d**
28:12

**Z**

**Z76**
71:6,10
**Zabka**
10:25 11:21
**Z-a-b-k-a**
11:2
**zero**
68:4

**0**

**023**
36:4,5 37:5
**026**
27:3
**09**
105:12,15

**1**

**1**
4:7 6:24,25
14:6 35:15
51:23 62:3,14
63:18,24
**10**
67:15 74:16
94:23 113:8,
9,13
**10/19/2007**
86:10
**10/26**
86:12
**107**
4:10
**109**
80:25 81:23
**10th**
69:18
**11**
82:21 108:9
**11/08**
67:3
**112**
82:8
**119**
101:11
**11902**
1:23 4:2
125:20
**11th**
71:17
**12**
79:10 80:13
84:6
**120**
45:7 80:9,10
**124**
3:8
**125**
102:4

**128**
102:18
**130**
41:20,21,22
45:23
**131**
103:24
**1344**
91:3
**1381**
91:10
**13th**
68:14
**14**
4:9 85:3
112:22 113:8
**144**
104:14,16
**15**
51:9 113:8
**154**
52:11 105:1
**158**
52:11
**1587**
99:11,24
**15-minute**
121:7
**16**
1:18 4:2 5:3
82:25
**160**
52:11
**1600**
72:19,20
**1602**
100:4
**1603.15**
63:19
**163**

**32:20 33:6**
34:8,18 61:22
**164**
34:18
**167**
35:12
**168**
38:6 39:4,16
**169**
32:21 33:6
34:9 38:6
42:6 61:23
124:10,12
**16th**
1:21 99:8,23
**17**
4:9 85:3 88:3
**1709**
76:17
**1799**
99:13
**17th**
13:2
**18**
52:1,2 73:25
74:8 76:20
89:6
**19**
52:2 80:22
**1979**
83:2
**1st**
27:25 28:20
117:6,12

**2**

**2**
4:8 14:7
62:3,14 63:23
75:2,3,5
77:11 78:13
96:17 106:18,

**23** 108:7,11
**2/24/2010**
90:21
**20**
51:9 95:20
96:1 126:20
**200**
9:5
**2000**
64:17 74:11
**2003**
13:2
**2004**
33:20,22 65:2
67:24 73:25
111:3
**2007**
62:24 63:1,3
74:8 76:20
82:25 86:4
91:9 94:23
99:9,23
117:5,12
**2008**
29:14 45:13
49:17,25
59:25 61:1,5,
8 62:4,6 63:6
64:15 65:19
77:2,8 78:12,
22 80:13
87:5,7,9,25
88:1 100:3,8,
9,11,13,14,
17 101:1,4
**2009**
13:14,15
29:14 38:4
45:13 67:15
69:18 72:19
80:22 81:20
108:9
**2010**



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                    September 16, 2010
154

**1:18** 4:2 5:3
28:20 37:25
47:10 74:18,
19 82:5 90:6
101:6 117:3,
6,13 125:15
**202**
32:21 33:3
**204**
32:21 33:3,4
51:23
**206**
51:25 115:5
**20th**
62:23 63:3
81:20
**21**
87:7
**21st**
77:2 87:9
**22**
62:4,6 63:6
**230**
121:3
**23rd**
125:15
**24**
113:3
**25**
74:17 113:16
**250**
112:21
**25th**
74:11 82:5
90:6
**26**
63:1
**27**
91:1
**286**
41:7,13,21

**45:23**
**29**
64:15 65:19
86:4
**29501**
2:5

─────── 3 ───────

**3**
4:9 62:14
64:13 77:1
83:20 85:5,6,
8 109:22
**3/11/2009**
69:10
**30**
52:2 57:16
93:14
**300**
112:21
**306**
2:9
**30th**
66:3 77:8
87:5 88:1
**313**
124:23
**33**
92:13
**330**
121:3
**345156**
126:4
**35**
52:5
**351**
94:7
**35201-0306**
2:9
**37**
52:5
**38**

**89:6** 90:5
**39**
91:12

─────── 4 ───────

**4**
4:10 88:3
107:20 108:8
**40**
92:6 95:21
**400**
60:23
**402**
1:20
**42**
92:6
**430**
121:3
**45**
24:4,16 25:8,
13 26:10
27:13 34:22
35:2,6,9,13
43:23 92:14
94:10
**45-day**
25:21 34:19,
25 45:19
**45-F**
24:1
**45-G**
23:25 24:2,
18,22
**45-P**
23:25 24:7
25:10
**46**
93:6
**48**
93:6
**49**
93:22 94:7

─────── 5 ───────

**5**
3:7 6:21 40:7
42:6 67:14
68:20 110:24
124:11
**500**
120:25 121:1
**5034**
71:3,4
**51**
52:6 93:22
**510-CV-369-
IPJ**
1:7
**52**
74:18,24
113:10,14
**53**
65:24 66:17
67:2 69:18
**54**
3:14 113:10,
14
**549**
2:4
**55**
94:13,14
95:18
**57**
94:14
**58**
52:6
**5th**
64:17 87:25

─────── 6 ───────

**6**
3:14 4:7
37:11 43:14
78:12,22
**6/7/10**

**99:17**
**60**
96:7
**600**
121:3
**61**
97:5,15
**63**
97:15
**63346**
95:6,9
**64**
97:8,15,16
**65**
97:16
**66**
97:16
**68**
96:7

─────── 7 ───────

**7**
7:2 73:3,15,
23 74:18
94:6,8,12
**70**
118:12,14,25
**700**
121:3
**73**
62:11,22 98:3
**75**
4:8

─────── 8 ───────

**8**
6:21 67:24
74:16 113:7,
9,13
**800**
120:25 121:3
**8000**



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                              September 16, 2010
                                                            155

60:19

**85**
4:9 98:6

**8875**
9:5

**8th**
65:2

---
                    **9**
---

**9**
43:14

**9/9/10**
115:19

**900**
120:25

**909**
1:19

**91**
98:18

**92123**
9:6

**95**
22:20

**954**
105:5,14
106:12,14,20,
22,24 107:2,3

**954.12**
67:3 77:17,20
78:3

**99**
57:21

**99.9**
44:25



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com