FILED
2010 Nov-15  PM 04:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

*Jamon Brim v. Midland Credit Management, et al.*
### Case No. 5:10-cv-0369-IPJ

# Exhibit C
## Deposition of Jamon Brim

# FREEDOM COURT REPORTING

Page 1

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE NORTHERN DISTRICT OF ALABAMA
3        NORTHEASTERN DIVISION
4    CIVIL ACTION NUMBER 5:10 CV369-IPJ
5
6    JAMON T. BRIM,
7        Plaintiff,
8    V.
9    DELL FINANCIAL SERVICES, LLC; et al.,
10       Defendants.
11
12       S T I P U L A T I O N
13       IT IS STIPULATED AND AGREED by and
14   between the parties through their respective
15   counsel that the deposition of JAMON T. BRIM,
16   may be taken before Lori S. Sizemore,
17   Registered Professional Reporter, Notary
18   Public, State of Alabama at Large, at the
19   offices of Freedom Reporting, Huntsville,
20   Alabama, on OCTOBER 13, 2010, commencing at
21   approximately 9:00 A.M.
22       IT IS FURTHER STIPULATED AND AGREED
23   that the signature to and the reading of the

Page 2

1    deposition by the witness is waived, the
2    deposition to have the same force and effect as
3    if full compliance had been had with all laws
4    and rules of Court relating to the taking of
5    depositions.
6        IT IS FURTHER STIPULATED AND AGREED
7    that it shall not be necessary for any
8    objections to be made by counsel to any
9    questions, except as to form or leading
10   questions and that counsel for the parties may
11   make objections and assign grounds at the time
12   of trial or at the time said deposition is
13   offered in evidence, or prior thereto.
14       IT IS FURTHER STIPULATED AND AGREED
15   that notice of filing of the deposition by the
16   Commissioner is waived.
17
18
19
20
21
22
23

Page 3

1        I N D E X
2
3    EXAMINATION INDEX
4
EXAMINATION OF JAMON BRIM
5
BY MR. TOMPKINS ...... 6
6
7
8        EXHIBIT INDEX
8
Defendant's
9
10   1  Itemized statement        25
10
11   2  Surge protector statement     27
11
12   3  Statement            29
12
13   4  Purchase document        30
13
14   5  Statement            36
14
15   6  BBB Complaint         42
15
16   7  Letter to Dell        51
16
17   8  Letter from Dell         54
17
18   9  Letter to Midland      58
18
19   10 Letter to Midland dated 3/10/09   61
19
20   11 Equifax credit report      69
20
21   12 Experian credit report     77
21
22   13 TransUnion credit report     82
22
23   14 Letter sent to Equifax      86
23

Page 4

1        EXHIBIT INDEX CONTINUED
2    Defendant's
3    16 Letter sent to TransUnion      88
4    17 Investigation from TransUnion      89
5    18 Experian Credit Report      92
6    19 Letter sent to Equifax      93
7    20 Dispute to Experian      96
8    21 Letter to TransUnion      98
9    22 Investigation from Equifax    100
10   23 TransUnion investigation result    102
11   24 Experian results         103
12   25 Redstone document        124
13   26 American Express credit denial    129
14   27 Plaintiff's Response to Defendant    140
        Midland's First Interrogatories
15      and Request for Production
16
17
18
19
20
21
22
23

## 2015 3RD AVENUE NORTH
## (205) 397-2397 BIRMINGHAM, ALABAMA 35203 877-373-3660

# FREEDOM COURT REPORTING

Page 5

A P P E A R A N C E S

APPEARING ON BEHALF OF THE PLAINTIFF:
Ronald C. Sykstus
BOND, BOTES, SYKSTUS, TANNER
& EZZELL, P.C.
415 Church Street, Suite 100
Huntsville, Alabama 35601


APPEARING ON BEHALF OF THE DEFENDANTS:

Jason B. Tompkins, Esq.

BALCH & BINGHAM, LLP

Post Office Box 306

Birmingham, Alabama 35201


I, Lori S. Sizemore, a Registered
Professional Reporter, of Decatur, Alabama, and
a Notary Public for the State of Alabama at
Large, acting as Commissioner, certify that on
this date, pursuant to the Federal Rules of
Civil Procedure, and the foregoing stipulation

Page 6

of counsel, there came before me at the offices
of Freedom Reporting, Huntsville, Alabama,
commencing at approximately 9:00 A.M. on
OCTOBER 13, 2010, JAMON T. BRIM, witness in the
above cause, for oral examination, whereupon
the following proceedings were had:

JAMON T. BRIM,
being first duly sworn, was examined
and testified as follows:

COURT REPORTER:  Usual stipulations?
MR. SYKSTUS:  Yes.
MR. TOMPKINS:  Yes.
EXAMINATION
BY MR. TOMPKINS:
Q. Mr. Brim, my name is Jason Tompkins. I
represent Midland Funding & Midland Credit
Management in the lawsuit you filed. I'm going
to be asking you questions today. Have you
ever given a deposition before?
A. I have not.
Q. If you don't understand any of my

Page 7

questions, just let me know and I'll repeat
them or try to rephrase it. Make sure you
answer all the questions clearly since
everything you say is being taken down.
Um-hums and hum-ums don't come off very well
when you read them and can't get the tone. If
you need to take any breaks, just let me know.
And that's fine. I just ask that we don't take
a break while the question is pending. Answer
the question that's pending and then you can
take a break if you need to.
For the record, would you state your full
name?
A. Jamon Tremayne Brim.
Q. Would you spell your middle name?
A. T-R-E-M-A-Y-N-E.
Q. Mr. Brim, how old are you?
A. Thirty-two.
Q. And what's your birth date?
A. ███████ 1977.
Q. Are you married?
A. No.
Q. Have you ever been married?

Page 8

A. No.
Q. Do you have any children?
A. Yes.
Q. How many children do you have?
A. Two.
Q. And what are their names?
A. JaMya Brim and Angela Brim.
Q. Can you spell --
A. J-A-M-Y-A. Capital M-Y-A, Brim.
Q. And Angela Brim?
A. Yes.
Q. And how old are they?
A. Seven and four.
Q. Do they live with you?
A. No.
Q. And who do they live with?
A. Their mother.
Q. And what is her name?
A. Adrianne Jones.
Q. Ms. Jones and your children live in
Huntsville?
A. Yes.
Q. Are you on any medications today?

2 (Pages 5 to 8)

## FREEDOM COURT REPORTING

Page 9

1    A. No.
2    Q. Have you taken any medications in the
3  last twenty-four hours?
4    A. No.
5    Q. Where do you currently live?
6    A. My address?
7    Q. Yes, your address.
8    A. 2426 Autumn Ridge Drive Southwest,
9  Huntsville, Alabama 35803.
10   Q. And is that a house or an apartment?
11   A. A house.
12   Q. Do you own that house?
13   A. I'm trying to own it.  The bank owns it
14  now.
15   Q. So you have a mortgage?
16   A. Yes.
17   Q. And how long have you lived there?
18   A. A year.
19   Q. Does anyone live with you there?
20   A. No.
21   Q. Where did you live before 2426 Autumn
22  Ridge?
23   A. 2225 Golf Road Southwest, Unit 106,

Page 10

1  Huntsville.  And the ZIP is 35802.
2    Q. I take it that was an apartment?
3    A. Yes.  It was a condo.
4    Q. Did you rent that or own it?
5    A. I rented it.
6    Q. Did anyone live with you in that unit?
7    A. No.
8    Q. And how long did you live there?
9    A. I cannot remember the exact number.
10  I'd say about three or four years, maybe.
11   Q. And where did you live before 2225 Golf
12  Road?
13   A. 4134-H South Memorial Parkway.  And it
14  was the same ZIP as Golf Road.
15   Q. Is that a house or an apartment?
16   A. Apartment.
17   Q. And you rented that apartment?
18   A. Yes.
19   Q. Do you recall how long you lived at
20  that address?
21   A. I do not.
22   Q. What's the highest level of education
23  that you've completed?

Page 11

1    A. Bachelor's degree.
2    Q. And what is that degree in?
3    A. Business management.
4    Q. And where is that degree from?
5    A. Alabama A & M.
6    Q. Is Alabama A & M the only college
7  you've attended?
8    A. University.  Is it, period?
9    Q. Is it the only college you attended?
10   A. No, it's not.
11   Q. Where else did you attend?
12   A. University of Maryland, University
13  college.
14   Q. Did you get a degree?
15   A. No.
16   Q. Do you remember when you attended the
17  University of Maryland?
18   A. It was about two years ago.
19   Q. What year did you get your --
20   A. No, no, it was longer than two years
21  ago.  It was at least five years.
22   Q. What year did you get your degree from
23  Alabama A & M?

Page 12

1    A. 2004.
2    Q. Do you have any student loans for any
3  of these --
4    A. Yes.
5    Q. -- colleges?
6    A. Yes.
7    Q. Which one?
8    A. Which student loan company or --
9    Q. Which universities do you have student
10  loans for?
11   A. Both of them.
12   Q. Both of them?
13   A. I went to another school.
14   Q. Which one?
15   A. Athens State University.
16   Q. And when was that?
17   A. Last year.
18   Q. Are you still going there?
19   A. Not this semester.  I was.
20   Q. Are you working toward another degree?
21   A. Yes.
22   Q. What degree?
23   A. Accounting.

3  (Pages 9 to 12)

## 2015 3RD AVENUE NORTH
## (205) 397-2397 BIRMINGHAM, ALABAMA 35203 877-373-3660

**FREEDOM COURT REPORTING**

Page 13

1    Q. And is that a bachelor's degree?
2    A. Yes.
3    Q. Do you know approximately how much in
4    student loans you have?
5    A. I do not, total.
6    Q. Who are the lenders?
7    A. Sallie Mae and direct loans. I think
8    it's the U.S. department.
9    Q. And where did you graduate from high
10   school?
11   A. Tupelo High School.
12   Q. Mississippi?
13   A. Yes.
14   Q. What year was that?
15   A. '96.
16   Q. Are you currently employed?
17   A. Yes.
18   Q. And where do you work?
19   A. Yellow Book USA.
20   Q. And what is your position there?
21   A. Distribution manager.
22   Q. What does a distribution manager do?
23   A. I travel around and hire people to

Page 14

1    distribute the Yellow Book product.
2    Q. And Yellow Book is like the Yellow
3    Pages?
4    A. That's our competition, but yes.
5    Q. How would you describe that? It's a
6    directory of?
7    A. Service. I would call it a service
8    company.
9    Q. Is that publication the only product
10   that Yellow Book has?
11   A. I mean, we buy out -- or they buy out
12   other companies, and they don't put Yellow Book
13   on the cover right when they buy it out, so --
14   Q. But same type of products?
15   A. Yes.
16   Q. Just different names. How long have
17   you worked at Yellow Book?
18   A. Five years.
19   Q. Is that the only job you've held over
20   the last five years?
21   A. It is.
22   Q. Where did you work before Yellow Book?
23   A. Target Distribution Center.

Page 15

1    Q. And what did you do there?
2    A. Distribution. I worked in the
3    warehouse. I was a warehouse worker.
4    Q. How long did you work at Target?
5    A. One or two years.
6    Q. Did you have any other sources of
7    income other than Yellow Book for the past five
8    years?
9    A. None.
10   Q. Have you ever filed bankruptcy?
11   A. No.
12   Q. Have you ever been convicted of any
13   criminal offense?
14   A. No.
15   Q. And I want to talk a little bit about
16   the Dell computer purchase --
17   A. Okay.
18   Q. -- that forms the basis of this
19   lawsuit, ultimately. Do you remember exactly
20   what you purchased from Dell?
21   A. A computer.
22   Q. Anything else other than computer?
23   A. A surge protector that came with the --

Page 16

1    you know, I had to buy it separately, but it
2    came with the computer.
3    Q. Is this a laptop or a desktop?
4    A. Desktop.
5    Q. Did you buy a monitor?
6    A. I mean, it came -- I think it was a
7    package.
8    Q. And why did you buy a computer?
9    A. Because I think at the time I might --
10   think I was -- started thinking about online
11   school, or maybe I just wanted a computer.
12   Q. Do you remember when you made that
13   purchase?
14   A. October. It was on credit. October.
15   Q. When you say it was on credit --
16   A. Like it was supposed to be financed,
17   but I knew I was going to buy it. This was to
18   establish credit.
19   Q. October of what year?
20   A. '04.
21   Q. And how did you order it? Did you do
22   it over the phone --
23   A. Over the phone.

4  (Pages 13 to 16)

**2015 3RD AVENUE NORTH**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35203 877-373-3660**

## FREEDOM COURT REPORTING

Page 17

1    Q.  Did you find the computer through a
2   catalog or on the internet?
3    A.  I just called, I think.
4    Q.  Did you speak to a live person?
5    A.  I did.
6    Q.  Do you recall her name, his name?
7    A.  It was a her, but I can't remember her
8   name.
9    Q.  You said it was supposed to be
10  financed?
11   A.  Yes.
12   Q.  Was that directly through Dell?
13   A.  Yes.
14   Q.  And why did you choose to finance it
15  through Dell?
16   A.  I mean, it was just, I think, like nine
17  hundred and fifty-four dollars -- or nine
18  hundred, actually, and the surge protector was
19  thirty.
20   Q.  Were you offered any incentive to
21  finance it through Dell?
22   A.  Just -- I think they had something like
23  preferred customer or something.  It was

Page 18

1   preferred something.  I really can't remember.
2    Q.  Do you remember if you got any sort of
3   discount for financing it through Dell?
4    A.  I don't think it was a discount.
5    Q.  Did you open a Dell line of credit at
6   the time that you placed the order?
7    A.  Just for the computer.
8    Q.  Do you remember any of the terms of the
9   line of credit?  How long you had to pay,
10  interest rate, anything like that?
11   A.  I don't remember because I knew that I
12  was going to pay it within thirty days.
13   Q.  And what was significant about thirty
14  days?
15   A.  That's when they were going to start
16  adding on interest.
17   Q.  And had you ever had a Dell account
18  prior to that?
19   A.  Never had any business with Dell before
20  that.
21   Q.  And did you pay it within the thirty
22  days?
23   A.  Of course.

Page 19

1    Q.  And how did --
2    A.  It was like within fifteen days.
3    Q.  Within fifteen days of the purchase?
4    A.  Yes.
5    Q.  How did you pay it?
6    A.  Check.
7    Q.  Bank check?
8    A.  Like a draft check over the phone.
9    Q.  Tell me a little bit about that
10  process.  How did you know what number to call?
11   A.  I just -- I think it was just a
12  one-eight-hundred number that I called, and
13  they directed me to the right place.
14   Q.  Do you remember where you got that
15  one-eight-hundred number?
16   A.  Maybe the same number I called to order
17  the computer.
18   Q.  And they transferred you to someone
19  else?
20   A.  I think so.
21   Q.  Do you recall if you spoke to a live
22  person when --
23   A.  When I made the payment, I did.

Page 20

1    Q.  Do you recall that person's name?
2    A.  I do not.
3    Q.  So just describe to me what happened on
4   the phone when you were transferred to this
5   person.
6    A.  I just told them I was paying the
7   computer off.
8    Q.  Did you tell them the amount you were
9   paying?
10   A.  Well, I knew what it was, but I asked
11  him how much did I owe, and he told me and I
12  paid it.
13   Q.  Do you remember receiving a bill before
14  calling to make the payment?
15   A.  I might have, but I do not remember.
16  The lady that I spoke to when I ordered the
17  computer, she told me exactly how much I owed.
18   Q.  Is that the amount you paid?
19   A.  Yes.
20   Q.  So did this -- you referred to the
21  person you talked to when you paid as a him, so
22  did he give you the same amount --
23   A.  Yes.

## 2015 3RD AVENUE NORTH
## (205) 397-2397 BIRMINGHAM, ALABAMA 35203 877-373-3660

## FREEDOM COURT REPORTING

Page 21

1    Q. -- that the lady when you ordered gave
2  you?
3    A. Yes.
4    Q. And where was that check drawn from?
5    A. Redstone Federal Credit Union.
6    Q. And how are you eligible to be a member
7  of that credit union?  Through your job or
8  military service?
9    A. I just went in.
10    Q. Is that an account solely in your name
11  or is it a joint account?
12    A. My name.
13    Q. Do you remember when you opened that
14  account?
15    A. No, I do not.
16    Q. Is it still open?
17    A. Yes.
18    Q. Is there a particular branch of
19  Redstone that you use?
20    A. All of them.
21    Q. How many are there?  Do you know?
22    A. I do not know because they have them in
23  Decatur, and I think there is one in Marshall

Page 22

1  County.
2    Q. How many of the branches do you think
3  you use?
4    A. I've used probably all of them.
5    Q. Do you work with any of them more
6  frequently than others?
7    A. Maybe -- recently maybe the one down
8  South Parkway, which is by Wal-Mart.
9    Q. You said recently.  Is there one you
10  used more before that?
11    A. Not that I can recall.
12    Q. At the time of your Dell purchase, was
13  there a particular branch that you used a lot?
14    A. Maybe the street -- I can't remember.
15  I don't know if it's Bailey Cove.  It's right
16  off of Bailey Cove.
17    MR. SYKSTUS:  Just for clarification,
18  it's Bailey Cove and Weatherly.
19    Q. Do you know any of the tellers at any
20  of the branches?
21    A. By name, no.
22    Q. Any of the managers?
23    A. No.

Page 23

1    Q. No particular people that you use on a
2  regular basis?
3    A. No.
4    Q. Did you get a receipt from Dell for
5  that purchase?
6    A. If I did, it would have came in the
7  e-mail, and I do not remember.
8    Q. Have you checked your e-mail --
9  searched your e-mail for that?
10    A. Yes.
11    Q. Did you request a receipt?
12    A. I don't remember.
13    Q. Had you made phone payments like this
14  before to other companies?
15    A. Physically went in.
16    Q. So before your phone payment to Dell,
17  you'd never paid with a check by phone to
18  anyone?
19    A. No, not that I can recall.  Maybe I
20  have like a cable bill or something, but I
21  don't remember.
22    Q. Have you made payments by that method
23  since the Dell purchase?

Page 24

1    A. I make payments over the internet now.
2    Q. And not by phone?
3    A. Not by phone.
4    Q. You said if you had a receipt it would
5  have come to the e-mail.  You had internet
6  access --
7    A. Yes.
8    Q. -- at the time you ordered that
9  computer?
10    A. No, when I purchased the computer, I
11  ordered the internet, when I did get the
12  computer.  So maybe like after that, they sent
13  the e-mail or receipt.
14    Q. Prior to purchasing the Dell computer,
15  did you have internet access?
16    A. Probably only on the school campus.
17    Q. Did you own another computer before
18  purchasing --
19    A. No.  I mean, I think I had an old
20  computer, but not -- it was like an old --
21  just maybe to write reports on.
22    Q. Was it connected to the internet?
23    A. No.

6 (Pages 21 to 24)

## 2015 3RD AVENUE NORTH
## (205) 397-2397 BIRMINGHAM, ALABAMA 35203 877-373-3660

# FREEDOM COURT REPORTING

Page 25

1    Q. I'm going to show you a document that
2 I'm marking as Defendant's Exhibit One and ask
3 you if you recognize this document?
4
5        (Whereupon, Defendant's Exhibit One was
6        marked for identification and copy of
7        same is attached hereto.)
8
9    A. It looks like the itemized statement of
10 the computer I purchased.  I'm not for sure,
11 but it looks like it.
12    Q. Do you think you received this after
13 you purchased the computer?
14    A. After?  I don't think so.
15    Q. Did you receive it at the time you
16 purchased the computer?
17    A. Like when I first ordered it, I think I
18 did.
19    Q. Do you see the receipt total at the
20 bottom?
21    A. I do.
22    Q. What is that amount?
23    A. $914.25.

Page 26

1    Q. Does that amount sound familiar?
2    A. It sounds about right.
3    Q. If you look up at the top, ship to, and
4 it has your name and it says Target stores?
5    A. You lost me.  Okay.  I see it.
6    Q. So you had this computer delivered to
7 your work address?
8    A. No, to -- I remember now.  At the time,
9 I worked at Target Distribution, and there was
10 a discount on Dell computers if I was an
11 employee.
12    Q. Do you remember if you had to sign up
13 for the financing to get that discount?
14    A. No, I didn't.
15    Q. You didn't have to?
16    A. No, I didn't.
17    Q. Do you see the date at the top of
18 this -- top right-hand corner of this document?
19    A. Yes.
20    Q. September 17, 2004; is that correct?
21    A. Yes.
22    Q. Do you think that's the day you ordered
23 the computer?

Page 27

1    A. No.  I don't remember September --
2 ordering it in September.
3    Q. I think you said earlier you thought it
4 was October?
5    A. Yes.
6    Q. I'm going to show you another document
7 that I'm marking as Defendant's Exhibit Two.
8
9        (Whereupon, Defendant's Exhibit Two was
10        marked for identification and copy of
11        same is attached hereto.)
12
13    A. Okay.
14    Q. And ask if you recognize this?
15    A. That's the surge protector I told you
16 about earlier.
17    Q. Is this the receipt for the surge
18 protector?
19    A. Is this the receipt?  I didn't receive
20 this -- like when I ordered this, it came with
21 this.  You know, like all on one -- it was
22 actually an e-mail.  She e-mailed it to me, and
23 this was with this.

Page 28

1    Q. She e-mailed what to you?
2    A. This -- a statement like this.  I don't
3 know if this is the exact one, but something
4 like this that had the surge protector added on
5 it.
6    Q. So you received a statement by e-mail?
7    A. Yes.
8    Q. Similar to Defendant's Exhibits One and
9 Two?
10    A. Yes.
11    Q. And when did you receive that?
12    A. When I ordered the computer from her.
13 Maybe a day or two later.
14    Q. So you received that before you
15 actually received the computer?
16    A. The statement?
17    Q. Yes.
18    A. Yes.
19    Q. I show you a document that I'm marking
20 as Defendant's Exhibit Three.
21
22        (Whereupon, Defendant's Exhibit Three
23        was marked for identification and copy

## 2015 3RD AVENUE NORTH
## (205) 397-2397 BIRMINGHAM, ALABAMA 35203 877-373-3660

# FREEDOM COURT REPORTING

Page 29

1    of same is attached hereto.)
2
3        Q.  Do you recognize that?
4        A.  Yes.
5        Q.  And what is this?
6        A.  This is what I provided to my attorney.
7        Q.  How would you describe this document?
8        A.  This is one of the statements that I
9    received after the computer was paid for.
10       Q.  Do you see a date on this statement?
11       A.  November 10.
12       Q.  What year?
13       A.  2004.
14       Q.  So you're saying you paid for the
15   computer prior to --
16       A.  Yes.
17       Q.  -- November 10, 2004?
18       A.  Yes.
19       Q.  Do you see the previous balance?
20       A.  $934.78.
21       Q.  That's right.  Does that number look
22   familiar to you at all?
23       A.  I cannot remember the number.

Page 30

1        Q.  Do you recall receiving this in
2    November of 2004?
3        A.  I had received several of these
4    statements.  But this particular one, I don't
5    remember.  To be honest, I don't remember any
6    of them, but I remember getting them.
7        Q.  So you recall receiving statements --
8        A.  Yes.
9        Q.  -- from Dell, but you're saying you
10   don't recall specific amounts?
11       A.  No.
12       Q.  I show you a document I'm marking as
13   Defendant's Exhibit Four.
14
15          (Whereupon, Defendant's Exhibit Four
16          was marked for identification and copy
17          of same is attached hereto.)
18
19       Q.  Do you recognize this?
20       A.  Yes.
21       Q.  And what is it?
22       A.  This is a paper I provided to my
23   attorney.

