FILED

2011 Feb-18  AM 11:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

*Brim v. Midland, et al.*
**Case No. 5:10-cv-0369-IPJ**

# Exhibit D
## Highlighted Transcript of Deposition of Angelique Ross, Midland Credit Management, Inc.

Angelique D. Ross                                    September 16, 2010

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION
------------------------------------
JAMON T. BRIM,

        Plaintiffs,

vs.                          Civil No.
                             5:10-CV-369-IPJ

DELL FINANCIAL SERVICES, LLC,
MIDLAND CREDIT MANAGEMENT, INC.,
MIDLAND FUNDING, LLC,

        Defendants.
------------------------------------
DEPOSITION OF
PERSON MOST KNOWLEDGEABLE OF
MIDLAND CREDIT MANAGEMENT, INC.
ANGELIQUE DANIELLE ROSS

September 16, 2010
9:09 a.m.

402 West Broadway
16th Floor
San Diego, California

Reported by Denise T. Johnson, CSR No. 11902

---

INDEX TO EXAMINATION

WITNESS: ANGELIQUE DANIELLE ROSS ANGELIQUE DANIELLE ROSS

| EXAMINATION | PAGE |
|---|---|
| BY MS. CAULEY | 5 |
| BY MR. LANGLEY | 124 |

QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER

Page   Line

54     6

---

## Appearances of Counsel

For Plaintiff:

HAYS CAULEY
BY:  PENNY HAYS CAULEY
549 West Evans Street, Suite E
Florence, South Carolina 29501
E-mail:  phc917@hayscauley.com

For Defendants:
BALCH & BINGHAM
BY:  ERIK LANGLEY
P.O. Box 306
Birmingham, Alabama 35201-0306

Also Present:  Brian L. Frary

---

ANGELIQUE DANIELLE ROSS
Brim v. Dell Financial
Thursday, September 16, 2010
Denise T. Johnson, CSR No. 11902

INDEX TO EXHIBITS

| EXHIBITS | | MARKED |
|---|---|---|
| Exhibit 1 | Notice of Deposition | 6 |
| Exhibit 2 | Collection Detail | 75 |
| Exhibit 3 | Documents 14 through 17, production notes | 85 |
| Exhibit 4 | Defendant's Answers to Interrogatories | 107 |

(Original exhibits have been attached to the original transcript.)



# ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                September 16, 2010

PERSON MOST KNOWLEDGEABLE

DEPOSITION OF ANGELIQUE DANIELLE ROSS

SEPTEMBER 16, 2010

ANGELIQUE DANIELLE ROSS,

having been first duly sworn, testified as follows:

EXAMINATION

BY MS. CAULEY:

Q.  Please state your name for record.

A.  Angelique Danielle Ross.

Q.  My name is Penny Cauley.  I am here representing Jamon Brim in a case that we filed against Midland Funding.

We talked a little bit off the record.  If you need a break at any time -- this is a very informal setting.  If you need a break, let us know and we'll take a break when you need it.  Okay?

A.  Yes.

Q.  Also, if I ask a question and you are not sure about the meaning of the question, let me know that you don't understand it so we can take care of it right then.

A.  Okay.

Q.  You are doing a great job of saying "okay" or "yes" or "no."  In a deposition, it is very easy to get caught up in head nodding.  She can't take that down.  If I remind you or say something like, "Is that a yes or is that a no," that is not to pick on you or make you uncomfortable.  It is just to make sure the answer was clear.

A.  Okay.

MR. LANGLEY:  Usual stipulations?

MS. CAULEY:  That's fine with me, if that is fine with Midland.

MR. LANGLEY:  Yes, that is good for us.  I think the witness will read and sign.  But other than that, the usual stipulations.

MS. CAULEY:  Pursuant to Alabama.

MR. LANGLEY:  Yes.

BY MS. CAULEY:

Q.  Have you had a chance, Angelique, to review the Notice of Deposition?

A.  Yes.

Q.  We spoke off the record with your counsel.  Are you the person who would be most knowledgeable regarding the topics identified in the Notice of Deposition except for Topic No. 5 and No. 8?

A.  Yes.

Q.  And we're going to mark that notice as Plaintiff's Exhibit 1.

(Exhibit 1 was marked.)

MR. LANGLEY:  The one nuance to that is Grant will be the witness for No. 7 as it relates to FDCPA.

MS. CAULEY:  Okay.

BY MS. CAULEY:

Q.  The reason you've been put up for the deposition is the experience and the duties you have for the FCRA?

A.  Yes.

Q.  Do you understand that you are testifying here on behalf of Midland Credit Management?

A.  Yes.

Q.  And also on behalf of Midland Funding?

A.  Yes.

Q.  Do you hold any type of office or are you a member of Midland Funding, LLC?

A.  No.

Q.  And you are not an employee of Midland Funding?

A.  No.

Q.  You do not get paid by Midland Funding?

A.  No.

Q.  You are an employee of Midland Credit Management?

A.  Yes.

Q.  And, in fact, is it true that Midland Funding has no employees?

A.  That's true.

Q.  Midland Funding is the owner of the debt that was purchased with respect to Mr. Brim?

A.  Yes.

Q.  And all accounts are actually purchased by Midland Funding, LLC; is that right?

A.  Yes.

Q.  But all employees who have any responsibility with respect to collecting or the handling of disputes through the credit bureau are employed by Midland Credit Management?

A.  Yes.

Q.  Can we agree for purposes of the deposition that if I use the term "Midland," I'm referring to Midland Credit Management?

A.  Yes.

Q.  And you are not a director or an officer of Midland Funding?

A.  No.

Q.  You already gave us your name.  Will you give us your address, please.

A.  My home address?

Q.  Yes, please.

A.  Will that be public record?

Q.  It will be in this deposition.

A.  I just don't want it to get out publicly with my address on anything.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                                  September 16, 2010

**Page 9**

MR. LANGLEY: Can she give you her business address?

MS. CAULEY: That would be fine.

THE WITNESS: Thank you.

8875 Aero Drive, Suite 200, San Diego, California, 92123.

BY MS. CAULEY:

