## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **JAMON T. BRIM,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **5:10-cv-0369-IPJ** |
| **MIDLAND CREDIT** | ) | |
| **MANAGEMENT, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MOTION FOR REMITTITUR AND CONSTITUTIONAL REDUCTION OF PUNITIVE DAMAGES AWARD

Pursuant to Federal Rules of Civil Procedure 50, 59(a), and 59(e), defendant Midland Credit Management, Inc. ("Midland") moves this Court for remittitur of the compensatory award in this case and for elimination or reduction (according to federal constitutional limitations) of the punitive damages award in this case.  In support of this motion, Midland states as follows:

## INTRODUCTION

If the compensatory and punitive damages are left intact, this case will stand for the proposition that a plaintiff with no monetary damages may recover nearly three-quarters of a million dollars based only on his own unsupported testimony of mental anguish.  The compensatory damages of $100,000 far exceed the maximum

amount that a reasonable jury could award based on the evidence presented at trial. The majority of awards in similar cases are a fraction of the $100,000 award here, with many less than $10,000.   The punitive damages award in this case is unconstitutional; it is not only duplicative of the substantial award for mental anguish in this case, but also unsupported by the evidence.   The *only* evidence presented by plaintiff regarding Midland's conduct was the deposition testimony of Midland's own witness who testified that the investigation of plaintiff's disputes was consistent with Midland's procedures.

Midland respectfully requests that the Court (1) reduce compensatory damages to an amount of $25,000 or less, and (2) either eliminate the punitive damages award or reduce it to a ratio of no greater than 1:1.

## I.   THE COMPENSATORY DAMAGES AWARD OF $100,000 IS GROSSLY EXCESSIVE UNDER THE CIRCUMSTANCES OF THIS CASE.

Compensatory damages in the amount of $100,000 are excessive and unsupported by the evidence at trial.   The *only* evidence of injury was plaintiff's own testimony, in which he (1) suggested some ambiguous, unsubstantiated type of credit injury and (2) offered conclusory testimony regarding emotional distress. (Trial Tr. vol. 3, 108-109; 121-123). As explained more fully in Midland's other contemporaneously-filed post-trial motions, Brim offered no evidence—not even his own testimony—that he was ever actually *denied* a loan (at all, let alone as a

result of the Midland account) or that the interest rate on the loan he obtained was negatively affected by the Midland account.  To the contrary, plaintiff testified that his ultimate lender, Platinum Mortgage, actually disregarded the Midland account when approving his mortgage application. (Trial Tr. vol. 3, 119:15-22).  As such, plaintiff did not offer any evidence to show that he suffered an actual economic injury.  *See Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1161 (11th Cir. 1991); *Ruffin-Thompkins v. Experian Info. Sys., Inc.*, 2003 WL 25719228, *5 (N.D. Ill. 2003) ("Because [plaintiff] has failed to adduce any evidence of actual damages, she obviously cannot show a causal link between the inaccuracy in her report and her alleged damages.").

The only evidence of any actual credit denial between August 2008 and September 2010 (the time between when plaintiff first disputed the Midland account and the ultimate deletion of the Midland account) was an unauthenticated, hearsay denial letter from American Express stating as its sole basis for denial that plaintiff's "consumer credit bureau score from TransUnion is too low."  (Pl.'s Ex. 7).  But as explained in the Motion for Judgment as a Matter of Law and the Motion for a New Trial, a TransUnion witness testified at trial that a disputed account, such as the Midland account on plaintiff's credit report, "does not get factored into the credit score." (Trial Tr. vol. 3, 58:7-14).  Because this evidence was *uncontroverted*, the jury could not reasonably have concluded that the

