FILED

2011 Apr-06  PM 05:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **JAMON T. BRIM,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION NO.** |
| ) | **5:10-cv-0369-IPJ** |
| **MIDLAND CREDIT** ) | |
| **MANAGEMENT, INC.,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## UNOPPOSED MOTION TO SUPPLEMENT TRIAL RECORD

Defendant Midland Credit Management, Inc. ("Midland") moves the Court to supplement the record to include the testimony of Dell Financial Services, LLC in the trial transcript.  In support of this motion, Midland states as follows:

1.      During trial, the videotaped deposition of Dell Financial Services, LLC was played to the jury.  The Court instructed the jury to disregard only three discrete portions of the testimony: 31:8-14; 36:24-37:25; and 42:20-24.  (Trial Tr. vol. III, 223:10-229:18).  The remainder of the direct and redirect testimony[1] was received into evidence without objection and without limiting instruction.

---

[1]   Midland believes that a portion of Plaintiff's cross-examination of Dell Financial Services, LLC was also played, but that Plaintiff's counsel also agreed to skip over a portion of the cross-examination.  Because the transcript only says "(Videotape played)" without further detail, Midland cannot ascertain what those portions may have been.

1146414.1

2.    The trial transcript received by undersigned counsel does not contain the testimony of Dell Financial Services, LLC.  At the part of the trial where Dell Financial Services, LLC testified, the trial transcript simply reads:  "(Videotape played)." (*Id.* at 226:24).

3.    For completeness of the trial transcript and the record of the proceedings, the record should be supplemented to include the testimony of Dell Financial Services, LLC that was admitted into evidence.   Otherwise, the testimony may not be available for purposes of appellate review (if needed by either party).

4.    The entire transcript of the testimony of Dell Financial Services, LLC is attached as Exhibit A to this motion.

5.    Counsel for Plaintiff Jamon T. Brim does not oppose this motion.

WHEREFORE, the premises considered, Midland respectfully requests that the Court supplement the trial record with the testimony of Dell Financial Services, LLC that was played into evidence.

Respectfully submitted this 6th day of April 2011.

/s/ *Eric B. Langley*
One of the Attorneys for Defendant
Midland Credit Management, Inc.

**OF COUNSEL**:
Eric B. Langley
Jason B. Tompkins
**BALCH & BINGHAM LLP**
Post Office Box 306
Birmingham, Alabama  35201-0306
Telephone:  (205)251-8100
Facsimile:  (205)226-8798
elangley@balch.com
jtompkins@balch.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 6th day of April 2011, I have filed the above and foregoing via CM/ECF, which will notify the following counsel of record:

Penny Hays Cauley
HAYS CAULEY, P.C.
549 West Evans Street, Suite E
Florence, SC 29501
phc917@hayscauley.com

Ronald C. Sykstus
BOND, BOTES, SYKSTUS, TANNER & EZZELL, P.C.
415 Church Street, Suite 100
Huntsville, AL 35801

Leonard A Bennett
CONSUMER LITIGATION ASSOCIATES PC
12515 Warwick Blvd, Suite 100
Newport News, VA 23606
Email: lenbennett@clalegal.com

/s/ Eric B. Langley
Of Counsel

# Exhibit A

**Condensed Transcript**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

JAMON T. BRIM,

        Plaintiffs,

                                         CA NO. 5:10-CV-369-IPJ

    VS.

DELL FINANCIAL SERVICES,
LLC, ET AL,

        Defendants.


## ORAL AND VIDEOTAPED DEPOSITION OF

### RACHEL GARLOCK

January 7, 2011
10:06 a.m.

3101 Bee Caves Road
Suite 220
Austin, Texas


Janalyn Reeves, CSR
in and for the State of Texas



Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin TX 78746
www.esquiresolutions.com

Rachel Garlock

January 7, 2011

---

**Page 1**

```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS

JAMON T. BRIM,              )
        Plaintiffs,         )
                            )   CA NO. 5:10-CV-369-IPJ
vs.                         )
                            )
DELL FINANCIAL SERVICES,    )
LLC, ET AL,                 )
        Defendants.         )

      *****************************************
          ORAL AND VIDEOTAPED DEPOSITION OF
                   RACHEL GARLOCK
                   JANUARY 7, 2011
      *****************************************
```

ORAL AND VIDEOTAPED DEPOSITION OF RACHEL GARLOCK, produced as a witness at the instance of the Defendants, and duly sworn, was taken in the above-styled and numbered cause on January 7, 2011, from 10:06 a.m. to 11:31 a.m., before Janalyn Reeves, CSR in and for the State of Texas, reported by machine shorthand, at the offices of ESQUIRE DEPOSITION SERVICES, 3101 Bee Caves Road, Suite 220, Austin, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

---

**Page 3**

INDEX

Appearances.................................... 2

RACHEL GARLOCK

Examination by Mr. Langley.................... 5
Examination by Ms. Cauley..................... 43
Further Examination by Mr. Langley............ 59

Witness' Signature Page...................... 63
Reporter's Certificate....................... 65

EXHIBITS
NUMBER   DESCRIPTION                          PAGE
1                             8
  Receipt
2                             8
  Receipt
3                             9
  Terms and Conditions
4           ...................... 11
  Transaction Detail Report
5           ...................... 15
  Transactions Processed on Account
6                             17
  Information from System of Record
7                             28
  Bank Statement
8                             35
  Complaint Activity Report from
  Better Business Bureau
9           ...................... 38
  Credit Bureau Dispute Form

---

**Page 2**

APPEARANCES

FOR THE PLAINTIFF:
  Ms. Penny Hays Cauley (Via Telephone)
  HAYS CAULEY, PC
  549 West Evans Street, Suite E
  Florence, South Carolina 29501
  (843) 665-1717

FOR MIDLAND CREDIT MANAGEMENT:
  Mr. Eric B. Langley
  BALCH & BINGHAM, LLP
  1901 South Avenue North Suite 1500
  Birmingham, Alabama 35203
  (205) 226-8772

FOR DELL FINANCIAL SERVICES:
  Mr. D. Keith Andress
  LAW OFFICES OF BAKER DONELSON BEARMAN CALDWELL &
  BERKOWITZ, PC
  420 20th Street North, Suite 1600
  Birmingham, Alabama  35203
  (205) 250-8367

ALSO PRESENT:
  Naomi Aldape
  Norm Wiley - Videographer

---

**Page 4**

THE REPORTER:  This is the court reporter.  Ms. Cauley, are you going to want a copy of the deposition?

MS. CAULEY:  Yes.

THE VIDEOGRAPHER:  This is the videotaped deposition of Rachel Garlock in the matter of Jamon Brim versus Dell Financial Services, being heard in the United States District Court, Northern District of Alabama, Case No. 5:10-CV-369-IPJ.

This deposition is being held at the office of Esquire Deposition Solutions on January 7, 2011.  The time is approximately 10:07 a.m.  My name is Norman Wiley.  I'm the videographer.  The court reporter is Janalyn Reeves.

Counsel, will you please introduce yourselves and affiliations and the witness will be sworn in.

MR. LANGLEY:  This is Eric Langley here for Midland Credit Management.

MR. ANDRESS:  Keith Andress here for Dell Financial Services.

MS. CAULEY:  I'm Penny Cauley, on behalf of Jamon Brim.

RACHEL GARLOCK,

having being first duly sworn, testified as follows:

---



Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Rachel Garlock

January 7, 2011

5

1                    EXAMINATION
2    BY MR. LANGLEY:
3        Q.  Ms. Garlock, thank you for being here today.
4    My name is Eric Langley.  I am a lawyer that represents
5    Midland Credit Management in this lawsuit that we're
6    here about today.
7        A.  Uh-huh.
8        Q.  Do you understand that you're here today
9    pursuant to a deposition trial subpoena?
10       A.  Yes, sir.
11       Q.  Have you and I ever met before this morning
12   just a minute ago?
13       A.  No, sir.
14       Q.  And, Ms. Garlock, would you please tell the
15   jury your full name?
16       A.  Rachel Renee Garlock.
17       Q.  Ms. Garlock, by whom are you currently
18   employed?
19       A.  Dell Financial Services.
20       Q.  What is Dell Financial Services?
21       A.  Dell Financial Services is the finance company
22   for Dell, Inc., which is Dell Computers.  We finance
23   any of the -- the products that Dell, Inc. sales.
24       Q.  Ms. Garlock, right before the deposition your
25   counsel had provided me with some documents.  Are those

6

1    documents that are from your file at Dell Financial
2    Services?
3        A.  Yes, sir.
4        Q.  Are you familiar with those documents?
5        A.  Yes, sir.
6        Q.  Are you also familiar with document produced
7    by Dell earlier in this lawsuit that bear what we call
8    Bates labels?
9        A.  I'm not sure exactly which ones are labeled
10   that, but I have seen what was submitted.
11       Q.  At some point during my questions if I show
12   you some documents that have a Bates label on them and
13   you're confused about what they mean, just let me know
14   and we can work through and make sure that you're
15   looking at a document that you understand and that
16   you're comfortable with.
17       A.  Okay.
18       Q.  Is that fair?
19       A.  Yes, sir.
20       Q.  Ms. Garlock, are you familiar with a Dell
21   Financial Services account held by the plaintiff in
22   this case, Mr. Jamon Brim?
23       A.  Yes, sir.
24       Q.  And how did you first come to be familiar with
25   that account?

