FILED
2011 Apr-11  AM 09:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT A

**1**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

JAMON T. BRIM,                    )
                                  )
        Plaintiff,                )
              CIVIL ACTION FILE   )
vs.        NO. 5:10-CV0369-IPJ    )
                                  )
DELL FINANCIAL SERVICES, LLC, et  )
al,                               )
                                  )
        Defendants.               )
                                  )

VIDEOTAPED DEPOSITION OF
VICKI BANKS
January 21, 2011
1:27 p.m.

King & Spalding, LLP
1230 West Peachtree Street
Atlanta, Georgia

Robin K. Ferrill, CCR-B-1936, RPR

**3**

INDEX

VIDEOTAPED DEPOSITION OF
VICKI BANKS
January 21, 2011

EXAMINATION BY                    PAGE
Ms. Cauley                    5, 67
Mr. Langley                   43


DESCRIPTION OF EXHIBITS
EXHIBIT  IDENTIFICATION             PAGE
1 Letter to Equifax from Brim, 7/29/08      9
2 Archived dispute                 16
3 Archived dispute letter from Brim,     24
  3/09
4 Automated Consumer Dispute Verification  25
5 Maintenance sheet summary            29
6 Automated Consumer Dispute Verification  32
7 Terminal audit trails            36
8 Universal Data Form              43

(Original exhibits attached to the
Original transcript.)

**2**

APPEARANCES OF COUNSEL

On behalf of the Plaintiff
PENNY HAYS CAULEY, Attorney At Law (via phone)
    Hays Cauley, P.C.
    549 West Evans Street
    Suite E
    Florence, South Carolina  29501
    843.665.1717


On behalf of the Defendants
ERIC B. LANGLEY, Esquire (via phone)
    Balch & Bingham LLP
    1901 Sixth Avenue North
    Suite 1500
    Birmingham, Alabama 35203
    205.251.8100
    elangley@balch.com


On behalf of the Witness
K. ANN BROUSSARD, Attorney At Law
    King & Spalding, LLP
    1180 Peachtree Street, N.E.
    Atlnata, Georgia   30309
    404.572.4600
    abroussard@kslaw.com


ALSO PRESENT:
    Brandon Brantley, Videographer

**4**

VIDEOTAPED DEPOSITION OF
VICKI BANKS
January 21, 2011

(Reporter disclosure made pursuant to Article 8.B. of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia.)

THE VIDEOGRAPHER:  This is Tape Number 1 of the videotaped deposition of Vicki Banks on January 21st, 2011.

The court reporter is Robin Ferrill. My name is Brandon Brantley.  I'm the videographer.

Counsel, please identify yourselves and the witness will be sworn in.

MS. CAULEY:  My name is Penny Cauley.  I represent Jamon Brim.

MR. LANGLEY:  My name is Eric Langley.  I represent Midland Credit Management.

MS. BROUSSARD:  And my name is Ann Broussard.  I represent third-party Equifax Information Services, L.L.C.

VICKI BANKS, having been first duly sworn, was examined and testified as follows:



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

5

EXAMINATION

BY-MS.CAULEY:

Q.   Miss Banks, my name is Penny Cauley. And as I indicated a few minutes ago, I represent Mr. Brim in an action that he has filed against Midland Credit Management.

And do you understand that you're here today pursuant to a trial deposition subpoena that was sent out?

A.   Yes.

Q.   And will you state your name for the record, please?

A.   Yes.  My name is Vicki Banks.

Q.   And are you currently employed?

A.   Yes.

Q.   Can you tell us who -- by whom you're employed?

A.   Yes.  I am employed by Equifax Information Services, L.L.C.

Q.   And what is your position at Equifax?

A.   I am a consumer research analyst.

Q.   What do your duties include as a consumer research analyst?

A.   My duties include assisting

6

consumers with various disputes that they may have.  I also support our outside counsel when there is a lawsuit filed.  I am responsible for the production of the documents that are used in our litigation cases.

Q.   Have you had an opportunity to review seven exhibits that were provided to your counsel?

A.   Yes, I have.

Q.   And other than -- I sent, I believe, eight exhibits, excuse me.

The first seven exhibits that have been pre-marked, are those all exhibits that were maintained or created by Equifax?

A.   Yes.

Q.   Okay.  And you've had the opportunity to actually review those documents for your testimony here today?

A.   Yes, I have.

Q.   How long have you been employed as a consumer research analyst?

A.   Roughly about eight years now.

Q.   And during that eight years, have your duties basically been the same?

A.   Yes.

7

Q.   Can you explain for the jury what Equifax Information Services, L.L.C. is?

A.   Equifax is a repository of information.  We receive information from various sources such as credit grantors, public record information, as well as employment ID information on various consumers.

Q.   And is Equifax commonly known as a credit reporting agency?

A.   Yes, it is.

Q.   The entities that Equifax receives information from, be it credit grantor or public record, are those credit grantors generally referred to as furnishers of information?

A.   Yes.  That would be data furnishers.

Q.   And is "data furnisher" a term of art that you're familiar with in your job at Equifax?

A.   Yes.

Q.   To your knowledge, is Midland Credit Management a data furnisher with respect to Mr. Brim and his credit report?

A.   Yes, they are.

8

Q.   And based upon the information that Equifax compiles regarding specific individuals, those credit reports can be actually provided to potential credit grantors; is that correct?

A.   Yes.

Q.   Did I lose you?

A.   No.

MS. BROUSSARD:  The witness did answer.

A.   I said yes.

Q.   (By Ms. Cauley) I'm sorry.  I just did not hear that.  I apologize.

And those credit reports can also be viewed by current creditors of an individual; is that right?

