FILED

2011 Apr-15  PM 09:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **Jamon T. Brim,** | ) |
| | ) |
| **Plaintiff** | ) |
| | ) |
| **v.** | ) **Civil No. 5:10-CV-369-IPJ** |
| | ) |
| **Dell Financial Services, LLC,** | ) |
| **Midland Credit Management,** | ) |
| **Inc., Midland Funding, LLC,** | ) |
| | ) |
| **Defendants.** | ) |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW AND MOTION FOR REMITTITUR AND CONSTITUTIONAL REDUCTION OF PUNITIVE DAMAGES AWARD

### OVERVIEW

Defendant has filed three mostly-interdependent Motions for post-trial relief. Midland Credit Management, Inc. ("Midland") filed its Renewed Motion for Judgment as a Matter of Law pursuant to Rule 50. (Docket No. 79). It asks for Remittitur pursuant to Rules 50 and 59 (Docket No. 80). And it moves for a new trial pursuant to Rule 59 (Docket No. 81). While the standard of review for each motion may vary, the substantive issues in each regard are nearly uniform. Midland's Motion for a New Trial presents largely discrete evidentiary objections and may effectively be answered independently of Defendant's other arguments. However the Renewed Motion for Judgment as a Matter of Law and the Motion for Remittitur are inseparable. Accordingly, Jamon Brim responds to these later two motions in this single opposition memorandum. Further, where the New Trial Motion overlaps, Plaintiff presents his argument in the present pleading.

## STANDARD OF REVIEW

Each of Defendants' Motions rely mostly, if not entirely, on Midland's own view of the evidence and the conclusions it sought therefrom, rather than the evidence offered by the Plaintiff and the broad inferences permitted a jury.  This of course is improper, regardless of the basis for any one of Midland's motions.  When a defendant's Rule 50 and 59 motions are based on similar arguments, the Court properly considers them together.  *Tucker v. Hous. Auth. of Birmingham Dist.*, 507 F. Supp. 2d 1240, 1265 (N.D. Ala. 2006) *aff'd,* 229 F. Appx. 820 (11th Cir. 2007); *Walls v. Button Gwinnett Bancorp, Inc.,* 1 F.3d 1198, 1201 (11th Cir.1993) ("Concerning the clear weight of the evidence, [defendant] essentially rehashes its arguments to uphold the judgment as a matter of law. These arguments are equally unpersuasive under the new trial motion.")

### A.      RULE 50 MOTION FOR JUDGMENT.

The standards for a motion for judgment notwithstanding the verdict and a motion for new trial are different.  Judge Proctor explained:[1]

> Specifically, a Rule 50(b) motion for judgment as a matter of law as to a particular issue should be granted when "there is no legally sufficient evidentiary basis for a reasonable jury to find for [the non-movant] on that issue." Fed.R.Civ.P. 50(a)(1); *Wood v. Green,* 323 F.3d 1309, 1312 (11th Cir.2003); *Shannon v. Bellsouth Telecomms., Inc.,* 292 F.3d 712, 715 (11th Cir.2002). When, as here, the merits of the motion turn on the sufficiency of the evidence, "[t]he court should review all of the evidence in the record, draw all reasonable inferences in favor of the non-moving party, and disregard all evidence favorable to the moving party that the jury is not required to believe." *Akouri v. State of Florida Dept. of Transp.,* 408 F.3d 1338, 1343 (11th Cir.2005) (citing *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150-51(2000)). *See also Russell v. N. Broward Hosp.,* 346 F.3d 1335, 1343 (11th Cir.2003); *Brochu v. City of Riviera Beach,* 304 F.3d 1144, 1154 (11th Cir.2002). "Credence should also be given to 'evidence supporting the moving party that is

---

[1] Plaintiff incorporates these several 'block quotes' because this cite-supported decision from this District comprehensively states that which Plaintiff could not better paraphrase.

uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.' " *Akouri,* 408 F.3d at 1343 (citing *Reeves,* 530 U.S. at 150-51). However, it is the task of the jury, not the court, "to weigh conflicting evidence and inferences, and determine the credibility of witnesses." *Lipphardt v. Durango Steakhouse of Brandon, Inc.,* 267 F.3d 1183, 1186 (11th Cir.2001) (internal quotation marks omitted). Therefore, "[i]f reasonable jurors could reach different results, [this court] must 'not second-guess the jury or substitute our judgment for [the jury's] judgment.' " *Brochu,* 304 F.3d at 1155 (quoting *Lipphardt,* 267 F.3d at 1186).

*Tucker v. Hous. Auth. of Birmingham Dist.*, 507 F. Supp. 2d at 1247-48.

## B.     REMITTITUR.

The Eleventh Circuit held that "[o]nce a defendant is found liable for the plaintiff's injury, the District Court has a great deal of discretion in deciding the level of damages to be awarded." *Ferrill v. Parker Group, Inc.,* 168 F.3d 468, 476 (11th Cir.1999). "Where the jury's decision has been approved by the trial judge, [the appellate court] will not disturb the award except where [the] verdict is so gross as to be contrary to right reason or to be a clear abuse of discretion." *Hatfield v. Anthony Forest Prods. Co.,* 642 F.2d 175, 178 (5th Cir.1981), *cited with approval in, Agro Air Assocs., Inc. v. Houston Cas. Co.,* 128 F.3d 1452, 1455 n. 5 (11th Cir.1997). In this case, because the jury awarded damages for emotional distress, the court should be "particularly deferential to the fact finder's determination of compensatory damage awards for intangible, emotional harms because the harm is so 'subjective and evaluating it depends considerably on the demeanor of the witnesses.' " *Tucker*, 507 F. Supp. 2d at 1249-50(citations omitted).

## ARGUMENT

## I.     WILLFULNESS

**A.      (In Response to renewed Motion for Judgment).  A violation of the FCRA is "Willful" if Defendant's conduct – including its adoption of unlawful investigation procedures – was either "reckless" or "knowing."**

In its Motion for Judgment, Midland reasserts its contention that the Plaintiff failed to show sufficient evidence by which the jury could have concluded that its violation of law was willful. The Court properly rejected this argument at trial. Willfulness has always been a question of fact for the jury.  *Lenox v. Equifax Info. Servs. LLC,* 2007 WL 1406914, at *6 (D. Or. May 7, 2007)(reasoning "whether defendant's action or inaction rises to the level of willfulness so as to violate the statutory obligations of the FCRA is also a question of fact"); *Guimond v. Trans Union Credit Info. Co.,* 45 F.3d 1329, 1333 (9th Cir.1995)(recognizing "The reasonableness of the procedures and whether the agency followed them will be jury questions in the overwhelming majority of cases."); *Cahlin v. Gen'l Motors Acceptance Corp.,* 936 F.2d 1151, 1156 (11th Cir.1991); *Centuouri v. Experian Info. Solutions, Inc.,* 431 F.Supp.2d 1002, 1007 (D.Ariz.2006)(refusing to grant summary judgment on the issue of willfulness in a case involving the reasonableness of consumer protection procedures); *Holmes v. Telecheck Int'l, Inc.,* 556 F. Supp. 2d 819, 847 (M.D. Tenn. 2008).  Twelve jurors agreed with the Court and found the evidence sufficient.  Defendant's refusal to comprehend the egregiousness of its conduct is merely further confirmation of its indifference to the serious obligations of the FCRA.

In its post-trial brief, Midland both misstates and misapplies the law.  Defendant correctly cites *Levine v. World Fin. Network Nat'l Bank*, 554 F.3d 1314, 1318 (11th Cir. 2009).   In *Levine*, the Eleventh Circuit actually just restated the Supreme Court's 2007

decision in *Safeco Ins. Co. of Am. v. Burr,* 551 U.S. 47 (2007).  *Id.*  As Midland must be

aware, *Safeco* actually reduced the Plaintiff's willfulness burden:

> *Safeco* changed the standard previously applied in the Fifth Circuit,
> pursuant to which a defendant could have been found in willful
> noncompliance under § 1692n only if it " 'knowingly and intentionally
> committed an act in conscious disregard for the rights of others.' "
> *Stevenson v. TRW Inc.,* 987 F.2d 288, 293-94 (5th Cir.1993) (quoting
> *Pinner v. Schmidt,* 805 F.2d 1258, 1263 (5th Cir.1986), cert. denied, 483
> U.S. 1022 (1987)); *see also Harris v. Equifax Info. Servs., LLC,* No. C A
> 606CV-01810-GRA, 2007 WL 1862826, at *2 (D.S.C. June 26, 2007) ("In
> Safeco, the Supreme Court unequivocally resolved this circuit split,
> holding that willfulness under 15 U.S.C. § 1681n(a) covers a violation
> committed in reckless disregard of Plaintiff's rights.").

*Robertson v. J.C. Penney Co., Inc.*, No. 2:06CV3-KS-MTP, 2008 WL 623397, at *9

(S.D. Miss. Mar. 4, 2008).  While in many circuits, the courts had previously required

"knowing or conscious disregard," *Dalton v. Capital Associated Indus., Inc*., 257 F.3d

409, 418 (4th Cir. 2001), or even "willful concealment," *Cousin v. Trans Union Corp*.,

246 F.3d 359, 372 (5th Cir. 2001), the post-*Safeco* standard included "recklessness."

*Levine*, 554 F.3d at 1318.  In the face of this significant difference, all but one of the non-

*Levine* cases Midland cites in its motion are pre-*Safeco* and have been conclusively

abrogated.

