FILED
2011 May-31 AM 09:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

STATE OF MINNESOTA      FILED PSL      DISTRICT COURT

COUNTY OF HENNEPIN    11 MAY 19 AM 8: 03   FOURTH JUDICIAL DISTRICT

BY_____DEPUTY
HENN CO DISTRICT
COURT ADMINISTRATOR

Case Type:  Other Civil
(Consumer Protection)

State of Minnesota by its Attorney General,
Lori Swanson,

            Plaintiff,

vs.

Midland Funding, LLC and
Midland Credit Management, Inc.,

            Defendants.

Court File No. _____

**COMPLAINT**

The State of Minnesota, by its Attorney General, Lori Swanson, for its Complaint against Defendants Midland Funding, LLC ("Midland") and Midland Credit Management, Inc. ("MCM") (collectively "Defendants") alleges as follows:

## INTRODUCTION

1.     Midland is one of the nation's largest debt buyers.  Midland purchases electronic portfolios of old consumer debt from some of the nation's largest credit and telecommunications companies for about three cents on the dollar.  Midland is financed in part by some of the nation's largest banks — including several that sell consumer debt to Midland.  Since inception, Midland and its affiliates have paid about $1.8 billion to purchase about 33 million consumer accounts with a face value of about $54.7 billion.

2.     In 2009 alone, Midland and MCM filed over 245,000 lawsuits against individual citizens nationwide, and they have filed 15,000 lawsuits against individual Minnesota citizens in Minnesota state courts since 2008.  Midland and MCM secured default judgments against unrepresented citizens in these lawsuits by filing with the courts mass-produced "robo-signed"

affidavits generated at their St. Cloud, Minnesota office.  The employees who "robo-signed" the affidavits have testified under oath that they signed up to 400 computer-generated form affidavits a day without reading them, without personal knowledge of their contents, and/or without verification of the accuracy of the underlying information.  Through the filing of false, "robo-signed" affidavits with the Minnesota courts, Midland and MCM have engaged in conduct prejudicial to the fair administration of justice and have defrauded courts and citizens.

       3.      In addition, Midland and MCM have aggressively pursued many individual citizens out of court for payment of bills they do not owe or that they already paid.  This occurs in part because the debt they purchase is so old and because the electronic files they acquire from credit card, telecommunications, and other companies lack substantiation and contain errors.  Midland and MCM often force individual citizens to prove they do not owe money instead of themselves substantiating that the citizens actually owe the money being pursued for collection.

       4.      The State of Minnesota, by its Attorney General, brings this government enforcement lawsuit to hold Midland and MCM accountable for the unlawful acts and practices set forth in this Complaint.

## PARTIES

       5.      Lori Swanson, the Attorney General of the State of Minnesota, is authorized under Minn. Stat. Ch. 8, including Minn. Stat. §§ 8.01 and 8.31 (2010), and under § 332.39 (2010), and has common law authority to bring this action.

       6.      Midland Funding, LLC is a Delaware limited liability company.  Midland's principal office is located at 8875 Aero Drive, Suite 200, San Diego, California 92123.  Midland is registered with the Minnesota Secretary of State as a foreign corporation, and its registered agent is CT Corporation Systems, Inc., 100 South Fifth Street, suite 1075, Minneapolis,

Minnesota 55402.  Midland is licensed by the Minnesota Department of Commerce as a debt collector.  Midland, in concert with MCM, is engaged in the business of purchasing and collecting consumer debt.

7.     Midland Credit Management, Inc. is a Kansas corporation with an office in St. Cloud, Minnesota.  MCM's principal office is located at 8875 Aero Drive, Suite 200, San Diego, California 92123.  MCM is registered with the Minnesota Secretary of State as a foreign corporation, and its registered agent is CT Corporation Systems, Inc., 100 South Fifth Street, suite 1075, Minneapolis, Minnesota 55402.  MCM is licensed by the Minnesota Department of Commerce as a debt collector.  MCM, in concert with Midland, is engaged in the business of purchasing and collecting consumer debt.

8.     Both Midland and MCM are subsidiaries of Encore Capital Group, Inc., a Delaware corporation.  Encore's principal office is located at 8875 Aero Drive, Suite 200, San Diego, California 92123.  Encore is a publicly held corporation.  Encore states in its 2010 Form 10-K that it has "one of the industry's largest distressed consumer databases containing information regarding approximately 20 million consumer accounts."

## JURISDICTION AND VENUE

9.     Pursuant to Minn. Stat. § 8.31 (2010) and § 332.39 (2010), this Court has jurisdiction over the subject matter of this action.

10.    This Court has personal jurisdiction over Midland and MCM through their debt collection practices in Minnesota.  Defendants do business in Minnesota and have committed acts causing injury to Minnesota citizens.  MCM has an office in St. Cloud, Minnesota from which it engages in debt collection on behalf of and in concert with Midland.  MCM "robo-

3

signed" false affidavits, which it filed in Minnesota courts and exported throughout the country, at its St. Cloud, Minnesota office.

