FILED

2011 Jul-14  PM 04:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION


JAMON T. BRIM,                    *
                Plaintiff,  *   10-CV-00369-IPJ
                            *   February 22, 2011
vs.                         *   Florence, Alabama
                            *   8:59 a.m.
MIDLAND CREDIT MANAGEMENT, *
INC.,                       *
                Defendant. *
* * * * * * * * * * * * * * * * * * * * * * * * * * *


TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE INGE P. JOHNSON
UNITED STATES DISTRICT JUDGE

**VOLUME I**


FOR THE PLAINTIFF:

MR. LEONARD A. BENNETT, ESQ.
(No Appearance)
CONSUMER LITIGATION ASSOCIATES
12515 Warwick Blvd
Suite 100
Newport News, VA 23606
757-930-3660

MS. PENNY HAYS CAULEY, ESQ.
HAYS CAULEY
P O Box 509
Darlington, SC 29540
843-393-5200

MR. RONALD C. SYKSTUS, ESQ.
BOND, BOTES, SYKSTUS & LARSEN
415 Church Street
Suite 100
Huntsville, AL 35801
256-539-9899

*CHERYL K. POWELL, CCR, RPR, FCRR*
Federal Official Court Reporter
1729 Fifth Avenue, North
Birmingham, AL 35203
256-508-4050/wrd4wrdrpr@aol.com

1

2

3          FOR THE DEFENDANT:

4          MR. ERIC B. LANGLEY, ESQ.
           BALCH & BINGHAM
           1710 Sixth Avenue North
5          P O Box 306
           Birmingham, AL 35201-0306
6          205-251-8100

7          MR. JASON B. TOMPKINS, ESQ.
           BALCH & BINGHAM
8          1901 Sixth Avenue North
           Suite 1500
9          Birmingham, AL 35203
           205-251-8100

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **P R O C E E D I N G S**

2                    THE COURT:  Have a seat.  Good

3          morning.  Let the record show this is CV10-369,

4          Jamon T. Brim versus Midland Credit Management,

08:59:28   5    Inc.  And let the record show that the plaintiff

6          is present with his attorneys, Penny Cauley and

7          Ron Sykstus.  The defendant is represented by

8          whom?  I mean, I know you're here.  The lawyers

9          are here.  Eric Langley and Jason Tompkins.  Who

08:59:46  10    is here as a representative?

11                   MR. LANGLEY:  Yes, Your Honor.

12         Our representative is Mr. Gabriel Edrozo for

13         Midland Credit Management.

14                   THE COURT:  Mister what?

08:59:50  15                   MR. LANGLEY:  Edrozo, E-D-R-O-Z-O.

16                   THE COURT:  Gabriel is the first

17         name?

18                   MR. LANGLEY:  Gabriel.  He goes by

19         Gabe.  And then Your Honor at the mediation on

09:00:00  20    November 30th met Chris Yang, who is inside

21         counsel.

22                   THE COURT:  All right.  And while

23         Tammi is organizing the jury, let's just talk

24         about I have read plaintiff's voir dire questions

09:00:16  25    and defendant's voir dire questions.

1           Are there any objections by the defendant

2    to the plaintiffs?

3               MR. LANGLEY:  We do have a couple

4    of small objections which I think can be handled

09:00:28  5    through tweaks to the questions.  I think there

6    may be only two or three questions we have an

7    outright objection to.

8           You want me to go through them in order on

9    the plaintiff's list?

09:00:36  10              THE COURT:  Yeah.

11              MR. LANGLEY:  In Question Number 1

12   and 2, the questions seem to suggest that the

13   issue in the case will be whether the reporting

14   wasn't accurate which, of course, is not the main

09:00:52  15   issue.  The main issue will be whether or not the

16   investigation of the dispute was reasonable.

17          And especially at this early stage in the

18   proceeding, we think it would be prejudicial to

19   the defendant for the jury to develop the

09:01:04  20   impression that the issue or especially the main

21   issue is whether the report was right or not.

22              THE COURT:  Okay.  That's

23   overruled.  Next?

24              MR. LANGLEY:  Your Honor, on Items

09:01:16  25   9, 10, and 11 -- excuse me.  Nine, 10, 11, and

12, there are issues relating -- the questions

suggest that there are available to the plaintiff

damages relating to credit standing and

reputation.  The damages, if available to

09:01:40  plaintiff at all, would be damages resulting from

credit denials and any emotional distress or

mental anguish that he's able to substantiate.

So we would urge that those portions of

the questions be reworded so as to not suggest

09:01:58  the category of damages that's not recoverable.

THE COURT:  Well, credit denial

would be damage -- would be damaging to his

credit reputation.

MR. LANGLEY:  One of the problems

09:02:24  here is we don't really know what credit

reputation means.

THE COURT:  Well, I do.  I don't

have -- it is a pretty normal term.

MR. LANGLEY:  Well, if Your Honor

09:02:34  is overruling the motion --

THE COURT:  I'm going to overrule.

Yeah.

MR. LANGLEY:  Your Honor, the last

objection relates to Question 25.  And our

09:02:46  objection to this is that it -- in essence

1    contains an instruction that the Court will give

2    regarding -- if punitive damages reach the jury,

3    it contains an instruction that is for the Court

4    to give for us to hash through at the charge

09:03:04  5    conference.

6                 THE COURT:  Well, I would sustain

7    that in part and deny it in part.

8         I think I would like for the plaintiff to

9    add to that the specific definition of punitive

09:03:22  10   damages will be given to you by the Court in its

11   instruction to you with respect to damages such

12   as this.  And with that being said, you can ask

13   it.

14                 MS. CAULEY:  Yes, Your Honor.

09:03:32  15                THE COURT:  And that's it?

16                 MR. LANGLEY:  Yes, Your Honor.

17                 THE COURT:  All right.  And let me

18   ask you since I don't know that anybody has said

19   anything about it.  I know you have a written

09:03:44  20   questionnaire?

21                 MR. LANGLEY:  We do.  This was

22   something that we discussed at least in theory at

23   the pretrial conference, and it relates to some

24   of that very sensitive information that both

09:03:54  25   sides may want from the venire, especially the

```
  1   defendant, about their prior experience with

  2   credit disputes.  And so that nobody is put on

  3   the spot or inclined to not reveal the full

  4   extent of their history on these issues, we think

09:04:14  5  the better way to handle it is private

  6   questionnaire.  If any side feels they need to

  7   follow up on that, they can do that.

  8                THE COURT:  I thought we agreed I

  9   was going to ask those questions.  That's how we

09:04:28 10  were going to handle it.

 11                MR. LANGLEY:  I know we discussed

 12   that.  We're still open to that approach.

 13                THE COURT:  I don't mind asking

 14   them.  And I mean, I tell the jury anyway if they

09:04:36 15  have anything they want to say privately to me,

 16   they just have to tell me they would prefer to

 17   answer it privately, and we'll go from there.

 18                MR. LANGLEY:  If Your Honor is

 19   willing to ask those questions, then we're fine

09:04:48 20  with that.

 21                THE COURT:  I will be glad to.

 22         Any objections from the plaintiff to the

 23   defendant's questions?

 24                MS. CAULEY:  Yes, Your Honor.

09:04:54 25  Just two.
```

1        On Number 12, the question asks if

2    evidence shows the plaintiff suffered no damages

3    as a result of Midland's conduct, could you

4    return a verdict for Midland, and the law under

09:05:04  5    the (s)(2)(B) provisions of the act allows for

6    either actual damages or statutory damages.  So

7    it's not really a correct statement.

8        We might could correct it with a jury

9    instruction like we did on the plaintiff's

09:05:18  10   question regarding punitive damages.  The Court

11   will instruct you on what damages are available.

12   But if you find that they didn't meet their

13   burden, you know, could you return a verdict.  If

14   we could just reword that slightly.

09:05:26  15          THE COURT:  That's fine.

16          MR. CAULEY:  And then Number 15,

17   the -- I mean, we had an objection with the term

18   financial institutions, because that makes it

19   sound like Midland is a bank rather than a debt

09:05:40  20   collector.

21          THE COURT:  Well, that's

22   overruled.

23       It's going to be interesting to see what

24   they answer to that question.

09:05:48  25       What do you have to say about Number 12?

1            MR. LANGLEY:  Well, on Number 12,

2      if we can handle it the same way that Your Honor

3      suggested the punitive damages question be

4      handled, that will be fine.  We will say the

09:05:58 5      Court will instruct you on when to award actual

6      damages, but if -- and then we'll follow with our

7      question.

8            THE COURT:  I think you should say

9      the Court will instruct you as to what is

09:06:10 10      recoverable as damages in a suit such as this.

11      However, if the evidence shows -- and that's

12      fine.

13            MR. LANGLEY:  Okay.

14            THE COURT:  And then I'll ask them

09:06:20 15      these other questions.  I don't mind.

16         And do y'all want to say anything else

17      about the motions in limine?

18            MR. LANGLEY:  Your Honor, I think

19      we probably do.  But --

09:06:38 20            THE COURT:  I've read what you

21      filed.  And I've read Penny's response.

22            MR. LANGLEY:  Okay.  We can

23      probably make this easier on the Court.  Penny

24      and I had some discussion before court convened.

09:06:50 25      Our motion in limine really addresses six issues.

1    One of which is uncontested by any of the

2    parties.

3                 THE COURT:  That's the Johnson

4    deposition.

09:07:02  5                 MR. LANGLEY:  Right.  That was

6    Greg Johnson's --

7                 THE COURT:  That is actually moot,

8    but I will be glad to say it's granted.  And that

9    is Number 6 in defendant's motion in limine.  Any

09:07:12 10    deposition testimony of Greg Johnson because

11    plaintiff's counsel has indicated that plaintiff

12    is not going to use the deposition.  And

13    consents.

14                 MR. LANGLEY:  With respect to --

09:07:30 15    I'm referring to our motion in limine.  With

16    respect to Items 2 and 3, Item 2 being any

17    evidence of plaintiff's contacts directly with

18    Midland and Item 3, any credit report that

19    predates Midland's receipt of the dispute from

09:07:48 20    the CRA we're willing to withdraw those motions

21    in anticipation if the plaintiffs are afforded

22    the opportunity to develop contacts, we will be

23    afforded the same opportunity.

24                 I anticipate both sides may have specific

09:08:02 25    objections along the way.  But we're willing to

1    withdraw that as a motion in limine.

2              THE COURT:  Okay.  Two and Three

3    are withdrawn.

4              MR. LANGLEY:  And that leaves us

09:08:12  5  really with two issues where I do think the

6    parties have some dispute.

7              The first is evidence relating to the

8    small claims court collection lawsuit filed by

9    Midland's subsidiary, called Midland Funding,

09:08:26 10  L.L.C., who is no longer a party to this case.

11             There are a couple of reasons that we

12   don't think evidence of that collection lawsuit

13   is admissible.  First and foremost, it does not

14   bear on the plaintiff's damages at all, because

09:08:40 15  all of that activity, including the state court

16   collection lawsuit, occurred before the first

17   dispute in this case.  And there's no contention

18   by the plaintiff that the duties on Midland's

19   part are triggered any earlier than our first

09:08:58 20  receipt of the dispute from the CRA which

21   happened in August, 2008.

22             The collection lawsuit and the collection

23   efforts, for that matter, had run their course by

24   spring of 2008.  So it would, in essence, be

09:09:14 25  damages testimony that relates to a period of

1    time during which damages are not recoverable.

2                    THE COURT:  Okay.  Let me see what

3    they -- are you through with that?

4                    MR. LANGLEY:  With that reason.  I

09:09:24 5    had some others.

6                    THE COURT:  Okay.

7                    MR. LANGLEY:  Did you want to hear

8    them all?

9                    THE COURT:  No.  That's fine.

09:09:28 10                    MR. LANGLEY:  The second reason is

11   that it really would be, in essence, a malicious

12   prosecution claim in FCRA clothing.  And there's

13   no claim for malicious prosecution here.  And the

14   entity that would be accused of maliciously

09:09:48 15   prosecuting is not even in the case anymore.

16   That's really the extent of our argument.

17                    THE COURT:  Ms. Cauley?

18                    MS. CAULEY:  Yes, Your Honor.

19   First off, the motion to dismiss the state court

09:10:00 20   lawsuit was not filed until February 10th of

21   2009.

22            So although the state court action to

23   collect the debt was filed previous to Mr. Brim's

24   first dispute in July of 2008 through the credit

09:10:12 25   bureaus, the state court lawsuit continued until

1   February of 2009.  So it is occurring during the

2   same time that he is disputing with Midland.

3        It also goes to the intent and willfulness

4   of Midland's handling and investigation of the

09:10:28  5   ACDVs, because it shows whether or not they're

6   actually going to investigate that or whether

7   their intent is just to keep it on the credit

8   because that's their only real means of

9   collecting it.

09:10:38  10        THE COURT:  Well, I think you're

11   mixing apples and oranges.  Because what we're

12   talking about here is their duty to investigate.

13   And what they did there in the small claims court

14   was a collection.  So we're talking about two

09:10:48  15   different things.

16        MS. CAULEY:  Yes.  It's not -- the

17   reason that we would offer the lawsuit is simply

18   to show, one, when it was filed, and that it was

19   filed after their records indicate the statute of

09:11:06  20   limitations had already run.

21        THE COURT:  That is collection.

22        MS. CAULEY:  Right.  But it goes

23   to their whole intent of whether or not their

24   actions under FCRA were willful and their failure

09:11:18  25   to investigate Mr. Brim's dispute and why they

```
 1    would not investigate.  And the reason is they

 2    had no other means of collecting it but putting

 3    it on the credit report because, I mean, they

 4    tried to sue, and they had to dismiss it.  So I

 5    mean, we think it's relevant.  It is pending

 6    during the time.

 7                  THE COURT:  I'm going to withhold

 8    my ruling on it.  Don't discuss it in opening

 9    statements, though.

10                  MS. CAULEY:  Okay.

11                  MR. SYKSTUS:  Your Honor, may I

12    add one thing to that?

13                  THE COURT:  Sure.

14                  MR. SYKSTUS:  The dismissal itself

15    was without prejudice, meaning they could bring

16    it again if they truly -- and this is after the

17    dispute was already received by Midland.  If they

18    truly were going to renege on it, they would have

19    dismissed it with prejudice.  But certainly

20    without prejudice, they could bring it again.

21                  THE COURT:  Okay.  Fine.

22    Overruled.  Overruled.  What's the next one?

23                  MR. LANGLEY:  Your Honor, for

24    clarification, are you overruling our motion in

25    limine on that issue?
```

1                        THE COURT:  Yeah.

2                        MR. LANGLEY:  Your Honor, our next

3       item in the motion in limine relates to the

4       American Express.

09:12:28  5                        THE COURT:  Yeah.  Now, I thought

6       we rehashed that at the pretrial conference when

7       we talked about the taking of the deposition of

8       American Express and what they were going to say

9       and --  did we not talk about all of this or did

09:12:40  10      I dream this?

11                        MR. LANGLEY:  We did talk about

12      this.

13                        THE COURT:  Okay.  I'm going to

14      overrule it.  We've already discussed that in

09:12:48  15      great detail.  It's overruled.  I mean, we're not

16      going to rehash anything.  We talked about that

17      when I went through the objections to the

18      plaintiff's exhibit list.  And you said you were

19      going to set it out more specifically in the

09:12:58  20      motion in limine.  But we've already discussed

21      all this.

22                        MR. LANGLEY:  I will only make

23      arguments that Your Honor has not heard if you'll

24      permit me just a minute.

09:13:08  25                        THE COURT:  Sure.

1          MR. LANGLEY:  Since that time, the

2     plaintiffs have opted not to take the deposition

3     of American Express for purposes of

4     authenticating the record that we contended was

09:13:18  5     unauthenticated hearsay.

6          What they've done is acquired what

7     purports to be an affidavit of records, saying

8     that it is a business record or a copy of a

9     business record from American Express.  However,

09:13:32 10     what the custodian of records actually

11     authenticated, to use that term quite errantly

12     for purposes of argument, was a copy that

13     plaintiff's counsel sent to them.

14          Importantly, that declaration did not

09:13:48 15     contain the language that Rule 803(6) and Rule

16     902(12) require for purposes of self

17     authentication.

18          And the glaring omission in there is that

19     the record was kept in the ordinary course of

09:14:06 20     business.  Both 803(6) and 902(12) use the word,

21     "kept," in the rule.  And there is nothing in

22     this affidavit that says it was kept in the

23     ordinary course of business.  In fact, the copy

24     of the letter that purports to have been

09:14:24 25     authenticated was the copy that plaintiff's

1   counsel sent to --

2               THE COURT:  I mean, but you don't

3   dispute it was a copy of American Express' own

4   letter, do you?

09:14:34   5               MR. LANGLEY:  We don't know

6   whether it is or isn't.

7               THE COURT:  I thought you got it.

8   You got a copy of it.  You know which one

9   American Express furnished.

09:14:44  10               MR. LANGLEY:  No.  American

11  Express could never furnish one.  That's the

12  point we made at the last hearing.  We subpoenaed

13  records from AmEx.  They had no record of this.

14  Plaintiff subsequently sent their copy to AmEx in

09:14:58  15  an effort to get them to authenticate it.  And

16  all the custodian of records could say is this

17  looks like a copy of something that we would have

18  sent.  But it doesn't say -- and this is very

19  important for 803(6) and 902(12).  It doesn't say

09:15:10  20  it was kept in the ordinary course of business.

21  Because, in fact, it was not kept.  Had it been

22  kept, we would have received it in response to

23  our subpoena.

24               THE COURT:  Okay.  What does the

09:15:20  25  plaintiff say about that?

1          MS. CAULEY:  Your Honor, the

2    reason that the deposition wasn't taken is that

3    their normal deponent that they put up for these

4    type of depositions was not available due to the

09:15:32  5    time constraints we were under.

6          Mr. Garganian is very kind.  He is the

7    official records custodian.  He provided this

8    affidavit of records, confirming -- and we have

9    the original that was actually received on Friday

09:15:46  10    at 9:00 o'clock at night -- that the copy of the

11    letter that we provided is a true and correct

12    copy of the denial of credit letter provided to

13    Jamon Brim by American Express.

14          They are two pages of an original or an

09:16:00  15    exact duplicate of the original records from a

16    system of records in which letters are made in

17    the ordinary course of business at or near the

18    time that they are made.  So we have this

19    affidavit --

09:16:10  20          THE COURT:  Can I see that?  You

21    read it really fast.

22          MS. CAULEY:  I'm sorry.

23          THE COURT:  Okay.  Anything else

24    from anyone?

09:16:50  25          MR. LANGLEY:  Your Honor, the last

1    thing I would point out is that Rule 902(12)(b)

2    is very specific on this issue.  And it requires

3    that the purported custodian of records state

4    under oath that the document was kept in the

09:17:04   5    course of regularly-conducted activity.  And that

6    simply has not been met here.

7            THE COURT:  Okay.  Well, I tell

8    you what.  You read this differently from the way

9    I read it.  And I'm going to overrule it.  It

09:17:16  10    flat out says under oath in the original document

11    that I assume plaintiffs is going to introduce.

12            MS. CAULEY:  That is the original.

13            THE COURT:  Yeah.  I'm going to

14    give it back to you.  I'm not going to keep it.

09:17:32  15    It says, attached hereto are two pages of the

16    original or exact duplicate of the original

17    records from a system of records in which letters

18    are made in the ordinary, regular course of

19    American Express' business at or near the time or

09:17:48  20    reasonably soon thereafter.  So that's overruled.

21    Next?

22            MR. LANGLEY:  Your Honor, I

23    believe the last issue relates to certain

24    deposition excerpts from --

09:18:02  25            THE COURT:  I'm just going to have

1    to do those as we go through the deposition.  I

2    don't have the deposition up here with me.  So

3    we're just going to have to go through that as

4    the deposition is read.  And I can't rule on this

09:18:16    5    in advance.  Sorry.  I'm just going to hold my

6    ruling on this.

7                    MR. LANGLEY:  That's fine with us.

8                    THE COURT:  Okay.  Is that okay

9    with you?

09:18:24   10                    MS. CAULEY:  Yes, Your Honor.  We

11    were able to narrow down greatly.  And I actually

12    have a copy of the depo.  There's eight

13    provisions in the deposition that we were not

14    able to agree to that we have been -- you know,

09:18:40   15    we worked on all the other ones.  Some we

16    withdrew our intention to read.  Some he withdrew

17    his objections.  There just remains eight

18    portions.  We can take them up now or during the

19    deposition.

09:18:54   20                    THE COURT:  How close are we to

21    having the jury ready?

22                    COURTROOM DEPUTY:  I've got them

23    ready to bring down.

24                    THE COURT:  Let me just see them.

09:19:04   25    That's all right.  Are those the eight points?

1          MS. CAULEY:  I can give them to

2     you, Your Honor.  The first one is Page 50 --

3          THE COURT:  Well, are you going

4     through their motion in limine?

09:19:20    5          MS. CAULEY:  Yes.

6          THE COURT:  Okay.

7          MS. CAULEY:  These are in response

8     to their motion in limine.

9          THE COURT:  Just tell me which

09:19:26   10    ones you don't object to so I'll know which ones

11    you're talking about.

12          MR. LANGLEY:  Your Honor, if I

13    may, may I present to the Court the issues that

14    we haven't resolved and then --

09:19:34   15          THE COURT:  Just show me line

16    through line, page through page.

17          MR. LANGLEY:  Page --

18          THE COURT:  I have read it.  I'm

19    trying to explain to y'all I got up at 4:30 this

09:19:44   20    morning to read all this.  So I have read it.  I

21    don't need to have an explanation when I've

22    already read it.  I just need to know which parts

23    you are saying you have worked out.

24          MR. LANGLEY:  We've worked out

09:19:56   25    everything but eight parts.

1          THE COURT:  Which eight parts have

2    you not worked out?

3          MR. LANGLEY:  Page 50, Line 1

4    through 5.

09:20:04  5          THE COURT:  50?

6          MR. LANGLEY:  Yes, Your Honor.

7          THE COURT:  Okay.  One through

8    five.  Okay.

9          MR. LANGLEY:  Question:  When was

09:20:10  10    the last deposition --

11          THE COURT:  No.  Just give me the

12    page number.  I'll read it myself.

13          MR. LANGLEY:  Page 50, 1 through

14    5.  Next one is Page 50, Lines 12 through 17.

09:20:22  15    Next one is Page 51, Lines 5 through 9.  Next one

16    is Page 55, Lines 4 through 11.  Page 55, Lines

17    16 through 21.

18          MS. CAULEY:  We agreed not to use

19    that one.  55:16 through 21 we've agreed not to

09:20:46  20    use.

21          THE COURT:  I'll strike that.

22          MR. LANGLEY:  Page 73, Line 15

23    through Page 74, Line 9.

24          THE COURT:  Wait.  Page 73, Line

09:21:02  25    15 through Page 74, Line 9?

1              MR. LANGLEY:  Yes, Your Honor.

2              THE COURT:  Okay.

3              MR. LANGLEY:  Page 89, Line 9

4    through 25.