Page 31

1        Q.  And what is it?
2        A.  This is showing the purchase of the
3    computer.
4        Q.  Showing the purchase -- and where is
5    this document from?
6        A.  Redstone Federal Credit Union.
7        Q.  Is this a statement of your account?
8        A.  Yes.
9        Q.  You said showing the purchase of the
10   computer.  Can you show me where it shows the
11   purchase of the computer?
12       A.  November 8, at the bottom.
13       Q.  Can you read that --
14       A.  Dell financial payment.
15       Q.  There is a number after that.  Do you
16   know what that is?
17       A.  I cannot read that number.
18       Q.  What amount does it show?
19       A.  $954.12.
20       Q.  Looking back at Defendant's Exhibit
21   One, do you have any idea why that number
22   differs?
23       A.  I do not.  Maybe the surge -- you mean

Page 32

1    the $914.25?
2        Q.  Yes.
3        A.  The surge protector is not added on
4    there.
5        Q.  Okay.  Looking at Defendant's Exhibit
6    Two, which you told me showed the surge
7    protector, do you see a total amount for that?
8        A.  I do.
9        Q.  What is that amount?
10       A.  It is 934.78, I think.  My math might
11   be off.
12       Q.  And then looking at Defendant's Exhibit
13   Three, which is the Dell statement?
14       A.  Um-hum.
15       Q.  Do you see the amount that says
16   previous balance?
17       A.  I do.  The same number.
18       Q.  I'm impressed by the quick math, by the
19   way.
20       A.  Well, my minor was accounting, but
21   thank you.
22       Q.  So, on Defendant's Exhibit Four, there
23   is your bank statement showing a debit of

## 2015 3RD AVENUE NORTH
## (205) 397-2397 BIRMINGHAM, ALABAMA 35203 877-373-3660

# FREEDOM COURT REPORTING

Page 33

1  $954.12?
2     A. Correct.
3     Q. You told me earlier that the amount you
4  paid was the amount they told you over the
5  phone?
6     A. That -- what I owed?
7     Q. Yes, sir.
8     A. Um-hum.
9     Q. Do you think that's the amount that
10  they told you over the phone, the 954.12?
11     A. That's what I thought it was.
12     Q. Other than receipts or statements
13  similar to Defendant's Exhibits One and Two,
14  did you receive any other documents from Dell
15  at the time you made your purchase?
16     A. No.
17     Q. After you made your payment to Dell
18  listed on your bank statement as November 8,
19  did you hear from Dell again?
20     A. I did not.
21     Q. But you did tell me you continued to
22  receive statements from them?
23     A. I received this one, and I don't think

Page 34

1  I received another one until months later.
2     Q. When's the first time you learned that
3  Dell said you still owed them?
4     A. When I received a second statement.
5     Q. Do you remember about when that was?
6     A. I do not, to be honest.
7     Q. But you think it was months --
8     A. I think it was.
9     Q. -- later after -- months after November
10  2004?
11     A. Correct.
12     Q. From November 2004 until the time you
13  received that statement, did you have any idea
14  that Dell was contending you hadn't paid?
15     A. No, because I thought the issue was
16  done.
17     Q. So after you received a statement
18  months later, what did you do?
19     A. I called Dell.
20     Q. Do you remember what month that may
21  have been?
22     A. I do not remember the month.
23     Q. And what did -- did you talk to someone

Page 35

1  live at Dell?
2     A. I did.
3     Q. Do you remember who?
4     A. It was a guy. After the first person
5  that I spoke with, the lady, it was nothing but
6  guys after that. It was foreign guys.
7     Q. What did you tell Dell when you called
8  them?
9     A. That it was paid.
10     Q. What was their response?
11     A. Send them the receipt or send them, I
12  think, a statement. Bank statement.
13     Q. So they told you to send the bank
14  statement?
15     A. Correct.
16     Q. Did they ask you to send anything else
17  other than a bank statement or a receipt?
18     A. No.
19     Q. I show you what I'm marking as
20  Defendant's Exhibit Five and ask you if you
21  recognize that?
22
23        (Whereupon, Defendant's Exhibit Five

Page 36

1        was marked for identification and copy
2        of same is attached hereto.)
3
4     A. Yes.
5     Q. And what is this?
6     A. This is a letter I provided to my
7  lawyer.
8     Q. Okay. And what is that document?
9     A. This is a document with the -- another
10  balance on the date of February 10.
11     Q. Who is this document from?
12     A. Dell.
13     Q. Is this the statement you were
14  referring to that you received months later?
15     A. Yes.
16     Q. And what's the balance that Dell says
17  you owe now?
18     A. It's $1,122 -- no, I'm sorry. It is
19  $1,185.69.
20     Q. There is some handwritten notation --
21     A. That is.
22     Q. -- in the middle of that page. Can you
23  tell me what that is?

**2015 3RD AVENUE NORTH**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35203 877-373-3660**

# FREEDOM COURT REPORTING

Page 37

1    A. I had called the Better Business Bureau
2  on Dell.
3    Q. So this says BBB number --
4    A. That's the case number.
5    Q. Did you write this on this document?
6    A. I did.  That's my writing.
7    Q. If you would look with me on Page Two
8  of this document, there are two boxes about
9  halfway down.  In the left-hand box, there is
10  some additional handwriting.
11    A. Yes.
12    Q. Can you tell me what that refers to?
13    A. It's either the case number with
14  Dell -- I think it's the case number with Dell,
15  and a number that I faxed -- it might not be
16  the number I faxed.  It's a number that I
17  called -- it might be the finance department.
18  I'm not sure.
19    Q. At the bottom of the page, there is
20  some handwriting.  Can you tell me what those
21  numbers are?
22    A. That's another account number.
23    Q. Which one is another account number?

Page 38

1    A. The 114044466.
2    Q. What type of account number?
3    A. Maybe pertaining to the case.  I don't
4  remember.  I never ordered anything else.
5    Q. So you think this could be a case
6  reference?
7    A. They kept assigning different case
8  numbers, I think, when I spoke with someone
9  each time.
10    Q. How many times do you think you spoke
11  with Dell?
12    A. Maybe -- I didn't call them but maybe
13  three, four.
14    Q. When you would call them --
15    A. Yes.
16    Q. Well, let me back up.  When you called
17  them the first time, did they give you a case
18  number?
19    A. I don't remember.  I do not remember.
20    Q. So where do you think --
21    A. We just used my account number.  What
22  do I think I got the case number for?
23    Q. Yes, sir.

Page 39

1    A. I do not remember.
2    Q. To the left of what you think is the
3  case number at the bottom of that second page,
4  there is what looks like OFOO, 131A, do you
5  know what that is?
6    A. I do not.
7    Q. You told me a second ago that you
8  called the Better Business Bureau?
9    A. Yes.
10    Q. Tell me how -- tell me about that
11  conversation.
12    A. I did it over the internet.
13    Q. Was it an online submission or e-mail?
14    A. It was, because I didn't remember
15  saying I called them.  But I think it was
16  online.
17    Q. Was that on the Better Business
18  Bureau's website?
19    A. Correct.
20    Q. Did you file a complaint against Dell?
21    A. Correct.
22    Q. Did you get a response?
23    A. From?

Page 40

1    Q. From Dell?
2    A. Yes.
3    Q. What was Dell's response?
4    A. Send them another statement.
5    Q. Do you remember when you filed your
6  complaint with the Better Business Bureau?
7    A. I do not.
8    Q. Was it before or after your phone
9  conversations with Dell?
10    A. It was after the phone conversations
11  because this statement was -- I think it was
12  when I received this statement.
13    Q. So you received this statement and you
14  called Dell?
15    A. Yes.
16    Q. And Dell asked you to send a bank
17  statement?
18    A. No.  They had told me to send one
19  before.  I spoke with them -- I cannot
20  remember.  Maybe I somehow -- I can't
21  remember.  It may be when I saw this statement,
22  but I think it might have been before.
23    Q. You told me before that until you

## 2015 3RD AVENUE NORTH
## (205) 397-2397 BIRMINGHAM, ALABAMA 35203 877-373-3660

# FREEDOM COURT REPORTING

1  received this statement, you thought that your
2  payment had been credited.
3      A. I did.
4      Q. And when you received this, you called
5  Dell?
6      A. Yes, I might have. I might have spoken
7  with them before this.
8      Q. But at some point Dell told you to send
9  a receipt or a statement?
10     A. Yes.
11     Q. Did you do that?
12     A. I did that.
13     Q. Did you do that after your first phone
14 conversation with Dell?
15     A. Send a statement -- you mean after the
16 check over the phone?
17     Q. No. After receiving the second
18 statement months after the purchase.
19     A. Send them a statement? Yes, I faxed
20 them.
21     Q. You faxed them a statement. After you
22 faxed them a statement, did you call them
23 again?

1      A. To make sure they received the fax?
2      Q. For any reason. You told me earlier
3  you talked to them three or four times after
4  receiving this March 2005 statement that said
5  you still owed money.
6      A. I spoke with them again when I think I
7  received another statement.
8      Q. Okay. So what prompted the Better
9  Business Bureau complaint?
10     A. Because they frustrated me when I knew
11 that it was paid.
12     Q. I show you what I'm marking as
13 Defendant's Exhibit Six and ask you if you
14 recognize that?
15
16     (Whereupon, Defendant's Exhibit Six was
17     marked for identification and copy of
18     same is attached hereto.)
19
20     A. Yes.
21     Q. And what is this?
22     A. This is the Better Business Bureau
23 complaint -- e-mail response, I mean.

1      Q. From who?
2      A. Better Business Bureau.
3      Q. And they sent this to your e-mail
4  address?
5      A. Correct.
6      Q. And that's your e-mail address? Jamon
7  B at hotmail dot com?
8      A. Correct.
9      Q. And when did you receive this message?
10     A. Looks like November 16, 2005.
11     Q. And what was the Better Business
12 Bureau's response?
13     A. That the dispute wasn't resolved
14 because I didn't feel like it was resolved.
15     Q. Looking at Page Two of this document,
16 have you ever seen this before?
17     A. Yes.
18     Q. And what is this?
19     A. This is a copy of my complaint.
20     Q. Looks like it also describes --
21     A. Dell's response.
22     Q. -- Dell's response; is that right?
23     A. Correct.

1      Q. Okay. Do you see a date that your
2  complaint was filed on this document?
3      A. October 7.
4      Q. What year?
5      A. 2005.
6      Q. So on the statement we looked at a few
7  minutes ago, Defendant's Exhibit Five, that was
8  dated February 10, 2005 -- is that right?
9      A. Yes.
10     Q. In the eight months between that
11 statement and your Better Business Bureau
12 complaint, how many phone conversations do you
13 think you had with Dell?
14     A. It couldn't have been but one if it
15 took me this long to file a complaint. I
16 didn't talk to them recent between this.
17     Q. What do you mean?
18     A. Like -- with a gap this long, I
19 couldn't have talked to them or even known that
20 I still owed the money after I sent the
21 statement in.
22     Q. Let me make sure I've got it right.
23 After you received this February 10, 2005

## 2015 3RD AVENUE NORTH
## (205) 397-2397 BIRMINGHAM, ALABAMA 35203 877-373-3660

# FREEDOM COURT REPORTING

Page 45

1    statement, you called Dell; is that right?
2        A.  Maybe so.
3        Q.  And Dell told you to send --
4        A.  To fax a statement.
5        Q.  And you did that?
6        A.  Correct.
7        Q.  And then you thought it was taken care
8    of?
9        A.  Correct.
10       Q.  So when did you realize that it wasn't
11   resolved?
12       A.  I probably just up and called Dell,
13   maybe.
14       Q.  Do you think you received another
15   statement?
16       A.  I don't think so.  I don't remember --
17   I don't remember exactly what prompted me to
18   file the complaint -- or to call, but I --
19   maybe I called them to make sure it was taken
20   care of.
21       Q.  Do you recall what prompted the October
22   complaint to the Better Business Bureau?
23       A.  Because I don't think it was taken -- I

Page 46

1    found out it wasn't taken care of, I believe.
2        Q.  But you don't remember how you found
3    out --
4        A.  I do not remember.
5        Q.  -- that it wasn't taken care of?
6        A.  I honestly do not remember.
7        Q.  Looking at Page Two of Exhibit Six, the
8    description of your complaint, Dell's response
9    to the Better Business Bureau, what was Dell's
10   response to your complaint?
11       A.  It looks like they were waiting on a
12   transaction or detailed report.
13       Q.  Did you know what a transactional
14   detailed report was?
15       A.  I did because I went to my bank and
16   asked for one and -- let's go back to Exhibit
17   Four.  And that's what they gave me.
18       Q.  When did you go to your bank and ask
19   for one?
20       A.  I can't --
21       Q.  Was it after receiving Dell's response
22   and the Better Business Bureau?
23       A.  No.  I think I sent a statement

Page 47

1    before.  I can't remember.
2        Q.  So you asked your bank what a
3    transactional detailed report was?
4        A.  I remember asking them that.
5        Q.  Do you remember if you asked them that
6    before or after this Better Business Bureau
7    response?
8        A.  It was before that, I think.
9        Q.  Had Dell used that phrase,
10   "transactional detailed report --
11       A.  No, they didn't.
12       Q.  -- before"?  If they had never used
13   that phrase, why would you ask your bank for a
14   transactional detailed report?
15       A.  I just asked for it.  I wanted to --
16   because I had a statement before that I sent to
17   Dell.  Obviously, it didn't work.  So I wanted
18   something that would show every information
19   that they would ask for.
20       Q.  And Defendant's Exhibit Four is what
21   the bank gave you?
22       A.  They did.  The lady told me -- I can't
23   remember who, but she said, "This is a

Page 48

1    transactional detailed report."
2        Q.  When is the first time you ever heard
3    that phrase "transactional detailed report"?
4        A.  I don't remember.
5        Q.  Did you ever ask Dell what they meant
6    by transactional detailed report?
7        A.  I didn't.
8        Q.  If you look with me on Defendant's
9    Exhibit Six, Page Two, describing the responses
10   in the Better Business Bureau.  The one in the
11   middle appears to be a response from you; is
12   that correct?
13       A.  Right here?
14       Q.  Yes.
15       A.  Yes.
16       Q.  Do you see where it says, "The bank
17   stated they did not know what a transactional
18   detailed report was?"
19       A.  Yes.
20       Q.  Do you remember that conversation with
21   your bank?
22       A.  I do not.
23       Q.  Looking back at that same page, do you

## 2015 3RD AVENUE NORTH
## (205) 397-2397 BIRMINGHAM, ALABAMA 35203 877-373-3660

## FREEDOM COURT REPORTING

Page 49

1  see in two places where Dell says you were
2  working with Angela in the recovery department?
3     A. Yes.
4     Q. Do you recall working with an Angela in
5  the recovery department?
6     A. I don't remember her name.
7     Q. At the time of this complaint, were you
8  working with someone at Dell to try to resolve
9  it?
10    A. I do. I remember sending this to the
11 recovery department.
12    Q. "This" being Defendant's Exhibit Number
13 Four?
14    A. Yes.
15    Q. Did you ever send the recovery
16 department anything other than this statement
17 that's Defendant's Exhibit Four?
18    A. No.
19    Q. Did they ever ask for anything else
20 other than a bank statement?
21    A. Did Dell?
22    Q. Yes.
23    A. Transactional detailed report.

Page 50

1     Q. Is a transactional detailed report
2  different from the bank statement?
3     A. No, because I went into the branch and
4  asked for a transactional detailed report. I
5  had a -- I think it was a copy of this. And
6  she said, "This is a transactional detailed
7  report. This is all we can provide. If you
8  need anything else, call us."
9     Q. Did you show anyone at the bank Dell's
10 response --
11    A. No.
12    Q. -- when you asked for that? Do you
13 remember who you talked to at the bank?
14    A. No.
15    Q. Do you remember which branch you were
16 at?
17    A. Madison, maybe.
18    Q. Did you file this Better Business
19 Bureau complaint yourself?
20    A. Yes.
21    Q. Did you consult a lawyer before filing
22 the complaint?
23    A. No.

Page 51

1     Q. In your conversations with Dell, did
2  they ever tell you that they had sold your
3  account?
4     A. No.
5        MR. SYKSTUS: Before we get started on
6  this next iteration, what if we take a break
7  now?
8        MR. TOMPKINS: That's fine.
9
10       (Break.)
11
12    Q. (BY MR. TOMPKINS:) Before we move on,
13 I want to show you another document I've marked
14 as Defendant's Exhibit Seven.
15
16       (Whereupon, Defendant's Exhibit Seven
17       was marked for identification and copy
18       of same is attached hereto.)
19
20    Q. Does this look familiar?
21    A. (Witness reviews document.) Yes.
22    Q. And what is this?
23    A. This is a letter that I wrote trying --

Page 52

1  I think I sent it to -- I sent out -- I think I
2  sent it to Dell.
3     Q. This letter is undated. Do you
4  remember when you sent it?
5     A. I do not.
6     Q. Did you, in fact, send this letter?
7     A. I did. The one I sent, I think I
8  signed.
9     Q. So this is not the copy you actually
10 sent?
11    A. This is actually a copy before I signed
12 it.
13    Q. Did you keep a copy of the letter you
14 signed?
15    A. A copy of -- no.
16    Q. In this letter, you state, the fourth
17 sentence, you decided to turn this over to a
18 collection agency. What were you referring to
19 there?
20    A. This is -- they turned it -- when they
21 turned it over to a credit agency, I knew it
22 was going on my credit.
23    Q. And the next sentence you say you have

## 2015 3RD AVENUE NORTH
## (205) 397-2397 BIRMINGHAM, ALABAMA 35203 877-373-3660

## FREEDOM COURT REPORTING

Page 53

1 turned it over to Midland Credit Management.
2 Is that the collection agency you're referring
3 to?
4     A. Correct.
5     Q. Was there ever any other collection
6 agency that tried to collect this debt from
7 you?
8     A. Not to my recollection. I think
9 Midland is it. I don't remember, though.
10    Q. You also state in this letter, "I'm
11 enclosing a copy of all the documentation and
12 what I've been through over the past several
13 years on this." Do you see that? Right about
14 in the middle.
15    A. In the middle, yes.
16    Q. Do you recall what documentation you
17 enclosed with this?
18    A. I think it was a driver's license,
19 another bank statement and my Social Security
20 card.
21    Q. You also asked Dell to contact Midland
22 and correct all three of your credit reports.
23 When was the first time you saw your credit

Page 54

1 reports?
2     A. I do not remember. Honestly, I do not
3 remember.
4     Q. When is the first time you heard of
5 Midland Credit Management?
6     A. Through the situation with Dell.
7     Q. How did you hear about Midland Credit
8 Management?
9     A. A letter from Midland.
10    Q. Do you remember when that letter was --
11    A. When I received it.
12    Q. Yes, sir.
13    A. I don't.
14    Q. Do you remember what that letter said?
15    A. That I owed a debt with Dell.
16    Q. I show you what I'm marking as
17 Defendant's Exhibit Eight and ask you if you
18 recognize that document?
19
20        (Whereupon, Defendant's Exhibit Eight
21        was marked for identification and copy
22        of same is attached hereto.)
23

Page 55

1     A. This is the letter from Dell -- I mean
2 Midland.
3     Q. Do you think this is the first time you
4 received anything from Midland?
5     A. I don't think so.
6     Q. You think you received something from
7 Midland prior to this?
8     A. I think so.
9     Q. What makes you think that?
10    A. Because I had sent them a letter saying
11 that I don't owe this debt, and I faxed them --
12 not faxed them, but sent them a bank statement
13 with the letter that I wrote them.
14    Q. Why do you think that was before you
15 received this letter?
16    A. Because this letter does not tell me
17 that I had thirty days. The first letter told
18 me I had thirty days to send them a response,
19 and I sent them a response in the mail. And
20 not handwritten, but typed.
21    Q. Do you see a date on this letter?
22    A. Yes.
23    Q. What is that?

Page 56

1     A. 1/22/2008.
2     Q. January 22, 2008?
3     A. Correct.
4     Q. Do you remember how long before this
5 you received a different letter from Midland?
6     A. I do not.
7     Q. You said the first letter told you
8 had thirty days?
9     A. Correct.
10    Q. Thirty days to do what?
11    A. To reply if I don't think that I owe
12 the debt, and I replied by mail.
13    Q. Do you have a copy of the letter you
14 sent them?
15    A. I do not.
16    Q. Have you looked for all correspondence
17 and documents related to the Dell or Midland
18 accounts?
19    A. As far -- as best I could. Maybe I
20 have some more, but I don't --
21    Q. Do you keep files at home?
22    A. I keep papers for -- I mean pretty much
23 everything.

14  (Pages 53 to 56)

# FREEDOM COURT REPORTING

Page 57

1    Q. Do you have a filing system?
2    A. That's why I cannot locate a lot of
3  things because I do not -- I just have them in
4  wherever I can put papers.
5    Q. Have you provided everything that you
6  do have to your attorneys?
7    A. Yes.
8    Q. When you received this letter dated
9  January 22, 2008, what did you do?
10    A. I disputed it with the credit bureau.
11    Q. Do you remember when you disputed it
12  with the credit bureaus?
13    A. Maybe shortly after I saw this.
14    Q. Did you send Midland anything after
15  seeing this January 22 letter?
16    A. I think I did send them a letter.
17    Q. Did you send that at the same time you
18  filed the credit bureau disputes or at a
19  different time?
20    A. I cannot remember.
21    Q. I show you what I'm marking as
22  Defendant's Exhibit Nine and ask you if you
23  recognize this?

Page 58

1
2       (Whereupon, Defendant's Exhibit Nine
3       was marked for identification and copy
4       of same is attached hereto.)
5
6    A. This is a letter I sent to Midland.
7    Q. And when did you send this letter?
8    A. July 29th.
9    Q. Of what year?
10    A. 2008.
11    Q. What prompted this letter?
12    A. Because I think I had got fed up at
13  that point.
14    Q. This letter states, "I'm writing you in
15  response to the recent communication." Are you
16  referring to Defendant's Exhibit --
17    A. I think I might have received a call.
18    Q. When do you think you might have
19  received a call?
20    A. I honestly don't remember.
21    Q. Do you remember receiving any letters
22  from Midland between the January 22, 2008
23  letter that's Defendant's Exhibit Eight and

Page 59

1  your letter of July 29, 2008?
2    A. No, I didn't.
3    Q. Do you recall specifically receiving
4  any phone calls during that time?
5    A. I received a phone call.
6    Q. How many?
7    A. I can't remember.
8    Q. Less than five?
9    A. Probably.  Maybe.  I would probably say
10  less than five.
11    Q. Less than three?
12    A. I don't honestly remember.  The one I
13  remember is the one I spoke to him.  I don't
14  remember the rest of them.
15    Q. Tell me about that one that you do
16  remember.
17    A. I let -- it was a lady first.  I let
18  her know that the account was paid.  We had --
19  I can't remember the details of the
20  conversation.  And she put me on the phone with
21  a guy who she said was a supervisor or
22  manager.  And at that time, I asked him to stop
23  calling my phone.

Page 60

1    Q. And what did he say?
2    A. Send them a bank statement.
3       MR. SYKSTUS:  Can we go off the record
4  real quick?
5
6       (Whereupon, a brief discussion was held
7       off the record.)
8
9    Q. Do you think this July 29 letter is in
10  response to talking to that supervisor?
11    A. I don't remember.
12    Q. In this letter, you also state, "Please
13  do not contact me again by phone or in
14  writing."  Is that right?
15    A. Correct.
16    Q. Did the supervisor tell you to put that
17  in the letter?
18    A. No.  But I didn't want them calling me.
19    Q. Did you consult a lawyer before sending
20  this letter?
21    A. No.  I think I know a little bit about
22  collection agencies so I didn't -- I just knew
23  I didn't want them calling me.

## 2015 3RD AVENUE NORTH
## (205) 397-2397 BIRMINGHAM, ALABAMA 35203 877-373-3660

# FREEDOM COURT REPORTING

Page 61

1    Q.  Did they ever contact you again after
2  this letter?
3    A.  I don't remember.
4    Q.  Did you ever contact them again after
5  this letter?
6    A.  By letter, maybe.
7    Q.  Do you recall ever calling them?
8    A.  I do not recall ever calling them.
9    Q.  At any time?
10    A.  At any time.
11    Q.  I show you what I'm marking as
12  Defendant's Exhibit Ten.  Can you tell me what
13  this document is?
14
15    (Whereupon, Defendant's Exhibit Ten was
16    marked for identification and copy of
17    same is attached hereto.)
18
19    A.  A letter to Midland Credit Management.
20    Q.  And when is it dated?
21    A.  March 10, 2009.
22    Q.  Do you recall what prompted this
23  letter?

Page 62

1    A.  I think I was being -- it was on my
2  credit report.  I bought a -- I think -- I
3  didn't buy, but Annual Credit Report dot com.
4    Q.  And why did you pull your credit
5  reports at that time?
6    A.  2009?  Because I wanted a house.
7  Actually, I tried to get a house before that, I
8  think.
9    Q.  When you say you tried to get a house
10  before that, what do you mean?
11    A.  Tried to get a loan to purchase a
12  house.
13    Q.  Do you remember when that was?
14    A.  I do not.
15    Q.  Do you remember a year?
16    A.  I do not.
17    Q.  So in early 2009, you were house
18  shopping?
19    A.  Yes.
20    Q.  And you pulled your credit reports?
21    A.  Yes.
22    Q.  Did you pull your credit reports
23  because you had talked to a lender or you just

Page 63

1  did it yourself?
2    A.  I talked to a few lenders.
3    Q.  Did they tell you to pull your credit
4  reports?
5    A.  No.  But I think I talked to a few
6  lenders before '09, to be honest with you.
7    Q.  Do you remember when?
8    A.  I don't.
9    Q.  Did you send Midland any letters
10  between the last letter we looked at of --
11    A.  And this one?
12    Q.  -- July 29, 2008 and this one of March
13  8, 2009?
14    A.  I don't remember.
15    Q.  After your letter of July 29, 2008,
16  Defendant's Exhibit Nine, did you assume that
17  the matter had been taken care of?
18    A.  I do not know.  I just know that -- I
19  don't know -- I can't remember.  I don't
20  remember sending another statement to them
21  after this until I think this letter.
22    Q.  Before pulling your credit reports in
23  early 2009, did you have any reason to believe

Page 64

1  that the account was still on your credit
2  report?
3    A.  I think before I realized I could get a
4  free credit report, I think I purchased a
5  credit report from Equifax on line.
6    Q.  When do you think you purchased that?
7    A.  I don't know.
8    Q.  Do you remember if it was before or
9  after that July 2008 letter?
10    A.  I've done that like two or three times
11  so I don't remember.
12    Q.  And you told me the March 10, 2009
13  letter was prompted by you reviewing your
14  credit reports; right?
15    A.  Correct.
16    Q.  Between the previous credit report and
17  the ones in 2009, did you believe that the
18  Midland account was still on your credit
19  reports?
20    A.  Maybe so.  I can't remember.  I know at
21  one point in time I received a letter from
22  Dell.  I mean -- not Dell, but Midland about a
23  lawsuit.