Q. And what position do you hold at Midland?

A. I am the consumer relations manager.

Q. How long have you held that position?

A. A little over four years.

Q. Have you held any other positions at Midland?

A. Yes.

Q. What were they?

A. Consumer relations liaison and consumer relations lead.

Q. How long were you the liaison?

A. Approximately six months.

Q. And then I presume you were promoted to consumer relations manager?

A. I was the consumer liaison first, then promoted to lead, then promoted to manager.

Q. How long did you work as the lead?

A. About two-and-a-half years.

Q. Who is your supervisor at Midland?

**Page 10**

A. Juan Naves.

Q. Do you know how to spell that?

A. N-a-v-e-s.

Q. What is his title?

A. General counsel.

Q. Do you know how long he's been in that position?

A. A little over a year.

Q. Who was your supervisor prior to Ron Naves?

A. Lance Martin.

Q. Did Lance Martin also serve as general counsel?

A. No.

Q. What was his position?

A. He was VP of -- I think it is legal and compliance or legal affairs and compliance. I'm not sure of the exact title.

Q. How long has Ron Naves been your supervisor?

A. For about eight months.

Q. And then Mr. Martin, how long was he your supervisor?

A. I would say two to two-and-a-half years.

Q. Do you recall who your supervisor was prior to Lance Martin?

A. Yes.

Q. Who was that?

A. Sven Zabka, S-v-e-n, last name is Zabka.

**Page 11**

Q. Can you spell that?

A. Z-a-b-k-a.

Q. Is that a man or a woman?

A. Man.

Q. And what was his job title, position?

A. I'm not sure. I know it was corporate counsel. But I'm not sure if there was anything in addition to that.

Q. Any other supervisors that you've had while you've been employed at Midland?

A. Yes, Christina Fudge.

Q. What was her position?

A. She was the consumer relations manager.

Q. Okay. That would have been while you were working as the liaison?

A. Yes.

Q. I take it Mr. Naves is still employed at Midland?

A. Yes.

Q. Is Mr. Martin still employed at Midland?

A. No.

Q. What about Sven Zabka?

A. No.

Q. Christina Fudge?

A. No.

Q. Where did you work prior to Midland?

**Page 12**

A. Telespectrum.

Q. What did you do there?

A. I was a quality assurance manager.

Q. And what do they do?

A. It was a call center.

Q. Are they a creditor?

A. No.

Q. What kind of call center is it?

A. I worked in the telesales department.

Q. How long did you do that job?

A. Four-and-a-half years.

Q. Where did you work before that?

A. Service America.

Q. What type of a job was that?

A. It was actually retail.

Q. Do they sell goods and services?

A. Yeah, goods.

Q. Besides working at Midland, have you worked at any other employer where you had any responsibilities with respect to the Fair Credit Reporting Act?

A. No.

Q. Prior to being employed by Midland, had you ever had any training regarding the Fair Credit Reporting Act?

A. No.

Q. Tell me approximately when you started at



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                          September 16, 2010

13

Midland?

A. It was March 17th, I believe, 2003.

Q. As the consumer relations manager, did you supervise other employees?

A. Yes.

Q. How many?

A. I currently supervise -- directly supervise two. I have supervised up to nine.

Q. In your position for the past four years, have you always had responsibilities for supervising employees in that position?

A. Yes.

Q. That would range currently at two. How many was it in 2009?

A. For most of 2009, it was between six and seven employees.

Q. Why the reduced number of employees?

A. I managed two supervisors. They manage the rest of that number of people. So those seven that I previously managed, those two people only managed that group. And I managed the two supervisors.

Q. Who were the two supervisors that you managed?

A. Roque Faura, R-o-q-u-e. The last name is F-a-u-r-a. And Michelle Lusk.

Q. What are their job titles?

14

A. Consumer relations supervisor.

Q. Then the two of those consumer relations supervisor managed approximately seven employees?

A. Total. Yes.

Q. What are the positions of those employee?

A. Consumer Relations Liaison 1 and Consumer Relations Liaison 2.

Q. Are there still consumer relations leads?

A. No.

Q. Has that become the consumer relations supervisor position?

A. Basically. There is some difference, but yes.

Q. The consumer relations department is the only department at Midland that is responsible for the handing consumer disputes, either directly through Midland or through the credit bureaus?

A. I'm not sure what you mean.

Q. When a dispute comes in from a consumer to Midland and it is a dispute regarding whether or not they owe the account or owe the debt, what department would that dispute go to for review?

A. Any review of the dispute would come to consumer relations.

Q. Are you familiar with the term "ACDV"?

A. Yes.

15

Q. When ACDVs come into Midland, are those handled by the consumer relations department?

A. Yes.

Q. No other department at Midland would be responsible for responding to ACDVs?

A. No.

Q. Tell me what your duties are as the consumer relations manager.

A. I managed the consumer relations staff, which includes managing workload and workload assignments, in addition to responding to some escalated consumer issues.

(A discussion off the record was held.)

BY MS. CAULEY:

Q. What other duties do you have?

A. Basically, the overall overseeing of the operations of consumer relations.

Q. Have your duties changed at all during the four years that you served as a consumer relations manager?

A. Yes.

Q. What is the different now?

A. Initially, there were no consumer relations supervisors. So I would handle all of the escalated issues. Now that is split between several people.

Q. Would any other employees be responsible other than those three individuals for handling escalated

16

disputes?

A. Not responsible. There may be someone that could take an escalated call if the managers and supervisors were not there.

Q. Ultimately, it would come to a supervisor or to you?

A. Yes.

Q. Any other changes in your duties over the past four years?

A. No.

Q. What are the duties for the consumer relations supervisors?

A. They first have to manage the consumer relations liaisons directly.

They also respond to escalated consumer issues.

They also may answer questions from their team members.

Q. And that would be the liaisons?

A. Yes.

Q. Anything else?

A. I'm responsible for the whole operation. They are partly responsible for the day-to-day operations of consumer relations.

Q. Then the liaisons. Are those the individuals responsible for handling the ACDVs?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                                    September 16, 2010

17

A. Yes.

Q. Do they have any other duties?

A. Yes.

Q. What are those?

A. They process consumer correspondence and answer consumer phone calls.

Q. The consumer correspondence that the liaisons process, is that in response to correspondence received directly from the consumer?

A. Yes.

Q. The liaisons are not responsible for the form letters that are sent out as part of the collection efforts by Midland? Would that be right?

A. I'm not sure what you mean by "responsible."

Q. Midland has a lot of form letters that are generated when they purchase accounts that are sent out in an attempt to collect a debt that state, "We purchased this debt. This is your balance. You owe this money. Please pay by this debt." Are the liaisons responsible for making sure that all of those letters are sent out or do they just handle specific correspondence to consumers?

A. They do not handle any letters related to collection of the debt. They may use some form letters, but those form letters are not related to collection of the account.

18

Q. So any time they're responding or sending out correspondence to a consumer, it would be in response to either a telephone call or a letter from that consumer regarding some type of dispute?

A. That's correct.

Q. And that is how it came to the consumer relations department in the first place?

A. Correct.

Q. So the liaisons actually answer the telephone calls that come in from consumers?

A. Yes.

Q. And then they process mail that comes in from consumers?

A. Yes.

Q. And they are responsible for sending correspondence out to consumers?

A. Yes.

Q. And they also handle ACDVs?

A. Yes.

Q. And there are seven liaisons currently?

A. In the San Diego site there are seven.

Q. How many other sites for Midland have consumer relations department?

A. One.

Q. What is that site?

19

A. St. Cloud, Minnesota.

Q. How many do they have?

A. There are five full-time liaisons and one liaison that splits her time between consumer relations and another department.

Q. Is there a consumer relations supervisor at the St. Cloud site?

A. Yes.

Q. And then there is also someone who holds your position there?

A. No.

Q. Are you responsible for overseeing and managing the St. Cloud site as well as the San Diego site?

A. I do manage St. Cloud's workload. The supervisor does not report directly to me.

Q. Who does the supervisor report to?

A. The operations manager.

Q. Who is that?

A. Bonnie Trigg.

Q. T-r-i-g-g?

A. Yes.

Q. I take it Bonnie Trigg is in St. Cloud, Minnesota?

A. Yes.

Q. Does the St. Cloud site also handle ACDVs that

20

come in?

A. Yes.

Q. So ACDVs are actually handled at two separate sites, then?

A. Yes, the majority are handled by the St. Cloud team.

Q. Why is it that the majority are handled by the St. Cloud team?

A. It is just a split of the workload. The St. Cloud team does not take phone calls. And the San Diego team does. So it is just to even up the workload.

Q. What about correspondence? Does the St. Cloud team send out correspondence?

A. Yes.

Q. Basically, the difference between the two sites is, St. Cloud does not take any telephone calls from consumers? Those are all routed to San Diego?

A. Correct.

Q. In return, St. Cloud handles the majority of the ACDVs that come in?

A. Correct.

Q. How is it determined which site will handle an ACDV?

A. Generally, the St. Cloud team will handle most of



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross

them. There are a few accounts that they may not have access to. Those are the only ones that are responded to by San Diego.