Midland account contributed to American Express's purported denial of plaintiff's request for credit.   Moreover, the supposed American Express denial could not legally form the basis of any damages under the FCRA.   The FCRA applies only to credit obtained "to be used primarily for personal, family, or household purposes." 15 U.S.C. § 1681a(d)(1)(A).   "An applicant denied credit for a commercial purpose does not have a claim under the FCRA."   *Thomas v. Cendant Mortgage*, No. Civ.A. 03-1672, 2004 WL 2600772, at *3 (E.D. Pa. Nov. 15, 2004) (citing *Podell v. Citicorp Diners Club, Inc.*, 914 F. Supp. 1025, 1036 (S.D.N.Y. 1996)).   At trial, plaintiff testified that he applied for credit from American Express for business purposes:

> Q.   Mr. Brim, were you seeking to obtain that [American Express] card for business purposes?
>
> A.   Correct.
>
> Q.   And that was not going to be a personal credit card, was it?
>
> A.   No.

(Trial Tr. vol. 2, 131:14-19).   Consequently, as a matter of law, plaintiff did not have a claim under the FCRA for any damages related to this supposed denial.

Thus, there was absolutely no evidence from which a reasonable jury could conclude that plaintiff was denied *any* credit or suffered any other "credit injury" as a result of the Midland account.   It follows, then, that the jury's $100,000

compensatory damage award could have been based only on plaintiff's alleged emotional distress.

A review of compensatory damage awards in other FCRA cases alleging emotional distress demonstrates the excessiveness of the award in the case:

| Case[1] | Nature of Alleged Harm | Award |
|---|---|---|
| *Bryant* | Inaccuracies on credit report "contributed meaningfully" to denial of home loan application; plaintiff suffered "consequent anguish and humiliation." | $8,000 |
| *Millstone* | Consumer report stated that plaintiff was a "hippy type" who housed demonstrators, was suspected of drug use, and was disliked by neighbors. Plaintiff suffered "loss of sleep, nervousness, frustration and mental anguish" as a result. | $2,500 |
| *Stevenson* | Plaintiff was denied credit three times before numerous inaccuracies were corrected, and one previous inaccuracy reappeared during the same time period; plaintiff suffered "terrific shock" and "considerable embarrassment." | $30,000 |
| *Morris* | Plaintiff was denied credit for home heating fuel and had to ask employer for salary advance.  Plaintiff's wife testified about strain on marriage, and they even separated for a short time.  As a result, "plaintiff suffered significant injury to his reputation, his family, his | $10,000 |

---

[1] *Bryant v. TRW, Inc.,* 689 F.2d 72 (6th Cir. 1982); *Millstone v. O'Hanlon Reports Inc.,* 383 F. Supp. 269 (E.D. Mo. 1974); *Stevenson v. TRW Inc.,* 987 F.2d 288 (5th Cir. 1993); *Morris v. Credit Bureau of Cincinnati, Inc.,* 563 F. Supp. 962 (S.D. Ohio 1983); *Pinner v. Schmidt,* 805 F.2d 1258 (5th Cir. 1986); *Sloane v. Equifax Info. Serivces, LLC,* 510 F.3d 495 (4th Cir. 2007);*Cortez v. TransUnion, LLC,* 05-cv-05684-JF, 2007 WL 2702945 (E.D. Pa. Sept. 13, 2007), *aff'd,* 617 F.3d 688 (3d Cir. 2010).

| Case[1] | Nature of Alleged Harm | Award |
|---|---|---|
| | work and his sense of well-being." | |
| *Pinner* | Plaintiff was embarrassed and humiliated about credit denials from several retail stores, all of which advised him in writing that the denials were based on the defendant. He subsequently received loans, which weighed in favor of reducing damages. | $25,000 (reduced from $100,000) |
| *Sloane* | Plaintiff's identity was stolen while she was in the maternity ward giving birth. She was subsequently denied a home loan and told by the loan officer that her credit was the "worst" he had ever seen. She disputed 24 separate items. Plaintiff and her husband slept in separate rooms and husband researched divorce options. Plaintiff saw a marriage counselor, but husband refused counseling because "bad credit" was "obviously" their only problem. Plaintiff offered "extensive corroboration" of emotional distress damages, including "sufficiently articulated" descriptions of protracted anxiety and testimony from her husband. In addition, the repeated denials of credit were "objective and inherently reasonable 'factual context' for emotional distress." | $150,000 (reduced from $245,000) |
| *Cortez* | Credit report reflected that plaintiff was on Treasury Department list of individuals thought to be "terrorists, international narcotics traffickers, . . . [and] proliferat[ors] of 'weapons of mass destruction'"; plaintiff was detained for 6.5 hours at car dealership while FBI was allegedly contacted. Plaintiff lost weight and resorted to medication for insomnia. Plaintiff's | $50,000 (described by district court as "exceedingly generous") |