7

1        A.  I guess it was mid -- mid last year when the
2    counsel brought the account over to my team to be
3    researched for the payment.
4        Q.  Ms. Garlock, what is your position with Dell
5    Financial Services?
6        A.  Accounts receivable manager.
7        Q.  And as accounts receivable manager, what are
8    your job responsibilities?
9        A.  I currently manage payment research for Dell
10   Financial Services, as well as refund requests.  I also
11   manage our -- some of our payment vendors.  We have a
12   lockbox vendor that I manage, as well as we have an
13   offshore site that I manage that also handles various
14   different payment postings.
15       Q.  Are you familiar with Dell Financial Services'
16   relationships with various debt buyers?
17       A.  A little bit.  I mean, I wouldn't say I'm an
18   expert at it or anything, but I've had -- have had some
19   situations with it, I guess.
20       Q.  Are you familiar with Midland Funding, LLC?
21       A.  I've heard of Midland Funding.
22       Q.  Are you aware that Midland Funding, LLC is the
23   entity that actually purchased a debt from Dell
24   Financial Services in the name of Mr. Brim?
25       A.  Yes, sir.

8

1        Q.  Ms. Garlock, when did Mr. Brim open an account
2    with Dell Financial Services?
3        A.  September of 2004.
4        Q.  Why did Mr. Brim open an account based on your
5    knowledge and understanding of the documents?
6        A.  I show that he purchased a computer system as
7    well as a surge protector.  Those were the
8    two purchases that he had made in September of '04.
9            (Exhibit Nos. 1 and 2 marked)
10       Q.  (BY MR. LANGLEY)  Ms. Garlock, I'm showing you
11   what I've marked as Exhibits 1 and 2.
12       A.  Okay.
13       Q.  Can you identify those documents?
14       A.  Yes.  This is the Dell receipt that goes along
15   with any of the purchases, and it just describes the
16   purchases that were made by the customer.
17       Q.  Are the purchases reflected on Exhibits 1 and
18   2 the purchases that were made on Mr. Brim's account
19   with Dell Financial Services?
20       A.  Yes, sir.
21       Q.  To your knowledge, are these the only
22   purchases made on that account?
23       A.  Yes, sir.
24       Q.  Ms. Garlock, when a customer opens an account
25   with Dell Financial Services, do they execute some sort



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Rachel Garlock

January 7, 2011

9

1  of agreement that governs the terms of that account?
2      A.   Yes.  It is considered a revolving account,
3  which is similar to a credit card.  So the customer
4  does have Ts and Cs, which is terms and conditions,
5  that are provided to them when the account is opened.
6           (Exhibit No. 3 marked)
7      Q.   (BY MR. LANGLEY)  Let me show you what I've
8  marked as Exhibit 3.
9      A.   Uh-huh.
10          MS. CAULEY:  Eric, can you give us
11  Bates -- can you give me Bates numbers?
12          MR. LANGLEY:  Yes.  I'm sorry, Penny.
13  The Bates numbers to Exhibit 1 were Dell -- this is
14  from the Dell production.  And all of them will be from
15  the Dell production unless otherwise stated --
16  Document 65 through 67.  Exhibit 2 was Document 68.
17          MS. CAULEY:  Thank you.
18          MR. LANGLEY:  And Exhibit 3 is Bates
19  range 71 through 72.
20      Q.   (BY MR. LANGLEY)  Ms. Garlock, what is
21  Exhibit 3?
22      A.   The terms and conditions of the account that
23  was opened.
24      Q.   Are these the terms and conditions that
25  governed Mr. Brim's account with Dell Financial

10

1  Services?
2      A.   Yes.
3      Q.   Is this the entirety of the terms and
4  conditions that governed Mr. Brim's account with Dell
5  Financial Services?
6      A.   Yes.
7      Q.   Did Mr. Brim ever pay the amounts charged to
8  his account with Dell Financial Services?
9      A.   Yes.
10      Q.   When were those paid?
11      A.   According to the bank statement, it was paid
12  on November 6th of 2004.
13      Q.   Was Dell Financial Services aware that the
14  payment had been made on November 6, 2004?
15      A.   No.
16      Q.   When did Dell become aware that Mr. Brim had
17  paid his account on November 6, 2004?
18      A.   The bank statement was provided by Mr. Brim.
19  I apologize.  I don't have the notes right in front of
20  me, but I believe it was in May or June of 2005 is when
21  the bank statement was provided that showed the payment
22  on the account.  But, unfortunately, the bank statement
23  only showed a payment was made to Dell Financial
24  Services.  So we weren't able to locate that -- that
25  payment without additional information to show exactly

11

1  how that payment was made to Dell Financial Services.
2      Q.   Was the bank statement itself insufficient to
3  allow Dell Financial Services to track Mr. Brim's
4  payment?
5      A.   Yes.
6      Q.   Was Mr. Brim advised of this fact?
7      A.   Yes.
8      Q.   How did Dell Financial Services ultimately
9  determine what happened with Mr. Brim's payment?
10      A.   In August of 2010 our counsel provided the
11  transaction detail report.  That was provided to them
12  from Mr. Brim's counsel.  And on that transaction
13  detail report we were able to confirm where that
14  payment was posted based on the account number that was
15  provided on the transaction detail report.
16           (Exhibit No. 4 marked)
17      Q.   (BY MR. LANGLEY)  I'm showing you what I've
18  marked as Exhibit 4.  Is Exhibit 4 the transaction
19  detail report that you were just referencing?
20      A.   Yes, sir.
21      Q.   What is it about this transaction detail
22  report that allowed Dell Financial Services to
23  determine what happened with Mr. Brim's payment?
24      A.   The account number that is listed right under
25  Mr. Brim's name.  That is the -- our Dell Financial

12

1  Services account number minus the first four digits
2  because our account numbers are 19 digits long.
3      Q.   Mr. Garlock, are you talking about the second
4  page of Exhibit 4?
5      A.   Yes.  Yes.  Second page right under Mr. Brim's
6  name there's an account number that starts in 4501.  So
7  based on that information, we were able to look up that
8  account, because that is one of our account numbers,
9  and we were able to locate that payment posted to that
10  account.
11      Q.   And what happened with that particular
12  payment?
13      A.   It was posted to another customer's account.
14      Q.   Do you know how that occurred?
15      A.   No, I do not.
16      Q.   Is that a transaction that Dell Financial
17  Services itself handles or does Dell Financial Services
18  use an outside vendor for that?
19      A.   I do not show exactly how that payment -- you
20  know, what agency that payment was made with.  We do
21  have an outside agency that does -- that at the time
22  was taking our pay-by-phone payments.
23      Q.   If Dell Financial Services had this
24  information in Exhibit 4 in 2004 and 2005, would it
25  have been able to trace Mr. Brim's payment?



Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

13

1    A. Yes, sir.
2    Q. Is the information in Exhibit 4 the
3  information that Dell Financial Services asked Mr. Brim
4  to provide in 2005?
5    A. Yes. It's -- it is a transaction detail
6  report.
7       MS. CAULEY: Objection, states facts not
8  in evidence.
9       THE REPORTER: Pardon?
10      MS. CAULEY: I object to that question.
11  It states facts not in evidence.
12   Q. (BY MR. LANGLEY) Ms. Garlock, earlier you had
13  mentioned that at some point Dell Financial Services
14  advised Mr. Brim that he needed to provide a
15  transactional detail report, correct?
16   A. Yes, sir, uh-huh.
17   Q. And I think you told me just a minute ago that
18  Exhibit 4 is the transactional detail report that you
19  were referring to?
20   A. Yes, sir.
21   Q. So had Mr. Brim provided the information in
22  Exhibit 4 in 2005 when Dell Financial Services
23  requested it, would it have been able to trace
24  Mr. Brim's payment?
25   A. Yes, sir.