A.   Yes.

Q.   And by potential employers as well?

A.   Yes.

Q.   Okay.  If you will please look at Plaintiff's Exhibit 1.

A.   Okay, I have it available.

Q.   And for the record, it should be labeled on the bottom EIS-BRIM-000034 and continuing through Page 57.



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Vicki Banks                                             January 21, 2011

---

9

A. Yes, I have it available.

Q. Great. Can you please identify what Exhibit 1 is?

A. Would you like me to go through the entire exhibit?

Q. We are going to go through it, but let me ask a better question. Is Exhibit 1 a copy of a letter received by Equifax from Mr. Brim, dated July 29th, 2008?

A. Yes.

Q. And when Equifax receives a dispute letter from a consumer, does Equifax actually store the actual letter itself?

A. Yes, we will archive the document.

Q. And is that done by scanning it into a computer system?

A. We actually have our own imaging system that once we receive the document, we will automatically hold it on the system.

Q. Okay. But Equifax doesn't actually maintain the hard copy of the letter itself?

A. That's correct.

Q. So Exhibit 1 would be the image of Mr. Brim's letter that was received by Equifax; is that right?

---

11

if they are printed from the Internet versus a hard copy sent from Equifax; is that right?

A. Yes.

Q. If you look at Page 37 of exhibit --

A. Okay.

Q. At the very top of the page, it has a category Account Age. And then if you come down, it says Oldest Account, Midland Credit Management, and then it has a parentheses opened and then NA, close parentheses. Is that right?

A. Let me just say this before I answer. The copies I have are very, very difficult to read. I can kind of, you know, see what you're saying on them. But I want to make sure if you could just, you know, guide me through it because it is very hard to see it.

Q. Yes, I understand. The copies are very difficult.

If you come down under Account Age, which is the first.

A. Yes, I see that.

Q. After the paragraph, the third line down says Oldest Account.

---

10

A. Yes. Yes, that's correct.

Q. And on the first page of Exhibit 1, Mr. Brim indicates in his letter to Equifax that he is writing to dispute an account being reported by Midland Credit Management. Is that right?

A. That's correct.

Q. And Mr. Brim's dispute was due to the fact that the bill had been paid in full on November 8th, 2004?

A. Yes, ma'am.

Q. With Mr. Brim's letter, did he also include a document from Red Stone Federal Credit Union?

A. Yes, he did.

Q. And then also a copy of a credit report he had obtained from Equifax dated July 29th, 2008?

A. Yes.

Q. And the credit report Mr. Brim included with his letter from July 29th, 2008, would that have been one printed from the Internet?

A. Yes, it is.

Q. Because they actually look different

---

12

A. Yes, I see that.

Q. And then it identifies Midland Credit Management.

A. Yes.

Q. And we can actually, if you will go to Page 48.

A. Okay.

Q. On Page 48 of Plaintiff's Exhibit 1, do you see where the Midland Credit Management account is being reported under Closed Account?

A. Yes, I do.

Q. And it has an account number that's partially blocked out.

A. Yes.

Q. And then under Date Opened, it has NA for not available. Do you see that?

A. Yes, I do.

Q. Do you know what impact not available being reported as a date opened has on this account?

A. I do not know what the impact is.

Q. And then it also is reporting a balance of $1,617.

A. Yes.

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Vicki Banks                                                    January 21, 2011

13

Q.  And then account status has Collection Accounts.  Do you see that?

A.  Yes, I do.

Q.  All of Plaintiff's Exhibit 1 was actually received by Equifax in one mailing from Mr. Brim; is that correct?

A.  That's correct.

Q.  What is Equifax's policy when a dispute is received from a consumer regarding a specific account?

A.  Well, what we will do is we will first review and consider the information that has been presented to us based on what the consumer has sent to us.  If we are able to update the credit report based on the documents that we receive, we will go ahead and do so.  If not, we will go ahead and contact the credit grantor and ask them to verify the information based on the consumer's dispute.

Q.  And are you familiar with what action Equifax took in response to Mr. Brim's dispute of July 29th, 2008?

A.  Yes.

Q.  And what action was that?

14

A.  Equifax sent the Midland account out for re-investigation.

Q.  And how did Equifax go about sending the Midland account out for re-investigation?

A.  We sent that information out via our internal system.  And we asked Midland to validate the information that is being reported on the credit report.

Q.  Is that referred to as an ACDV?

A.  Yes.

Q.  And will you tell the jury what ACDV stands for?

A.  ACD stands for Automated Consumer Dispute Verification.

Q.  And is it Equifax's policy and practice that when a consumer dispute is received regarding a specific account, that an ACDV is sent out to the credit grantor or furnisher to re-investigate that dispute?

A.  Yes.

Q.  Did Equifax receive any response from Midland Credit Management in response to the ACDV?

A.  For this investigation in particular, no, we did not receive anything

15

from Midland.

Q.  All right.  If you will look at Plaintiff's Exhibit 2.

A.  Okay.

Q.  Can you identify for us, please, what Plaintiff's Exhibit 2 is?

A.  The Exhibit 2 is an archived dispute that the consumer made that we made on behalf of the consumer.  What this does is it keeps -- this is a record of our internal investigation on behalf of Mr. Brim.

Q.  So Exhibit 2 is actually a printout of actions taken by Equifax itself?

A.  Yes.

Q.  And it's -- Exhibit 2 has a date on the top of August 27th, 2008?

A.  Yes.

Q.  Is that right?

A.  Yes.

Q.  Would that have -- would that have been the date the actions were taken by Equifax?

A.  This is the date that we actually sent the credit report out to the consumer and the date that the investigation closed.

16

Q.  Okay.  So once -- well, let me ask this:  What happened at Equifax or what steps were taken by Equifax when Midland Credit Management did not respond to the ACDV?

A.  Well, what we did was we actually -- we updated the account to show it as a zero balance.  The dispute at that time was that the balance was incorrect.  And once we did not receive a response from Midland, Equifax updated the account to show zero.

Q.  All right.  And so the -- once the account was updated by Equifax to show a zero balance, a new credit report or disclosure was sent to Mr. Brim; is that right?