The one case Defendant found that actually applies the correct standard is a

decision in a *pro se* case that, by factual contrast, strongly supports Mr. Brim's own

willfulness claim. *Rambarran v. Bank of Am., N.A.*, 609 F. Supp. 2d 1253, 1262 (S.D.

Fla. 2009).  Upon the facts presented in *Rambarran*, "The earliest deadline for [the

furnisher-defendant] to complete its FCRA-mandated investigation occurred on March 9,

2006; and, assuming the investigation unreasonably verified the existence of a charged

off account, its error was corrected by May 25, 2006." *Id.* at 1262.  In contrast, Mr. Brim

established that the Midland FCRA violations and inaccuracy persisted over two years and long after Defendant had received numerous disputes, an authenticated bank statement, and even over a month after it received from Plaintiff's litigation counsel a copy of its "Holy Grail" transaction detail document.  (Pl's Ex. 3).  In fact, Midland retained the account in Mr. Brim's credit files nearly 9 months into federal litigation. (Pl's Ex. 36). Just as the Florida court in *Rambarran* held, the length of time that a Defendant takes to correct its FCRA violation is a factor in determining willfulness. *Dalton*, 257 F.3d at 415 (willfulness not found, in part, because the inaccurate account was corrected the day after dispute); *Saunders v. Branch Banking & Trust Co.*, 526 F.3d 142, 151 (4th Cir. 2008)(applying the holding in *Dalton,* 257 F.3d 409).

**B.     (In Response to renewed Motion for Judgment).  The Jury Properly Found that Midland was at least Reckless.**

The "FCRA is concerned with whether the defendant ran an unjustifiably high risk of *violating the law.*" *Drew v. Equifax Info. Servs., LLC*, C 07-00726 SI, 2010 WL 5022466 (N.D. Cal. Dec. 3, 2010) (citing *Safeco*).  A defendant may "willfully violate the FCRA by adopting a policy with reckless disregard of whether it contravenes a plaintiff's rights under the FCRA."   *Cortez v. Trans Union, LLC*, 617 F.3d 688, 721-22 (3d Cir. 2010) (citing *Safeco,* 551 U.S. 47).

*Rambarran*, the decision upon which Midland hangs its argument, is an odd choice to cite in light of the substantial differences between its facts and those *sub judice*. In the cited decision, the *pro se* Plaintiff had actually stipulated that the furnisher had properly investigated his lone dispute.  This contrasts sharply with the facts in the present case in which numerous disputes, inquiries and contacts had long placed Midland on

actual notice of its inaccuracy. *Rambarran* even offers its own comparison to a case described therein as almost identical to Mr. Brim's:

> The undersigned notes that this case bears only a superficial resemblance to *Schaffhausen v. Bank of America, N.A.,* 393 F.Supp.2d 853 (D.Minn.2005), a case that offers helpful guidance by way of juxtaposition. In that case, plaintiff's FCRA allegations survived summary judgment on all fronts, including his claim for punitive damages against a bank, based on its willful failure to comply with the FCRA after it issued "inconsistent response[s] in the face of numerous requests ... and inquiries" to remove mention of an incorrectly reported charged off account.

*Rambarran v. Bank of Am., N.A.*, 609 F. Supp. 2d at 1272.

Defendant also asserts that Plaintiff's liability and willfulness claim must fail because Plaintiff did not use an expert witness or other attempt to demonstrate that Midland's policies deviated from some industry standard. (Def.'s Mot. J. at 6-7, 8, 10). Similarly, it claims that because it followed its own procedures, it could not have willfully violated the FCRA. *Id.* at 8. But neither of these "factors" are elements of a FCRA claim – willfulness or otherwise. *See e.g.*, *Wilson v. CARCO Group, Inc.*, 518 F.3d 40 (D.C. Cir. 2008) (Consumer "was not required to present expert testimony on issue of whether consumer reporting agency's procedures in conducting background check for potential employer were reasonable.")  And given the plain language of the statute and its remedial purpose, it would seem an odd conclusion to exonerate a defendant for following it (or Dell's) procedures regardless of whether or not those procedures actually accomplish the substantive investigation the law demands.

Both pre- and post-*Safeco*, courts have recognized a number of factors to inform a jury's decision as to whether an FCRA violation was willful.  One, the delay in correcting the violation, has been discussed *supra*.  Another factor is whether the Defendant

intended the conduct and procedures that violated the statute. *Saunders v. Branch Banking & Trust Co.*, 526 F.3d at 150-51.   At trial, the Defendant's representative testified to just such intent, conceding, "Are you aware of anything about the way that . . . Mr. Brim was treated, that was contrary to Midland's standard operating procedure? Nothing I'm aware of no."  Trial Tr., Vol. II, 79:11-15.  Mr. Edrozo also admitted that everything that Midland did with respect to Mr. Brim was in accordance with its intended procedures.  *Id.* at 79:16-19.

Additional trial evidence of willfulness – recklessness at a minimum – included the magnitude of Midland's problem.   It followed the same "automated" dispute procedures for at least 95% of its consumers.  Trial Tr., Vol. II, 94:15-18.  Its reporting was apparently so systemically inaccurate that it forced over 8,000 disputes per week. Trial Tr., Vol II, 108:3-8.    And it did so in the face of a long-established duty.  The FCRA had required s substantive investigation since 15 U.S.C. §1681s-2(b) was enacted in 1996, and certainly this was clear since *Johnson v. MBNA Am. Bank*, the seminal case on this particular question. *Robertson v. J.C. Penney Co., Inc.*, No. 2:06CV3-KS-MTP, 2008 WL 623397, at *7(stating "This requirement to conduct a reasonable investigation to determine whether disputed information in a consumer credit report can be verified is widely recognized. *Johnson v. MBNA Am. Bank, N .A.,* 357 F.3d 426, 430 n. 2, 431 (4th Cir.2004) (collecting cases); *accord Lang v. TCF Nat'l Bank,* No. 07-1415, 2007 WL 2752360, at *1 (7th Cir. Sept. 21, 2007); *Johnson v. MBNA Am. Bank, N.A.,* No. 1:05CV00150, 2006 WL 618077, at *5 (M.D.N.C. Mar. 9, 2006); *DiPrinzio v. MBNA Am. Bank, N.A.,* No. 04-872, 2005 WL 2039175, at *10 (E.D.Pa. Aug. 24, 2005).")

The jury could also have found that Midland was willfully culpable in light of the significant and numerous communications from Mr. Brim regarding its inaccurate account. By Defendant's own admission, there were no less than eight disputes made. Pl's Ex. 76; *See Bach v. First Union Nat. Bank*, 486 F.3d 150, 155 (6th Cir. 2007) ("We recognize that FUNB engaged in blameworthy conduct in this case. As the jury's verdict established, FUNB continued to report unfavorable credit information regarding Bach even after receiving notification from Bach, an elderly widow, that the information was inaccurate. Without question, these actions merit strong disapproval and justify an award of punitive damages.").

**C.      (In Response to Motion for Remittitur).   The Punitive Damage Verdict is Proper.**

Defendant also moves the Court to remit the jury's $623,000 punitive damages verdict, approximately a 6:1 ratio to Mr. Brim's actual damages. To do so it again ignores the actual evidence and case against it, relying almost entirely on its own now rejected arguments to the jury. Midland's conduct in this case was absolutely as egregious as nearly any fact pattern presented in a FCRA case.

Initially, Plaintiff notes that while very few FCRA cases actually try to a jury, amongst sustained verdicts, the present case is certainly not unique amongst successful large punitive damage verdicts:

> (1)      Bach v. First Union Nat. Bank, 486 F.3d 150, 152 (6th Cir. 2007) $2,628,600 in punitive damages remitted to $400,000 in one-dispute case);
>
> (2)      Boris v. ChoicePoint Servs., Inc., 249 F.Supp.2d 851, (W.D. Ky. 2003)($250,000 in punitive damages award was appropriate under FCRA);

(3)     Conseco Finance Servicing Corp. v. Carlson, District Court, Creek County, Sapulpa Division, State of Oklahoma, No. CJ-00-227, Feb. 14, 2002 (jury award of $ 900,000 in punitive damages upheld);

(4)     Drew v. Equifax Info. Services, LLC, C 07-00726 SI, 2010 WL 5022466 (N.D. Cal. Dec. 3, 2010) (No remittitur of $700,000 punitive damage award);

(5)     Mills v. NationsBank, N.A. 3d Judicial District of Florida (Lake County1999) (Jury award $300,000 punitive damages for false credit reports)

(6)     Soghomonian v. Trans Union, No. 99CV5773, 2005 WL 1972594(E.D. Ca 2005)($660,000 punitive damages);

(7)     Thomas v. Trans Union, No. 3:00CV1150 (D. Or. Jan. 29, 2003) ($5 million for punitive damages, remitted to $1 million);

(8)     Thorton v. Equifax Inc., 467 F. Supp. 1008 (E.D. Ark. 1979) ($250,000 in punitive damages).

 (9)     Williams v. Equifax Information Solutions, LLC:  Circuit Ct. or 9th Judicial Circuit, Orange County, Florida – No. 48-2003-CA-9035-O; order dated Nov. 17, 2007; jury verdict, Nov. 30, 2007 ($2.7 million in punitive damages).