11.     Venue in Hennepin County is proper under Minn. Stat. § 542.09 (2010) because the cause of action arose, in part, in Hennepin County.

## FACTUAL BACKGROUND

### I.     Midland and MCM Purchase High Volumes of Consumer Debt for Pennies on the Dollar.

12.     Midland and MCM operate in concert with one another to purchase and collect portfolios of debts primarily consisting of charged-off consumer credit card debts, auto loan deficiencies, and telecommunications debts from some of the nation's largest issuers of consumer credit. For example, Midland has purchased consumer debt from, among others, financial sector companies such as Bank of America, J.P. Morgan Chase, Citigroup, Wells Fargo, Providian, and HSBC, and from telecommunications companies like Verizon Wireless. Midland purchases debts from the original creditor or another debt buyer. MCM sends collection letters and places telephone calls to alleged debtors on behalf of Midland. MCM also retains third-party law firms for legal action against alleged debtors on behalf of Midland.

13.     Over the past 20 years, MCM, Midland, and their parent company, Encore, have paid more than $1.8 billion to purchase 33 million consumer accounts with a face value of approximately $54.7 billion, or an average cost of three cents on the dollar. For 2010 alone, Midland and its parent, Encore, paid $362 million to acquire debt portfolios with a face value of $10.9 billion for an average price of about 3.3 cents per dollar of debt acquired. These debt portfolio acquisitions are funded in part by some of the same creditors who sell their own consumer debts to debt buyers. For example, Encore recently entered into a credit agreement with J.P. Morgan Chase and several other lenders, including Bank of America and Citigroup,

under which it obtained $410.5 million of credit to, among other things, purchase old consumer debt. J.P. Morgan Chase, Bank of America, and Citigroup have all sold consumer debt to Midland.

14.    When Midland/MCM purchase consumer debt, they generally acquire an electronic portfolio, or "datastream," containing limited categories of information about the accounts, such as the name of the alleged debtor and amount allegedly owed. Debt buyers such as Midland and MCM sometimes contract for the right to request and purchase supporting documentation after acquisition of the portfolio on an account-by-account basis.

**II.    Prior to Filing Debt Collection Lawsuits, Midland and MCM Engage in Practices That Place a Premium on Quick Collections Over Accuracy.**

15.    Midland and MCM churn out millions of collection letters and telephone calls annually, often using incomplete and/or inaccurate electronic information purchased from original creditors, or incorrect information obtained through their own efforts. Defendants sometimes target the wrong person for collection or attempt to collect debts that have been paid, settled, or are otherwise uncollectable.

16.    Defendants send mass mailings of collection letters to citizens, often offering discounts to settle alleged debts. In 2010, Defendants sent collection letters to approximately 8.7 million people. MCM also oversees telephone campaigns from call centers in St. Cloud, Minnesota, California, Arizona, and India. In 2010, MCM called approximately 8.6 million people.

17.    MCM and Midland regularly direct collection letters and telephone calls to the wrong person or to someone who has already paid or settled an alleged debt. Moreover, MCM's initial collection letters generally include very little information about the alleged debt, no

supporting documentation, and no proof that ownership of the debt was properly assigned to Midland.

18.     In some cases, when a citizen contacts Midland or MCM to dispute a debt or ask for additional information, little or nothing is done by the companies to investigate or verify the legitimacy of the alleged debt.  Instead, Defendants often simply provide the citizen with the name of the original creditor, the account number, and the alleged current balance, as found in a purchased portfolio's electronic datastream.  Defendants regularly contend that they have resolved a dispute by providing such cursory information and resume collection after doing so. Midland and MCM often take the position that they do not need to prove that the individual owes the debt to continue collection but that, rather, the citizen must prove the debt is not owed for collection to cease.

19.     In order to actually investigate a citizen's dispute or respond to a request for information about an alleged debt, Defendants would have to review supporting documentation, if it exists, follow up with the original creditor, and/or sacrifice their "efficiency."  Doing so would cost Defendants money.  Consequently, it is more "efficient" for Defendants to simply exert pressure on citizens to pay the purported debt than to investigate disputes or request information about the alleged debt.  Such pressure may include threats to report the alleged debt to the credit rating agencies.  Some people pay Defendants just to avoid false reports to credit bureaus or to otherwise avoid harassment or the legal process.

20.     Midland and MCM, like debt buyers generally, have little incentive to spend the time and resources necessary to respond to citizen disputes and requests for information about alleged debts.  They profit not from resolving disputes or investigating the accuracy of the debts

of which they are collecting, but by getting alleged debtors to pay money, whether or not the individuals they are targeting actually owe the money.

21. Midland and MCM generate millions of dollars in profits while receiving payments on less than one percent of their accounts each month. In 2010, Defendants reported approximately $364 million in revenue and $49 million in profits.