09:21:14  5              THE COURT:  Okay.

6              MR. LANGLEY:  Page 91, Lines 1

7    through 11.  But Your Honor, after further

8    review, we'll withdraw that one.

9              THE COURT:  91:1 through 11?

09:21:28 10              MR. LANGLEY:  Yes, Your Honor.

11              THE COURT:  Okay.

12              MR. LANGLEY:  And the last one is

13    Page 114, Lines 13 through 16.

14              THE COURT:  Okay.

09:21:38 15              MR. LANGLEY:  And Penny, we didn't

16    finish our conversation about whether y'all were

17    rethinking that one or --

18              MS. CAULEY:  Your Honor, we're

19    reviewing the other evidence with respect to Page

09:21:50 20    114.  We can -- the question was a little bit

21    ambiguous.  So we'll withdraw that one.  We'll

22    agree not to use.

23              THE COURT:  Okay.  Which one?

24    114 -- Page 114, Lines 13 through 16 you're not

09:22:04 25    going to use those?

1           MS. CAULEY: Yes, Your Honor.

2           THE COURT: Okay. What's your

3   argument about One through Five on Page 50? And

4   for that matter, 12 through 17 about the number

09:22:44  5   of depositions she has given and them being about

6   the FCRA?

7           MR. LANGLEY: Well, we don't think

8   that that -- depositions that she's given in a

9   prior case or how many are relevant. If there's

09:22:56  10   something offered for impeachment purposes,

11   that's fine.

12           THE COURT: What do you have to

13   say about it?

14           MS. CAULEY: Your Honor, she's not

09:23:04  15   here for us to offer any impeachment evidence.

16   This goes to their knowledge of the act and their

17   duty and responsibilities under the act. The

18   fact she's testified before shows she's familiar

19   with the act. She's put up as their corporate

09:23:18  20   representative under a Fair Credit Reporting Act

21   claim. Certainly this isn't the first time

22   they've ever been sued.

23           THE COURT: Defendant's motion in

24   limine on this point is granted. You don't go

09:23:30  25   into that. Don't read that.

1          MS. CAULEY:  Okay.  Was that One

2     through Five and 12 through 17?

3          THE COURT:  Yeah.  Same thing for

4     51:5 through 9.  It's granted.  What's wrong with

09:24:00  5     55:4 through 11?

6          MR. LANGLEY:  Your Honor, our

7     concern with that is fairly similar to our

8     concern with the first two of plaintiff's

9     proposed voir dire questions in that it may

09:24:14 10     erroneously suggest to the jury that the issue is

11     the accuracy of the report which is covered under

12     a different section of the FCRA for which a

13     private right of action does not exist.  So our

14     objection is relevance.  If not relevance, then

09:24:30 15     Rule 403 objection.

16          THE COURT:  It's overruled.  You

17     may go into that.  Okay.  And your objection to

18     73 to 74?

19          MR. LANGLEY:  Your Honor, our

09:25:04 20     objections to those are intertwined with our

21     objection to the evidence regarding the

22     collection lawsuit.  And if I understood Your

23     Honor's ruling earlier, you've overruled our

24     motion on that.  And so if evidence for

09:25:20 25     collection lawsuit is coming in, then I suppose

1   this would, too, although we would like the

2   record to reflect we object to that.

3                   THE COURT:  It's overruled.  89?

4                   MR. LANGLEY:  Your Honor, same

09:25:40  5   argument.

6                   THE COURT:  Yeah.  It's overruled.

7   And that's it, right?

8                   MS. CAULEY:  Yes, Your Honor.

9                   THE COURT:  Do any of you need a

09:26:12 10   break before we get the jury in here?  Let's just

11   get them in here.

12                   (Short recess.)

13                   THE COURT:  When do you want me to

14   ask those questions that the defendant has

09:27:00 15   proposed?  Do you want me to ask them at the end

16   of all the voir dire?  Wouldn't that be the best

17   time to ask them?

18                   MR. LANGLEY:  Your Honor, actually

19   I would like you to ask them at the beginning so

09:27:12 20   if there's a need to follow up or the plaintiff,

21   we would have that opportunity.

22                   THE COURT:  That will be fine.

23                   (Short recess.)

24                   THE COURT:  I'm looking at the

09:30:30 25   agreed summary in the pretrial order.  How much

|          |    |                                                                    |
|----------|----|--------------------------------------------------------------------|
|          | 1  | of this do you want me to read to the jury?  Just                  |
|          | 2  | the very first?  Because I was really not going                    |
|          | 3  | to read a whole lot.  But since y'all are going                    |
|          | 4  | to ask the -- you want me to ask the questions                     |
| 09:30:46 | 5  | first, what if I read:  Jamon Brim filed this                      |
|          | 6  | action under the Fair Credit Reporting Act, 15 US                  |
|          | 7  | Code, Section 1681, and following, based on                        |
|          | 8  | defendant, Midland Credit Management's reporting                   |
|          | 9  | of the collection account as belonging to                         |
| 09:30:58 | 10 | Mr. Brim to the national credit reporting                          |
|          | 11 | agencies and the defendant's alleged failure to                    |
|          | 12 | conduct a reasonable investigation upon the                        |
|          | 13 | receipt of Mr. Brim's dispute through the credit                   |
|          | 14 | reporting agencies and let it go with that?  Is                    |
| 09:31:12 | 15 | that all right with you?                                           |
|          | 16 | MS. CAULEY:  That's fine.                                          |
|          | 17 | MR. LANGLEY:  So it will end with                                  |
|          | 18 | credit reporting agencies?                                         |
|          | 19 | THE COURT:  Yes, sir.  And I                                       |
| 09:31:20 | 20 | scratched out the line that says Alabama state                     |
|          | 21 | law.                                                               |
|          | 22 | MS. CAULEY:  Right.                                                |
|          | 23 | THE COURT:  Because that was                                       |
|          | 24 | dismissed.  Without going into the details about                   |
| 09:31:28 | 25 | what he purchased and when he did it and all that                  |

1    stuff?

2                    MR. LANGLEY:  We're okay with

3    that, Your Honor.

4                    (In open court.  Jury venire

09:31:34  5    present.)

6                    THE COURT:  Okay.  All right.

7    Please be seated.  Good morning.  Hope everybody

8    had a nice long weekend.  I guess not everybody

9    was off on President's Day.  I still hope you had

09:38:02 10    a nice weekend.  I know Saturday and Sunday were

11    beautiful.

12            I want to thank y'all for coming here

13    today.  We can't try a case without you.  So we

14    just appreciate you being here.  As you can see,

09:38:16 15    there are some empty chairs.  Some people

16    apparently did not show up, but I'm not going to

17    deal with that today.  It's not my duty to do

18    that.  The jury section in Birmingham will do

19    that.  But I do want to thank everyone who did

09:38:26 20    come for being here.

21            The first thing I would like to do is to

22    introduce you to the parties in this case.  We

23    only have one case we're going to select a jury

24    in for this week.  And we're going to finish up

09:38:38 25    this week, just so you know that for your own

1   practical purposes.  And the case is numbered

2   CV10-369 in the United States District Court for

3   the Northern District of Alabama.

4           The plaintiff, who is the one who brings

09:38:56   5   the lawsuit, is named Jamon Brim.  And he is

6   seated on -- in the middle right there on my

7   right.  This is Mr. Brim.  You might want to turn

8   around so the jury back there can see you.  Thank

9   you, Mr. Brim.

09:39:10   10          He's represented by two attorneys.  Penny

11  Cauley and Ron Sykstus.  And actually, he has

12  another attorney who will be here tomorrow, Len

13  Bennett.  But he couldn't be here today but he'll

14  be here tomorrow.

09:39:26   15          The defendant in this case is Midland

16  Credit Management, Inc., and their representative

17  is Gabe Edrozo.  He's seated on my left.  And

18  they're represented by Eric Langley and Jason

19  Tompkins.  And they're seated on my left, as

09:39:42   20  well.  And their in-house lawyer is also present.

21  And that's Chris Yang.  Thank you.

22          And the first thing I'm going to tell you

23  is -- well, I think I'm going to call the roll

24  just to make sure everybody's here who is

09:40:00   25  supposed to be.  Joseph Aiello.

1                    PROSPECTIVE JUROR 1:  Yes.

2                    THE COURT:  Phillip Bess.

3                    PROSPECTIVE JUROR 2:  Here.

4                    THE COURT:  Jeffrey Bibbee.

09:40:04  5          PROSPECTIVE JUROR 5:  Here.

6                    THE COURT:  Belinda Courtney.

7                    PROSPECTIVE JUROR 8:  Here.

8                    THE COURT:  Melissa Dobbins --

9                    COURTROOM DEPUTY:  Judge, I have a

09:40:14 10   few left.  I lost them.  They're right here.

11                   THE COURT:  Oh.  Never mind.

12   Before I repeat who the parties are and the

13   lawyers are, I'm going to call the roll first.

14   That's the safest.

09:41:20 15        Joey Aiello.  Phillip Bess.  Jeffrey

16   Bibbee.  Belinda Courtney.  Are you James Davis?

17                   PROSPECTIVE JUROR 9:  Yes, ma'am.

18                   THE COURT:  Good morning.  Melissa

19   Dobbins.

09:41:34 20          PROSPECTIVE JUROR 10:  Yes, ma'am.

21                   THE COURT:  Stephen Drzycimski.

22                   PROSPECTIVE JUROR 12:  Here.

23                   THE COURT:  Beckie Edwards.

24                   PROSPECTIVE JUROR 14:  Here.

09:41:44 25          THE COURT:  James Guess.

1                       PROSPECTIVE JUROR 15:  Here.

2                       THE COURT:  Monica Gregory.

3                       PROSPECTIVE JUROR 16:  Here.

4                       THE COURT:  Who's sitting in the

09:41:50  5   middle, then?

6                       PROSPECTIVE JUROR 20:  Marni Kent.

7                       THE COURT:  Okay.  You need to

8   move.  I'll tell you.  Step out of the seats just

9   a minute.  Okay.  James Guess.  Monica Gregory.

09:42:12 10   Would you scoot over a little bit?  Charles

11   Hines.

12                      PROSPECTIVE JUROR 19:  Here.

13                      THE COURT:  Marni Kent.  You're

14   supposed to sit next to Mr. Hines.  And Jean

09:42:20 15   Kezo?

16                      PROSPECTIVE JUROR 21:  Here.

17                      THE COURT:  Frank Luther.

18                      PROSPECTIVE JUROR 23:  Here.

19                      THE COURT:  Chris Matthews.

09:42:22 20                      PROSPECTIVE JUROR 24:  Here.

21                      THE COURT:  Carl McGrady.

22                      PROSPECTIVE JUROR 25:  Here.

23                      THE COURT:  Casey Miller.

24                      PROSPECTIVE JUROR 26:  Here.

09:42:30 25                      THE COURT:  Donna Missildine.

1                          PROSPECTIVE JUROR 27:  Here.

2                          THE COURT:  Deborah Moody?

3                          PROSPECTIVE JUROR 29:  Here.

4                          THE COURT:  Stacey Moseley.

09:42:44  5                PROSPECTIVE JUROR 31:  Here.

6                          THE COURT:  Gwen Naylor.

7                          PROSPECTIVE JUROR 32:  Here.

8                          THE COURT:  Robert Neutze.

9                          PROSPECTIVE JUROR 33:  Here.

09:42:52 10                THE COURT:  Jerry Reyer.

11                         PROSPECTIVE JUROR 34:  Here.

12                         THE COURT:  Maurice Robinson.

13                         PROSPECTIVE JUROR 35:  Here.

14                         THE COURT:  Wendell Shields.

09:43:04 15                PROSPECTIVE JUROR 36:  Here.

16                         THE COURT:  Lawrence Spiller.

17                         PROSPECTIVE JUROR 38:  Here.

18                         THE COURT:  Jane Wylie.

19                         PROSPECTIVE JUROR 40:  Here.

09:43:08 20                THE COURT:  Peggy Whitt.

21                         PROSPECTIVE JUROR 41:  Here.

22                         THE COURT:  And Jan Williamson.

23                         PROSPECTIVE JUROR 42:  Here.

24                         THE COURT:  Okay.  Let me just say

09:43:14 25   very briefly since we were having some people

1    that were not in here when I told you who the

2    parties are -- for the ones of you who missed it,

3    this is Case Number CV10-369 in the United States

4    Court for the Northern District.  And this is

09:43:34  5    Mr. Brim, Jamon T. Brim.  He is the plaintiff.

6    And he's represented by Penny Cauley and Ronald

7    Sykstus.  And tomorrow he will have another

8    lawyer who couldn't be here today named Len

9    Bennett.  You will be introduced to him tomorrow.

09:43:52  10         The defendant is Midland Credit

11    Management, Inc.  And their representative is

12    Gabe Edrozo, who is seated on my left.  They are

13    represented by Eric Langley and Jason Tompkins.

14    And their in-house counsel, Chris Yang, is here,

09:44:06  15    as well.

16         And the first thing I'm going to ask

17    everyone to do is to stand and raise their right

18    hand and take the preliminary oath of a juror.

19                   (Jurors sworn.)

09:44:34  20              THE COURT:  Would you give us the

21    information -- well, let me just tell you:  I'm

22    going to ask you some questions after you give us

23    some information.  And then the lawyers are going

24    to ask you some questions.  If the questions

09:44:48  25    apply to you, then -- you can go ahead and put it

1      up.  If the questions apply to you, then the

2      first thing you need to do is give us your name

3      so the court reporter who is seated right there

4      can take down who is saying what because she's

09:45:06  5      got to take down what everybody says all day long

6      to make a record of what we're doing here in

7      court today.  Then after you give us your name,

8      you need to give us your answer.  If you're

9      seated behind the rail, if you would also stand

09:45:18 10      when you give us your answer -- there may be

11      questions that a lot of people have their hands

12      up for.  You don't have to stand with your hand

13      up.  But if -- when you give your answer, please

14      stand up so we can hear you better.

09:45:30 15          The rule is that if a question applies to

16      you, you answer it.  If you're not sure whether a

17      question applies to you or not, please answer it.

18      We'd rather have one answer too many than you're

19      later on sitting in the jury box, thinking, now I

09:45:46 20      know what they're talking about and I should have

21      answered that.

22          If for some reason you feel like you

23      cannot answer the question and -- because you

24      need it clarified, speak up.  Tell us what it is

09:45:56 25      you need clarified, and we'll clarify it for you.

If you don't answer a question because you don't

think it applies to you, even after a

clarification and we go on to the next question

or questions and you're sitting there, thinking

09:46:14  back and all of a sudden you realize you probably

should have answered a question that was asked

way back when, go back to that question and say,

I'd like to give an answer or supplement an

answer because I've thought about it.

09:46:26  Finally, even when you're -- if you're

seated as a juror in this case to hear this case

and you think of something you should have

answered when you're sitting actually in the jury

box, trying the case, give us whatever it is you

09:46:42  should have told us.  Just give us that

information.  We need it.  And we'll make proper

use of it.

I do want to tell you that with respect to

any question asked, both of the Court and of the

09:46:54  lawyers, if there's any information you do not

want to stand up and give in front of all the

other jurors, you should feel free to tell me

that you want to do this privately, and we'll go

in chambers and do it privately outside the

09:47:08  presence and hearing of the rest of the jurors.

1    You certainly have that right.  And you should

2    not hesitate to exercise it if you think that

3    would be best for you.

4        Now, the first thing I would like for you

09:47:20  5    to do is to answer the questions on the easel.

6    And then I'll ask you some more questions after

7    those have been answered.  And we should start

8    with Mr. Aiello.  You don't have to tell us

9    street address.  Just the city you live in or the

09:47:34 10    county.

11        PROSPECTIVE JUROR 1:  My name is

12    Joey Aiello.  I live in Huntsville, Alabama.  I'm

13    a plaintiff's personal injury lawyer.  Morris,

14    Conchin, King & Hodge in Huntsville.  My -- and

09:47:48 15    that's what I've done for the past five years.

16    My -- I graduated from law school at Alabama.

17    I'm married to Claire Aiello.  And she works at

18    Channel 19 in Huntsville.  And she is a web

19    content manager.  And never been a juror.  And I

09:48:06 20    like Alabama football.

21        THE COURT:  Thank you.

22        COURTROOM DEPUTY:  Phillip Bess.

23        THE COURT:  Wait.  Have you ever

24    been a plaintiff or defendant, witness?

09:48:16 25        PROSPECTIVE JUROR 1:  Never been a

1    witness and never sued or been sued.

2              THE COURT:  Okay.  Thank you.

3              PROSPECTIVE JUROR 2:  My name is

4    Phillip Bess.  I've lived in Toney, Alabama the

09:48:28  5    last six years.  I'm a quality engineering

6    manager for Navistar Diesel of Alabama.  I've

7    been there four years.  Before that, I was a

8    quality manager down in Cullman, Alabama for

9    another company.  Highest level of school, I've

09:48:46  10    got four years of college, but have not got a

11    degree.  I am married.  My wife, Vickie, is a

12    safety manager for Selex Galileo in Huntsville.

13    I've never been a juror.  Never been a witness.

14    I've never been sued or sued anybody.  I have a

09:49:02  15    hobby farm, and I love Alabama football.

16              THE COURT:  Thank you.

17              COURTROOM DEPUTY:  Jeffrey Bibbee.

18              PROSPECTIVE JUROR 5:  I'm Jeffrey

19    Bibbee.  I live in Florence, Alabama.  Prior to

09:49:14  20    that, my legal residence was Somerville, Alabama

21    while I was a graduate student in London.  I am

22    an assistant professor of history at the

23    University of North Alabama and have been for

24    two-and-a-half years.  Prior to that, I was a

09:49:26  25    research assistant at the London School of

1    Economics.  I have a Ph.D. in history from the

2    University of London.  I am unmarried.  I have

3    never been a juror.  I have never been a witness.

4    I have never been sued.  And my special interests

09:49:40  5    would be travel, reading, cooking.

6                    THE COURT:  Thank you.  Now, have

7    you ever sued anyone?

8                    PROSPECTIVE JUROR 5:  No, ma'am.

9                    THE COURT:  Okay.  Travel,

09:49:50 10    reading, and cooking?

11                    PROSPECTIVE JUROR 5:  Yes, ma'am.

12                    COURTROOM DEPUTY:  Belinda

13    Courtney.

14                    PROSPECTIVE JUROR 8:  I live in

09:49:56 15    Meridianville.  I've been there 20-something

16    years.  I'm self-employed.  Clean houses.  Been

17    doing that for, like, five years.  I finished

18    high school.  I'm married.  My husband does

19    computer work at SAIC.  I have never been a

09:50:14 20    juror.  I've never been a witness in court.  And

21    I've never sued or been sued.  And my hobbies are

22    camping.

23                    THE COURT:  Thank you.

24                    COURTROOM DEPUTY:  James Davis.

09:50:26 25                    PROSPECTIVE JUROR 9:  I'm James

```
1   Davis.  Lived in Rogersville, Alabama all my
2   life.  Work for Simcoe Construction.  I'm
3   equipment operator.  That's about all I got.
4   Never sued.  Never been sued.  All that.
5               THE COURT:  No.  Wait.  Wait just
6   a minute.  Did you go to high school?
7               PROSPECTIVE JUROR 9:  Yes, ma'am.
8               THE COURT:  Did you finish 12th
9   grade?
10              PROSPECTIVE JUROR 9:  Yes, ma'am.
11              THE COURT:  What does your wife
12  do?
13              PROSPECTIVE JUROR 9:  She works at
14  Listerhill Credit Union.
15              THE COURT:  And you've never sued
16  or been sued?
17              PROSPECTIVE JUROR 9:  No, ma'am.
18              THE COURT:  You've never been a
19  witness?
20              PROSPECTIVE JUROR 9:  No, ma'am.
21              THE COURT:  Never been a juror?
22              PROSPECTIVE JUROR 9:  No, ma'am.
23              THE COURT:  And do you do
24  something for fun?
25              PROSPECTIVE JUROR 9:  Farm.
```

09:50:48
09:50:56
09:51:02
09:51:10
09:51:16

```
 1                    THE COURT:  Thank you.

 2                    COURTROOM DEPUTY:  Melissa

 3  Dobbins.

 4                    PROSPECTIVE JUROR 10:  I'm Melissa

 5  Dobbins.  I lived in Moulton, Lawrence County for

 6  the past 18 years.  I'm a nurse at Huntsville

 7  Hospital.  I work in the neonatal intensive care.

 8  Been there for four years.  And I worked at

 9  Decatur General Hospital before that.  I have an

10  associate's degree from Calhoun.  I am married.

11  And he works at Nucor Steel.

12                    THE COURT:  Where?

13                    PROSPECTIVE JUROR 10:  Nucor

14  Steel.  I have been a juror several years ago in

15  Lawrence County for -- it was a family case.

16  Would that be civil case?  Where one part of the

17  family was suing the other family.  Other part of

18  the family.

19                    THE COURT:  What did they sue for?

20                    PROSPECTIVE JUROR 10:  They -- a

21  daughter was saying that the son was taking

22  advantage of the father because he had

23  Alzheimer's.

24                    THE COURT:  That would be a civil

25  case.
```

09:51:20 (line 5)
09:51:36 (line 10)
09:51:50 (line 15)
09:52:04 (line 20)
09:52:12 (line 25)

1          PROSPECTIVE JUROR 10:  Okay.  I'm
2     not real big on court and stuff.
3          THE COURT:  That's fine.  So what
4     was the result?
09:52:18  5          PROSPECTIVE JUROR 10:  He --
6          THE COURT:  Who was the one that
7     brought the lawsuit?  The son?
8          PROSPECTIVE JUROR 10:  The
9     daughter brought the lawsuit.  The son just had
09:52:28 10    to pay a small amount back.
11         THE COURT:  So did y'all decide
12    that he had to pay some money back?
13         PROSPECTIVE JUROR 10:  Yes.
14         THE COURT:  Were you the
09:52:36 15    foreperson of the jury?
16         PROSPECTIVE JUROR 10:  No, ma'am.
17    No.  And I have never been sued or sued anybody.
18    And my hobbies are my kids and following them in
19    ball and stuff.  That's about it.
09:52:48 20         THE COURT:  Okay.  Thanks.
21         COURTROOM DEPUTY:  Stephen
22    Drzycimski.
23         PROSPECTIVE JUROR 12:  I live in
24    Laceys Spring, Alabama.  I work for the U.S.
09:52:56 25    Government on Redstone Arsenal.  I'm an engineer.

And work in the research and development
engineering center.  Worked there for 17 -- 20
years, I guess.  Something like that now.  Let's
see.  I haven't had any other jobs the last five
years.  I graduated from college with a BS in
mechanical engineering.  I'm married.  My spouse
doesn't -- she does work.  She does out of the
house.  She's a -- she likes to buy junk and
antique things and sells them back on EBay.  That
kind of thing.  She has her own little business,
kind of thing.

THE COURT:  Can I call her an EBay
trader?