16  (Pages 61 to 64)

# FREEDOM COURT REPORTING

Page 65

1    Q. Do you remember when that was?
2    A. I do not.
3    Q. And what did it say about a lawsuit?
4    A. That I owed a debt and they were suing
5    me.
6    Q. And what did you do, if anything, in
7    response to that letter?
8    A. I called Mr. Skystus.
9    Q. Do you recall what month and year that
10   would have been?
11   A. I do not.
12   Q. Do you recall if it was before or after
13   this March 10, 2009 letter?
14   A. I do not because I was out of town.  I
15   don't remember when.  And there was a card on
16   my door.
17   Q. Did you ever respond to the lawsuit in
18   court?
19   A. I didn't.  I think I was out of town.
20   Q. Do you know what happened to that
21   lawsuit?
22   A. I do not.
23   Q. In this March 10, 2009 letter, you

Page 66

1    again say you've enclosed a copy of your bank
2    statement; is that right?
3    A. Did I say it on this letter?
4    Q. March 10, 2009, Defendant's Exhibit
5    Ten, yes, sir.
6    A. Oh, okay, I did.
7    Q. Is that the same bank statement --
8    A. That is.
9    Q. -- that we've been talking about?
10   A. Four.
11   Q. Defendant's Exhibit Four, right.  Did
12   you ever send Midland anything other than --
13   A. I did.
14   Q. -- that bank statement?  What was it?
15   A. My license and my Social Security
16   number.
17   Q. Did Midland ever ask you to send
18   anything else?
19   A. No.  You mean besides my license,
20   Social Security number and the bank statement
21   that they asked me to send them?
22   Q. Yes, sir.
23   A. Oh, no, I volunteered that.

Page 67

1    Q. You volunteered --
2    A. My license and Social Security.
3    Q. Did Midland ever ask you to send
4    anything?
5    A. Besides the bank statement?
6    Q. So they did ask you to send the bank
7    statement?
8    A. When I talked to the guy.
9    Q. The supervisor?
10   A. He did.
11   Q. Okay.  But they've never asked you to
12   send anything else other than the bank
13   statement?
14   A. No.
15   Q. Between your July 2008 letter and your
16   March 2009 letters to Midland, did you ever
17   wonder what was going on with the account?
18   A. I was out of town, so -- I mean, I was
19   out of town working, so at that point in time I
20   was traveling like -- I mean, it was
21   ridiculous.
22   Q. What were you -- was that for Yellow
23   Book that you were traveling?

Page 68

1    A. Yes.
2    Q. And where were you traveling?
3    A. Like -- I don't remember.  It depends
4    on -- all over Alabama, Tennessee -- some parts
5    of Tennessee.  Maybe Florida, maybe Iowa.
6    Q. Do you receive any phone calls from
7    Midland after this March 10, 2009 letter?
8    A. I don't remember.
9    Q. Do you have any notes or recordings of
10   any phone calls you ever received from Midland?
11   A. No.
12   Q. Other than the one phone call you
13   described in which you talked to a lady and
14   then a supervisor, do you recall the substance
15   of any other phone calls with Midland?
16   A. No.
17   Q. Did you ever ask Midland in writing or
18   over the phone to contact your bank about the
19   payment?
20   A. I do not remember.
21   Q. Did you ever authorize Midland to
22   contact your bank?
23   A. Maybe.  I can't remember.

17  (Pages 65 to 68)

## 2015 3RD AVENUE NORTH
## (205) 397-2397 BIRMINGHAM, ALABAMA 35203 877-373-3660

## FREEDOM COURT REPORTING

Page 69

1    Q.  Would you have done that in writing or
2  over the phone?
3    A.  Maybe I would have done it in writing.
4  I just can't remember.  I don't remember.
5    Q.  Did you ever ask anyone at Dell to
6  contact your bank?
7    A.  I don't remember.
8    Q.  I show you what I'm marking as
9  Defendant's Exhibit Eleven.  Do you recognize
10  that?
11
12       (Whereupon, Defendant's Exhibit Eleven
13       was marked for identification and copy
14       of same is attached hereto.)
15
16    A.  I do.
17    Q.  What is it?
18    A.  A credit report.
19    Q.  From which agency?
20    A.  Equifax.
21    Q.  Do you see a date on that?
22    A.  July 13, 2008.
23    Q.  Do you remember what prompted you to

Page 70

1  request this report?
2    A.  Maybe I was house shopping.  At the
3  point in time of this one, I think maybe I
4  bought a credit report on line.
5    Q.  And why did you buy it?
6    A.  Just for general purposes.  I think I
7  was house shopping at the same time is what it
8  was.
9    Q.  You say you bought it for general
10  purposes.  You didn't buy this in response to
11  any sort of communication from Dell or Midland?
12    A.  I don't think so.  I think I was house
13  shopping.
14    Q.  Did you review this report after you
15  received it?
16    A.  You mean online?
17    Q.  Yeah.  Did you look it over?
18    A.  Of course, I did.
19    Q.  Did you see anything that you thought
20  was inaccurate?
21    A.  The -- I think it was a few things, but
22  I think I remember the Midland sticking out.
23  Hold on.  Let me look.  The -- what do I think

Page 71

1  was incorrect?
2    Q.  Yes, sir.
3    A.  The Midland Credit Management.
4    Q.  A second ago when I asked you if
5  anything was inaccurate, you said maybe a few
6  things.  Do you see any others that you thought
7  were incorrect when you reviewed this?
8    A.  Not on this one, I don't believe.  I
9  might question some of the student loans.
10    Q.  What do you mean you might question
11  some of the student loans?
12    A.  The amount.
13    Q.  The amount?  While we're on student
14  loans let me ask you to look at Page Twelve.
15  Page numbers are at the top right-hand corner.
16  And at the bottom of that page do you see an
17  entry for Alabama A & M University?
18    A.  I do.
19    Q.  And it says, "Account status,
20  collection account?"
21    A.  I do.
22    Q.  Do you recall a collection agency
23  trying to collect that debt from you?

Page 72

1    A.  No.
2    Q.  Were you ever behind on your payments
3  on that student loan?
4    A.  Not that I remember.  This was a -- I
5  don't think so because I was still in school.
6  I think Athens.
7    Q.  If you look on Page Seventeen, do you
8  see an entry from Midland Credit Management?
9  Is that the entry you're talking about?
10    A.  That is.
11    Q.  You think this entry is inaccurate for
12  what reason?
13    A.  Because this account was paid.  The
14  Dell account was paid.
15    Q.  How do you know that this account
16  relates to the Dell account?
17    A.  Because it's the same balance as --
18  it's not the same balance, but it's close to
19  that balance on Exhibit Eight.  Which I didn't
20  remember the exact number, but that -- it was
21  sixteen hundred, so it led me to believe that
22  was it.
23    Q.  Has Midland Credit Management ever

## 2015 3RD AVENUE NORTH
## (205) 397-2397 BIRMINGHAM, ALABAMA 35203 877-373-3660

# FREEDOM COURT REPORTING

Page 73

1  contacted you about any other debt?
2      A. No.
3      Q. Go with me to Page Twenty-one.  Do you
4  see the heading that says "negative accounts"?
5      A. I do.
6      Q. And under that the first one listed is
7  Alabama A&M?
8      A. I do.
9      Q. Again, you don't recall ever missing a
10  payment on your Alabama A&M loan?
11     A. I don't because I was in school.
12     Q. Are you current on that loan now?
13     A. I think I might owe them like fifty
14  dollars.
15     Q. Are they trying to collect anything
16  from you?
17     A. They might be.
18     Q. Have you been contacted by any
19  collection agencies regarding that debt?
20     A. No.
21     Q. Looking at the next page, Page Twenty-
22  two, still under the heading of negative
23  accounts, there is a Sam's Club MBGA?

Page 74

1      A. Correct.
2      Q. Do you know what account that is?
3      A. That is -- I had a Sam's account.
4      Q. Is that --
5      A. No.  I still have a Sam's account, but
6  a -- what do you call it?  A card like Sam's --
7      Q. Like a store credit card?
8      A. Yes.
9      Q. Do you still have that today?
10     A. Well, I closed the account.
11     Q. When did you close the account?
12     A. I don't remember.  When I paid it off.
13     Q. Do you remember what year that was?
14     A. I do not.
15     Q. Do you know why this would be a
16  negative account on your credit report?
17     A. I do not.
18     Q. Have you ever disputed this?
19     A. I did.  I called them.
20     Q. You called who?
21     A. Sam's.  And they said since the account
22  was closed that they couldn't take it off.
23     Q. Had you ever disputed it with Equifax?

Page 75

1      A. No, because I had a Sam's credit card.
2      Q. Okay.  So you've never disputed this
3  entry with Equifax?
4      A. No.
5         MR. SYKSTUS:  Just for the record, I'm
6  going to object to relevance.  It shows a zero
7  balance.  It says "pays as agreed" so there is
8  no reflection that it is a negative account.
9         MR. TOMPKINS:  It's under the heading
10  negative account.  The document speaks for
11  itself.
12         MR. SYKSTUS:  I know.  I just wanted to
13  note that for the record.
14     Q. The next entry below Sam's is Midland
15  Credit Management.
16     A. Okay.
17     Q. Is this the entry that you said you
18  thought was inaccurate?
19     A. Correct.
20     Q. Is there any indication within this
21  entry itself that it's a negative account?
22     A. You mean does it -- how do I know that
23  it's negative?  Is that what you're asking me?

Page 76

1      Q. Yes, sir.
2      A. Because it's under that heading.
3      Q. Let me ask you to go to Page Twenty-
4  four.  Do you see "last reported employment"
5  toward the top a quarter of the way down?  You
6  see it says "Adult Video"?
7      A. That is.
8      Q. Is that a job you've had?
9      A. Yes, it was.
10     Q. What kind of job within the adult video
11  industry did you have?
12     A. Videos.  Adult videos.
13     Q. You made videos?
14     A. No, I never made them.  But they sold
15  videos from like Vivid -- I can't remember the
16  --
17     Q. Who was your employer?
18     A. You mean the guy who -- I don't
19  remember his name.
20     Q. When was this employment?
21     A. I don't remember.  Maybe early 2000.  I
22  don't remember.
23     Q. And it's before Yellow Book -- was it

## 2015 3RD AVENUE NORTH
## (205) 397-2397 BIRMINGHAM, ALABAMA 35203 877-373-3660

# FREEDOM COURT REPORTING

Page 77

1  before Yellow Book?
2      A. Yes.
3      Q. Was it before Target?
4      A. Yes. Hum, did I make videos.
5      Q. It was a confusing entry there.
6      A. Okay.
7      Q. Other than the Midland entry on this
8  Equifax credit report, did you ever dispute
9  anything else with Equifax?
10     A. With Equifax? I don't remember. I
11 don't remember.
12
13         (Whereupon, Defendant's Exhibit Twelve
14         was marked for identification and copy
15         of same is attached hereto.)
16
17     Q. I show you another document,
18 Defendant's Exhibit Twelve. Do you recognize
19 what this is?
20     A. This is an Experian credit report.
21     Q. And do you see a date on this one?
22     A. Yes, I do.
23     Q. And what is that date?

Page 78

1      A. July 29, 2008.
2      Q. This is about two weeks after that
3  Equifax report we just looked at; correct?
4      A. Correct.
5      Q. Did you request this report at the same
6  time as the Equifax report? Did you request --
7  you told me you requested --
8      A. This one was -- I think this one I paid
9  for, and then I think I did annual credit
10 report -- annual credit -- get your credit
11 report free.
12     Q. Once a year?
13     A. Yes.
14     Q. So why didn't you do the Equifax report
15 under the annual --
16     A. Because I did not know about it at the
17 time, I don't think.
18     Q. So you learned about it in that two
19 weeks between the Equifax and Experian report?
20     A. Yes.
21     Q. What was the reason that you requested
22 your Experian report?
23     A. I think I was trying to get a house.

Page 79

1      Q. Did you review this report when you
2  received it?
3      A. I did.
4      Q. Do you recall if you saw anything
5  inaccurate on this report?
6      A. Besides Midland? I do.
7      Q. What else was inaccurate?
8      A. Professional Finance.
9      Q. Can you tell what page you're looking
10 at?
11     A. Page Three.
12     Q. Have you ever heard of Professional
13 Finance?
14     A. I have not. And --
15     Q. Do you see the original creditor
16 beneath that entry?
17     A. Yes.
18     Q. Atmos Energy. Have you ever heard of
19 Atmos Energy?
20     A. I have not. And also a texas student
21 loan.
22     Q. Also on Page Three?
23     A. Three.

Page 80

1      Q. Do you see the original creditor on
2  that, Missouri Higher Education Loan?
3      A. I do.
4      Q. Have you ever heard of Missouri Higher
5  Education Loan?
6      A. I have not.
7      Q. Have you ever heard of Texas Guaranteed
8  Student Loan?
9      A. I have not.
10     Q. Did you dispute both of those with
11 Experian?
12     A. I did.
13     Q. Do you remember if they resolved your
14 dispute?
15     A. I think they did.
16     Q. Do you remember what they did?
17     A. They removed it -- removed them.
18     Q. Do you remember on what basis you
19 disputed them?
20     A. Because they weren't mine.
21     Q. Did you know whose they were?
22     A. At the time, I think -- I don't know
23 about Professional Finance. But the Texas

## 2015 3RD AVENUE NORTH
## (205) 397-2397 BIRMINGHAM, ALABAMA 35203 877-373-3660

# FREEDOM COURT REPORTING

Page 81

1 Student Loan, I think, was my brother.
2     Q.  And what is your brother's name?
3     A.  Jamie Brim.
4     Q.  J-A-M-I-E?
5     A.  Correct.
6     Q.  Before seeing those two companies on
7 your credit report, had you ever received any
8 collection calls?
9     A.  From them?
10    Q.  From Professional Finance or Texas
11 Guaranteed?
12    A.  I have not.
13    Q.  If you look with me at Page Twelve of
14 this report under personal information on the
15 right-hand column.
16    A.  Um-hum.
17    Q.  There is several names.
18    A.  I see.
19    Q.  It's the third one, Jamie D. Brim.  Is
20 that your brother?
21    A.  It is.
22    Q.  If you look with me on Page Fourteen of
23 this report.

Page 82

1     A.  Um-hum.
2     Q.  Do you see employers at the bottom of
3 that column?
4     A.  Um-hum.
5     Q.  The first one is Manpower.  Have you
6 ever heard of Manpower?
7     A.  I have.
8     Q.  Did you ever work for Manpower?
9     A.  Maybe so.  I don't know.  If I was, I
10 was a teenager.
11    Q.  What about Leggett, Platt?
12    A.  I don't recall working for them.
13    Q.  So if you worked for either one of
14 those companies, was it before Target?
15    A.  Correct.  Before Adult Video.
16
17        (Whereupon, Defendant's Exhibit
18        Thirteen was marked for identification
19        and copy of same is attached hereto.)
20
21    Q.  And we've got one more credit report to
22 look at.  Defendant's Exhibit Thirteen.  Does
23 that look familiar?

Page 83

1     A.  Yes, it does.  TransUnion credit
2 report.
3     Q.  What's the date on this one?
4     A.  July 29, 2008.
5     Q.  Do you think you got this one in
6 response to your annual credit report?
7     A.  I did.
8     Q.  Did you review it when you received it?
9     A.  I did.
10    Q.  Do you recall if there was anything
11 inaccurate?
12    A.  Midland.
13    Q.  Anything else?
14    A.  I don't think so.
15    Q.  Believing that Midland entries were
16 inaccurate on the three reports we just looked
17 at, Defendant's Exhibits Eleven, Twelve and
18 Thirteen, what did you do?
19    A.  I sent letters.
20    Q.  Who did you send letters to?
21    A.  These three, Dell and Midland.
22    Q.  Earlier, we looked at Defendant's
23 Exhibit Nine, a letter dated July 29, 2008 to

Page 84

1 Midland Credit Management.
2     A.  Who did I send it to?
3     Q.  Midland Credit Management.
4     A.  On July 10?
5     Q.  July 29?
6     A.  July 29th?
7     Q.  Did you find that one?
8     A.  Yes.
9     Q.  Is that the letter you sent after
10 receiving these credit reports?
11    A.  Yes.
12    Q.  So before receiving these credit
13 reports in July of 2008, did you believe that
14 the Midland account was on your credit reports?
15    A.  Before July the 29th, 2008?
16    Q.  Yes, sir.
17    A.  I do.
18    Q.  What makes you believe the Midland
19 account was on the report?
20    A.  Because this is July 13, and it's on
21 here.
22    Q.  Well, prior to the July -- the three
23 credit reports you received in July 2008.

**2015 3RD AVENUE NORTH**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35203 877-373-3660**

**FREEDOM COURT REPORTING**

Page 85

1    A. Did I think it was on there?
2    Q. Yes.
3    A. I don't remember.  Maybe -- maybe I saw
4  a credit report before that, but I don't
5  remember.
6    Q. Do you specifically remember seeing a
7  credit report before July 2008?
8    A. I don't remember.
9    Q. Do you think you ever requested a
10  credit report before July 2008 that showed
11  Midland?
12    A. I can't remember because I was trying
13  to purchase a house, or thinking about
14  purchasing a house off and on, and I was on the
15  road so much that I didn't really have time to
16  sit and focus.
17    Q. So prior to seeing these July 2008
18  credit reports, you weren't focused on your
19  credit reports?
20    A. No, no, no.  I was not focused on
21  trying to get the house at that particular --
22
23      (Whereupon, Defendant's Exhibit

Page 86

1      Fourteen was marked for identification
2      and copy of same is attached hereto.)
3
4    Q. I'm going to show you a couple more
5  documents.  Defendant's Exhibit Fourteen.  Can
6  you tell me what that is?
7    A. Yes.  This is a letter that I sent to
8  Equifax.
9    Q. And what's the date on that?
10    A. July 29, 2008.
11    Q. And what were you telling Equifax in
12  this letter?
13    A. That I disputed the debt with Midland
14  for the Dell computer.
15    Q. This was in response to the credit
16  report we just looked at?
17    A. Yes.
18
19      (Whereupon, Defendant's Exhibit Fifteen
20      was marked for identification and copy
21      of same is attached hereto.)
22
23    Q. All right.  I show you another one,

Page 87

1  Defendant's Exhibit Fifteen, and ask if you can
2  tell me what that one is?
3    A. This is to Experian.
4    Q. And what's the date?
5    A. July the 29th of 2008.
6    Q. Do you believe this was in response to
7  the Experian credit report we just looked at?
8    A. Correct.
9    Q. And what did you dispute in this
10  letter?
11    A. The Midland credit report, the Texas
12  student loans and Professional Finance.
13    Q. So the two we just talked about?
14    A. Correct.
15    Q. And you enclosed --
16    A. License, Social Security card.
17    Q. At the bottom of this letter you state,
18  "Enclosed is a copy of a transactional detailed
19  report from my bank."
20    A. Statement.
21    Q. You're referring to Defendant's Exhibit
22  Four?
23    A. Correct.

Page 88

1    Q. The Redstone statement?
2
3      (Whereupon, Defendant's Exhibit Sixteen
4      was marked for identification and copy
5      of same is attached hereto.)
6
7    Q. I show you Defendant's Exhibit Sixteen
8  and ask you if you recognize that one?
9    A. It was to TransUnion.
10    Q. And the date?
11    A. July 29, 2008.
12    Q. Is this in response to the TransUnion
13  credit report we just looked at?
14    A. Correct.
15    Q. And what did you dispute in this one?
16    A. The Midland, Texas student loans and
17  Professional Finance.
18    Q. Again, you stated that there is a copy
19  of the transactional detailed report from the
20  bank.  If you look at the last page of this
21  exhibit, is the Redstone Federal Credit Union
22  statement where you're referring to there?
23    A. Correct.

22  (Pages 85 to 88)

# FREEDOM COURT REPORTING

Page 89

1    Q.  Did you receive results from any or all
2  of the credit bureaus?
3    A.  I did.
4    Q.  Do you remember which ones?
5    A.  I remember TransUnion because I
6  remember receiving a letter from them.
7    Q.  Do you remember what they said in that
8  letter?
9    A.  They didn't take it off.  I remember
10 that.
11   Q.  Do you remember if they said why they
12 didn't take it off?
13   A.  No.
14
15     (Whereupon, Defendant's Exhibit
16      Seventeen was marked for identification
17      and copy of same is attached hereto.)
18
19   Q.  I show you Defendant's Exhibit
20 Seventeen.  Do you know what this is?
21   A.  This is the investigation from
22 TransUnion.
23   Q.  Is this the letter you were just

Page 90

1  referring to?
2    A.  Yes, it is.
3    Q.  You said that they said they didn't
4  take it off.  Can you show me -- can you point
5  out where they --
6    A.  It's at the bottom of this page.
7  Investigation results.
8    Q.  And it says "Midland Credit Management
9  new information below?"
10   A.  Yes.
11   Q.  Did you look at the information
12 provided below?
13   A.  All right.  It's still on here.
14   Q.  Do you know what the new information is
15 that they were referring to on the first page?
16   A.  No.
17   Q.  When you received these results from
18 TransUnion, did you do anything?
19   A.  I contacted Mr. Skystus.
20   Q.  Is that the first time that you
21 contacted Mr. Skystus?
22     MR. SYKSTUS:  Objection, privileged.
23   Q.  Do you remember if you received this

Page 91

1  letter before or after the lawsuit you told me
2  about earlier from Midland?
3    A.  I do not remember.
4    Q.  The dispute letters that we just looked
5  at, Defendant's Exhibits Fourteen, Fifteen and
6  Sixteen --
7    A.  Yes.
8    Q.  -- did you write those yourself?
9    A.  Yes.
10   Q.  Did you consult a lawyer before writing
11 those letters?
12   A.  If I did, it maybe was to look over it.
13   Q.  Do you recall if a lawyer looked over
14 those letters?
15   A.  I think so.
16   Q.  Was that Mr. Skystus?
17   A.  Correct.
18   Q.  I'm showing you what I'm marking as
19 Defendant's Exhibit Eighteen.  Do you know what
20 this document is?
21
22     (Whereupon, Defendant's Exhibit
23      Eighteen was marked for identification

Page 92

1  and copy of same is attached hereto.)
2
3    A.  Experian credit report.
4    Q.  Do you see a date on this?
5    A.  August 12, 2008.
6    Q.  Would you look at the top of the second
7  page, a document which is actually at the top
8  of Page Three.  It looks like Page Two is
9  missing from this production.  On the left-hand
10 upper corner it says "investigation results."
11   A.  Um-hum.
12   Q.  Is this what you received in response
13 to the dispute --
14   A.  Experian.
15   Q.  And do you see the results from
16 Experian?
17   A.  Yes.
18   Q.  And what did they do, if anything?
19   A.  They took Capital One off, Texas
20 student loans and Professional Finance.  I
21 don't know what -- I guess Mahella is
22 Professional Finance.
23   Q.  Do you see any results from Midland?