Q. So unless an account has been flagged for San Diego, all other ACDVs are going to be handled by the St. Cloud office?

A. Yes.

Q. What type of accounts would St. Cloud not have access to?

A. Health care accounts.

Q. And in this case, Mr. Brim's account was related to a computer purchase. So all his ACDVs would have been handled by the St. Cloud site?

A. Either the St. Cloud site or our automated system, yes.

Q. And what automated system does Midland use?

A. We use a batch interface.

Q. Batch interface?

A. Yes.

Q. How does that work?

A. When an ACDV comes in, we use the E-Oscar system. And our automated system can look at the ACDV, match it, compare it to our account system information and respond to the majority of the ACDVs.

Q. Does that batch interface system have a name?

A. No. We just call it the "batch interface."

Q. Is that a system or program that was designed by Midland?

A. It wasn't designed by Midland. We had to adapt it to work with our system. But it wasn't designed by Midland, no.

Q. Do you know where it came from? Who designed it?

A. We purchased the basic program from the same people that created the E-Oscar program.

Q. So the batch interface system was actually initially developed by the same company that you purchased E-Oscar program from; is that right?

A. Yes.

Q. It's been modified to work with Midland's own internal system?

A. Yes.

Q. Can you give me your best judgment on what percentage of ACDVs are handled exclusively by the batch interface?

A. I would say maybe 95 percent.

Q. So I make sure that I understand, when an ACDV comes in, the batch interface system can review the computer codes on the ACDV and compare the information contained on the ACDV with the information in Midland's system and automatically verify that the information is

accurate?

A. Yes.

Q. If an ACDV comes in claiming an account has been paid in full, are those ACDVs also handled by the batch interface system?

A. It would depend.

Q. What would it depend on?

A. It would depend on information on the actual Midland account, not the ACDV itself.

Q. Tell me what information on the Midland system would cause an ACDV claiming that its debt had been paid in full to be handled by an individual versus the batch interface system.

A. There may be specific codes on the account or the account may reside in a specific location in our system.

Q. What would some of those codes on the account be?

A. For instance, if the account had a DIS dispute code, the system could select that ACDV for manual review.

Q. What are the other codes where the system can select an ACDV for manual review?

A. I don't know off -- I can't think of other ones offhand. It may select or move the account for being in a specific location in our system.

Q. What would those locations be?

A. It could be -- there are several. 45-G, 45-P,

45-F.

Q. What does "45-G" mean?

A. It means the consumer disputed in writing within 45 days of the validation letter and the account is currently under an investigation. And it was a general dispute, nonspecific.

Q. What about "45-P"?

A. So it means all of the same things except this dispute -- the dispute was that the account was paid prior.

Q. Paid prior to Midland purchasing the account?

A. Yes.

Q. What about "F"?

A. All of the same -- the account -- or the dispute is that the account is fraudulent.

Q. If a consumer sends in a letter within 45 days of the validation letter that goes out on the account with a general dispute, a code of 45-G is placed on that account; is that right?

A. Yes. Well, that's actually the location it is moved to. The code would be the DIS code.

Q. So the account itself is moved to a 45-G location in the system?

A. Yes.

Q. Meaning the computer system?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                    September 16, 2010

**25**

A. Yes.

Q. And Midland doesn't have files of all these accounts, right? They're all computerized?

A. That's right.

MR. LANGLEY: Object to the form.

BY MS. CAULEY:

Q. If a consumer sends in a dispute in writing within the 45 days of the validation letter claiming that the account was paid prior to it being purchased by Midland, that would be placed in the location of 45-P?

A. Correct.

Q. What happens if a consumer sends in a dispute in writing but it's not within 45 days of the validation letter?

A. It would depend on exactly what they sent in.

Q. Can you tell me what the options are?

A. If the consumer -- I'm sorry. For general or just --

Q. Let's start with general.

A. Okay. If the consumer only sends in a letter with their general dispute outside of the 45-day period, the consumer would receive a letter stating that we need additional information related to their dispute.

Q. Does that letter have a code that is referred to or refers to it?

**26**

A. Yes.

Q. What is the Code?

A. QCPP.

Q. Does that stand for something?

A. "QC" stands for quality control. I don't know what the first "P" is, but the second "P" is for prove, so I think it is "provide proof."

Q. If a consumer sends in a letter disputing an account but there is no documentation included with the letter and it is outside the 45 days of the first letter from Midland, Midland will send out a form letter, which is the QCPP letter, stating to the consumer that additional information is needed?

A. That's correct, as long as the consumer has not requested that we cease contact with them.

Q. If a letter contains a dispute and also requests that Midland cease contact, is that same form letter sent out?

A. No.

Q. Is any form letter sent out?

A. No.

Q. What happens to the account?

A. The account is marked as "disputed," annotated with what was received from the consumer. And another code is placed on the account to indicate that the

**27**

consumer wants no further contact.

Q. What is that code?

A. 026.

Q. If the consumer's letter says "cease contact" or there is a cease and desist letter as well as a dispute, no request from Midland regarding additional documentation is sent?

A. Correct.

Q. Is that the same whether it is a general dispute, a paid prior dispute or a fraud dispute?

A. Yes.

Q. So that's Midland's policy with respect to any dispute; if it is a writing outside the 45 days and it includes a cease and desist contact, then the account is simply marked as "disputed" and a no-contact code is entered and no letter from Midland is ever sent to the consumer?

A. Yes, as long as the consumer is not -- does not mention credit reporting. As of the timeframe of this account, that's what would have happened, yes.

Q. During time that Mr. Brim was sending his letters, this is what would have happened?

A. Yes.

Q. Is that different now?

A. Yeah. As of July 1st, yes.

**28**

Q. What is the procedure now?

A. Now, if the consumer requests a cease and desist and did not provide documentation, a letter will go out stating that we need more information but also include information that says, "Per your request, we will not contact you any further."

Q. Who was responsible for that change in policy?

A. The compliance department.

Q. Who is in charge of the compliance department?

A. Tamara Yudenfreund.

Q. Go ahead and spell that for me?

A. Y-u-d-e-n-f-r-e-u-n-d.

Q. What her title?

A. Director of compliance and legal affairs.

Q. Did you get a memo or new policies and procedures handbook that talks about this policy changing?

A. Yes.

Q. What did you get?

A. I guess it is a manual or packet of papers.

Q. Were there other changes made July 1st, 2010?

A. There were a few related to the same issue.

Q. What were those other changes?

A. There were some letters created. For instance, there was a letter created that if we were unable to locate the account, we could generate this letter, send it



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                    September 16, 2010

29

to the consumer to ask them for more information to help them locate their account.

Q. Any changes with respect to the handling of the ACDVs?

A. No.

Q. So basically, now if a consumer sends in a letter that does not contain any documentation but is just a letter of dispute, even if it has the cease and desist request, Midland has a new form letter that can go out stating they need additional information regarding the dispute and that no contact will be made with the consumer; is that right?

A. Yes.

Q. Going back to 2008 and 2009, if a consumer sent in a written dispute, regardless of what the dispute was, and it did contain some documentation, how was that dispute handled?

A. It would depend on the documentation that was received.

Q. All right. What type of documentation does Midland normally get?

A. Do you mean generally?

Q. With respect to a dispute.

A. It will vary depending on the type of dispute.

Q. What about with respect to a paid prior dispute?

30

A. We may receive paid letters.

Q. Like a paid-in-full letter?

A. Yes.

Q. Okay.

A. We may receive settlement offer letters with copies of proof of payment. Sometimes we receive canceled checks. We receive bank statements.