| Case[1] | Nature of Alleged Harm | Award |
|---|---|---|
| | daughter corroborated the mental anguish, recalling numerous conversations with plaintiff about the "ordeal," which often reduced plaintiff to tears. | |

As this table demonstrates, compensatory awards for emotional distress do not approach $100,000 in the majority of FCRA cases. In fact, even the Fourth Circuit noted—in the course of reducing an FCRA award from $245,000 to $150,000—that approved awards for emotional distress in FCRA cases "more typically range between $20,000 and $75,000." *Sloane v. Equifax Info. Servs., LLC*, 510 F.3d 495, 505 (4th Cir. 2007). The award in *Sloane* exceeded this mark based on, *inter alia*, "the extensive corroboration offered at trial concerning the many months of emotional distress, mental anguish and humiliation." 410 F.3d at 507. But the Fourth Circuit recognized that the award of $150,000 was an outlier:

> We recognize that even this amount is appreciably more than that awarded for emotional distress in most other FCRA cases. But, as explained earlier, the case at hand differs significantly from those cases. A $150,000 award reflects those differences – the repeated violations of the FCRA found by the jury in its special verdict, the number of errors contained in Equifax's credit reports, and the protracted length of time during which Equifax failed to correct [plaintiff's] credit file.

*Id.*

Damage awards of $100,000 or more for emotional distress outside the FCRA context likewise involve far more egregious circumstances than the case at

bar.  For example, the Alabama Supreme Court has held that $100,000 was appropriate for each parent of a deceased child whose eyes were harvested for donation without their consent; the parents felt like they had been taken advantage of, had nightmares, and offered testimony from a therapist that the eye removal "greatly compounded" the mother's recovery.  *See George H. Lanier Mem. Hosp. v. Andrews*, 901 So. 2d 714 (Ala. 2004).  By contrast, mental anguish associated with financial concerns results in much lower awards.  *See, e.g.*, *Acceptance Ins. Co. v. Brown*, 832 So. 2d 1 (Ala. 2001) (reducing mental anguish damages relating to worrying about finances from $200,000 to $21,000 where there was no evidence "demonstrating quantifiable effects, whether from [plaintiff], from other family members, or from a professional").

The alleged harm in this case does not approach the harm alleged in *Sloane*. Rather, plaintiff here testified that he was "kind of saddened" (Trial Tr. vol. 3, 108:16-19); that it "was rough" (Trial Tr. vol. 3, 109:3-9); that "[i]t added a lot of stress" ( Trial Tr. vol. 3,121:3-6); that he "los[t] … sleep because worrying about trying to get a loan to get a house" (Trial Tr. vol. 3, 121:7-11); and that the inability to get a loan "was a headache in itself" (Trial Tr. vol. 3, 121:14-16). Plaintiff did not support his alleged emotional distress with *any* corroboration, much less the "extensive corroboration" offered in *Sloane*.  *See Sloane*, 510 F.3d at 504 (distinguishing lower-recovery cases which "relied almost exclusively on

conclusory testimony"). Plaintiff did not seek medical or any other professional help in connection with his alleged emotional distress. (Trial Tr. vol. 3, 143:11-19). Nor was plaintiff subjected to "repeated violations and numerous errors" on his credit report, as was the case in *Sloane*.