14

1    Q. What was the timeframe that Dell Financial
2  Services received the transactional detail report
3  marked as Exhibit 4?
4    A. We received it in August of 2010.
5    Q. After receiving the transactional detail
6  report, how long did it take Dell Financial Services to
7  research this payment and determine what had occurred?
8    A. It was less than one day.
9    Q. Was August 2010 the first occasion that Dell
10  Financial Services was able to determine what happened
11  with Mr. Brim's account?
12   A. Yes, sir.
13   Q. So if someone had inquired about the status of
14  Mr. Brim's account prior to August of 2010, what would
15  Dell Financial Services' response have been?
16   A. That the customer still had a balance on the
17  account and it was still owed.
18      MS. CAULEY: I'm sorry. I need the
19  witness to speak up or move the microphone closer -- or
20  phone closer to her. Thank you.
21      MR. ANDRESS: How is that?
22      THE WITNESS: Is that better?
23      MS. CAULEY: That's much better.
24      THE WITNESS: Okay. Thank you.
25   Q. (BY MR. LANGLEY) Ms. Garlock, are you

15

1  familiar with the term "charge-off"?
2    A. Yes, sir.
3    Q. What is a charge-off?
4    A. A charge-off means that the customer has gone
5  more than 180 days past due.
6    Q. At some point did Dell Financial Services
7  charge off Mr. Brim's account?
8    A. Yes.
9    Q. Do you know when that occurred?
10   A. It occurred in May of 2005. I don't know the
11  exact date offhand.
12   Q. At the time of the charge-off what did Dell
13  Financial Services show as Mr. Brim's balance?
14   A. I don't -- I don't have that exactly with me.
15  I know it was $1,300 and change, I believe. Sorry.
16  I -- I don't know offhand.
17   Q. No, that's okay.
18      (Exhibit No. 5 marked)
19   Q. (BY MR. LANGLEY) Ms. Garlock, I'm showing you
20  what I've marked as Exhibit 5.
21   A. Uh-huh.
22   Q. Can you identify this document?
23      MR. LANGLEY: And, Penny, this is
24  Document 102.
25      THE WITNESS: Yes. This is -- actually

16

1  shows all the transactions processed on Mr. Brim's
2  account.
3    Q. (BY MR. LANGLEY) Is there anything on
4  Exhibit 5 that allows you to state with specificity the
5  balance as reflected in Dell Financial Services'
6  records at the time it charged off Mr. Brim's account?
7    A. Yes. That would be the total, which is
8  $1,381.01.
9    Q. Ms. Garlock, at some point I think you said
10  earlier this particular account was sold to Midland.
11  Is that accurate?
12   A. Yes, it was sold.
13   Q. Do you know what amount of the account was
14  sold to Midland?
15   A. No, I do not.
16   Q. Would it have been anything less than the
17  total amount at the time of the charge-off?
18   A. I do not know the answer to that question. I
19  apologize.
20   Q. Do you know if there are any Dell Financial
21  Services' records that have been produced that would
22  allow you to answer that question?
23   A. No.
24   Q. You also mentioned earlier that in August of
25  2010, Dell Financial Services was able to determine



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Rachel Garlock

January 7, 2011

---

**17**

1  that Mr. Brim's payment in November 2004 had been
2  misapplied to another customer's account. What was the
3  name of that customer, if you know?
4      A. Hilda Cervantes.
5      Q. Where does Ms. Cervantes live?
6      A. Los Angeles, California.
7      Q. And so is it fair to say that Ms. Cervantes
8  just got a $950 credit on her account?
9      A. Correct, yes. We do not show that we were
10 notified.
11     Q. So out of the blue she gets a $950 credit?
12     A. Correct.
13     Q. Did she ever call Dell Financial Services and
14 tell you this was a mistake?
15     A. No, sir.
16     Q. If she had, would your notes in your account
17 reflect that?
18     A. Yes, sir.
19         (Exhibit No. 6 marked)
20     Q. (BY MR. LANGLEY) I'm showing you what has
21 been marked as Exhibit 6, which bears the Bates
22 numbers 80 through 101.
23         Ms. Garlock, can you identify this
24 document?
25     A. These is -- is the notes and the information

**18**

1  from our system of record. This is where the
2  customers -- where we house our customers' accounts.
3      Q. Does this system have a name that's used
4  within Dell Financial Services?
5      A. Yes. It's called Fiserv.
6         THE REPORTER: Called what?
7         THE WITNESS: Fiserv. F -- do you
8  want -- do you need me to spell it?
9         MR. ANDRESS: Yes.
10        THE WITNESS: Okay. F-i-s-e-r-v.
11        THE REPORTER: Thank you.
12        THE WITNESS: Uh-huh.
13     Q. (BY MR. LANGLEY) What is the purpose of the
14 Fiserv system?
15     A. Fiserv houses all of the customer information;
16 customer's name, address, their transactions, payments.
17 Basically it's -- it's our system of record.
18     Q. Are the documents -- are the pages within
19 Exhibit 6 records that are prepared and maintained in
20 Dell Financial Services' regular course of business?
21     A. Yes, sir.
22     Q. Are the entries in these records made
23 contemporaneous with the events described?
24     A. Can you rephrase that? I'm sorry.
25     Q. For example, in some of the pages there are

**19**

1  notes regarding conversations with Mr. Brim.
2      A. Correct.
3      Q. You're familiar with those?
4      A. Yes, uh-huh.
5      Q. When a Dell Financial Services' representative
6  is having a conversation with a customer, are the notes
7  input into the system contemporaneous with that
8  conversation?
9      A. They are manually put into the system by
10 the -- by the agent.
11     Q. At or near the time of the conversation?
12     A. Correct, yes.
13     Q. So, in other words, there's not a time lag
14 between when the notes -- between when the conversation
15 is had and when the notes are entered?
16     A. There should not be. But, like I said, it's
17 manually entered by the agent.
18     Q. Once notes are entered on the system can they
19 be modified?
20     A. No.
21     Q. I want to ask you a few questions about some
22 of the specific items on Exhibit 6.
23     A. Okay.
24     Q. I note that at the top left of each page
25 there's some information typewritten?

**20**

1      A. Yes, sir.
2      Q. Is that information that is part of the system
3  or are those just notes provided to help the reader of
4  this document understand?
5      A. Yes, they were just notes provided to assist.
6      Q. So the notes on the top left are not part of
7  the Fiserv system?
8      A. Correct.
9      Q. Within what appears to be the screen shot on
10 each page at the upper right-hand corner there is a
11 date of 4/9/2010. Do you see that?
12     A. Yes, sir.
13     Q. Is that the date on which this particular
14 screen shot was printed?
15     A. Correct.
16     Q. On the first page of Exhibit 6, on the
17 left-hand side, it lists an account number, and then
18 beneath it it has the name "Jamon Brim"?
19     A. Yes, sir.
20     Q. Is Exhibit 6 and the screen shots contained
21 therein the entirety of Dell Financial Services' Fiserv
22 system as it relates to Mr. Brim's account?
23     A. It's certain screens within the system. It's
24 not -- it's every screen that we have in the system.
25     Q. What type of screens are not included in the



Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Rachel Garlock                                          January 7, 2011

21

1    pages marked collectively as Exhibit 6, if you know?
2        A.   I mean, like I said, we do have multiple
3    screens.  You know, we don't have the statement screens
4    listed in here.
5        Q.   What is a statement screen?
6        A.   The statement screen will show the agent what
7    information was listed on the statement.  So it will
8    slow the payment due date, any transactions.  And it --
9    and it goes by date of the statement.
10       Q.   If you need a minute to flip through to answer
11   this question, that's perfectly fine.  Based on your
12   knowledge of -- of this account and your knowledge of
13   the Fiserv system and -- and the document in front of
14   you, are there any screens missing that would reflect
15   any communications with Mr. Brim?
16       A.   No.  I mean, the -- the notes are all in
17   order.
18       Q.   So if there was a communication between Dell
19   Financial Services and Mr. Brim it would be reflected
20   in Exhibit 6?
21       A.   Yes.
22       Q.   Ms. Garlock, if you would turn to Page 4 of
23   Exhibit 6.  In the middle of the screen shot there are
24   the capital letters "OPNED."
25       A.   Uh-huh.

22

1        Q.   What does that mean?
2        A.   That's when the account was opened.
3        Q.   And are the numbers next to that entry
4    September 14th, 2004?
5        A.   Yes, sir.
6        Q.   And is that the date that Mr. Brim's account
7    was opened?
8        A.   Yes, sir.
9        Q.   Do you know if that was also the date that
10   Mr. Brim made a purchase of Dell products?
11       A.   The purchase date -- yes.  According to
12   Exhibit 1, the order date was September 14th.
13       Q.   Turn to Page 5 of Exhibit 6.  On the left-hand
14   side it says "CURR BAL."  Does that stand for current
15   balance?
16       A.   Yes, sir.
17       Q.   And next to it it says, "$1381.01"?
18       A.   Yes, sir.
19       Q.   Do you see that?  What does that current
20   balance reflect?
21       A.   That would be at the time of charge-off.  If
22   there was no other adjustments done, that's -- that's
23   the current balance?
24       Q.   Is there anything on the first five pages of
25   Exhibit 6 that allows you to identify with specificity