A.  That's correct.

Q.  And Plaintiff's Exhibit 2 is a printout of the information contained in that credit report?

A.  Correct.

Q.  Okay.  On Page 1 of Plaintiff's Exhibit 2, it has a listing of inquiries that -- in May 2008.

A.  Yes, I see that.

Q.  Okay.  And inquiries, can you tell the jury what an inquiry is?



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

17

A.  An inquiry is a formal record of who has accessed the consumer's credit file.

Q.  And if we go down -- well, we can just start at the top.  It has the initials on the far left of ACIS, which is what this report is.  Is that right?

A.  Yes.

Q.  Okay.  So that was actually something done by Equifax itself?

A.  Yes.

Q.  Can you tell us, please, what the initials PRM stand for?

A.  Yes.  PRM stands for promotional.

Q.  And would that be an inquiry done by someone other than a credit grantor who was looking for to provide a promotional offer to a consumer?

A.  Would you repeat that for me?  I'm not --

Q.  Sure.  Let me ask it a better way.

Can you just define or describe, please, what PRM, what a PRM inquiry is?

A.  Yes.  A promotional inquiry is an inquiry that is placed on the file when a consumer may be offered pre-approved offers.

18

Those items that you may get in the mail.

Q.  Okay.  And if it's a promotional inquiry, does that entity actually view the entire credit report?

A.  No, they do not.

Q.  Okay.  If there is an inquiry under AR, what do the initials AR stand for?

A.  AR is an account review.

Q.  And that would be done by current creditors of an individual?

A.  Yes.  Or -- or creditors that may have a relationship with a current creditor on the file.

Q.  And then a CR, what type of inquiry is that?

A.  That's a credit report.

Q.  Is that the way a credit report is actually provided to an entity?

A.  Yes.

Q.  So if we look on Plaintiff's Exhibit 2, we see that a credit report was provided to the Credit Bureau of Delaware on July 28th, 2008?

A.  Yes.

Q.  And a credit report was provided to

19

CIC/Experian July 30th, 2008?

A.  Well, actually, no.  The CIC/Experian is an on-line inquiry.  But it's also a credit report or an alert that the consumer may receive via a product that he may have purchased.

Q.  All right.  So with respect to the CIC/Experian, that would not have actually been a credit report that was distributed.

A.  That's correct.

Q.  There's also a credit report for Factual Data on May 8, 2008.  Do you know what Factual Data is?

A.  I believe that Factual Data is a underwriting company for a mortgage.

Q.  And then if you come down right under that entry, there's also a credit report that was provided to Land Save Credit on May 6, 2008?

A.  Yes.  I see that.

Q.  And a credit report to GRC on May 1st, 2008?

A.  Yes.  Correct.

Q.  And then another credit report to Factual Data on April 22nd, 2008?

20

A.  Yes.  Correct.

Q.  If you turn to Page 30 at the bottom.

A.  Okay.

Q.  It has the entry where Midland Credit Management account is listed and it has -- across the top it has 1381 and then a zero.  Is that where Equifax updated to show the zero balance?

A.  Yes, it is.

Q.  Okay.  If you go to the last two pages of Plaintiff's Exhibit 2.

A.  Okay.

Q.  It's a -- it's called a Maintenance Sheet Summary?

A.  Yes.

Q.  Can you tell us what that is, please?

A.  Yes.  This is the record where Equifax sent out the re-investigation on behalf of Mr. Brim.

Q.  So this is -- would show that on July 31st, 2008, Equifax would have sent the ACDV to Midland Credit Management?

A.  Yes.


ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

## 21

Q. And on the very last page, it shows the Midland Credit Management account?

A. That's correct.

Q. And on the comments, it says: Disputes current balance, verify original loan amount scheduled monthly P and then it has QUK. Do you know what that is?

A. Yes. That's the agent's log-in who actually processed the dispute.

And I need to go back for a minute. When you asked me about the 7/31/2008 date, that is not the actual date that we started the investigation. That is the date that we received the dispute.

Q. Okay. And can you tell from the maintenance sheet summary what date the investigation was actually started?

A. Yes. It was started on August 4th, 2008.

Q. And you can tell that by the initials under the comments of the Midland Credit Management account; is that right?

A. Yes.

Q. Okay. And the comments that are contained under the Midland Credit Management

## 22

account on Page 33 where it's stated "disputes current balance," is that the information that was sent to Midland?

A. Yes.

Q. And then it -- did the ACDV also indicate that consumer states account was paid on November 8th, 2004, please provide open date?

A. Yes.

Q. Okay. Do you know how long the Midland Credit Management account was reported by Equifax with a zero balance?

A. According to the documents that I have reviewed, we did make the update to zero balance on this dispute. However, when the next tape information came in to Equifax, Midland again reported that there was an outstanding balance.

Q. Do you know if Midland reports monthly or quarterly?

A. I don't know exactly how often they report.

Q. So Equifax had updated the account to show a zero balance and that information only remained until Midland sent in a new tape

## 23

of account information and then it resorted back to having the past due balance?

MR. LANGLEY: Objection, leading.

MS. BROUSSARD: Go ahead and answer.

A. That would be correct.

Q. (By Ms. Cauley) Okay. Let me just ask again so we can be clear for the record.

In August, as set forth in Plaintiff's Exhibit 2, Equifax -- did Equifax start reporting the Midland Credit Management account with a zero balance?

A. Yes, we did.

Q. If you will please look at Plaintiff's Exhibit 3.

A. Okay, I have it available.

Q. Great. Is this Plaintiff's Exhibit 3, is this a archived copy of a dispute letter received from Mr. Brim that was dated March 2009?

A. Yes, it is.

Q. And, again, the Bates numbers start with Page 65 and go through Page 103. Would Page 65 through 103, that was all sent to Equifax in one packet by Mr. Brim; is that right?