The Court is "charged with reviewing the jury's award to determine whether it "can fairly be categorized as 'grossly excessive' in relation to" the state's legitimate interests, *Gore,* 517 U.S. at 568, 116 S.Ct. at 1595, and to "ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *Campbell,* 538 U.S. at 426, 123 S.Ct. at 1524." *Action Marine, Inc. v. Cont'l Carbon Inc.*, 481 F.3d 1302, 1318 (11th Cir. 2007).   When determining whether a punitive damages award is unconstitutionally excessive, the Court should be guided by "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and punitive damages award; and (3) the difference between the punitive damages awarded by the jury

and the civil penalties authorized or imposed in comparable cases." *Id*. at 1318, citing *Campbell,* 538 U.S. at 418. "Of the three guideposts, the reprehensibility of a defendant's conduct is the most relevant." *Id.*   In evaluating reprehensibility, the Court should consider whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated  incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect.

*Campbell,* 538 U.S. at 419, 123 S.Ct. at 1521 (citations omitted).

While the statutory claim in this case – violation of the FCRA – is principally an economic injury – the evidence in the case established that Mr. Brim suffered actual physical harm and damage as a result of Midland's conduct, suffering from headaches and insomnia for example.   Regardless, these factors are satisfied by the legislative decision to impose punitive damages for a FCRA violation.   As the Fourth Circuit explained in sustaining an 80:1 ratio,

> FCRA violations result in economic and emotional harm, but such violations  will very infrequently cause physical harm or endanger the health and safety of others. Thus, the first and second factors will usually be absent, as they are here. Yet Congress has nonetheless authorized punitive damages in FCRA cases, so we do not believe the absence of the first or second factors weighs strongly against the punitive damages award here. *See Gore,* 517 U.S. at 583, 116 S.Ct. 1589 ("[A] reviewing court ... should 'accord "substantial deference" to legislative judgments concerning appropriate sanctions for the conduct at issue.' "

*Saunders v. Branch Banking And Trust Co. Of VA*, 526 F.3d 142, 152-53 (4th Cir. 2008) (citations omitted).  See also *Action Marine, Inc. v. Cont'l Carbon Inc.*, 481 F.3d at 1319 (Considering health harm caused by damage to property in economic loss case).

Contrary to Midland's assertion, the Court should easily find that Mr. Brim was financially vulnerable to Defendant's misconduct.   Midland's brief cites and quotes Saunders v. B.B. & T, but then omits the opening and most crucial part of the Fourth Circuit's explanation, one that sounds right from this case: "This case clearly does involve the third factor, the "financial vulnerability" of "the target of the conduct." *State Farm,* 538 U.S. at 419, 123 S.Ct. 1513. Saunders has a modest income and limited resources compared to BB & T. Furthermore, BB & T's conduct rendered Saunders significantly more financially vulnerable."   *Saunders v. Branch Banking And Trust Co. Of VA*, 526 F.3d 142, 153 (4th Cir. 2008).   Defendant's only response is to repeat its discredited argument that it did not harm Mr. Brim's credit.  It did.  The jury certainly found it did.  This Court would reasonably find that it did.

The "Fourth" reprehensibility guidepost also strongly supports the jury's verdict. As recounted earlier, Midland admitted that it receives 8,000 disputes per week and for at least 95% it conducts absolutely no investigation, instead using its "automated batch interface" program to bounce back to the bureaus an automatic rejection of the consumer dispute and verification of the account.  Contrast *Bach v. First Union Nat. Bank*, 486 F.3d 150, 155 (6th Cir. 2007) (No evidence that Furnisher engaged "in repeated instances of misconduct.").  In fact, if nothing else, the evidence in the case at bar showed that as to Mr. Brim himself, Midland had engaged in numerous FCRA violations over a multi-year period.

The "Fifth" guidepost is similarly cleanly against Midland's argument.  In this case, there was more than sufficient evidence that Midland had engaged in willful, and intentional, misconduct.  And unlike the creditors in *Bach* and *Saunders*, the present

defendant was a debt buyer, purchasing for pennies and then reporting accounts against consumers when it had zero supporting documents and no realistic mechanism for any of its many victims to obtain correction of Midland inaccuracies.  Oddly, Midland's only argument as to this guidepost is its citation of the District Court's remittitur in *Cortez v. Trans Union, LLC*.  2008 WL 1944160 (E.D. Pa. May 1, 2008) *aff'd*, 617 F.3d 688 (3d Cir. 2010).  Defendant is correct that the trial court remitted the FCRA verdict on $50,000 in compensatory damages from $750,000 to $100,000.  But Midland fails to reveal that the Third Circuit was harshly critical of that decision stating:

> Because Cortez accepted the conditional remittitur, we do not need to reach the issue of whether the district court abused its discretion in reducing the punitive damages award from $750,000 to $100,000. We do note, however, that we are troubled by the court's reasoning in reducing the punitive damages. There is certainly nothing wrong with a jury focusing on a "defendant's seeming insensitivity" in deciding how much to award as punitive damages. *Id.* "Punitive damages awards are 'the product of numerous, and sometimes intangible, factors....' "

*Cortez v. Trans Union, LLC*, 617 F.3d 688, 724 (3d Cir. 2010) (citations omitted).

Finally, despite its mainstream 6.23:1 ratio, Midland suggests that the jury's verdict is by ratio analysis constitutionally suspect.  Again, it is incorrect.  The Supreme Court has suggested that a proper ratio of compensatory to punitive damages in most cases should not exceed "single digits."  538 U.S. at 425, 123 S.Ct. at 1524.  Further, the Eleventh Circuit has sustained nearly every punitive damage Due Process appeal even for large punitive damage awards and large ratios (or both).  *Action Marine, Inc. v. Cont'l Carbon Inc.*, 481 F.3d 1302 (11th Cir. 2007) ($17.5 million punitive damage award on $3.2 million compensatory damages); *Bogle v. McClure*, 332 F.3d 1347, 1350 (11th Cir. 2003) (Sustaining approximately $3.5 million in compensatory damages for emotional distress; and sustaining approximately $13.3 million in punitive damages); *Myers v. Cent.*

- 13 -

*Florida Investments, Inc.*, 592 F.3d 1201, 1205 (11th Cir. 2010) *cert. denied,* 131 S. Ct. 299, 178 L. Ed. 2d 143 (U.S. 2010) and *cert. denied,* 131 S. Ct. 392, 178 L. Ed. 2d 137 (U.S. 2010) ($103,622.09 in compensatory damages and $506,847.75 in punitive damages); *Kemp v. Am. Tel. & Tel. Co.*, 393 F.3d 1354, 1357 (11th Cir. 2004) (On $115.05 in actual damages, punitive damages remitted from $1 million to $250,000); *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1326 (11th Cir. 1999) ($47,000 in compensatory damages and $4.35 million sustained); *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1283 (11th Cir. 2008) ($500,000 punitive damages to $54,321 compensatory damages); *U.S. E.E.O.C. v. W&O, Inc.*, 213 F.3d 600, 616 (11th Cir. 2000) ("If considered in the aggregate, the ratio of punitive damages to back pay is 8.3 to 1 ($300,000 to $36,257.13)").  In fact, Plaintiff's counsel could not find a single post-*Gore* decision of the Eleventh Circuit that reversed a trial court's decision not to remit punitive damages.

In fact, even the presumption of single digit ratios is inapposite in a case like this one with relatively modest actual damages.  *Saunders v. Branch Banking And Trust Co. Of VA*, 526 F.3d 142, 154 (4th Cir. 2008) ("The Supreme Court has long recognized that greater ratios may comport with due process, however, when reprehensible conduct results " 'in only a small amount of economic damages.' " *State Farm,* 538 U.S. at 425, 123 S.Ct. 1513 (quoting *Gore,* 517 U.S. at 582, 116 S.Ct. 1589)").  *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1283 (11th Cir. 2008) (Finding that compensatory damages of $54,321 was a low damage award justifying departure from a 9:1 presumption.

The jury's verdict was rational in part because the Court's charge instructed it to be so. The Court instructed the jury that the amount of punitive damages "must be fixed with calm discretion and sound reasoning[.]" Trial Tr. Vol. 4, 26:4-6. The jury followed that instruction.

## II.     ACTUAL DAMAGES

**A.     (In Response to Renewed Motion for Judgment). The Jury Properly Found that Mr. Brim Suffered Actual Damages.**

The case that was before the jury (as opposed to the selective recall relied on by Midland) more than established significant actual damages – both economic and non-economic. Nevertheless, Defendant asks the Court to enter judgment in its favor despite the verdict because of its various repeated objections to a select number of these items. Notwithstanding Defendant's prayer, there was more than sufficient basis to find that the Plaintiff suffered the damages alleged. This is particularly so in light of Midland's failure to even argue, oppose, object to or otherwise challenge major portions of Mr. Brim's damages case.

The Plaintiff presented evidence supporting, and his counsel asked the jury to award, an amount at or in excess of $ 100,000 compensatory damages. Such damages were to compensate Mr. Brim for his *economic injury* – the credit denials the jury could find caused in a substantial part by Midland including the credit denial by American Express; denial of his Capital One credit card application; denial of various mortgage applications; and a long delay of approval by Platinum Mortgage; the time Mr. Brim had to spend to correct the Midland problem; his out of pocket expenses incurred to correct the Midland problem. Mr. Brim also presented sufficiently detailed evidence of his *non-*

*economic damages* - substantial unliquidated damages for humiliation, embarrassment, damage to his reputation and emotional and mental distress.