**III.  In Filing Debt Collection Lawsuits Against Debtors, Midland and MCM Defraud Courts and Citizens by Obtaining Judgments on Claims Using False Affidavits that are "Robo-Signed" by Individuals Who Have No Knowledge of the Alleged Debts.**

22. Defendants generate a significant portion of their revenue by filing lawsuits and collecting on judgments that are granted by courts in lawsuits filed against individual citizens. Midland serves as the plaintiff in these actions as alleged owner of the debt or successor in interest to the original creditor, while MCM manages and oversees collection efforts. As noted above, Midland filed 245,000 collection lawsuits nationwide in 2009 alone. Midland has filed more than 15,000 collection lawsuits in Minnesota courts since 2008. The majority of these lawsuits result in default judgments in favor of Midland because the unrepresented defendant failed to appear or respond.

23. When using the courts to collect on purchased debts in Minnesota, Midland typically files a two-page, boilerplate Complaint that identifies Midland as the successor in interest to an alleged creditor, asserts a claim for breach of contract, and demands judgment for principal, interest, costs, disbursements, and attorneys' fees. The vast majority of these lawsuits are filed against unrepresented citizens and subject to a motion for default judgment, and judgment is entered without a hearing or a trial, sometimes by a court clerk.

A.    **Midland and MCM Abuse the Court System by Filing Lawsuits For Which They Do Not Have Proper Evidentiary Support.**

24.    Midland and MCM file thousands of collection actions with Minnesota courts each year, often with little or no admissible evidence, knowing that they will be able to obtain default judgments against the overwhelming majority of people, who are not represented by attorneys and who do not respond to these lawsuits.

25.    As plaintiff, Midland identifies itself as the owner of the alleged debt or successor in interest to the original creditor, and claims that the defendant breached a contract with the creditor by failing to pay for goods or services purchased on an account issued by the creditor. When suing on a credit card debt, Midland typically attaches a copy of a form credit card agreement to its complaint.  Midland represents to the court that the attachment is a true and correct copy of the contract at issue, when in fact the document is often an incomplete copy of a generic credit card agreement with excerpts addressing recovery of collection costs and attorneys' fees.  The attached document often does not have an account number, date, the name of the alleged debtor, the signature of the alleged debtor, or any apparent information to indicate that the alleged account was actually issued to the defendant.

26.    After serving or purporting to serve its summons and complaint on an individual citizen who is the defendant, Midland sometimes waits months or even years before filing the case with the court.  When it finally does file the case, Midland often files a motion for default judgment and a request for attorneys' fees.  The majority of the cases Midland files with Minnesota courts result in default judgments against unrepresented citizens.

27.    In order to leverage an individual citizen into settlement or persuade the courts to enter judgment, Midland has filed false, mass-produced affidavits with its motions for default judgment and summary judgment.  Many of these affidavits have been executed at MCM's

office in St. Cloud, Minnesota. These affidavits were signed by MCM employees who attest to the validity of the alleged debt without reading the affidavit, reviewing records, and/or having any knowledge of the validity of the alleged debts.

28.     Many people subjected to Defendants' practices do not understand the court system, cannot afford to hire an attorney, and/or feel forced into settling a lawsuit in which Midland may be seeking a total judgment that has ballooned to more than twice the principal amount of the alleged debt due to interest, attorneys' fees, etc.

29.     Midland and MCM sometimes do not properly notify citizens of the lawsuits. On numerous occasions, Midland has obtained default judgments against Minnesota citizens who do not recall being served with a summons and complaint. In such cases, the citizen may not know about the lawsuit or judgment until Midland garnishes the citizen's wages or bank account, or the citizen is declined for a loan when a financial institution sees the judgment on a credit report.

30.     In December of 2008, the Hennepin County District Court issued a Standing Order stating that it had come to the court's attention that an employee of Major Legal Professional Process Servers "falsified his Affidavit of Service and did not in fact serve the defendant," and "gave perjured testimony regarding service of process in more than one instance" between January and July of 2008. Midland filed numerous cases with affidavits of service signed by this individual. The court's order provided that "in the interest of justice, District Court Administration cannot enter judgment against a party if there is any question about the validity of the service of process" and directed court administrators not to enter default judgments and to return any cases received for filing that had affidavits of serviced signed by the process server in question.

**B.**   **Midland and MCM Deceive and Defraud Courts and Citizens and Abuse the Judicial Process by Filing False Affidavits that are "Robo-Signed" by Individuals Who Have No Knowledge of the Alleged Debts.**

31.     Midland and MCM have affirmatively deceived and defrauded courts and citizens and engaged in conduct prejudicial to the fair administration of justice by filing false, mass-produced, computer-generated affidavits that are "robo-signed," or signed without the affiant reading the contents of the document, and/or signed by MCM employees with no personal knowledge of the validity of the debt or other facts to which they are attesting.  Many of these affidavits have been executed at MCM's St. Cloud, Minnesota office for filing in courts in several different states, including Minnesota state courts.