PROSPECTIVE JUROR 12:  Yeah.  She
goes to yard sales and sells that or junk, things
like that.  I have been a juror.  Probably been
20-plus years ago.  Heard one -- it was civil
case.  Tax case.  I don't really remember the
specifics of it.  We heard one day of evidence,
and then it was pleaded out.  And I haven't been
a witness.  Haven't sued anybody.  And I play
lots of tennis, lots of golf, and have a barbecue
competition team.

THE COURT:  Thank you.

COURTROOM DEPUTY:  Beckie Edwards.

1              PROSPECTIVE JUROR 14:  I live in

2       Hanceville, Alabama.  I've lived there for the

3       last 20 years.  And I'm a retired postal worker.

4       But I have worked for Alabama Coal Cooperative

09:54:22  5       for the past ten years.

6              THE COURT:  What do you do for

7       them?

8              PROSPECTIVE JUROR 14:  I'm a

9       bookkeeper.

09:54:32 10             THE COURT:  Okay.

11             PROSPECTIVE JUROR 14:  And I

12      graduated from Wallace State Junior College.  I

13      am divorced.  And I have been a juror in a murder

14      trial.  He was convicted.  I've never been a

09:54:54 15      witness in court.  I have been sued in traffic

16      accident.  And I won.  And my hobbies are my

17      grandchildren and Auburn athletics.

18             THE COURT:  Thank you.  Were you

19      the foreperson of the jury that heard the murder

09:55:12 20      case?

21             PROSPECTIVE JUROR 14:  No.

22             THE COURT:  Okay.

23             COURTROOM DEPUTY:  James Guess.

24             PROSPECTIVE JUROR 15:  James E.

09:55:34 25      Guess.  I live in Fackler, Alabama for last 36

1   years.  I'm retired person.  I was an electrical

2   supervisor for TVA for those years.  I do not

3   work now.  I'm retired.  The other jobs I've had

4   in the last five years is mowing lawns for the

09:56:10   5   public.  I do a little bit of that on the side.

6   My highest level of education is two-year degree

7   from Northeast State Junior College.  I'm

8   married.  I have three children.  My wife does

9   not work.  She's retired from TVA.  I've been on

09:56:28   10   a jury one time in Jackson County before.  I've

11   never been a witness in court.  Never sued

12   anyone.  My hobbies is Alabama football.

13                  THE COURT:  Okay.  Have you ever

14   been sued?

09:56:44   15                  PROSPECTIVE JUROR 15:  No, ma'am.

16                  THE COURT:  Can you remember what

17   case you heard as a juror?

18                  PROSPECTIVE JUROR 15:  Highway

19   patrol was injured in an accident, investigating

09:56:52   20   an accident.  He had the court suit.

21                  THE COURT:  And do you remember

22   what the jury did?

23                  PROSPECTIVE JUROR 15:  Yes, ma'am.

24   He lost the court.

09:57:02   25                  THE COURT:  Okay.  All right.

```
 1   Were you the for person of the jury?
 2                   PROSPECTIVE JUROR 15:  Yes, ma'am,
 3   I was.
 4                   THE COURT:  All right.  Thank you,
 5   sir.
 6                   COURTROOM DEPUTY:  Monica Gregory.
 7                   PROSPECTIVE JUROR 16:  I'm Monica
 8   Gregory.  Live in Hartselle, Alabama.
 9   Previous -- I've been there almost five years.
10   Before that, we were in Portland, Tennessee, just
11   north of Nashville.  I am a quality control
12   manager.  A chemist for the last probably ten, 15
13   years.  I work for a company called Southern
14   Water Consultants.  I've only been there three
15   weeks.  I just recently changed jobs.  Before
16   that, I was employed with Bunge Corporation.
17   Make soybean oil.  I have a bachelor's degree in
18   biology from the University of Tennessee Martin.
19   I am married.  My husband is Jason.  He does
20   project engineering for Southwestern
21   Communications which is jails and prisons.  They
22   do the controls.  Their company does.  I've never
23   been a juror.  I've never been a witness.  I have
24   sued, I guess, or in -- my mother sued.  My
25   father was killed in a car accident.  That case
```

09:57:08  5
09:57:18 10
09:57:34 15
09:57:50 20
09:58:12 25

```
 1   never went to court.  It was settled out.  But I
 2   guess I was part of that lawsuit because I was
 3   over the age of 18.  So --
 4                   THE COURT:  Okay.
 5                   PROSPECTIVE JUROR 16:  My hobbies
 6   are two baby girls and baking.
 7                   THE COURT:  Have you ever been
 8   suit?
 9                   PROSPECTIVE JUROR 16:  No, ma'am.
10                   THE COURT:  Thank you.
11                   COURTROOM DEPUTY:  Charles Hines.
12                   PROSPECTIVE JUROR 19:  I'm Charles
13   Hines.  I live in Huntsville, Alabama.  I'm
14   retired.  I was electronic engineer and
15   electromagnetic compatibility engineer.  I have a
16   bachelor's and master's and all but thesis toward
17   a doctorate.  Let's see.  Widowed.  Was married
18   to a precious treasure for 29 years and lost her
19   in 2009.  I was a jury foreman on a criminal
20   case.  And.
21                   THE COURT:  What was the result?
22                   PROSPECTIVE JUROR 19:  He was
23   convicted.
24                   THE COURT:  Okay.
25                   PROSPECTIVE JUROR 19:  And I was
```

09:58:24  (line 5)
09:58:32  (line 10)
09:58:44  (line 15)
09:59:20  (line 20)
09:59:30  (line 25)

1    sued as a result of an automobile accident 30

2    years ago.

3              THE COURT:  Who won that case?

4              PROSPECTIVE JUROR 19:  They won.

09:59:42  5    The insurance company had to pay.  And my hobby

6    is baking.

7              THE COURT:  Thank you, sir.

8              COURTROOM DEPUTY:  Marni Kent.

9              PROSPECTIVE JUROR 20:  My name is

09:59:52  10   Marni Kent.  I live in Cullman, Alabama.  I work

11   for G.E. in Huntsville.  And I work in the

12   technology group with the engineers.  I do

13   technical documentation.  I'm a technical writer.

14   And let's see.  I finished high school.  I've had

10:00:10  15   some college, but I don't have any degrees.  I am

16   married.  My spouse is Austin Kent.  He works in

17   Cullman for Lumpkin Industries, and they do

18   industrial gear repair.  I've not ever heard a

19   case as a juror.  And I've not been a witness.

10:00:28  20   I've not been sued or sued anyone.  And I like to

21   spend time with my family and extended family.

22             THE COURT:  Thank you.

23             COURTROOM DEPUTY:  Jean Kezo.

24             PROSPECTIVE JUROR 12:  Hello.  My

10:00:40  25   name is Jean Kezo.  I live in Huntsville,

1   Alabama.  I am a cashier with the South Parkway

2   Wal-Mart in Huntsville.  I've had that job for

3   the past five-and-a-half years.  Let's see.  I

4   graduated from high school in Wisconsin in 1970.

10:01:00   5   Do not have any degrees.  But I have also spent

6   some time as a creative freelance writer.

7   Creative writing is one of my hobbies also.  I

8   did some freelance work for the local newspaper

9   in Wisconsin.  That was part-time on my even --

10:01:20   10   you know, as a self-employed person.  I am

11   divorced.  I have three grown children.  Yes.  I

12   was a juror, but this was back, like, 20, 25

13   years ago back in -- for the county court in

14   Wisconsin.  All the cases were sort of local and

10:01:38   15   sort of, you know, smaller cases.  Nothing like

16   murder trials or anything like that.  I don't

17   remember who won.  I've never been a witness in a

18   court.  And my hobbies are writing, reading, and

19   traveling.

10:01:54   20                   THE COURT:  Have you ever sued or

21   been sued?

22                   PROSPECTIVE JUROR 21:  No.

23                   THE COURT:  Thank you.

24                   COURTROOM DEPUTY:  Frank Luther.

10:02:00   25                   PROSPECTIVE JUROR 23:  Frank

1    Luther.  I live in Madison.  I work for the Hall
2    Metal Door Company.  I'm the production
3    scheduler.  Been there for the past 14, 15 years.
4    No other jobs.  Education degree, University of
10:02:26  5    Texas.  Married.  My wife works as a floral
6    designer, Design World in Madison.  I have heard
7    a case as a juror.  It was a criminal DUI case El
8    Paso County.
9              THE COURT:  I'm sorry.  Who won?
10:02:42 10             PROSPECTIVE JUROR 23:  Who won?
11             THE COURT:  You said it was El
12   Paso County in Texas?
13             PROSPECTIVE JUROR 23:  El Paso
14   County, Texas.  It was a DUI case.  The county
10:02:56 15  won on that one.
16             THE COURT:  So y'all found him
17   guilty?
18             PROSPECTIVE JUROR 23:  Ma'am?
19             THE COURT:  Y'all found him
10:03:02 20  guilty?
21             PROSPECTIVE JUROR 23:  Yes, ma'am.
22             THE COURT:  Were you the
23   foreperson?
24             PROSPECTIVE JUROR 23:  No, ma'am.
10:03:06 25             THE COURT:  Any other juror

1    experience?

2                      PROSPECTIVE JUROR 23:  I'm sorry?

3                      THE COURT:  Any other juror

4    experience?

10:03:10  5                      PROSPECTIVE JUROR 23:  Show up and

6    get dismissed.

7                      THE COURT:  Okay.

8                      PROSPECTIVE JUROR 23:  I've not

9    been sued.  Or I have been, I guess, for a car

10:03:20 10   accident, but the insurance company handled it.

11   And my hobbies are my grandchildren and sports.

12                     THE COURT:  Thank you.

13                     COURTROOM DEPUTY:  Chris Matthews.

14                     PROSPECTIVE JUROR 24:  Hi.  My

10:03:32 15   name is Chris Matthews.  I'm a registered nurse.

16   I work in Highlands in the emergency department.

17   Prior to that, I worked for Walker Isbell

18   Surgeons for --

19                     THE COURT:  I'm sorry.  You worked

10:03:40 20   where?

21                     PROSPECTIVE JUROR 24:  Now?

22                     THE COURT:  Yeah.

23                     PROSPECTIVE JUROR 24:  Presently I

24   work at Highlands in the emergency room.  Prior

10:03:48 25   to that, I worked for Walker Isbell Surgeons.  I

```
 1    have an associate's from northeast.  I am married
 2    to Ryan Matthews.  He works for TVA.  He is an
 3    operator.  I've never heard a case as a juror.  I
 4    have never been a witness.  I have never been
 5    sued.  I have never sued anyone.  And my hobbies
 6    are cooking, cleaning, and Auburn football.
 7                 THE COURT:  Okay.  Where do you
 8    live?
 9                 PROSPECTIVE JUROR 24:  I live in
10    Scottsboro.
11                 THE COURT:  Thanks.
12                 COURTROOM DEPUTY:  Carl McGrady.
13                 PROSPECTIVE JUROR 25:  My name is
14    Carl McGrady.  I live in Florence.  Been in
15    Florence since I was two months old.  I'm almost
16    60.  The work I do, I am a warehouse manager for
17    TNT Fireworks, which is American promotional
18    events.  I've been there approximately ten years.
19    Before that, I worked for Reynolds Metal Company
20    and Wise Alloys.  Highest level of schooling, I
21    have a degree from the University of North
22    Alabama in math and science.  I am married.  My
23    wife, 38 years, she is a housewife.  She doesn't
24    work.  Works around the house and keeps our
25    grandchildren.  Heard a case as a juror.  I was
```

Timestamps: 10:04:04 (line 5), 10:04:18 (line 10), 10:04:24 (line 15), 10:04:42 (line 20), 10:05:04 (line 25)

1   appointed as a juror on the grand jury of

2   Lauderdale County for three months about 15 years

3   ago.  That was involving if the D.A. had enough

4   evidence to bind those cases over to court.  And

10:05:28  5   I have never been a witness in a court.  I have

6   been sued as an individual.  I mean, as an

7   accident, but my insurance company took care of

8   that.  And on the suit case, I was with a group

9   that sued I think a corporation for Reynolds'

10:05:48 10   employees at that time for -- years ago for

11   benefits that they knocked us out of when they

12   sold the company.  And my hobbies are my

13   grandchildren.

14                  THE COURT:  All right.  Thank you,

10:06:00 15   sir.

16                  COURTROOM DEPUTY:  Casey Miller.

17                  PROSPECTIVE JUROR 26:  My name is

18   Casey Miller.  I live in Florence, Alabama.

19   Before that, I lived in Sacramento, California.

10:06:10 20   Currently unemployed.  Before that, I was a store

21   manager for Movie Gallery until they went out of

22   business.  That was in Tuscumbia, Alabama.  And

23   high school graduate.  No college.  Not married.

24   Yes.  I was a juror.  I was a juror -- I was a

10:06:36 25   member of a jury in I guess another civil case

1   where a gentleman had sued his lawyer for what he

2   felt he was -- misrepresentation from a previous

3   case that they had had.  We heard about half a

4   day of arguments and testimony and evidence, came

10:06:52  5   back from lunch, and they had settled while we

6   were out at lunch.

7           THE COURT:  All right.

8           PROSPECTIVE JUROR 26:  Never been

9   a witness.  Never been sued.  Never sued anybody.

10:07:02  10  And I am a musician.

11          THE COURT:  All right.

12          COURTROOM DEPUTY:  Donna

13   Missildine.

14          PROSPECTIVE JUROR 27:  My name is

10:07:10  15  Donna Missildine.  I live in Falkville, Alabama.

16   And I am a preschool teacher.  I work for Bethel

17   Baptist School in Hartselle.  I've worked there

18   for 25 years.  I have an associate's degree.  And

19   I am married.  My husband works for Family Dollar

10:07:30  20  as a store opener.  And I have heard a case as a

21   juror.  It was a DUI case.  And I think she lost.

22          THE COURT:  Were you the

23   foreperson?

24          PROSPECTIVE JUROR 27:  No, ma'am.

10:07:50  25          THE COURT:  Okay.

1                    PROSPECTIVE JUROR 27:  Never been

2        a witness.  Never been sued.  I never sued

3        anyone.  My hobbies are reading, and I have a

4        brand new grand baby.

10:08:04  5                    THE COURT:  Congratulations.

6                    COURTROOM DEPUTY:  Deborah Moody.

7                    PROSPECTIVE JUROR 29:  My name is

8        Deborah Moody.  I live in Killen, Alabama.  I

9        work as a manager at the Green Hills Senior

10:08:20 10       Center.  My former occupation was school teacher.

11       I have a master's degree in early childhood

12       education from Western Kentucky University.  I am

13       married.  My husband is disabled from Reynolds

14       Metals.  I've never heard a case as a juror.

10:08:44 15       I've never been a witness.  I had a case -- it

16       was settled out of court, but it was a car

17       accident.

18                    THE COURT:  Were you the plaintiff

19       or the defendant?

10:08:56 20                    PROSPECTIVE JUROR 29:  I would

21       have been the plaintiff.  It was settled out.

22                    THE COURT:  Okay.

23                    PROSPECTIVE JUROR 29:  And my

24       hobbies are bass fishing and Alabama football.

10:09:06 25                    THE COURT:  Thank you.

1            COURTROOM DEPUTY:  Stacey Moseley.

2            PROSPECTIVE JUROR 31:  My name is

3     Stacey Moseley.  I live here in Florence for,

4     like, the last 16 years.  I am an LPN office

10:09:20  5     nurse.  I'm at this -- I've been at this job

6     since, like, November.  Before that, I had worked

7     for another doctor for last -- the last five or

8     six years here in Florence.

9            THE COURT:  Who do you work for?

10:09:32 10            PROSPECTIVE JUROR 31:  Dr. Felix

11     Morris.

12            THE COURT:  Okay.

13            PROSPECTIVE JUROR 31:  I have an

14     LPN certificate from Northwest Shoals.  I'm

10:09:40 15     married.  My husband does not work.  He is

16     disabled.  He's 13 years out from a heart

17     transplant.  I have served as a juror.  I've

18     never been a witness.  And I've never sued or

19     been sued.  And my hobbies and interests are

10:09:58 20     whatever my son is into and reading.

21            THE COURT:  Okay.  With respect to

22     being a juror, has that been here in Lauderdale

23     County?

24            PROSPECTIVE JUROR 31:  Yes, ma'am.

10:10:06 25            THE COURT:  And do you remember

```
 1   what the case was about?
 2                    PROSPECTIVE JUROR 31:  DUI charge.
 3                    THE COURT:  Do you know who won?
 4                    PROSPECTIVE JUROR 31:  Well, the
 5   prosecution -- the defendant lost.
 6                    THE COURT:  Was he found guilty?
 7                    PROSPECTIVE JUROR 31:  Yes.
 8                    THE COURT:  Were you the
 9   foreperson?
10                    PROSPECTIVE JUROR 31:  No.
11                    THE COURT:  Thank you, sir.
12                    COURTROOM DEPUTY:  Gwen Naylor.
13                    PROSPECTIVE JUROR 32:  My name is
14   Gwen Naylor, and I live in Athens, Alabama.  I
15   retired from TVA in 2001.  In 2009, I started to
16   take some part-time jobs and things.  I worked
17   for the census for the decennial census for a
18   year and just starting to do something part-time
19   from home.  I have a BS degree in accounting.  I
20   am married.  My husband works for IBEC in
21   Madison.  I have heard a case as a juror in this
22   court.  It was a civil case.  The defendant won.
23   I have --
24                    THE COURT:  What was it about?
25                    PROSPECTIVE JUROR 32:  It was
```

Timestamps: 10:10:18 (line 5), 10:10:26 (line 10), 10:10:34 (line 15), 10:10:52 (line 20), 10:11:08 (line 25)

1    sexual harassment.

2                     THE COURT:  Okay.

3                     PROSPECTIVE JUROR 32:  I have

4    never been sued nor have I sued anyone.  And my

10:11:16  5    hobbies are just outdoor activities with my

6    family.

7                     THE COURT:  Thank you.  Were you

8    the foreperson of the jury?

9                     PROSPECTIVE JUROR 32:  No, ma'am.

10:11:24 10                     COURTROOM DEPUTY:  Robert Neutze.

11                     PROSPECTIVE JUROR 33:  I live in

12   Huntsville, Alabama.  I work at NASA for CSC as a

13   systems engineer.  Highest degree, four years at

14   UAH.  Computer software.  I'm widowed.  I have

10:12:00 15   heard multiple criminal cases.  Mixed bag.  Some

16   innocent, some guilty.

17                     THE COURT:  I got the part where

18   you said I've heard multiple criminal cases.

19   Mixed bags?

10:12:16 20                     PROSPECTIVE JUROR 33:  Some

21   guilty, some innocent.  So this would be my

22   fourth jury selection.  Never been a foreman on

23   any of the juries.

24                     THE COURT:  Okay.

10:12:26 25                     PROSPECTIVE JUROR 33:  I have been

1    a witness to an auto accident trial.  I've never

2    been sued nor have a sued anyone.  And my hobbies

3    are golf, home improvement, college sports.

4                    THE COURT:  Thank you.

10:12:42  5                    COURTROOM DEPUTY:  Jerry Reyer.

6                    PROSPECTIVE JUROR 34:  I'm Jerry

7    Reyer.  I've lived in Ardmore, Alabama all my

8    life.  Worked for WYLE Laboratories 32 years.  My

9    wife is Paula Reyer.  She's an Avon

10:12:56  10   representative.  I served on one trial thing.  It

11   was food poisoning.  They lost on it.

12                    THE COURT:  Okay.  Stop.  You're

13   losing me.  Okay.  Where do you work?

14                    PROSPECTIVE JUROR 34:  WYLE

10:13:16  15   Laboratories.  Huntsville, Alabama.

16                    THE COURT:  And what do you do

17   there?

18                    PROSPECTIVE JUROR 34:  I'm an

19   electrician by trade.

10:13:16  20                   THE COURT:  Okay.  And highest

21   level of education?

22                    PROSPECTIVE JUROR 34:  High school

23   graduate.

24                    THE COURT:  And your wife works

10:13:22  25   for Avon as a representative?

1                    PROSPECTIVE JUROR 34:  She is a

2       manager.

3                    THE COURT:  And you have been a

4       juror?

10:13:28  5                    PROSPECTIVE JUROR 34:  Before in a

6       case.  And it was on food poisoning, and they

7       lost on it.

8                    THE COURT:  Who sued whom?

9                    PROSPECTIVE JUROR 34:  In Athens,

10:13:36 10      there was an individual that eat at a restaurant

11      and got food poisoning.  He sued the restaurant.

12      Proved it wasn't food poisoning is what it boiled

13      down to.

14                    THE COURT:  Okay.  Thank you.

10:13:50 15      Were you the foreperson?

16                    PROSPECTIVE JUROR 34:  No, ma'am.

17      And I've never sued anybody or been sued either.

18      My hobby is Alabama football.

19                    THE COURT:  Thank you.

10:14:00 20                    COURTROOM DEPUTY:  Maurice

21      Robinson.

22                    PROSPECTIVE JUROR 35:  Maurice

23      Robinson.  And I live in Triana, Alabama.  And I

24      work for -- I'm a contractor for Redstone

10:14:12 25      Arsenal.  And I'm a HVAC mechanic.  And I'm a

1    high school graduate.  I graduated from high

2    school.  And I'm married.  My wife, she runs a

3    strip mall.  I can barely see this.

4                    THE COURT:  Can you scoot it over?

10:14:40  5                    PROSPECTIVE JUROR 35:  I've been

6    on -- I have been a juror.  On a murder trial.

7                    THE COURT:  Was he found guilty or

8    not guilty?

9                    PROSPECTIVE JUROR 35:  Guilty.

10:14:56 10                    THE COURT:  Were you the

11    foreperson?

12                    PROSPECTIVE JUROR 35:  No.

13                    THE COURT:  Okay.  Any other

14    trials?

10:15:00 15                    PROSPECTIVE JUROR 35:  No, ma'am.

16                    THE COURT:  Okay.

17                    PROSPECTIVE JUROR 35:  And I have

18    never been a witness.  I have never been sued.

19    And my hobbies are chess.

10:15:14 20                    THE COURT:  Chess?

21                    PROSPECTIVE JUROR 35:  Chess.

22                    THE COURT:  Have you ever sued

23    anybody?

24                    PROSPECTIVE JUROR 35:  No, ma'am.

10:15:18 25                    THE COURT:  All right.  Thank you,

1    sir.

2                         COURTROOM DEPUTY:  Wendell

3    Shields.

4                         PROSPECTIVE JUROR 36:  My name is

10:15:34  5    Wendell Shields.  I live in Town Creek, Alabama

6    for the last 15, 16 years.

7                         THE COURT:  Where?

8                         PROSPECTIVE JUROR 36:  Town Creek.

9    I am a truck driver for the last 22 years.  I

10:15:46 10    work for LLL Farms now.  I'm a high school

11    graduate.  My wife, she's a manager for Dollar

12    General in Sheffield.  I have been a juror on a

13    case in Lawrence County.  That was about six

14    years ago, seven years ago.  It was a lady rolled

10:16:16 15    into another lady at a red light.  And lady was

16    rolled in to, she said she had neck problems.