23  (Pages 89 to 92)

# FREEDOM COURT REPORTING

Page 93

1    A.  It just says "reviewed."
2    Q.  Looking at the next page that shows the
3  Midland entry on the Experian report.  Did you
4  notice anything that was changed after their
5  review?
6    A.  It was not removed.
7    Q.  Do you recall how you received these
8  results that are Defendant's Exhibits Seventeen
9  and Eighteen?  Did you receive them online, by
10  mail?
11    A.  I think by mail.
12    Q.  Do you recall how you sent your dispute
13  letters that were Exhibits Fourteen, Fifteen
14  and Sixteen?
15    A.  By mail.
16    Q.  I show you what I'm marking as
17  Defendant's Exhibit Nineteen.  Do you know what
18  this is?
19
20      (Whereupon, Defendant's Exhibit
21      Nineteen was marked for identification
22      and copy of same is attached hereto.)
23

Page 94

1    A.  This is a letter I sent to Equifax.
2    Q.  And what was the purpose of this
3  letter?
4    A.  To dispute the Midland debt.
5    Q.  What date did you send this letter?
6    A.  March 10.
7    Q.  What year?
8    A.  2009.
9    Q.  Do you remember what prompted this
10  letter?
11    A.  Looking at a house, I think.
12    Q.  You state in this letter, "Please
13  immediately correct the disputed information on
14  Page Seventeen of my credit report."  Do you
15  see that in the first sentence?
16    A.  Yes.
17    Q.  And if you look at the last page of
18  this exhibit, there is a Page Seventeen.  Do
19  you see a date on this page?
20    A.  A date on the page?
21    Q.  Yes.
22    A.  At the bottom it is 8/11/2008.
23    Q.  Do you know which credit report this

Page 95

1  page is from?
2    A.  This looks like Equifax.  This is
3  Equifax.
4    Q.  Is this from the credit report that you
5  requested in July of 2008?
6    A.  I think so.  July of 2008?
7    Q.  We looked at an Equifax credit report
8  from July of 2008 that's Defendant's Exhibit --
9    A.  Let's see.  That was July.  It is.
10    Q.  So, in your March 2009 dispute, this
11  letter that's Defendant's Exhibit Nineteen,
12  you're disputing something that was on your
13  July 8, 2008 credit report; is that right?
14    A.  Correct.
15    Q.  Did you see any credit reports between
16  that July 2008 credit report and this March 10,
17  2009 letter?
18    A.  I do not remember.
19    Q.  Is it fair to say if you had, you
20  probably would have pointed to the more recent
21  credit report?
22    A.  Would I -- you mean would I have
23  pointed out --

Page 96

1    Q.  Right.  Instead of attaching the July
2  2008 report.
3    A.  Yes.
4      MR. TOMPKINS:  You want to take a short
5  break?
6      (Break.)
7
8    Q.  (BY MR. TOMPKINS:)  Mr. Brim, we have a
9  few more documents to go through.
10    A.  Okay.
11
12      (Whereupon, Defendant's Exhibit Twenty
13      was marked for identification and copy
14      of same is attached hereto.)
15
16    Q.  This is Defendant's Exhibit Twenty.  Do
17  you recognize this?
18    A.  This is a dispute to Experian.
19    Q.  What's the date on this?
20    A.  March 10, 2009.
21    Q.  What are you disputing?
22    A.  The Midland Credit Management.
23    Q.  We just looked at Defendant's Exhibit

## 2015 3RD AVENUE NORTH
## (205) 397-2397 BIRMINGHAM, ALABAMA 35203 877-373-3660

# FREEDOM COURT REPORTING

Page 97

1  Nineteen, which was a letter to --
2      A.  Equifax.
3      Q.  -- Equifax on the same date.  You told
4  me that it was prompted because you were house
5  shopping?
6      A.  Correct.
7      Q.  And I've looked at your credit
8  reports.  Is that the same reason that you sent
9  this letter?
10     A.  Correct.
11     Q.  If you look at the second page of this
12 exhibit, which looks like documents you
13 enclosed with your letter, can you tell me what
14 that is?
15     A.  You mean the accounts?
16     Q.  Well, what is this page from?
17     A.  Experian credit report.
18     Q.  In your letter you say, "Immediately
19 correct the disputed information on Page Two of
20 my credit report?"
21     A.  Um-hum.
22     Q.  Is this second page --
23     A.  Of the credit report.

Page 98

1      Q.  Is that Page Two of the credit report?
2      A.  Yes.
3      Q.  What's the date on that credit report?
4      A.  July, 29, 2008.
5      Q.  And behind that page is another
6  document?
7      A.  Yes.
8      Q.  And this is the bank statement; is that
9  right?
10     A.  Correct.
11     Q.  Same bank statement --
12     A.  As Exhibit Four?
13
14     (Whereupon, Defendant's Exhibit Twenty-
15     one was marked for identification and
16     copy of same is attached hereto.)
17
18     Q.  Yes.  All right.  Defendant's Exhibit
19 Twenty-one.  Can you tell me what this is?
20     A.  A letter to TransUnion.
21     Q.  What's the date on that?
22     A.  March 10, 2009.
23     Q.  So you sent this at the same time as

Page 99

1  the previous two letters to Equifax and
2  Experian?
3      A.  Correct.
4      Q.  Were you disputing the same
5  information?
6      A.  Correct.
7      Q.  That's the Midland Credit Management
8  entry?
9      A.  Correct.
10     Q.  If you look at the fourth page of this
11 exhibit, did you attach this page from your
12 credit report to your letter?
13     A.  To this letter?
14     Q.  Yes, sir.
15     A.  I don't think so.  I might have.  I do
16 not remember.
17     Q.  Do you remember if you ever received
18 responses to any of these letters, Defendant's
19 Exhibits Nineteen, Twenty and Twenty-one?
20     A.  From the credit bureau?
21     Q.  Yes, sir.
22     A.  I think I did.
23     Q.  Do you remember any specific responses?

Page 100

1      A.  The wording?  No.
2
3      (Whereupon, Defendant's Exhibit Twenty-
4      two was marked for identification and
5      copy of same is attached hereto.)
6
7      Q.  I show you what I've marked as
8  Defendant's Exhibit Twenty-two.  Do you
9  remember this document?
10     A.  Yes.
11     Q.  And what is this?
12     A.  The investigation from Equifax.
13     Q.  Do you see a date on this?
14     A.  It is March 20th of 2009.
15     Q.  Do you believe this was in response to
16 the letter we just looked at?
17     A.  I think so.
18     Q.  This Defendant's Exhibit Nineteen?
19     A.  Yes.
20     Q.  What was Equifax's response to your
21 dispute?
22     A.  They did not take it off.
23     Q.  Do you see about two-thirds of the way

**2015 3RD AVENUE NORTH**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35203 877-373-3660**

# FREEDOM COURT REPORTING

Page 101

1  down it says, "We have researched the credit
2  account?"
3     A. Yes.
4     Q. "If you have additional questions about
5  this item, please contact Midland Credit
6  Management?"
7     A. Yes.
8     Q. Did you contact Midland after receiving
9  this?
10    A. I think I sent a letter to them.  Or
11 maybe not.  It might have been the letter that
12 I sent all at the same time.
13    Q. We earlier looked at a letter to
14 Midland dated March 10, 2009.
15    A. Yes.
16    Q. Same date as the letters to the credit
17 bureaus?
18    A. Yes.
19    Q. But do you recall sending a letter
20 after receiving these results?
21    A. After?  no.
22    Q. I show you what I'm marking as
23 Defendant's Exhibit Twenty-three and ask if you

Page 102

1  recognize that?
2
3        (Whereupon, Defendant's Exhibit Twenty-
4        three was marked for identification and
5        copy of same is attached hereto.)
6
7     A. This is TransUnion investigation
8  results.
9     Q. What's the date on these results?
10    A. March 20, 2009.
11    Q. Was this in response to your March 10
12 dispute?
13    A. Yes.
14    Q. And what was TransUnion's response?
15    A. They left it on the report.
16    Q. On Page One of this letter under
17 investigation results it says, "New information
18 below."  Do you see that?
19    A. On which page?
20    Q. Page One of the actual letter it says,
21 "Investigation results."
22    A. Yes.
23    Q. "New information below."

Page 103

1     A. Yes.
2     Q. Did you notice any new information in
3  the credit report?
4     A. It was still on my credit report.
5
6        (Whereupon, Defendant's Exhibit Twenty-
7        four was marked for identification and
8        copy of same is attached hereto.)
9
10    Q. I show you Defendant's Exhibit Twenty-
11 four.  Do you know what this document is?
12    A. Experian -- I don't know if it's the
13 results.
14    Q. What's the date on this?
15    A. This is March 21, 2009, so I guess it
16 is the results.
17    Q. And what was their response?
18    A. They didn't take it off.
19    Q. And where do you see that?
20    A. It was still on the credit report.  I
21 think the credit report came with this, and it
22 was still on there.
23    Q. Look at the first paragraph of this

Page 104

1  letter from Experian.  Just take a minute to
2  read that.
3     A. (Witness complies.)  Um-hum.
4     Q. So what does that say?
5     A. Send them address, my driver's license,
6  identification card, Social Security number,
7  updated address.  Just the first paragraph?
8     Q. The first paragraph on the left-hand
9  side.
10    A. Oh, I'm sorry.  I didn't provide
11 sufficient identification information to verify
12 my identity.
13    Q. So reading that now, do you remember
14 now -- do you remember then ever receiving
15 actual results from Experian?
16    A. I think I -- you mean results or --
17    Q. Results of the dispute.
18    A. No.
19    Q. Because this appears to say that they
20 didn't process it because they didn't have
21 sufficient information; is that right?
22    A. Correct.
23    Q. Do you remember ever receiving anything

26 (Pages 101 to 104)

## 2015 3RD AVENUE NORTH
## (205) 397-2397 BIRMINGHAM, ALABAMA 35203 877-373-3660

## FREEDOM COURT REPORTING

Page 105

1  saying, "We investigated and this is what we're
2  going to do," from Experian?
3      A.  From Experian, I might not have.  I
4  can't remember.
5      Q.  Do you remember when you filed the
6  current lawsuit?
7      A.  I do not.
8      Q.  Did you review the complaint before it
9  was filed?
10     A.  I did.
11     Q.  In your own words, why did you file
12 this lawsuit?
13     A.  Because this has been going on since
14 2004 about a debt that was paid in 2004.  And I
15 provided the information that everyone asked
16 for in 2004, or 2005, maybe, and it was still
17 going on.
18     Q.  And what do you want out of this
19 lawsuit?  What do you want to happen?
20     A.  I want Midland to admit that it was
21 paid.  I want this removed from my credit
22 report forever.  I want this removed from
23 public record.

Page 106

1      Q.  When you say public record, what do you
2  mean?
3      A.  The lawsuit.
4      Q.  What do you mean removed?
5      A.  Like that's on -- that's public record
6  forever saying that I was sued for a collection
7  for a debt that was paid in 2004.
8      Q.  Are you aware that Midland has deleted
9  it from your credit report?
10     A.  Not -- I have not -- the only thing
11 I've seen was recent credit reports, and they
12 weren't on there.  I didn't know that it was by
13 Midland's admission that it was a mistake.
14     Q.  When did you see credit reports
15 recently?
16     A.  Maybe before August.  I'm trying to
17 remember.  I was in and out of town so I'm
18 trying to remember.  I think it was maybe then.
19     Q.  And you said the Midland entry was not
20 on your credit report?
21     A.  It was not.
22     Q.  In August of this year?
23     A.  I think August.  But I wasn't finished.

Page 107

1      Q.  Okay.
2      A.  I want compensation for at least the
3  two and a half years of stress, worry, loss of
4  sleep.
5      Q.  You say two and a half years?  Is that
6  --
7      A.  I mean I've been going through this
8  like trying to buy a house for two years, and
9  this is on my credit report and could have kept
10 me from getting a house.  I was worried about
11 that.
12     Q.  When did you purchase your current
13 house?
14     A.  It was last year.
15     Q.  Do you remember what month?
16     A.  Maybe March.
17     Q.  Of 2009?
18     A.  Maybe so.  Maybe April.
19     Q.  Anything else?
20     A.  Yes.  Compensation for my attorneys.
21     Q.  Anything else?
22     A.  No.
23     Q.  Your attorneys' fees aside, what amount

Page 108

1  of compensation are you seeking?
2      A.  I mean, this -- if you had to ask me a
3  number, I would say a minimum of a hundred
4  thousand just because this has been going on
5  since 2004.  I was refused a home loan from
6  Wells Fargo because of this on my credit.
7      Q.  When were you denied a loan from Wells
8  Fargo?
9      A.  I do not remember.
10     Q.  Was it at the time you were purchasing
11 your house in March 2009?
12     A.  No, no.  I had been looking for a house
13 before.  Like maybe 2008 or 2007.
14     Q.  Do you remember which year that Wells
15 Fargo --
16     A.  I do not remember.
17     Q.  Did Wells Fargo give you a reason for
18 denying?
19     A.  They were saying I had to prove that
20 the deal thing was paid off, which was -- I
21 mean, the only thing I had was a bank
22 statement.  They wouldn't -- my bank statement
23 was coming from me, but they needed like word

27 (Pages 105 to 108)

# FREEDOM COURT REPORTING

Page 109

1    from Dell or Midland.
2        Q.  Do you recall them saying they needed
3    word from Midland specifically?
4        A.  No.  I know I sent them a bank
5    statement, but it was not good enough.
6        Q.  Did Wells Fargo ever say you were being
7    denied because of Midland?
8        A.  Do I remember them saying that?
9        Q.  Yes, sir.
10       A.  I remember sending him the bank
11   statement, and I remember not getting
12   approved.  I don't remember speaking to them
13   again after I sent him the bank statement, but
14   I remember receiving denied.  I remember being
15   denied for a credit card.
16       Q.  This is a copy of the complaint in this
17   case.  I'm not going to mark it as an exhibit,
18   but you just told me you reviewed this
19   complaint before it was filed; is that right?
20       A.  Yes.
21       Q.  And were all the allegations accurate?
22       A.  (Witness reviews document.)  Yes.
23       Q.  I just want to ask you about a couple

Page 110

1    of paragraphs.  Paragraph Seven on Page Three
2    states, "In November 2004, the plaintiff
3    purchased a computer from Dell."  And we talked
4    earlier, and I think you said you think it was
5    October; is that right?
6        A.  Correct.
7        Q.  I just wanted to be clear on the
8    timing.  And let's move on to Paragraph Thirty-
9    three on Page Eight.
10       MR. SYKSTUS:  And for clarification,
11   there are two Page Eights on both of ours.  The
12   first one is garbled, and then there is a
13   second one.
14       Q.  Referring to the nongarbled Page
15   Eight.
16       MR. SYKSTUS:  Okay.  The second one.
17       Q.  Paragraph Thirty-three, the last
18   sentence says, "The plaintiff was also caused
19   to incur out-of-pocket expenses and attorneys
20   fees."  Can you tell me what those out-of-
21   pocket expenses are?
22       A.  Going to my lawyer and the lawyers'
23   fees.

Page 111

1        Q.  So you've had to pay your lawyer a fee?
2        MR. SYKSTUS:  Objection, privileged.
3        MR. TOMPKINS:  I think if he's claiming
4    it as a damage, we're entitled to know if he's
5    paid something.  Not the amount at this point,
6    but if he has actually paid something out of
7    pocket.
8        MR. SYKSTUS:  I'm okay, Jamon, if you
9    answer that.
10       A.  Have I paid directly to my attorney?
11       Q.  Yes.  Have you had to pay your lawyer
12   any out-of-pocket payments?
13       A.  No.
14       Q.  Do you owe him any money --
15       A.  He's provided me services.
16       Q.  -- for services in connection with
17   the --
18       MR. SYKSTUS:  Objection.  That gets
19   into what he does owe me on the basis of this
20   lawsuit.  He's answered the question.  He's
21   paid no money out of pocket.
22       Q.  Any other out-of-pocket expenses other
23   than transportation to and from your lawyer's

Page 112

1    office?
2        A.  As of now at this point, I can't recall
3    any.
4        Q.  In the sentence above that in Paragraph
5    Thirty-three, you state that you were caused to
6    suffer actual damages to your credit
7    reputation, worry, humiliation, fear, loss of
8    sleep, anxiety, nervousness, physical sickness,
9    physical pain and mental anguish.  Have you
10   seen a medical professional or counselor about
11   any of those problems?
12       A.  I did not.
13       Q.  Have you taken any medication for any
14   of those problems?
15       A.  I did not.  Over-the-counter medicine.
16       Q.  What over-the-counter medicines have
17   you taken?
18       A.  Like just relaxation medicine.  Like I
19   might drink Nyquil or something to make me go
20   to sleep.  I might take Advil -- not Advil, but
21   BC is what I take.
22       Q.  And what's that for?
23       A.  Just because it eases me.

28  (Pages 109 to 112)

# FREEDOM COURT REPORTING

Page 113

1    Q. How often do you take Nyquil?
2    A. Not often.
3    Q. How many times would you say you've
4  taken Nyquil in the past year?
5    A. I do not remember.
6    Q. Before 2007, did you ever take Nyquil
7  to help you sleep?
8    A. No.
9    Q. Did you ever take BC prior to 2007?
10    A. I took BC.
11    Q. Do you take BC on a regular basis?
12    A. Not like every day or even every week.
13    Q. How often would you say you take BC?
14    A. It depends on like if I have a headache
15  that I just can't sit off or sleep off.
16    Q. You have a history of headaches?
17    A. No, I don't.
18    Q. History of inability to sleep?
19    A. No, I do not.
20    Q. Have you ever seen a doctor for
21  headaches or inability to sleep?
22    A. No, I haven't.
23    Q. Why do you attribute headaches and loss

Page 114

1  of sleep to Midland?
2    A. Because -- I mean, when I was getting
3  sued, you know, that was a headache.  I had a
4  sheriff deliver -- was it the -- he tried to
5  deliver a subpoena, but he left a card.  And
6  this was when I was living at the condo.  He
7  left his card there.  So that's embarrassment
8  there, and -- I mean, it's just headache.  I
9  travel for a living, and when I got denied for
10  my credit card -- I wanted that credit card to
11  pay for hotels.  I mean, it's just a lot of
12  extra stress being denied credit for something
13  that I know was paid.
14    Q. When were you denied credit?
15    A. For -- besides Wells Fargo?  American
16  Express.  And I think I tried to get a higher
17  credit limit for Capital One.
18    Q. Do you remember when the American
19  Express denial was?
20    A. I do not.
21    Q. Do you remember when you tried to get a
22  higher credit limit with Capital One?
23    A. It was a couple of times, but the exact

Page 115

1  dates, I don't remember.
2    Q. In the last year?
3    A. Last year, maybe.
4    Q. Maybe in 2009?
5    A. Yes.
6    Q. Did you have to apply for the higher
7  credit limit?
8    A. For Capital One?
9    Q. For Capital One.
10    A. I called in.
11    Q. Did they give you a response over the
12  phone or a written response?
13    A. He checked my credit.  He said, "Let me
14  pull your credit," and declined.
15    Q. He declined --
16    A. Over the phone.
17    Q. -- over the phone while you were still
18  on the phone with him?
19    A. Yes.
20    Q. Did he say which credit reports he
21  looked at?
22    A. He didn't say.
23    Q. Did he mention any specific reasons

Page 116

1  from your credit report that you weren't
2  approved?
3    A. He didn't mention anything.  He just
4  said at this time, we are.
5    Q. And we're going to talk about the
6  American Express in a minute because we've
7  actually seen that one, but I want to finish
8  going through the complaint first.
9    A. Okay.
10    Q. Going back to what you said a minute
11  ago about the sheriff left a card, what did
12  that card look like?
13    A. It was a card with his name, his phone
14  number and his position like deputy sheriff.
15    Q. Did it say what it was about or
16  anything like that?
17    A. No, it didn't.
18    Q. Was it a business card?
19    A. Yes, it was.
20    Q. And did it have a note written on the
21  card?
22    A. It didn't.  Call him.
23    Q. You said it was embarrassing.  Did

## 2015 3RD AVENUE NORTH
## (205) 397-2397 BIRMINGHAM, ALABAMA 35203 877-373-3660

## FREEDOM COURT REPORTING

Page 117

1  anybody see that card?
2      A. They had to. I mean, the card was -- I
3  travel. I was out of town for at least a
4  month, maybe, and that card was on my door that
5  whole time.
6      Q. And these were at condos, you said?
7      A. Correct.
8      Q. Can you tell me how those condos are
9  set up? Are they exterior?
10     A. It's a courtyard. I stayed on this
11  side of the courtyard. There are condos both
12  sides, and you can walk up through the
13  courtyard. I stayed on the left-hand side.
14     Q. So as you walk up through the
15  courtyard, is it door after door after door in
16  a line?
17     A. It's two doors on -- in my particular
18  section and then two doors across the hall.
19  Then on up a little bit is two more condos and
20  then two more.
21     Q. You said a courtyard, but then you just
22  said a hall. Is this outside or inside?
23     A. No, no, it's outside. The hall and the

Page 118

1  courtyard, I'm referring to both as the same,
2  but it's a courtyard.
3      Q. How wide would you say that courtyard
4  is looking across it to the doors that face
5  you?
6      A. Looking across -- it's not -- I don't
7  know the approximate feet, but it's not wide --
8  that wide where I couldn't -- not look in
9  anyone's home and see.
10     Q. Did anyone ever say anything to you
11  about the sheriff's card?
12     A. They wouldn't. You know, they didn't.
13     Q. Is there any other reasons you
14  attribute the headaches and the loss of sleep
15  to Midland other than what you've already told
16  me?
17     A. No.
18     Q. Page Ten of this complaint, Paragraph
19  Forty-two, do you see that you allege that
20  Dell, Midland Credit Management and Midland
21  Funding communicated false and defamatory
22  statements to third parties and the public at
23  large?

Page 119

1      A. Um-hum.
2      Q. And what third parties are you
3  referring to?
4      A. The credit bureaus.
5      Q. Any other third parties?
6      A. The -- obviously, the sheriff knew, who
7  put his card on my door.
8      Q. Anyone else?
9      A. The -- whoever had access to see the
10  case filed against me. With the age of the
11  internet, who knows.
12     Q. When you say the "public at large,"
13  what are you referring to?
14     A. Like the -- I mean, whoever would look
15  at -- I mean, everyone, basically.
16     Q. What statement are you saying the
17  public at large had access to?
18     A. The public -- is the lawsuit not public
19  information?
20     Q. So when you say the "public at large,"
21  you're referring to the lawsuit?
22     A. Um-hum.
23     Q. Anyone who could see the lawsuit?

Page 120

1      A. The lawsuit.
2      Q. Other than the lawsuit, are you
3  aware -- are you alleging that any other
4  statements by Midland were viewed by the public
5  at large?
6      A. The people who I tried to get a home
7  loan through. Wells Fargo -- not only Wells
8  Fargo. You know, Countrywide and Platinum
9  Mortgage.
10     Q. Did you apply to all those places --
11     A. I did.
12     Q. -- for a home loan? Were you denied
13  with all those places?
14     A. Wells Fargo was denied. Countrywide
15  gave me a high interest rate. So, Platinum
16  Mortgage -- and I actually spoke with one more
17  person, but --
18     Q. Who did you end up getting your
19  mortgage from?
20     A. Platinum Mortgage.
21     Q. Looking back at the complaint and
22  looking down at Paragraph Forty-four, you say
23  that these statements have harmed your

30  (Pages 117 to 120)

# FREEDOM COURT REPORTING

Page 121

1  representation and deterred third persons from
2  associating with you?
3      A. Um-hum.
4      Q. Taking each of those in turn, how do
5  you contend that your reputation has been
6  harmed?
7      A. By destroying my credit.
8      Q. You say destroying your credit. How
9  does that relate to your reputation?
10     A. Because that's -- my credit speaks of
11 me as a person.
12     Q. Who do you think is aware of your
13 credit?
14     A. Employers.
15     Q. Anyone else?
16     A. Whoever I apply for credit with.
17     Q. Anyone else?
18     A. (Witness shakes head.)
19     Q. The second part of that, deterred third
20 persons from associating with you, who are you
21 referring to?
22     A. Like if -- you mean as far as anyone
23 associated with me as far as my credit?

Page 122

1      Q. Is that what you're referring to?
2      A. Yes. I don't have anyone on any credit
3  applications that I have, but if I did --
4      Q. Turn to the next page, Paragraph Forty-
5  seven. We just discussed your reputation
6  allegations. This also says you were subjected
7  to ridicule. What type of ridicule were you
8  subjected to?
9      A. People -- I mean, it's embarrassing if
10 I'm denied for like any type of credit or loan.
11     Q. Have you ever talked to anyone about
12 your -- other than the credit bureaus and
13 Midland and Dell, have you ever talked to
14 anyone about your credit report?
15     A. No.
16     Q. Have you ever talked to anyone about
17 Midland?
18     A. No, that's embarrassing.
19     Q. And you've sued Dell in this case; is
20 that correct?
21     A. Correct.
22     Q. And are they still in the case, that
23 you're aware of?