Q. Who reviews the documentation that is sent in respect to a dispute? Is that the consumer relations department?

A. Yes.

Q. What determines where the letter is sent, San Diego versus St. Cloud?

A. There isn't a determination based on the mail itself. It is just basically the date that the mail came in. We know there is shipping time, so the mail generally will go out to St. Cloud. Is it not based on the type of mail.

Q. Does all mail come to San Diego?

A. Yes, most of it.

Q. Is it scanned? Does the department open the letter and deal with the letter, or is it scanned and sent electronically?

A. We get the hard copies of the correspondence, so the letters are actually opened and read, the hard copies.

31

Q. In consumer relations?

A. Yes.

Q. If all the mail comes into San Diego, how does some of it get to St. Cloud?

A. It is shipped there.

Q. Do you just take, like, a stack of mail that comes in and say, "This stack is going to go to St. Cloud"?

A. Basically, yes.

Q. Trying to divide up the amount of mail that comes in?

A. Yes.

Q. Regardless of whether it is in San Diego or St. Cloud, a consumer relations employee will actually open the mail and read the letter?

A. The mail is opened by our mailroom. But the consumer relations team -- either site, they're responsible for reading the letter.

Q. Does the letter go to consumer relations as the actual letter or is it scanned?

A. It is the actual letter.

Q. What is done with it after consumer relations sees it?

A. After it is received and reviewed, any dispute letters will then be scanned after they have been

32

processed.

Q. Are there any policies or procedures that instruct the consumer relations employees on how to review the documentation that's supplied with respect to a dispute?

A. Yes.

Q. Where are those policies maintained?

A. That would be in the consumer relations manual.

MS. CAULEY: We don't have that.

MR. LANGLEY: I think you do.

MS. CAULEY: It is two pages?

THE WITNESS: No.

MR. LANGLEY: I think it is about seven pages in a chart format with designations in the upper left-hand corner about the type of dispute and when it is received.

BY MS. CAULEY:

Q. Let me hand you that. Please tell me which parts of that constitute the consumer relations manual.

MR. LANGLEY: Just to make sure the record is clear, we're looking at Bates labeled Documents 163 through 169 and 202 through 204.

MS. CAULEY: The top page doesn't go with it.

THE WITNESS: This is part of the new hire training manual.

BY MS. CAULEY:



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

33

Q. Okay.

MR. LANGLEY: By "this," we're talking about 202 through 204?

MS. CAULEY: Right, 204.

BY MS. CAULEY:

Q. Pages 163 through 169 constitutes the entire operations manual; is that correct?

A. No.

Q. Are there other materials that are contained within the consumer relations operation manual?

A. There are other pages, yes.

Q. What's contained on those other pages we don't have?

A. The same procedures, but in relation to different types of disputes. So on this one (indicating), this is the process for the dispute of paid prior. The other pages contain the process for general or fraud disputes.

Q. Do you know when the consumer relations manual was created?

A. I believe this one was created in 2004.

Q. Had there been any changes to the manual, this consumer relations operation manual since 2004?

A. No.

Q. Is it contained on the system, the computer system at Midland?

34

A. No.

Q. Do you see on the top left corner it has a date that is printed?

A. I'm sorry. There are soft copies of this, yes, electronic copies of the document. But as far as people looking at it, they look at a hard copy.

Q. Actually, the employees who work in consumer relations have an actual hard copy of Pages 163 through 169?

A. Yes.

Q. Also the pages that we're missing?

A. Yes.

Q. Are there any other policies or procedures, guidelines or manuals that would instruct an employee on how to review the documentation received along with the dispute?

A. No, I don't think so.

Q. The first page, which is 163 through 164, deals with 45-day verbal disputes?

A. Yes.

Q. That dispute would actually be where a customer calls in disputing an account within 45 days of receipt of the letter?

A. Yes, receipt of the validation letter.

Q. The next section is the 45-day written dispute.

35

That's where the consumer sends in a written dispute within 45 days of receipt of the validation letter?

A. Yes.

I want to clarify. It is not the consumers' receipt of the letter but when Midland sent out the first -- 45 days from when Midland sent out the first letter.

Q. Thank you.

So the 45 days runs from the date Midland generates the letter and it goes out?

A. Yes.

Q. Page 167 deals with the verbal dispute paid prior outside 45 days from the date of the validation letter?

A. Yes.

Q. Then, if we look at No. 1, Step 1, upon receipt of a verbal dispute, what is the consumer relations employee supposed to do?

A. Did you want me to --

Q. Walk me through this chart that the employees have for handling verbal disputes.

A. So the liaison would review information on the account that would include verifying social, the name, the address, put in any commentary, check for comments on the account already. If the consumer has an attorney, they would request that information, both in writing and then

36

also at the time of -- that they're on the phone.

In this case, they would ask the consumer to provide written proof regarding their dispute. They would add a warning code onto the account 023.

Q. 023 is the dispute code for -- I think you told me that was for disputes?

A. I don't know if I mentioned it before. It is one of the dispute warning codes. And that one says it is okay to work the dispute outside of the validation period.

Q. Then it has -- on the column, it has "point of access." Then it has an L series.

A. It is actually the "I series."

Q. What is that?

A. It is the name of our computer system.

Q. What is that?

A. I'm sorry. What is the computer system?

Q. Yes.

A. It is -- I don't -- I don't know. It maintains account information.

Q. But it is referred to as "I series"?

A. It is actually referred to as a couple of names, but they're all the same. "I series" or "R2K" or also "GUI."

Q. "R2K"?

A. Yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross

37

Q. So "GUI," "R2K" and "I series" all refer to the same computer system?

A. Yes.

Q. The liaison is to look at the account, view the account history and then add a warning code, 023, which is just noting that a dispute was just received?

A. Yes.

Q. But that it is okay to continue to work on the account?

A. Yes.

Q. Step 6 is, "Send the consumer a QCPP letter requesting documentation."

A. Yes.

Q. And that is supposed to be done on all verbal disputes claiming that an account was paid prior to Midland purchasing it?

A. Unless the consumer is represented by an attorney or they requested a cease and desist, then typically that QCPP letter would go out once those conditions are there.

Q. I see that now under the "Comment" section. If there is an attorney or a cease and desist request, then no QCPP letter is sent?

A. Correct.

Q. Have you received an updated consumer relations operation manual since July 2010?

38

A. No.

Q. So the employees in consumer relations are continuing to handle verbal disputes the same way today as they were in 2009?

A. Yes.

Q. Pages 168 through 169, that's the guidelines for handling written disputes that it has been paid prior; is that correct?

A. Correct.

Q. The liaison is to review the account and verify that the social, name and address match?

A. Yes, if they can. Consumers don't always include all the information on their correspondence.

Q. They're also looking for proof. Here it says it could be the front and back of a cancelled check with a settlement offer letter or paid letter with a matching account number?

A. Yes.

Q. That matching account number matching Midland's account number or the original creditor's account number?

A. It should be with the original creditor's account number.

Q. Are there any other documents that help consumer relations liaisons determine what is sufficient proof with respect to the accounts with a paid prior?

39

A. Say that again.

Q. Sure.

It has two examples of what would constitute proof of a paid prior dispute on Page 168, right?

A. Correct.

Q. Is there any other document or memo or guideline that would help a liaison know what other proof would be acceptable with respect to Midland?

A. No.

MR. LANGLEY: Object to the form.

THE WITNESS: No.

BY MS. CAULEY:

Q. There is no list of other documents that would be accepted as proof that an account had been paid prior?

A. Not that I'm aware of.

Q. So according to Page 168, the only acceptable proof is the front and back of a cancelled check with a settlement offer or a paid letter?