This case, rather, resembles the other cases cited above in which compensatory damage awards were (or were reduced to) well below $100,000:

> The plaintiff produced no evidence of any monetary damages. He testified that he was embarrassed by his denial of credit and sustained deep emotional distress because of [the defendant's] negligence. The evidence is far from sufficient to justify an award of $100,000.

*Pinner*, 805 F.2d at 1265 (reducing award to $25,000); *see also Anderson v. Conwood Co.*, 34 F. Supp. 2d 650, 655 (W.D. Tenn. 1999) (reducing compensatory damages awards from $2,000,000 to $50,000 and vacating punitive damages entirely where "the record is void of any proof of damages beyond plaintiffs' testimony of worry, stress, anxiety, loss of sleep and expense in bringing litigation").

* * *

For these reasons, the compensatory damages award in this case exceeds the maximum amount supported by the evidence. Midland therefore requests that if the Court does not grant it judgment as a matter of law, the Court reduce the compensatory damage award to no more than $25,000, which is still generous but much closer to other FCRA cases involving mental anguish damages.

## II.   THE PUNITIVE DAMAGES AWARD OF $623,180 IS GROSSLY EXCESSIVE UNDER THE CIRCUMSTANCES OF THIS CASE.

In *BMW of North America v. Gore*, 517 U.S. 559 (1996), the United States Supreme Court identified three guideposts as especially relevant in determining whether an award of punitive damages is excessive so as to violate the Due Process Clause.  The guideposts are (1) the reprehensibility of the defendant's conduct; (2) the ratio of punitive damages to the amount of actual harm suffered by the plaintiff; and (3) a comparison of the amount of the punitive damages award with any civil or criminal penalties that could be imposed for comparable conduct.  *Id.* at 575-583.  These factors weigh heavily in favor of an elimination or substantial reduction of the punitive damages award in this case.

### A.   Midland's Conduct Was Not Reprehensible.

In *BMW*, the Supreme Court observed that "[p]erhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct."  *BMW*, 517 U.S. at 575.  Courts should "determine the reprehensibility of a defendant by considering whether: [1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident."  *State Farm Mut. Auto.*

*Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003).  As applied here, these factors weigh heavily against a finding of reprehensibility.

### 1.   The harm caused was economic, not physical.

The harm that plaintiff suffered, if any, was economic.  "Embarrassment and humiliation are not the types of physical injuries contemplated under the reprehensibility analysis."  *Dixon-Rollins v. Experian Info. Solutions, Inc.*, No. 09-0646, 2010 U.S. Dist. LEXIS 100015, at *26 (E.D. Pa. Sept. 23, 2010) (citing *Jurinko v. The Medical Protective Co.*, 305 F. App'x 13, 26 (3d Cir. 2008); *Bach v. First Union Nat'l Bank*, 149 F. App'x 354, 364 (6th Cir. 2005)).  Because there is no evidence that plaintiff suffered physical injuries of the type contemplated by *BMW* and its progeny, this factor weighs against a finding of reprehensibility.

### 2.   The tortious conduct did not evince a disregard for the health and safety of anyone.

As with the first reprehensibility factor, the relevant conduct—investigating the dispute of information in a credit report—was purely economic in nature.  Such economic actions do not evince a disregard for the health or safety of any person.  *Dixon-Rollins*, 2010 U.S. Dist. LEXIS 100015, at *26 ("Similarly, because TransUnion's actions were economic in nature, its conduct does not display an indifference or reckless disregard for the health and safety of others.") (citing *Jurinko v. The Medical Protective Co.*, 305 F. App'x 13, 26 (3d Cir. 2008); *Bach v.*

*First Union Nat'l Bank*, 149 F. App'x 354, 364 (6th Cir. 2005)).   This factor

likewise weighs against a finding of reprehensibility.

### 3.   The target of the alleged conduct was not financially vulnerable.

There is no evidence in the record to suggest that plaintiff was financially

vulnerable.   In *Saunders v. Branch Banking & Trust Co.*, 526 F.3d 142 (4th Cir.