23

1    the date that Dell Financial Services charged off
2    Mr. Brim's account?  Strike that.  I'm going to ask you
3    an easier question.
4        A.   Okay.
5        Q.   Looking at Page 6 --
6        A.   Yes.
7        Q.   -- of Exhibit 6, is there anything on that
8    page that allows you to state with specificity the date
9    that Dell Financial Services charged off Mr. Brim's
10   account?
11       A.   Yes.
12       Q.   And what was that date?
13       A.   On May 16, 2005.
14       Q.   And how do you know that based on Page 6?
15       A.   This "CHG OFF" means charge-off, and that is
16   the charge-off date.
17       Q.   And this is in the lower left quadrant of the
18   screen shot on Page 6?
19       A.   Yes, sir.
20       Q.   Turning to Page 7 of Exhibit 6, in the top
21   center of the screen shot it says, "Payment History."
22       A.   Correct.
23       Q.   What is this screen or this part of the Fiserv
24   system designed to track?
25       A.   It holds the last six payments the customer

24

1    has -- has made.
2        Q.   And so if any payments have been made by
3    Mr. Brim as of the date the screen was printed, would
4    they be reflected on Page 7?
5        A.   Yes, the last six payments.
6        Q.   And so is it fair to say that according to
7    Dell Financial Services' records, on April 9th, 2010,
8    when this screen shot was printed, no payments had been
9    made on the account?
10       A.   That is correct.
11       Q.   Would you turn to Page 8, please?  In the top
12   left corner of the screen shot there is a term spelled
13   "ASHI"?
14       A.   Yes, sir.
15       Q.   What is that?
16       A.   The -- ASHI is our note screen.
17       Q.   Will all of the page that contain notes
18   regarding Mr. Brim's account have that designation in
19   the top left corner?
20       A.   Yes, sir.
21       Q.   And on the very top left corner of each
22   page -- we discussed these earlier, these -- these
23   notes about how to read the account notes.  And one of
24   them says, "Call notes to be read by date from bottom
25   to top"; is that accurate?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Rachel Garlock

January 7, 2011

**25**

1  A.  Correct, yes, sir.
2  Q.  So if we wanted to work through this
3  chronologically we would start at the bottom of each
4  page --
5  A.  Yes, sir.
6  Q.  -- And work towards the top?
7  A.  Yes, sir.
8  Q.  If you will, look at the first note on that
9  page.  Can you tell me when that note was entered?
10  A.  October 20th, 2004.
11  Q.  And immediately next to that 10/20/2004 date,
12  there is a "13:13."  What is that?
13  A.  That is a timestamp in military time.
14  Q.  And will those -- will the date and the time
15  reflect the time that the entry -- the date and time
16  the entry was actually made?
17  A.  Correct.
18  Q.  And is that true for each of the entries that
19  are contained in the notes within Exhibit 6?
20  A.  Yes, sir.
21  Q.  Within that first note there is a term CCI.
22  Do you see that?
23  A.  Yes, sir.
24  Q.  What does that stand for?
25  A.  "Customer called in."

**26**

1  Q.  And if the term "CCI" is used elsewhere in the
2  notes, does it mean the same thing?
3  A.  Yes, sir.
4  Q.  Does CCI ever mean anything other than
5  "customer called in"?
6  A.  Not that I know of.
7  Q.  Ms. Garlock, on Page 9 of Exhibit 6, under the
8  entry at the top of the page that bears a date of
9  December 2nd, 2004 with the time 15:56 --
10  A.  Yes, sir.
11  Q.  -- and the bottom line -- well, let me -- let
12  me back up.
13  Can you read for me in -- in layman's
14  English what that entry says?
15  A.  Okay.  "Conferenced the call with phone pay
16  escalations as per their advice gave ING number," and
17  then there's the phone number.
18  Q.  What is ING number?
19  A.  ING is short for iEnergizer.
20  Q.  What does that mean?
21  A.  It is one be of our third-party vendors.
22  Q.  Does this mean that Mr. Brim was given the
23  number to a third-party vendor on December 2nd, 2004?
24  A.  It doesn't actually -- I -- I do not know.  It
25  shows it conferenced the call and has the phone number,

**27**

1  so I do not -- I do not know if that was given to him
2  or not.
3  Q.  If you would, turn to Page 10 of Exhibit 6.
4  Could you read the entry that bears a date of
5  January 13, 2005, time 12:50?
6  A.  Okay.  From the bottom up?
7  Q.  Please.
8  A.  "Customer called in and says that he paid off
9  the account in full for $962.92 with the first
10  statement due date and says why he has a balance.  Told
11  to fax a bank statement for the payment research and
12  gave the fax number."  And then a name of Kevin.
13  Q.  Based on Dell Financial Services' records,
14  when did it first receive a bank statement, if ever,
15  from Mr. Brim?
16  A.  Can I go through the notes?
17  Q.  Yes.
18  A.  So when -- when we first got it -- I'm sorry.
19  I'm sorry.  Can you repeat the question?
20  Q.  Do Dell Financial Services' notes reflect
21  when, if ever, it received a bank statement from
22  Mr. Brim?
23  A.  Yes.
24  Q.  When was that?
25  A.  On January 27th it shows a copy of the bank

**28**

1  statement was forwarded.
2  (Exhibit No. 7 marked)
3  Q.  (BY MR. LANGLEY)  Let me show you what I've
4  marked as Exhibit 7.
5  MR. LANGLEY:  Penny, this does not have a
6  Bates number, but this is the version of the Redstone
7  Federal Credit Union bank statement that was received
8  pursuant to the subpoena.
9  MS. CAULEY:  Okay.
10  Q.  (BY MR. LANGLEY)  Ms. Garlock, have you seen
11  Exhibit 7 before?
12  A.  Yes, sir.
13  Q.  What is it?
14  A.  It is a copy of the customer's bank statement.
15  Q.  Is this similar to what Dell Financial
16  Services received from Mr. Brim on January 27, 2005?
17  A.  Yes, sir.
18  Q.  Was the bank statement marked as Exhibit 7
19  sufficient for Dell to determine what happened with
20  Mr. Brim's payment?
21  A.  No, sir.
22  Q.  Does Dell Financial Services accept a bank
23  statement alone as proof of payment?
24  A.  We can, yes.
25  Q.  In this situation, though, did Dell Financial



Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Rachel Garlock

January 7, 2011

---

29

1   Services accept the bank statement as sufficient proof
2   of payment?
3       A.   No, sir.
4       Q.   And why is that?
5       A.   There wasn't enough information to identify
6   exactly how the payment was made.
7       Q.   Looking at the bottom of the first page of
8   Exhibit 7 there's an entry on November 8th.
9       A.   Yes, sir.
10      Q.   Next to it, it says "Dell Financial Payment."
11  The amount is $954.12.  Do you see that?
12      A.   Yes, sir.
13      Q.   Next to the entry that says "Dell Financial"
14  there are some numbers, "04116"?
15      A.   Yes, sir.
16      Q.   Do you know what those numbers are?
17      A.   It's the date of the payment.  So it would be
18  November 6, 2004.
19      Q.   So those numbers do not in any way identify
20  the payment?
21      A.   Correct.
22      Q.   Going back to Page 10 of Exhibit 6, there's an
23  entry at the top of the screen shot for January 19th,
24  2005.  Do you see that?
25      A.   Yes, sir.

---

30

1       Q.   Would you read that entry?
2       A.   "Customer called in very upset why his payment
3   not posted.  That's why he is in collections already.
4   NASHI, same case, has happened to previous rep.  Wants
5   to talk to Dell manager not to sup.  He wants
6   American."
7       Q.   Is "sup" an abbreviations for supervisor?
8       A.   Yes, sir.
9       Q.   And when it says, "NASHI, same case has
10  happened to previous rep," is that just a reference to
11  the fact that the notes say that a similar call already
12  had been placed?
13      A.   Yes, sir.
14      Q.   Going back to the bottom of the screen shot on
15  Page 10 of Exhibit 6, is that the first occasion that
16  Dell Financial Services asked Mr. Brim to send
17  information?
18      A.   According to the notes, yes.
19      Q.   But as of January 19th, 2005, when Mr. Brim
20  called back in, had Dell Financial Services received
21  the information it requested?
22      A.   It does not show, no.
23      Q.   Turn to Page 12 of Exhibit 6.  At the bottom
24  of the screen shot there's an entry on January 25th,
25  2005.  Would you read that entry, please?