## 24

A. That's correct.

Q. And can you tell me what steps Equifax took when it received Mr. Brim's letter dated March 10th, 2009?

A. Yes. Equifax again contacted Midland based on the dispute that Mr. Brim had made via our office.

Q. You also have Plaintiff's Exhibit 4?

A. Yes, I do.

Q. Can you tell the jury, please, what Plaintiff's Exhibit 4 is?

A. Yes. This is an ACDV previously noted as an Automated Consumer Dispute Verification.

Q. And is this actually the response that was received from Midland?

A. Yes, it is.

Q. Okay. I want to go back briefly to Exhibit 3 and if you will, please, look at Page 75.

Let me start at the beginning. I apologize. On the first page, 65, we have his letter, and then on the second page of Plaintiff's Exhibit 3, we have a document from Red Stone Federal Credit Union that



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

25

highlighted showing a payment to Dell Financial. And --

MR. LANGLEY: Objection to foundation.

MS. CAULEY: I'm sorry?

MR. LANGLEY: Objection to foundation.

MS. CAULEY: I'm just clarifying what documents were received.

Q. (By Ms. Cauley) Miss Banks, in Plaintiff's Exhibit 3, we have the letter dated March 10th, 2009. Is that right?

A. Yes.

Q. And then what is Page 2?

A. If that's page number 66, that would be the letter from Red Stone Federal Credit Union.

Q. All right. And then Page 67, is that a copy of Mr. Brim's previous dispute letter to Equifax?

A. Yes, it is.

Q. Then beginning on Page 68, Mr. Brim also included a printout of his credit report from July -- I'm sorry, from August 11th, 2008.

26

A. Actually, this document says that it's as of July 13, 2008.

Q. So even if he printed it August 11, it still would have been as reflected on July 13th, 2008?

A. Yes, according to these documents.

Q. Now, if you'll go back to Plaintiff's Exhibit 4.

A. Okay.

Q. Can you tell us the date that this ACDV was sent to Midland?

A. Yes, the date was March 19th, 2009.

Q. And what information regarding the dispute was provided to Midland?

A. We provided the consumer's ID information, as well as how the account was reporting at the time of the initial dispute, as well as what the consumer --

Q. And did you -- I'm sorry.

MS. BROUSSARD: Were you finished with your answer?

A. As well as what the consumer's dispute was.

Q. (By Ms. Cauley) And Mr. Brim's dispute, as set forth by Equifax, was that he

27

disputed the current balance, verify original loan amount, scheduled monthly payment amount, actual payment amount, amount past due and current balance. Is that right?

A. That's correct.

Q. Did Equifax also provide some additional information which is provided in the FCRA relevant information box?

A. Yes, we did.

Q. And what information was that?

A. We told Midland that we had received a document from Dell Financial as payment statement of that account.

Q. What was Midland's response to the ACDV from Equifax?

A. Midland asked us to modify the account. They also verified the consumer's ID information and they made a change to the current balance and the past due amount, as well as the current date of the past due and current balance.

Q. So the current balance, was that increased from 1692 to 1698?

A. Yes.

Q. And the past due was increased also

28

from 1692 to 1698?

A. That's correct.

Q. And the -- on the other change I see is on the date of account information where it was updated to March of 2009?

A. Yes.

Q. Are there any other modifications to the account that were added or changed by Midland Credit Management?

A. No.

Q. If you will please go to Plaintiff's Exhibit 5.

A. Okay, I have it available.

Q. I believe the last two pages of Plaintiff's Exhibit 5 are the maintenance sheet summary again.

A. That's correct.

Q. And would that be the maintenance sheet summary of what actions Equifax took following receipt of this ACDV response from Midland?

A. Yes, that's also correct.

Q. As a result of Midland's response to the ACDV from Equifax, did the Midland Credit Management account continue to be reported as



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

29

a collection account on Mr. Brim's credit report?

A.  Yes, it did.

Q.  As a result of Midland Credit Management's response to Equifax, did the Midland Credit Management account continue to be reported with a past due balance?

A.  Yes, it did.

Q.  If you will look at Page 1, which is Bates Number 58 of Plaintiff's Exhibit 5.

A.  Okay, I have it available.

Q.  The first page again lists inquiries that were made on Mr. Brim's credit report; is that right?

A.  Yes.

Q.  And if you will come down, there was a credit report inquiry by the Credit Bureau of Delaware on September 19th of 2008.  Would a credit report have been provided at that time?

A.  Yes, it would have.

Q.  And right above that, another credit report was provided to Land Safe Credit on September 19th, 2008?

A.  Yes.

30

Q.  And a credit report was provided to Factual Data on December 10th of 2008; is that right?

A.  Yes.

Q.  And a credit report was provided, it looks like CBC I-n-n-o-v-i-s on January 15th, 2009.  Are you familiar with that entity?

A.  Yes, that's CBC Innovis.

Q.  And is that a credit grantor?

A.  It appears to be the company that is under -- that would appear to be an underwriting company for the other party who is asking for the credit report.

Q.  Do you know what other party would have been asking for the credit report at that time?

A.  Well, next to it we show 2/24 RBC BAN.  I believe that's RBC Bank.

Q.  And on Page 3 of Plaintiff's Exhibit 5, the Midland Credit Management account is showing with the updated past due balance of 1698?

A.  Correct.

Q.  If you will please look at Plaintiff's Exhibit 6.

31

A.  I have it available.

Q.  Can you please identify what Plaintiff's Exhibit 6 is?

A.  Yes.  This is another form of an ACDV.

Q.  Is this a document that was created by Equifax?

A.  I'll have to answer it this way: This is the document form that we see it in. So, yes.  This is the actual pretty picture of how -- how we see the information.

Q.  Do you know the date of this ACDV?

A.  Yes, the date is March 19th, 2009.

Q.  Is this the same information that was contained on Plaintiff's Exhibit 4?

A.  Can I go back and look at the exhibit, please?

Q.  Sure.

A.  Thank you.

Actually, there are some differences as far as where the balance is concerned. Exhibit 4 indicates that there is a current balance of 1698 and a past due of 1698.  The ACDV indicates that there is a past due of amount of 1692 and a balance of 1692.  All

32

other information being the same.