Plaintiff's damages were not separated by the jury and Midland may not now demand an off the record division of the actual damages verdict to assign one value or another to each damage item.[2]   Instead, to prevail, Midland would have to convince the Court that there is not <u>any</u> element or combination of elements of Mr. Brim's damages that a jury could find valued to at least $100,000.   Midland cannot meet that burden.  Its chance to argue within this range of reasonableness was at trial – an opportunity it did not attempt at that time and one that cannot now be properly offered to it as a jury "do over."

     **1.**    **Economic damages.**

Contrary to Midland's assertion, there are other economic damages available and established in this case that are not dependent upon proof of a denial of credit.  Further, noneconomic damages, including emotional distress, are not dependent upon proof of credit injury.  *Crane v. Trans Union, LLC*, 282 F. Supp. 2d 311, 319 (E.D. Pa. 2003).  Nevertheless, the jury could have reasonably found that the Plaintiff established credit damage.

     **a.**    **Credit denials.**

Mr. Brim alleged four categories of credit damages: denial of his American Express credit card application; denial of his Capital One credit card application; denial of various mortgage applications; and a long delay of approval by Platinum Mortgage.

---

[2] Though the Court at the Final Pre-trial conference suggested its willingness to give a special verdict or special interrogatory charge to require the jury to itemize damages, Midland never requested such an instruction and in fact did not offer substantive instructions of its own on most of the issues about which it now complains. *See, e.g., Judd v. Rodman,* 105 F.3d 1339, 1342 (11th Cir.1997); *Typographical Serv., Inc. v. Itek Corp.,* 721 F.2d 1317, 1320 (11th Cir.1983).

***American Express***.   Defendant challenges the American Express credit card denial for three reasons.[3]   Plaintiff addresses each in turn.   Initially, Midland objects again to the admission of the authenticated American Express denial letter.   Midland argues that the American Express' authentication of the denial letter (Pl's Ex. 7) cannot possibly be true because Midland's attorney claims to have received an earlier letter from American Express in response to its subpoena in which the third party claimed that it lacked any responsive documents. (Def.'s Mot. J. at 8-9, 21). Further, Defendant claims that the document that American Express' witness authenticated was a copy of the actual document American Express mailed to Mr. Brim. Neither of these objections deny that the declaration otherwise complies with Fed. R. Civ. P. 902(11).   The more appropriate target of Midland's complaint would seem to be American Express, which to Defendant's chagrin apparently did not fully respond to Midland's subpoena.   Further, despite Midland's uproar about the point, the credit denial document itself is <u>of course</u> a copy of what American Express provided to Mr. Brim and thus correctly included and addressed in the declaration. It would make little sense for American Express to authenticate a document other than the one it actually provided to the consumer.

Defendant also objects that the jury discounted or rejected its argument that the Trans Union witness' testimony should be accepted over conflicting evidence from the Plaintiff and American Express.  (Def.'s Mot. J. at 23). At trial, Midland argued to the jury that because Trans Union's witness testified that a credit account reported in a disputed status is not factored into a typical credit score.  And then the jury rejected this evidence.  It did so because the American Express denial letter stated exactly the opposite

---

[3] Midland challenges the American Express denial in all three of its post-trial motions. Plaintiff's full response as regards each such motion is herein.

> The following are the primary factors in your credit report that affected
> your credit bureau score:
>> Serious delinquency, and public record or collection filed.
>> Time since derogatory public record or collection is too short.
>> Time since delinquency is too recent or unknown.
>> Too many inquiries last 12 months.

(Pl's Ex. 7).   Regardless of what the Trans Union employee claimed in response to defense counsel's question, the jury was just as entitled to believe the American Express document.  The only "Serious derogatory public record or collection" in Mr. Brim's credit report was the Midland account.[4]

Further, as Plaintiff's counsel explained in Closing Argument, using several admitted exhibits, there is a difference between reporting the tradeline account in a disputed "status" versus reporting the tradeline merely with a disputed "remark."  For example, the Plaintiff's credit reports before the American Express application (Pl's Ex. 6) showed that the Midland account was reported merely with the disputed remark while after litigation, the Midland tradeline in Experian's credit reports had been changed to a full dispute status. (Pl's Ex. 72).

Such uncertainties and evidentiary interpretations are of course why we have a jury.  Plaintiff is not simply required to roll over and accept as true and infallible the testimony of a credit reporting agency (a frequent FCRA defendant in its own right).  Not

---

[4] As the Federal Reserve Board regulation and commentary governing adverse action notices explains: " 4. Credit scoring system.  If a creditor bases the denial or other adverse action on a credit scoring system, the reasons disclosed must relate only to those factors actually scored in the system. Moreover, no factor that was a principal reason for adverse action may be excluded from disclosure. The creditor must disclose the actual reasons for denial (for example, ``age of automobile") even if the relationship of that factor to predicting creditworthiness may not be clear to the applicant." Official Staff Interpretation to Regulation B, 12 C.F.R. § 202.9(b)(2) found at http://ecfr.gpoaccess.gov/cgi/t/text/text-idx?c=ecfr&sid=3f1954c6690810388135e3f14828fb22&rgn=div9&view=text&node=12:2.0.1.1.3.0.2.17.5&idno=12 (last visited 4/14/2011).

only was it proper for the jury to accept the American Express direct evidence and the Plaintiff's circumstantial evidence (lack of any other major derogatory in his file to better explain the credit denial), but also it was proper for the jury to reject outright the Trans Union testimony as unbelievable.   It is more common than not that the consumer attempting to prove the basis for a credit denial must depend on a reasonable inference that the disputed inaccuracy was one of the causes of the credit injury or denial.  *Heupel v. Trans Union LLC*, 193 F.Supp.2d 1234 (N.D. Ala. 2002).  In *Heupel*, the Court permitted the inference that because a credit denial letter identified "Bankruptcy" as the reason for the denial, the only tradeline that listed a bankruptcy status had to be the one that caused the denial, even if the adverse action letter was not as precise in its explanation.

The actual American Express denial letter identifies a "collection account" as the cause of the denial and, scored or not, disputed or not, the inaccurate Midland account was the only collection tradeline in the Plaintiff's credit report.  Other courts have considered such "it can't be us" theories from other FCRA defendants and upon the same inferences as Plaintiff now suggests, each court left resolution of the factual dispute to the jury.  *See e.g. Lendino v. Trans Union Credit Info. Co.*, 970 F.2d 1110, 1112-13 (2d Cir. 1992) ("Trans Union denies forwarding to Bloomingdale's the bad credit history of Lendino. … [Lendino] argues that a reasonable inference can be drawn from the documentary exhibits that Trans Union did issue the obsolete information to Bloomingdale's. Lendino relies upon (1) Bloomingdale's letter to Lendino[4] indicating that its rejection was based in part or in full on Trans Union information, and (2) the fact that the good credit rating shown in the "James R. Lending" report would have afforded no

reasonable  basis for Bloomingdale's to deny Lendino's credit application."); *Alley v. First Am. Credco, Inc.*, No. 05CV2130, 2007 WL 188036, at *5 (N.D. Ill. Jan. 19, 2007) ("Although [the mortgage broker] also testified that he did not personally know why Alley's loan was denied. Nevertheless, material issues of fact remain. Specifically, CREDCO concedes that the Shell Management account was the only delinquency on Alley's credit report. … Further, the item complained of by Alley was an account that she had paid off completely nearly two years before her application with Lending Tree. As noted above, Lending Tree's applications considered 24-month histories and, as such, had the Shell Management account been properly reported, the late payment date would have been almost beyond the scope of consideration. As in *Koropoulos v. Credit Bureau, Inc.*, 274 F.2d 37 (D.C.Cir.1984), (the plaintiff presented a material question of fact as to whether "the only reasonable interpretation" was that this was the reason for the denial."); *Sloane v. Equifax Info. Servs., LLC*, 510 F.3d 495, 501 (4th Cir. 2007) (Equifax next argues that the evidence does not support any award for economic losses. Equifax claims that only speculation and conjecture support such an award … We disagree. The evidence at trial in this case clearly demonstrates that on numerous occasions Suzanne attempted to secure lines of credit from a variety of financial institutions, only to be either denied outright or offered credit on less advantageous terms that she might have received absent Equifax's improper conduct. At times, these financial institutions consulted credit reports from other agencies, but at other times these institutions relied exclusively on the erroneous credit information provided by Equifax. Based on these incidents, we find that there is a legally sufficient evidentiary basis for a reasonable jury to have found that Equifax's conduct resulted in economic losses for Suzanne."); *Bach v. First Union Nat.*

*Bank*, 149 F. Appx. 354, 361 (6th Cir. 2005) ("FUNB also argues that the district court erred in relying on Bach's rejected credit card application in finding that Bach had proved actual damages resulting from FUNB's FCRA violation. FUNB asserts that the credit report on which Bank One relied in rejecting Bach's application did not include the false FUNB information from Bach's file and says this false information had already been deleted. However, the letter Bank One sent to Bach rejecting her credit card application stated that her application was being rejected due to "credit accounts now delinquent[,] number of accounts ever delinquent[, and] total available revolving credit." Viewing this evidence in the light most favorable to Bach, the district court did not err in finding that sufficient evidence was presented from which a jury could reasonably conclude that a causal link existed between the rejected credit card application and FUNB's FCRA violation.")  The jury could have properly found that the Midland collection account was a substantial factor in Mr. Brim's American Express credit denial.