32.     Affidavits are sworn statements of individuals, attesting to certain facts or information.  Affidavits are typically used by debt buyers and debt collectors like MCM and Midland to attest to the validity of a debt against the defendant.  In other words, these affidavits are used to factually "prove" the debt to the court, so that the court will award judgment against the debtor in favor of the debt buyer and the debt buyer will "win" its lawsuit.

33.     MCM employees have signed false affidavits filed in Minnesota courts as evidentiary support in Midland's collection actions against Minnesota citizens to leverage payments from alleged debtors and to persuade courts to enter judgments against Minnesota citizens.

**1.**   **Three Separate MCM Employees Have Admitted Under Oath that They "Robo-Signed" Affidavits Without Knowing the Contents of the Affidavits and Without Personal Knowledge of the Debts to Which They Were Attesting.**

34.     At least three MCM employees have admitted under oath in different sworn deposition testimony that they signed affidavits containing false statements that were filed with courts to obtain judgments against individual citizens in favor of Midland.  All three employees

10

worked in MCM's St. Cloud, Minnesota office, and affidavits of all three were filed in courts in Minnesota and around the country against individual citizens. Judy Richter signed affidavits for Midland between 2004 and 2009, and was deposed in October of 2010. Elizabeth Neu signed affidavits for Midland between 2005 and 2009, and was deposed in October of 2010. Ivan Jimenez signed affidavits for Midland between 2008 and 2009, and was deposed in October of 2008.

35.   Ms. Richter, Ms. Neu, and Mr. Jimenez testified about MCM's process of executing affidavits before they are filed with courts to obtain judgments against citizens on behalf of Midland. Ms. Richter and Ms. Neu testified that they each signed up to 300 affidavits a day, and Mr. Jimenez testified that he signed up to 400 a day. They signed affidavits without reading them and/or without checking into or having any knowledge of the accuracy of the information to which they were attesting, including the validity of the alleged underlying debt. The text of the affidavits often referenced attached exhibits and attested to the accuracy of such documents, but Ms. Richter, Ms. Neu, and Mr. Jimenez routinely executed affidavits without ever reviewing or handling exhibits; rather, they simply signed and notarized the affidavits and mailed them to collection law firms in Minnesota and other states, with no knowledge of who would later attach the exhibits to which they attested.

### 2.   Midland Has Regularly Obtained Judgments Against Minnesota Citizens Using Affidavits in which the Representations Sworn to by MCM Employees are False.

36.   A typical mass-produced affidavit form signed by MCM employees and used by Midland to persuade courts to enter judgments against Minnesota citizens is a document called a "Form 400" affidavit. This two page document, created by MCM for Midland to be filed in courts against individual citizens, consists of five paragraphs on the first page and a signature

block on the second page.  The computer-generated affidavits contain many falsehoods and do not meaningfully substantiate the authenticity of the alleged debt.

> **a. Defendants' Affidavits Falsely Attest to the Personal Knowledge of the Affiant About the Alleged Debt.**

37.     The first paragraph of the Form 400 affidavit reads as follows:

I am employed by Midland Credit Management, Inc., servicer of this account on behalf of Midland Funding LLC.  **I make the statements herein based upon my personal knowledge**....

(Emphasis added).  Similar representations to the court are made elsewhere in the affidavits, including the "certification" that states that, "I certify under penalty of perjury that the foregoing statements are true and correct."

38.     But the testimony of Ms. Richter, Ms. Neu, and Mr. Jimenez indicates that they had no personal knowledge of the information in the affidavits they signed for Midland.  They testified that the affidavits were computer-generated and that they did little to nothing to review their contents.

39.     For example, Mr. Jimenez testified that he personally signed up to 400 affidavits a day.  Mr. Jimenez said he simply found stacks of affidavits on a printer, signed them, and sent them by internal mail to a notary, as stated in the following testimony:

Q:     Where do your affidavits come from?

A:     As far as what I deal with, they just come from the printer as far as where we get them.

. . . .

Q:     You mentioned earlier, when I asked you about that, you signed these affidavits and had them notarized.  Was the notary present in the room when you were signing all the affidavits, or do you sign them and give them to the notary?

A:      I sign them and give them to the notary.[1]

40.     Similarly, Ms. Neu testified the she also got her affidavits from the "printer":

Q:      Okay.  Okay.  Now with respect to the affidavits that you signed, how would those come to your desk?

A:      There was – we had a big printer.  They didn't come directly to our desk.  We had a big printer and they would all print out at the same time.

. . . .

Q:      Okay.  Do you know how they were caused to be printed?

A:      No.  That was Midland Credit.

Q:      Okay.  And to you know the person at Midland Credit that printed those?

A:      No.

41.     Likewise, Mr. Jimenez also testified:

Q:      Did you ever have any contact with [the alleged debtor], any business contact at all?