17    And she lost.

18                         THE COURT:  Okay.

19                         PROSPECTIVE JUROR 36:  And I've

10:16:26 20    never been sued nor have I ever sued anyone.  And

21    my hobbies are whatever my grandson wants to do

22    that day.

23                         THE COURT:  What?

24                         PROSPECTIVE JUROR 36:  Whatever my

10:16:38 25    grandson wants to do that day.

1          THE COURT:  Okay.  All right.

2     Thank you.

3          COURTROOM DEPUTY:  Lawrence

4     Spiller.

10:16:42  5          PROSPECTIVE JUROR 38:  My name is

6     Lawrence Spiller.  I live in Hampton Cove,

7     Alabama.  I'm retired after 28 years as a sales

8     manager, sales and sales manager with Hercules,

9     Incorporated.  I don't work anymore.  I have a BS

10:17:08 10   is mechanical engineering from the University of

11    Maine.  I am married for 36 years.  My wife is a

12    part-time physical therapist.  I've never heard a

13    case as a juror.  I've never been a witness.

14    I've never been sued or sued anyone.  I like golf

10:17:32 15   and fishing and just about anything.

16          THE COURT:  Thank you.

17          COURTROOM DEPUTY:  Jane Wylie.

18          PROSPECTIVE JUROR 40:  Can you

19    move the board over in the middle?  I can't see

10:17:44 20   it.

21          My name is Jane Wylie.  I live in

22    Sheffield, Alabama.  I'm a housewife.  I have a

23    high school education and two years at the

24    University of North Alabama.  I've been married

10:18:12 25   for 32 years.  My husband is a retired

1          communications supervisor with the Alabama State
2          Troopers.  I did jury duty in Colbert County, but
3          I was not chosen for a case.  I did federal grand
4          jury in Birmingham for two years.  Do you want to
10:18:42  5     know what I heard?
6                         THE COURT:  No.  Not grand jury.
7                         PROSPECTIVE JUROR 40:  Okay.  I've
8          never been a witness.  Never sued anyone.  Never
9          been sued.  My interests are antiques and Kenny
10:18:58 10     Chesney.
11                         THE COURT:  Thank you.
12                         COURTROOM DEPUTY:  Peggy Whitt.
13                         PROSPECTIVE JUROR 41:  Yes.  I'm
14         Peggy Whitt.  I live in Madison, Alabama.  I've
10:19:06 15     lived there basically in that area all my life.
16         I work for Dynetics IT Services.  We have a
17         contract with NASA.  I'm on a LITES contract.
18         I've been working out at the Arsenal since 1985.
19         Prior to that, I was in banking for about 13
10:19:26 20     years.  I have a high school degree with some
21         technical classes, courses.  I'm married to my
22         husband, Larry Whitt.  He's retired now.  He was
23         in the procurement department.  I have never been
24         a juror.  I've always wanted to be called.  I
10:19:56 25     have never been a witness.  I've never been sued.

1    Can't read the last line.

2              THE COURT:  Have you --

3              PROSPECTIVE JUROR 41:  Travel and

4    reading.

10:20:08   5              THE COURT:  Have you ever sued

6    anybody?

7              PROSPECTIVE JUROR 41:  No, ma'am.

8              THE COURT:  Thank you.

9              COURTROOM DEPUTY:  Jan Williamson.

10:20:14  10              PROSPECTIVE JUROR 42:  Jan

11    Williamson.  I live in Hampton Cove, Alabama.

12    Been there for about 16 years.  I am currently

13    working with UAH as a program coordinator for the

14    atmospheric sciences researchers.  I've been

10:20:30  15    there for just six or seven months.  Prior to

16    that, I was a prospect researcher with the

17    university's fundraising division.  I have a

18    degree in business from the University of

19    Pennsylvania.  And I am married to Allen

10:20:46  20    Williamson.  He is a vice-president of ADS

21    Environmental.  I have been a juror on a case in

22    Madison County.  It was a civil case.  At

23    first -- first case, not the one I heard, there

24    was a young man who was charged with drunk

10:21:08  25    driving.  He was found guilty.  During that

1  accident, there was someone hurt.  The case that

2  I was a juror on was the followup where the

3  plaintiff, the accident victim, was suing for

4  damages.  The plaintiff won that case.  And I was

10:21:22  5  not a foreperson.  I have never been a witness.

6  I have never sued anyone or been sued.  And my

7  hobbies are my family and travel.

8              THE COURT:  Thank you.  I want to

9  ask you some questions.  And remember the rules

10:21:56  10  about answering them if they apply to you.

11      Is there anyone on this jury panel that

12  have just stood up and introduced themselves --

13  and thank you for doing that -- who is not a

14  citizen of the United States?

10:22:08  15              (No response.)

16              THE COURT:  Is there anyone who is

17  not over the age of 18 years?

18              (No response.)

19              THE COURT:  Is there anyone who

10:22:22  20  has not resided for a period of one year within

21  the Northern District of Alabama?

22              (No response.)

23              THE COURT:  Is there anyone who

24  has been convicted in state or federal court of a

10:22:32  25  court of record of a crime punishable by

```
 1    imprisonment for more than one year without
 2    having your civil rights restored?
 3                    (No response.)
 4                    THE COURT:  Is there anyone who is
 5    not able to read, write, speak, and understand
 6    English?
 7                    (No response.)
 8                    THE COURT:  Is there anyone who by
 9    reason of mental or physical infirmity is
10    incapable of rendering efficient jury service?
11                    (No response.)
12                    THE COURT:  Is there anyone who is
13    a member of a fire or police department?
14                    PROSPECTIVE JUROR 36:  Yes.
15                    THE COURT:  Is it a volunteer fire
16    department?
17                    PROSPECTIVE JUROR 36:  Kind of.
18    It is volunteer.  But we get paid for the calls
19    we go on.
20                    THE COURT:  That's Mr. Shields?
21                    PROSPECTIVE JUROR 36:  Yes, ma'am.
22                    THE COURT:  Have a seat.  Anyone
23    else?
24                    (No response.)
25                    THE COURT:  Is there anyone who is
```

1    a member in the -- in active service in the armed

2    forces?

3                    (No response.)

4                    THE COURT:  Is there anyone who is

10:23:24  5    related by blood or by marriage to Jamon Brim,

6    the plaintiff in this case?

7                    (No response.)

8                    THE COURT:  Is there anyone who is

9    an officer, director, stockholder, or employee of

10:23:38 10    Midland Credit Management, Inc.?

11                    (No response.)

12                    THE COURT:  Is there anyone who is

13    related by blood or by marriage to Len Bennett,

14    who is the lawyer who will be here tomorrow?  He

10:23:50 15    is from Virginia.

16                    (No response.)

17                    THE COURT:  Penny Cauley, who is

18    seated here on my right?

19                    (No response.)

10:23:54 20                    THE COURT:  And Ronald Sykstus?

21                    (No response.)

22                    THE COURT:  Is there anyone who in

23    the past has been or presently is being

24    represented by these attorneys or have been in

10:24:06 25    their office for legal advice or sought legal

```
 1   advice from them?
 2                    (No response.)
 3                    THE COURT:  Is there anyone who is
 4   related by blood or by marriage to Eric Langley
 5   or Jason Tompkins or Gabe Edrozo or Chris Yang?
 6                    (No response.)
 7                    THE COURT:  Is there anyone who
 8   has been represented by or is represented by or
 9   has sought legal advise from Mr. Langley,
10   Mr. Tompkins, or Mr. Yang?
11                    (No response.)
12                    THE COURT:  Let me just ask the
13   whole panel.  Is there anyone who knows these
14   people?  Knows these people at all?
15                    (No response.)
16                    THE COURT:  Well, let me just tell
17   you:  This is what the case is about -- it is a
18   very, very brief synopsis.  Jamon Brim filed this
19   action under the Fair Credit Reporting Act, which
20   is located in 15 U.S. Code, Section 1681 and the
21   following sections, based on defendant, Midland
22   Credit Management's, reporting of a collection
23   account as belonging to Mr. Brim to the national
24   credit reporting agencies and the defendant's
25   alleged failure to conduct a reasonable
```

10:24:16 (line 5)
10:24:32 (line 10)
10:24:44 (line 15)
10:24:56 (line 20)
10:25:16 (line 25)

1    investigation upon receipt of Mr. Brim's dispute

2    through the credit reporting agencies.

3           Now, with that being said, is there anyone

4    who knows anything about the facts of this case?

10:25:32  5                (No response.)

6                THE COURT:  Is there anyone who is

7    going to be a witness in this case?

8                (No response.)

9                THE COURT:  Is there anyone who

10:25:38 10  has any financial interest in the outcome of this

11   case?

12                (No response.)

13                THE COURT:  And is there anyone

14   who has ever heard of Midland Credit Management,

10:25:48 15  Inc. or its affiliate, Midland Funding, L.L.C.?

16                (No response.)

17                THE COURT:  Okay.  Is there any of

18   you who -- have you ever disputed anything on

19   your credit report?  Is there anyone who has ever

10:26:06 20  done that?  All right.  Are you okay answering

21   that out loud?

22                PROSPECTIVE JUROR 38:  Sure.

23                THE COURT:  That's Mr. Smith?

24                PROSPECTIVE JUROR 38:  Spiller.

10:26:18 25                THE COURT:  I got you.  Yeah.

1    You're Mr. Lawrence Spiller.

2              PROSPECTIVE JUROR 38:  Yes, I am.

3    What's the question?

4              THE COURT:  If you have ever

10:26:28  5    disputed anything on your credit report?

6              PROSPECTIVE JUROR 38:  Yeah.  They

7    turned something over to a credit collection

8    agency that I -- was not mine.

9              THE COURT:  Okay.

10:26:40 10              PROSPECTIVE JUROR 38:  I took care

11    of it.

12              THE COURT:  Do you know when that

13    was?

14              PROSPECTIVE JUROR 38:  Ten-plus

10:26:44 15    years, probably.

16              THE COURT:  Do you remember the

17    credit reporting agency's name?

18              PROSPECTIVE JUROR 38:  No.  I sure

19    don't.

10:26:54 20              THE COURT:  That's fine.  Thank

21    you.

22              PROSPECTIVE JUROR 38:  It seems

23    like it changed names as it kind of went along

24    there for a while.

10:27:00 25              THE COURT:  Thank you, sir.

1    Anyone else?

2                    PROSPECTIVE JUROR 16:  It was a

3    college credit loan.  They had credited a check

4    to my husband's account and not mine.  It was

10:27:12 5    right after we first got married.  That would

6    have been in about the fall of '99.  But it was

7    cleared up.  They sent us the proper paperwork

8    and adjusted the credit reports.

9                    THE COURT:  You're Ms. Gregory?

10:27:24 10                    PROSPECTIVE JUROR 16:  Yes, ma'am.

11                    THE COURT:  Okay.  Now, who was it

12    that had credited it to your husband's account?

13                    PROSPECTIVE JUROR 16:  It had

14    changed names.  We both had an account.  Like,

10:27:30 15    somebody had acquired my loans and his.  Now it's

16    Sallie Mae.  I don't know who it was.  Loans

17    First or something like that.

18                    THE COURT:  So do you mind talking

19    about it?

10:27:40 20                    PROSPECTIVE JUROR 16:  Oh, no,

21    ma'am.

22                    THE COURT:  How did it first come

23    to your attention that it was credited to the

24    wrong account?

10:27:46 25                    PROSPECTIVE JUROR 16:  We had

1   pulled to purchase a vehicle, and I noticed they

2   had -- mine was still showing a balance and his

3   was not.  And I had paid mine off.  And that's

4   what that check was for.  Paid in full.  And they

10:27:58  5   credited it to his student loan.  So it made his

6   balance go down, and mine was still there.

7                   THE COURT:  And that was on the

8   credit report?

9                   PROSPECTIVE JUROR 16:  On the

10:28:06 10   credit report.

11                   THE COURT:  So what did you do to

12   clear it up?

13                   PROSPECTIVE JUROR 16:  They sent

14   us the paperwork and got -- I had to send them

10:28:12 15   the checks where I had shown -- it had both our

16   names on it.  So they just -- it didn't have my

17   account -- I made the mistake of not putting my

18   account number.  I just mailed it with the

19   receipt.

10:28:24 20                   THE COURT:  Okay.  Thank you.

21   Anyone else?  Yes.  And you are -- Ms. Courtney?

22                   PROSPECTIVE JUROR 8:  Yes.  We had

23   filed bankruptcy years ago, and it had been

24   discharged.  And collection company tried to

10:28:36 25   get -- you know, tried to get it.  I sent them a

```
 1    letter that, you know, it had been discharged.
 2                    THE COURT:  Okay.  And did they
 3    straighten it out?
 4                    PROSPECTIVE JUROR 8:  Yeah.
 5    Anybody else?
 6                    (No response.)
 7                    THE COURT:  Was there anyone who
 8    has disputed something on their credit report --
 9    is there anyone of the three that answered who is
10    of the opinion that the dispute was not resolved
11    to your satisfaction?
12         Okay.  Mr. Spiller, you don't think it
13    was?
14                    PROSPECTIVE JUROR 38:  No.
15    Because it just finally went away.
16                    THE COURT:  Okay.
17                    PROSPECTIVE JUROR 38:  After time.
18                    THE COURT:  Okay.  The next
19    question I want to ask you is whether or not
20    anybody ever has had the experience of a business
21    rather than a person seeking to collect a debt
22    from you that you had already paid?  You have?
23                    PROSPECTIVE JUROR 8:  Yeah.  It
24    was, for, like a credit card.  Phillips 66.
25                    THE COURT:  And it was paid
```

10:28:50 (line 5)
10:29:04 (line 10)
10:29:12 (line 15)
10:29:28 (line 20)
10:29:48 (line 25)

1    through the bankruptcy?

2                    PROSPECTIVE JUROR 8:  It was

3    settled through the bankruptcy.

4                    THE COURT:  That's Ms. Courtney.

10:29:56   5    Anyone else?

6                    (No response.)

7                    THE COURT:  Okay.  Is there anyone

8    who before you came here today asked the jury

9    section in Birmingham to be excused and did not

10:30:16   10    get excused?

11                    (No response.)

12                    THE COURT:  Okay.  All right.  Do

13    y'all need a break before we proceed?

14                    MR. SYKSTUS:  Yes.

10:30:26   15                    THE COURT:  Let's take a

16    midmorning break.  While you're out on break,

17    don't discuss the case among yourselves, and

18    don't let anyone discuss it in your presence or

19    in your hearing.  And please be back in here in

10:30:36   20    15 minutes.

21                    (Short recess.)

22                    (In open court.  Jury present.)

23                    THE COURT:  I need to see the

24    lawyers at the bench please.

10:30:46   25                    (Bench discussion off the record.)

*CHERYL K. POWELL, CCR, RPR, FCRR*
Federal Official Court Reporter
1729 Fifth Avenue, North
Birmingham, AL 35203
256-508-4050/wrd4wrdrpr@aol.com

1                    (End of bench discussion.)

2                    THE COURT:  You ready to ask your

3    questions?

4                    MS. CAULEY:  Yes, Your Honor.

10:53:40  5    Thank you.

6         As Judge Johnson introduced me, my name is

7    Penny Cauley.  I'm one of the attorneys that's

8    representing Mr. Brim in this case today.  I do

9    have some follow-up questions and some additional

10:53:54 10   questions.  I am also not very good with names.

11   So help me out as best you can.

12        Mr. Aiello.  You indicated that you were a

13   plaintiffs attorneys.

14                   PROSPECTIVE JUROR 1:  Yes.

10:54:06 15                   MS. CAULEY:  Prior to today, are

16   you familiar at all with the Fair Credit

17   Reporting Act?

18                   PROSPECTIVE JUROR 1:  I am aware

19   that it exists.

10:54:12 20                   MS. CAULEY:  Have you ever brought

21   any claims for a client --

22                   PROSPECTIVE JUROR 1:  I've never

23   drafted a complaint or anything dealing with

24   that.

10:54:20 25                   MS. CAULEY:  Has anyone else

1    that's here today prior to today coming in and

2    hearing the brief description of this case -- has

3    anyone else ever heard of the Fair Credit

4    Reporting Act and they offer some -- Mr. Miller?

10:54:48  5              PROSPECTIVE JUROR 26:  I'm aware

6    it offers protections.  As far as credit

7    reporting, what's on there, what's put on there.

8    Just look at it.  Stuff like that.

9              MS. CAULEY:  Have you ever had to

10:54:58 10   file a dispute?

11              PROSPECTIVE JUROR 26:  No, ma'am.

12              PROSPECTIVE JUROR 41:  The

13   question you asked, I didn't hear the name.

14              MS. CAULEY:  Is anyone familiar

10:55:18 15   with the Fair Credit Reporting Act.

16              PROSPECTIVE JUROR 41:  Thank you.

17              MS. CAULEY:  And Mr. Hines?

18              PROSPECTIVE JUROR 19:  Just heard

19   of it.  Basic tenets of it.

10:55:34 20              MS. CAULEY:  All right.  Anyone

21   else that's at least heard of the Fair Credit

22   Reporting Act?

23              THE COURT:  If you will, please

24   stand up and state your name.

10:55:46 25              PROSPECTIVE JUROR 24:  Chris

1    Matthews.

2              MS. CAULEY:  Do you have any

3    familiarity where you've actually had to file a

4    dispute with the credit bureau?

10:55:56  5              PROSPECTIVE JUROR 24:  No, ma'am.

6    Just that it exists.

7              PROSPECTIVE JUROR 33:  Robert

8    Neutze.  I know it exists and allows you to check

9    your report on a regular basis.

10:56:12  10              PROSPECTIVE JUROR 32:  Gwen

11    Naylor.

12              MS. CAULEY:  Yes.

13              PROSPECTIVE JUROR 32:  I am aware

14    that it exists.  And when I worked at TVA, I did

10:56:22  15    background investigations.  So credit was part of

16    what is involved in their background

17    investigation.  So sometimes there were people

18    who would have issues that might come up that

19    were different than they had expected.

10:56:34  20              MS. CAULEY:  It's Ms. Naylor,

21    right?

22              PROSPECTIVE JUROR 32:  Yes.

23              MS. CAULEY:  Ms. Naylor, when you

24    worked at TVA and you did background checks, were

10:56:44  25    you actually pulling copies of employees' or

```
 1   particular employees' credit reports?
 2                    PROSPECTIVE JUROR 32:  Equifax did
 3   it.
 4                    MS. CAULEY:  Did you have any
 5   responsibility for reporting any information on
 6   the employees to Equifax.
 7                    PROSPECTIVE JUROR 32:  Not back to
 8   Equifax.  No.  We used the information that came
 9   from them as part of the elements that were
10   required for background investigation.
11                    MS. CAULEY:  And when you would
12   receive those reports, would it also have the
13   credit reports, like, credit accounts that would
14   be on those credit reports?
15                    PROSPECTIVE JUROR 32:  It did not.
16                    MS. CAULEY:  Just like employment
17   background?
18                    PROSPECTIVE JUROR 32:  Only
19   situations where they had maybe issues or if what
20   they reported contradicted what was on the credit
21   report.
22                    MS. CAULEY:  Okay.
23                    PROSPECTIVE JUROR 32:  If the
24   questions that they had answered about their own
25   background, if that didn't match what the report
```

1    said.

2                    MS. CAULEY:  Did you have any

3    employees that you were working with after the

4    background check came in that claimed that the

10:57:40  5    information on the credit report was inaccurate?

6                    PROSPECTIVE JUROR 32:

7    Occasionally.

8                    MS. CAULEY:  Did you have any

9    responsibility for telling them about their right

10:57:48  10    to dispute the accuracy?

11                    PROSPECTIVE JUROR 32:  Only that

12    they told the truth.  My part was to determine

13    whether or not they were being honest.

14                    MS. CAULEY:  Did you have that

10:58:00  15    flexibility where you could take what the

16    potential employee was saying or maybe

17    documentation they presented and overrule what

18    the credit report said?

19                    PROSPECTIVE JUROR 32:  Not just as

10:58:08  20    the credit report but just an overall liability

21    issue.

22                    MS. CAULEY:  So you did have that

23    ability a little bit to look at the individual

24    and judge their credibility compared to just what

10:58:20  25    was on paper?

1           PROSPECTIVE JUROR 32:  Somewhat.

2           MS. CAULEY:  Anyone else familiar

3    at all with the Fair Credit Reporting Act?

4           PROSPECTIVE JUROR 2:  Phil Bess.

10:58:28  5    Just what you normally hear.  TV news, reading

6    about it.  I think we have posters on the wall at

7    work in our human resources.

8           MS. CAULEY:  Okay.  And Mr. Bess,

9    you work as a quality engineering manager?

10:58:46 10           PROSPECTIVE JUROR 2:  Right.

11           MS. CAULEY:  What do you do?

12           PROSPECTIVE JUROR 2:  We build

13    diesel engines for diesel trucks.  Navistar

14    Diesel.  And we actually have global quality,

10:58:56 15    which is now Brazil, India, all around the world.

16    And where we manufacture parts or have parts

17    manufactured for us.  And if there's any quality

18    issues that are of outside the normal, we get

19    involved with them and find out what the root

10:59:10 20    cause is.

21           MS. CAULEY:  And do you recall the

22    posters that might be on the wall in human

23    resources about the Fair Credit Reporting Act?

24    Do you know what they might say?

10:59:20 25           PROSPECTIVE JUROR 2:  I think what

1    the government policy would be so that we offer

2    counseling and offer credit, you know, at the

3    company.  But I mean, I'm just an employee there.

4    I'm not involved with it.  I just know it's

10:59:32  5    available to us if we need it.

6                  MS. CAULEY:  Great.  I appreciate

7    that very much.  Mr. Spiller?

8                  PROSPECTIVE JUROR 38:  Yes.

9                  MS. CAULEY:  You indicated

10:59:50 10    previously to Judge Johnson's questions that you

11    had a credit dispute?

12                  PROSPECTIVE JUROR 38:  Uh-huh

13    (indicating yes).

14                  MS. CAULEY:  With a collection

10:59:56 15    agency that had put an account on your credit

16    report that was not yours?

17                  PROSPECTIVE JUROR 38:  Was not

18    mine.

19                  MS. CAULEY:  Did you actually do a

11:00:04 20    dispute through the credit reporting agencies?

21                  PROSPECTIVE JUROR 38:  I wrote

22    them letters.  I never got any replies.  It

23    dragged on and on.  And after about seven or

24    eight years, it kind of disappeared.  So I

11:00:16 25    just --

1                    MS. CAULEY:  Who did you write

2      your letters to?  Did you write it to the

3      collection agency or --

4                    PROSPECTIVE JUROR 38:  Yes.  Yes.

11:00:22  5   It was -- that's about -- I can't remember the

6      name of the collection agency.

7                    MS. CAULEY:  I appreciate that.

8                    THE COURT:  Mr. Luther, did you

9      have your hand up?