Page 123

1      A. Were they still --
2      Q. Are they still a defendant in the case?
3         MR. SYKSTUS: It's a confidential
4  settlement.
5      Q. So you have the fact of settlement.
6  You have settled with Dell; is that right?
7      A. Correct.
8         MR. TOMPKINS: I assume the amount was
9  confidential?
10        MR. SYKSTUS: Yes.
11     Q. Are you aware that Midland offered to
12 settle the case with you?
13     A. No.
14     Q. Are you aware -- then you're not aware
15 that offer was rejected?
16     A. No.
17     Q. Do you think Midland is more at fault
18 than Dell?
19     A. They are because they -- I mean,
20 they -- on every credit report, you see
21 Midland. Even after I sent the information to
22 them, they still did not take it off.
23     Q. It's my understanding that Dell

Page 124

1  ultimately resolved your payment issue. Are
2  you aware of that?
3      A. Yes.
4      Q. Do you know how that happened?
5      A. Yes.
6      Q. And how was that?
7      A. They found the payment.
8      Q. Do you know how they found it?
9      A. They, to my knowledge, applied it to
10 someone else's account.
11     Q. Dell didn't tell you that, did they?
12 I'm assuming --
13     A. No.
14     Q. That happened during this lawsuit; is
15 that correct?
16     A. Correct.
17
18        (Whereupon, Defendant's Exhibit Twenty-
19        five was marked for identification and
20        copy of same is attached hereto.)
21
22     Q. I ask you if you recognize Defendant's
23 Exhibit Twenty-five?

31 (Pages 121 to 124)

## FREEDOM COURT REPORTING

Page 125

1    A.  Yes.
2    Q.  And what is this?
3    A.  This is from Redstone -- wait -- yes,
4  this is from Redstone.
5    Q.  Did you obtain this from Redstone?
6    A.  I did.
7    Q.  And how did you get this?
8    A.  I put in a request.  I had to put in a
9  request, and then the lady told me that she
10  would have to call me when it's ready because
11  they don't have this information on hand.  And
12  she called me, and I drove up there and got it
13  and picked it up.
14    Q.  Did you put it in the request -- how
15  did you put in the request?  By phone, fax, in
16  person?
17    A.  No, person.
18    Q.  Which branch?
19    A.  It was a -- I don't remember.  It
20  was -- I think -- on South Memorial Parkway, I
21  think.
22    Q.  And what prompted you to make this
23  request?

Page 126

1    A.  Because either Midland or someone
2  requested this information.  Dell requested
3  this information.
4    Q.  Was that request made through your
5  attorneys?
6    A.  I think so.
7    Q.  Or directly to you?
8    A.  I think it was through my attorneys.
9    Q.  Do you recall specifically what they
10  asked for?
11    A.  They asked for the bank to trace the
12  account because they did not have any proof
13  that I had made a payment.
14    Q.  And what specifically did you request
15  from the bank in order to get this?
16    A.  I went inside the bank and said, "I
17  need to know where this money went to."
18    Q.  And what date was this?  Do you recall?
19    A.  I do not recall.
20    Q.  There is a date at the top of this.  It
21  looks like a fax date.
22    A.  August 11.
23    Q.  2010?

Page 127

1    A.  Yes.
2    Q.  Do you think that's about the time,
3  give or take a couple of days?
4    A.  Maybe so.  I don't -- August 11.  Maybe
5  so.
6    Q.  Was it definitely within the past
7  couple months?
8    A.  It has been.  I was in Montgomery in
9  August, but maybe.
10    Q.  Earlier, we talked about Defendant's
11  Exhibit Four a lot, the Redstone Federal Credit
12  Union bank statement, showing payment, and
13  that's what you provided to Dell and Midland
14  and the credit bureaus?
15    A.  Correct.
16    Q.  And up until this time, how was this
17  request different?
18    A.  Because they tell you where the money
19  went to.  I mean -- excuse me.  The first one
20  did the same thing, but this is -- this right
21  here, the front page, is different.
22    Q.  The front page.  What about the second
23  page?

Page 128

1    A.  The second page is just -- just tells
2  you where the money went.
3    Q.  Looks like a lot of account numbers and
4  routing numbers, things like that?
5    A.  Um-hum.
6    Q.  Before, when you requested a
7  transaction detailed report from your credit
8  union --
9    A.  Correct.
10    Q.  -- you told me that they referred you
11  back to bank statement?
12    A.  Yes.
13    Q.  So, what was different about this
14  request that provided you with this instead of
15  just referring you back to the bank statement?
16    A.  The fact that I said, "I need to know
17  the account -- the specific account that this
18  money went to."  The specific account number.
19    Q.  Was that the only difference in your
20  request is you told them you need to know a
21  specific account number of where it went?
22    A.  No.  I said, "I need to show -- when
23  she tried to offer me the same statement, I

32  (Pages 125 to 128)

# FREEDOM COURT REPORTING

Page 129

1   said, "No, I need to know where this money
2   went."
3        Q. Okay.  So initially, she just gave you
4   the bank statement again?
5        A. Um-hum.
6        Q. And you followed up and asked her for
7   something more specific?
8        A. Where did this money go basically.
9        Q. And you got this?
10       A. Um-hum.
11
12       (Whereupon, Defendant's Exhibit Twenty-
13       six was marked for identification and
14       copy of same is attached hereto.)
15
16       Q. I show you Defendant's Exhibit Twenty-
17   six. Have you seen this document before?
18       A. Yes.
19       Q. And what is this?
20       A. Being denied credit by American
21   Express.
22       Q. What's the date on this?
23       A. May 14, 2009.

Page 130

1        Q. Do you remember when you applied for
2   this credit line?
3        A. It's May 14.
4        Q. And you received the denial on the same
5   date that you applied?
6        A. Same day.
7        Q. How did you apply?  Was it online?
8        A. Online.
9        Q. So you applied online, and you received
10  this immediately?
11       A. Correct.
12       Q. Why did you apply for this line of
13  credit?
14       A. Because I was in Tuscaloosa at the time
15  in May -- because I wanted to pay for a hotel.
16  I didn't want to pay out of pocket, and I
17  wanted American Express.
18       Q. Why did you want American Express?
19       A. I mean, it didn't necessarily have to
20  be American Express, but American Express -- I
21  don't want Discover.
22       Q. Why don't you want Discover?
23       A. I just don't.

Page 131

1        Q. Is there something that drew you to
2   American Express specifically or --
3        A. I already have Capital One.
4        Q. You said you wanted it for a hotel
5   room.  Was that on your business travel?
6        A. Yes.
7        Q. Do you use your personal credit card
8   for your business travel?
9        A. Yes.
10       Q. And you get reimbursed for the
11  expenses?
12       A. Yes.
13       Q. Are you provided a business credit card
14  of any sort?
15       A. No.
16       Q. Did you want the American Express for
17  any other reason other than --
18       A. No, just work.
19       Q. -- your travel with work?  What
20  information did you have to provide online to
21  apply for this?
22       A. Just answer the questions that they
23  asked me.

Page 132

1        Q. Do you remember what some of those
2   questions were?
3        A. Just basic information, like putting my
4   information in.
5        Q. Did you have to provide your Social
6   Security number?
7        A. Maybe so.
8        Q. Did you have to provide your income?
9        A. I don't think I had to provide my
10  income.  Maybe I did.
11       Q. Did you ever talk to anyone at American
12  Express or purely online?
13       A. Online.
14       Q. Have you had any correspondence with
15  American Express since this denial?
16       A. No.
17       Q. You haven't talked to anyone since this
18  denial?
19       A. No.
20       Q. Did you read this letter when you
21  received it?
22       A. I did.
23       Q. And what makes you think that this

**2015 3RD AVENUE NORTH**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35203 877-373-3660**

# FREEDOM COURT REPORTING

Page 133

1  denial could be attributed to Midland?
2      A.  Because the credit bureaus are
3  reporting on here so I know that they looked at
4  the credit.
5      Q.  This letter tells you which report they
6  looked at, right, in the second paragraph?
7      A.  Yes.
8      Q.  TransUnion; is that right?
9      A.  Yes.
10      Q.  And then at the end of that paragraph
11  it says, "The following are the primary factors
12  in your credit report that affected your
13  score?"
14      A.  Yes.
15      Q.  It lists four factors.  Do you see
16  those?
17      A.  Yes.
18      Q.  Do any of those specifically refer to
19  Midland?
20      A.  They don't, but I knew at the time.
21      Q.  And how did you know?
22      A.  Because -- I mean, the only thing that
23  is negative against me is when I was sued.

Page 134

1  That's public record.  So I know -- I mean, I
2  haven't been in trouble.  I haven't -- nothing
3  until that.
4      Q.  Have you ever seen anything about the
5  lawsuit on your credit reports?
6      A.  No.
7      Q.  Do you think American's Express' denial
8  was in any way based on that lawsuit?
9      A.  It had to be.
10      Q.  Did you look at your TransUnion credit
11  report after receiving this letter?
12      A.  I did.
13      Q.  Did you have to make a request for that
14  credit report?
15      A.  No.  I think they sent it to me when I
16  wrote the letter.
17      Q.  Which letter?
18      A.  Let's see.  Exhibit Twenty-one, I
19  think.
20      Q.  Twenty-one is your letter?
21      A.  To TransUnion.
22      Q.  To TransUnion.  And then Twenty-four is
23  TransUnion's response that we looked at

Page 135

1  earlier.
2      A.  That's Experian.  Twenty-four is.
3  TransUnion, I think, is Twenty-three response.
4      Q.  TransUnion response dated March 20,
5  2009; is that right?
6      A.  Yes.
7      Q.  And they attached information about the
8  Midland credit --
9      A.  Still on there.
10      Q.  -- entry.  But after -- you didn't pull
11  a new credit report after receiving this
12  American Express denial a month later; right?
13      A.  No.
14      Q.  Two months later.  Excuse me.  Did you
15  get credit somewhere else at this time?
16      A.  For a credit card?
17      Q.  Yes, sir.
18      A.  No.
19      Q.  Did you apply anywhere else after
20  getting this American Express --
21      A.  I didn't want to be denied again.
22      Q.  Did you incur any charges or expenses
23  because of this denial?

Page 136

1      A.  The hotel, I had to pay for out of
2  pocket and wait for my expenses to come back to
3  me.
4      Q.  So your business -- your employer
5  reimbursed you for that hotel?
6      A.  Yes.
7      Q.  How would it have been different if you
8  had had the American Express card?
9      A.  Then I wouldn't have to pay for it out
10  of pocket.  Like -- I mean, if I have other
11  things to do -- like I have two kids.  Like I
12  might need the money that I have to do whatever
13  for them instead of paying for a hotel while
14  I'm out of town and needing gas and eat.  I
15  have to eat while I'm out of town.
16      Q.  Did you pay for those things with cash
17  then?
18      A.  No.  Debit card.
19      Q.  Is that debit card with your --
20      A.  Redstone.
21      Q.  Redstone Federal Credit Union?
22      A.  Yes.
23      Q.  Do you have any other bank accounts or

## 2015 3RD AVENUE NORTH
## (205) 397-2397 BIRMINGHAM, ALABAMA 35203 877-373-3660

# FREEDOM COURT REPORTING

Page 137

1  debit cards?
2      A. I do.
3      Q. And who are those with?
4      A. It's Wells Fargo now.  It used to be
5  Wachovia.
6      Q. Do you have a bank account with them?
7      A. I do.
8      Q. Do you have any other credit cards?
9      A. Capital One.
10     Q. Other than Capital One, any other
11  credit cards?
12     A. No.
13     Q. How long have you had that Capital One
14  credit card?
15     A. I don't remember.
16     Q. Do you know what the limit is on that?
17     A. It's only like, I think, fifteen
18  hundred.
19     Q. And you say you requested a higher
20  credit limit --
21     A. I did.
22     Q. -- at some point?  How much did you
23  request?

Page 138

1      A. Just a higher limit, whatever they
2  would have given me.  Even if it was fifty
3  dollars.
4      Q. Was there anything going on that
5  prompted you to request the higher limit?
6      A. If I'm out of town for -- I mean, it
7  might cost me a thousand dollars a week just
8  for a hotel.  That's not including food.
9      Q. So you requested a higher credit limit
10  because you were traveling a lot?
11     A. Yes.
12     Q. Do you have any store credit cards?  We
13  talked about the Sam's credit card before.
14     A. No, I do not.
15     Q. You don't have any other store credit
16  cards?
17     A. I don't.
18     Q. Have you ever had any other store
19  credit cards?
20     A. I don't.
21     Q. Other than the American Express denial
22  and the denial of a higher credit limit with
23  Capital One, are there any other denials that

Page 139

1  you attribute to Midland?
2      A. Not right off, no, besides Wells Fargo.
3      Q. Are there any other reasons that you
4  would experience headaches or loss of sleep
5  other than worrying about your credit?
6      A. No.
7      Q. Is your job stressful when you're
8  traveling?
9      A. No, because I pretty much stay on top
10  of everything.
11          MR. TOMPKINS:  Let's take a short
12  break.
13
14          (Break.)
15
16     Q. (BY MR. TOMPKINS:)  Mr. Brim, I think
17  this will be our last session.
18     A. Okay.
19     Q. Other than the loss of sleep and the
20  headaches, do you have any other physical
21  symptoms or problems that you attribute to
22  Midland?
23     A. Physically, no.  Limbs or anything --

Page 140

1  not nothing physically.
2      Q. Well, what about nonphysical?
3      A. Mental?  Besides what I mentioned
4  earlier?
5      Q. Well, give me -- what mental problems
6  do you attribute to --
7      A. No, no, I mean like the stress and
8  embarrassment like what I mentioned earlier.
9      Q. And other than the stress and the
10  embarrassment that we talked about earlier --
11     A. And the headaches.
12     Q. Stress, embarrassment, headaches, loss
13  of sleep, are there any other physical or
14  mental problems that you attribute to Midland?
15     A. No.
16     Q. I show you what I'm marking as
17  Defendant's Exhibit Twenty-seven.  Have you
18  seen this document before?
19
20          (Whereupon, Defendant's Exhibit Twenty-
21          seven was marked for identification and
22          copy of same is attached hereto.)
23

**2015 3RD AVENUE NORTH**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35203 877-373-3660**

# FREEDOM COURT REPORTING

Page 141

1     A.  Yes.
2     Q.  For the record, it's entitled
3   Plaintiff's Response to Defendant Midland's
4   First Interrogatories and Request for
5   Production.  The plaintiff, Jamon T. Brim.  If
6   you look on page -- well, these are not
7   numbered, but if you look next to the last
8   page, is that your signature?
9     A.  That is.
10     Q.  Did you review those responses before
11   you signed that?
12     A.  I did.
13     Q.  And what was your understanding of the
14   purpose of you signing that?
15     A.  To let you know that I read it.
16     Q.  Was everything in these responses true?
17     A.  Correct.
18     Q.  If you look at Response to Request for
19   Production Number Thirteen, you state that
20   you've incurred out-of-pocket expenses for
21   postage and copies to send disputes to MCM.
22   What postage and copies are you referring to
23   there?

Page 142

1     A.  The certified copy receipt mailed
2   letter.  But I sent it to everyone.  Three
3   credit bureaus and Dell.
4     Q.  Do you have receipts where you sent all
5   those copies?
6     A.  Yes.
7     Q.  Have you given those to your attorneys?
8     A.  Yes.
9     Q.  You state you also have incurred out-
10   of-pocket expenses for over-the-counter
11   medication?
12     A.  Correct.
13     Q.  Is that referring to the NyQuil and BC
14   that we talked about?
15     A.  Correct.
16     Q.  Do you know how much you've spent on
17   NyQuil and BC that you attribute to Midland?
18     A.  BC, I get like the big box.  I don't
19   know -- and I bought a few of them.  But I
20   don't know how much I've spent.  I can't give
21   you a monetary value.
22     Q.  Look at response to interrogatory
23   number five a couple pages later.  It states

Page 143

1   that the plaintiff has suffered physical
2   sickness, worry, humiliation, loss of sleep,
3   anxiety, nervousness, nausea, loss of appetite,
4   frustration, insomnia and loss of his good
5   name.  Been treated with over-the-counter
6   medication.  Other than those two medications
7   we've talked about, have you taken any
8   medications for any of these symptoms?
9     A.  No.
10     Q.  Other than the headaches and loss of
11   sleep and stress --
12     A.  And worry.
13     Q.  Worry, have you experienced any of
14   these other things?  Any physical sicknesses.
15     A.  Humiliation, of course.
16     Q.  And that's what we talked about with
17   the sheriff --
18     A.  Um-hum.
19     Q.  -- leaving the card?  Any other
20   humiliation other than the sheriff?
21     A.  Being denied credit is humiliation in
22   itself.
23     Q.  Have you experienced nausea because of

Page 144

1   Midland?
2     A.  You know, I get, every now and then,
3   like stomach sickness.
4     Q.  Do you have a history of that?
5     A.  No.
6     Q.  When did it start?
7     A.  I don't remember when it started.  Like
8   a bloated feeling, if you want to say.
9     Q.  Have you been experiencing that for
10   more than five years?
11     A.  No.
12     Q.  More than three years?
13     A.  Not three years.  I would say maybe
14   two.
15     Q.  Do you attribute that to Midland?
16     A.  Well, stress, yes.
17     Q.  Turn to interrogatory number thirteen.
18   Your response states that "Plaintiff did not
19   apply for credit from Dell or Dell Financial
20   when he purchased the computer from Dell in
21   November 2004.  The plaintiff states he paid
22   for the computer in full by a check over the
23   phone during the same conversation with a Dell

## 2015 3RD AVENUE NORTH
## (205) 397-2397 BIRMINGHAM, ALABAMA 35203 877-373-3660

# FREEDOM COURT REPORTING

Page 145

1 representative from which he ordered the
2 computer." Is that incorrect?
3     A. It's like they were giving me thirty
4 days to say that -- basically, like to
5 establish credit.
6     Q. Did you understand at the time you made
7 the order over the phone that they were opening
8 a line of credit with Dell Financial for you to
9 purchase that computer?
10     A. I knew that I had a thousand dollars to
11 pay for the computer right then. So I said,
12 "I'll pay you when I get the computer,
13 basically."
14     Q. Okay. So you did not pay them at the
15 same time you ordered --
16     A. No.
17     Q. -- the computer over the phone?
18     A. No.
19     Q. Okay. You also sued Midland Funding in
20 this lawsuit. Have you ever heard -- when is
21 the first time you heard of Midland Funding?
22     A. With Midland -- I think that was on the
23 letter from the lawsuit. It was not even on

Page 146

1 white paper. It was a colored letter that
2 explained the lawsuit.
3     Q. Have you ever seen -- other than the
4 lawsuit, have you ever seen the name Midland
5 Funding on any documentation --
6     A. No.
7     Q. -- related to this Dell account?
8     A. Not that I can remember.
9     Q. Do you ever remember seeing Midland
10 Funding on your credit reports?
11     A. I don't remember. I might have. I
12 don't remember.
13     Q. You said that the only time you've
14 heard of Midland Funding, and you remember, is
15 in connection with the lawsuit. Is that
16 lawsuit any part of your complaint against
17 Midland now?
18     A. Of course. That's embarrassing,
19 humiliation. That's when the guy brought the
20 card and left it on my door.
21     Q. Other than the embarrassment and
22 humiliation, are there any other damages that
23 you attribute to that lawsuit?

Page 147

1     A. No.
2     Q. Did you have any out-of-pocket expenses
3 for that lawsuit?
4     A. No.
5     Q. You didn't have to -- I think you
6 testified that that's when you first saw your
7 current attorneys?
8     A. Yes.
9     Q. But you also testified you didn't pay
10 your attorneys anything. So you didn't have to
11 pay any attorneys fees in connection with that
12 lawsuit?
13     A. No.
14     Q. Do you have any other evidence that you
15 want to tell me about for your embarrassment
16 other than what we've talked about today?
17     A. No. Do I want to present anything,
18 you're asking me?
19     Q. Yeah. Is there anything you want to
20 tell me about your embarrassment or your
21 humiliation?
22     A. No.
23     Q. And there are no other credit denials

Page 148

1 other than the ones we've talked about that you
2 attribute to Midland?
3     A. That I can remember.
4     Q. Is there any more -- any additional
5 physical problems other than the ones we've
6 talked about?
7     A. No.
8     Q. Any other emotional problems other than
9 the ones we've talked about?
10     A. No.
11     Q. What do you think Midland should have
12 done differently?
13     A. They should have -- when they got the
14 first bank statement letting them know that it
15 was paid, they should have contacted Dell --
16 they should have showed me where they contacted
17 Dell showing me that Dell is telling them that
18 they owe this money -- I mean that I still owe
19 them money and why after I have shown them
20 proof. And why did it take so many letters for
21 me to write them? Why did it have to come to
22 this for them to finally get it taken care of?
23     Q. So you think Midland should have

## 2015 3RD AVENUE NORTH
### (205) 397-2397 BIRMINGHAM, ALABAMA 35203 877-373-3660

# FREEDOM COURT REPORTING

Page 149

1  contacted you after receiving --
2      A.  No, no.  They should have at least let
3  me know why they -- after my first letter.
4  After my first fax or whatever let me know why
5  they was not taking it off.  Like -- not just
6  say, "We're not taking it off."  Let me know
7  why.
8      Q.  Do you think Midland did anything
9  intentionally to hurt you?
10     A.  I don't know what the purpose of
11 leaving it on was after me sending a bank
12 statement -- after me sending them what they
13 requested.
14     Q.  And given the expenses we've talked
15 about and the emotional and physical damages
16 that you're claiming, putting aside your
17 attorneys' fees, what amount do you think makes
18 you whole after this ordeal?
19     A.  Like the minimum I said earlier.  I
20 think I said a minimum of a hundred thousand
21 just because -- I mean, it's been so much time,
22 time, time, letters.  It's been a lot put into
23 this trying to get my credit right even before

Page 150

1  I obtained an attorney.
2      MR. TOMPKINS:  Mr. Brim, that's all I
3  have for you.  Thank you for being forthcoming
4  with me.  Your attorney may have a couple of
5  followups.
6      A.  Thank you.
7      MR. SYKSTUS:  I don't.
8
9      FURTHER DEPONENT SAITH NOT.
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 151

1          C E R T I F I C A T E
2  STATE OF ALABAMA)
3      I hereby certify that the above and
4  foregoing deposition was taken down by me in
5  stenotype and the questions and answers thereto
6  were transcribed by means of computer-aided
7  transcription, and that the foregoing
8  represents a true and correct transcript of the
9  testimony given by said witness upon said
10 hearing.
11     I further certify that I am neither of
12 counsel, nor of kin to the parties to the
13 action, nor am I in anywise interested in the
14 result of said cause.
15
16
17     /s/Lori S. Sizemore
18     Lori S. Sizemore, CCR, RPR
19     CCR #282, Expires 9/30/10
20     Commissioner for the State
21     of Alabama at Large
22     My Commission Expires 7/16/13
23

**2015 3RD AVENUE NORTH**
**(205) 397-2397 BIRMINGHAM, ALABAMA 35203 877-373-3660**

## FREEDOM COURT REPORTING

**A**

**access** 24:6,15
119:9,17
**account** 18:17
21:10,11,14
31:7 37:22,23
38:2,21 51:3
59:18 64:1,18
67:17 71:19,20
72:13,14,15,16
74:2,3,5,10,11
74:16,21 75:8
75:10,21 84:14
84:19 101:2
124:10 126:12
128:3,17,17,18
128:21 137:6
146:7
**accounting**
12:23 32:20
**accounts** 56:18
73:4,23 97:15
136:23
**accurate** 109:21
**acting** 5:21
**action** 1:4
151:13
**actual** 102:20
104:15 112:6
**added** 28:4 32:3
**adding** 18:16
**additional** 37:10
101:4 148:4
**address** 9:6,7
10:20 26:7
43:4,6 104:5,7
**admission**
106:13
**admit** 105:20
**Adrianne** 8:19
**adult** 76:6,10,12
82:15
**Advil** 112:20,20
**age** 119:10
**agencies** 60:22

73:19
**agency** 52:18,21
53:2,6 69:19
71:22
**ago** 11:18,21
39:7 44:7 71:4
116:11
**agreed** 1:13,22
2:6,14 75:7
**al** 1:9
**Alabama** 1:2,18
1:20 5:8,14,19
5:20 6:2 9:9
11:5,6,23 68:4
71:17 73:7,10
151:2,21
**allegations**
109:21 122:6
**allege** 118:19
**alleging** 120:3
**American** 4:13
114:15,18
116:6 129:20
130:17,18,20
130:20 131:2
131:16 132:11
132:15 135:12
135:20 136:8
138:21
**American's**
134:7
**amount** 20:8,18
20:22 25:22
26:1 31:18
32:7,9,15 33:3
33:4,9 71:12
71:13 107:23
111:5 123:8
149:17
**amounts** 30:10
**Angela** 8:7,10
49:2,4
**anguish** 112:9
**annual** 62:3
78:9,10,15