A. Right. There isn't another document that gives a list. But if someone provided a settlement offer letter with a different proof of payment, that could be considered proof even though it doesn't specifically say that.

Q. Bank statement is not on there, is it?

A. No.

40

Q. Is a bank statement showing payment to the original creditor sufficient proof that the account had been paid prior?

A. No.

Q. Never?

A. Not by itself, no.

Q. On No. 5, it says, "If unable to determine if proof is valid, account will be referred to ACQ." What is "ACQ"?

A. It stand for "acquisitions."

Q. Where is acquisitions?

A. Where are they?

Q. Are they in the San Diego office?

A. Yes, in San Diego.

Q. Also in St. Cloud or just San Diego?

A. Just San Diego.

Q. Who is in charge of the acquisitions department?

A. The entire acquisitions department would be Amy Anuk.

Q. How do you spell that?

A. A-n-u-k.

Q. What is her title?

A. I'm not sure. I know she is the VP.

Q. Do you have any knowledge what happens when an account is assigned to the acquisitions department?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross

September 16, 2010

**41**

A. Yes.

Q. What happens?

A. Like in this case, if an account is assigned to them, they may follow up, go back to the seller of the account to ask questions related to whatever the issue is.

Q. If the account is referred to ACQ, then a different warning code, which is 286, is entered on the account; is that right?

A. That's actually when the account is deleted. So that would be where it says, "If proof is valid, update to delete." And then that code would be added.

Q. If the proof is determined sufficient, then a warning code, 286, is entered on the account; is that correct?

A. Correct.

Q. Then the reporting of the account to the credit bureaus would stop and the account would be deleted?

A. Correct.

Q. If the proof is determine insufficient, then warning code of 130 is added to the account?

A. It is actually the 286 and the 130 would be added at the same time. So the 130 is added when that consumer is provided documentation and the account is being deleted.

Q. If the proof is deemed not sufficient and it is

**42**

assigned to acquisitions, then neither of those warning codes would be entered on the account?

A. That's correct.

MR. LANGLEY: Object to the form.

BY MS. CAULEY:

Q. In the comments on Page 169 for Step 5, it says, "Assign account to the CPLQ."

What is "CPLQ"?

A. It is a designated location in our system which indicates the account should be deleted.

Q. Is the account deleted from Midland's system all together or just from the credit bureaus?

A. From the credit bureaus.

Q. It would only be assigned to the CPLQ if the proof provided was deemed valid by Midland?

A. Correct.

Q. Let's go to the next comment. It says, "Forward proof to acquisitions for possible put-back."

Is that what happens if the proof is not sufficient?

A. That actually happens if the proof is sufficient.

Q. What does that mean, "Forward proof for possible put-back"?

A. There is a period of time in which the account can be sent back to the seller if Midland received proof

**43**

that it was valid and no longer collectible. So the information would be sent to acquisitions to see if they could give that back to the seller.

Q. Then the next comment, "Send the consumer a QCDT letter," which is the deletion letter.

That's only done if the proof was determined to be valid?

A. Correct.

Q. Are there any comments that tell you what happens if the consumer relations liaison is unable to determine if the proof is valid?

A. Yes. If the consumer relations liaison is unable to determine that the proof is valid, then they would go to Step 6 through 9.

Q. So the account is not sent to acquisitions or it is?

A. It would be sent to acquisitions. It is not the actual account itself. It is more the document is sent to acquisitions.

Q. And the account is also assigned the PDPQ?

A. Correct.

Q. And what does that stand for?

A. It is a written dispute outside of the 45 days where the consumer has disputed that the account has been paid prior.

**44**

Q. For any paid prior dispute that is received in writing where the consumer relations department is unable to determine if the proof is valid, the account should be assigned to the PDPQ; is that correct?

A. Yes, if they were unable to determine if it's valid. For example, if it was missing an account number and it was a paid letter, that is something they would put in that -- assign to that.

Q. What if it is a bank statement received showing a payment and they can't determine if that is valid? Is it also sent to the PDPQ?

A. That document would be considered invalid, so they would have made a determination that it was invalid.

Q. So a dispute containing a bank statement showing a payment is automatically deemed invalid?

A. Yes. Generally, I would say that is true, unless there was something else with it or maybe something else on the account that would add to the determination.

Q. So any letters that are received from consumers disputing an account as paid prior that contain a bank statement would not be assigned to the PDPQ?

MR. LANGLEY: Object to the form.

THE WITNESS: Unless there was something else on the account that would make the liaison believe it should be, I would say 99.9 percent would not be assigned to the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                September 16, 2010

**45**

PDPQ.

BY MS. CAULEY:

Q.   If an account is assigned to the PDPQ, then it stays in that queue until the dispute is resolved; is that right?

A.   Yes.

Q.   If the dispute is not resolved in 120 days, the account automatically moves through a process into the PDRQ?

A.   Yes.

Q.   And all reporting on the account is stopped?

A.   Yes.

Q.   That was the policy that existed in 2008 and 2009 for Midland?

A.   Yes.

Q.   That's the same policy that exists today?

A.   Yes.

Q.   What is the process of the handling of a written dispute outside the 45-day time period claiming that it was a fraud account?

A.   The process itself is the same.  If the consumer provided proof of the fraud, then the account would be coded with those warning codes, 286 and 130, moved to the CPO queue and the consumer would be sent a deletion letter.  The account would be deleted.

**46**

If there was information that could be investigated in terms of the documents provided by the consumer with relation to fraud, that would follow the same process except the account would go into a different queue.

Q.   That queue would be for fraud disputes as opposed to paid prior disputes?

A.   Right.

Q.   When someone is hired as a consumer relations liaison, how are they trained to handle these types of disputes?

A.   A specific person is assigned to train them so they essentially shadow that person.  They are given an overview of all this information, how to use the system, the I series system and how to read and review the letters and correspondence.

Initially, all of their -- they would start to input work on accounts and all of their work is double-checked by the person that is training.

Q.   How long do they actually shadow someone while they're being trained?

A.   The entire process takes about six to eight weeks.  They aren't necessarily sitting with that person the entire time, but that person is always available for questions.  The shadowing part takes the majority of the

**47**

first three weeks.

Q.   Any classes that are given to help update the consumer relations employees on changes in the law or things that might come up?

A.   We have had some classes, yes.

Q.   When were the classes?  Do you remember?  This year?  Last year?

A.   We had a class this year.

Q.   When?

A.   June 2010.

Q.   Was it in San Diego?

A.   Yes.

Q.   Did people from St. Cloud come for the class?

A.   They didn't come, but they were conferenced in.

Q.   Was it just by phone or, like, a videoconference?

A.   It was by phone with the other site being able to view the computer screen on the other end, but not a videoconference.

Q.   Who taught that class?

A.   Jill Brown.

Q.   What is her position?

A.   She is one of the compliance attorneys.

Q.   You told me earlier there were materials.  Were those presented to the class?

A.   Yes.

**48**

Q.   Any other classes that you remember?

A.   No.

Q.   Do you have any responsibility for holding classes to train employees on specifics on how to handle disputes?

A.   I do.

Q.   What are your duties with respect to training classes?

A.   If there's a follow-up -- follow-up questions that maybe came out of the initial class, I may, you know, confer with Jill or another attorney and then present the information to the group.  Or I may give information in team meetings.  They're not formal classes.

Q.   How often do you have team meetings?

A.   Those are biweekly.

Q.   Is that just with the San Diego employees?

A.   No, St. Cloud and San Diego.

Q.   What do you talk about at the team meetings?

A.   Just normally the team will bring up any questions they have.  So we'll review questions.  We may talk about scheduling or different things that are going on, workload.