2008), the Fourth Circuit used this factor to support an $80,000 punitive damage

award in an FCRA case where the defendant's actions contributed to the plaintiff's

financial vulnerability, but expressly distinguished the very situation present in this

case—where the reporting had no effect on the consumer's financial vulnerability:

> The CRAs lowered Saunders' credit score substantially because of the
> reported debt, making it impossible for him to obtain a new loan at a
> favorable interest rate, *but the CRAs would not have factored this debt
> into Saunders' credit score if BB&T had reported the dispute*. Thus,
> BB&T's refusal to correct its error made it more difficult for Saunders
> to access credit and increased his financial vulnerability.

*Id.* at 153 (emphasis added).   This case is different from *Saunders* in a critical

respect.   The evidence presented at trial showed that Midland *did* report plaintiff's

account as disputed and it did "*not get factored into the credit score.*" (Trial Tr.

vol. 3, 58:11-14).   Accordingly, Midland's actions did not contribute to plaintiff's

financial vulnerability (assuming plaintiff was financially vulnerable at all).   This

factor also weighs against a finding of reprehensibility.

### 4.     Midland's conduct was not repetitive.

There was no evidence at trial that any other consumer had been harmed by Midland's investigation of disputes similar to those made by plaintiff.  In *Philip Morris USA v. Williams*, 549 U.S. 346, 355 (2007), the Supreme Court explained: "Evidence of actual harm to nonparties can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public." Plaintiff's complaint here was based on Midland's failure to discover a prior payment to the original creditor (Dell Financial Services) from whom Midland's affiliate purchased plaintiff's account.  Plaintiff offered *no evidence* that any other consumers had made similar disputes, had similar experiences, or had been harmed by Midland's conduct.   Plaintiff offered only the deposition testimony of Midland's witness that it is "probably likely" that, "[i]f everything were the same as Mr. Brim's case, then the response to the ACDV would be the same."  (Trial Tr. vol. 2, 135:17-20).  That testimony says nothing about whether there were, in fact, similar disputes or, more importantly, whether Midland's investigations of those disputes resulted in actual harm to anyone.   This factor therefore also weighs against a finding of reprehensibility.

### 5.     The harm was not the result of intentional malice, trickery, or deceit.

Even if Midland's actions were willful for purposes of the FCRA, any alleged harm to plaintiff was not the result of any intentional malice, trickery, or

deceit.[2]  That is, an assessment of reprehensibility includes whether the conduct "involves deliberate false statements rather than omissions."  *Cortez*, 617 F.3d at 723 (quoting *Inter Med. Supplies Ltd. v. EBI Med. Sys., Inc.*, 181 F.3d 446, 467 (3d Cir. 1999)).  The Third Circuit concluded in *Cortez* that this factor weighed in favor of punitive damages because the defendant "contorted its policies to avoid its responsibilities under the FCRA."  *Id.*  In *Cortez*, the credit report reflected that plaintiff was on the Treasury Department list of individuals thought to be "terrorists, international narcotics traffickers, . . . [and] proliferat[ors] of 'weapons of mass destruction.'"  TransUnion had a policy of *never* providing consumers with their own reports showing the terrorist alert and a policy of *never* investigating disputes about the terrorist alert, and it repeatedly lied to the plaintiff about whether the terrorist alert was on her credit report.  *Id.*  Even on these egregious facts, the trial court reduced the punitive damages from $750,000 to $100,000.  *Cortez*, 2007 WL 2702945, at *2 ("On balance, I conclude that an award of punitive damages would exceed the maximum permissible limit if it were to exceed double the amount of the compensatory award.").

In this case, there was no evidence at trial (or even argument, for that matter) that Midland intentionally or maliciously tricked or deceived plaintiff.  The

---

[2] For all of the reasons stated in Midland's contemporaneously filed motions under Rules 50 and 59, plaintiff has failed to offer legally sufficient evidence of willfulness.  Because the willfulness standard is less stringent than intentional malice and deceit, those arguments apply equally to this factor of reprehensibility.