---

31

1       A.   "Customer called in asking if auto pay is
2   activated already or if we received the fax.  Rep said
3   no.  Transferred to DCC to verify."
4       Q.   What is auto pay?
5       A.   Auto pay is when the customer sets it up
6   for -- for Dell Financial Services to take the payment
7   out every month on their due date.
8       Q.   Based on the records that you have reviewed,
9   why would Mr. Brim have asked about auto pay if he was
10  contending that the payment already had been made in
11  full?
12      A.   I -- I do not know.
13           MS. CAULEY:   Object, calls for
14  speculation.
15      Q.   (BY MR. LANGLEY)  What does DCC mean in that
16  entry?
17      A.   I -- I do not know.
18      Q.   Turn to Page 16 of Exhibit 6.  There's an
19  entry at the top of the screen shot for May 23rd of
20  2005 at 16:28.
21      A.   Uh-huh, yes, sir.
22      Q.   Would you read that entry, please?
23      A.   "Customer called in regarding payment not
24  posted on the account for the amount of $954.12.
25  Balance on November 8, 2004, Check No. 041106, Redstone

---

32

1   Federal Credit Union."  And "Jojo."
2       Q.   Is the information entered here about the
3   balance, the check number, and the credit union
4   information provided by the customer?
5       A.   It -- it does not say.  I do not know.
6       Q.   Would it -- could it have come from someplace
7   else?
8       A.   Sure.  Yes.
9       Q.   Turn to Page 17 of Exhibit 6.  Based on the
10  entries on the screen shot on Page 17 of Exhibit 6, can
11  you tell whether or not Mr. Brim sent his bank
12  statement to Dell Financial Services again?
13      A.   Yes.
14      Q.   And did he send his bank statement again?
15      A.   Yes.
16      Q.   And on what date was that?
17      A.   September 8, 2005.
18      Q.   The note in the center of the page bearing a
19  time of 11:47 --
20      A.   Uh-huh.
21      Q.   -- what does that entry say?
22      A.   "Customer faxed bank statement, forward to
23  Diana Stearns to put a rush on research.  Will call
24  customer back," and then a phone number.
25      Q.   And so had Mr. Brim faxed his bank statement

---



Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Rachel Garlock

January 7, 2011

---

**33**

1  again shortly before or contemporaneous with that
2  entry?
3      A.  Yes.
4      Q.  And then what does the next entry state?
5      A.  "Called customer.  He will go to his bank
6  during lunch to get transaction detail report from his
7  bank."
8      Q.  Who made that entry?
9      A.  That was one of our recovery agents.
10     Q.  And do you know that based on the initials
11 that are immediately to the -- to the left of the date?
12     A.  Correct.  Correct.
13     Q.  And the two entries we just discussed appear
14 to have been made by someone with the initials AJT?
15     A.  Correct.
16     Q.  Do you know who that?
17     A.  Yes, I do.
18     Q.  Who is that?
19     A.  Angela Tennent.
20     Q.  Who is Diana Stearns, if you know?
21     A.  She was working in the cash department at the
22 time.
23     Q.  So on September 8, 2005, shortly after
24 Mr. Brim had just sent a second copy of his bank
25 statement, Dell Financial Services asked for a

---

**34**

1  transactional detailed report, correct?
2      A.  Correct.
3      Q.  Did Mr. Brim ever provide that transactional
4  detail report?
5      A.  No, sir.
6      Q.  Is "transactional detail report" a term of art
7  in your industry?
8      A.  I'm not sure "art."  Can you define that?
9      Q.  Let me ask a better question.
10     A.  Okay.
11     Q.  What is a transactional detail report?
12     A.  A transaction detail report is details of
13 payment made by the bank.  So it will show exactly how
14 that payment was made; either electronic, wire, check,
15 and will also show the -- the additional information,
16 if it was electronic or wire, what banking account
17 information it was sent to; if it was check, have the
18 check number.  Will also show where -- where the
19 payment was made to.  It will show -- also have
20 additional information such as the account number, a
21 name, and/or a social security number with it.
22     Q.  Earlier we had looked at Exhibit 4.  Do you
23 still have that in front of you?
24     A.  Yes.  It's right here.
25     Q.  And you had identified that as a transactional

---

**35**

1  detail report, correct?
2      A.  Yes, sir.
3      Q.  Is it uncommon for Dell Financial Services to
4  ask a customer to provide a transactional detail
5  report?
6      A.  No, sir.
7      Q.  This sort of thing happens regularly at Dell
8  Financial Services?
9      A.  Yes, sir.
10     Q.  And are banks usually willing to comply with
11 that?
12     A.  Yes, sir.
13     Q.  Does Dell Financial Services ever contact the
14 banks directly to request these type of documents?
15     A.  No, sir.
16     Q.  Turn to Page 18 of Exhibit 6.  On 10/21/05 at
17 14:33 there's an entry in the center of the page.
18     A.  Yes, sir.
19     Q.  Can you read that entry?
20     A.  "BBB advised to keep working with Angela and
21 advised she needs the transaction detail from his
22 bank."
23     Q.  What is BBB?
24     A.  Better Business Bureau.
25              (Exhibit No. 8 marked)

---

**36**

1      Q.  (BY MR. LANGLEY)  Let me show you what's been
2  marked as Exhibit 8 --
3      A.  Yes, sir.
4      Q.  -- which bears a Bates label --
5      MR. LANGLEY:  And, Penny, this is a
6  plaintiffs' Bates label of 0004.
7      Q.  (BY MR. LANGLEY)  Ms. Garlock, what is
8  Exhibit 8?
9      A.  It is the complaint activity report from the
10 Better Business Bureau.
11     Q.  Is this something that you have seen before?
12     A.  Not before two days ago.
13     Q.  Within the entries on Exhibit 8 there is
14 someone identified from Dell Financial Services as
15 Esperanza Clouston?
16     A.  Yes, sir.
17     Q.  Do you know Esperanza Clouston?
18     A.  Yes, sir.
19     Q.  Is Esperanza Clouston the person at Dell
20 Financial Services who's charged with communicating
21 with the Better Business Bureau?
22     A.  At the time, yes.  I'm not -- I apologize.
23 I'm not sure what she does now.
24     Q.  Are the entries that purport to have come from
25 Esperanza Clouston on behalf of Dell Financial Services

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

37

1    accurate -- complete and accurate to the best of your
2    knowledge?
3        A.  Yes, sir.
4            MS. CAULEY:  Object to form and to the
5    witness' knowledge.  She said she had not seen this
6    before two days ago.  And she's not personally
7    responsible for the information contained in Exhibit 8.
8        Q.  (BY MR. LANGLEY)  Ms. Garlock, you're here
9    today on behalf of Dell Financial Services, correct?
10       A.  Yes, sir.
11       Q.  And you've reviewed the document marked as
12   Exhibit 8 prior to this deposition?
13       A.  Prior to today.
14       Q.  Prior to today?
15       A.  Two -- two days ago, yes.
16       Q.  And you've had an opportunity to determine
17   whether the documents and the communications are what
18   they purport to be?
19       A.  Can you rephrase that?  I'm sorry.
20       Q.  Do you have any reason to doubt that the
21   entries that purport to have been made by Dell
22   Financial Services on the document marked as Exhibit 8
23   are not, in fact, complete and accurate entries of what
24   Dell told the Better Business Bureau?
25       A.  No.

38

1        Q.  Staying with Page 18 of Exhibit 6, the entry
2    above the one we just discussed --
3        A.  Uh-huh.
4        Q.  -- as dated November 8, 2005, what is that
5    entry?
6        A.  "Received credit dispute from Equifax," and it
7    gives a control number.  "Customer disputes amount.  I
8    verified info.  Advised the account charged off with
9    $1,381 balance.  Advised the account was closed at
10   credit grantor's request."
11           (Exhibit No. 9 marked)
12       Q.  (BY MR. LANGLEY)  I'm showing you what I've
13   marked as Exhibit 9 --
14       A.  Uh-huh.
15       Q.  -- which is a four-page document that includes
16   Dell Bates labels 42, 41, 39, and 40.
17           Ms. Garlock, can you identify this
18   document?
19       A.  I'm -- I'm not very familiar.  I -- credit
20   bureau disputes is not my field of work.
21       Q.  Do you know what this document is?
22       A.  I -- I know what it is, yes.
23       Q.  What -- what is it?
24       A.  Credit bureau dispute form.
25       Q.  Do you know what the purpose of these forms

39

1    is?
2        A.  Just from personal experience, it's a dispute
3    that you do with the credit bureau.
4        Q.  Do you have anything do at all with responding
5    to credit bureaus upon receipt of --
6        A.  No, sir.
7        Q.  -- disputes?
8        A.  No, sir.
9        Q.  Turn to Page 19 of Exhibit 6.  At the bottom
10   of the page there is an entry on 11/8/2005.
11       A.  Yes, sir.
12       Q.  What is that entry?
13       A.  "Gave collections VAK phone as further
14   contact."
15       Q.  What is VAK?
16       A.  It's one of our collection agencies.
17       Q.  Turn to Page 21 of Exhibit 6.  How many
18   separate entries are there on Page 21 of Exhibit 6?
19       A.  There's three separate entries.
20       Q.  Does that mean there are three separate calls?
21       A.  No.  No, sir.
22       Q.  How many different calls does -- strike that.
23           How many different calls are reflected on
24   Page 21 of Exhibit 6?
25       A.  Two.