Q.  Plaintiff's Exhibit 6 in the first block of information says Originator Name, TransUnion.

A.  Yes.

Q.  Would this have been an ACDV that was forwarded from TransUnion regarding the Midland Credit Management account?

A.  Yes, it was forwarded to Equifax.

Q.  Okay.  Is that something that's routinely done where another credit reporting agency will forward a ACDV response?

A.  Yes.

Q.  Can you tell me, please, what Page 3 of Plaintiff's Exhibit 6 is?

A.  I hope I have them in order.  The -- I think it says Page 2 of 2 on the top or is it the Page 1 of 1 on the top?

Q.  Page 1 of 1.

A.  Okay.  Thank you.

Q.  ACTS.

A.  Okay, thank you.  This is just our internal way of actually pulling the documents so we can see what was supposed to transpire on the account.



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Vicki Banks                                                    January 21, 2011

33

MR. LANGLEY: Penny, why don't we identify that last page by Bates numbers just so there's no confusion.

MS. CAULEY: Sure. I have a Bates number of EIS-BRIM-000076. And in the left bottom corner, it says: "Produced pursuant to subpoena."

Q. (By Ms. Cauley) Is that the same document you have, Miss Banks?

A. Yes.

Q. Okay. And on this page, that's Page 3 of Plaintiff's Exhibit 6, it has a received date of February 26th, 2010.

A. Yes, it does.

Q. Do you know which ACDV that would be referring to?

A. I'm not exactly sure. But I want to say it belongs with the March 19th ACDV. Oh, I'm sorry, no, no. It belongs to the 2/25 ACDV.

Q. Is that Page 4 and 5 of Plaintiff's Exhibit 6?

A. Yes. Yes.

Q. Okay. And that was another ACDV that was sent or provided by TransUnion?

34

A. Yes.

Q. Did Equifax take any steps upon receipt of this ACDV from February of 2010?

A. I don't know that we did. Most of the time when we received these ACDVs, ACDVs, the information is already updated. We are just copied in basically to give a heads-up that this is what is supposed to happen with the account.

So I'm not actually sure that we did anything on that particular date. The account may have already been updated by Midland by the time we received this.

Q. And any information that Midland would have sent to update the account, with respect to like the balance or the current past due, that would have automatically been updated to Mr. Brim's credit report by Equifax?

A. That's correct.



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Vicki Banks                                                    January 21, 2011

37



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Vicki Banks                                                    January 21, 2011

---

**41**

[text redacted]

---

**42**

[text redacted]

---

**43**

[text redacted]

THE WITNESS:  Thank you.
EXAMINATION
BY-MR.LANGLEY:
    Q.   Miss Banks, this is Eric Langley. As I mentioned at the beginning of your testimony, I'm a lawyer for Midland Credit Management.  Can you hear me okay?
    A.   I can hear you just fine.
    Q.   If you would, please, go back to Exhibit 2.  And in the last page of Exhibit 2, which bears the Bates Number 33, there's an entry that says the item has been updated to report as paid in full.
        Do you see that?

---

**44**

    A.   Yes, I do.
    Q.   And what is the actual date that the item was updated to report as paid in full?
    A.   August 27, 2008.
    Q.   And looking now at Exhibit 5, in the last page of Exhibit 5, which bears Bates Number 63, there's an entry that says the balance of this item has been updated.  And I think you testified earlier that that meant the balance had been updated to reflect a balance owed at that time.  Correct?
    A.   That's correct.
    Q.   And what is the date of that entry?
    A.   That would be March 20th, 2009.
    Q.   And so between August 27th, 2008 and March 20th, 2009, do you know whether the Midland account was reporting a balance at all, according to Equifax?
    A.   I do not know that it was.  Based on the documents that we see, based on the disputes that -- that Mr. Brim made, is when we would have noted that there was a balance.
    Q.   So based on the documents available to Equifax, for all you know, this account was reporting as a zero balance from August 27,

---



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

45

2008 through March 20, 2009.

A.   That's correct.

MS. CAULEY:  Object for speculation.

Q.   (By Mr. Langley) Miss Banks, going back to Exhibit 2, is there anything on Exhibit 2 that confirms for Equifax that Midland, in fact, received the dispute?

A.   Well, there is no indication that we received ACDV back from you. Our records indicate, based on what we have here, that we did send Midland out an ACDV.  And this is followed through our normal processes of investigations.

Q.   But is there anything on Exhibit 2 or any of the other documents, for that matter, which confirm from Midland's end that it actually received the dispute?

A.   No.

Q.   Let's go back to Exhibit 5.  And I want to ask you some questions about the first page which bears a Bates number of 58.

A.   Okay, I have it available.

Q.   And Mrs. Cauley asked you some questions about credit reports that were provided to potential creditors on September

46

19th, 2008, December 10th, 2008, and January 15th, 2009.  Do you remember those questions?

A.   I do.

Q.   And given that Equifax cannot say whether the Midland account was reporting a balance during that period of time, is it fair to say that Equifax cannot testify whether or not these potential creditors would have seen a Midland account owing a balance or not?

A.   Can you repeat that for me again, please?

Q.   That may have -- that may have been a bad question.

Earlier you said that for all you know, between August 27th, 2008 and March 20th, 2009, the Midland account was being reported with a zero balance, correct?

A.   Correct.

Q.   And if that's true, those four credit reports that are -- that Miss Cauley asked you about earlier that are reflected on the first page of Exhibit 5, would have shown a zero balance on the Midland account, correct?

MS. BROUSSARD:  Object to the form.

47

Go ahead.

A.   Well, if, in fact, it was a zero balance, yes.

Q.   (By Mr. Langley) Because the truth is, we don't know what was on the Equifax report during that time period, correct?