Defendant's last argument as to the American Express denial is that it should not be considered as an element of Mr. Brim's damages because he intended to make some or even many work related charges on the card.  But as the Court clarified in Mr. Brim's trial testimony, the credit cards at issue were always to be his own personal credit cards, for which he could charge anything he chose.  (Trial Tr., Vol. III, 131:20-24; 132:5-12).  Groceries, gifts for his children and – certainly – hotel bills for later reimbursement by his employer.

To make this argument, Midland has to skip several steps of analysis in FCRA jurisprudence and then misconstrue cases that make only a related point.  The FCRA protects "consumers," narrowed only by the requirement that each consumer be "an

individual." 15 U.S.C. §1681a(c). However, in contrast, the term "consumer report" as applied to a "credit report" is limited to those "used primarily for personal, family, or household purposes." 15 U.S.C. §1681a(d). And there is where Midland stops. But the FCRA violation in this case is not based on Midland's furnishing of consumer report. It is not a consumer reporting agency and thus not subject to 15 U.S.C. §1681e(b), the claim against the credit bureau for furnishing a consumer report that is not accurate. Instead, it is under 15 U.S.C. §1681s-2(b), the FCRA provision that governs creditor-furnishers such as Midland. That provision requires Midland to conduct a substantive investigation when it receives the consumer's dispute from the credit bureau. There is no element of such a claim pertaining to a consumer report. In contrast, the claims involved in the two cases cited by Midland were based on FCRA provisions expressly predicated on the furnishing of a consumer report – 15 U.S.C. §§1681m and 1681e(b). *See e.g., Fernandez v. Retail Credit Co.*, 349 F. Supp. 652, 655 (E.D. La. 1972) ("The primary purpose of the policy in question was for business use. … Thus, it must be considered that the report issued by Retail Credit to the named insurance companies was not a 'consumer report.' But this does not dispose of the jurisdictional challenge, because the Act regulates more than "consumer reports." Section 1681g requires that a consumer reporting agency disclose to a consumer the nature, substance, and sources of information in its files with respect to that consumer. In the event that the consumer disputes the accuracy of any such information, Section 1681i establishes procedures allowing the consumer to challenge the information and requiring the reporting agency to either delete or reinvestigate. Damages are provided for in Section 1681n for willful noncompliance, and in Section 1681o for negligent noncompliance, with these sections of the Act. The

mandate of sections 1681g and 1681n is not restricted to information classified as a 'consumer report.'").

Mr. Brim asserted his credit denials as a result of the failure of Midland to investigate and correct his credit files at Equifax, Trans Union and Experian. Under the plain statutory language at 15 U.S.C §§1681n and 1681o, he is entitled to recover all damages that thereafter ensue, whether or not they involve a consumer report.

*Capital One credit card. Multiple Mortgage denials.* At trial, the Plaintiff presented sufficient evidence by which a jury could have found that he suffered an additional denial of a credit card application when he attempted to increase his Capital One credit limit. (Trial Tr., Vol III, 117:18 – 119:3.) Defendant did not object at trial to this testimony and even now makes no mention of this damage source. In fact, this was one of the most obvious articulations of his emotional distress related to a credit denial. Mr. Brim explained that he needed to stay one more week at the hotel but he did not have the ability to pay for the room. Mr. Brim requested the credit limit increase on his Capital One account because he was already at his limit. When that increase was declined, Mr. Brim applied for an American Express card so he could pay for his room. When the American Express card was declined, Mr. Brim was humiliated, upset and distressed because he really did need the money at the time and was left no other choice, but to borrow the money from his mother. (Trial Tr., Vol III, 106:19-109:9).

The jury could have also accepted Mr. Brim's evidence that he suffered multiple mortgage loan denials before ultimately obtaining credit with Platinum Mortgage. Mr. Brim testified that he applied for a mortgage with First Metropolitan Mortgage on or about July 28, 2008, and again on September 19, 2008. (Trial Tr., Vol III, 105:3-17).

Mr. Brim also testified that he applied for a mortgage with Lending Tree on September 19, 2008.  *Id*. at 105:23-25.  Finally, Mr. Brim testified that he applied for a mortgage with Platinum Mortgage in December 2008.  *Id*. at 106:4-9.  Each of these mortgage applications was confirmed by the regular inquiries identified in Mr. Brim's February 24, 2010 credit disclosure.  (Pl's Ex. 57).   Defendant did not object at trial to Mr. Brim's testimony in such regards – hearsay, foundation or otherwise.  *Judd v. Rodman,* 105 F.3d at 1342; *Typographical Serv,, Inc. v. Itek Corp.,* 721 F.2d at 1320.

At trial, the Plaintiff presented sufficient evidence – both direct and circumstantial – by which the jury should find that the inaccurate Midland tradeline was a substantial factor in Mr. Brim's Capital One, credit card and First Metropolitan Mortgage, Lending Tree and Platinum Mortgage denials.  Consumers regularly face defense arguments founded upon the considerable difficulty consumers face in obtaining creditor explanations for denials and admissible evidence to prove them.   More often than not, the consumer will not receive a detailed explanation of the denial sufficient to survive beyond any reasonable doubt against a defense spray of arguments.   In enacting the FCRA, in addition to enabling a consumer to overcome the "difficulty in correcting inaccurate information," and "getting [his] version of a legitimate dispute recorded in ... [his] credit file," "Congress also hoped to address a number of related problems, including 'the inability at times of the consumer to know he is being damaged by an adverse credit report' [and] the lack of 'access to the information in [his] file[.]' " S.Rep. No. 91-517, at 3 (1969). *Cortez v. Trans Union, LLC*, 617 F.3d 688, 706 (3d Cir. 2010). (emphasis added).

Accordingly, traditional tort causation principles have been remedially applied to

the FCRA.  The principle case on point is the Third Circuit's decision in *Philbin v. Trans Union Corp.*, 101 F.3d 957 (3d Cir. 1996), cited by multiple Circuits, including the Eleventh.  *See e.g. Levine v. World Financial Network Nat. Bank*, 437 F.3d 1118.  The Third Circuit considered a case in which the consumer did not have direct evidence that any of his credit denials were caused by the FCRA defendant, Trans Union.  As a result, the agency challenged the consumer's credit damage claim contending that there could be other factors to explain the adverse decisions by Philbin's third party lenders.  The Court of Appeals rejected such challenges and permitted proof of the credit denials by circumstantial evidence and inference:

> More fundamentally, the district court erred by assuming that Philbin could satisfy his burden only by introducing direct evidence that consideration of the inaccurate entry was crucial to the decision to deny credit. While Philbin's case might have been stronger had he deposed or taken affidavits of those responsible for the decision, such evidence is not essential to make out a prima facie case pursuant to  § 1681e(b). We deem it sufficient that, as with most other tort actions, a FCRA plaintiff produce evidence from which a reasonable trier of fact could infer that the inaccurate entry was a "substantial factor" that brought about the denial of credit. Restatement (Second) of TortsS § 431(a); Keeton *et al.,* Prosser and Keeton on Torts § 41, at 266-68 (5th ed. 1984) [hereinafter Prosser & Keeton]. Philbin has met that burden in this instance as to each of the six credit denials encompassed by his complaint.

*Philbin v. Trans Union Corp.*, 101 F.3d 957, 968 (3d Cir. 1996).  This "substantial factor" language has become established law.

A consumer often cannot rule out every alternate explanation for an adverse credit decision.  Under the "substantial factor" analysis, "Courts have recognized that where a decision-making process implicates a wide range of considerations, all of which factor into the ultimate decision, it is inappropriate to saddle a plaintiff with the burden of

proving that one of those factors was *the* cause of the decision." *Id.* at 969.  As Philbin explained,

> Forcing a plaintiff affirmatively to rule out other explanations for the credit denial ignores the fact that decisions to deny credit will frequently have more than one cause. For example, in some instances the inaccurate entry and another factor may each, considered separately, be insufficient to have caused the denial of credit but when taken together are sufficient. Each may then be considered a substantial factor in bringing about the denial of credit and therefore a cause of plaintiff's injury. *See* Prosser & Keeton § 41, at 266-67 & n. 25.

*Id.*

In practice, the "substantial factor" analysis and the permitted use of circumstantial evidence to establish credit injury makes sense.  A jury is permitted thereby to draw reasonable inferences and accept the impact of an inaccurate credit report as a relevant and substantial factor in a lender's denial decision.  For example, in *Philbin*, the Court of Appeals criticized the District Court's reversal of its initial willingness to allow a consumer "convince a jury, 'by process of elimination,' *Philbin I* at 19, that the credit granting agencies must have both used the inaccurate report and considered the inaccurate information on that report in reaching their decisions to deny credit." *Philbin*, 101 F.3d at 967-68.  The better set of proofs required to circumstantially a credit inaccuracy as a substantial factor in causing credit damage is: (1.) proof of a credit inaccuracy and  (2.) proof that the consumer applied for credit and (3.) proof that the consumer did not obtain the credit.  *Price v. Trans Union, LLC*, 737 F. Supp. 2d 281 (E.D. Pa. 2010) ("a consumer-plaintiff is minimally required to present some evidence of a credit inaccuracy and then some evidence of applying for and not obtaining credit.").