A:      I did not personally.

42.     Mr. Jimenez also testified:

Q:      So you simply sign them?

A:      Yes.

43.     In the following deposition exchange, Ms. Richter testified that she never read the

text of the affidavits:

Q:      Approximately how many affidavits would you sign each day when you were signing affidavits?

A:      Anywhere from 100 to 300.

Q:      Okay.  And about how long would you spend on each one before you signed it?

---

[1] Minn. Stat. § 358.07(10) requires that an oath shall be administered to affiants.

A:    I -- don't know.  It would depend on how fast the -- it would depend on what you were doing.  If you were stamping and notarizing it takes longer. If you are just signing it takes less time, so I would say one to two minutes.

Q:    Okay.  Is there anything else you would do when you were signing affidavits other than sign them?  I mean would you - - would you review the text that was in them?

A:    No.

44.    Similarly, Ms. Neu testified that she did not read the affidavits before signing them either:

Q:    Did you ever read the affidavit all the way through?

A:    No.

Q:    Up until and including today have you ever read the affidavit all the way through?

A:    No.

45.    Ms. Neu also testified that she did nothing to confirm the accuracy of the affidavits:

Q:    Okay.  Did you review any of the Midland Credit records before you signed the affidavit?

A:    No.

Q:    And did you review any other documents before you signed the affidavit?

A:    No.

. . . .

Q:    Okay.  And would you check the affidavits at all to make sure that even the information that was supposed to be there was there?

A:    No.

46.    Ms. Neu's lack of personal knowledge is illustrated by the following excerpt from her deposition testimony:

Q:    And it is my understanding that personal knowledge that you had was the information in Midland Credit's database?

A:    Midland Credit Management.

Q:    Midland Credit Management.  In their database?

A:    Yes.

Q:    Okay.  And nothing else; is that correct?

A:    That's correct.

Q:    And can you describe for me what information is in Midland Credit Management's database?

A:    No.  I do not have that information.

Q:    Okay.   Did you ever see the information that was in Midland Credit Management's database - -

A:    No.

Q:    -- at any time?

A:    No.

Q:    Okay.  So how would you know then what information was in Midland Credit Management's database?

A:    I trusted that the information that was sent to me was true and accurate.

Q:    Okay.  And what information was that, that was sent to you?

A:    In the affidavit that came.

### b.  Defendants' Affidavits Falsely Attest to the Validity of the Alleged Debt.

47.    The second paragraph of the Form 400 affidavit reads as follows:

That by virtue of such relationship and my employment with Midland Credit Management Inc., **I have personal knowledge of all relevant financial information concerning Midland Credit Management Inc.'s account number [account number inserted],** which includes the following information: **that the defendant did fail to make payments on the account** and that **demand has been made for defendant to make payment** of the balance owing on the account described above more than thirty (30) days prior to making this affidavit;

> **... and that there was due and owing to Midland Funding LLC the sum of [amount to be inserted]....**

(Emphasis added).

48.    Similarly, the fourth paragraph of the Form 400 affidavit reads:

The final statement of account reveals that the defendant owed a balance of [dollar amount inserted] on the following date: [date inserted]; and that such balance will continue to earn interest at a rate of [interest rate inserted] as annual percentage rate calculated as required by the Federal Truth In lending Act, until judgment is entered herein, after which interest on the unpaid balance shall accrue as required by law and as set forth within the terms of the judgment.

49.    But the testimony of Ms. Richter, Ms. Neu, and Mr. Jimenez shows that they did not have any personal knowledge whatsoever of the validity of the alleged underlying debt. They testified that they signed affidavits without checking the accuracy of the information in the affidavits, and without any independent knowledge of the veracity of the alleged "facts" contained in the affidavits.

50.    For example, Ms. Neu testified about her lack of knowledge as to any of the statements in the second paragraph of the Form 400 affidavits:

Q:    Do you now or did you at any time in the past ever have any knowledge of the relevant financial information concerning any of the Midland Funding or Midland Credit accounts?

A:    No.

51.    Ms. Neu similarly testified that she had no personal knowledge of how interest rates were calculated or applied:

Q:    When you worked for Midland Credit Management did you look at the interest rates before you signed these affidavits?

A:    No.

Q:    And would you take any measures to independently verify that the numbers were correct other than just looking at the affidavit?

A:    No.

52.     Ms. Neu also testified that she had no knowledge of any of the key contents of the affidavit:

Q.     Do you now or did you at any time in the past ever have any knowledge of the relevant financial information concerning any of the Midland Funding or Midland Credit accounts?

A.     No.

Q.     Do you now or did you at any time have any knowledge regarding agreements that a customer had made with an original creditor before it came to Midland Credit or Midland Funding?

A.     No.

Q.     Do you now or did you at any time in the past regarding any of your -- the affidavits that you signed have knowledge of whether any defendant used or authorized the use of a credit card account?