11:00:40 10                   PROSPECTIVE JUROR 23:  Yes, ma'am.

11                   MS. CAULEY:  Yes, sir?

12                   PROSPECTIVE JUROR 23:  I've heard

13     about it.

14                   MS. CAULEY:  Have you heard any

11:00:50 15   specifics about the Fair Credit Reporting Act

16     or --

17                   PROSPECTIVE JUROR 23:  You get one

18     year to check your stuff.  Just the basics that

19     you have.

11:00:58 20                   MS. CAULEY:  Some from those

21     commercials that you've seen, the funny

22     commercials about the free credit report?  Is

23     there anyone in here that --

24                   THE COURT:  Is that everybody we

11:01:14 25   got that raised their hand?

```
 1                     PROSPECTIVE JUROR 14:  I've just
 2    heard of it is all.
 3                     MS. CAULEY:  Never had to file a
 4    dispute with the credit bureau over something on
11:01:30  5  your credit report?
 6         Has anyone in here actually pulled a copy
 7    of their credit report either from the internet
 8    or through annualcreditreport.com?  We have a lot
 9    of people.  I'm going to start with the box and
11:01:44 10  have Mr. Aiello.
11                     PROSPECTIVE JUROR 1:  Yes.
12                     MS. CAULEY:  Within the last year?
13                     PROSPECTIVE JUROR 1:  Been a few
14    years.
11:01:50 15                   MS. CAULEY:  Okay.  Did you obtain
16    your credit report from a specific agency?
17                     PROSPECTIVE JUROR 1:  I think they
18    passed a law that says you get one for free.  And
19    I went on the internet, and I think I downloaded
11:02:04 20  it.  And it was, I think, all three agencies.
21                     MS. CAULEY:  Okay.  And was there
22    anything incorrect on there that you had to
23    dispute?
24                     PROSPECTIVE JUROR 1:  Not at that
11:02:10 25  time, no.
```

1          MS. CAULEY:  Great.  Anyone else

2    in the jury box?

3          PROSPECTIVE JUROR 2:  About four

4    years ago, our credit union offered us a service

11:02:20  5    that pulled it for you and showed it to you.

6    Didn't have any dispute or anything.

7          MS. CAULEY:  Yes, sir?

8          PROSPECTIVE JUROR 5:  Mine was

9    pulled as part of a mortgage application.

11:02:32  10          MS. CAULEY:  And when was that, if

11    you remember?

12          PROSPECTIVE JUROR 5:  One year

13    ago.

14          MS. CAULEY:  A year ago?  And did

11:02:38  15    you have any issues with the credit report that

16    you had to take up with the mortgage?

17          PROSPECTIVE JUROR 5:  No.

18          MS. CAULEY:  Anyone else in the

19    box?

11:02:44  20          PROSPECTIVE JUROR 14:  I have.  I

21    just pulled up the free one, and there was no

22    discrepancies.

23          MS. CAULEY:  On the first row, is

24    there anyone?  We've got Ms. Gregory?

11:03:02  25          PROSPECTIVE JUROR 16:  Yes, ma'am.

1           MS. CAULEY:  When did you pull

2      your credit report?

3           PROSPECTIVE JUROR 16:  Probably

4      three years ago.  On line.  We got all three.

11:03:08  5      And they were all okay for me and my husband

6      both.

7           MS. CAULEY:  You actually had the

8      issue where you had made a payment in full and it

9      had been credited to the wrong account?

11:03:18 10           PROSPECTIVE JUROR 16:  Yes.

11           MS. CAULEY:  What did you have to

12      do in order to get that taken care of?

13           PROSPECTIVE JUROR 16:  I spoke

14      with the higher party in that loan company, and

11:03:26 15      he sent me some paperwork.  And I still have it

16      to this date to keep in case it ever came back.

17      They adjusted it and got it corrected.  My maiden

18      name -- they just saw my husband's name.  They

19      didn't have an account with my married name.

11:03:40 20      It's resolved.

21           MS. CAULEY:  Fairly easy to take

22      care of?

23           PROSPECTIVE JUROR 16:  It was with

24      them.  I didn't have to deal with the credit

11:03:48 25      reporting agencies.  It's since gone away.

1          MS. CAULEY:  Mr. Hines?

2          PROSPECTIVE JUROR 19:  The company

3    I was with lost a computer that had all kinds of

4    personal information on it.  And as part of

11:04:04  5    guarding against that information being used for

6    identity theft, they signed us up for a periodic

7    credit report.  And then they monitored our --

8    the credit activity and sent us periodic reports.

9          MS. CAULEY:  And when you received

11:04:26 10    your credit reports, were there any credit

11    accounts that you had to dispute with the

12    furnisher?

13          PROSPECTIVE JUROR 19:  No.

14    Evidently the information they had, on me anyway,

11:04:40 15    was not used for identity theft.

16          MS. CAULEY:  Second row?  Oh.  I'm

17    sorry.  Ms. Kent?

18          PROSPECTIVE JUROR 20:  Yes.  We

19    bought a house back in September.  So it was

11:04:50 20    pulled from all three for mortgage loan.

21          MS. CAULEY:  I'm assuming --

22          PROSPECTIVE JUROR 20:  It was all

23    correct.

24          MS. CAULEY:  Everything was fine?

11:05:06 25          PROSPECTIVE JUROR 20:  Yes, ma'am.

1              MS. CAULEY: Anyone on the second
2    row? Yes. Mr. Miller?
3              PROSPECTIVE JUROR 26: Yeah. I
4    pulled -- as Mr. Aiello said, you can get one
11:05:20 5   free per year. I got mine from the
6    government-provided web site. Pulled it from all
7    three. The only issue I had with it wasn't
8    really an issue. Just something that was on
9    there from an emergency room bill from before my
11:05:32 10  bankruptcy. So it shouldn't have been on there
11   anymore. But I didn't take any action to remove
12   it or anything.
13             MS. CAULEY: So even though there
14   was something on there incorrect, you didn't file
11:05:42 15  a dispute to have them remove it?
16             PROSPECTIVE JUROR 26: It was a
17   legitimate bill. It should have been gone with
18   the bankruptcy. It was a legitimate bill. I
19   didn't fight it or anything.
11:05:56 20            PROSPECTIVE JUROR 24: Chris
21   Matthews. Bank of America -- we refinanced our
22   home probably about six months ago. And it was
23   pulled. And about a year prior to that, Mercedes
24   Benz of Huntsville pulled it. And at that time,
11:06:14 25  it was from three different companies. And they

```
 1   were correct.
 2                   MS. CAULEY:  And they were
 3   correct?
 4                   PROSPECTIVE JUROR 24:  Yes, ma'am.
 5                   MS. CAULEY:  So the companies like
 6   the Bank of America was actually the entity that
 7   was pulling your credit rather than you pulling
 8   it?
 9                   PROSPECTIVE JUROR 24:  Correct.
10                   MS. CAULEY:  But it was for credit
11   you had applied for?
12                   PROSPECTIVE JUROR 24:  Yes, ma'am.
13                   MS. CAULEY:  Anyone on the third
14   row?  Mr. Neutze?
15                   PROSPECTIVE JUROR 33:  Yes.  Did
16   the on line.  Pulled my three reporting agencies,
17   and there was no anomalies.  About a year ago.
18                   MS. CAULEY:  And everything was
19   all right?  Anyone else on the third row?
20                   (No response.)
21                   MS. CAULEY:  Fourth row?
22   Ms. Williamson?
23                   PROSPECTIVE JUROR 42:  I pull my
24   credit report regularly through American Express.
25   They give you a free one.  And every time we
```

Time stamps: 11:06:18 (line 5), 11:06:28 (line 10), 11:06:36 (line 15), 11:06:48 (line 20), 11:06:58 (line 25)

purchase a house -- and we've purchased houses a
lot -- we always ask for the credit report that
was done for that financing process since 1973.

MS. CAULEY:  Have you ever had any
11:07:12  issues that you had to file a dispute regarding
the furnisher that was putting false stuff on
your credit report?

PROSPECTIVE JUROR 42:  No.

PROSPECTIVE JUROR 41:  I, too,
11:07:22  have pulled it up on the internet.  And
everything was fine.

MS. CAULEY:  Mr. Spiller?

PROSPECTIVE JUROR 38:  Same one
that she pulled, I pulled.  But to me, always
11:07:34  surprises me is that there's a -- there were
things on there that I thought had been closed
for ten-plus years.  And so I just took the
action of writing to each of the places and
closing the accounts.

11:07:48  MS. CAULEY:  I think, based on my
previous question, we probably know the answer to
this, but just so we're clear, has anyone ever,
in your judgment, been wrongfully denied a credit
card or a mortgage or a car loan based on
11:08:12  inaccurate information that was contained on your

 1    credit report?

 2                    (No response.)

 3                    MS. CAULEY:  Do you know anyone in

 4    your family or friends who has ever been, in

11:08:26 5    their judgment, wrongfully denied credit based on

 6    inaccuracies within their credit report?

 7                    (No response.)

 8                    MS. CAULEY:  This case, as a

 9    little bit Judge Johnson instructed you, is a

11:08:46 10    case Mr. Brim has brought under the Fair Credit

11    Reporting Act.  And he's actually seeking damages

12    to his credit reputation, his ability to get

13    credit, and his alleged distress, frustration,

14    and difficulty in obtaining the correction of his

11:09:00 15    good credit.

16         Does anyone that's in here today think

17    that or disagree with the concept that the Fair

18    Credit Reporting Act allows for an individual to

19    recover damages to their credit reputation and

11:09:16 20    standing?

21                    MR. LANGLEY:  Your Honor, I guess

22    I need to object to that question.

23                    THE COURT:  You don't.  It's in

24    the record that you have objected to it.

11:09:28 25                    (No response.)

1              MS. CAULEY:  So is everyone

2     here -- the Court will instruct you on exactly

3     what damages are available under the Fair Credit

4     Reporting Act.  But if when the Court instructs

11:09:38  5     you regarding what damages are available and if

6     you think Mr. Brim has proved those damages, is

7     there anyone in here who would have a problem

8     awarding damages for alleged harm to a credit,

9     credit reputation, credit report, denial of

11:09:54 10     credit, anything like that?

11              (No response.)

12              MS. CAULEY:  Is there anyone here

13     that feels that damage to one's credit report or

14     their reputation is not sufficiently important to

11:10:06 15     bring a federal lawsuit?

16              (No response.)

17              MS. CAULEY:  Fair Credit Reporting

18     Act is a federal law.  And so jurisdiction's in

19     federal court.

11:10:16 20          Is there anyone who thinks we shouldn't be

21     in federal court over an issue like this?

22          Ms. Whitt?

23              PROSPECTIVE JUROR 41:  Yes, ma'am.

24              MS. CAULEY:  Were you just nodding

11:10:34 25     for the question?

 1            PROSPECTIVE JUROR 41:  I'm just
 2    nodding for the question.  I'm okay.
 3            MS. CAULEY:  Is there anyone who
 4    would be opposed to awarding damages against a
11:10:46  5    company whose conduct has, in fact, damaged ones
 6    credit reputation or their ability to obtain
 7    credit?
 8            (No response.)
 9            MS. CAULEY:  In previous cases,
11:11:04 10    you always learn about, you know, people's
11    beliefs.  And sometimes someone might have a
12    religious belief or a philosophical belief or
13    just a political belief that lawsuits seeking
14    money for damage to reputation or mental
11:11:22 15    suffering are just wrong.
16        Is there anyone who has a philosophical or
17    religious or political opposition to damages --
18    to lawsuits that seek damages for reputation and
19    credit?
11:11:40 20            (No response.)
21            MS. CAULEY:  So everyone would be
22    okay if Mr. Brim presents the evidence that's
23    necessary and the Court instructs you -- everyone
24    would be all right with the fact that this
11:11:50 25    lawsuit is seeking money damages?

1              (No response.)

2              MS. CAULEY:   I talked with

3    Ms. Gregory about the fact that Ms. Gregory had

4    made a payment that wasn't properly credited.

11:12:12   5    And then she told us about what she did to get it

6    fixed.

7         Is there anyone in here that had a payment

8    that was misapplied to someone else's account

9    that you had to take steps to try and get

11:12:26  10   corrected?

11              (No response.)

12              MS. CAULEY:   That hasn't happened

13   to anyone else?  Yes, sir.

14              PROSPECTIVE JUROR 23:   Frank

11:12:34  15   Luther.

16              THE COURT:   Mr. Luther?

17              PROSPECTIVE JUROR 23:   Yes.  My

18   wife and I ten years ago, 15 years ago, were

19   applying for a house.  We had to clean up our

11:12:48  20   credit with stuff that had been on there from ten

21   years before that.  And from my understanding, it

22   should have been either dropped off after seven

23   or cleared up somehow.

24              MS. CAULEY:   Mr. Luther, in trying

11:13:04  25   to clear up that credit, did you have to send in

1      disputes to the credit reporting agencies

2      regarding specific accounts?

3                    PROSPECTIVE JUROR 23:  No.  We had

4      to contact the person who was making the claim

11:13:16   5      and ask them to remove it.  But they had changed

6      companies.  And they had no clue, and they

7      weren't going to do anything with it.

8                    MS. CAULEY:  So you had to

9      actually contact the company that was furnishing

11:13:28  10      the information?  And were you successful in

11      contacting the furnisher and having that removed?

12                    PROSPECTIVE JUROR 23:  No.  Like I

13      said, they changed ownership.  It was an

14      apartment complex.  They had changed ownership.

11:13:42  15      There was nothing we could do.  We were advised

16      since it was such an old debt it wouldn't really

17      affect what we were doing.

18                    MS. CAULEY:  So you were able to

19      go forward with the house purchase?

11:13:52  20                    PROSPECTIVE JUROR 23:  Yes.

21                    MS. CAULEY:  Do you remember how

22      long you might have spent trying to go back to

23      that furnisher and have the item corrected?

24                    PROSPECTIVE JUROR 23:  Yeah.  It

11:14:06  25      was a jump-through-the-hoop, 30 days type of

1    thing before the loan expired.  I had to apply

2    again.

3                    MS. CAULEY:  So you were able to

4    get everything done in that 30 days?

11:14:24 5                    PROSPECTIVE JUROR 23:  Your

6    question is not clear.  We finished the process,

7    but we had no -- there was no resolution to it.

8                    MS. CAULEY:  Okay.

9                    PROSPECTIVE JUROR 23:  And we just

11:14:36 10   went ahead with the loan process.  The person in

11   charge of the loan process just kind of threw

12   that out.

13                   MS. CAULEY:  Okay.  And so the

14   mortgage company was able to override or overlook

11:14:48 15   that account --

16                   PROSPECTIVE JUROR 23:  I imagine,

17   yes.

18                   MS. CAULEY:  Ms. Whitt?

19                   PROSPECTIVE JUROR 41:  Yes.

11:15:14 20                   MS. CAULEY:  You stated before you

21   worked at Dynetics, you worked in the banking

22   industry for 13 years?

23                   PROSPECTIVE JUROR 41:  Yes.

24                   MS. CAULEY:  Can you tell us what

11:15:22 25   you did in banking?

                         1          PROSPECTIVE JUROR 41:  I began

                         2     opening accounts for customers.  Then I went to

                         3     the installment loan department.  And then after

                         4     the installment loan department, I was the

11:15:36     5     manager of our processing center.

                         6          MS. CAULEY:  I take it from your

                         7     response you had no duties with providing account

                         8     information to credit reporting agencies.

                         9          PROSPECTIVE JUROR 41:  Now, this

11:15:54   10     has been a long, long time ago.  Because I did

                        11     get information from the credit bureau on

                        12     applications for, you know, they would make an

                        13     application for a loan, car loan, and I would get

                        14     in contact with the credit bureau and get credit

11:16:14   15     information at that time.  Now, that was local

                        16     credit bureau.  Now, this has been -- this was --

                        17     I started working there in '69.  And worked there

                        18     for 13 years.  I think I moved over to another

                        19     career in 1983.

11:16:34   20          MS. CAULEY:  Is that -- you're

                        21     currently with Dynetics?

                        22          PROSPECTIVE JUROR 41:  No.  That

                        23     was with Compass Bank.

                        24          MS. CAULEY:  What do you do as the

11:16:44   25     IT supervisor?

1              PROSPECTIVE JUROR 41:  The IT

2      security.  I'm the training coordinator for our

3      group.  I work under the HR department.  But I'm

4      in the training division and education division.

11:17:00  5              MS. CAULEY:  What type of items

6      are you training individuals on?

7              PROSPECTIVE JUROR 41:  Computer

8      software, that type of thing.

9              MS. CAULEY:  Has anyone else

11:17:28 10      worked in banking or where they had any

11      responsibility for reporting accounts to a credit

12      bureau?

13              (No response.)

14              MS. CAULEY:  Has anyone ever

11:17:40 15      worked in the area of debt collections?

16              (No response.)

17              MS. CAULEY:  Anyone besides

18      Ms. Whitt that's worked in an area -- someone

19      else had this responsibility, too, where you were

11:18:04 20      responsible for actually pulling credit reports

21      on individuals and reviewing those credit

22      reports?

23              (No response.)

24              MS. CAULEY:  Anyone ever worked in

11:18:24 25      the field of mortgage lending?  At all?

1                    (No response.)

2                    MS. CAULEY:  No?  Does anyone have

3       strong personal feelings regarding the use of

4       credit in our society?

11:18:38  5                    (No response.)

6                    MS. CAULEY:  Does anyone not have

7       a credit card?  That's Mr. Miller?

8                    PROSPECTIVE JUROR 26:  Yes, ma'am.

9                    MS. CAULEY:  Anyone else not have

11:19:00 10       a credit card?  Yes, ma'am.

11                    PROSPECTIVE JUROR 42:  Charge

12       card.  Not a credit card.

13                    PROSPECTIVE JUROR 26:  If I can't

14       afford it, I don't need it.

11:19:18 15                    MS. CAULEY:  This case involves

16       claims, again, arising under the Fair Credit

17       Reporting Act.  And that act provides for

18       punitive damages against a person who willfully

19       fails to comply with any requirement under the

11:19:38 20       act.

21            Do any of you believe, for whatever

22       reason, that punitive damages should never be

23       awarded to an individual, regardless of the facts

24       in the case?

11:19:52 25                    (No response.)

1          MS. CAULEY:  The Court will give

2     you a specific instruction regarding punitive

3     damages and what they are.  But for purposes of

4     this venire, does everyone understand that

11:20:04  5     punitive damages are generally meant to punish

6     the wrongdoer and also to deter similar conduct

7     in the future?

8               (No response.)

9          MS. CAULEY:  Does anyone think

11:20:14 10     that punitive damages should never be allowed?

11              (No response.)

12          MS. CAULEY:  Judge Johnson will

13     decide whether punitive damages are an issue to

14     be decided by the jury.  But you know in the last

11:20:26 15     several years there's been a lot of publicity and

16     political discussion regarding punitive damages

17     and tort reform.

18          If Judge Johnson determines that punitive

19     damages are going to be allowed to be decided by

11:20:36 20     the jury, is there anyone who believes that they

21     should not be allowed; that is, punitive damages

22     should just never be allowed?

23              (No response.)

24          MS. CAULEY:  Does anyone -- I know

11:20:50 25     Mr. Aiello is an attorney.  But does anyone else

have friends or family that works in the court
system as a judge, lawyer, or they actually work
for a lawyer or a courthouse? Yes, sir. Let me
start with the front row. Ms. Kezo?

11:21:10              PROSPECTIVE JUROR 21: Yes. I
have a brother-in-law who is a bailiff in the
county court system in Wisconsin.

              MS. CAULEY: Thank you.

              PROSPECTIVE JUROR 21: What was
11:21:24  the other part of your question?

              MS. CAULEY: Work for a lawyer,
judge, or courthouse.

              PROSPECTIVE JUROR 21: I used to
work for a courthouse. This was, again, in 1986
11:21:36  for four years. That was for the county planning
and zoning department. I was just an entry-level
clerical person.

              MS. CAULEY: Okay. Thank you.
Anyone on the second row? Yes, sir. Mr. Miller?
11:21:46              PROSPECTIVE JUROR 26: Can you
repeat the question?

              MS. CAULEY: Yes, sir. The
question is: Has anyone in here or any of your
family or friends ever -- are they involved at
11:22:02  all with the legal system such as a judge, a

1   lawyer, they work for lawyers, or they work for

2   the courthouse?  Yes, ma'am.

3              PROSPECTIVE JUROR 24:  I have

4   several friends that are attorneys.

11:22:14  5              MS. CAULEY:  Ms. Best?

6              PROSPECTIVE JUROR 24:  Matthews.

7              MS. CAULEY:  Wrong page.  I'm

8   sorry.  And they work for lawyers?

9              PROSPECTIVE JUROR 24:  They are

11:22:26 10   lawyers.

11              MS. CAULEY:  What kind of lawyers

12   are they?

13              PROSPECTIVE JUROR 24:  I don't

14   really know the difference.  I just know they're

11:22:36 15   attorneys.  Attorney at law.

16              MS. CAULEY:  Do you know -- do

17   they work for their own firm?

18              PROSPECTIVE JUROR 24:  They do.

19   Scottsboro, Fort Payne.

11:22:50 20              MS. CAULEY:  There's a Mickey

21   Parrish.

22              PROSPECTIVE JUROR 24:  (Shakes

23   head, indicating no.)

24              MS. CAULEY:  Anyone else who

11:23:00 25   has --

1                    THE COURT:  Mr. Miller had his

2       hand up.

3                    PROSPECTIVE JUROR 26:  Judge Mike

4       Jones is related to me through my grandparents.

11:23:16  5                    MS. CAULEY:  Mr. Robinson?

6                    PROSPECTIVE JUROR 35:  Yes.  My

7       wife is working for Judge William Morgan.

8                    MS. CAULEY:  What does your wife

9       do for Judge Morgan?

11:23:32 10                    PROSPECTIVE JUROR 35:  He's the

11      owner of this strip mall.  His daddy is the

12      owner.  But his daddy -- he take -- him and my

13      wife runs it.

14                    MS. CAULEY:  She doesn't actually

11:23:44 15      work in the courthouse for him; she's running the

16      strip mall you told us about.

17                    PROSPECTIVE JUROR 35:  Right.

18                    MS. CAULEY:  Anyone I missed?

19      I've got one on the back.  Ms. Williamson?

11:23:56 20                    PROSPECTIVE JUROR 42:  I worked

21      for attorneys for three years in Connecticut.  I

22      was responsible for the secretarial -- the 42

23      secretaries.

24                    MS. CAULEY:  I'm sorry.  I missed

11:24:06 25      what you did.

1          PROSPECTIVE JUROR 42:  I was

2  responsible for the 42 secretaries that supported

3  the 67 attorneys.

4          MS. CAULEY:  Wow.  Was that a

11:24:14  5  defense firm?

6          PROSPECTIVE JUROR 42:  It was a

7  general firm.

8          MS. CAULEY:  All right.  And over

9  here?  Mr. Bibbee?