83:6
**answer** 7:3,9
111:9 131:22
**answered**
111:20
**answers** 151:5
**anxiety** 112:8
143:3
**anybody** 117:1
**anyone's** 118:9
**anywise** 151:13
**apartment** 9:10
10:2,15,16,17
**APPEARING**
5:3,10
**appears** 48:11
104:19
**appetite** 143:3
**applications**
122:3
**applied** 124:9
130:1,5,9
**apply** 115:6
120:10 121:16
130:7,12
131:21 135:19
144:19
**approved**
109:12 116:2
**approximate**
118:7
**approximately**
1:21 6:3 13:3
**April** 107:18
**aside** 107:23
149:16
**asked** 20:10
40:16 46:16
47:2,5,15 50:4
50:12 53:21
59:22 66:21
67:11 71:4
105:15 126:10
126:11 129:6
131:23

**asking** 6:20 47:4
75:23 147:18
**assign** 2:11
**assigning** 38:7
**associated**
121:23
**associating**
121:2,20
**assume** 63:16
123:8
**assuming**
124:12
**Athens** 12:15
72:6
**Atmos** 79:18,19
**attach** 99:11
**attached** 25:7
27:11 29:1
30:17 36:2
42:18 51:18
54:22 58:4
61:17 69:14
77:15 82:19
86:2,21 88:5
89:17 92:1
93:22 96:14
98:16 100:5
102:5 103:8
124:20 129:14
135:7 140:22
**attaching** 96:1
**attend** 11:11
**attended** 11:7,9
11:16
**attorney** 29:6
30:23 111:10
150:1,4
**attorneys** 57:6
107:20,23
110:19 126:5,8
142:7 147:7,10
147:11 149:17
**attribute** 113:23
118:14 139:1
139:21 140:6

140:14 142:17
144:15 146:23
148:2
**attributed** 133:1
**August** 92:5
106:16,22,23
126:22 127:4,9
**authorize** 68:21
**Autumn** 9:8,21
**aware** 106:8
120:3 121:12
122:23 123:11
123:14,14
124:2
**A&M** 73:7,10
**A.M** 1:21 6:3

**B**

**B** 5:11 43:7
**bachelor's** 11:1
13:1
**back** 31:20
38:16 46:16
48:23 116:10
120:21 128:11
128:15 136:2
**Bailey** 22:15,16
22:18
**balance** 29:19
32:16 36:10,16
72:17,18,19
75:7
**BALCH** 5:12
**bank** 9:13 19:7
32:23 33:18
35:12,13,17
40:16 46:15,18
47:2,13,21
48:16,21 49:20
50:2,9,13
53:19 55:12
60:2 66:1,7,14
66:20 67:5,6
67:12 68:18,22
69:6 87:19

**FREEDOM COURT REPORTING**

88:20 98:8,11
108:21,22
109:4,10,13
126:11,15,16
127:12 128:11
128:15 129:4
136:23 137:6
148:14 149:11
**bankruptcy**
15:10
**based** 134:8
**basic** 132:3
**basically** 119:15
129:8 145:4,13
**basis** 15:18 23:2
80:18 111:19
113:11
**BBB** 3:14 37:3
**BC** 112:21 113:9
113:10,11,13
142:13,17,18
**BEHALF** 5:3,10
**believe** 46:1
63:23 64:17
71:8 72:21
84:13,18 87:6
100:15
**Believing** 83:15
**beneath** 79:16
**best** 56:19
**Better** 37:1 39:8
39:17 40:6
42:8,22 43:2
43:11 44:11
45:22 46:9,22
47:6 48:10
50:18
**big** 142:18
**bill** 20:13 23:20
**BINGHAM**
5:12
**Birmingham**
5:14
**birth** 7:19
**bit** 15:15 19:9

60:21 117:19
**bloated** 144:8
**BOND** 5:5
**Book** 13:19 14:1
14:2,10,12,17
14:22 15:7
67:23 76:23
77:1
**BOTES** 5:5
**bottom** 25:20
31:12 37:19
39:3 71:16
82:2 87:17
90:6 94:22
**bought** 62:2
70:4,9 142:19
**box** 5:13 37:9
142:18
**boxes** 37:8
**branch** 21:18
22:13 50:3,15
125:18
**branches** 22:2
22:20
**break** 7:9,11
51:6,10 96:5,6
139:12,14
**breaks** 7:7
**brief** 60:6
**Brim** 1:6,15 3:4
6:4,8,17 7:14
7:17 8:7,7,9,10
81:3,19 96:8
139:16 141:5
150:2
**brother** 81:1,20
**brother's** 81:2
**brought** 146:19
**bureau** 37:1
39:8 40:6 42:9
42:22 43:2
44:11 45:22
46:9,22 47:6
48:10 50:19
57:10,18 99:20

**bureaus** 57:12
89:2 101:17
119:4 122:12
127:14 133:2
142:3
**Bureau's** 39:18
43:12
**business** 11:3
18:19 37:1
39:8,17 40:6
42:9,22 43:2
43:11 44:11
45:22 46:9,22
47:6 48:10
50:18 116:18
131:5,8,13
136:4
**buy** 14:11,11,13
16:1,5,8,17
62:3 70:5,10
107:8

___

**C**

**C** 5:1,4 151:1,1
**cable** 23:20
**call** 14:7 19:10
38:12,14 41:22
45:18 50:8
58:17,19 59:5
68:12 74:6
116:22 125:10
**called** 17:3
19:12,16 34:19
35:7 37:1,17
38:16 39:8,15
40:14 41:4
45:1,12,19
65:8 74:19,20
115:10 125:12
**calling** 20:14
59:23 60:18,23
61:7,8
**calls** 59:4 68:6
68:10,15 81:8
**campus** 24:16

**Capital** 8:9
92:19 114:17
114:22 115:8,9
131:3 137:9,10
137:13 138:23
**card** 53:20
65:15 74:6,7
75:1 87:16
104:6 109:15
114:5,7,10,10
116:11,12,13
116:18,21
117:1,2,4
118:11 119:7
131:7,13
135:16 136:8
136:18,19
137:14 138:13
143:19 146:20
**cards** 137:1,8,11
138:12,16,19
**care** 45:7,20
46:1,5 63:17
148:22
**case** 37:4,13,14
38:3,5,7,17,22
39:3 109:17
119:10 122:19
122:22 123:2
123:12
**cash** 136:16
**catalog** 17:2
**cause** 6:5 151:14
**caused** 110:18
112:5
**CCR** 151:18,19
**Center** 14:23
**certified** 142:1
**certify** 5:21
151:3,11
**changed** 93:4
**charges** 135:22
**check** 19:6,7,8
21:4 23:17
41:16 144:22

**checked** 23:8
115:13
**children** 8:2,4
8:20
**choose** 17:14
**Church** 5:7
**Civil** 1:4 5:23
**claiming** 111:3
149:16
**clarification**
22:17 110:10
**clear** 110:7
**clearly** 7:3
**close** 72:18
74:11
**closed** 74:10,22
**Club** 73:23
**collect** 53:6
71:23 73:15
**collection** 52:18
53:2,5 60:22
71:20,22 73:19
81:8 106:6
**college** 11:6,9,13
**colleges** 12:5
**colored** 146:1
**column** 81:15
82:3
**com** 43:7 62:3
**come** 7:5 24:5
136:2 148:21
**coming** 108:23
**commencing**
1:20 6:3
**Commission**
151:22
**Commissioner**
2:16 5:21
151:20
**communicated**
118:21
**communication**
58:15 70:11
**companies**
14:12 23:14

**FREEDOM COURT REPORTING**

81:6 82:14
**company** 12:8
14:8
**compensation**
107:2,20 108:1
**competition**
14:4
**complaint** 3:14
39:20 40:6
42:9,23 43:19
44:2,12,15
45:18,22 46:8
46:10 49:7
50:19,22 105:8
109:16,19
116:8 118:18
120:21 146:16
**completed** 10:23
**compliance** 2:3
**complies** 104:3
**computer** 15:16
15:21,22 16:2
16:8,11 17:1
18:7 19:17
20:7,17 24:9
24:10,12,14,17
24:20 25:10,13
25:16 26:6,23
28:12,15 29:9
29:15 31:3,10
31:11 86:14
110:3 144:20
144:22 145:2,9
145:11,12,17
**computers**
26:10
**computer-aided**
151:6
**condo** 10:3
114:6
**condos** 117:6,8
117:11,19
**confidential**
123:3,9
**confusing** 77:5

**connected** 24:22
**connection**
111:16 146:15
147:11
**consult** 50:21
60:19 91:10
**contact** 53:21
60:13 61:1,4
68:18,22 69:6
101:5,8
**contacted** 73:1
73:18 90:19,21
148:15,16
149:1
**contend** 121:5
**contending**
34:14
**continued** 4:1
33:21
**conversation**
39:11 41:14
48:20 59:20
144:23
**conversations**
40:9,10 44:12
51:1
**convicted** 15:12
**copies** 141:21,22
142:5
**copy** 25:6 27:10
28:23 30:16
36:1 42:17
43:19 50:5
51:17 52:9,11
52:13,15 53:11
54:21 56:13
58:3 61:16
66:1 69:13
77:14 82:19
86:2,20 87:18
88:4,18 89:17
92:1 93:22
96:13 98:16
100:5 102:5
103:8 109:16

124:20 129:14
140:22 142:1
**corner** 26:18
71:15 92:10
**correct** 26:20
33:2 34:11
35:15 39:19,21
43:5,8,23 45:6
45:9 48:12
53:4,22 56:3,9
60:15 64:15
74:1 75:19
78:3,4 81:5
82:15 87:8,14
87:23 88:14,23
91:17 94:13
95:14 97:6,10
97:19 98:10
99:3,6,9
104:22 110:6
117:7 122:20
122:21 123:7
124:15,16
127:15 128:9
130:11 141:17
142:12,15
151:8
**correspondence**
56:16 132:14
**cost** 138:7
**counsel** 1:15 2:8
2:10 6:1
151:12
**counselor**
112:10
**Countrywide**
120:8,14
**County** 22:1
**couple** 86:4
109:23 114:23
127:3,7 142:23
150:4
**course** 18:23
70:18 143:15
146:18

**court** 1:1 2:4
6:12 65:18
**courtyard**
117:10,11,13
117:15,21
118:1,2,3
**Cove** 22:15,16
22:18
**cover** 14:13
**credit** 3:19,20
3:21 4:5,13
6:18 16:14,15
16:18 18:5,9
21:5,7 31:6
52:21,22 53:1
53:22,23 54:5
54:7 57:10,12
57:18 61:19
62:2,3,4,20,22
63:3,22 64:1,4
64:5,14,16,18
69:18 70:4
71:3 72:8,23
74:7,16 75:1
75:15 77:8,20
78:9,10,10
81:7 82:21
83:1,6 84:1,3
84:10,12,14,23
85:4,7,10,18
85:19 86:15
87:7,11 88:13
88:21 89:2
90:8 92:3
94:14,23 95:4
95:7,13,15,16
95:21 96:22
97:7,17,20,23
98:1,3 99:7,12
99:20 101:1,5
101:16 103:3,4
103:20,21
105:21 106:9
106:11,14,20
107:9 108:6

109:15 112:6
114:10,10,12
114:14,17,22
115:7,13,14,20
116:1 118:20
119:4 121:7,8
121:10,13,16
121:23 122:2
122:10,12,14
123:20 127:11
127:14 128:7
129:20 130:2
130:13 131:7
131:13 133:2,4
133:12 134:5
134:10,14
135:8,11,15,16
136:21 137:8
137:11,14,20
138:9,12,13,15
138:19,22
139:5 142:3
143:21 144:19
145:5,8 146:10
147:23 149:23
**credited** 41:2
**creditor** 79:15
80:1
**criminal** 15:13
**current** 73:12
105:6 107:12
147:7
**currently** 9:5
13:16
**customer** 17:23
**CV369-IPJ** 1:4

**D**

**D** 3:1 81:19
**damage** 111:4
**damages** 112:6
146:22 149:15
**date** 5:22 7:19
26:17 29:10
36:10 44:1

**FREEDOM COURT REPORTING**

55:21 69:21
77:21,23 83:3
86:9 87:4
88:10 92:4
94:5,19,20
96:19 97:3
98:3,21 100:13
101:16 102:9
103:14 126:18
126:20,21
129:22 130:5
**dated** 3:18 44:8
57:8 61:20
83:23 101:14
135:4
**dates** 115:1
**day** 26:22 28:13
113:12 130:6
**days** 18:12,14
18:22 19:2,3
55:17,18 56:8
56:10 127:3
145:4
**deal** 108:20
**debit** 32:23
136:18,19
137:1
**debt** 53:6 54:15
55:11 56:12
65:4 71:23
73:1,19 86:13
94:4 105:14
106:7
**Decatur** 5:19
21:23
**decided** 52:17
**declined** 115:14
115:15
**defamatory**
118:21
**defendant** 4:14
123:2 141:3
**Defendants** 1:10
5:10
**Defendant's** 3:8

4:2 25:2,5 27:7
27:9 28:8,20
28:22 30:13,15
31:20 32:5,12
32:22 33:13
35:20,23 42:13
42:16 44:7
47:20 48:8
49:12,17 51:14
51:16 54:17,20
57:22 58:2,16
58:23 61:12,15
63:16 66:4,11
69:9,12 77:13
77:18 82:17,22
83:17,22 85:23
86:5,19 87:1
87:21 88:3,7
89:15,19 91:5
91:19,22 93:8
93:17,20 95:8
95:11 96:12,16
96:23 98:14,18
99:18 100:3,8
100:18 101:23
102:3 103:6,10
124:18,22
127:10 129:12
129:16 140:17
140:20
**definitely** 127:6
**degree** 11:1,2,4
11:14,22 12:20
12:22 13:1
**deleted** 106:8
**deliver** 114:4,5
**delivered** 26:6
**Dell** 1:9 3:15,16
15:16,20 17:12
17:15,21 18:3
18:5,17,19
22:12 23:4,16
23:23 24:14
26:10 30:9
31:14 32:13

33:14,17,19
34:3,14,19
35:1,7 36:12
36:16 37:2,14
37:14 38:11
39:20 40:1,9
40:14,16 41:5
41:8,14 44:13
45:1,3,12 47:9
47:17 48:5
49:1,8,21 51:1
52:2 53:21
54:6,15 55:1
56:17 64:22,22
69:5 70:11
72:14,16 83:21
86:14 109:1
110:3 118:20
122:13,19
123:6,18,23
124:11 126:2
127:13 142:3
144:19,19,20
144:23 145:8
146:7 148:15
148:17,17
**Dell's** 40:3 43:21
43:22 46:8,9
46:21 50:9
**denial** 4:13
114:19 130:4
132:15,18
133:1 134:7
135:12,23
138:21,22
**denials** 138:23
147:23
**denied** 108:7
109:7,14,15
114:9,12,14
120:12,14
122:10 129:20
135:21 143:21
**denying** 108:18
**department**

13:8 37:17
49:2,5,11,16
**depends** 68:3
113:14
**DEPONENT**
150:9
**deposition** 1:15
2:1,2,12,15
6:21 151:4
**depositions** 2:5
**deputy** 116:14
**describe** 14:5
20:3 29:7
**described** 68:13
**describes** 43:20
**describing** 48:9
**description** 46:8
**desktop** 16:3,4
**destroying**
121:7,8
**detailed** 46:12
46:14 47:3,10
47:14 48:1,3,6
48:18 49:23
50:1,4,6 87:18
88:19 128:7
**details** 59:19
**deterred** 121:1
121:19
**difference**
128:19
**different** 14:16
38:7 50:2 56:5
57:19 127:17
127:21 128:13
136:7
**differently**
148:12
**differs** 31:22
**direct** 13:7
**directed** 19:13
**directly** 17:12
111:10 126:7
**directory** 14:6
**discount** 18:3,4

26:10,13
**Discover** 130:21
130:22
**discussed** 122:5
**discussion** 60:6
**dispute** 4:7
43:13 77:8
80:10,14 87:9
88:15 91:4
92:13 93:12
94:4 95:10
96:18 100:21
102:12 104:17
**disputed** 57:10
57:11 74:18,23
75:2 80:19
86:13 94:13
97:19
**disputes** 57:18
141:21
**disputing** 95:12
96:21 99:4
**distribute** 14:1
**distribution**
13:21,22 14:23
15:2 26:9
**DISTRICT** 1:1
1:2
**DIVISION** 1:3
**doctor** 113:20
**document** 3:12
4:12 25:1,3
26:18 27:6
28:19 29:7
30:12 31:5
36:8,9,11 37:5
37:8 43:15
44:2 51:13,21
54:18 61:13
75:10 77:17
91:20 92:7
98:6 100:9
103:11 109:22
129:17 140:18
**documentation**

# FREEDOM COURT REPORTING

53:11,16 146:5
**documents**
33:14 56:17
86:5 96:9
97:12
**dollars** 17:17
73:14 138:3,7
145:10
**door** 65:16
117:4,15,15,15
119:7 146:20
**doors** 117:17,18
118:4
**dot** 43:7 62:3
**draft** 19:8
**drawn** 21:4
**drew** 131:1
**drink** 112:19
**Drive** 9:8
**driver's** 53:18
104:5
**drove** 125:12
**duly** 6:9

**E**

**E** 3:1 5:1,1
151:1,1
**earlier** 27:3,16
33:3 42:2
83:22 91:2
101:13 110:4
127:10 135:1
140:4,8,10
149:19
**early** 62:17
63:23 76:21
**eases** 112:23
**eat** 136:14,15
**education** 10:22
80:2,5
**effect** 2:2
**eight** 44:10
54:17,20 58:23
72:19 110:9,15
**Eighteen** 91:19

91:23 93:9
**Eights** 110:11
**either** 37:13
82:13 126:1
**Eleven** 69:9,12
83:17
**eligible** 21:6
**else's** 124:10
**embarrassing**
116:23 122:9
122:18 146:18
**embarrassment**
114:7 140:8,10
140:12 146:21
147:15,20
**emotional** 148:8
149:15
**employed** 13:16
**employee** 26:11
**employer** 76:17
136:4
**employers** 82:2
121:14
**employment**
76:4,20
**enclosed** 53:17
66:1 87:15,18
97:13
**enclosing** 53:11
**Energy** 79:18,19
**entitled** 111:4
141:2
**entries** 83:15
**entry** 71:17 72:8
72:9,11 75:3
75:14,17,21
77:5,7 79:16
93:3 99:8
106:19 135:10
**Equifax** 3:19,22
4:6,9 64:5
69:20 74:23
75:3 77:8,9,10
78:3,6,14,19
86:8,11 94:1

95:2,3,7 97:2,3
99:1 100:12
**Equifax's**
100:20
**Esq** 5:11
**establish** 16:18
145:5
**et** 1:9
**evidence** 2:13
147:14
**exact** 10:9 28:3
72:20 114:23
**exactly** 15:19
20:17 45:17
**examination** 3:3
3:4 6:5,15
**examined** 6:9
**excuse** 127:19
135:14
**exhibit** 3:7 4:1
25:2,5 27:7,9
28:20,22 30:13
30:15 31:20
32:5,12,22
35:20,23 42:13
42:16 44:7
46:7,16 47:20
48:9 49:12,17
51:14,16 54:17
54:20 57:22
58:2,16,23
61:12,15 63:16
66:4,11 69:9
69:12 72:19
77:13,18 82:17
82:22 83:23
85:23 86:5,19
87:1,21 88:3,7
88:21 89:15,19
91:19,22 93:17
93:20 94:18
95:8,11 96:12
96:16,23 97:12
98:12,14,18
99:11 100:3,8

100:18 101:23
102:3 103:6,10
109:17 124:18
124:23 127:11
129:12,16
134:18 140:17
140:20
**Exhibits** 28:8
33:13 83:17
91:5 93:8,13
99:19
**expenses** 110:19
110:21 111:22
131:11 135:22
136:2 141:20
142:10 147:2
149:14
**Experian** 3:20
4:5,7,11 77:20
78:19,22 80:11
87:3,7 92:3,14
92:16 93:3
96:18 97:17
99:2 103:12
104:1,15 105:2
105:3 135:2
**experience**
139:4
**experienced**
143:13,23
**experiencing**
144:9
**Expires** 151:19
151:22
**explained** 146:2
**Express** 4:13
114:16,19
116:6 129:21
130:17,18,20
130:20 131:2
131:16 132:12
132:15 134:7
135:12,20
136:8 138:21
**exterior** 117:9

**extra** 114:12
**EZZELL** 5:6
**e-mail** 23:7,8,9
24:5,13 27:22
28:6 39:13
42:23 43:3,6
**e-mailed** 27:22
28:1

**F**

**F** 151:1
**face** 118:4
**fact** 52:6 123:5
128:16
**factors** 133:11
133:15
**fair** 95:19
**false** 118:21
**familiar** 26:1
29:22 51:20
82:23
**far** 56:19 121:22
121:23
**Fargo** 108:6,8
108:15,17
109:6 114:15
120:7,8,14
137:4 139:2
**fault** 123:17
**fax** 42:1 45:4
125:15 126:21
149:4
**faxed** 37:15,16
41:19,21,22
55:11,12
**fear** 112:7
**February** 36:10
44:8,23
**fed** 58:12
**Federal** 5:22
21:5 31:6
88:21 127:11
136:21
**fee** 111:1
**feel** 43:14

## FREEDOM COURT REPORTING

**fees** 107:23
110:20,23
147:11 149:17
**feet** 118:7
**fifteen** 19:2,3
86:19 87:1
91:5 93:13
137:17
**fifty** 73:13 138:2
**fifty-four** 17:17
**file** 39:20 44:15
45:18 50:18
105:11
**filed** 6:19 15:10
40:5 44:2
57:18 105:5,9
109:19 119:10
**files** 56:21
**filing** 2:15 50:21
57:1
**finally** 148:22
**finance** 17:14,21
37:17 79:8,13
80:23 81:10
87:12 88:17
92:20,22
**financed** 16:16
17:10
**financial** 1:9
31:14 144:19
145:8
**financing** 18:3
26:13
**find** 17:1 84:7
**fine** 7:8 51:8
**finish** 116:7
**finished** 106:23
**first** 4:14 6:9
25:17 34:2
35:4 38:17
41:13 48:2
53:23 54:4
55:3,17 56:7
59:17 73:6
82:5 90:15,20

94:15 103:23
104:7,8 110:12
116:8 127:19
141:4 145:21
147:6 148:14
149:3,4
**five** 11:21 14:18
14:20 15:7
35:20,23 44:7
59:8,10 124:19
142:23 144:10
**Florida** 68:5
**focus** 85:16
**focused** 85:18
85:20
**followed** 129:6
**following** 6:6
133:11
**follows** 6:10
**followups** 150:5
**food** 138:8
**force** 2:2
**foregoing** 5:23
151:4,7
**foreign** 35:6
**forever** 105:22
106:6
**form** 2:9
**forms** 15:18
**forthcoming**
150:3
**Forty** 122:4
**Forty-four**
120:22
**Forty-two**
118:19
**found** 46:1,2
124:7,8
**four** 8:13 10:10
30:13,15 32:22
38:13 42:3
46:17 47:20
49:13,17 66:10
66:11 76:4
87:22 98:12

103:7,11
127:11 133:15
**Fourteen** 81:22
86:1,5 91:5
93:13
**fourth** 52:16
99:10
**free** 64:4 78:11
**Freedom** 1:19
6:2
**frequently** 22:6
**front** 127:21,22
**frustrated** 42:10
**frustration**
143:4
**full** 2:3 7:12
144:22
**Funding** 6:18
118:21 145:19
145:21 146:5
146:10,14
**further** 1:22 2:6
2:14 150:9
151:11

_____

### G

**gap** 44:18
**garbled** 110:12
**gas** 136:14
**general** 70:6,9
**getting** 30:6
107:10 109:11
114:2 120:18
135:20
**give** 20:22 38:17
108:17 115:11
127:3 140:5
142:20
**given** 6:21 138:2
142:7 149:14
151:9
**giving** 145:3
**go** 46:16,18 60:3
73:3 76:3 96:9
112:19 129:8

**going** 6:19 12:18
16:17 18:12,15
25:1 27:6
52:22 67:17
75:6 86:4
105:2,13,17
107:7 108:4
109:17 110:22
116:5,8,10
138:4
**Golf** 9:23 10:11
10:14
**good** 109:5
143:4
**graduate** 13:9
**grounds** 2:11
**Guaranteed**
80:7 81:11
**guess** 92:21
103:15
**guy** 35:4 59:21
67:8 76:18
146:19
**guys** 35:6,6

_____

### H

**half** 107:3,5
**halfway** 37:9
**hall** 117:18,22
117:23
**hand** 125:11
**handwriting**
37:10,20
**handwritten**
36:20 55:20
**happen** 105:19
**happened** 20:3
65:20 124:4,14
**harmed** 120:23
121:6
**head** 121:18
**headache**
113:14 114:3,8
**headaches**
113:16,21,23