Q.   As the manager, do you ever get memos from the compliance department telling you about changes that you have to discuss at these team meetings?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                                            September 16, 2010

**49**

A. I wouldn't say memos. They may send information to me in an e-mail that I'll discuss with the team.

Q. Do you keep those e-mails?

A. Yes.

Q. I sort of took a long, off-the-beaten path. Now is a good time for a break. Would you like a break?

A. Yes.

(A recess was taken.)

BY MS. CAULEY:

Q. Have you ever testified on behalf of Midland before, either a deposition, an affidavit or in court?

A. Yes.

Q. How many times in court?

A. Once.

Deposition, maybe ten times.

Q. Do you remember when you testified in court?

A. I believe it was June of 2008.

Q. Do you remember what that case was about or the name of the case or where it was?

A. It was in Oklahoma. And I don't remember the name. And it was about the FDCPA.

Q. Do you have any responsibilities with respect to FDCPA compliance?

A. That's only time I testified in court, June of 2008, yes.

**50**

Q. When was the last deposition prior to today that you have given?

A. I think about two weeks ago.

Q. Do you recall what that was about?

A. It believe it was related to FCRA.

Q. Is that case pending here or somewhere else?

A. Here.

Q. The deposition was here?

A. Yes.

Q. Is the case pending in California?

A. I believe it is California.

Q. How many times have you testified by deposition this year?

A. Including today, I believe four.

Q. Testifying on behalf of Midland is also part of your job duties as well?

A. Well, it is part of my job description, yes.

Q. Do you work with the compliance department in compiling the documents that are necessary to respond to discovery requests in lawsuits?

A. I don't actually work on gathering any of the documents for any of the cases unless I'm asked for something that I may have. But generally, no.

Q. Do you have a judgment as to what percentage of your time is actually spent testifying by depositions or

**51**

in court versus consumer relations?

MR. LANGLEY: Object to the form.

THE WITNESS: Three to five percent, maybe.

BY MS. CAULEY:

Q. Have you ever given an affidavit?

A. Yes.

Q. Do you have any idea how many times have you done that?

A. 15 to 20.

Q. Do you assist in any way on the lawsuits other than giving deposition testimony?

A. No, not other than, perhaps, signing a document or giving testimony.

Q. Are you familiar with the term "interrogatories"?

A. Yes.

Q. As part of your responsibilities as the manager of consumer relations, have you signed interrogatories on behalf of Midland?

A. Yes.

Q. Did you review the documents produced by us prior to your deposition today?

A. Yes.

Q. I think they go from Document 1 to Document 204. Do you know if you reviewed all those?

MR. LANGLEY: Actually, 206.

**52**

THE WITNESS: I don't know if I reviewed 18 and 19. I'm not sure about 18 through 30.

BY MS. CAULEY:

Q. Okay.

A. I'm not sure about 35 to 37. I don't know if I've even seen 58 and 51 in the hard copy form, but I did see the screen.

Q. Okay.

A. A lot of these I haven't seen the hard copies, but I'm familiar with the screen itself. I think I looked at 154 or 158 through 160.

Q. Other than the pages you've identified, you either reviewed a hard copy of the documents produced or reviewed the information within the computer screens on the system, correct?

A. Correct.

Q. You mentioned that you have some duties with respect to FDCPA compliance. What are those duties?

A. That would basically be to -- like with the documents here, consumer relations training manual, to make sure people are following these guidelines.

Q. In order to be in compliance with FDCPA, your responsibility is just to make sure that the employees in consumer relations are following the guidelines set up in the consumer relations manual?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

A. Yes.

Q. Meaning to mark the account as "disputed" or to put it in the proper queue?

A. Right. Or if there is a cease and desist request or attorney representation, to follow steps appropriately.

Q. The consumer relations department doesn't make any attempts to collect the debt from a consumer, correct?

A. Correct.

Q. With respect to the FDCPA, the responsibilities would come in with the handling of a cease and desist request or reporting the account to the credit bureau?

A. Or processing written disputes that are received from the consumer.

Q. Have you testified in a deposition before regarding your responsibilities pursuant to the FDCPA?

A. Yes.

Q. In the depositions you've given before, have any of those cases involved claims similar to those here under the Fair Credit Reporting Act in the handling of an ACDV?

A. Yes.

Q. Were any of those depositions this year?

A. I do not believe so.

Q. Are there any other documents you reviewed in preparation for the deposition that were not in the documents I provided you, other than the two that we got today?

MR. LANGLEY: To the extent it involves some document that Brian or I may have shown you, I'm going to object on the grounds of attorney-client privilege, work-product doctrine and instruct the witness not to answer.

THE WITNESS: I've seen the Notice of Deposition.

BY MS. CAULEY:

Q. Any other documents or screens or information that you might have reviewed that was not shown to you by your attorney?

A. Oh, that wasn't shown to me? No.

Q. The reporting of accounts is done by Midland Credit Management; is that correct?

A. Correct.

Q. Is there any type of contract between Midland Funding and Midland Credit Management regarding the reporting of accounts by Midland Credit Management?

A. I don't know.

Q. Do you know if Midland Funding pays Midland Credit Management any type of fee or payment for the reporting and the handling of ACDV?

A. I don't know.

Q. I'm going back to "Midland" as referring to Midland Credit Management.

With respect to Midland, Midland does not use any type of outsource vendors for the handling of ACDV?

A. No.

Q. You would agree that Midland is responsible for reporting accurate information to the credit reporting agencies regarding specific accounts, correct?

A. Correct.

Q. Would you agree that Midland is responsible for the accuracy of the information that it reports specifically to the credit bureaus?

A. Correct.

Q. Midland is also responsible for the accuracy of information that it provides to any other entity regarding a specific account?

A. I'm not sure what you mean.

Q. If Midland were to send information on an account to an attorney for collection or for a lawsuit or to any other entity with respect to collection or to sell the account, the information that Midland provides should be accurate, right?

A. Yes.

Q. With respect to the Fair Debt Collection Practices Act, it is a violation of that act for Midland to communicate any information that it knows or which it should know to be false, correct?

MR. LANGLEY: Object to the form. You can answer, if you can.

THE WITNESS: Yes.

BY MS. CAULEY:

Q. I believe you told me earlier that you are familiar with the Fair Credit Reporting Act?

A. Yes.

Q. And in the new hire training manual, there are a few pages that deal with the Fair Credit Reporting Act. Did you receive a copy of the new hire training manual?

A. I don't have a hard copy. But there is a -- I do have access to a copy.

Q. Were you provided a copy when you were hired or is that something done electronically in the system?

A. I was not provided a copy when I was hired. This is for the account managers. But all employees have access to it on our system.

Q. So the consumer relations employees are not given the new hire training manual that was provided?

A. No.

Q. How are the consumer relations employees trained on the Fair Credit Reporting Act?

A. Well, it is not as specific -- or it wasn't a specific training. It was just basically in relation to the procedures they were doing in processing the disputes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross

**57**

Q. The consumer relations employees are not provided with a copy of the Fair Credit Reporting Act when they're hired; is that correct?

A. That's correct. But they also have access to this.

Q. They have access to the new hire training manual?

A. Yes.

Q. But the new hire training manual doesn't contain the Fair Credit Reporting Act?

A. No, I don't think so.

Q. Are you aware that Midland is responsible for investigating the disputes received on an account to the credit reporting agencies?

A. Yes.

Q. And Midland is responsible for conducting that investigation within 30 days?

A. Yes.

Q. Those disputes are all received via the ACDV through the credit bureaus?

A. Yes.

Q. You told me 99 percent of ACDVs are handled electronically through the batch; is that right?

A. Yes.

Q. If an ACDV is not handled automatically through the batch system, are there steps contained in any type of

**58**

manual or policy, whether it is printed or just a note on the system, that tells an individual in consumer relations how to investigate that credit dispute?