14

evidence instead demonstrated that Midland reviewed the bank statement sent by plaintiff, determined it was insufficient proof of prior payment according to its procedures, marked plaintiff's account as disputed, and subsequently processed his disputes using the software purchased from the very CRAs who forwarded the disputes that actually triggered Midland's duties under the FCRA. (*See* Trial Tr. vol. 2, 89-155). The evidence further demonstrated that Midland did not contact plaintiff at the time because he had specifically requested that Midland "not contact [him] again by phone or in writing" (Pl.'s Ex. 11). Unlike *Cortez*, where the court concluded that the defendant concealed information from the plaintiff and contorted its policies, Midland's actions were not deceitful. This factor also weighs against a finding of reprehensibility.

### B. Because The Compensatory Award Is Substantial, A Low Ratio Of Compensatory To Punitive Damages Is Appropriate.

Although the Supreme Court has declined to impose rigid benchmarks for the appropriate ratios of compensatory to punitive damages, it has indicated that a single-digit multiplier sets the outer limit in the vast majority of cases. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 424-26 (2003). Moreover, when, as here, "compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Id.* at 425. And further, where the compensatory damages award is based largely on emotional distress, punitive damages would be duplicative and

should be even lower, if not eliminated altogether. *Id.* at 426. ("The compensatory damages for the injury suffered here, moreover, likely were based on a component which was duplicated in the punitive award. Much of the distress was caused by the outrage and humiliation the Campbells suffered at the actions of their insurer; and it is a major role of punitive damages to condemn such conduct. Compensatory damages, however, already contain this punitive element.") (*citing* Restatement (Second) of Torts § 908, Comment c, p. 466 (1977) ("In many cases in which compensatory damages include an amount for emotional distress, such as humiliation or indignation aroused by the defendant's act, there is no clear line of demarcation between punishment and compensation and a verdict for a specified amount frequently includes elements of both").

Because plaintiff offered no evidence of actual credit injury or monetary harm, the $100,000 compensatory damages award in this case is based substantially, if not entirely, on his alleged mental anguish and emotional distress. As demonstrated above, the typical recoveries for mental anguish in FCRA cases are a fraction of this amount. Because the award for these damages—which plaintiff testified consisted of occasional sleeplessness and headaches—is significant (even if reduced to $25,000 or less), then, if a punitive damages award is appropriate at all, "a lesser ratio, perhaps only equal to compensatory damages"

is appropriate.  *Campbell*, 538 U.S. at 424-26.  Punitive damages in excess of a 1:1 ratio would be redundant given the compensatory damages award.

### C.     Civil Penalties.

"The third guidepost in [*BMW v. Gore*] is the disparity between the punitive damages award and the 'civil penalties authorized or imposed in comparable cases.'"  *Campbell*, 538 U.S. at 428.  Section 1681s of the FCRA gives the Federal Trade Commission ("FTC") enforcement powers for violations of the FCRA, including the ability to seek civil penalties.  15 U.S.C. § 1681s.  The civil penalties are limited to $3,500 per violation.  *Id.* § 1681s(a)(2)(A); 16 C.F.R. § 1.98(m).  Thus, even if Midland's investigation of each dispute received from the CRAs was a separate violation, the civil penalty would only be $17,500 ($3,500 times the five disputes received by Midland from the CRAs).  This factor supports a substantial reduction of the punitive damages in this case.

* * *

For these reasons, the punitive damages award should be stricken or, alternatively, reduced to no more than a 1:1 ratio with the compensatory award.

## II.    THE JUDGMENT ENTERED ON THE JURY'S VERDICT SHOULD BE REDUCED BY THE AMOUNTS ALREADY PAID TO PLAINTIFF BY DELL FINANCIAL SERVICES AND THE CRAS.