40

1        Q.  And which is the first one?
2        A.  October 9th of 2006.
3        Q.  At what time?
4        A.  15:45.
5        Q.  And what is the entry?
6        A.  "Customer called in to know about the
7    collection's phone number.  Gave the number and asked
8    the customer to contact them.  Paul."
9        Q.  Okay.  And what's the second entry?
10       A.  For the customer call in?
11       Q.  Yes.
12       A.  Okay.  "Customer called in.  Wanted to inquire
13   about the account and informed Tim that he has to get
14   in touch with the ARS department and he disconnected
15   the call.  Don."
16       Q.  What is the ARS department?
17       A.  I believe it's the collection agency.
18       Q.  What does it mean to "disconnect the call"?
19       A.  The customer hung up.
20       Q.  Based on Dell Financial Services' records, is
21   that the last direct communication that it had with
22   Mr. Brim?
23       A.  Yes, sir.
24       Q.  At the time of that last communication with
25   Mr. Brim on October 9th, 2006, had Mr. Brim provided



Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Rachel Garlock

January 7, 2011

---

**41**

1  the transactional detail report requested by Dell
2  Financial Services?
3      A.  No, sir.
4          MR. LANGLEY:  Do y'all want to take a
5  short break, maybe two or three minutes?
6          MR. ANDRESS:  Sure.
7          MR. LANGLEY:  Okay.
8          Penny, are you okay with that.
9          MS. CAULEY:  That's fine.
10         THE VIDEOGRAPHER:  We are off the record
11  at 10:55.
12         (Recess from 10:55 a.m. to 11:05 a.m.)
13         THE VIDEOGRAPHER:  We are on the record
14  at 11:05.
15     Q.  (BY MR. LANGLEY)  Ms. Garlock, how did
16  Mr. Brim make his payment in November of 2004?
17     A.  It was made over the phone.
18     Q.  Can you explain that?
19     A.  Customer calls in and the -- the checking
20  account information is taken, so the customer advices
21  how much he wants to pay and then we take their bank
22  account routing number and checking account number.
23     Q.  Under the terms of the Dell Financial Services
24  credit agreement, is there any advantage to paying it
25  that way?

---

**42**

1      A.  It's -- it will get credited -- the receive
2  date will be for that day.
3      Q.  At the time Dell Financial Services sold
4  Mr. Brim's account to Midland, did Dell Financial
5  Services believe the account was valid and payable?
6      A.  No.
7      Q.  At the time of the sale -- at the time -- let
8  me ask the question again.
9      A.  Okay.  Yeah.  Sorry.
10     Q.  At the time Dell Financial Services sold
11  Mr. Brim's account to Midland --
12     A.  Uh-huh.
13     Q.  -- did Dell Financial Services believe the
14  account was due and payable?
15     A.  Yes.  Sorry.
16     Q.  And -- and did Dell Financial Services, in
17  fact, believe the account was due and payable until
18  August of 2010?
19     A.  Yes, sir.
20     Q.  And so if Midland had contacted Dell in August
21  of 2008 and inquired about the account, what would Dell
22  Financial Services' response have been?
23         MS. CAULEY:  Object, calls for
24  speculation.
25     Q.  (BY MR. LANGLEY)  You can go ahead and answer.

---

**43**

1      A.  Okay.  That -- that there was still a balance
2  on the account and we still had not received proof of
3  payment for this account.
4      Q.  And would your answer be the same if Midland
5  called in in March of 2009?
6      A.  Yes.
7      Q.  And would your answer be the same if Midland
8  had contacted Dell in February of 2010?
9      A.  Yes.
10         MR. LANGLEY:  I would like to offer
11  Exhibits 1 through 9, and I have no further questions
12  at this time.
13         Thank you very much.
14         THE WITNESS:  Okay.  Thank you.
15             EXAMINATION
16  BY MS. CAULEY:
17     Q.  Ms. Garlock --
18     A.  Yes, ma'am.
19     Q.  -- my name is Penny Cauley.
20     A.  Yes, ma'am.
21     Q.  I represent Jamon Brim in this action that
22  we're here about today.  Can you tell me how long
23  you've been employed at Dell?
24     A.  Yes.  I have been employed with Dell since
25  August of 2002.

---

**44**

1      Q.  And that -- during that time since August of
2  2002 have you always worked as an accounts receivable
3  supervisor?
4      A.  No, ma'am.
5      Q.  How long have you been an accounts receivable
6  supervisor?
7      A.  Since August of 2009.
8      Q.  What were your duties prior to August of 2009?
9      A.  I would assist with payment research as well
10  as posting payments for -- for about three years.
11     Q.  So from August 2006 to August of 2009, you
12  were assisting with payment research and also posting
13  of payments?
14     A.  Yes, ma'am.
15     Q.  And what did you do before that?
16     A.  Prior to that I was in the transactional
17  collections department.
18     Q.  And did you work as a collector?
19     A.  No, ma'am.  I was -- I apologize.  I don't
20  remember what my title was.  But we actually supported
21  the agencies.  So we would provide any information
22  that -- that they needed from us or any assistance that
23  they needed.
24     Q.  And those are outside agencies who were
25  retained by Dell to collect on the accounts?

---



# ESQUIRE
an Alexander Galle Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Rachel Garlock                                                       January 7, 2011

45

1    A.  Yes, that's correct.
2    Q.  Okay.  And during your time from August of
3  2006 to August of 2009 when you were working as an
4  assistant in payment research --
5    A.  Yes, ma'am.
6    Q.  -- can you tell us, please, how many employees
7  worked in the payment research area of Dell Financial?
8    A.  Three specifically titled for payment
9  research.
10    Q.  I'm sorry?
11    A.  Three.
12    Q.  Okay.  And what was that afterwards?
13    A.  The -- specifically titled for payment
14  research.
15    Q.  Okay.  And in 2006, from August forward, did
16  you ever, as part of your duties in payment research,
17  research Mr. Brim's payment to learn what happened with
18  his payment?
19    A.  No, ma'am.
20    Q.  And did you ever review the account or perform
21  any type of payment research in 2007?
22    A.  No, ma'am.
23    MR. ANDRESS:  Ms. Cauley, this is
24  Keith Andress.  For the purposes of your question, are
25  you asking the witness in her individual capacity or

46

1  Dell?  Could you please specify.
2    MS. CAULEY:  Yes.  I'm asking in her
3  individual capacity as an employee of Dell Financial
4  who was assigned and worked in the payment research
5  department.
6    Q.  (BY MS. CAULEY)  Ms. Garlock, did you ever
7  perform any type of payment research on Mr. Brim's
8  account any time during -- from August of 2006 to
9  August of 2009 while you were working in the payment
10  research area?
11    A.  No, ma'am.
12    Q.  Now, if you will, please, refer to Defendants'
13  Exhibit 4, which is the transactional research
14  information.
15    A.  Yes, ma'am.
16    Q.  And on that Exhibit 4, on Page 2, it shows
17  that it was a telephone?
18    A.  Correct.
19    Q.  Okay.  And the -- the payment of $954.12 did
20  actually go to Dell Financial Services on November 6 of
21  2004, correct?
22    A.  Yes, ma'am.
23    Q.  So Dell actually got their money for
24  Mr. Brim's account on November 8th of 2004?
25    A.  Yes, ma'am.

47

1    Q.  It's just that Dell Financial posted it to
2  another customer's account?
3    A.  Correct.
4    Q.  And as part of your duties in payment
5  research, have you had other accounts that you've dealt
6  with where payments were posted to other customers'
7  accounts rather than the correct account?
8    A.  Yes, ma'am.
9    Q.  And that's not uncommon at Dell Financial, is
10  it?
11    MR. ANDRESS:  Object.  What do you mean
12  "uncommon"?  I'm not -- I don't really understand the
13  relevance of this question in regards to the trial
14  subpoena sent by Midland.
15    MS. CAULEY:  Well, there's been a lot of
16  testimony about what Mr. Brim did or did not do, and
17  I'm questioning Ms. Garlock on what Dell Financial did
18  or did not do.
19    MR. ANDRESS:  And I think she's testified
20  to that, and now you're asking about other accounts.
21  And I think that's outside the scope of this
22  deposition.  She certainly has --
23    MS. CAULEY:  I'll rephrase my question.
24    Q.  (BY MS. CAULEY)  Ms. Garlock, in your
25  three years in the payment research department did you

48

1  handle other customer disputes wherein the customer
2  claimed they had made a payment and it had actually
3  been misapplied to another customer's account?
4    A.  Yes, ma'am.
5    Q.  And the notes, if you will go, please -- I
6  believe it's Exhibit 6.  It's the Fiserv account notes.
7    A.  Yes, ma'am.
8    Q.  Exhibit 6.
9    A.  Uh-huh.
10    Q.  If you could pull Exhibit 6.
11    A.  Yes, I have that here.
12    Q.  Okay.  And if Midland Funding or Midland
13  Credit Management had made any communications with
14  Dell, those communications would be reflected in
15  Defendants' Exhibit 6; is that correct?
16    A.  I do not know the answer to that question.
17    Q.  In preparing for this deposition, did you
18  review any documentation whatsoever regarding any
19  communications from Midland Funding or Midland Credit
20  Management to Dell after the sale of this account to
21  Midland Funding regarding Mr. Brim's dispute the
22  account had previously been paid in full?
23    A.  No, ma'am, I did not.
24    Q.  And if Midland Credit Management's witness
25  testified that Midland Credit Management and Midland



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Rachel Garlock

January 7, 2011

**49**

1 Funding never contacted Dell Financial Services you
2 would agree with that, correct?
3    A.  I --
4       MR. LANGLEY:  Objection, because it
5 assumes facts not in evidence as phrased.
6    Q.  (BY MS. CAULEY)  Ms. Garlock, if Midland
7 Credit Management testifies at trial regarding this
8 case and their witness testified that Midland Credit
9 Management and Midland Funding never contacted Dell
10 Financial Services in response to a credit dispute from
11 Mr. Brim, you don't have any information to disagree
12 with that; is that correct?
13    A.  I do not have any information on that.
14    Q.  And if you would please turn to Page 8 of
15 Exhibit 6.
16    A.  Yes, ma'am.
17    Q.  And previously you testified regarding the
18 entry of October 20th, 2004?
19    A.  Yes, ma'am.
20    Q.  At that -- on that entry it indicates that the
21 customer called in and wanted the address changed,
22 which was done.
23    A.  Uh-huh.
24    Q.  And then the statement was to be resent; is
25 that correct?