A.   That's correct.

Q.   And so we don't know what information, if any, about the Midland account would have been provided to creditors during that period of time.

A.   That's correct.

Q.   Let's look at Exhibit 3.  I want you to first look at what is the fourth page of Exhibit 3 which bears the Bates Number 68.  At the top of that page, the report is dated as of July 13, 2008.  Do you see that?

A.   Yes, I do.

Q.   What is the difference between that report and the report that is contained within Exhibit 1 which bears an identical date?

A.   If you will give me a moment to look at Exhibit 1.  Okay.  Looking at Exhibit 1, Exhibit 1 appears to be an Internet-based disclosure.  And looking at Exhibit 3, this

48

seems to be a score report that Mr. Brim has asked for.

Q.   Are the reports contained in Exhibits 1 and 3 just different versions of the same information?

A.   Yes.  Some things have more, some have less.  Exhibit 1 does not have -- does not appear to have a score.  Exhibit 3 appears to be a score report.

Q.   But the score report in Exhibit 3 would have been based on information identical to that contained in the report that is part of Exhibit 1?

A.   That's correct, if it's around that same time frame.

Q.   And it is around that same time frame, isn't it?

A.   Uh-huh, yes.

Q.   In fact, it's the exact date.

A.   Yes.

Q.   Looking at the first page of Exhibit 3, which bears a Bates number of 65, the date of the letter from Mr. Brim is March 10, 2009. Do you see that?

A.   Yes, I do.



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

49

Q.  Can you tell from the document when Equifax actually received that letter and the enclosures?

A.  To do that, I'm going to have to go back to Exhibit 4.

Q.  Okay.  Would you mind doing that?

A.  Sure.  And Exhibit 4 indicates that we opened up this investigation on March 19th on behalf of Mr. Brim.

Q.  The information that was enclosed with Mr. Brim's letter in March of 2009, was it any different than the information Mr. Brim had sent to Equifax in August of 2008?  Or, excuse me, late July of 2008?

A.  No, it does not appear to be any different.

Q.  Going back to the dispute that Equifax received in late July or early August 2008, did Equifax send to Mr. Brim after its investigation the results of that investigation?

A.  Yes, we did.

Q.  Would the results of that investigation have reflected that the Midland account was being reported with a zero

50

balance?

A.  Yes.

Q.  And is that a document that Mr. Brim would have received?

A.  Are you asking from us from Equifax?

Q.  Yes.

A.  Well, it would have been part of his re-investigation results package, so, yes.

Q.  Equifax would have sent that package to Mr. Brim?

A.  That's correct.

Q.  And the information therein would have included the fact that Equifax was reporting the Midland account with the zero balance, correct?

A.  That's correct.

Q.  When Equifax receives a dispute from a consumer, does it ever delete an item based on its own investigation?

A.  I'm not really sure as to how you're asking that.  Are you asking do we just delete it without contacting the credit grantor or do we just delete it based on what the consumer has said or -- I'm not really sure.

Q.  If Equifax receives information that

51

leads it to believe that an item should be deleted, will it go ahead and delete the item?

MS. BROUSSARD:  Object to the form.

A.  I'm still not really clear how to answer that because there's a yes and a no answer, answer.  If the consumer has provided us documents to where he we can accept them and update the account, yes, we will go ahead and remove the account.

If not, we will contact the data furnisher as previously testified and ask them to validate the information.

Q.  (By Mr. Langley) So if Equifax is satisfied from the information and documents provided by a consumer that an item should be deleted from the report, it can go ahead and do so?

A.  Yes.

Q.  And in this instance, in both instances in which Equifax received a dispute from Mr. Brim, it did not take that action, correct?

A.  That is correct.  Not at face value.  We contacted Midland.

Q.  If you would look at Exhibit 4,

52

please.

A.  Okay.  I have it available.

Q.  In the box in the upper right-hand corner that says "FCRA Relevant Information," where does the typewritten text come from?

A.  From the agent who has the paperwork.

Q.  And so is that something manually input onto this form by an Equifax agent?

A.  Yes.

Q.  Look at Exhibit 6, please.

A.  I have it available.

Q.  You testified earlier that -- you testified earlier that the date of this document was March 19, 2009.

A.  Yes.

Q.  How were you able to determine that?

A.  Well, if you look at Bates label 75 where it says "Authorization," in that little box, there is a note that says "date created in 3/19/2009," and then there is some additional sequence numbers behind it that lets us know that the ACDV was prepared 3/19 of 2009.

Q.  Okay.  Let's look at Exhibit 7.



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Vicki Banks                                                    January 21, 2011

---

53

A.  Okay, I have it available.

Q.  I want to first look at the very last page of Exhibit 7 which bears a Bates number of 88.

A.  Okay.

Q.  And the date of this terminal audit detail appears to be December 10th, 2008; is that correct?

A.  That's correct.

Q.  And at that time what was Mr. Brim's credit score?

A.  We show a score of 628.

Q.  And is there any information in here that would explain how that credit score was calculated?

A.  Yes, it's the series of numbers that you see next to the 628 are the reason codes.

Q.  What do those reason codes mean?

A.  Those are the key indicators that impacted Mr. Brim's score.  Unfortunately, I don't have those numbers memorized so I can't tell you exactly what each score number means.

Q.  So you can't say whether any of those indicators relate to Midland account or not?

---

54

A.  No, I cannot.

Q.  If you would, please, turn to the second page of Exhibit 7.  And at the top -- do you have it yet?

A.  I'm getting there.  Go ahead.

Q.  It bears Bates Number 80.

A.  Okay.

Q.  And at the top of that page there is a terminal audit report dated May 14th, 2009.

A.  That's correct.

Q.  Do you see that?

A.  Yes, I do.

Q.  And that date -- that date would have been after Equifax updated the Midland account in March 2009 to reflect a balance of more than $1600, correct?