In this case, in addition to the American Express denial, Mr. Brim presented evidence that the jury could have reasonably considered that over the period after he

made his first FCRA dispute regarding the Midland account and through the date a year later on which he was finally able to purchase a home, (1) he applied for a mortgage on multiple occasions, (Trial Tr. Vol III, 86, 105, 106)  (2) each was recorded as in inquiry in his credit history and reports (Pl's Ex. 41, 57, and 70)  and (3) he did not receive any of these mortgage loans (Trial Tr. Vol III,  86, 106).  There was no alternate explanation, or more appropriately stated, there was no scenario in which the jury could not fairly infer that the inaccurate Midland account, a growing unpaid collection account and "major collection derogatory," was not at least a "substantial factor" in his inability to obtain a mortgage.  Coupled with the details stated in his unobjected credit reports, Mr. Brim's own testimony was more than sufficient to prove his credit damage.     *See e.g. Bach v. First Union Nat. Bank*, 149 F. Appx. 354, 361 (6th Cir. 2005) ("FUNB argues further that the district court erred in relying on this mortgage application at all in determining whether Bach had proven actual damages because she failed to produce any evidence other than her own testimony documenting the failed mortgage application."); *Drew v. Equifax Info. Servs., LLC*, No. C 07-00726 SI, 2010 WL 5022466 (N.D. Cal. Dec. 3, 2010) ("Defendant also argues that the only evidence that could possibly support an award are tri-merge documents, which are hearsay and cannot be used to prove the contents of plaintiff's Equifax file. But other evidence-such as plaintiff's testimony-shows that plaintiff's Equifax file contained erroneous information both before and after plaintiff considered investing in the Chico properties. The jury was free to deduce from that evidence and from plaintiff's testimony that his emotional distress damages were caused by defendant's FCRA violation."); *Adams v. Phillips*, No. 01-3803, 2002 WL 31886737, at \*2-3 (E.D. La. Dec. 19, 2002) ("In order to prove the amount of his economic loss

damages, Adams testified that his access to credit was severely damaged as a result of Phillips' actions. … Adams also testified that his damaged credit reputation has prevented him from carrying on his construction business in which he was earning more than $100,000 a year. Adams additionally testified that his construction business has still not fully recovered from the damage suffered due to Phillips' actions. Lastly, Adams testified that he also lost an opportunity to make a $35,000 profit on the purchase and sale of a condominium in Florida.    A review of Adams' testimony supports the finding that the jury's verdict in regards to compensatory damages was not against the great weight of the evidence produced at trial. While it is true that much of Adams' testimony was not corroborated by any documentary evidence, the jury was entitled to base its determination on the credibility of Adams as a witness.")

> **b.**    **Mortgage approval delay.**

Midland also implicitly argues that it should somehow be released of culpability for the difficulties it caused Mr. Brim in his efforts to obtain a mortgage because, at the end of his ordeal, he finally obtained credit with Platinum Mortgage.  However, Defendant ignores the fact and evidence that it took the Plaintiff eight months and numerous failed attempts and denials to obtain a mortgage after the date he first disputed the Midland inaccuracy.  This delay is itself compensable.  *Casella v. Equifax Credit Info. Servs.*, 56 F.3d 459, (4th Cir. 1995); *Gill v. Kostroff*, 98-930-CIV-T-17A, 2000 WL 141258, at *9 (M.D. Fla. Feb. 8, 2000).

> **c.**    **Mr. Brim's time and expenses in obtaining correction of the Midland inaccuracy.**

At trial and now after verdict, Midland continues to silently ignore Mr. Brim's claim and proof that he suffered significant economic damages in his time lost and expenses incurred forcing Midland to correct its inaccuracy.   At trial, the Plaintiff testified, that in July of 2008, when he was preparing his dispute letters and making copies of his credit reports and everything, he spent ten (10) hours doing all of that.   Trial Tr. Vol III, 103:13-17; 104:1-2.   In 2009, he spent six (6) hours preparing his dispute letters.   *Id.* at 104:11.   From July 2008 through the date of trial, Mr. Brim testified that he spent a month of time trying to correct his credit reports, including using one week of his vacation time to attend trial.   *Id.* at 123:11-18.   Mr. Brim testified that in July 2008 he was earning $17.00 per hour.   *Id.* at 104:12-13.   In March 2009, Mr. Brim began earning $22.00 per hour.   *Id.* at 123:22-25.

Mr. Brim also spent a total of $60.51 for postage and mailings in his Midland disputes.   (Pl's Ex. 4 – certified mail costs for July 2008 disputes - $24.46; Pl's Ex. 6 – Express Mail to Midland - $17.50; Pl.'s Ex. 39 – Certified mail to Equifax - $6.58; Pl's Ex. 52 – Certified mail to TransUnion - $5.90; and Pl's Ex. 67 – Certified mail to Experian - $6.07.

The jury could have thus found that Mr. Brim suffered such non-credit denial economic damages at or in excess of $12,572.51.   Such injury is fully compensable under the FCRA. *Robinson v. Equifax Info. Servs, LLC*, 560 F.3d 235, 246 (4th Cir. 2009) ("Based on our review of the record, we also conclude that Robinson proffered sufficient evidence of loss of income from time missed from work addressing Equifax's errors."); *Dixon-Rollins v. Experian Info. Solutions, Inc.*, No. 09-0646, 2010 WL 4939441 (E.D. Pa. Sept. 23, 2010) ("At the very least, she is entitled to damages suffered in connection

with her efforts to correct the error in Trans Union's credit report.); *see Cortez,* 617 F.3d at 717("Time spent trying to resolve problems with the credit reporting agency may also be taken into account."); *Sheffer v. Experian Solutions, Inc.,* No. 02-76404, 2003 WL 21710573, at *3 (E.D.Pa. July 24, 2003) (plaintiff may be entitled to damages for emotional distress suffered in connection with trying to correct the error).

> **2.** **Non-economic damages.**

It is possible that the jury attributed all of the awarded compensatory damages based on Mr. Brim's economic injury.  However, the jury may have just as properly found that the Plaintiff suffered significant non-economic injury even in the absence of a credit denial. *Cortez v. Trans Union, LLC,* 617 F.3d at 719; *Bach v. First Union National Bank,* 149 Fed. Appx. at 360; *Guimond v. Trans Union Credit Corp.,* 45 F.3d at 1333. Often, as in this case, "[T]he most significant damage sustained by a consumer is the emotional distress and vexation of dealing with the repercussions of an inaccurate credit report and the often frustrating ordeal of trying to set the record straight." *Fair Credit Reporting,* Fifth Ed., NCLC, §11.2.3.1, at 273 (2002).   The Court instructed the jury – without Midland's objection – that:

> In considering the issue of the plaintiff's damages, you are instructed that you should assess the amount you find to be justified by a preponderance of the evidence as full, just, and reasonable compensation for all of the respective plaintiff's damages, no more and no less.  Whether in regard to negligent or willful violation of the act, compensatory, or actual damages are intended as money compensation to the party wronged to compensate him for the injury and or the damages that have been inflicted as the result of or were caused by the wrong complained of.
> Compensatory or actual damages are allowed and should be awarded where a party satisfied the jury by a preponderance of the evidence that the party has been injured or damaged by the wrongful act or acts of the party charged.

Trial Tr., Vol IV, 23.  The Court also instructed:

> Also, compensatory damages must not be based on speculation or guesswork, because it is only actual damages that are recoverable. Actual damages include recovery for any out-of-pocket expenses and damages for personal humiliation, embarrassment, anguish, and emotional distress. On the other hand, compensatory damages are not restricted to actual loss of time or money. They cover both the mental and physical aspects of the injury, tangible and intangible. Thus, no evidence of the value of such intangible things as emotional and mental anguish has been or need be introduced.

Trial Tr., Vol IV, 24:1-14. Defendant now – after the fact – improperly asks the Court to accept an alternate standard for emotional distress and non-economic damages in conflict to that to which it previously agreed.

A jury's determination that a Plaintiff has suffered humiliation, emotional distress and other non-economic damages is entitled to great deference. As Judge Proctor explained in considering a comparable defense motion: "In this case, because the jury awarded damages for emotional distress, the court [should be] "particularly deferential to the fact finder's determination of compensatory damage awards for intangible, emotional harms because the harm is so 'subjective and evaluating it depends considerably on the demeanor of the witnesses.' " *Griffin v. City of Opa-Locka,* 261 F.3d 1295, 1315 (11th Cir.2001) (quoting *Ferrill,* 168 F.3d at 476); *see also Bogle v. McClure,* 332 F.3d 1347, 1359 (11th Cir.2003)." *Tucker v. Hous. Auth. of Birmingham Dist.*, 507 F. Supp. 2d at 1249-50.

Contrary to Midland's post-trial assertion, "[T]he Eleventh Circuit has held, 'general compensatory damages, as opposed to special damages, need not be proven with a high degree of specificity.' In fact, this Circuit has repeatedly noted that "damages for emotional distress ... 'may be inferred from the circumstances as well as proved by the

testimony.' " *Tucker v. Hous. Auth. of Birmingham Dist.*, 507 F. Supp. 2d  at 1276-77 (citations omitted).

A plaintiff's own testimony that he was embarrassed and humiliated by defendant's conduct is sufficient to support an award of compensatory damages. *Marable v. Walker,* 704 F.2d 1219, 1220 (11th Cir.1983), *cited with approval in Akouri v. Florida DOT,* 408 F.3d 1338, 1345 (11th Cir.2005) and *Ferrill,* 168 F.3d at 476; *Tucker v. Hous. Auth. of Birmingham Dist.*, 507 F. Supp. 2d at 1276-77.