A.     No.

Q.     Do you now know or at any time did you -- in the past did you know whether any defendant failed to make a payment on an account?

A.     No.

Q.     Did you at any time know whether Midland Credit Management or Midland Funding had demanded payment from a defendant?

A.     No.

53.     Likewise, the fifth paragraph of the Form 400 affidavit reads as follows:

That upon information and belief, **based on business dealings with the defendant(s)**, the defendant(s), is/are not a minor(s) or mentally incapacitated person(s).

(Emphasis added).  But, according to the deposition testimony of all three MCM employees, they never had any business dealings or contact with the alleged debtors and no personal knowledge as to an alleged debtor's age or mental state.

17

**c. Defendants' Affidavits Falsely Attest to the Validity of Defendants' Ownership of the Debt.**

54.     The first paragraph of the Form 400 affidavit states, based on the personal knowledge of the affiant, that, "Midland Funding LLC is the current owner of, and/or successor to, the obligation sued upon." Likewise, the third paragraph of the Form 400 affidavit states, "That plaintiff's predecessor in interest sold and assigned all right title and interest in the defendant's ...account to the plaintiff."

55.     But sworn testimony of Defendants' employees makes clear they lacked the knowledge necessary to make these statements. None of the affiants participated in the sale and assignment of accounts to Midland or had personal knowledge of portfolio transactions. Mr. Jimenez testified that he did not know anything about the terms of the purchase of an account. Ms. Neu testified that she did not know what a "predecessor in interest" was, and that she thought MCM was the plaintiff and owner of the accounts in cases actually filed by Midland.

56.     For example, Mr. Jimenez testified:

Q:     You work for Midland Credit Management; correct?

A:     Yes.

Q:     This affidavit lists at the top as a plaintiff, Midland Funding, LLC. What's the relationship between Midland Credit Management and Midland Funding LLC?

A:     I wouldn't be the best person to ask that question. I don't know.

57.     Similarly, Mr. Jimenez further testified:

Q:     Well, it says in this affidavit that, in number 3, "That Plaintiff's predecessor in interest sold and assigned all right, title, and interest in this account to the plaintiff." So if it was sold to the plaintiff, my assumption is it was purchased by the plaintiff. And the question I have is, did you have any role or were you involved in any way, shape, or form in the purchase of the account?

A:     I was not.

Q:      Do you know anything about the terms of the purchase of this account?

A:      I do not.

58.     Similarly, Ms. Neu's deposition testimony reveals her lack of personal knowledge

as to the information about Midland's ownership of the alleged debt:

Q:      Do you know what "a predecessor in interest" is?

A:      No.

59.     Likewise, Ms. Neu testified:

Q:      Do you know what Midland Funding is?

A:      No, I'm not familiar with it at all.

### d. Defendants' Affidavits Falsely Attest to the Retention of Attorneys To Collect on the Debt.

60.     The second paragraph of the Form 400 affidavit reads as follows:

That by virtue of such relationship and my employment with Midland Credit Management Inc., I have personal knowledge of all relevant financial information concerning Midland Credit Management Inc.'s account number . . . which includes the following information: **that the attorneys representing plaintiff Midland Funding LLC were retained on Midland Funding LLC [sic] behalf by me or persons reporting to me for the purpose of collecting the delinquent debt owed on the defendant's account number set out above**; and that there was due and owing to Midland Funding LLC the sum of . . . .

(Emphasis added).

61.     Ms. Neu and Mr. Jimenez testified, however, that they did not retain the attorneys

representing Midland and that no one reported to them.   For example, the following is an

excerpt from Mr. Jimenez's deposition:

Q.      For example, Okay.  If you look at paragraph 2, four lines from the bottom of paragraph 2, you're attesting to the fact, "that the attorneys representing Plaintiff Midland Funding LLC were retained on Midland Funding behalf by me or persons reporting to me for the purpose of collecting the delinquent debt." Is that what it says?  Did I read it correctly?

A:      Yes.

Q:     When did you retain the attorneys representing Midland Funding LLC?

A:     I did not.

Q:     Which person in your department did retain the attorneys?

A:     I wouldn't know specifically.

Q:     Are these-how many people do you have reporting to you?

A:     I have zero.

Q:     Do you know the names of any persons in your department or any persons
       in Midland Credit who actually have the responsibility of retaining
       attorneys?

A:     I don't know who in my department would do that.

Q:     Would that be someone from another department that would do that?

A:     I wouldn't know.

### e. Defendants' Affidavits Falsely Attest to the Authenticity of Documents That Allegedly Support the Validity of the Debt.

62.     In some cases, Defendants submit affidavits to courts in which MCM employees,

acting as affiants, testify as to the authenticity of underlying documents that supposedly

substantiate the debt and are attached to the affidavit.  But Defendants' employees have testified

that they routinely signed affidavits in which they attested to the authenticity of attached

documents, even though no such documents were attached by the affiant or at the time the

affidavit was signed.  For example, Ms. Neu testified:

Q:     In the entire time that you worked for Midland Credit Management did
       you ever see a statement attached to any affidavit?