11:24:32 10          PROSPECTIVE JUROR 5:  Personal

11  friends with Christina Thompson, in-house counsel

12  for TNT Fireworks.

13          PROSPECTIVE JUROR 12:  Couple of

14  friends that are attorneys.

11:24:54 15          MS. CAULEY:  Do you know what kind

16  of attorneys they are?

17          PROSPECTIVE JUROR 12:  Clem

18  Cartron.  He closed my loan.  And Larry Morgan.

19          MS. CAULEY:  Does Mr. Morgan close

11:25:08 20  loans also?

21          PROSPECTIVE JUROR 12:  No.  He is

22  a criminal lawyer.

23          MS. CAULEY:  Ms. Dobbins?

24          PROSPECTIVE JUROR 10:  Yes.  My

11:25:14 25  daughter's ball coach for travel ball softball in

1   summer is an attorney.  One of her coaches.  And

2   he ran for judge in Lawrence County just

3   recently.

4                  MS. CAULEY:  What's his name?

11:25:32  5                  PROSPECTIVE JUROR 10:  Chris

6   Malcolm.  He does have his own firm.  Yes.

7                  MS. CAULEY:  Mr. Luther?

8                  PROSPECTIVE JUROR 23:  I'm sorry.

9   This was a long time ago.  Yeah.  My high school

11:25:42  10  friend was a municipal judge in El Paso, Texas.

11                  PROSPECTIVE JUROR 29:  Judge Gill

12  Self works for fund raisers where I work.

13                  THE COURT:  Who's talking?

14                  PROSPECTIVE JUROR 29:  Deborah

11:25:58  15  Moody.

16                  THE COURT:  Okay.  I just couldn't

17  see her.

18                  MS. CAULEY:  Anyone else that I've

19  missed?  Did any of y'all know each other prior

11:26:12  20  to today?  Did you know each other?  Mr. Spiller?

21  Okay.

22                  THE COURT:  Who knew who?

23                  MS. CAULEY:  Mr. Spiller and

24  Mr. Drzycimski knew each other before today.

11:26:28  25  Friends, acquaintances?

1                    PROSPECTIVE JUROR 12:  We're

2       members of the same golf course.

3                    MS. CAULEY:  Do any of you have

4       web sites or blogs that you post to regularly?

11:26:44  5     Yes, ma'am.

6                    PROSPECTIVE JUROR 21:  It's not

7       a -- not one that I created myself.  It's part of

8       the Multiply blog system.  Multiply web sites.

9       As opposed to Facebook, it's called Multiply.

11:27:04  10    Just a different web-posting site.

11                   MS. CAULEY:  Do you actually post,

12      like, personal information on there, or you post

13      your writings on there?

14                   PROSPECTIVE JUROR 21:  A little of

11:27:16  15    both.

16                   MS. CAULEY:  Is it similar to

17      Facebook in that it connects people who are

18      friends?

19                   PROSPECTIVE JUROR 21:  Yes.

11:27:22  20                  MS. CAULEY:  Anyone else post

21      regularly to a web site or a blog?  Yes.

22      Mr. Aiello?

23                   PROSPECTIVE JUROR 1:  I'm past

24      president of the Rocket City Democrats.  And we

11:27:32  25    have a web site.  And I don't know if your

question is asking this.  I also have a Facebook
and a Twitter account.  I don't know if that was
part of your question.

PROSPECTIVE JUROR 5:  Facebook.

MS. CAULEY:  Facebook probably has
lots of people.  Everyone have Facebook?  I
Facebook.  But I'm not only looking for Facebook.
I'm looking more for blogs about various maybe
political campaigns or that kind of thing.  We'll
exclude Facebook.  How about that?  Mr. Luther?

PROSPECTIVE JUROR 23:  I regularly
read.  I haven't posted to them in six months or
so because of work restriction.

MS. CAULEY:  What blog is that?

PROSPECTIVE JUROR 23:  Knowledge
Is Power.

MS. CAULEY:  Knowledge Is Power?
Anyone have a personalized car tag or bumper
sticker on their car?  Yes.  Ms. Dobbins?

PROSPECTIVE JUROR 10:  My car tag
just says love my five.  Choose life tag.  I
don't know if that's what you're asking.  A
little sticker on the window.  Just a saying.

MS. CAULEY:  Exactly.  Anyone
else?  Ms. Matthews?

```
 1                    PROSPECTIVE JUROR 24:  It says I
 2    go AU.
 3                    MS. CAULEY:  Is that for Auburn?
 4                    PROSPECTIVE JUROR 24:  Yes.
 5                    MS. CAULEY:  Mr. Robinson?
 6                    PROSPECTIVE JUROR 35:  Second to
 7    none.  Military.
 8                    MS. CAULEY:  Okay.  Second to
 9    none.  And Mr. Shields?
10                    PROSPECTIVE JUROR 36:  I have a
11    fire fighter tag and Masonic sticker on the
12    truck.
13                    MS. CAULEY:  I'm sorry?
14                    PROSPECTIVE JUROR 36:  I have a
15    fire fighter tag and Masons sticker on the
16    struck.
17                    MS. CAULEY:  Ms. Williamson?
18                    PROSPECTIVE JUROR 42:  I have a
19    personalized tag.  Lex and sun.  It's a Lexus and
20    a convertible.
21                    MS. CAULEY:  Got it.  Anyone else?
22                    PROSPECTIVE JUROR 32:  Mine was
23    just for a child.
24                    MS. CAULEY:  Ms. Naylor?  I'm
25    sorry.  Can you speak louder?
```

11:29:10 (line 5)
11:29:20 (line 10)
11:29:28 (line 15)
11:29:42 (line 20)
11:29:46 (line 25)

                    1                      PROSPECTIVE JUROR 32:  Mine was

                    2          just for one of my children.

                    3                      MS. CAULEY:  Your tag?

                    4                      PROSPECTIVE JUROR 32:  Yes.  It's

11:29:56   5          on my daughter's car.

                    6                      MS. CAULEY:  Okay.  What does it

                    7          say?

                    8                      PROSPECTIVE JUROR 32:  It's in

                    9          reference to her initials and Auburn.

11:30:02  10                      MS. CAULEY:  Okay.

                   11                      PROSPECTIVE JUROR 25:  My wife has

                   12          a personalized tag called Ruffian, her favorite

                   13          racehorse.

                   14                      MS. CAULEY:  Anyone else?

11:30:14  15                      PROSPECTIVE JUROR 2:  I have some

                   16          hunting decals on my truck.

                   17                      MS. CAULEY:  Is there anyone in

                   18          here for whatever reason you just do not want to

                   19          sit on this jury this week?  Okay.  Got

11:30:32  20          Mr. Luther.  Ms. Naylor.  Mr. Shields.

                   21                      PROSPECTIVE JUROR 36:  Yes, ma'am.

                   22                      MS. CAULEY:  Anyone else?

                   23                      (No response.)

                   24                      MS. CAULEY:  Appreciate that very

11:30:52  25          much.

1        Is there anyone that's here who has

2    heard -- you know, you just heard tiny, tiny bits

3    with my questions and just the brief synopsis

4    from the judge.  But anyone here who thinks that

11:31:02  5    they cannot be impartial in this case?  Anything

6    at all that you've heard so far that makes you

7    unsure or worries you that you couldn't decide

8    the case fairly?  Mr. Shields?  Okay.

9        That's all the questions I have.  Thank

11:31:24  10   you very much.

11                   THE COURT:  Are you ready?

12                   MR. LANGLEY:  Yes, I am.

13        Good morning.  Just barely.  Judge Johnson

14   introduced me earlier.  I'm Eric Langley.  I'm

11:31:46  15   one of the lawyers for the defendant in this

16   case, Midland Credit Management.  My co-counsel

17   is Jason Tompkins.

18        And the judge asked you some questions

19   about whether you were related by blood or

11:32:00  20   marriage to a few people.  I want to take it a

21   step further.

22        Does anyone know the plaintiff in this

23   case, Mr. Brim, socially or otherwise?

24                   (No response.)

11:32:10  25                   MR. LANGLEY:  Does anyone know

1    either Ms. Cauley or someone who works at her

2    firm, the Hays Cauley firm in Florence, South

3    Carolina?

4                    (No response.)

11:32:24  5                MR. LANGLEY:  Does anyone either

6    know Mr. Sykstus or know someone who works at his

7    firm, who is the Bonds & Botes firm based in

8    Huntsville?

9                    (No response.)

11:32:34 10                MR. LANGLEY:  Is there anyone here

11   who has heard of the Bonds & Botes firm in

12   Huntsville?

13                    PROSPECTIVE JUROR 2:  Commercial.

14                    PROSPECTIVE JUROR 20:  Commercial.

11:32:44 15                MR. LANGLEY:  You've seen

16   commercials on either radio or television?

17       Is there anyone who knows anyone that

18   works at the firm called Consumer Litigation

19   Associates in Virginia?

11:32:58 20                    (No response.)

21                MR. LANGLEY:  All of this started,

22   as the evidence will show, when Mr. Brim

23   purchased a computer from Dell Financial.  Is

24   there anyone here -- excuse me.  From Dell

11:33:20 25   Computers.

1          Is there anyone here who has purchased a

2     Dell computer product before?  Keep your hands

3     up.  And I'll just go through.  It's Mr. Aiello?

4               PROSPECTIVE JUROR 1:  Yes.

11:33:32  5               MR. LANGLEY:  What kind of --

6               PROSPECTIVE JUROR 1:  I buy a lot

7     of computers for our law office.

8               MR. LANGLEY:  Did you finance any

9     of them through Dell Financial?

11:33:46 10               PROSPECTIVE JUROR 1:  No.

11               MR. LANGLEY:  What I'll do just to

12     whittle the question down:  Of those of you who

13     have their hands up, did anyone finance their

14     computer purchase through Dell Financial

11:33:58 15     services?

16               (No response.)

17               MR. LANGLEY:  Who was it over here

18     that worked in IT?  Someone remind me who that

19     was.

11:34:30 20               PROSPECTIVE JUROR 41:  Are you

21     talking about I worked for Dynetics IT Services.

22     They're a contractor for NASA.

23               MR. LANGLEY:  You're Ms. Whitt,

24     correct?

11:34:40 25               PROSPECTIVE JUROR 41:  That's

1   correct.

2                    MR. LANGLEY:  What kind of work is

3   that?

4                    PROSPECTIVE JUROR 41:  We have

11:34:44  5   about 450 employees.  It's computer-type work for

6   NASA.  I guess that's basically the way I can

7   explain it.

8                    MR. LANGLEY:  Are y'all the IT

9   contractor for the mainframe or for processing?

11:35:04 10   Does that ring a bell?

11                    PROSPECTIVE JUROR 41:  I don't

12   know.  I don't know how to answer that.

13                    MR. LANGLEY:  Is NASA the sole

14   client of your company?

11:35:18 15                    PROSPECTIVE JUROR 41:  Contract,

16   yes.  For our contract, yes.

17                    MR. LANGLEY:  Okay.  Is there

18   anyone else here that works with computer systems

19   that process large amounts of data as part of

11:35:32 20   their profession?  Is it Mr. Neutze?

21                    PROSPECTIVE JUROR 33:  Yes, sir.

22                    MR. LANGLEY:  Tell me about that.

23                    PROSPECTIVE JUROR 33:  I'm in

24   charge of the ground computer systems for the

11:35:50 25   International Space Station.  We handle all the

                    communications to and from space station and

                    store all the data that's generated off the

                    station.

                                MR. LANGLEY:  Anyone else?

11:36:00    Mr. Luther?

                                PROSPECTIVE JUROR 23:  Not as much

                    as -- big as his, but it is processing orders to

                    the --

                                MR. LANGLEY:  What kind of orders?

11:36:16                        PROSPECTIVE JUROR 23:  Metal doors

                    and frames.

                                MR. LANGLEY:  How does that work?

                                PROSPECTIVE JUROR 23:  The orders

                    are brought in.  Customer service will enter

11:36:26    them.  I have a database that I pull the

                    information up that puts it out to our production

                    floor to produce.

                                MR. LANGLEY:  Are you in charge of

                    the computer processing?

11:36:34                        PROSPECTIVE JUROR 23:  Of that

                    aspect of it, yes.

                                MR. LANGLEY:  Is there anyone that

                    thinks that --

                                THE COURT:  Well, there was one

11:36:44    other person who had their hand up.

1            PROSPECTIVE JUROR 19:  In the

2     past, I have used large mainframes for technical

3     complications.

4            MR. LANGLEY:  Mr. Hines?

11:36:56  5            PROSPECTIVE JUROR 19:  Yeah.

6            MR. LANGLEY:  When you say

7     technical complications, what do you mean by

8     that?

9            PROSPECTIVE JUROR 19:  Electrical

11:37:06 10    magnetic analysis.

11            MR. LANGLEY:  Remind me what you

12    do for a living.

13            PROSPECTIVE JUROR 19:  I was

14    electronic engineer and

11:37:16 15    electromagnetic capabilities --

16            MR. LANGLEY:  And you're working

17    on your doctorate, right?

18            PROSPECTIVE JUROR 19:  No.  I have

19    all but thesis toward doctorate.  I'm retired

11:37:24 20    now.

21            MR. LANGLEY:  What was your

22    doctorate on?

23            PROSPECTIVE JUROR 19:  I was

24    electrical engineering.

11:37:30 25            MR. LANGLEY:  Was there anyone

1    else that had their hand up that I missed?

2                    PROSPECTIVE JUROR 20:  I'm not

3    sure if this counts or not.  I have worked with

4    technical manuals that get posted to the web.

11:37:42  5              MR. LANGLEY:  It's Ms. Kent?

6                    PROSPECTIVE JUROR 20:  Yes.

7                    MR. LANGLEY:  What kind of

8    technical manuals?

9                    PROSPECTIVE JUROR 20:  We build

11:37:44 10   products like single-board computers, processors.

11   You know, the green boards that go into other

12   computers that control different things.  It also

13   goes into, like, military equipment.  We do

14   software for reflective memory.

11:38:02 15              MR. LANGLEY:  Thank you.  Anyone

16   else?

17                    (No response.)

18                    MR. LANGLEY:  I'm going to ask a

19   general question.  And a lot of times you get no

11:38:12 20   response at all to these.  But if you have a

21   feeling about this, I urge you to share it.

22         Is there anyone that thinks there's

23   something fundamentally wrong with a business

24   using a computer system to process large amounts

11:38:24 25   of data?

1                    (No response.)

2                    MR. LANGLEY:  Is there anyone who

3     doesn't think that it's just part of modern

4     business?

11:38:34   5                    (No response.)

6                    MR. LANGLEY:  Ms. Cauley asked you

7     some questions relating to the damages that her

8     client, Mr. Brim, is claiming in this case.  And

9     I have some follow-up questions for you.

11:38:48  10          Is there anyone who thinks that someone is

11    entitled to a money damages award simply because

12    they bring a lawsuit?

13                    (No response.)

14                    MR. LANGLEY:  If the judge

11:39:02  15   instructs you in this case that any award of

16    damages must be caused by the defendant in this

17    case, would you be willing to follow that

18    instruction?

19                    PROSPECTIVE JUROR 36:  Can you

11:39:18  20   repeat that, please?

21                    MR. LANGLEY:  If the judge

22    instructs you that the only damages you can award

23    in the case are those caused by the defendant,

24    would you be willing to follow that instruction?

11:39:30  25                    (No response.)

CHERYL K. POWELL, CCR, RPR, FCRR
Federal Official Court Reporter
1729 Fifth Avenue, North
Birmingham, AL 35203
256-508-4050/wrd4wrdrpr@aol.com

1              MR. LANGLEY:  Is that true even if

2       you think that Midland Credit Management did

3       something wrong?  In other words, is there anyone

4       in here who thinks that just because -- suppose

11:39:46  5   that you find that Midland Credit Management did

6       something wrong.  Is there anyone who thinks that

7       that alone entitled the plaintiff to an award of

8       damages?

9                   (No response.)

11:40:00 10             MR. LANGLEY:  Ms. Gregory?

11              PROSPECTIVE JUROR 16:  Yes, sir.

12              MR. LANGLEY:  Do you mind if I ask

13      you some additional questions about your credit

14      dispute issue?

11:40:08 15             PROSPECTIVE JUROR 16:  Sure.

16      That's fine.

17              MR. LANGLEY:  You had mentioned

18      that you had to contact the original creditor.

19      Was it a college loan?

11:40:16 20             PROSPECTIVE JUROR 16:  Yes, it

21      was.

22              MR. LANGLEY:  What type of

23      documents did you have to provide to that

24      creditor?

11:40:20 25             PROSPECTIVE JUROR 16:  We just had

1    to -- the cancelled check.  They just needed it

2    because it had information for them as to what

3    account they put it to.  We knew which account

4    they put it to.  Obviously it was my husband's.

11:40:34  5    But we just had to show them that documentation.

6    And they cleared it up.

7                 MR. LANGLEY:  That documentation,

8    once you provided it to them, they were able to

9    use to clear up?

11:40:44  10                PROSPECTIVE JUROR 16:  Yes.

11                MR. LANGLEY:  Did you think that

12    was unreasonable for you to have to do that?

13                PROSPECTIVE JUROR 16:  No.

14                MR. LANGLEY:  Does anyone in here

11:40:58  15    have any experience, either personally or

16    professionally, with something called factoring?

17                (No response.)

18                MR. LANGLEY:  Let me ask a

19    different question.  Does anyone know what

11:41:10  20    factoring is?  Anyone heard that term?

21                PROSPECTIVE JUROR 19:  From the

22    mathematics perspective.

23                MR. LANGLEY:  I'm glad you raised

24    that.  I should have known better with all the

11:41:22  25    engineers in here.  The sense in which I'm using

1    the term, "factoring," is a business arrangement

2    where one company will buy the receivables of

3    another company to allow the first company the

4    opportunity for continued cash for business

11:41:38  5    operations while transferring over the interest

6    in those receivables.

7            Is anyone familiar with that either

8    personally or professionally?

9                    (No response.)

11:41:48 10               MR. LANGLEY:  The evidence in this

11   case is going to show that that's what Midland

12   Credit Management does.  Buys accounts from other

13   businesses.  Does anyone have a problem with that

14   concept?

11:42:02 15                    (No response.)

16               MR. LANGLEY:  Who here has heard

17   of Dave Ramsey?

18                    (Show of hands.)

19               MR. LANGLEY:  So just about

11:42:20 20   everyone.  Who regularly -- well, let me back up.

21   Who listens to Dave Ramsey more than once a

22   month?  Ms. Naylor?

23               PROSPECTIVE JUROR 32:  Yes.

24               MR. LANGLEY:  How often do you

11:42:38 25   listen to Dave Ramsey?

1                    PROSPECTIVE JUROR 32:  Probably

2    every couple of weeks or so.

3                    MR. LANGLEY:  On the radio?

4                    PROSPECTIVE JUROR 32:  Yes.  There

11:42:48  5    was someone over here.  Was it Mr. Bess?

6                    PROSPECTIVE JUROR 2:  No.

7                    MR. LANGLEY:  Ms. Edwards, how

8    often do you listen to Dave Ramsey?

9                    PROSPECTIVE JUROR 14:  I used to

11:43:00 10    listen to him a lot.  But now it's about once a

11    month maybe.

12                    MR. LANGLEY:  I'm sorry.

13                    PROSPECTIVE JUROR 14:  I used to

14    listen to him a lot.  Now it's about once a

11:43:12 15    month.  He gets on my nerves.

16                    MR. LANGLEY:  Have I touched on

17    everyone that listens to Dave Ramsey at least

18    once a month?  Did I miss anyone?

19                    (No response.)

11:43:28 20                    PROSPECTIVE JUROR 24:  Going back

21    to the factoring, is that like when you have a

22    mortgage and then it gets sold to another

23    mortgage company and they sell it to another

24    mortgage company?

11:43:38 25                    MR. LANGLEY:  That's actually a

little different.  The factoring we're talking

about here is when one company has a commercial

receivable and it sells that receivable to

another entity.  Does that make it more familiar

11:43:50   to you?

PROSPECTIVE JUROR 24:  Not really.

MR. LANGLEY:  Okay.  Ms. Dobbins?

I have it right, don't I?

PROSPECTIVE JUROR 10:  Yes.

11:44:02   MR. LANGLEY:  You said that you

had been on a jury involving a family dispute of

some sort.

PROSPECTIVE JUROR 10:  Yes.

MR. LANGLEY:  Did I understand

11:44:10   correctly that your jury returned a verdict in

favor of the plaintiff?

PROSPECTIVE JUROR 10:  Well, it's

hard to remember.  It's been a long time ago.

But all I really remember about it is the

11:44:28   daughter and the son.  The daughter took the son

to court over her -- their father's money because

she had said he had spent all this money, you

know, and took advantage of their dad.  And we

found that he did spend a small amount unfairly.

11:44:48   But all that she was claiming, no.  So --

1           MR. LANGLEY:  So y'all did award

2     some money damages?

3           PROSPECTIVE JUROR 10:  Yes.  He

4     did have to pay some back.

11:44:58  5           MR. LANGLEY:  Do you remember how

6     much?

7           PROSPECTIVE JUROR 10:  It was very

8     little.

9           MR. LANGLEY:  Like four figures?

11:45:06 10           PROSPECTIVE JUROR 10:  Maybe.  It

11    was very small.  It was a small family dispute,

12    really.  That's why I barely remember.  It wasn't

13    a real big deal.

14           MR. LANGLEY:  How long ago was

11:45:14 15    that?

16           PROSPECTIVE JUROR 10:  Oh,

17    probably 12 -- 11, 12 years ago.

18           MR. LANGLEY:  I think Ms. Cauley

19    covered this earlier.  But I'm going to make sure

11:45:40 20    and ask a more specific question.

21        Is there anyone here who posts on blogs

22    relating to consumer credit issues?

23           (No response.)

24           MR. LANGLEY:  Ms. Cauley mentioned

11:46:18 25    that there's been a good bit of political and

1    other discussion about punitive damages.  I have
2    a question for you that relates to something else
3    that's a hot button issue, and that's financial
4    institutions.
11:46:32  5          Is there anyone who has such a strong bias
6    against financial institutions that they don't
7    think they could be fair to Midland Credit
8    Management?
9                    (No response.)
11:46:44 10               MR. LANGLEY:  Anyone who just
11   hates banks?
12                   (No response.)
13               MR. LANGLEY:  Well, maybe I need
14   to add on to that question.  Anyone that hates
11:46:56 15   banks so bad that they can't be fair to another
16   financial institution?
17                   (No response.)
18               MR. LANGLEY:  Anyone who hates
19   credit companies so much that they don't think
11:47:06 20   they can be fair to a financial institution?
21                   (No response.)
22               MR. LANGLEY:  Is there anyone who
23   thinks that just because the defendant is a large
24   company that the plaintiff is entitled to
11:47:16 25   damages?

```
 1                    (No response.)

 2                    (Discussion off the record.)

 3              MR. LANGLEY:  I believe that's all

 4     I have.  Thank you.

 5              THE COURT:  Anything else?

 6              MS. CAULEY:  No, Your Honor.

 7     Thank you.

 8              THE COURT:  Can I see you at the

 9     bench, please?

10                    (Bench discussion off the record.)

11              THE COURT:  Can I see the court

12     reporter and the lawyers while I wait for Tammi

13     to come back in?  Over here.

14                    (Bench discussion:)

15              THE COURT:  Are there any

16     challenges for cause?

17              MS. CAULEY:  I'm concerned about

18     the three that don't want to be here for any

19     reason.  But other than those three, no.

20              MR. LANGLEY:  I'm concerned --

21              THE COURT:  I mean, you have to

22     either tell me -- nobody has followed up.  They

23     haven't told me why they don't want to be here.

24     People don't want to be here for jury duty many

25     times for many reasons.  Unless you ask the
```

1    question.  And you haven't said you're striking

2    them for cause.  So let's make the record clear.