118:14 139:4
139:20 140:11
140:12 143:10
**heading** 73:4,22
75:9 76:2
**hear** 33:19 54:7
**heard** 48:2 54:4
79:12,18 80:4
80:7 82:6
145:20,21
146:14
**hearing** 151:10
**held** 14:19 60:6
**help** 113:7
**hereto** 25:7
27:11 29:1
30:17 36:2
42:18 51:18
54:22 58:4
61:17 69:14
77:15 82:19
86:2,21 88:5
89:17 92:1
93:22 96:14
98:16 100:5
102:5 103:8
124:20 129:14
140:22
**high** 13:9,11
120:15
**higher** 80:2,4
114:16,22
115:6 137:19
138:1,5,9,22
**highest** 10:22
**hire** 13:23
**history** 113:16
113:18 144:4
**Hold** 70:23
**home** 56:21
108:5 118:9
120:6,12
**honest** 30:5 34:6
63:6
**honestly** 46:6

## FREEDOM COURT REPORTING

54:2 58:20
59:12
**hotel** 130:15
131:4 136:1,5
136:13 138:8
**hotels** 114:11
**hotmail** 43:7
**hours** 9:3
**house** 9:10,11
9:12 10:15
62:6,7,9,12,17
70:2,7,12
78:23 85:13,14
85:21 94:11
97:4 107:8,10
107:13 108:11
108:12
**Hum** 77:4
**humiliation**
112:7 143:2,15
143:20,21
146:19,22
147:21
**hum-ums** 7:5
**hundred** 17:17
17:18 72:21
108:3 137:18
149:20
**Huntsville** 1:19
5:8 6:2 8:21
9:9 10:1
**hurt** 149:9

___

**I**

**idea** 31:21 34:13
**identification**
25:6 27:10
28:23 30:16
36:1 42:17
51:17 54:21
58:3 61:16
69:13 77:14
82:18 86:1,20
88:4 89:16
91:23 93:21

96:13 98:15
100:4 102:4
103:7 104:6,11
124:19 129:13
140:21
**identity** 104:12
**immediately**
94:13 97:18
130:10
**impressed** 32:18
**inability** 113:18
113:21
**inaccurate**
70:20 71:5
72:11 75:18
79:5,7 83:11
83:16
**incentive** 17:20
**including** 138:8
**income** 15:7
132:8,10
**incorrect** 71:1,7
145:2
**incur** 110:19
135:22
**incurred** 141:20
142:9
**INDEX** 3:3,7
4:1
**indication** 75:20
**industry** 76:11
**information**
47:18 81:14
90:9,11,14
94:13 97:19
99:5 102:17,23
103:2 104:11
104:21 105:15
119:19 123:21
125:11 126:2,3
131:20 132:3,4
135:7
**initially** 129:3
**inside** 117:22
126:16

**insomnia** 143:4
**intentionally**
149:9
**interest** 18:10
18:16 120:15
**interested**
151:13
**internet** 17:2
24:1,5,11,15
24:22 39:12
119:11
**Interrogatories**
4:14 141:4
**interrogatory**
142:22 144:17
**investigated**
105:1
**investigation**
4:4,9,10 89:21
90:7 92:10
100:12 102:7
102:17,21
**Iowa** 68:5
**issue** 34:15
124:1
**item** 101:5
**itemized** 3:9
25:9
**iteration** 51:6

___

**J**

**Jamie** 81:3,19
**Jamon** 1:6,15
3:4 6:4,8 7:14
43:6 111:8
141:5
**JaMya** 8:7
**January** 56:2
57:9,15 58:22
**Jason** 5:11 6:17
**job** 14:19 21:7
76:8,10 139:7
**joint** 21:11
**Jones** 8:19,20
**July** 58:8 59:1

60:9 63:12,15
64:9 67:15
69:22 78:1
83:4,23 84:4,5
84:6,13,15,20
84:22,23 85:7
85:10,17 86:10
87:5 88:11
95:5,6,8,9,13
95:16 96:1
98:4
**J-A-M-I-E** 81:4
**J-A-M-Y-A** 8:9

___

**K**

**keep** 52:13
56:21,22
**kept** 38:7 107:9
**kids** 136:11
**kin** 151:12
**kind** 76:10
**knew** 16:17
18:11 20:10
42:10 52:21
60:22 119:6
133:20 145:10
**know** 7:1,7 13:3
16:1 19:10
21:21,22 22:15
22:19 27:21
28:3 31:16
39:5 46:13
48:17 59:18
60:21 63:18,18
63:19 64:7,20
65:20 72:15
74:2,15 75:12
75:22 78:16
80:21,22 82:9
89:20 90:14
91:19 92:21
93:17 94:23
103:11,12
106:12 109:4
111:4 114:3,13

118:7,12 120:8
124:4,8 126:17
128:16,20
129:1 133:3,21
134:1 137:16
141:15 142:16
142:19,20
144:2 148:14
149:3,4,6,10
**knowledge**
124:9
**known** 44:19
**knows** 119:11

___

**L**

**L** 1:12
**lady** 20:16 21:1
35:5 47:22
59:17 68:13
125:9
**laptop** 16:3
**large** 1:18 5:21
118:23 119:12
119:17,20
120:5 151:21
**laws** 2:3
**lawsuit** 6:19
15:19 64:23
65:3,17,21
91:1 105:6,12
105:19 106:3
111:20 119:18
119:21,23
120:1,2 124:14
134:5,8 145:20
145:23 146:2,4
146:15,16,23
147:3,12
**lawyer** 36:7
50:21 60:19
91:10,13
110:22 111:1
111:11
**lawyers** 110:22
**lawyer's** 111:23

## FREEDOM COURT REPORTING

**leading** 2:9
**learned** 34:2
  78:18
**leaving** 143:19
  149:11
**led** 72:21
**left** 39:2 102:15
  114:5,7 116:11
  146:20
**left-hand** 37:9
  92:9 104:8
  117:13
**Leggett** 82:11
**lender** 62:23
**lenders** 13:6
  63:2,6
**letter** 3:15,16,17
  3:18,22 4:3,6,8
  36:6 51:23
  52:3,6,13,16
  53:10 54:9,10
  54:14 55:1,10
  55:13,15,16,17
  55:21 56:5,7
  56:13 57:8,15
  57:16 58:6,7
  58:11,14,23
  59:1 60:9,12
  60:17,20 61:2
  61:5,6,19,23
  63:10,15,21
  64:9,13,21
  65:7,13,23
  66:3 67:15
  68:7 83:23
  84:9 86:7,12
  87:10,17 89:6
  89:8,23 91:1
  94:1,3,5,10,12
  95:11,17 97:1
  97:9,13,18
  98:20 99:12,13
  100:16 101:10
  101:11,13,19
  102:16,20

104:1 132:20
  133:5 134:11
  134:16,17,20
  142:2 145:23
  146:1 149:3
**letters** 58:21
  63:9 67:16
  83:19,20 91:4
  91:11,14 93:13
  99:1,18 101:16
  148:20 149:22
**letting** 148:14
**let's** 46:16 95:9
  110:8 134:18
  139:11
**level** 10:22
**license** 53:18
  66:15,19 67:2
  87:16 104:5
**Limbs** 139:23
**limit** 114:17,22
  115:7 137:16
  137:20 138:1,5
  138:9,22
**line** 18:5,9 64:5
  70:4 117:16
  130:2,12 145:8
**listed** 33:18 73:6
**lists** 133:15
**little** 15:15 19:9
  60:21 117:19
**live** 8:14,16,20
  9:5,19,21 10:6
  10:8,11 17:4
  19:21 35:1
**lived** 9:17 10:19
**living** 114:6,9
**LLC** 1:9
**LLP** 5:12
**loan** 12:8 62:11
  72:3 73:10,12
  79:21 80:2,5,8
  81:1 108:5,7
  120:7,12
  122:10

**loans** 12:2,10
  13:4,7 71:9,11
  71:14 87:12
  88:16 92:20
**locate** 57:2
**long** 9:17 10:8
  10:19 14:16
  15:4 18:9
  44:15,18 56:4
  137:13
**longer** 11:20
**look** 26:3 29:21
  37:7 48:8
  51:20 70:17,23
  71:14 72:7
  81:13,22 82:22
  82:23 88:20
  90:11 91:12
  92:6 94:17
  97:11 99:10
  103:23 116:12
  118:8 119:14
  134:10 141:6,7
  141:18 142:22
**looked** 44:6
  56:16 63:10
  78:3 83:16,22
  86:16 87:7
  88:13 91:4,13
  95:7 96:23
  97:7 100:16
  101:13 115:21
  133:3,6 134:23
**looking** 31:20
  32:5,12 43:15
  46:7 48:23
  73:21 79:9
  93:2 94:11
  108:12 118:4,6
  120:21,22
**looks** 25:9,11
  39:4 43:10,20
  46:11 92:8
  95:2 97:12
  126:21 128:3

**Lori** 1:16 5:18
  151:18
**loss** 107:3 112:7
  113:23 118:14
  139:4,19
  140:12 143:2,3
  143:4,10
**lost** 26:5
**lot** 22:13 57:2
  114:11 127:11
  128:3 138:10
  149:22

_____

**M**

**M** 11:5,6,23
  71:17
**Madison** 50:17
**Mae** 13:7
**Mahella** 92:21
**mail** 55:19 56:12
  93:10,11,15
**mailed** 142:1
**management**
  6:19 11:3 53:1
  54:5,8 61:19
  71:3 72:8,23
  75:15 84:1,3
  90:8 96:22
  99:7 101:6
  118:20
**manager** 13:21
  13:22 59:22
**managers** 22:22
**Manpower** 82:5
  82:6,8
**March** 42:4
  61:21 63:12
  64:12 65:13,23
  66:4 67:16
  68:7 94:6
  95:10,16 96:20
  98:22 100:14
  101:14 102:10
  102:11 103:15
  107:16 108:11

135:4
**mark** 109:17
**marked** 25:6
  27:10 28:23
  30:16 36:1
  42:17 51:13,17
  54:21 58:3
  61:16 69:13
  75:14 82:18
  86:1,20 88:4
  89:16 91:23
  93:21 96:13
  98:15 100:4,7
  102:4 103:7
  124:19 129:13
  140:21
**marking** 25:2
  27:7 28:19
  30:12 35:19
  42:12 54:16
  57:21 61:11
  69:8 91:18
  93:16 101:22
  140:16
**married** 7:21,23
**Marshall** 21:23
**Maryland** 11:12
  11:17
**math** 32:10,18
**matter** 63:17
**MBGA** 73:23
**MCM** 141:21
**mean** 14:11 16:6
  17:16 24:19
  31:23 41:15
  42:23 44:17
  55:1 56:22
  62:10 64:22
  66:19 67:18,20
  70:16 71:10
  75:22 76:18
  95:22 97:15
  104:16 106:2,4
  107:7 108:2,21
  114:2,8,11

## FREEDOM COURT REPORTING

117:2 119:14
119:15 121:22
122:9 123:19
127:19 130:19
133:22 134:1
136:10 138:6
140:7 148:18
149:21
**means** 151:6
**meant** 48:5
**medical** 112:10
**medication**
112:13 142:11
143:6
**medications**
8:23 9:2 143:6
143:8
**medicine** 112:15
112:18
**medicines**
112:16
**member** 21:6
**Memorial** 10:13
125:20
**mental** 112:9
140:3,5,14
**mention** 115:23
116:3
**mentioned**
140:3,8
**message** 43:9
**method** 23:22
**middle** 7:15
36:22 48:11
53:14,15
**Midland** 3:17,18
6:18,18 53:1,9
53:21 54:5,7,9
55:2,4,7 56:5
56:17 57:14
58:6,22 61:19
63:9 64:18,22
66:12,17 67:3
67:16 68:7,10
68:15,17,21

70:11,22 71:3
72:8,23 75:14
77:7 79:6
83:12,15,21
84:1,3,14,18
85:11 86:13
87:11 88:16
90:8 91:2
92:23 93:3
94:4 96:22
99:7 101:5,8
101:14 105:20
106:8,19 109:1
109:3,7 114:1
118:15,20,20
120:4 122:13
122:17 123:11
123:17,21
126:1 127:13
133:1,19 135:8
139:1,22
140:14 142:17
144:1,15
145:19,21,22
146:4,9,14,17
148:2,11,23
149:8
**Midland's** 4:14
106:13 141:3
**military** 21:8
**mine** 80:20
**minimum** 108:3
149:19,20
**minor** 32:20
**minute** 104:1
116:6,10
**minutes** 44:7
**missing** 73:9
92:9
**Mississippi**
13:12
**Missouri** 80:2,4
**mistake** 106:13
**monetary**
142:21

**money** 42:5
44:20 111:14
111:21 126:17
127:18 128:2
128:18 129:1,8
136:12 148:18
148:19
**monitor** 16:5
**Montgomery**
127:8
**month** 34:20,22
65:9 107:15
117:4 135:12
**months** 34:1,7,9
34:18 36:14
41:18 44:10
127:7 135:14
**mortgage** 9:15
120:9,16,19,20
**mother** 8:17
**move** 51:12
110:8
**M-Y-A** 8:9

___

### N

**N** 1:12 3:1 5:1
**name** 6:17 7:13
7:15 8:18 17:6
17:6,8 20:1
21:10,12 22:21
26:4 49:6
76:19 81:2
116:13 143:5
146:4
**names** 8:6 14:16
81:17
**nausea** 143:3,23
**necessarily**
130:19
**necessary** 2:7
**need** 7:7,11 50:8
126:17 128:16
128:20,22
129:1 136:12
**needed** 108:23

109:2
**needing** 136:14
**negative** 73:4,22
74:16 75:8,10
75:21,23
133:23
**neither** 151:11
**nervousness**
112:8 143:3
**never** 18:19
23:17 38:4
47:12 67:11
75:2 76:14
**new** 90:9,14
102:17,23
103:2 135:11
**nine** 17:16,17
57:22 58:2
63:16 83:23
**Nineteen** 93:17
93:21 95:11
97:1 99:19
100:18
**nongarbled**
110:14
**nonphysical**
140:2
**NORTHEAS...**
1:3
**NORTHERN**
1:2
**Notary** 1:17
5:20
**notation** 36:20
**note** 75:13
116:20
**notes** 68:9
**notice** 2:15 93:4
103:2
**November** 7:20
29:11,17 30:2
31:12 33:18
34:9,12 43:10
110:2 144:21
**number** 1:4 10:9

19:10,12,15,16
29:21,23 31:15
31:17,21 32:17
37:3,4,13,14
37:15,16,16,22
37:23 38:2,18
38:21,22 39:3
49:12 66:16,20
72:20 104:6
108:3 116:14
128:18,21
132:6 141:19
142:23 144:17
**numbered** 141:7
**numbers** 37:21
38:8 71:15
128:3,4
**Nyquil** 112:19
113:1,4,6
142:13,17

___

### O

**O** 1:12
**object** 75:6
**Objection** 90:22
111:2,18
**objections** 2:8
2:11
**obtain** 125:5
**obtained** 150:1
**obviously** 47:17
119:6
**October** 1:20
6:4 16:14,14
16:19 27:4
44:3 45:21
110:5
**offense** 15:13
**offer** 123:15
128:23
**offered** 2:13
17:20 123:11
**office** 5:13 112:1
**offices** 1:19 6:1
**OFOO** 39:4

# FREEDOM COURT REPORTING

**of-pocket** 142:10
**Oh** 66:6,23 104:10
**okay** 15:17 26:5 27:13 32:5 36:8 42:8 44:1 66:6 67:11 75:2,16 77:6 96:10 107:1 110:16 111:8 116:9 129:3 139:18 145:14 145:19
**old** 7:17 8:12 24:19,20
**Once** 78:12
**ones** 64:17 89:4 148:1,5,9
**one-eight-hun...** 19:12,15
**online** 16:10 39:13,16 70:16 93:9 130:7,8,9 131:20 132:12 132:13
**open** 18:5 21:16
**opened** 21:13
**opening** 145:7
**oral** 6:5
**ordeal** 149:18
**order** 16:21 18:6 19:16 126:15 145:7
**ordered** 20:16 21:1 24:8,11 25:17 26:22 27:20 28:12 38:4 145:1,15
**ordering** 27:2
**original** 79:15 80:1
**outside** 117:22 117:23
**out-of** 110:20

**out-of-pocket** 110:19 111:12 111:22 141:20 147:2
**over-the-coun...** 112:15,16 142:10 143:5
**owe** 20:11 36:17 55:11 56:11 73:13 111:14 111:19 148:18 148:18
**owed** 20:17 33:6 34:3 42:5 44:20 54:15 65:4
**owns** 9:13

---

**P**

**P** 1:12 5:1,1
**package** 16:7
**page** 36:22 37:7 37:19 39:3 43:15 46:7 48:9,23 71:14 71:15,16 72:7 73:3,21,21 76:3 79:9,11 79:22 81:13,22 88:20 90:6,15 92:7,8,8 93:2 94:14,17,18,19 94:20 95:1 97:11,16,19,22 98:1,5 99:10 99:11 102:16 102:19,20 110:1,9,11,14 118:18 122:4 127:21,22,23 128:1 141:6,8
**pages** 14:3 142:23
**paid** 20:12,18,21 23:17 29:9,14

33:4 34:14 35:9 42:11 59:18 72:13,14 74:12 78:8 105:14,21 106:7 108:20 111:5,6,10,21 114:13 144:21 148:15
**pain** 112:9
**paper** 30:22 146:1
**papers** 56:22 57:4
**paragraph** 103:23 104:7,8 110:1,8,17 112:4 118:18 120:22 122:4 133:6,10
**paragraphs** 110:1
**Parkway** 10:13 22:8 125:20
**part** 121:19 146:16
**particular** 21:18 22:13 23:1 30:4 85:21 117:17
**parties** 1:14 2:10 118:22 119:2,5 151:12
**parts** 68:4
**pay** 18:9,12,21 19:5 111:1,11 114:11 130:15 130:16 136:1,9 136:16 145:11 145:12,14 147:9,11
**paying** 20:6,9 136:13
**payment** 19:23 20:14 23:16

31:14 33:17 41:2 68:19 73:10 124:1,7 126:13 127:12
**payments** 23:13 23:22 24:1 72:2 111:12
**pays** 75:7
**pending** 7:9,10
**people** 13:23 23:1 120:6 122:9
**period** 11:8
**person** 17:4 19:22 20:5,21 35:4 120:17 121:11 125:16 125:17
**personal** 81:14 131:7
**persons** 121:1 121:20
**person's** 20:1
**pertaining** 38:3
**phone** 16:22,23 19:8 20:4 23:13,16,17 24:2,3 33:5,10 40:8,10 41:13 41:16 44:12 59:4,5,20,23 60:13 68:6,10 68:12,15,18 69:2 115:12,16 115:17,18 116:13 125:15 144:23 145:7 145:17
**phrase** 47:9,13 48:3
**physical** 112:8,9 139:20 140:13 143:1,14 148:5 149:15
**physically** 23:15

139:23 140:1
**picked** 125:13
**place** 19:13
**placed** 18:6
**places** 49:1 120:10,13
**plaintiff** 1:7 5:3 110:2,18 141:5 143:1 144:18 144:21
**Plaintiff's** 4:14 141:3
**Platinum** 120:8 120:15,20
**Platt** 82:11
**please** 60:12 94:12 101:5
**pocket** 110:21 111:7,21 130:16 136:2 136:10
**point** 41:8 58:13 64:21 67:19 70:3 90:4 111:5 112:2 137:22
**pointed** 95:20 95:23
**position** 13:20 116:14
**Post** 5:13
**postage** 141:21 141:22
**preferred** 17:23 18:1
**present** 147:17
**pretty** 56:22 139:9
**previous** 29:19 32:16 64:16 99:1
**primary** 133:11
**prior** 2:13 18:18 24:14 29:15 55:7 84:22

85:17 113:9
**privileged** 90:22
111:2
**probably** 22:4
24:16 45:12
59:9,9 95:20
**problems**
112:11,14
139:21 140:5
140:14 148:5,8
**Procedure** 5:23
**proceedings** 6:6
**process** 19:10
104:20
**product** 14:1,9
**production** 4:15
92:9 141:5,19
**products** 14:14
**professional**
1:17 5:19 79:8
79:12 80:23
81:10 87:12
88:17 92:20,22
112:10
**prompted** 42:8
45:17,21 58:11
61:22 64:13
69:23 94:9
97:4 125:22
138:5
**proof** 126:12
148:20
**protector** 3:10
15:23 17:18
27:15,18 28:4
32:3,7
**prove** 108:19
**provide** 50:7
104:10 131:20
132:5,8,9
**provided** 29:6
30:22 36:6
57:5 90:12
105:15 111:15
127:13 128:14

131:13
**public** 1:18 5:20
105:23 106:1,5
118:22 119:12
119:17,18,18
119:20 120:4
134:1
**publication** 14:9
**pull** 62:4,22
63:3 115:14
135:10
**pulled** 62:20
**pulling** 63:22
**purchase** 3:12
15:16 16:13
19:3 22:12
23:5,23 31:2,4
31:9,11 33:15
41:18 62:11
85:13 107:12
145:9
**purchased**
15:20 24:10
25:10,13,16
64:4,6 110:3
144:20
**purchasing**
24:14,18 85:14
108:10
**purely** 132:12
**purpose** 94:2
141:14 149:10
**purposes** 70:6
70:10
**pursuant** 5:22
**put** 14:12 57:4
59:20 60:16
119:7 125:8,8
125:14,15
149:22
**putting** 132:3
149:16
**P.C** 5:6

_____

**Q**

**quarter** 76:5
**question** 7:9,10
71:9,10 111:20
**questions** 2:9,10
6:20 7:1,3
101:4 131:22
132:2 151:5
**quick** 32:18 60:4

_____

**R**

**R** 5:1 151:1
**rate** 18:10
120:15
**read** 7:6 31:13
31:17 104:2
132:20 141:15
**reading** 1:23
104:13
**ready** 125:10
**real** 60:4
**realize** 45:10
**realized** 64:3
**really** 18:1
85:15
**reason** 42:2
63:23 72:12
78:21 97:8
108:17 131:17
**reasons** 115:23
118:13 139:3
**recall** 10:19 17:6
19:21 20:1
22:11 23:19
30:1,7,10
45:21 49:4
53:16 59:3
61:7,8,22 65:9
65:12 68:14
71:22 73:9
79:4 82:12
83:10 91:13
93:7,12 101:19
109:2 112:2
126:9,18,19
**receipt** 23:4,11

24:4,13 25:19
27:17,19 35:11
35:17 41:9
142:1
**receipts** 33:12
142:4
**receive** 25:15
27:19 28:11
33:14,22 43:9
68:6 89:1 93:9
**received** 25:12
28:6,14,15
29:9 30:3
33:23 34:1,4
34:13,17 36:14
40:12,13 41:1
41:4 42:1,7
44:23 45:14
54:11 55:4,6
55:15 56:5
57:8 58:17,19
59:5 64:21
68:10 70:15
79:2 81:7 83:8
84:23 90:17,23
92:12 93:7
99:17 130:4,9
132:21
**receiving** 20:13
30:1,7 41:17
42:4 46:21
58:21 59:3
84:10,12 89:6
101:8,20
104:14,23
109:14 134:11
135:11 149:1
**recognize** 25:3
27:14 29:3
30:19 35:21
42:14 54:18
57:23 69:9
77:18 88:8
96:17 102:1
124:22

**recollection**
53:8
**record** 7:12 60:3
60:7 75:5,13
105:23 106:1,5
134:1 141:2
**recordings** 68:9
**recovery** 49:2,5
49:11,15
**Redstone** 4:12
21:5,19 31:6
88:1,21 125:3
125:4,5 127:11
136:20,21
**refer** 133:18
**reference** 38:6
**referred** 20:20
128:10
**referring** 36:14
52:18 53:2
58:16 87:21
88:22 90:1,15
110:14 118:1
119:3,13,21
121:21 122:1
128:15 141:22
142:13
**refers** 37:12
**reflection** 75:8
**refused** 108:5
**regarding** 73:19
**Registered** 1:17
5:18
**regular** 23:2
113:11
**reimbursed**
131:10 136:5
**rejected** 123:15
**relate** 121:9
**related** 56:17
146:7
**relates** 72:16
**relating** 2:4
**relaxation**
112:18

## FREEDOM COURT REPORTING

relevance 75:6
remember 10:9
  11:16 15:19
  16:12 17:7
  18:1,2,8,11
  19:14 20:13,15
  21:13 22:14
  23:7,12,21
  26:8,12 27:1
  29:23 30:5,5,6
  34:5,20,22
  35:3 38:4,19
  38:19 39:1,14
  40:5,20,21
  45:16,17 46:2
  46:4,6 47:1,4,5
  47:23 48:4,20
  49:6,10 50:13
  50:15 52:4
  53:9 54:2,3,10
  54:14 56:4
  57:11,20 58:20
  58:21 59:7,12
  59:13,14,16,19
  60:11 61:3
  62:13,15 63:7
  63:14,19,20
  64:8,11,20
  65:1,15 68:3,8
  68:20,23 69:4
  69:4,7,23
  70:22 72:4,20
  74:12,13 76:15
  76:19,21,22
  77:10,11 80:13
  80:16,18 85:3
  85:5,6,8,12
  89:4,5,6,7,9,11
  90:23 91:3
  94:9 95:18
  99:16,17,23
  100:9 104:13
  104:14,23
  105:4,5 106:17
  106:18 107:15