A. Well, as far as using the actual system, there is a tutorial that is available through the E-Oscar system to show them how to actually put information in. Other than that, we have just some screen prints that show the screen in order to find the information on our system.

Q. You lost me just a little bit.

You have screen prints that tell the employees where to find the information on your system. Can you explain that more for me? Does consumer relations have the same computer system that the collections department might have?

A. Yes.

Q. They have access -- consumer relations has access the same screens as the collections department?

A. Yes.

Q. So the information would be that there might be a screen that would tell them where to find a payment history or previous addresses or something of that nature?

A. Yes.

Q. There are quite a few screens in the system --

A. Right.

Q. -- judging from the documents that were produced.

**59**

To sort of make that easier for the person in consumer relations to actually find which screen to go to?

A. Yes.

Q. Like a cheat-sheet, for lack of a better term?

A. Yes.

Q. Is the E-Oscar tutorial also something that can be printed?

A. Yeah, you can print it.

Q. Do all employees in the consumer relations department take the E-Oscar tutorial?

A. Yes.

Q. Does that E-Oscar tutorial help the employees know how to perform or respond to an ACDV that is received through E-Oscar?

A. No. Well, it shows them the choices they have to respond. But it is more or less a user guide of how to use and navigate through the E-Oscar system itself.

Q. So the tutorial doesn't explain to the consumer relations employee how to actually conduct an investigation with respect to an ACDV but basically gives them the drop-down menus of what codes are available for responding?

Would that be fair?

A. Yes.

Q. Since January of 2008, you have been in charge of

**60**

overseeing the handling of ACDVs?

A. Yes.

Q. Did you or the supervisors that are under you conduct any type of review of responses to ACDV?

A. We may review non-submitted responses. But if there a question about a response, we'll review the account and the ACDV to look at the most appropriate response.

Q. Once an ACDV is actually completed and returned to the credit bureau, there is no internal monitoring of whether those responses were correct?

A. No.

Q. You don't have any type of reports that you compile on the number of disputes that were handled?

A. Well, I can see how many disputes came in through the E-Oscar.

Q. How many disputes does Midland normally get, say, per week for ACDV?

A. I would say maybe about 8,000.

Q. Would that be the same pretty much every week?

A. Yeah.

Q. And then if my math is right, five percent of that would be about 400 are actually handled by an individual in the consumer relations department per week?

A. Yeah, I guess that is about right.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                    September 16, 2010

61

Q. Have those numbers been the same from 2008 to today?

A. I would say approximately the same.

Q. I understand they might go up slightly, but overall they've been about the same since January of 2008?

A. Yes.

Q. You have actually been the manager of the consumer relations department since January of 2008?

A. Yes.

Q. Do you have any knowledge regarding the validation letter or how interest was calculated on the account with respect to collecting this account from Mr. Brim?

A. No.

MS. CAULEY: That would be our other witness most likely.

MR. LANGLEY: I'm not sure if he can testify about that since his thing is more related to FDCPA training issues. He may. I guess we can find out.

MS. CAULEY: Off the record.

(A discussion off the record was held.)

MS. CAULEY: I'm not marking documents 163 through 169 --

MR. LANGLEY: Okay.

MS. CAULEY: -- since they're confidential.

62

BY MS. CAULEY:

Q. If you'll look at the top page, which is Midland 1 and 2, this was provided as a letter sent to Mr. Brim on January 22, 2008. Upon your reviewing of the computer screens and the documents, are you aware of any previous letter to this January 22, 2008 letter being sent to Mr. Brim?

A. I would need to look at the production notes. Yes.

Q. What page is that?

A. 73.

Q. This is the "Letter History" screen?

A. Yes.

Q. It says "Page 1 of 3." Page 2 and Page 3 are blank. Do you know why they're blank?

A. I believe there is information that needs to fill those pages.

Q. So that's the amount of space that is allotted to enter information regarding letters, and it is just that that space was not needed?

A. I believe so.

Q. If we look at Page 73, the "Letter History" screen, it shows a letter was sent on October 20th of 2007?

A. I see October --

63

Q. I can't read. I'm sorry. October 26, 2007.

A. Yes.

Q. Then December 20th, 2007?

A. Yes.

Q. And then the letter that we have which is dated January 22, 2008?

A. Yes.

Q. If a letter is sent by Midland, that letter is documented in the letter history inquiry, correct?

A. Correct.

Q. Even if a letter is sent by the consume relations department, it would be documented in the "Letter History" screen?

A. Yes.

Q. Based on the "Letter History" screen, we know only three letters were sent to Mr. Brim by Midland?

A. Yes.

Q. If you go back to Document No. 1, it indicates a current balance of $1,603.15; is that right?

A. Yes.

Q. It indicates that Midland Funding owns the debt.

A. Yes.

Q. If you turn to Page 2, which would have been attached to this letter, Page 1; is that right?

A. Yes.

64

Q. On the back, it has an interest rate of six percent.

Did you see that?

A. Yes.

Q. Do you know how this interest rate was selected for this account?

A. I do not.

Q. Do you have any knowledge of how interest rates are selected for specific accounts by Midland?

A. No, I don't.

Q. Midland still owns this account?

A. Yes.

Q. If you go to the next letter, which is Page 3, this is actually a letter that Mr. Brim sent in to Midland. And it is dated July 29, 2008, correct?

A. Correct.

Q. It was received on August 5th, 2000 by your department?

A. Correct.

Q. Attached to that letter was a bank statement from Red Stone Federal Credit Union.

A. Correct.

Q. In this letter, Mr. Brim indicated that he disputed the debt; is that right?

A. Yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross

September 16, 2010

Q. And he disputed the debt because the debt was paid on November 8th of 2004?

A. Yes.

Q. And indicated in his letter he was included a detailed report from his bank statement showing the payment and transaction number.

A. Yes.

Q. He also requested no further communication by phone or in writing from Midland.

A. Yes.

Q. As a result of that cease and desist request, no additional letters were ever sent to Mr. Brim?

A. Correct.

Q. Based on that cease and desist request, no additional phone calls should have been made to him as well, correct?

A. Not from Midland, no.

Q. If phone calls were made to Mr. Brim after July 29, 2008, that would have been a violation of the Fair Debt Collection Practices Act?

A. Yes.

Q. Did you know which employee received this letter?

A. According to the notes, Melanie Bloom. It's on Page 53.

Q. Are you at the bottom where it says, "Received certified letter"?

A. Yes.

Q. It is postmarked "July 30th."

How do you know who received it?

A. There is a code that's three columns over from that notation.

Q. Is that the "YGC" or the "BU8"?

A. It's the "BU8."

Q. Who is represented by "BU8"?

A. Melanie Bloom.

Q. Is she in the St. Cloud office or San Diego?

A. San Diego.

Q. Is she a liaison or supervisor?

A. A liaison.

Q. Still employed?

A. Yes.

Q. Can you tell from Page 53 what action Ms. Bloom took upon receipt of this letter?

A. Well, I know that she noted the account. I believe she would have marked the account as "disputed" and also marked it with a "cease and desist" which is indicated by the "DISP" for dispute and "CND" for cease and desist. And then the letter, it says to forward it over to the firm handling it at the time.

Q. That was an outside attorney collection firm?

A. Yes.

Q. Page 53 it says, "Included copy of the bank statement showing 954.12 to Dell Financial, 11/08."

Is that right?