The judgment (including any judgment reduced for the reasons stated above) must be offset by the amounts already recouped by Plaintiff through prior

settlement agreements reached with co-defendant Dell Financial Services and the three CRAs (Equifax, TransUnion and Experian).  *See Singer v. Olympia Brewing Co.*, 878 F.2d 596, 600 (2d Cir. 1989) ("[A] plaintiff is entitled to only one satisfaction for each injury.") (citations omitted); *Harris v. Union Elec. Co.*, 846 F.2d 482, 485 (8th Cir. 1988) ("[A]n injured party is entitled to only one satisfaction for each injury.  Whether there is one tortfeasor or ten, the injured party may only recover once.") (citation omitted); *see also BUC Intern. Corp. v. Int'l Yacht Council Ltd.*, 517 F.3d 1271, 1277 (11th Cir. 2008) (noting that "one-satisfaction" rule is "an equitable doctrine designed to prevent multiple recoveries by a plaintiff on its own claim and for a single injury"); *Equal Emp't Opportunity Comm'n v. Outrigger Rest., Inc.*, 2000 WL 1005943 (S.D. Ala. June 19, 2000) ("It is well settled that a non-settling joint tortfeasor in Alabama is entitled to set-off once the [sic] injured party enters into a pro tanto settlement and release agreement with another joint tort-feasor.").

Here, plaintiff has already been compensated, in whole or in part, by Dell Financial Services and the three CRAs for the single injury he suffered.  Plaintiff named Dell Financial as a defendant in this action and filed a separate action against TransUnion, Experian, and Equifax, utilizing a complaint nearly identical to the one in this case.  The complaints are both based on the Midland account on plaintiff's credit reports.  Plaintiff has settled with all other parties that he sought to

hold liable for his alleged injuries resulting from this credit report item.  By trial subpoena, Midland requested that plaintiff produce his settlement agreements with Dell Financial, TransUnion, Equifax, and Experian.[3]  Midland requests that the compensatory damages in this case be reduced by the amounts that plaintiff received from Dell Financial, TransUnion, Experian, and Equifax.

## CONCLUSION

The compensatory and punitive damages awards in this case are outside the range of awards in other FCRA cases and outside constitutional limits. Midland respectfully requests that the Court (1) reduce compensatory damages to an amount of $25,000 or less, and (2) eliminate the punitive damages award or, at the very least, reduce it to a ratio of no greater than 1:1.  Midland also respectfully requests a setoff of sums paid by Dell Financial Services, TransUnion, Equifax and Experian against any award that might ultimately be rendered in this case.

Respectfully submitted this 28th day of March 2011.

*/s/ Eric B. Langley*
One of the Attorneys for Defendant
Midland Credit Management, Inc.

---

[3] Plaintiff moved in limine to exclude any such evidence from the trial.  The court withheld ruling on this part of plaintiff's motion in limine, but plaintiff never produced the documents at trial as subpoenaed.  The subpoenaed documents should be produced, either to Midland or to the court *in camera* for purposes of effectuating the setoff.

**OF COUNSEL**:
Eric B. Langley
Jason B. Tompkins
**BALCH & BINGHAM LLP**
Post Office Box 306
Birmingham, Alabama  35201-0306
Telephone:  (205)251-8100
Facsimile:  (205)226-8798
elangley@balch.com
jtompkins@balch.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 28th day of March 2011, I have filed the above and foregoing via CM/ECF, which will notify the following counsel of record:

Penny Hays Cauley
HAYS CAULEY, P.C.
549 West Evans Street, Suite E
Florence, SC  29501
phc917@hayscauley.com

Ronald C. Sykstus
BOND, BOTES, SYKSTUS, TANNER & EZZELL, P.C.
415 Church Street, Suite 100
Huntsville, AL  35801

Leonard A Bennett
CONSUMER LITIGATION ASSOCIATES PC
12515 Warwick Blvd, Suite 100
Newport News, VA  23606
Email: lenbennett@clalegal.com

*/s/ Eric B. Langley*
Of Counsel