**50**

1    A.  That's what the notes show, yes.
2    Q.  Okay.  And then the notes go on to say,
3 "Informed about a 25-day grace period, due date being
4 November 4th, balance being $934.78"; is that correct?
5    A.  Yes, ma'am.  Yes, ma'am.
6    Q.  Okay.  And at that time the notes indicate
7 that Mr. Brim wanted to make a payment by CC?
8    A.  Yes, ma'am.
9    Q.  And is "CC" credit card?
10    A.  Yes, ma'am.
11    Q.  And then if you go up to the next entry on
12 October 20th, 2004 at 13:14, is that a continuation of
13 the first entry note?
14    A.  Yes, ma'am, uh-huh.
15    Q.  All right.  And that is a continuation about,
16 "Informed him about balance transfer check and other
17 modes of payment"; is that right?
18    A.  Yes, ma'am.
19    Q.  Okay.  Then if you'll turn to Page 9, there's
20 an entry -- if you'll look at the entry dated
21 December 2nd, 2004 at 15:52?
22    A.  Yes, ma'am.
23    Q.  Can you please read that entry for us?
24    A.  "Customer called in to say that he has paid
25 the amount over the phone for full balance on the

**51**

1 account, which is -- was made over the phone.
2 Transferred to phone pay escalation."
3    Q.  Okay.  And do you know the employee
4 represented by the initials NN1?
5    A.  No, ma'am.
6    Q.  But according to Dell Financial's notes, as of
7 December 2nd, less than 30 days after the payment was
8 made, Mr. Brim called in stating that he had made the
9 payment over the phone and his call was transferred to
10 phone pay escalations?
11    A.  Yes, ma'am.
12    Q.  Now, this iEnergizer, where is that company
13 located?
14    A.  They are located in India.
15    Q.  And this company is responsible for posting
16 payments on behalf of Dell Financial?
17    A.  They're responsible for taking the payments.
18    Q.  For taking the payments and entering the
19 account information to where the payment will be
20 posted?
21    A.  Yes, ma'am.
22    Q.  And there are no notes contained within
23 Exhibit 6 regarding any communications from Dell
24 Financial to iEnergizer regarding a request for
25 research on this payment, correct?

**52**

1    A.  Not -- not that I can see, no.
2    Q.  And if you'll turn to Page 10, the first entry
3 on January 13, 2005 --
4    A.  Uh-huh.
5    Q.  -- "The customer called in and says that he
6 paid off the account in full for $962.92 within the
7 first statement due date and says why he has a balance,
8 told to fax the bank statement for payment research and
9 gave the fax number," correct?
10    A.  Correct.
11    Q.  On this entry of January 13th, 2005, there's
12 no notation that any other document other than a bank
13 statement was necessary?
14    A.  Correct.
15    Q.  Okay.  And then on the entry for January 19th,
16 2005, it indicates that Mr. Brim called in and was very
17 upset that his payment was not posted and he was in
18 collections already?
19    A.  Yes, ma'am.
20    Q.  And if you'll turn to Page 11 on January 19th,
21 2005, 14:33 --
22    A.  Yes, ma'am.
23    Q.  -- "Customer called in regarding payment.
24 Told that not received.  Told to fax bank statement
25 NT."  I guess that's the rest of statement?



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

53

1    A.  Yes, ma'am.

2    Q.  Okay.  So, again, Mr. Brim was told to fax

3    another bank statement but was never told any other

4    information would be necessary?

5    A.  At that time, yes.

6    Q.  And if you'll go back to Page 7.

7    A.  Okay.

8    Q.  As of the date that Exhibit 6 was printed

9    there's no account payment showing.  But as you sit

10   here and testify today on behalf of Dell Financial

11   there's no dispute that full payment was made by

12   Mr. Brim?

13   A.  Can you rephrase that question?  I'm sorry.

14   Q.  Certainly.  On Page 7 -- you testified in

15   response to Mr. Langley's questions that there was no

16   payment evidenced on Page 7 of Defendants' Exhibit 6;

17   is that right?

18   A.  Correct.  As of April 9, 2010, yes, there

19   was -- there shows no payments received for this

20   customer.

21   Q.  Thank you.  And as you sit here today, Dell

22   Financial now has confirmation that it did, in fact,

23   receive payment in full from Mr. Brim on November 6,

24   2004?

25   A.  That was the date that the payment was made to

54

1    Dell Financial Services, but Dell Financial Services

2    did not locate that payment until August of 2010 when

3    we got the transaction detail report.

4    Q.  Right.  But we looked at Exhibit 4, the

5    transactional detail report --

6    A.  Uh-huh.

7    Q.  -- and it indicates that Dell Financial

8    actually received the money on November 6 of 2004,

9    correct?

10   A.  Correct.  The money was received.  It was

11   posted to another customer's account.

12   Q.  Right.  But Dell received the money?

13   A.  Correct.

14   Q.  Are any of the notes represented in Exhibit 6,

15   were any of those notes entered by you personally?

16   A.  No, ma'am.

17   Q.  Have you had any conversations with any of the

18   individuals who actually entered any of the notes

19   represented in Exhibit 6?

20   A.  No, ma'am.

21   Q.  Have you had any conversations with any other

22   employees at Dell Financial regarding Mr. Brim's

23   account?

24   A.  I did have one of my employees assist in the

25   research of this account.

55

1    Q.  And who was that?

2    A.  Ann Mendiola.  Do you need me to spell her

3    last name?

4    Q.  Yes, please.

5    A.  Okay.  M-e-n-d-i-o-l-a.

6    Q.  And when did you request Ms. Mendiola to

7    assist you in the research of this account?

8    A.  I don't know the exact date, but I believe it

9    was in August of 2010.

10   Q.  So even when you became the accounts

11   receivables supervisor in August of '09, you retained

12   some responsibilities for payment research?

13   A.  Yes.  It was -- it's my team that handles the

14   payment research cases.

15   Q.  And were you the person actually responsible

16   for receiving Exhibit 4 and researching this payment

17   that was made to Dell Financial?

18   A.  Yes, ma'am.

19       MR. ANDRESS:  And, Penny, can you clarify

20   the date?  You say she became responsible for

21   researching.  What date are you talking about?

22       MS. CAULEY:  I'm sorry.  She testified

23   she became the supervisor in August of '09, and then

24   she just testified that in August 2010 she was

25   responsible for researching the payment made to Dell

56

1    Financial at that time.

2        MR. ANDRESS:  Okay.  Fair.  Thank you.  I

3    just wanted to make sure that we were not unclear about

4    2004 versus 2009, 2010.

5        THE WITNESS:  Uh-huh.

6    Q.  (BY MS. CAULEY)  Other than Ms. Mendiola, have

7    you had conversations with anyone else at Dell

8    Financial?

9    A.  Just the Dell Financial counsel.

10   Q.  Okay.  And have you had any conversations with

11   any employees at Midland Credit Management?

12   A.  No, ma'am.

13   Q.  If you'll turn -- let me see if I can -- to

14   Page 18 in Exhibit 6.

15   A.  Yes, ma'am.

16   Q.  The only entry that is contained within

17   Exhibit 6 regarding any type of notice filed with the

18   Better Business Bureau is the entry on October 21st,

19   2005?