A.  Repeat that, please.

Q.  May 14th, 2009 was after Equifax already had updated the Midland account to show a balance of more than $1600, correct?

A.  That's correct.

Q.  And what credit score for Mr. Brim was reported on May 14th, 2009?

A.  692.

Q.  And this may seem like a dumb

---

55

question, so I apologize.  But is 692 a higher credit score than 628?

A.  Yes, it is.

Q.  And in credit speak, is a higher credit score better?

MS. BROUSSARD:  Object to the form.

A.  I would say yes in some cases.  Again, speaking about credit scores is not really the area where I work.  And not only that, I don't know the criteria in which any company uses to access the file to receive the score that they receive.

Q.  (By Mr. Langley) Let's look at Exhibit 1 just a moment.

A.  Okay.

Q.  Well, excuse me.  I identified the wrong exhibit.  Let's look at Exhibit 3. Sorry.

A.  That's okay.  All right.

Q.  And if you would, please, look at the fourth page of the exhibit which bears the Bates number of 68.

A.  Okay.

Q.  And at the bottom of that page it has a little chart that says how your score

---

56

rates.  Do you see that?

A.  My copies are not really good.  Yes, I do see that.

Q.  And it appears to have descriptions that range from "great" on the top, to "bad" on the bottom.  Do you see that?

A.  Yes.

Q.  And is the lowest range of credit scores in the bad column?

A.  Yes.

Q.  And the highest range of scores is in the great column, correct?

A.  That's correct.

Q.  So given that information, is it fair to say that the higher the credit score, the better?

A.  Yes.

Q.  Let's go back to Exhibit 1, on the first page which bears a Bates number of 34.

A.  I have it.

Q.  The last -- the last paragraph of Mr. Brim's letter says:  "Pursuant to the FCRA, please forward them to the credit furnishers."

What -- to what is Mr. Brim

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Vicki Banks                                                    January 21, 2011

57

referring about by the word "them"?

MS. CAULEY:  Object to the form.

A.  Reading the document, it appears he's asking Equifax to forward the documents he's provided to us to Midland.

Q.  (By Mr. Langley) Is that how Equifax would have interpreted this letter when it received it in late July or early August 2008?

A.  When you say "interpreted the letter," could you be a little more specific?

Q.  Yes.  I think it was your counsel that objected to the form of the question and deservedly so because I was asking you what Mr. Brim meant, which is not the question I intended to ask.

How did Equifax interpret the last paragraph of the July 29, 2008 letter that bears a Bates label of 34 contained in Exhibit 1?

A.  It appears that Equifax asked Midland to validate the balance on the account.  And that is what it appears the agent took from this dispute.

Q.  I lost you there.  We're talking about Exhibit 1, Bates label 34.

58

A.  Yes, in the dispute --

Q.  You are looking at the last --

A.  Right.

Q.  We're looking at the last paragraph of the letter.

A.  Right.  As I had stated that it appears that Mr. Brim is asking Equifax to forward the documents he forwarded to us over to Midland.

Q.  Did Equifax actually do that?

A.  No.

Q.  Look at the third Page of Exhibit 1.

A.  Okay.

Q.  In the middle of the page where there's a heading that says "Accounts."  Can you read the second sentence of text under that heading?

A.  Can you give me the Bates label for the third page?

Q.  Yes, Number 36.

A.  Okay, great.  I wanted to make sure we were on the same page with you.  Under Accounts, honestly, I cannot read the writing because the copy is not really good.

Q.  And there's no way you can make out

59

what it says on this page?

A.  I can make out certain words, but I cannot read you the entire paragraph, word for word.

MS. BROUSSARD:  Eric, do you have, I guess, several questions on here?  Because I can go and print out another page of this to see if we can get a better copy.

MR. LANGLEY:  Well, yes, if there's a better copy, I suppose that would be helpful.  That was actually going to be my next question and that is whether the archived documents are the best copy that Equifax has.

MS. BROUSSARD:  Well, let me just -- if we can just take a break, I can go and print another.  Is it just this one page or this entire document?

MR. LANGLEY:  It would be -- it's not going to be the entire document.  It would be 36, 37, 49, and 55.

MS. BROUSSARD:  All right.  I'll just go and run and try to get those.  We can go off the record.

THE VIDEOGRAPHER:  We are off the record at 2:52 p.m.

60

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  We are back on the record at 3:05 p.m.

Q.  (By Mr. Langley) Miss Banks, Eric Langley again.  When we had left off, we were looking at the third page of Exhibit 1, which bears a Bates number of 36.  Do you have a cleaner copy of that page now?

A.  Yes.  I think I can do something with this one.

Q.  Well, let's try.  But I only want you to go as far as you're comfortable.

Looking in the middle of the page under the heading Accounts, can you read that second sentence?

A.  Okay.  Starting at "However"?

Q.  Yes, ma'am.

A.  Okay.  "However, a high debt-to-credit ratio on certain types of revolving credit card accounts and installment loans will typically have a negative impact."

Q.  Do you know whether that's a true statement or not?

A.  Well, let me answer it this way: I'll have to say no, but, again, because



ESQUIRE

an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Vicki Banks                                                    January 21, 2011

61

credit scoring is not my area of expertise, I can't give you a definitive yes or no.  It really depends upon what --

Q.  Miss Banks --

MS. BROUSSARD:  Mr. Langley, if you could let Miss Banks --

Q.  (By Mr. Langley) I'm sorry.  I interrupted you.  Go ahead.

A.  It just really depends upon what the creditor is looking for and what type of loan that the consumer is seeking.

Q.  And based on the information in Equifax's records, does it have any idea what's important to the creditors or what type of loans they're considering when it asks for a credit report?

A.  No, because Equifax does not make any credit decisions.

Q.  Miss Banks, do you have any personal knowledge of how credit scores are calculated?

MS. BROUSSARD:  Objection.  We are going outside the scope of the deposition subpoena and Attachment A, which is the categories of testimony.