A Plaintiff's testimony articulates emotional distress sufficiently to find that "that a reasonable jury could conclude that Plaintiff was entitled to $100,000 in emotional distress damages" when he testified to such factors as "his inability to sleep at night," "his stomach problems," "the embarrassment he suffered, the humiliation of pretending to go to work so that his children would not know he had lost his job," "his need to modify his spending habits due to financial difficulty," "the loss to his self-esteem" and "his feelings of anxiety." *Tucker v. Hous. Auth. of Birmingham Dist.*, 507 F. Supp. 2d at 1277-78. These facts are remarkably close to those presented by Mr. Brim. There was ample specific testimony regarding Mr. Brim's emotional damage resulting from Midland's actions. (Trial Tr., Vol. III, at 63-112).

**B.     (In Response to Motion for Remittitur)  Remittitur of Compensatory Damages would be improper.**

Midland asks the Court to reduce the actual damages determined by the jury from $100,000 to its (unexplained) number, $25,000.  There is no basis in the law or evidence to support such a decision.

Beyond its general challenges to specific damage categories – each answered above – Midland's only other actual damages remittitur argument is premised on a selective list of several low damage FCRA jury awards.  Midland relies for its argument on the Fourth Circuit's decision in *Sloane v. Equifax*, 510 F.3d 495 (4th Cir. 2007).  In *Sloane,* the Court considered remittitur of an emotional distress award of $245,000 following after a jury trial.  The Circuit Court remitted that number – just for emotional distress - to $150,000.  Midland misses the fact that Sloane was based solely on an assessment of emotional distress damages.  In addition to the $150,000 permitted by the Fourth Circuit in that category, the consumer also recovered an additional $106,000 solely for economic damages (credit damage).  After remittitur, the consumer in *Sloane* still recovered actual damages of $256,000.  *Id*.

This was possible because the parties in *Sloane* had asked for and obtained a special verdict instruction from the court to the jury.   A more appropriate parallel to the case *sub judice* is *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 237 (4th Cir. 2009).   In *Robinson,* as in this case, the Defendant never asked for a special verdict form to require the separation by the jury of different types of damages. *Id*. at 242 ("Equifax attacks the denial of its motion for a new trial on numerous grounds, asserting, among other things, that (1) the district court erred by submitting to the jury a general verdict form that did not separate damages for emotional distress from those for economic injury, and (2) the district court erred by failing to overturn "the excessive emotional distress award." Equifax's strained arguments are unconvincing. … [T]he parties agreed to the use of a general verdict form that did not separate damages for emotional distress from those for economic injury.")

Defendant suggests as well that an award of actual damages in the amount of $100,000 is a remarkable outlier.   This is also untrue.   The jury award is fully consistent with a large number of FCRA and credit injury cases:

(1)   Adams v. Phillips, 2002 U.S. Dist. LEXIS 24888 (E.D. La. 2002)($225,000 actual damages based upon general and economic damage theories);

(2)   Anderson v. Conwood Co. 34 F. Supp. 2d 650 (W.D. Tenn. 1999) ($50,000 in actual damages awarded in absence of testimony other than worry, stress and anxiety);

(3)   Bach v. First Union, No. 3:01CV191 (S. D. Ohio)($400,000 in actual damages);

(4)   Bell v. May Dep't Stores, (Missouri 2000, Case No. 22942-09508-01, jury award $50,000 actual damages);

(5)   Boris v. Choicepoint Servs., Inc., 249 F.Supp2d 851(W.D. Ky. Mar. 14, 2003) ($197,000 emotional distress damages remitted to $100,000 based upon inaccurate credit reporting by credit reporting agency);

(6)   Brown v. Experian, No. 3:01CV1967-RNC (D. Conn. April 16, 2004) ($50,000 jury verdict for emotional distress damages and lost credit in reinvestigation case under 15 U.S.C. §1681idefended by Jones Day);

(7)   Conseco Finance Servicing Corp. v. Carlson, District Court, Creek County, Sapulpa Division, State of Oklahoma, No. CJ 00 227, Feb. 14, 2002 ($450,000 in actual damages for emotional distress);

(8)   Drew v. Equifax No. 3:07CV726-SI (N.D. Cal. Aug. 8, 2010)($315,000 in compensatory damages for emotional distress, plus $6,326.00 in other actuals);

(9)   Guimond v. Trans Union, 45 F.3d 1329 (9th Cir. 1995) (jury awarded $275,000 for humiliation and mental distress damages available under FCRA following remand);

(10)   Johnson v. MBNA,  (E.D. Va. 2002) (jury award of $90,300 for emotional distress and damage to reputation sustained against credit furnisher MBNA for negligent investigation of consumer's dispute in violation of FCRA section 1681s 2(b) appeal reported at 357 F.3d 426 (4th Cir.2004);

(11)   Jorgenson v Experian, No. 96CV286-JE (D. Ore. 1998)($600,000 in actual

damages);

(12)     Kirkpatrick v. Equifax, (2005 WL 1231485, May 23, 2005, D. Oregon) ($210,000 actual damages for identity theft reinvestigation claim);

(13)     McGowan v. Warner, No. 95CV3310 (Alabama 1999)($1.85 million to theft of identity victim);

(14)     Mills v. NationsBank (3rd Judicial District, Lake City, Florida, 1999) (Jury award $140,000 actual);

(15)     Robinson v. Equifax, No. 06CV1336 (E.D. Va. 2006)($200,000 actual damages for identity theft reinvestigation claim) aff'd at 560 F.3d 235 (4th Cir. 2009);

(16)     Sloane v. Equifax, No. 1:05CV1272-LMB (E.D. Va. 2005)($350,000 actual damages for identity theft reinvestigation claim);

(17)     Soghomonian v. Trans Union, No. Civ. F 99CV5773-SMS (E.D. Cal. 2004) stipulated at 2005 WL 1972594 (E.D.Ca. June 20, 2005) ($330,000 actual damages);

(18)     Stevenson v. TRW, 987 F.2d 288 (5th Cir. 1993) ($30,000 in mental anguish and embarrassment damages);

(19)     Thomas v. Trans Union, No. 3:00CV1150 (Jan. 20, 2003)(docket #184)($300,000 actual damage for emotional distress);

(20)     Thompson v. Equifax, (2003 WL 1579757, M.D. Ala., March 3, 2003) (jury award $80,000);

(21)     Thompson v. San Antonio Retail Merchant, 682 F.2d 509 (5th Cir. 1982)($10,000 actual damages for humiliation and mental distress even when no out of pocket expenses);

(22)     Trans Union Corp. v. Crisp, 896 S.W. 2d 446 (Ark. App. 1995) ($15,000 compensatory damages, $25,000 punitive damages);

(23)     Wenger v. Trans Union, No. 2:95CV6445-ER (C.D. Cal. 1996)($200,000 actual damages award);

(24)     Williams v. Equifax, 9th Judicial Circuit, Orange County, Florida, Case No. 48-2003-CA-9035-0, Nov. 17, 2007 ($219,000 actual damages)

(25)     Zamora v. Valley Fed. S&L Ass'n, 811 F.2d 1368 (10th Cir. 1987) ($61,500 in actual damages for emotion distress sustained based on

impermissible access of consumer report under false pretenses);

(26) Zotta v. Nations Credit, No: 4:02 CV 1650 (E.D. Mo. Jan. 28, 2004)($87,000 actual damages award).

(27) Adams v. Phillips, 2002 WL 31886737 (E.D. La. Dec. 19, 2002)($200,000 actual damages);

(28) Reilly v. Duvall County Public Schools, 2007 WL 2120547 (M.D. Fla. July 23, 2007)($208,197.18 actuals awarded, but capped at $100,000 under Florida law);

(29) Quitto v. Bay Colony Golf Clubs, 2007 WL 4098847 (M.D. Fla. Nov. 15, 2007)($130,000 actual damages);

(30) Peer v. Lewis, 2008 WL 2047578 (S.D. Fla)($133,200 damages, remittitur to $12,500);

(31) Jansen v. Experian, 2011 WL 846876 (D. Or. Mar. 9, 2011)(stipulated judgment of $275,000).

Even at $100,000, the jury's actual damages award is somewhat modest given the evidence.  A reasonable jury of 12 strangers heard days of trial testimony and deliberated to a dispassionate and informed verdict.  Even if somehow the Court disagreed as to the most appropriate actual damages value, it may not substitute its own judgment for that of a jury.

## III. CAUSATION

Defendant characterizes its first argument stated as regarding "Causation" in its renewed Motion for Judgment.  The issues raised are not causation questions, but instead direct challenges to the jury's liability determination that Midland failed to conduct a lawful FCRA investigation.  Midland's second "causation" argument is a rehash of the Defendant's unhappiness that the authenticated American Express denial letter was admitted at trial.  This later defense argument is addressed above.  Plaintiff now addresses only those objections presented as Defendant's Section III (A).

Midland's argument – that its failure to conduct an investigation required by the law did not cause injury because it would not have changed the outcome – assumes incorrectly that Midland understands its obligations under the FCRA.  It also assumes incorrectly that it is somehow the Plaintiff litigant's obligation to draft, describe and proffer an alternative set of procedures for FCRA compliance.  Instead, a consumer such as Mr. Brim is required only to show that Midland did not conduct a substantive, searching and meaningful investigation.   15 U.S.C. § 1681s-2(b); *Robertson v. J.C. Penney Co., Inc.*, No. 2:06CV3-KS-MTP, 2008 WL 623397, at \*9; *Johnson v. MBNA Am. Bank, N .A.,* 357 F.3d at 430.  If Midland failed to do so, it violated the FCRA.