A:     No.

Q:     In the entire time you worked at Midland Credit Management did you ever
       see a cardholder agreement or original contract attached to an affidavit?

A:     No.

63.     Similarly, Ms. Richter testified as follows:

Q:     And then starting at page 3 it says, "The account, pursuant to the attached statement…" What statement does that refer to?

A:     I would say that that would be something that the firm would have attached to the affidavit.

Q:     Okay.  Did you ever see any statement that a firm attached to an affidavit, - -

A:     No.

Q:     - - to your knowledge?

A:     No.

Q:     Was there any attachment to the affidavits when you signed them?

A:     No.

## f.  Defendants Sign and Submit To Courts Affidavits that Are False and Misleading In Other Ways.

64.     In addition to the Form 400 affidavits, Midland uses other robo-signed form affidavits that are signed by MCM employees in the same manner as the Form 400 affidavits. One such affidavit is known as an "Affidavit of Lost Instrument," which represents that the original contract at issue has been lost or misplaced.  The affidavit sometimes states that a copy of the original contract is attached, and other times states that the amount alleged in the complaint is due and owing without attaching a copy of contract.  The affidavits falsely represent to citizens and courts that the affiant is "familiar with all the facts herein, having monitored and supervised the account of the defendant."  These affidavits were routinely signed by MCM employees in Minnesota who knew nothing about the accounts and never reviewed or handled exhibits referenced in the affidavits.  Midland has filed false and misleading Affidavits of Lost Instrument with Minnesota courts to obtain judgments against citizens.

65.    Midland also has filed form affidavits in support of motions for summary judgment, signed by MCM employees in Minnesota with no personal knowledge of the debts to which they are attesting.  Midland has filed these affidavits in cases where a citizen answers Midland's complaint and denies the allegations about the debt in order to persuade the court to enter judgment against the citizen without a trial.  The affidavits in support of summary judgment have contained statements by MCM employees similar to those found in the Form 400 affidavits.  As with the Form 400 affidavits, MCM employees have robo-signed the summary judgment affidavits without reading them, without reviewing any documents, and without checking the accuracy of the statements in the affidavits.

66.    For the reasons set forth above, Midland's affidavits that swear to the validity of the debt are not true.  Contrary to what the affidavits represent to the court, no one at Midland or MCM has ensured the accuracy of the debts on which they are attempting to collect.

**C.    Midland and MCM's Use of False Affidavits Constitutes an Abuse of the Legal Process and Undermines the Fair Administration of Justice.**

67.    One practical implication of Defendants' assembly-line approach to affidavits that are supposed to "prove" the debt is that Minnesota courts are led to issue judgments based on sworn statements that are false.  The "robo-signed" affidavits falsely signify to the courts that someone employed by MCM as a Midland representative verified the debt, the amount of the debt, and that the individual being sued is the correct person and owes the debt.

68.    The veracity of the evidence submitted to a court is key to a fair and just judicial process.  Midland and MCM also often file affidavits in support of default judgments, including administrative default judgments in which it asks court administrators (as opposed to judges) to enter judgment.  These cases are often never reviewed by a judge, and the court

system is lulled into entering judgments against debtors based on affidavits that, at least in respect to the aspects identified above, are not accurate.

69.     Through the above-described practices, Defendants ask Minnesota courts to unwittingly become part of their debt collection enterprise, and a great deal of state and judicial resources have gone to helping the debt buyers obtain dubious judgments based on incomplete information and supported by false and fraudulent affidavits.

70.     Another practical implication of filing false, robo-signed affidavits, for which the debt buyer did not actually verify the debt, is that Defendants pursue legal proceedings, and sometimes obtain judgments against, individuals who do not owe the debt.

## COUNT I
## CONTEMPT OF COURT

71.     The State re-alleges all prior paragraphs of the Complaint.

72.     It is within the inherent authority of the Court to order contempt to enforce the fair and orderly administration of justice, and to maintain the respect, discipline, and dignity of the courts. The Court also has statutory authority under Minnesota Statutes, chapter 588, which codifies, in part, the Court's common law contempt authority.  Minnesota Statute § 588.01 provides that a court may hold a party in contempt for "unlawful interference" or "deceit or abuse" of the process or proceedings of the court.

73.     As outlined above, Defendants have filed hundreds or thousands of false affidavits in Minnesota Courts, deceiving Minnesota courts into awarding judgment in favor of Defendants based on these false affidavits.  Defendants have treated the Minnesota courts as an arm of this debt collection enterprise, obtaining default judgments in thousands of cases, when many times Defendants lack evidentiary support, or even the ability to obtain evidentiary support, necessary to prove entitlement to the judgments they seek.  Defendants have therefore

routinely deceived and defrauded Minnesota courts, as well as causing the expenditure of substantial state and judicial resources, to administer default judgments in cases in which Defendants may not have been entitled to default judgment.