3              MS. CAULEY:  There's Luther and --

4    I didn't bring my notes.

11:49:50  5              THE COURT:  I have the notes here.

6    They are Mr. --

7              MR. LANGLEY:  Naylor, Luther, and

8    Shields.

9              MS. CAULEY:  Plaintiff moves to

11:50:00 10   strike those three jurors for cause because they

11   all indicated they did not want to serve, be on

12   this jury panel.

13             THE COURT:  Overruled.

14             MR. LANGLEY:  May I get you my

11:50:12 15   notes so I can give you one name?

16             THE COURT:  Yes.

17             MR. LANGLEY:  Defendant moves to

18   strike for cause Mr. Spiller.

19             THE COURT:  For what reason?

11:50:32 20             MR. LANGLEY:  He was the one who

21   is one of the people who had a credit dispute who

22   said it was never solved to his satisfaction.  It

23   just stayed on there.  He seemed to express

24   disdain for --

11:50:46 25             THE COURT:  You didn't ask him

1    whether that prevented him from being fair

2    and impartial.  I'm going to overrule the strike.

3    Anything else?

4              MR. LANGLEY:  No, Your Honor.

11:50:58  5              THE COURT:  Okay.  All right.

6              (End of bench discussion.)

7              (In open court.  Jury present.)

8              THE COURT:  We're fixing to take a

9    lunch break.  While you're out to lunch, do not

11:52:12 10    discuss the case with anyone.  Don't let anyone

11    discuss it in your presence or in your hearing.

12    Don't discuss it among yourselves.  Don't post

13    anything to any blogs or your Facebook pages.  Do

14    not use any kind of electronic equipment, whether

11:52:26 15    they be Twitter or Facebook or any other blog or

16    any other communication.  You're not allowed to

17    do that while you're seated on this case about

18    this case.

19         And you're not allowed to talk to the

11:52:42 20    parties about this case or the lawyers.  And

21    really what it means is don't talk to them about

22    anything.  Because I can't monitor the

23    conversation.  And if you start talking to them,

24    their natural inclination is to talk back to

11:52:56 25    y'all because that's polite.  But I've told them

1    they can't talk to you either except in open

2    court on the record.  So please don't talk to the

3    lawyers or the parties in this case.

4         I'm trying to get a little detail about

11:53:08  5    the lunch worked out.  I don't seem to be able to

6    get anybody in Birmingham.  But if you will be

7    patient, Tammi will know in just one minute.  And

8    then y'all need to be back at 1:15.  Okay?  Let

9    me go find out from her.

11:53:42  10                    (Short recess.)

11                    (Luncheon recess.)

12                    (Bench discussion.  In chambers:)

13                    THE COURT:  The defendants strikes

14    are Aiello, Courtney, Edwards, Kezo, Luther.

13:13:52  15   Let's see where Mr. Luther is.  Oh.  Here.

16    Miller, Robinson, and Spiller.

17         The plaintiff's strikes are Davis.  I

18    think that was wise.  Does it say Guess?

19                    COURTROOM DEPUTY:  Yes, ma'am.

13:14:38  20                    THE COURT:  Yeah.  Luther.

21    Naylor.  Did she say she was fired by TVA?

22                    MS. CAULEY:  Retired.

23                    THE COURT:  Oh.  I couldn't

24    understand what she was saying.  Shields, Kent,

13:15:26  25   and Neutze.  And what does that say?

```
 1                    COURTROOM DEPUTY:  Reyer.
 2      R-E-Y-E-R.
 3                    MS. CAULEY:  Right next to him.
 4                    COURTROOM DEPUTY:  Yeah.  They're
 5      side by side.
 6                    THE COURT:  Who was the last one?
 7      Okay.
 8                    MS. CAULEY:  We both did Luther,
 9      so there was --
10                    THE COURT:  That would leave
11      Mr. Bess, Mr. Bibbee, Melissa Dobbins,
12      Mr. Drzycimski, Monica Gregory, Charles Hines.
13      He is hopeless to understand, y'all.  Okay.
14      Chris Matthews, Carl McGrady, Donna Missildine.
15      That's nine.  Deborah Moody, Stacey Moseley, and
16      Jane Wylie.  Is that who y'all got?
17                    MR. LANGLEY:  Yes.
18                    THE COURT:  You got them, too?
19                    MS. CAULEY:  Yes.
20                    THE COURT:  Are there any *Batson*
21      challenges or anything?
22                    MS. CAULEY:  Your Honor, we have a
23      *Batson* challenge with respect to Maurice
24      Robinson.  He was the only African-American on
25      the jury.
```

13:15:36 (line 5)
13:15:44 (line 10)
13:16:30 (line 15)
13:16:46 (line 20)
13:17:12 (line 25)

```
1                    THE COURT:  Speak up.

2                    MS. CAULEY:  We have a Batson

3        challenge as to Maurice Robinson.  He was the

4        only African-American on the jury, and the

13:17:14  5      defendant struck Mr. Robinson.

6                    MR. LANGLEY:  We actually had

7        trouble understanding what he was saying.  Very

8        soft-spoken during voir dire.  His wife works for

9        a judge, which is a little too close to the law

13:17:28 10      than we want.  And when it really came down to

11       it, we were favoring people that had more

12       education.  He was one that had only a high

13       school degree.

14                    THE COURT:  Okay.  I'm going to

13:17:42 15      have to get my -- see if you struck anybody else

16       with those criteria.

17          Okay.  Ms. Kezo had a lawyer -- a

18       brother-in-law who was a bailiff.  Ms. Matthews

19       was not struck.  Mr. Matthews?  Was he struck?

13:18:38 20                    MR. LANGLEY:  She is a female.

21                    THE COURT:  Ms. Matthews.  Yeah.

22       Her.  Mike Jones is related.  I thought that was

23       a gentleman who said that.

24                    MS. CAULEY:  That was Casey

13:18:52 25      Miller.
```

1          MR. LANGLEY:  We have that under

2    Casey Miller.

3          THE COURT:  Miller.  Okay.  It

4    should be Miller.  Okay.  And let me just see

13:18:56  5    here.  Robinson.  That's who we're talking about.

6    Williamson -- Williamson.

7          MR. LANGLEY:  She's at the end.

8    And we just didn't think we would get to her.  So

9    we took a chance.

13:19:16  10          THE COURT:  Okay.  Bibbee.  He was

11    not struck.  Personal friends with Christy

12    Thompson.  She is a lawyer.  Drzycimski.  Two

13    lawyers.  One was Larry Morgan and one was

14    somebody else.  Friends of his.  Dobbins -- her

13:19:46  15    daughter's softball coach was Chris Malcolm.

16    Luther had high school friends, but he's struck.

17    Moody.  Gill Self.  Moody.  Moody.  Where is

18    Moody?

19          MS. CAULEY:  Last row, last page,

13:20:18  20    far right.  Deborah Moody.

21          THE COURT:  Oh, yeah.  And

22    Spiller.  Oh, no.  That's it.  Moody was the last

23    one.  So you didn't strike Bibbee.  You didn't

24    strike Drzycimski.  And you didn't strike

13:20:36  25    Dobbins.

             1              MR. LANGLEY:  Those all had
             2    connections to lawyers.  Not judges.  There were
             3    three people who had connections to judges
             4    through family.  And they were, as we understood,
13:20:46     5    Casey Miller, Mr. Robinson, and then one other
             6    whose connection was not through a family member.
             7    She said that she -- I can't remember who it was
             8    off the top of my head.
             9              MR. TOMPKINS:  I think it was
13:20:58    10    Moody, and she said judge attended a fundraiser.
            11              THE COURT:  I'll overrule the
            12    objection -- the motion.  And leave it like it
            13    is.  So what else do you plan to do today?
            14              MS. CAULEY:  That's it, Your
13:21:14    15    Honor.
            16              THE COURT:  Okay.  Y'all going to
            17    start at 9:00 in the morning?  Okay.  That will
            18    be good.  Get the jurors.  I'll go in, and tell
            19    them who's on the jury.
13:21:30    20              (End of bench discussion.)
            21              (In open court.  Jury present.)
            22              THE COURT:  Let the record show
            23    we're back in open court on CV10-369, Jamon Brim
            24    versus Midland Credit Management Inc.  And
13:22:12    25    everybody is here who is supposed to be here.

1       And the jury has been selected while y'all were

2       at lunch.

3             Well, not everybody was here.

4             And I'm going to call -- well, Tammi is

13:22:22  5   going to call the names of the jurors that have

6       been selected to serve in this case.

7             If you're seated in the jury box and your

8       name is called, remain seated.  If you're seated

9       behind the rail and your name is called, come

13:22:36 10  forward and have a seat in the jury box.  If

11      you're seated in the jury box and your name is

12      not called, you need to get out of the jury box

13      and have a seat behind the rail.

14            And please don't anybody move until all

13:22:48 15  the names have been called, because it's going to

16      be mass confusion of musical chairs if you move

17      before all names have been called.  Okay?

18                  COURTROOM DEPUTY:  The following

19      people will be the jurors:  Phillip Bess, Jeffrey

13:23:02 20  Bibbee, Melissa Dobbins, Stephen Drzycimski,

21      Monica Gregory, Charles Hines, Chris Matthews,

22      Carl McGrady, Donna Missildine, Deborah Moody,

23      Stacey Moseley, and Jane Wylie.  These are the

24      jurors.

13:23:38 25                  THE COURT:  Okay.  Everybody whose

```
 1    name was not called, please have a seat behind

 2    the rail.  Everybody whose name was called,

 3    please have a seat in the jury box.

 4                   (Jurors comply.)

 5          Okay.  We're going to call the names out

 6    one more time to make sure we have the 12 jurors

 7    in the box.  Please say "here" to indicate you're

 8    present and seated.

 9                   COURTROOM DEPUTY:  Phillip Bess.

10                   JUROR 2:  Here.

11                   COURTROOM DEPUTY:  Jeffrey Bibbee.

12                   JUROR 5:  Here.

13                   COURTROOM DEPUTY:  Melissa

14    Dobbins.

15                   JUROR 10:  Here.

16                   COURTROOM DEPUTY:  Stephen

17    Drzycimski.

18                   JUROR 12:  Here.

19                   COURTROOM DEPUTY:  Monica Gregory.

20                   JUROR 16:  Here.

21                   COURTROOM DEPUTY:  Charles Hines.

22                   JUROR 19:  Here.

23                   COURTROOM DEPUTY:  Chris Matthews.

24                   JUROR 24:  Here.

25                   COURTROOM DEPUTY:  Carl McGrady.
```

```
 1                    JUROR 25:  Here.
 2                    COURTROOM DEPUTY:  Donna
 3    Missildine.
 4                    JUROR 27:  Here.
13:24:54  5          COURTROOM DEPUTY:  Deborah Moody.
 6                    JUROR 29:  Here.
 7                    COURTROOM DEPUTY:  Stacey Moseley.
 8                    JUROR 31:  Here.
 9                    COURTROOM DEPUTY:  And Jane Wylie.
13:25:02 10          JUROR 40:  Here.
11                    THE COURT:  Everybody else is
12    excused.  Thank you so much for coming.  And be
13    safe driving back to wherever you are coming
14    from.  And you don't need -- you're not going to
13:25:10 15   be called back for another case that I know of.
16    Are they?
17                    COURTROOM DEPUTY:  No, ma'am.
18                    THE COURT:  In this term.  So
19    thank you so much.  We appreciate it.
13:25:26 20          (Prospective jurors excused.)
21                    THE COURT:  Please be seated.  And
22    would you all please stand and raise your right
23    hand and take the oath of a trial jury?
24                    (Jurors sworn.)
13:26:14 25          THE COURT:  Okay.  Actually this
```

1    is going to be a pretty short day, because we're

2    not going to do opening statements until

3    tomorrow.  But I would like to explain to you the

4    procedure we'll be following when we try this

13:26:28  5    case.  And I would like to do that before you

6    recess for the afternoon.

7          The first thing you will hear tomorrow

8    morning are the attorneys' opening statements.

9    And that is simply a statement by, first, the

13:26:40 10   attorney for the plaintiff and, next, the

11   attorney for the defendant where they outline for

12   you what they expect the evidence to be.  And

13   that's sort of a statement that familiarizes you

14   and the Court with the contentions and the

13:26:54 15   theories of each party from the very beginning.

16         What the lawyers say, not just during

17   opening statement but also during closing

18   argument, which I'll come back and explain in a

19   minute, and at other times during the trial is

13:27:08 20   not evidence.

21         After you have heard their opening

22   statements, which lawyers have a duty to give

23   you -- and it just is an outline of what they

24   expect the evidence to show -- you will actually

13:27:20 25   have the evidence presented to you.  The evidence

that will be presented to you can be and will be

testimony from witnesses while a witness is under

oath, sitting right over there on the witness

stand and testifying in front of you.  It can

also be depositions that may be read by the

parties of a witness.  And a deposition is simply

testimony taken from a witness prior to the trial

while the witness is under oath before a judicial

officer.  And if that is read to you, then one of

the lawyers will read the questions and another

one will read the answers that the witness gave

during his or her deposition.  You should

consider that as evidence, as well, as if the

witness were here in person, testifying under

oath in front of you.

There more than likely be documents

offered into evidence.  And that's called

exhibits.  And if they are admitted by the Court,

that is called just evidence through exhibits.

Admitted exhibits.  And that will also be

evidence.  Now, exhibits that are offered but not

admitted by the Court are not evidence.  The

admitted exhibits you will have with you in the

jury room when you go to deliberate at the end of

the trial.

1          After all the evidence has been presented

2     to you, live testimony from the witnesses or

3     deposition testimony or admitted exhibits, you

4     will -- I will charge you with respect to what

13:28:52  5     the law is that you are to apply.  And it's your

6     duty to apply the law, regardless of what your

7     own opinion about what the law should be or

8     should not be.  Then after I get through doing

9     that -- and I will read you that law and you will

13:29:08 10     actually have a copy with you in the jury room

11     when you go to deliberate for yourself -- the

12     lawyers will again talk to you.  And that's

13     called closing argument.

14          After you have heard the closing argument

13:29:20 15     by the attorneys, I will explain to you the

16     verdict forms that you will use.  And then you

17     will get the case.  And you will begin your

18     deliberations at that time.

19          Now, the first thing I want to tell you is

13:29:36 20     do not talk about this case among yourselves or

21     with anyone else until I tell you at the end of

22     the case that you can go to the jury room and

23     deliberate.  At that point, you can talk about it

24     among yourselves.  Do not talk to anybody else,

13:29:56 25     whether they be parties, witnesses, lawyers,

1   court personnel except for Tammi with respect to

2   practical -- you can talk to her about practical

3   issues such as your lunch being paid for which is

4   what I was trying to do for lunch today -- about

13:30:14  5   this case.

6       I know that there might be somebody at

7   home when you come home during recess who is

8   going to say, well, what case did you get on?

9   What are the names; what's it about?  Don't

13:30:28  10   discuss it.  Just tell whoever might be there --

11   just say, I'm under the Court's instruction not

12   to discuss it until we've reached a verdict in

13   this case.  And I'm sorry, but I can't discuss

14   it.  And that includes any other type of

13:30:42  15   communication, whether it be by Twitter,

16   Facebook.  What was the other thing Ms. Kezo

17   talked about?  Blogs.  Any kind of internet or

18   electronic communication.  Can't text.  Can't

19   cell phone.  Can't talk to anybody through any

13:31:02  20   media or spoken word or written word while you're

21   seated on this case.

22       I've always thought -- and I've never been

23   a juror.  I've always thought that it might be

24   difficult to be a juror because there you are,

13:31:16  25   the 12 of you.  And the one thing you have in

1    common is this case.  And by golly, you can't

2    talk about it.  But you will get a chance to talk

3    about it after the case has been presented to you

4    and I have instructed you with respect to the

13:31:30  5    law.

6         We usually take a midmorning break.  We

7    usually also take a midafternoon break and an

8    hour and 15 minutes for lunch.  We usually start

9    at 9:00 and we usually quit at 5:00.  If you need

13:31:48  10    breaks at any other time, all you have to do is

11    tell me you need a break.  By the way, that goes

12    for parties and lawyers, as well.  Regardless of

13    when we had the last break.  And I'll give you

14    one.

13:31:56  15         I also want to tell you that I don't

16    exactly stop at 12:00 sometimes if I have a

17    witness on the stand and the witness is about to

18    finish up and I think if we have ten more

19    minutes, we could finish up the witness.  And if

13:32:12  20    that happens and you're too hungry to pay

21    attention, you need to stop me.  Okay?  You can

22    just say, I got to eat.  Really what I'm trying

23    to say is if any of you have a condition where

24    you need to eat at a certain time, just make sure

13:32:28  25    you tell me because I can't have people become

1   sick just because I want a witness to finish up

2   before lunch.  So I'll be mindful of that.  But

3   let me know if you have a situation such as that.

4          Sometimes we have matters that we need to

13:32:42  5   take up outside your presence and outside your

6   hearing.  And it's required by law to be taken up

7   outside your hearing and presence.  Usually we do

8   this in the courtroom.  And -- because we're on

9   the record in here.  And our court reporter takes

13:32:58 10   down everything that's being said.  It's just

11   easier for us to stay in here.  I usually give

12   you a break when we do that.  And so if that

13   happens, please just make sure that the

14   instruction I've given you about not discussing

13:33:14 15   the case applies during all breaks.  Make sure

16   you understand that.

17          And more importantly, sometimes I can't

18   always gauge how long time it will take to take a

19   matter up like this.  Just remember that when you

13:33:30 20   go to the jury room to deliberate in your case --

21   in this case, your deliberations are yours and

22   yours only.  And we're not parties to that.  And

23   we can't tell you how long you'll take.  Okay?

24   That's up to y'all completely.  Sometimes I can't

13:33:44 25   tell how long it will take for us to take a

matter up.  And usually what I do is I gauge and
I give you whatever number of minutes I think is
appropriate or 30 minutes or whatever I think is
appropriate.  If I go over, please don't get mad
at them.  Just get mad at me.  I'm the one that
gauges it.  If I gauge wrong, I'll take the
blame.  That's perfectly all right.  It's
happened before, and it's going to happen again.
That's just part of it.

        I also want to tell you if at any time
while you're seated on this case you cannot hear
or see what the witness is saying -- for that
matter, what the lawyers say, speak up.
Sometimes jurors have gone to the jury room to
deliberate and they've come back out and they've
said, Judge Johnson, will you have your court
reporter read back -- and she is good -- I'll
tell you that -- certain part of a witness'
testimony or Witness X's testimony because we're
not sure we heard it all.  Jurors have told me
after they have been in a situation like that
it's because they disagreed on what they heard so
they wanted to go back in and have it reread to
them.  I generally do not allow that because it
takes the testimony out of the context in which

1        it was given.  And it puts undue emphasis on a

2        particular witness' testimony.

3              So what I'm telling you indirectly is you

4        will not hear the testimony but one time, and

13:35:10  5        that's when it's read to you or when it comes

6        from the witness stand in form of live testimony.

7        So if you can't hear what's being said or can't

8        see what's being shown, speak up.

9              The evidence usually is shown on the Elmo.

13:35:26 10        And you will see it on the two big screens.  And

11        we'll turn them on.  The way it works is I'll

12        look at it first with the lawyers on their

13        computers and then if I admit it, you'll get to

14        look on the big screens.  I suggest that -- well,

13:35:42 15        I'm not sure.  If you have issues with that

16        because you have to crane your neck to see it,

17        let me know.  With that screen over there.

18        Usually jurors don't have any trouble with that

19        screen.

13:35:52 20              We're going to do some work to the

21        courtroom.  And when it gets redesigned, we're

22        going to have them put different places.  And the

23        witness box is going to be over here so you don't

24        have to turn your neck 180 degrees or 90 degrees

13:36:08 25        or whatever it may be to see what's being said.

1     But if you can't see it, let me know.

2          I will also tell you you'll have some

3     pencils and paper during this trial.  And you can

4     take notes.  I just want you to remember that

13:36:22 5    notes are supposed to be an aide to your memory

6     if you think you need it.  And not authoritative

7     records to show the other jurors.  So just

8     remember that when you take your notes.  They are

9     to aide your memory in what you hear here in this

13:36:38 10   courtroom.

11         You will be permitted to ask questions.

12    That is something I do.  Not everybody does that.

13    But I do.  And the way it works is since you

14    can't discuss the case among yourselves, you

13:36:52 15   can't sit there and talk about what questions you

16    want to ask among yourselves.  When a witness has

17    been called to testify and has been examined and

18    cross-examined and the witness is through and the

19    lawyers have said they are finished, I will give

13:37:10 20   you a short amount of time to write down any

21    questions you have of that witness while the

22    witness is in front of you under oath.

23         Obviously, you can't do that with

24    testimony read by deposition, but you can do that

13:37:24 25   with live witnesses.  If you have any questions,

1    you can write them down on your notepad and give

2    them to Tammi.  And she will give them to me.

3    And I will go through them with the attorneys.

4    And if I think they are appropriate questions to

13:37:38  5    ask the witness, then I will ask the witness

6    those questions.  All right?  Just remember that.

7    That you have that right.

8          And I'm trying to think if there's

9    anything else.  We're not going to have opening

13:37:52 10    statements until tomorrow.  I excused plaintiff's

11    co-counsel, Len Bennett, until tomorrow morning

12    because he had to be in court somewhere else.

13    And I told him that was okay; that we would

14    strike a jury today.  And I'm sure you would not

13:38:06 15    be very terribly upset if we recess at 1:45

16    instead of 5:00.

17          So please be back -- unless there's

18    anything else we need to take up with the jury,

19    please be back at 9:00 o'clock in the morning.

13:38:22 20    And just come straight into the courtroom.

21                COURTROOM DEPUTY:  No, ma'am.  The

22    jury room upstairs on the third floor.  And the

23    guards will show you.

24                THE COURT:  Okay.

13:38:34 25                COURTROOM DEPUTY:  That will be

1  better in case they're talking.

2               THE COURT:  Just come on and do

3  what the boss lady says.  I guess I'm not the

4  boss lady.  Go up to the jury room at 9:00

13:38:42  5  o'clock in the morning, and we'll come get you

6  shortly thereafter.  You're recessed for the

7  night.  Just remember the instruction I've given

8  y'all.