108:9,14,16
109:8,10,11,12
109:14,14
113:5 114:18
114:21 115:1
125:19 130:1
132:1 137:15
144:7 146:8,9
146:11,12,14
148:3
removed 80:17
  80:17 93:6
  105:21,22
  106:4
rent 10:4
rented 10:5,17
repeat 7:1
rephrase 7:2
replied 56:12
reply 56:11
report 3:19,20
  3:21 4:5 46:12
  46:14 47:3,10
  47:14 48:1,3,6
  48:18 49:23
  50:1,4,7 62:2,3
  64:2,4,5,16
  69:18 70:1,4
  70:14 74:16
  77:8,20 78:3,5
  78:6,10,11,14
  78:19,22 79:1
  79:5 81:7,14
  81:23 82:21
  83:2,6 84:19
  85:4,7,10
  86:16 87:7,11
  87:19 88:13,19
  92:3 93:3
  94:14,23 95:4
  95:7,13,16,21
  96:2 97:17,20
  97:23 98:1,3
  99:12 102:15
  103:3,4,20,21

105:22 106:9
106:20 107:9
116:1 122:14
123:20 128:7
133:5,12
134:11,14
135:11
reported 76:4
Reporter 1:17
  5:19 6:12
reporting 1:19
  6:2 133:3
reports 24:21
  53:22 54:1
  62:5,20,22
  63:4,22 64:14
  64:19 83:16
  84:10,13,14,23
  85:18,19 95:15
  97:8 106:11,14
  115:20 134:5
  146:10
represent 6:18
representation
  121:1
representative
  145:1
represents
  151:8
reputation
  112:7 121:5,9
  122:5
request 4:15
  23:11 70:1
  78:5,6 125:8,9
  125:14,15,23
  126:4,14
  127:17 128:14
  128:20 134:13
  137:23 138:5
  141:4,18
requested 78:7
  78:21 85:9
  95:5 126:2,2
  128:6 137:19

138:9 149:13
researched
  101:1
resolve 49:8
resolved 43:13
  43:14 45:11
  80:13 124:1
respective 1:14
respond 65:17
response 4:14
  35:10 39:22
  40:3 42:23
  43:12,21,22
  46:8,10,21
  47:7 48:11
  50:10 55:18,19
  58:15 60:10
  65:7 70:10
  83:6 86:15
  87:6 88:12
  92:12 100:15
  100:20 102:11
  102:14 103:17
  115:11,12
  134:23 135:3,4
  141:3,18
  142:22 144:18
responses 48:9
  99:18,23
  141:10,16
rest 59:14
result 4:10
  151:14
results 4:11 89:1
  90:7,17 92:10
  92:15,23 93:8
  101:20 102:8,9
  102:17,21
  103:13,16
  104:15,16,17
review 70:14
  79:1 83:8 93:5
  105:8 141:10
reviewed 71:7
  93:1 109:18

reviewing 64:13
reviews 51:21
  109:22
Ridge 9:8,22
ridicule 122:7,7
ridiculous 67:21
right 14:13
  19:13 22:15
  26:2 29:21
  43:22 44:8,22
  45:1 48:13
  53:13 60:14
  64:14 66:2,11
  86:23 90:13
  95:13 96:1
  98:9,18 104:21
  109:19 110:5
  123:6 127:20
  133:6,8 135:5
  135:12 139:2
  145:11 149:23
right-hand
  26:18 71:15
  81:15
road 9:23 10:12
  10:14 85:15
Ronald 5:4
room 131:5
routing 128:4
RPR 151:18
rules 2:4 5:22

─────────
S
─────────

S 1:12,16 5:1,18
  151:17,18
SAITH 150:9
Sallie 13:7
Sam's 73:23
  74:3,5,6,21
  75:1,14 138:13
saw 40:21 53:23
  57:13 79:4
  85:3 147:6
saying 29:14
  30:9 39:15

## FREEDOM COURT REPORTING

55:10 105:1
106:6 108:19
109:2,8 119:16
**says** 26:4 32:15
36:16 37:3
48:16 49:1
71:19 73:4
75:7 76:6 90:8
92:10 93:1
101:1 102:17
102:20 110:18
122:6 133:11
**school** 12:13
13:10,11 16:11
24:16 72:5
73:11
**score** 133:13
**searched** 23:9
**second** 34:4 39:3
39:7 41:17
71:4 92:6
97:11,22
110:13,16
121:19 127:22
128:1 133:6
**section** 117:18
**Security** 53:19
66:15,20 67:2
87:16 104:6
132:6
**see** 25:19 26:5
26:17 29:10,19
32:7,15 44:1
48:16 49:1
53:13 55:21
69:21 70:19
71:6,16 72:8
73:4 76:4,6
77:21 79:15
80:1 81:18
82:2 92:4,15
92:23 94:15,19
95:9,15 100:13
100:23 102:18
103:19 106:14

117:1 118:9,19
119:9,23
123:20 133:15
134:18
**seeing** 57:15
81:6 85:6,17
146:9
**seeking** 108:1
**seen** 43:16
106:11 112:10
113:20 116:7
129:17 134:4
140:18 146:3,4
**semester** 12:19
**send** 35:11,11
35:13,16 40:4
40:16,18 41:8
41:15,19 45:3
49:15 52:6
55:18 57:14,16
57:17 58:7
60:2 63:9
66:12,17,21
67:3,6,12
83:20 84:2
94:5 104:5
141:21
**sending** 49:10
60:19 63:20
101:19 109:10
149:11,12
**sent** 3:22 4:3,6
24:12 43:3
44:20 46:23
47:16 52:1,1,2
52:4,7,10
55:10,12,19
56:14 58:6
83:19 84:9
86:7 93:12
94:1 97:8
98:23 101:10
101:12 109:4
109:13 123:21
134:15 142:2,4

**sentence** 52:17
52:23 94:15
110:18 112:4
**separately** 16:1
**September**
26:20 27:1,2
**service** 14:7,7
21:8
**services** 1:9
111:15,16
**session** 139:17
**set** 117:9
**settle** 123:12
**settled** 123:6
**settlement** 123:4
123:5
**seven** 8:13 51:14
51:16 110:1
122:5 140:21
**Seventeen** 72:7
89:16,20 93:8
94:14,18
**shakes** 121:18
**sheriff** 114:4
116:1,11
119:6 143:17
143:20
**sheriff's** 118:11
**ship** 26:3
**shopping** 62:18
70:2,7,13 97:5
**short** 96:4
139:11
**shortly** 57:13
**show** 25:1 27:6
28:19 30:12
31:10,18 35:19
42:12 47:18
50:9 51:13
54:16 57:21
61:11 69:8
77:17 86:4,23
88:7 89:19
90:4 93:16
100:7 101:22

103:10 128:22
129:16 140:16
**showed** 32:6
85:10 148:16
**showing** 31:2,4
31:9 32:23
91:18 127:12
148:17
**shown** 148:19
**shows** 31:10
75:6 93:2
**sickness** 112:8
143:2 144:3
**sicknesses**
143:14
**side** 104:9
117:11,13
**sides** 117:12
**sign** 26:12
**signature** 1:23
141:8
**signed** 52:8,11
52:14 141:11
**significant**
18:13
**signing** 141:14
**similar** 28:8
33:13
**sir** 33:7 38:23
54:12 66:5,22
71:2 76:1
84:16 99:14,21
109:9 135:17
**sit** 85:16 113:15
**situation** 54:6
**six** 42:13,16
46:7 48:9
129:13,17
**sixteen** 72:21
88:3,7 91:6
93:14
**Sizemore** 1:16
5:18 151:17,18
**Skystus** 65:8
90:19,21 91:16

**sleep** 107:4
112:8,20 113:7
113:15,18,21
114:1 118:14
139:4,19
140:13 143:2
143:11
**Social** 53:19
66:15,20 67:2
87:16 104:6
132:5
**sold** 51:2 76:14
**solely** 21:10
**sorry** 36:18
104:10
**sort** 18:2 70:11
131:14
**sound** 26:1
**sounds** 26:2
**sources** 15:6
**South** 10:13
22:8 125:20
**Southwest** 9:8
9:23
**speak** 17:4
**speaking** 109:12
**speaks** 75:10
121:10
**specific** 30:10
99:23 115:23
128:17,18,21
129:7
**specifically** 59:3
85:6 109:3
126:9,14 131:2
133:18
**spell** 7:15 8:8
**spent** 142:16,20
**spoke** 19:21
20:16 35:5
38:8,10 40:19
42:6 59:13
120:16
**spoken** 41:6
**start** 18:15

# FREEDOM COURT REPORTING

144:6
started 16:10
51:5 144:7
state 1:18 5:20
7:12 12:15
52:16 53:10
60:12 87:17
94:12 112:5
141:19 142:9
151:2,20
stated 48:17
88:18
statement 3:9,10
3:11,13 25:9
28:2,6,16
29:10 31:7
32:13,23 33:18
34:4,13,17
35:12,12,14,17
36:13 40:4,11
40:12,13,17,21
41:1,9,15,18
41:19,21,22
42:4,7 44:6,11
44:21 45:1,4
45:15 46:23
47:16 49:16,20
50:2 53:19
55:12 60:2
63:20 66:2,7
66:14,20 67:5
67:7,13 87:20
88:1,22 98:8
98:11 108:22
108:22 109:5
109:11,13
119:16 127:12
128:11,15,23
129:4 148:14
149:12
statements 29:8
30:4,7 33:12
33:22 118:22
120:4,23
states 1:1 58:14

110:2 142:23
144:18,21
status 71:19
stay 139:9
stayed 117:10
117:13
stenotype 151:5
sticking 70:22
STIPULATED
1:13,22 2:6,14
stipulation 5:23
stipulations
6:12
stomach 144:3
stop 59:22
store 74:7
138:12,15,18
stores 26:4
street 5:7 22:14
stress 107:3
114:12 140:7,9
140:12 143:11
144:16
stressful 139:7
student 12:2,8,9
13:4 71:9,11
71:13 72:3
79:20 80:8
81:1 87:12
88:16 92:20
subjected 122:6
122:8
submission
39:13
subpoena 114:5
substance 68:14
sued 106:6
114:3 122:19
133:23 145:19
suffer 112:6
suffered 143:1
sufficient
104:11,21
suing 65:4
Suite 5:7

supervisor
59:21 60:10,16
67:9 68:14
supposed 16:16
17:9
sure 7:2 25:10
37:18 42:1
44:22 45:19
surge 3:10 15:23
17:18 27:15,17
28:4 31:23
32:3,6
sworn 6:9
Sykstus 5:4,5
6:13 22:17
51:5 60:3 75:5
75:12 90:22
110:10,16
111:2,8,18
123:3,10 150:7
symptoms
139:21 143:8
system 57:1
s/Lori 151:17

_____
T
T 1:6,12,12,15
6:4,8 141:5
151:1,1
take 7:7,8,11
10:2 51:6
74:22 89:9,12
90:4 96:4
100:22 103:18
104:1 112:20
112:21 113:1,6
113:9,11,13
123:22 127:3
139:11 148:20
taken 1:16 7:4
9:2 45:7,19,23
46:1,5 63:17
112:13,17
113:4 143:7
148:22 151:4

talk 15:15 34:23
44:16 116:5
132:11
talked 20:21
42:3 44:19
50:13 62:23
63:2,5 67:8
68:13 87:13
110:3 122:11
122:13,16
127:10 132:17
138:13 140:10
142:14 143:7
143:16 147:16
148:1,6,9
149:14
talking 60:10
66:9 72:9
TANNER 5:5
Target 14:23
15:4 26:4,9
77:3 82:14
teenager 82:10
tell 19:9 20:8
33:21 35:7
36:23 37:12,20
39:10,10 51:2
55:16 59:15
60:16 61:12
63:3 79:9 86:6
87:2 97:13
98:19 110:20
117:8 124:11
127:18 147:15
147:20
tellers 22:19
telling 86:11
148:17
tells 128:1 133:5
Ten 61:12,15
66:5 118:18
Tennessee 68:4
68:5
terms 18:8
testified 6:10

147:6,9
testimony 151:9
texas 79:20 80:7
80:23 81:10
87:11 88:16
92:19
thank 32:21
150:3,6
thereto 2:13
151:5
thing 106:10
108:20,21
127:20 133:22
things 57:3
70:21 71:6
128:4 136:11
136:16 143:14
think 13:7 16:6
16:9,10 17:3
17:16,22 18:4
19:11,20 21:23
22:2 24:19
25:12,14,17
26:22 27:3
32:10 33:9,23
34:7,8 35:12
37:14 38:5,8
38:10,20,22
39:2,15 40:11
40:22 42:6
44:13 45:14,16
45:23 46:23
47:8 50:5 52:1
52:1,7 53:8,18
55:3,5,6,8,9,14
56:11 57:16
58:12,17,18
60:9,21 62:1,2
62:8 63:5,21
64:3,4,6 65:19
70:3,6,12,12
70:21,22,23
72:5,6,11
73:13 78:8,9
78:17,23 80:15

# FREEDOM COURT REPORTING

80:22 81:1
83:5,14 85:1,9
91:15 93:11
94:11 95:6
99:15,22
100:17 101:10
103:21 104:16
106:18,23
110:4,4 111:3
114:16 121:12
123:17 125:20
125:21 126:6,8
127:2 132:9,23
134:7,15,19
135:3 137:17
139:16 145:22
147:5 148:11
148:23 149:8
149:17,20
**thinking** 16:10
85:13
**third** 81:19
118:22 119:2,5
121:1,19
**thirteen** 82:18
82:22 83:18
141:19 144:17
**thirty** 17:19
18:12,13,21
55:17,18 56:8
56:10 110:8
145:3
**Thirty-three**
110:17 112:5
**Thirty-two** 7:18
**thought** 27:3
33:11 34:15
41:1 45:7
70:19 71:6
75:18
**thousand** 108:4
138:7 145:10
149:20
**three** 10:10
28:20,22 32:13

38:13 42:3
53:22 59:11
64:10 79:11,22
79:23 83:16,21
84:22 92:8
102:4 110:1,9
142:2 144:12
144:13
**time** 2:11,12
16:9 18:6
22:12 24:8
25:15 26:8
33:15 34:2,12
38:9,17 48:2
49:7 53:23
54:4 55:3
57:17,19 59:4
59:22 61:9,10
62:5 64:21
67:19 70:3,7
78:6,17 80:22
85:15 90:20
98:23 101:12
108:10 116:4
117:5 127:2,16
130:14 133:20
135:15 145:6
145:15,21
146:13 149:21
149:22,22
**times** 38:10 42:3
64:10 113:3
114:23
**timing** 110:8
**today** 6:20 8:23
74:9 147:16
**told** 20:6,11,17
27:15 32:6
33:3,4,10
35:13 39:7
40:18,23 41:8
42:2 45:3
47:22 55:17
56:7 64:12
78:7 91:1 97:3

109:18 118:15
125:9 128:10
128:20
**Tompkins** 3:5
5:11 6:14,16
6:17 51:8,12
75:9 96:4,8
111:3 123:8
139:11,16
150:2
**tone** 7:6
**top** 26:3,17,18
71:15 76:5
92:6,7 126:20
139:9
**total** 13:5 25:19
32:7
**town** 65:14,19
67:18,19
106:17 117:3
136:14,15
138:6
**trace** 126:11
**transaction**
46:12 128:7
**transactional**
46:13 47:3,10
47:14 48:1,3,6
48:17 49:23
50:1,4,6 87:18
88:19
**transcribed**
151:6
**transcript** 151:8
**transcription**
151:7
**transferred**
19:18 20:4
**transportation**
111:23
**TransUnion**
3:21 4:3,4,8,10
83:1 88:9,12
89:5,22 90:18
98:20 102:7

133:8 134:10
134:21,22
135:3,4
**TransUnion's**
102:14 134:23
**travel** 13:23
114:9 117:3
131:5,8,19
**traveling** 67:20
67:23 68:2
138:10 139:8
**treated** 143:5
**Tremayne** 7:14
**trial** 2:12
**tried** 53:6 62:7,9
62:11 114:4,16
114:21 120:6
128:23
**trouble** 134:2
**true** 141:16
151:8
**try** 7:2 49:8
**trying** 9:13
51:23 71:23
73:15 78:23
85:12,21
106:16,18
107:8 149:23
**Tupelo** 13:11
**turn** 52:17 121:4
122:4 144:17
**turned** 52:20,21
53:1
**Tuscaloosa**
130:14
**Twelve** 71:14
77:13,18 81:13
83:17
**Twenty** 73:21
76:3 96:12,16
98:14 99:19
100:3 102:3
103:6,10
124:18 129:12
129:16 140:20

**Twenty-five**
124:23
**twenty-four** 9:3
134:22 135:2
**Twenty-one**
73:3 98:19
99:19 134:18
134:20
**Twenty-seven**
140:17
**Twenty-three**
101:23 135:3
**Twenty-two**
100:8
**two** 8:5 11:18,20
15:5 27:7,9
28:9,13 32:6
33:13 37:7,8
43:15 46:7
48:9 49:1
64:10 73:22
78:2,18 81:6
87:13 92:8
97:19 98:1
99:1 100:4
107:3,5,8
110:11 117:17
117:18,19,20
135:14 136:11
143:6 144:14
**two-thirds**
100:23
**type** 14:14 38:2
122:7,10
**typed** 55:20
**T-R-E-M-A-Y...**
7:16

---

**U**

**U** 1:12
**ultimately** 15:19
124:1
**Um-hum** 32:14
33:8 81:16
82:1,4 92:11

# FREEDOM COURT REPORTING

97:21 104:3
119:1,22 121:3
128:5 129:5,10
143:18
**Um-hums** 7:5
**undated** 52:3
**understand** 6:23
145:6
**understanding**
123:23 141:13
**union** 21:5,7
31:6 88:21
127:12 128:8
136:21
**unit** 9:23 10:6
**UNITED** 1:1
**universities** 12:9
**University** 11:8
11:12,12,17
12:15 71:17
**updated** 104:7
**upper** 92:10
**USA** 13:19
**use** 21:19 22:3
23:1 131:7
**Usual** 6:12
**U.S** 13:8

_____

**V**

**V** 1:8
**value** 142:21
**verify** 104:11
**video** 76:6,10
82:15
**videos** 76:12,12
76:13,15 77:4
**viewed** 120:4
**Vivid** 76:15
**volunteered**
66:23 67:1

_____

**W**

**Wachovia** 137:5
**wait** 125:3 136:2
**waiting** 46:11

**waived** 2:1,16
**walk** 117:12,14
**Wal-Mart** 22:8
**want** 15:15
51:13 60:18,23
96:4 105:18,19
105:20,21,22
107:2 109:23
116:7 130:16
130:18,21,22
131:16 135:21
144:8 147:15
147:17,19
**wanted** 16:11
47:15,17 62:6
75:12 110:7
114:10 130:15
130:17 131:4
**warehouse** 15:3
15:3
**wasn't** 43:13
45:10 46:1,5
106:23
**way** 32:19 76:5
100:23 134:8
**Weatherly**
22:18
**website** 39:18
**week** 113:12
138:7
**weeks** 78:2,19
**Wells** 108:6,7,14
108:17 109:6
114:15 120:7,7
120:14 137:4
139:2
**went** 12:13 21:9
23:15 46:15
50:3 126:16,17
127:19 128:2
128:18,21
129:2
**weren't** 80:20
85:18 106:12
116:1

**we're** 71:13
105:1 111:4
116:5 149:6
**we've** 66:9 82:21
116:6 143:7
147:16 148:1,5
148:9 149:14
**When's** 34:2
**white** 146:1
**wide** 118:3,7,8
**witness** 2:1 6:4
51:21 104:3
109:22 121:18
151:9
**wonder** 67:17
**word** 108:23
109:3
**wording** 100:1
**words** 105:11
**work** 13:18
14:22 15:4
22:5 26:7
47:17 82:8
131:18,19
**worked** 14:17
15:2 26:9
82:13
**worker** 15:3
**working** 12:20
49:2,4,8 67:19
82:12
**worried** 107:10
**worry** 107:3
112:7 143:2,12
143:13
**worrying** 139:5
**wouldn't** 108:22
118:12 136:9
**write** 24:21 37:5
91:8 148:21
**writing** 37:6
58:14 60:14
68:17 69:1,3
91:10
**written** 115:12

116:20
**wrote** 51:23
55:13 134:16

_____

**X**

**X** 3:1

_____

**Y**

**Yeah** 70:17
147:19
**year** 9:18 11:19
11:22 12:17
13:14 16:19
29:12 44:4
58:9 62:15
65:9 74:13
78:12 94:7
106:22 107:14
108:14 113:4
115:2,3
**years** 10:10
11:18,20,21
14:18,20 15:5
15:8 53:13
107:3,5,8
144:10,12,13
**Yellow** 13:19
14:1,2,2,10,12
14:17,22 15:7
67:22 76:23
77:1

_____

**Z**

**zero** 75:6
**ZIP** 10:1,14

_____

**$**

**$1,122** 36:18
**$1,185.69** 36:19
**$914.25** 25:23
32:1
**$934.78** 29:20
**$954.12** 31:19
33:1

_____

**#**

**#282** 151:19

_____

**0**

**04** 16:20
**09** 63:6

_____

**1**

**1** 3:9
**1/22/2008** 56:1
**10** 3:18 29:11,17
36:10 44:8,23
61:21 64:12
65:13,23 66:4
68:7 84:4 94:6
95:16 96:20
98:22 101:14
102:11
**100** 4:9 5:7
**102** 4:10
**103** 4:11
**106** 9:23
**11** 3:19 126:22
127:4
**114044466** 38:1
**12** 3:20 92:5
**124** 4:12
**129** 4:13
**13** 1:20 3:21 6:4
69:22 84:20
**131A** 39:4
**14** 3:22 129:23
130:3
**140** 4:14
**16** 4:3 43:10
**17** 4:4 26:20
**18** 4:5 7:20
**19** 4:6
**1977** 7:20

_____

**2**

**2** 3:10
**20** 4:7 102:10
135:4
**20th** 100:14
**2000** 76:21

## FREEDOM COURT REPORTING

**2004** 12:1 26:20
29:13,17 30:2
34:10,12
105:14,14,16
106:7 108:5
110:2 144:21
**2005** 42:4 43:10
44:5,8,23
105:16
**2007** 108:13
113:6,9
**2008** 56:2 57:9
58:10,22 59:1
63:12,15 64:9
67:15 69:22
78:1 83:4,23
84:13,15,23
85:7,10,17
86:10 87:5
88:11 92:5
95:5,6,8,13,16
96:2 98:4
108:13
**2009** 61:21 62:6
62:17 63:13,23
64:12,17 65:13
65:23 66:4
67:16 68:7
94:8 95:10,17
96:20 98:22
100:14 101:14
102:10 103:15
107:17 108:11
115:4 129:23
135:5
**2010** 1:20 6:4
126:23
**21** 4:8 103:15
**22** 4:9 56:2 57:9
57:15 58:22
**2225** 9:23 10:11
**23** 4:10
**24** 4:11
**2426** 9:8,21
**25** 3:9 4:12

**26** 4:13
**27** 3:10 4:14
**29** 3:11 59:1
60:9 63:12,15
78:1 83:4,23
84:5 86:10
88:11 98:4
**29th** 58:8 84:6
84:15 87:5

___

**3**

**3** 3:11
**3/10/09** 3:18
**30** 3:12
**306** 5:13
**35201** 5:14
**35601** 5:8
**35802** 10:1
**35803** 9:9
**36** 3:13

___

**4**

**4** 3:12
**4134-H** 10:13
**415** 5:7
**42** 3:14

___

**5**

**5** 3:13
**5:10** 1:4
**51** 3:15
**54** 3:16
**58** 3:17

___

**6**

**6** 3:5,14
**61** 3:18
**69** 3:19

___

**7**

**7** 3:15 44:3
**7/16/13** 151:22
**77** 3:20

___

**8**

**8** 3:16 31:12

33:18 63:13
95:13
**8/11/2008** 94:22
**82** 3:21
**86** 3:22
**88** 4:3
**89** 4:4

___

**9**

**9** 3:17
**9/30/10** 151:19
**9:00** 1:21 6:3
**92** 4:5
**93** 4:6
**934.78** 32:10
**954.12** 33:10
**96** 4:7 13:15
**98** 4:8