A. Yes.

Q. Then it says "not proof"?

A. Yes.

Q. And then, "Forward to YGC." What does the "YGC" stand for?

A. That just collectively means the firm, the outside collection firm.

Q. The actual code doesn't refer to a specific firm?

A. That's right.

Q. Continuing on to Document 5, that is a letter from Mr. Brim dated March 10, 2009 to Midland; is that right?

A. Yes.

Q. It is disputing the debt?

A. Yes.

Q. He states, "He does not owe this debt and does not owe any debt to Dell"; is that right?

A. Yes.

Q. He puts that the debt was paid in full on November 8, 2004. And he encloses a copy of his bank statement.

A. Yes.

Q. Also in this letter, Mr. Brim requests Midland immediately correct his credit report with all three agencies to show a zero balance and no derogatory or negative information, correct?

A. Correct.

Q. If you go back to the collection detail, what was done upon receipt of this letter?

A. The account is noted. It would have already had cease and desists codes on there, so the information would have been noted and then scanned.

Q. Who handled this letter that was received?

A. Melanie Bloom.

Q. I see it is on the 13th?

A. Yes.

Q. It has "BU8." Ms. Bloom got this second letter from Mr. Brim?

A. Yes.

Q. Do you know if Ms. Bloom is the person who has the handwritten notes on Page 5?

A. It looks like her handwriting.

Q. What does that represent?

A. The Midland account number.

Q. That was not on the letter? She would have had to have looked that up in the system?



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross

A. Yes.

Q. The only action that would have been taken by Ms. Bloom upon receipt of the second letter is to document the receipt of it and then send it over to be scanned?

A. Yes.

Q. Look at the collection account detail. It notes that Mr. Brim called in with a dispute as well.

A. Yes.

Q. What date was that?

A. 3/11/2009.

Q. Which consumer relations employee received that call?

A. Sidney Barrett.

Q. Is that a man or a woman?

A. Woman.

Q. Is she in San Diego?

A. Yes.

Q. Looking at Page 53, March 10th, 2009, it has, "FAC Data called request authorization to release and to have consumer fax cease and desist."

Do you know what the means?

A. I believe so.

Q. Okay. Can you tell us?

A. I believe "FAC Data" is short for Factual Data, which is a company.

So Factual Data called in. Now it is referring back to the person who requested the note. They request information to release -- basically, to release information and also to have the consumer fax a cease and desist release.

Q. What kind of company is Factual Data?

A. I believe they are a credit verification company. They do something verifying information on the credit report.

Q. And the employee at Midland told them Mr. Brim would need to fax a cease and desist release?

A. He told them that they would need an authorization so that he could release information and to have the consumer fax a cease and desist release.

Q. What employee handled that?

A. I believe that is Jonathan Harkless.

Q. What is his position?

A. He is an account manager.

Q. He's not in consumer relations?

A. No.

Q. He just took the call in the collections department?

A. Correct.

Q. Continuing up from the same date, it has, "CCI, from blocked number."

Do you know what that is?

A. CCI is customer called in from a blocked number, transferred to Extension 5034.

Q. Who is "Extension 5034," if you know?

A. I don't know.

Q. Do you know who "Z76" is?

A. Not off the top of my head.

Q. That wouldn't be someone from your department?

A. No.

Q. Do you know if "Z76" is someone from the collections department?

A. I believe it is, yes.

Q. "BC7." Do you know who that is?

A. Sidney Barrett.

Q. She is in consumer relations?

A. Yes.

Q. She took the call on March 11th, the next day?

A. Yes.

Q. Do you know why the account manager employee indicated that Mr. Brim needed to fax a cease and desist release?

A. From what I know, the account managers can't speak with or they don't speak with consumers who have a cease and desist on their account. So they would request to have something indicating that the consumer basically wanted to have communication again.

Q. But that doesn't apply to consumer relations when the consumer is calling in regarding a dispute?

A. That's correct.

Q. There is no information that Ms. Barrett told Mr. Brim he needed to fax in a cease and desist release?

A. Correct.

Q. There is no notation that Ms. Barrett informed Mr. Brim that the documentation he previously provided was insufficient to resolve this dispute?

A. Correct.

Q. Following receipt of Mr. Brim's two letters and his telephone call, Midland continued to report the account with a past due balance and being owed by Mr. Brim?

A. Yes, it continued to report but was marked as "disputed."

Q. It was reporting with a balance due of over $1,600. So we're clear, after March 2009, Midland continued to report a balance due of over $1,600?

A. Yes.

Q. That amount changed monthly based on interest?

A. Yes.

Q. There is no information in the collection detail that Midland ever contacted Dell to question or



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Angelique D. Ross                                September 16, 2010

**73**

investigate Mr. Brim's dispute?

A. That's correct.

Q. Let's go back to document No. 7. Can you tell me what this is?

A. This is the customer "Additional Data" screen. It is a screen in our system.

Q. There is a "Customer Data" screen and then a customer "Additional Data" screen?

A. There isn't a specific screen labeled "Customer Data." But the "Customer Additional" screen would be the main screen.

Q. This contains additional information regarding the account itself?

A. Correct.

Q. On Page 7, it indicates an interest rate of six percent --

A. Yes.

Q. -- that Midland is adding to the account?

A. Yes.

Q. Do you have any information why Midland chose that interest rate?

A. No.

Q. And also on this Document 7 on the customer "Additional Data" screen, it indicates that the date of occurrence was October 18, 2004?

**74**

A. Okay.

Q. Do you see that?

A. Yes.

Q. To your knowledge, would that have been the charge-off date or the delinquency date?

A. It is the delinquency date.

Q. Under that, it has the statute of limitations expiration date as October 18, 2007.

A. Yes.

Q. And if you come down, it has, "Last work date, February 25th, 2000 by DPB."

Did you know who that is?

A. I don't.

Q. Is that in the San Diego site?

A. Yes, I believe so.

Q. Turn to the next page, 8 through 10. It's another collection detail. It was printed February 25, 2010. If you look at Page 52, it was printed June 7, 2010.

A. Yes.

Q. I believe they're exactly the same except for the print date and the balance on the account.

A. Yes, I believe so.

Q. If you would go back to Page 52, we'll just look at the most recent.

**75**

MS. CAULEY: We're going to mark that as Plaintiff's Exhibit 2.

(Exhibit 2 was marked.)

BY MS. CAULEY:

Q. Let's look at Plaintiff's Exhibit 2. The collection detail for this account consists of two pages?

A. Yes.

Q. Does it contain all comments or collection notes that would have been added on the account?

A. I don't think it does.

Q. Are collection calls kept separately?

A. Not necessarily, but there are some older notes that may be archives.

Q. Is there a way to determine whether there are older notes that would be archived?

A. Not that you could determine from this screen, but there should be a screen in here somewhere that shows --

Q. We'll get to that. When we get to it, if you would just let me know.

A. Okay.

Q. It is the main screen that comes up?

A. Yes.

Q. It contains the most up-to-date information regarding an account?

**76**

A. Yes.

Q. And should have the most up-to-date comments on the account?

A. Yes.

Q. If you look down, it has the -- it has Mr. Brim's name and the original account number from Dell Financial services.

Do you see that?

A. Yes.

Q. It has the attorney's address?

A. Correct.

Q. It still has the six percent interest indicated?

A. Yes.

Q. And interest and fees, it has with those totaled. It was printed.

A. Yes.

Q. If you come down, it has a balance due of $1,709?

A. Yes.

Q. It that's statute of limitations expiration of October 18, 2007?

A. Yes.

Q. If letters are mailed out on an account, they would be documented in the collection detail unless they've been previously archived?

A. Yes.



# ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com