20   A.  Yes, ma'am.

21   Q.  There's no entry in Dell Financial's notes

22   regarding when that complaint filed with the Better

23   Business Bureau was actually received?

24   A.  Not in the notes of the system, no.

25   Q.  And you haven't had any conversations with



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Rachel Garlock

January 7, 2011

57

1   Ms. Esperanza Clouston?
2       A.  No, ma'am.
3       Q.  And I believe you testified that you don't
4   have any responsibility with respect to the handling of
5   disputes through the credit reporting agencies?
6       A.  That is correct.
7       Q.  And you're not familiar with the process of an
8   ACDV or any of Dell Financial's responses?
9       A.  That is correct.  I'm not familiar with that.
10      Q.  If you'll turn to Page 19 of Exhibit 6.
11      A.  I'm sorry.  What was after Page 19?
12      Q.  Page 19 of Exhibit 6.
13      A.  Okay.
14      Q.  And the entry for November 8th, 2005 at 15:28,
15  the very -- the very first entry on the bottom of the
16  page.
17      A.  Okay.
18      Q.  Does that look like a partial note to you
19  since it says, "Gave collection back phone as further
20  contact"?
21      A.  I apologize.  I'm not sure what you mean by
22  "partial."
23      Q.  Well, it doesn't indicate that Mr. Brim called
24  in.
25      A.  Correct.

58

1       Q.  But it does indicate that a phone number was
2   given as further contact.
3       A.  Uh-huh.
4       Q.  In your reading of that note, would you
5   presume that Mr. Brim had, in fact, called in on
6   November 8th, 2005?
7       A.  No.  I would not know why that note was placed
8   on there.
9       Q.  So you have no information about why a number
10  was given or who it was given to?
11      A.  Correct.  I have no information on that.
12      Q.  And if you look at the note for
13  November 15th, 2005, there is an entry that a dispute
14  was received from TransUnion with a control number,
15  correct?
16      A.  I'm sorry.  What was that date again?
17      Q.  November 15th, 2005.  It's on Page 19.
18      A.  Yes.  Yes, according to the notes it is
19  showing a credit bureau dispute was received.
20      Q.  Are you familiar with the agreement governing
21  the sale of accounts between Dell Financial and Midland
22  Funding?
23      A.  No, ma'am.
24      Q.  Have you reviewed the agreement governing the
25  sale of accounts between Dell Financial and Midland

59

1   Funding?
2       A.  No, ma'am.
3       Q.  And to the best of your knowledge, Dell
4   Financial never contacted Redstone Federal Credit Union
5   to research any further the payment by Mr. Brim in
6   2004, 2005, or 2006?
7       A.  Correct.  Based on the information that I have
8   seen I do not show that.
9       Q.  Are you familiar with what documents are
10  provided when Dell Financial sells an account?
11      A.  No, ma'am.
12          MS. CAULEY:  That's all the questions I
13  have.  Thank you, Ms. Garlock.
14          THE WITNESS:  Thank you.
15          MR. LANGLEY:  Keith, do you have any?
16          MR. ANDRESS:  I don't.
17          MR. LANGLEY:  I've got just a couple of
18  follow-ups to Ms. Cauley's questions.
19          FURTHER EXAMINATION
20  BY MR. LANGLEY:
21      Q.  Ms. Garlock, Ms. Cauley had asked you some
22  questions about an entry at the bottom of Page 19 of
23  Exhibit 6.
24      A.  Yes, sir.
25      Q.  And the entry appears to have been made by

60

1   someone whose employee code is LW1.
2       A.  Okay.  Yes, sir.
3       Q.  If you'll look at the preceding page, which is
4   Page 18 of Exhibit 6 --
5       A.  Uh-huh.
6       Q.  -- is that the same person who made the entry
7   at the top of the screen shot on Page 18?
8       A.  Yes, it is.  And the same time, it looks like.
9       Q.  And based on that information, do you think
10  that the entry at the bottom of Page 19 that Ms. Cauley
11  asked you about is just a continuation of the entry at
12  the top of Page 18?
13      A.  Yes.  Based on the initials, the date, and the
14  time, yes, that would be a continued note.
15      Q.  Ms. Garlock, sometimes a bank statement alone
16  is sufficient for Dell Financial Services to track a
17  payment, correct?
18      A.  Yes, that's correct.
19      Q.  In the instance that we're here about today,
20  though, it was not?
21      A.  Correct.
22      Q.  Ms. Cauley asked you some questions about when
23  the payment was received?
24      A.  Yes.
25      Q.  Take a look at Exhibit 7, which is the bank



an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Rachel Garlock

January 7, 2011

61

1   statement from Redstone Federal Credit Union.
2       A.  Yes, sir, uh-huh.
3       Q.  Is there anything on that bank statement that
4   proved to Dell Financial Services that it had, in fact,
5   received the money paid by Mr. Brim?
6       A.  I mean, it shows that it -- it has our name.
7   But even with our name, especially with on-line
8   payments, stuff like that, anybody could have entered
9   that.  So at this time when we -- of the date of the
10  bank statement, I would say, no, it -- it still doesn't
11  show proof that we actually got the payment.  It shows
12  proof that a payment is showing to be sent to Dell
13  Financial Services.
14      Q.  Was the first proof that Dell Financial
15  Services had that the payment was actually received by
16  Dell the transactional detail report marked as
17  Exhibit 4?
18      A.  Uh-huh.  Yes, this was the first proof that we
19  actually showed that -- that we were actually able to
20  locate that the payment was indeed at Dell Financial
21  Services --
22      Q.  If you would, look at --
23      A.  -- for that date.
24      Q.  Oh, I'm sorry.
25      A.  That's okay.

62

1       Q.  If you would, look at Exhibit 8.
2       A.  Yes, sir.
3       Q.  Does Dell Financial Services have a copy of
4   this Better Business Bureau complaint activity report
5   in its files?
6       A.  Yes.
7       Q.  And is it Dell's practice to maintain copies
8   of Better Business Bureau reports when complaints
9   arise?
10      A.  Yes, sir.
11          MR. LANGLEY:  No further questions.
12          MS. CAULEY:  I have nothing further.
13          MR. LANGLEY:  Thank you, Ms. Garlock.
14          THE WITNESS:  Okay.  Thank you.
15          THE VIDEOGRAPHER:  We are off the record
16  at 11:31.
17          (Proceedings concluded at 11:31 a.m.)
18
19
20
21
22
23
24
25

63

1           CHANGES AND SIGNATURE
    RACHEL GARLOCK
2   JANUARY 7, 2011
3   PAGE  LINE   CHANGE              REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

64

1   _____
2   _____
3   _____
4   _____
5   _____
6
7       I, RACHEL GARLOCK, have read the foregoing
    deposition and hereby affix my signature that same is
    true and correct, except as noted above.
8
9
            _____
            RACHEL GARLOCK
10
11  THE STATE OF _____)
    COUNTY OF _____)
12
13      Before me, _____, on this
14  day personally appeared RACHEL GARLOCK, known to me (or
15  proved to me under oath or through
16  _____) (description of identity card or
17  other document) to be the person whose name is
18  subscribed to the foregoing instrument and acknowledged
19  to me that they executed the same for the purposes and
20  consideration therein expressed.
21      Given under my hand and seal of office this
22  _____ day of _____, 2011.
23
24          _____
            NOTARY PUBLIC IN AND FOR
25          THE STATE OF _____


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Rachel Garlock

January 7, 2011

```
                                                    65
1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
2
        JAMON T. BRIM,          )
3          Plaintiff,           )
                                )
4       VS.              ) CA NO. 5:10-CV-369-IPJ
                                )
5       DELL FINANCIAL SERVICES,  )
        LLC, ET AL              )
6          Defendants.          )
7
8              REPORTER'S CERTIFICATION
             DEPOSITION OF RACHEL GARLOCK
9                 JANUARY 7, 2011
10         I, JANALYN REEVES, a Certified Shorthand Reporter
11      in and for the State of Texas, do hereby certify to the
12      following:
13         That the witness, RACHEL GARLOCK, was duly sworn by
14      me and that this transcript of the oral deposition is a
15      true record of the proceedings held and the testimony
16      given by the witness;
17         That the original transcript, along with any
18      exhibits marked therein, was submitted on _____,
19      2011, to _____ for examination and
20      signature by the witness;
21         That pursuant to information given to me at the
22      time said testimony was taken, the following includes
23      counsel for all parties of record:
24          Ms. Penny Hays Cauley, Attorney for the
        Plaintiff
25
```

```
                                                    66
1           Mr. Eric B. Langley, Attorney for Midland
        Credit Management
2           Mr. D. Keith Andress, Attorney for the Dell
        Financial Services
3
4           That $_____ is the
5       deposition officer's charges to the Defendants for
6       preparing the original deposition transcript and any
7       copies of exhibits;
8           I further certify that I am neither counsel
9       for, related to, nor employed by any of the parties or
10      attorneys in the action in which this proceeding was
11      taken, and further that I am not financially or
12      otherwise interested in the outcome of the action.
13          I further certify that before the completion
14      of the deposition, the Deponent and/or the
15      Plaintiff/Defendant did request to review the
16      transcript.
17          Certified to by me this _____ day of
18      _____, 2011.
19
20
21          JANALYN REEVES, Texas CSR 3631
            Expiration Date 12/31/2012
22          3101 Bee Caves Road
            Centre II, Suite 220
23          Austin, Texas  78746
            (512) 328-5557
24          Firm Registration 283
25      EBS No. 199789
```



Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com