MR. LANGLEY:  Well, I think Penny's

62

asked some questions that at least inferred that certain entries in the report would have had a negative impact.  And I'm asking whether or not this witness has any knowledge whether that's true or not.

MS. BROUSSARD:  Well, Miss Banks can answer to the extent that she knows.

A.  Well, the extent of what I --

Q.  (By Mr. Langley) Miss Banks, do you know --

A.  The extent of what I do know is that if there is anything negative on the file, it could be an impact on the credit score.

Q.  But you don't know for a fact whether it is or not?

A.  No, I don't.

Q.  Or how it's weighted in the credit score?

A.  Right.

Q.  When a potential creditor asks for a credit report from Equifax, what type of information is provided?

A.  Again, I'm -- I don't know.  One, because I don't know what the creditor is asking for.  They may not be asking for a full

63

credit report.  They may be asking for a score only.  So I'm not sure what information is going to be provided at the time the credit report is asked for.

Q.  Can you tell from any documents in Equifax's possession what information any particular creditor requested from Equifax?

A.  No, I can't.

Q.  And so the credit report within Exhibit 1, it's not as if this document is provided in its entirety to every creditor who asked for a credit report.  Is that accurate?

A.  That's correct.  This is not a customer credit report.  This is a consumer's disclosure of all of his credit information.

Q.  So it's at least possible -- I'm sorry, Miss Banks, go ahead.  I guess these are the limitations of telephone testimony.

A.  Yes.

Q.  I apologize.

A.  I was going to say and this is also an Internet copy that Mr. Brim has asked for himself.

Q.  Is it at least possible that the information provided to the creditors who

64

inquired about Mr. Brim did not include any information at all about the Midland account?

MS. BROUSSARD:  Object to the form.

MS. CAULEY:  Object to the form. Calls for speculation.

A.  And I'm going to have to ask you to repeat it.

Q.  (By Mr. Langley) Is it at least possible that the information provided to creditors who inquired about Mr. Brim did not include any information regarding the Midland account?

A.  It's possible, based on what they asked for.

Q.  Do creditors ever include within their request employment history information maintained by Equifax?

MS. BROUSSARD:  Object to the form.

A.  Again, I don't know you're asking. What you're asking me really is to tell you what the creditor asked for and I'm not on the receiving end of the credit report for the credit grantor, so I really can't tell you what they got.

Q.  (By Mr. Langley) Does Equifax ever



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Vicki Banks                                         January 21, 2011

## 65

provide employment history information to potential creditors?

A. Yes.

Q. Do you know if it provided employment history information to any potential creditor of Mr. Brim's?

A. I do not know.

Q. If Equifax had provided employment history information to any creditor, what would that employment history information have been?

A. Do you mind if I look through the credit report to see what's on it?

Q. Please do.

A. Thank you. According to our records, it shows adult video.

Q. And do you know what that means?

A. No, I don't.

Q. On the credit report within Exhibit 1, how many negative accounts are there?

A. Give me just a second.

I can't see it on the copy. I can't see it on the copy.

MS. BROUSSARD: Is that the one I gave you?

## 66

THE WITNESS: Yes, this is the one you gave me.

Q. (By Ms. Cauley) I can help you out by pointing you to, I believe it's the fourth page of Exhibit 1, which bears a Bates number of 37.

A. Thank you. Negative accounts, I believe that's a three.

Q. From this report, can you tell whether or not Midland was one of those negative accounts?

A. Give me just a second. I'm going through the report.

Yes, Midland is on the file. And I'm looking at Bates number --

Q. And that was one of --

A. I was looking at Bates label 48 to show the Midland account.

Q. And that's one of three listed negative accounts?

A. Yes.

Q. What are the other two listed negative accounts?

A. You're going to have to give me a second to go back through the report.

## 67



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Vicki Banks                                    January 21, 2011

69

(WHEREUPON, proceedings were concluded at 3:23 p.m.)

(Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure and/or O.C.G.A. 9-11-30(e), signature of the witness has been reserved.)



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

73

C E R T I F I C A T E

STATE OF GEORGIA:

FULTON COUNTY:

I hereby certify that the foregoing deposition was reported, as stated in the caption, and the questions and answers thereto were reduced to the written Page under my direction, that the preceding pages represent a true and correct transcript of the evidence given by said witness.

I further certify that I am not of kin or counsel to the parties in the case, am not in the regular employ of counsel for any of said parties, nor am I in any way financially interested in the result of said case.

Dated this 10th day of February, 2011.

_____

ROBIN K. FERRILL, CCR-B-1936, RPR

---

74

COURT REPORTER DISCLOSURE

Pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia which states: "Each court reporter shall tender a disclosure form at the time of the taking of the deposition stating the arrangements made for the reporting services of the certified court reporter, by the certified court reporter, the court reporter's employer or the referral source for the deposition, with any party to the litigation, counsel to the parties, or other entity. Such form shall be attached to the deposition transcript," I make the following disclosure:

I am a Georgia Certified Court Reporter. I am here as a representative of Esquire Deposition Solutions. Esquire Deposition Solutions was contacted to provide court reporting services for the deposition. Esquire Deposition Solutions will not be taking this deposition under any contract that is prohibited by O.C.G.A. 9-11-28(c).

Esquire Deposition Solutions has no contract/agreement to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition. Esquire Deposition Solutions will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.

_____
ROBIN K. FERRILL, CCR-B-1936

---

75

DEPOSITION ERRATA SHEET

Our Assignment No. 206242
Case Caption:  Jamon T. Brim
vs.  Dell Financial Services

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the _____ day of _____, 20___.

_____
VICKI BANKS

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____

---

76

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

Page No._____Line No._____Change to:_____

_____

Reason for change:_____

SIGNATURE:_____DATE:_____

VICKI BANKS



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com