However, Midland argues that it would not have mattered if it had contacted Dell or contacted Redstone Credit Union because, for different reasons, it would not have received a response sufficient to cause it to delete the inaccurate account.  That Midland still to this point in the case takes this position is arrogantly remarkable.  It makes a number of assumptions that Mr. Brim's case has at a minimum proven wrong.  Plaintiff does argue that Midland did not even contact Dell.  But it made that argument in response to Midland counsel's attempted use of the Dell testimony and account history to somehow ask the jury to accept Dell's own failed procedures as somehow a reasonable industry standard.  Plaintiff's concern was not that Dell would have exonerated him with Midland.  Exactly the opposite was true.  Dell was as inept as Midland.  With its outsourced refusal to accept Mr. Brim's records of the full payoff of the account and it own refusal to conduct its own banking research to find out to which consumer its Indian vendor had credited Brim's payment, Plaintiff had zero confidence that Dell would have done anything different.   In fact, Plaintiff challenged as unreasonable Midland's

investigation requirement that a consumer first have a "paid in full" letter from Dell to obtain deletion of the inaccurate account. (Trial Tr. Vol. II, 82:19-86:1). *Swoager v. Credit Bureau of Greater St. Petersburg, Fla.*, 608 F. Supp. 972, 976 (M.D. Fla. 1985) (Unreasonable in a dispute investigation to rely solely on the original source of the challenged information).

Defendant's "Redstone Credit Union" argument also ignores the evidence at trial and is similarly confirmation as to willfulness that Midland is unrepentant. It bases its argument on what it believes is an entitlement to insist on a "transactional detail" document. There is nothing in the FCRA or any other provision of law that regards such a demand. Even Midland's own witness had never heard of the document. (Trial Tr., Vol II, 84:12-22). Regardless, the problem was not Midland's inability to obtain such a specialized banking document, but rather its refusal to accept a Redstone bank statement that proved definitely that Mr. Brim had paid the Dell account. As a last point on yhis issue, the Court also certainly recalls that the Redstone witness testified that his credit union did not provide creditors such a document because they already have the ability to get the same document from their own bank. (Trial Tr., Vol III, 220-221). As Plaintiff's counsel argued, "How many $954.12 payments came in from Redstone Federal Credit Union that day at that time." (Trial Tr., Vol IV, 44). The problem, of course, is that Midland did not want the expense and difficulty of contacting Dell and Dell did not want the expense and difficulty of contacting its Indian outsource vendor which took and misapplied Mr. Brim's payment. It didn't fit with a business model dependent upon a 4¢ per dollar collected cost structure. (Pl's Ex. 82, at 2).

Midland's admission that Dell was itself an unreliable investigation contact also nearly concedes FCRA liability. Its FCRA position and refusal to delete the account – and its initial willingness to report same to the credit bureaus – were presumably based on Midland's belief that Dell was a reliable source of account information. But now, and at trial, it argues that Dell itself would have refused any meaningful investigation and would have simply repeated the same information, information all parties today agree was inaccurate.

In fact, if as Midland claims, it could not have determined whether or not its information was accurate, based on contacts with Dell or bank research, it should never have violated 15 U.S.C. § 1681s-2(b) by untruthfully reporting to the credit bureaus that it had conducted an investigation and that it had thus "verified" that its information was accurate. Instead, all Midland needed to do to avoid violating the FCRA was to simply reveal the truth to the consumer reporting agencies: its "investigation" was unable to "verify" that Mr. Brim was indebted because it could or did not perform a more searching investigation. Midland's argument is not particularly novel. It was the same "Hail Mary" attempted by MBNA in the seminal *Johnson* case. *Johnson v. MBNA Am. Bank, N .A.,* 357 F.3d at 430. MBNA did not have access to any underlying documents on the account because it had purchased it as part of a portfolio from Citizen's Bank. It argued, exactly as Midland does now, that nothing more it could have done would have allowed it to determine any more conclusively that the consumer owed the disputed debt. The Fourth Circuit rejected that argument:

> Additionally, MBNA argues that Johnson failed to establish that MBNA's allegedly inadequate investigation was the proximate cause of her damages because there were no other records MBNA could have examined that would have changed the results of its investigation. In

particular, MBNA relies on testimony that, pursuant to its five-year document retention policy, the original account application was no longer in MBNA's possession. Even accepting this testimony, however, a jury could reasonably conclude that if the MBNA agents had investigated the matter further and determined that MBNA no longer had the application, they could have at least informed the credit reporting agencies that MBNA could not conclusively verify that Johnson was a co-obligor. *See* 15 U.S.C.A. § 1681i(a)(5)(A) (providing that if disputed information "cannot be verified, the consumer reporting agency shall promptly delete that item of information from the consumer's file or modify that item of information, as appropriate, based on the results of the reinvestigation") (amended Dec. 4, 2003).

*Johnson,* 357 F.3d at 432

Midland bases its argument on the results reached in several otherwise inapposite cases (The result being that the creditor-defendant prevailed).  None are applicable.  For example, in *Chiang v. Verizon New England Inc.*, the consumer had not even made FCRA disputes before filing suit. 595 F.3d 26, 33 (1st Cir. 2010) ("Chiang does not dispute these are the CRA inquiries at issue, although none of them had been made when he first filed his federal lawsuit.").  The challenged account was actually accurate. *Id.* at 40.  Similarly, just a quick read of the facts in *Donovan v. Bank of Am.,* clarifies why the court believed it was reasonable for the creditor to have suspected the consumer of fraud. 574 F. Supp. 2d 192, 207 (D. Me. 2008) ("at the time the Bank submitted the initial report on October 27, 2005, it had confirmed that the Maytag check Donovan deposited into his money market account had been altered, and that the mail-in deposit to Donovan's interest savings account was counterfeit. The Bank had learned previously that two other deposits into Donovan's regular checking account were dishonored as fraudulent: first the $59,110 check was returned as counterfeit; second, the $98,000 check was returned as altered.").  Midland's selection of cases almost appears intended to draw a favorable contrast with the clean facts in Mr. Brim's case.

- 40 -

### IV.     ONE-SATISFACTION RULE

In Defendant's Remittitur request, Midland repeats its pre-trial argument that the jury verdict be reduced in an amount equal to what the Plaintiff recovered from the co-Defendants.  The Court properly rejected the same argument when last raised and it should do so again.  Plaintiff incorporates his earlier arguments in such regard.   Now, after verdict, Midland's position seems even less reasoned.  It suggests that settlements with other parties that state an undefined lump sum amount be assumed to have covered payment for damages attributable to Midland.  There is no way to lawfully "assign" a purpose for one dollar versus another.  The amount paid could be attributable to attorneys fees, statutory damages, or punitive damages.  Regardless, the Court properly charged the jury to award damages attributable to Midland.  It did so.

The "One Satisfaction" rule is inapplicable under to the FCRA. *Sloane v. Equifax Info. Servs*., 510 F.3d 495, 500 and n.2 (4th Cir. 2007). The FCRA imposes distinct duties on furnishers of credit information such as the Defendant as well as the consumer reporting agencies with whom the Plaintiff has already settled. *Id*. These duties are not divisible. *Id*. There is no equitable offset for causes of action arising under the FCRA. *McMillan v. Equifax Credit Info. Servs, Inc*., 153 F.Supp.2d 129, 132 (D.Conn.2001).

More Midland itself lost nearly the exact same argument in a comparable FCRA case.  (Midland moved to compel the Plaintiff's production of settlement agreements with co-defendant credit bureaus and argued them relevant to show contribution or previous satisfaction of the damages sought by the consumer.)  *Pennington v. Midland Credit Mgmt., Inc.*, 1:10CV112, 2010 WL 3187955 (E.D. Va. Aug. 9, 2010).

### CONCLUSION

For the reasons set forth in the Plaintiff's Memorandum in Opposition, the Plaintiff respectfully requests the Court deny the Defendant's post-trial motions in their entirety.

/s/ Penny Hays Cauley
Penny Hays Cauley, ASB-6309-A63P
Attorney for Plaintiff

**HAYS CAULEY, P.C.**
549 West Evans Street, Suite E
Florence, SC 29501
(843) 665-1717
(843) 665-1718 Facsimile
phc917@hayscauley.com

Ronald C. Sykstus, Esq.
**BOND, BOTES, SYKSTUS, TANNER & EZZELL, P.C.**
415 Church Street, Suite 100
Huntsville, AL 35801
(256) 539-9899
(256) 539-9895 Facsimile
rsykstus@bondnbotes.com

Leonard A. Bennett, Esq.
**CONSUMER LITIGATION ASSOCIATES, P.C.**
VSB #37523
12515 Warwick Boulevard, Suite 100
Newport News, Virginia 23606
Phone: (757) 930-3660
Fax:    (757) 930-3662

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 15, 2011, I electronically filed the foregoing via the CM/ECF System, which will notify the following counsel of record:

Eric B. Langley, Esq.
Jason B. Tompkins, Esq.
BALCH & BINGHAM LLP
P. O. Box 306
Birmingham, AL 35201-0306

/s/ Penny Hays Cauley
Of Counsel