74.     These actions constitute multiple instances of constructive contempt to Minnesota courts.

75.     The State requests that, after a hearing, the Court impose a punitive fine against Defendants in such amount that adequately punishes Defendant's fraudulent and deceitful acts against the Court.  Additionally, or in the alternative, the State requests that the Court impose a fine, to be withdrawn upon Defendants' compliance, adequate to induce Defendants to correct every false affidavit it has filed in Minnesota courts since March of 2005 and to correct every default judgment it obtained where it does not have evidentiary support for the judgment.

## COUNT II
## MINNESOTA'S COLLECTION AGENCIES ACT

76.     The State re-alleges all prior paragraphs of this Complaint.

77.     All acts done by Midland and MCM are done to benefit one another as a common enterprise engaged in the business of buying and collecting debts.  Defendants are a "collection agency" as defined in Minn. Stat. § 332.31, subd. 3.

78.     As a collection agency, Defendants must adhere to Minnesota's statute governing collection practices, known as the Collection Agencies Act.  Minn. Stat. §§ 332.31-.45 (2010).

79.     Minn. Stat. § 339.39 provides that, in addition to penalties and other remedies, the Attorney General may apply for an injunction in district court to enjoin any violations of sections 332.31 to 332.45, or any practices prohibited in section 332.37.

80.     Minn. Stat. § 332.37 provides, in part:

No collection agency or collector shall:

(1)     in collection letters or publications, or in any communication, oral or written threaten wage garnishment or legal suit by a particular lawyer, unless it has actually retained the lawyer;

(3)     use or threaten to use methods of collection which violate Minnesota law;

(6)     exercise authority on behalf of a creditor to employ the services of lawyers unless the creditor has specifically authorized the agency in writing to do so and the agency's course of conduct is at all times consistent with a true relationship of attorney and client between the lawyer and creditor;

(12)    violate any of the provisions of the Fair Debt Collection Practices Act of 1977, Public Law 95-109, while attempting to collect on any account, bill or other indebtedness;

(20)    falsify any collection agency documents with the intent to deceive a debtor, creditor, or government agency.

81.     Pursuant to Minn. Stat. § 332.37(12), Minnesota's Collection Agencies Act incorporates the Fair Debt Collection Practices Act, which provides in part:

15 USC 1692d. Harassment or abuse

A debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt.

15 USC § 1692e. False or misleading representations

A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt.

15 USC § 1692f. Unfair practices

A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt.

82.     Defendants' conduct described above constitutes multiple, separate violations of the above-referenced provisions of Minn. Stat. § 332.37.

**RELIEF**

WHEREFORE, the State of Minnesota, by its Attorney General, Lori Swanson, respectfully asks this Court to award judgment against Midland Funding, LLC and Midland Credit Management, Inc. as follows:

1.      Declaring that Defendants' acts described in this Complaint constitute multiple and separate violations of Minn. Stat. § 332.37.

2.      Awarding judgment against Defendants, jointly and severally, for civil penalties in the amount of $25,000 for each separate violation of Minn. Stat. § 332.37 pursuant to Minn. Stat. § 8.31.

3.      Imposing fines against Defendants for their contempt of court.

4.      Enjoining Defendants and their officers, directors, members, employees, agents, successors, assignees, affiliates, merged or acquired predecessors, parent, subsidiaries, and all other persons acting in concert with Defendants, from the conduct described herein or in any other way violating Minn. Stat. § 332.37, pursuant to Minn. Stat. §§ 332.39 and 8.31.

5.      Awarding the State its costs, including costs of investigation and attorneys' fees, as authorized by Minn. Stat. § 8.31, subd. 3a.

6.      Granting such further relief as the Court deems appropriate and just, including but not limited to disgorgement of profits, to make Defendants' illegal acts unprofitable and to deter Defendants from further perpetrating fraud upon the courts and citizens of Minnesota.

Dated: *March 22*, 2011

LORI SWANSON
Attorney General
State of Minnesota

NATHAN BRENNAMAN
Assistant Attorney General

DAVID CULLEN
Assistant Attorney General
Atty. Reg. No. 0338898
445 Minnesota Street, Suite 1200
St. Paul, Minnesota 55101-2131
(651) 757-1221 (Voice)
(651) 296-1410 (TTY)

ATTORNEYS FOR PLAINTIFF
STATE OF MINNESOTA

## MINN. STAT. § 549.211 ACKNOWLEDGMENT

The party on whose behalf the attached document is served acknowledges through its undersigned counsel that sanctions, including reasonable attorney fees and other expenses, may be awarded to the opposite party or parties pursuant to Minn. Stat. § 549.211 (2010).

DAVID CULLEN

AG: #2793002-v1

27