9               (Jury excused.)

13:39:32  10              (In open court.  Jury not

11  present.)

12               THE COURT:  Anything we need to

13  take up?

14               MS. CAULEY:  Your Honor, the

13:39:50  15  plaintiff did file a supplemental motion in

16  limine.  I believe it was yesterday.  Just on

17  some facts that we would like to be able to use

18  in opening that have been admitted either through

19  the testimony already taken or through the

13:40:06  20  declaration of Kathy Rogan that was filed in

21  response to the summary judgment.  Do you have

22  that?

23               THE COURT:  No.  I sure don't.  I

24  thought I had printed everything.  Do you have

13:40:16  25  it?  We didn't have -- let's go get it.  We'll be

1   right back.  Did you file it yesterday?

2                   MS. CAULEY:  It was filed on

3   Friday.

4                   (Short recess.)

13:43:16  5                   THE COURT:  Be seated.  Let me see

6   what it says.  Okay.  I'm not sure -- I've not

7   seen a motion in limine like that before.  Are

8   you saying that you want Facts 1 through 14

9   stipulated to?  Is that what you're saying?

13:45:16 10                   MS. CAULEY:  Yes, Your Honor.  For

11   it to be --

12                   THE COURT:  You want it as a

13   stipulation by the parties?

14                   MS. CAULEY:  I don't know if the

13:45:22 15   defendant intends to object to them.  But it's

16   facts --

17                   THE COURT:  I'm fixing to ask

18   them.

19                   MS. CAULEY:  Yes.  We would like

13:45:28 20   for these to be read as part of the stipulated

21   facts so that -- there's no dispute regarding

22   these facts.  And it's something we would like to

23   be able to use in opening statement.

24                   MR. TOMPKINS:  Your Honor, there

13:45:46 25   is a dispute as to some of these facts.  I think

1    during the opening statement the plaintiff's

2    counsel can certainly say what they expect the

3    evidence to show.

4             THE COURT:  Well, why don't you

13:45:54   5    tell me which ones you dispute?

6             MR. TOMPKINS:  I know that Number

7    1 -- I'm not sure that Midland Funding is

8    considered a wholly-owned subsidiary of Midland

9    Credit Management.  It is an affiliate.

13:46:10  10             THE COURT:  I think you all argued

11   it was a wholly-owned subsidiary during summary

12   judgment.

13             MR. LANGLEY:  Your Honor, if we

14   did, then that was very unorthodox because I've

13:46:24  15   represented Midland in a number of these cases,

16   and we've always described it as an affiliate.

17             THE COURT:  Okay.  I'll go look it

18   up and see what you said.  You're stuck with what

19   you said.  Can I just ask you something about --

13:46:36  20   what else do you dispute?

21             MR. TOMPKINS:  I know another one

22   that jumped off the page was Number 11.

23             THE COURT:  Why don't you just

24   tell me -- go through without jumping.

13:46:48  25             MR. TOMPKINS:  Okay.

1                    THE COURT:  I mean, let's just

2        shorten this to the extent possible.  It's not a

3        complicated lawsuit.  Anything to --

4                    MR. LANGLEY:  Your Honor --

13:47:08  5                    THE COURT:  No.  I'm asking you to

6        go through these.  We're on Number 2 right now.

7                    MR. TOMPKINS:  Number 2 is

8        probably undisputed.

9                    THE COURT:  Is what?

13:47:18 10                    MR. TOMPKINS:  Is undisputed.

11                    THE COURT:  Okay.

12                    MR. TOMPKINS:  Number 3, I am not

13        sure about, Your Honor.  I don't have that

14        contract in front of me, but I believe that

13:47:30 15        that's a statement of the law anyway, right?  I

16        would have to look at the contract, Your Honor,

17        for that one.

18                    THE COURT:  Okay.

19                    MR. TOMPKINS:  The same for Number

13:47:46 20        4.  I don't have that deposition testimony in

21        front of me.

22                    THE COURT:  Okay.

23                    MR. TOMPKINS:  We would not

24        dispute Number 5.

13:48:08 25                    THE COURT:  Number 6 is not

1    disputed either.  It couldn't be.

2                    MR. TOMPKINS:  Correct.  Number 7

3    is not disputed.

4           For Number 8, I don't have the credit

13:48:50  5    report in front of me.  I don't know if it was

6    reported in the manner described, as an unpaid

7    collection account, but it was --

8                    THE COURT:  I'll give you a chance

9    to look at your -- you can check it out during

13:48:58  10   the break.

11                   MR. TOMPKINS:  Okay.  Number 9 is

12   not disputed, Your Honor.

13          Number 10 I would want to check the number

14   of ACDVs.  It says multiple.  And just to be

13:49:34  15   clear on the record, that fact is not reflected

16   in the declaration of Kathy Rogan.

17                   THE COURT:  Okay.

18                   MR. TOMPKINS:  Number 11, we would

19   dispute the 99-percent figure for the number of

13:49:52  20   ACDVs that are processed completely by the batch

21   interface system.  The deposition of Angelique

22   Ross does say 99 in one place.  But it says 95 in

23   at least two others.  We're not sure if that was

24   a typo or if it was just misstated.  But we would

13:50:14  25   dispute the 99-percent figure.

1              THE COURT:  Okay.

2              MR. TOMPKINS:  Number 12 would be

3    undisputed.  We would not agree with the way

4    Number 13 is phrased in that it states no human

13:50:46 5   being investigates the ACDV dispute.  We would

6    agree that when it's processed by the automated

7    batch interface system, no human employee reviews

8    any information.  But I believe "investigates"

9    here has a legal meaning.  And we would not

13:51:02 10  concede that sentence.

11              THE COURT:  No human being --

12              MR. TOMPKINS:  No human employee.

13              THE COURT:  Do they have robot

14   employees?  No employee of Midland -- what did

13:51:18 15  you say?

16              MR. TOMPKINS:  Reviews the

17   dispute.

18              THE COURT:  Okay.  Reviews ACDV

19   dispute.  Okay.  Is the rest of it okay?

13:51:32 20             MR. TOMPKINS:  I'm sorry, Your

21   Honor.  Give me just one minute.  We do dispute

22   that, the second sentence in Number 13.

23   There's -- it is a very complicated system.  And

24   there will be testimony about the different codes

13:51:54 25  that can be placed on the account and what would

1   happen if certain codes --

2              THE COURT:  We'll scratch that.

3   14?

4              MR. TOMPKINS:  That is correct.

13:52:10  5              THE COURT:  Okay.  That's not

6   correct English.  Okay?  In investigating to the

7   Mr. Brim -- in investigating Mr. Brim's ACDV

8   disputes?

9              MS. CAULEY:  Yes, Your Honor.

13:52:24 10              THE COURT:  Can I take out to the?

11              MS. CAULEY:  Yes.  Please.

12              THE COURT:  All right.

13              MR. TOMPKINS:  And I guess I would

14   ask for the same clarification for the use of the

13:52:32 15   word, "investigating," there and review in

16   processing Mr. Brim's disputes.

17              THE COURT:  I'm sorry.  What are

18   you talking about, Jason?

19              MR. TOMPKINS:  On the previous

13:52:42 20   number --

21              THE COURT:  13?

22              MR. TOMPKINS:  Right.  And I

23   expressed some concern about the use of the word,

24   "investigate," given the legal meaning that it

13:52:52 25   may have in this case.  And I would have the same

1    concern with Number 14.

2                 THE COURT:  Oh.  In reviewing.

3    No.  I'm going to leave "investigation" there

4    because that's a duty you have under the statute.

13:53:04 5    Okay.  But I haven't decided what I'm going to do

6    with it yet.  You go check -- you check your

7    things and I'll check mine, and I'll be right

8    back.  Do you have any --

9                 MS. CAULEY:  On Number 13, we

13:53:16 10   would be willing to take out the second sentence

11   which he disputed and leave in when Midland uses

12   its automated batch interface system to process

13   consumer disputes received in ACDVs, no employees

14   of Midland Credit Management reviews the dispute.

13:53:32 15                THE COURT:  Okay.

16                MS. CAULEY:  We would be fine with

17   that.

18                THE COURT:  Okay.  That's fine.

19   Anything else?  Is there some places -- I can't

13:53:40 20   remember off the top of my head -- when Angelique

21   testified that it said 95 percent?

22                MS. CAULEY:  I was trying to look

23   that up.  On the page we cited, on Page 22 of her

24   deposition, she does say 95 percent.  I need to

13:53:52 25   look to see if it was -- in another place, she

1   says 99.  I can look at that.

2                 THE COURT:  Well, could we put 95

3   to 99 percent?  Would that be agreeable?

4                 MS. CAULEY:  That's fine.

13:54:06  5                 MR. LANGLEY:  Your Honor, it would

6   not.  And here's why:  I think the only

7   reasonable inference is that the court reporter

8   heard 99 wrong because, earlier in the

9   deposition, Angelique testified --

13:54:12 10                 THE COURT:  Okay.  I'm sorry,

11   Mr. Langley.  I cannot change what the court

12   reporter heard.  I have deposition testimony,

13   which is sworn testimony.  She's not going to be

14   here in person, is she?

13:54:22 15                 MR. LANGLEY:  She's not.  But the

16   point that I was going to make is shortly after

17   that 99 appears in the transcript, Ms. Cauley

18   asked another question that included 95.  So that

19   five percent that's handled manually --

13:54:36 20                 THE COURT:  I know you want me to

21   say it is only 95.  I cannot change sworn to

22   testimony in a deposition.  If it says 99 percent

23   one place and 95 in another place, I'm stuck with

24   what it says.  As much as you might want to say

13:54:48 25   it is a misunderstanding.  I can't do that.

1              MR. LANGLEY:  I guess I was hoping

2      Penny would concede the point, given --

3              THE COURT:  That's different.

4              MR. LANGLEY:  Penny, would you be

13:55:02  5      willing to stipulate since we're talking about

6      stipulations?

7              MS. CAULEY:  I'm looking at Page

8      57.  And there, the question is specifically:

9      You told me 99 percent of ACDVs are handled

13:55:14 10      electronically through the batch is -- the

11      question was:  You told me 99 percent of ACDVs

12      are handled electronically through the batch; is

13      that right?  And her answer was:  Yes.

14              THE COURT:  Okay.

13:55:26 15              MS. CAULEY:  Is there another

16      place that you can cite me to that says 95?

17              MR. LANGLEY:  Well, there's the

18      portion that you pointed out earlier.  And then

19      on Page 60, you asked the question:  How many

13:55:40 20      disputes does Midland normally get, say, per week

21      for ACDV?  Answer:  I would say maybe about

22      8,000.  Question:  Would that be the same pretty

23      much every week?  Answer:  Yeah.  Question:  And

24      then if my math is right, five percent of that

13:56:04 25      would be about 400 are actually handled by an

1    individual in the consumer relations department
2    per week?  Answer:  Yeah.  I guess that is about
3    right.
4                    THE COURT:  Well, 99 percent is
13:56:24  5    obviously not correct.  Because she also says --
6    other places, she says 95.  So you all have the
7    choice if you want me to do this as a
8    stipulation -- you have the choice of either
9    stipulating to something different than 99
13:56:38  10    percent, or I don't read it.
11                    MS. CAULEY:  We would have no
12    problem with the 95 to 99.
13                    MR. LANGLEY:  We do have a problem
14    with that.  But I guess they're entitled to read
13:56:52  15    in --
16                    THE COURT:  Well, no.  This is
17    stipulation.  I mean, it's going to amount to
18    what they want me to do is grant the motion in
19    limine, which I've never seen in that form
13:57:02  20    before, and read it to the jury and say the
21    parties have -- you know, whatever.  I've never
22    seen a motion quite like this before.  I don't
23    mind doing it as a stipulation.  But it's not
24    something I can take judicial notice of.  And
13:57:16  25    that's really sort of what you're asking me to

1   do.

2           And I can't -- I can take judicial notice

3   of the fact she said 95 percent at some place in

4   her deposition and 99 in others.  And I can read

13:57:32 5   to the jury:  When Midland received the ACDVs

6   from Mr. Brim from Equifax, Transunion, and

7   Experian, it used its automated batch interface

8   system to respond.

9           MS. CAULEY:  That's fine, Your

13:57:46 10  Honor.  We can bring the rest up on deposition.

11          MR. LANGLEY:  Your Honor, if

12  there's going to be a stipulation read to the

13  jury, we would like an opportunity to --

14          THE COURT:  Absolutely.  I'm just

13:57:54 15  trying to see if you can get some of this ironed

16  out before 9:00 o'clock in the morning.  Unless

17  you want to try to do it now and come back.

18          MR. LANGLEY:  Actually, what we

19  would prefer is for both sides to be able to say

13:58:02 20  what they expect the evidence to show.

21          THE COURT:  I know.  I know that's

22  what you prefer.  Now, that's not what I have in

23  front of me right now, Mr. Langley.

24          MR. LANGLEY:  Understood.

13:58:10 25          THE COURT:  I have a motion, and

1      I'm trying to facilitate ruling on that motion.

2      I can either grant part of it, deny all of it, or

3      turn it into a stipulation.  And if I have a

4      stipulation, I can read it to the jury and tell

13:58:24  5      them stipulation facts mean there's no additional

6      evidence necessary to prove that.

7           You all have your pick.  Do you want me

8      just to rule on the motion?  Or do you want to

9      try to stipulate?

13:58:36 10           MR. TOMPKINS:  We would prefer

11      that you just deny the motion.

12           THE COURT:  I know that.  I'm not

13      going to deny it completely, Mr. Tompkins.  You

14      can't have your cake and eat it too.  Okay?  Some

13:58:46 15      of these facts are absolutely totally undisputed.

16      And there's no reason for anybody to have to drag

17      witnesses or read extra deposition testimony in

18      front of the jury this week to prove that when

19      it's undisputed.  And that's where I'm coming

13:59:02 20      from.  And that's what that motion is all about.

21           MR. TOMPKINS:  They've designated

22      these same portions.

23           THE COURT:  I'm going to go check.

24      You go check on your things.  That will be the

13:59:12 25      simplest thing.

1          MR. TOMPKINS:  I will, Your Honor.

2          (Short recess.)

3          THE COURT:  Okay.  With respect to

4   Number 1, I actually found it on Page 1 of my

14:16:00  5   opinion that it's a wholly-owned subsidiary.  I'm

6   not going to change my opinion.  So I'm going to

7   let Number 1 stand.

8          Number 2, defendants said was undisputed.

9          Number 3, I've looked through the

14:16:16  10  contract.  And Paragraph 7 is the only one that I

11  can find that deals with Midland's duties under

12  the federal consumer protection laws.  And

13  Paragraph 7 does not say the same thing as

14  Plaintiff's Number 3.

14:16:32  15         Do you have anything different,

16  Mr. Tompkins?

17         MR. TOMPKINS:  No, Your Honor.

18  That's the only paragraph I found.  And it

19  actually specifically references the FDCPA.  Not

14:16:44  20  the FCRA.

21         THE COURT:  It doesn't say what

22  you say.

23         MS. CAULEY:  Your Honor, it

24  doesn't say FDCPA either.  I mean, mine just says

14:16:50  25  that they would comply with all requirements --

1          THE COURT:  Well, if you want to

2     put in -- I'm telling you what you have put in

3     Number 3 is not what the contract says.  So if

4     you want to put a Number 3 in there that quotes

14:17:04  5     Paragraph 7 of the contract, then I'm sure that

6     would be okay.  But there's a different meaning

7     to Paragraph 7 than there is to what you say

8     here.

9          MS. CAULEY:  Okay.

14:17:12 10          THE COURT:  You can just think

11     about it.

12          MS. CAULEY:  Okay.

13          THE COURT:  Midland agrees that

14     it's responsible for the accuracy of the

14:17:22 15     information it reports to the credit bureau is

16     Number 4.  That is correct.  That is what it says

17     in the deposition.  So that would be okay.

18          Five is undisputed.

19          Six is undisputed.

14:17:34 20          Seven is undisputed.

21          Number 8 -- did you check, Jason?

22          MR. TOMPKINS:  Yes, Your Honor.  I

23     did check.  Well, I checked a couple of the

24     credit reports.  There's several.  One that I

14:17:50 25     looked at quickly was Transunion prior to 2008

did not list anything as an unpaid collection

account.  There are different ways that these

things could be --

            THE COURT:  That's not -- that's

not what it says.  I'll tell you it ties in with

Number 10.  And I don't know really how you want

to do it if you want to do it.

            Number 10 is where it's been proposed that

the stipulation reads in August, 2008, and March

of 2009, Midland received multiple ACDVs from the

credit recording agencies communicating that

Mr. Brim had disputed the accuracy of the debt.

            Okay.  First of all, that is not what

Kathy Rogan says in her declaration.  So that's

not correct.  But she does say in her deposition

that in August of 2008, she received information

from the credit reporting agencies, communicating

that Mr. Brim had disputed the accuracy of the

debt.

            So if Midland received that on August the

6th, 2008, which is what she says in her

deposition, they must have had his account prior

to August the 6th, 2008.

            MR. TOMPKINS:  They did have his

account prior to August 6, 2008.  And Midland did

1    report information about his account to the

2    consumer reporting agencies prior to August of

3    2008.  My concern is it states it was reported as

4    an unpaid collection account which may not be

14:19:32  5    true for any of the reports.  But it may be true

6    for some.  It's not true for the one that I was

7    able to quickly locate.  It did not list it in

8    that manner, as an unpaid collection account.

9                MS. CAULEY:  Your Honor, we can

14:19:46  10    simply just offer all the credit reports.  I

11    mean, they all show that it's being reported with

12    outstanding balance as -- and as a collection

13    account.

14                THE COURT:  Can I just see them?

14:20:08  15    I mean, the account was in 2004.  He purchased it

16    in 2004.  I doubt there was ever any credit

17    reporting agency that had it as a correct account

18    as paid.

19                MR. TOMPKINS:  Well, that may be

14:20:22  20    true.  But --

21                THE COURT:  You know, I mean --

22    okay.  Let me just look at them.

23                MS. CAULEY:  This is the first one

24    from Equifax.  It's the last page.

14:20:40  25                THE COURT:  I'll give them right

1    back to you.  I won't mess them up.  Okay.  Okay.

2    That one does say it.  And that is Equifax.

3                    MS. CAULEY:  Here's Transunion.

4                    MR. LANGLEY:  What's the exhibit

14:21:26  5    number on that page?

6                    MS. CAULEY:  43.

7                    MR. LANGLEY:  There is a 49.

8                    MS. CAULEY:  There is.

9                    THE COURT:  That one is 7, 2008.

14:22:00  10   Okay.  That one says it.  That 7, 2008 would be

11   prior to August, 2008 last I checked.

12                   MR. TOMPKINS:  I'm sorry, Your

13   Honor.  Which one?

14                   MS. CAULEY:  That's July 29th,

14:22:14  15   2008 report from Jamon Brim.  The next one is

16   just a duplicate.  Here's one.  Experian July,

17   2008.

18                   THE COURT:  Yeah.  That's the last

19   one.

14:23:06  20                   MS. CAULEY:  And it's on Page 2.

21                   THE COURT:  Oh.  This one is

22   reported as past due since December of 2007.

23   Okay.

24        So Number 8 would be okay.

14:23:38  25        But Number 10 is not okay.  That's not in

1    her declaration.

2                        MS. CAULEY:   Okay.   We just

3    withdraw that one.

4                        THE COURT:   And Number 11 should

14:23:48  5    just read:   When Midland received ACDVs for

6    Mr. Brim from Equifax, Transunion, Experian, it

7    used it automatic batch interface system to

8    respond.

9                        MS. CAULEY:   That will be fine.

14:23:58 10                        THE COURT:   Number 12 is

11    undisputed.

12           Number 13 would read:   When Midland uses

13    its automated batch interface system to process

14    consumer disputes received in ACDVs, no employees

14:24:14 15    of Midland Credit Management, Inc. reviews the

16    ACDVs disputed.

17           And Number 14 is undisputed with the

18    corrected English.

19           So that means I will -- whichever y'all

14:24:28 20    want to.   If you don't want to stipulate, I'm

21    just going to grant the motion and read it.

22    Whatever y'all want me to do.   It doesn't make

23    any difference to me.

24                        MR. LANGLEY:   Your Honor, on Item

14:24:36 25    13, where it says, when Midland uses its

automatic batch interface system, no employee
reviews it, that is only true in 95 percent of
the times. So would it be acceptable to limit
that to the situations where the batch
14:24:56 interface system handles the dispute in its
entirety?

THE COURT: No. I mean, no human
person does it when you use just the automated
batch. There is a human person that does in it
14:25:04 95 to 99 percent of the time. That's the
difference between the automated and the human
review.

MR. TOMPKINS: Well, everything
goes through the automated system first.

14:25:10 THE COURT: Right.

MR. TOMPKINS: And five percent of
them come out of the automated system.

THE COURT: And then it is
reviewed by a human being.

14:25:18 MR. TOMPKINS: Right.

THE COURT: But not until then.
They go all through -- when Midland uses its
automated batch interface system to process
consumer disputes received in ACDVs, no employee
14:25:32 of Midland reviews the ACDV dispute until it's

```
 1    been through the batch system one time.

 2                  MR. LANGLEY:  I think that's fine.

 3                  THE COURT:  Okay.  Is that all

 4    right with plaintiff?

 5                  MS. CAULEY:  That will be fine,

 6    Your Honor.

 7                  THE COURT:  I'm just not going to

 8    venture into 95 and -- I'm just going to leave

 9    that out.  The 95 and --

10                  MS. CAULEY:  We'll withdraw that

11    since there's confusion.

12                  THE COURT:  Am I to take this as a

13    stipulation or not?

14                  MR. LANGLEY:  No, Your Honor.

15                  THE COURT:  Okay.  Thank you.

16        We'll see y'all at 9:00 o'clock in the

17    morning.  If you have any issues we need to take

18    up before 9:00 o'clock, be here at 8:30.

19                  MS. CAULEY:  Thank you, Your

20    Honor.

21                  MR. LANGLEY:  Thank you.

22                  THE COURT:  Put on the record that

23    I am going to grant the plaintiff's motion in

24    limine as set out in this conference that has now

25    taken an hour.
```

14:25:48 (line 5)
14:26:16 (line 10)
14:26:22 (line 15)
14:26:32 (line 20)
14:26:48 (line 25)

1            (The Proceedings were recessed at

2  approximately 2:26 p.m. on February 22, 2011.)

3

4

5

6                 C E R T I F I C A T E

7

8

9       I, the undersigned, hereby certify that

10  the foregoing pages contain a true and correct

11  transcript of the aforementioned proceedings as

12  is hereinabove set out, as the same was taken

13  down by me in stenotype and later transcribed

14  utilizing computer-aided transcription.

15       This is the 11th day of March of 2011.

16



18  _____

19     Cheryl Renae King Powell, CCR, RPR, FCRR

20       Federal Certified Realtime Reporter

21

22

23

24

25