FILED
2011 Jul-14  PM 04:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

```
 1              IN THE UNITED STATES DISTRICT COURT
 2            FOR THE NORTHERN DISTRICT OF ALABAMA
                       NORTHEASTERN DIVISION
 3

 4
    JAMON T. BRIM,                   *
 5                    Plaintiff,     *   10-CV-00369-IPJ
                                     *   February 23, 2011
 6  vs.                             *   Florence, Alabama
                                     *   8:50 a.m.
 7  MIDLAND CREDIT MANAGEMENT, *
    INC.,                            *
 8                    Defendant.  *
        * * * * * * * * * * * * * * * * * * * * * * * * * *
 9

10              TRANSCRIPT OF JURY TRIAL
       BEFORE THE HONORABLE INGE P. JOHNSON
11            UNITED STATES DISTRICT JUDGE

12                     VOLUME II

13

        FOR THE PLAINTIFF:
14
        MR. LEONARD A. BENNETT, ESQ.
15      CONSUMER LITIGATION ASSOCIATES
        12515 Warwick Blvd
16      Suite 100
        Newport News, VA 23606
17      757-930-3660

18      MS. PENNY HAYS CAULEY, ESQ.
        HAYS CAULEY
19      P O Box 509
        Darlington, SC 29540
20      843-393-5200

21      MR. RONALD C. SYKSTUS, ESQ.
        BOND, BOTES, SYKSTUS & LARSEN
22      415 Church Street
        Suite 100
23      Huntsville, AL 35801
        256-539-9899

24

25
```

1

2          FOR THE DEFENDANT:

3          MR. ERIC B. LANGLEY, ESQ.
           BALCH & BINGHAM
4          1710 Sixth Avenue North
           P O Box 306
5          Birmingham, AL 35201-0306
           205-251-8100

6
           MR. JASON B. TOMPKINS, ESQ.
7          BALCH & BINGHAM
           1901 Sixth Avenue North
8          Suite 1500
           Birmingham, AL 35203
9          205-251-8100

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            **I N D E X**

2      **EXAMINATION**                              **PAGE**

3      **GABRIEL EDROZO**

4   DIRECT EXAMINATION                              77
    BY MR. BENNETT
5
       **ANGELIQUE ROSS**
6
    DIRECT EXAMINATION                              89
7   BY MS. CAULEY
    CROSS-EXAMINATION                              136
8   BY MR. LANGLEY

9      **KIMBERLY HUGHES**

10  DIRECT EXAMINATION                             156
    BY MS. CAULEY
11  CROSS-EXAMINATION                             163
    BY MR. LANGLEY

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **P R O C E E D I N G S**

2                    (In open court.  Jury not

3    present.)

4                    THE COURT:  This is CV-10-369.

08:50:04  5    Jamon -- he's not here.

6                    MS. CAULEY:  He is, Your Honor.

7    He had to run something down to the car.

8                    THE COURT:  All right.  Brim

9    versus Midland Credit Management, Inc.  And

08:50:20  10   everybody is here except Mr. Brim.

11         Do you want to proceed?  You haven't asked

12   me to put this on the record, but I don't know

13   how else to deal with it.  And I'm utterly

14   confused, because yesterday the defendants

08:50:40  15   vigorously opposed plaintiff's supplemental

16   motion in limine, and now they filed their own

17   supplemental motion in limine.

18         I think the thing to do is for the two of

19   y'all to sit down and figure out whether you want

08:50:52  20   to call this stipulated facts or not.

21                    MR. BENNETT:  Judge, we agree with

22   their stipulations.  The only caveat is -- I

23   think we resolved that this morning, as well.  In

24   their second stipulation, they again use the

08:51:06  25   word, "affiliated," whereas the Court has already

1    determined under 56(d) that it is a subsidiary.

2         Other than that, Judge, we would ask that

3    those stipulations be included within the

4    stipulations that have already been --

08:51:22  5              THE COURT:  Now, you understand --

6    you weren't here yesterday.  You understand they

7    do not agree with yours.

8              MR. BENNETT:  I understand, Judge.

9              THE COURT:  Okay.

08:51:28 10              MR. BENNETT:  I would suggest to

11   the Court I wasn't here.  You've already ruled.

12   Those were taking from their briefings, their

13   pleadings, and this Court's order that was not --

14   in fact, some of it was verbatim from the

08:51:38 15   30(b)(6) witness.

16              THE COURT:  I'll tell you, since

17   you weren't here yesterday, that Number 2 was

18   undisputed by the defendants.  Number 5 was

19   undisputed by the defendants.  Number 6 was

08:51:48 20   undisputed by the defendants.  Number 7 was

21   undisputed by the defendants.  Number 9 was

22   undisputed by the defendants.  Number 12 was

23   undisputed by the defendants.  And if I

24   understood correctly, Number 13, with the changes

08:52:06 25   I made, was undisputed by the defendants.  And

1   Number 14 was undisputed by the defendants.

2   Number 8 was disputed by them, but I looked it

3   up.  And I'm saying it's okay.  I struck Number

4   10.  Number 11 should be okay with the defendants

08:52:24  5   because I took out the issue about 95 percent or

6   99 percent.  And that was it.

7                MR. BENNETT:  Yes, Your Honor.

8                THE COURT:  Do y'all want me to

9   read it to the jury before you make opening

08:52:34  10   statements?

11                MR. BENNETT:  Yes, Your Honor.

12                MS. CAULEY:  Yes.

13                MR. BENNETT:  Your Honor, again,

14   in the same category of let's make this an

08:52:40  15   efficient trial, we have gone through the

16   exhibits with the defendant.  The Court has

17   already previously ruled at the final pretrial,

18   but to the extent that there was any issue

19   remaining, I have suggested and my opposing

08:52:58  20   counsel has suggested right back at us -- we

21   jointly suggest that it would be better for the

22   trial process if we can move before the jury is

23   seated -- they don't have to be here for the

24   admission of the exhibits.  They're clean.  It

08:53:14  25   will expedite the trial.  It will prevent

1    everybody from having to interrupt testimony for

2    checking boxes.  And to that objective, the

3    parties have withdrawn objections that might be

4    outstanding or lingering with just a couple of

08:53:28  5    exceptions.

6        With respect to their exhibits, the only

7    thing we object to is Exhibit 21, which is the

8    unredacted -- I'm sorry.  The redacted contract

9    that the Court considered at the final pretrial.

08:53:42 10        We have still not received redacted

11    version -- my opposing counsel says they're not

12    sure if they're going to use it or not.  But if

13    they're going to use it, we've still never seen

14    what they're going to use.  We would continue to

08:53:56 15    object to Exhibit 21.

16        There were other documents, like their

17    better business bureau matter, the Court had

18    withheld the decision on.  We will withdraw our

19    objection to it.

08:54:08 20        The Dell deposition the reading in

21    entirety.  They have two objections to two

22    plaintiff's exhibits.

23            THE COURT:  Let me go back to

24    Defendant's Exhibit 21.  I ruled that the price

08:54:18 25    they paid was not to be redacted.  Only the other

1  lawsuits.

2           MR. BENNETT:  Correct.

3           THE COURT:  Are you saying now

4  you're not sure you're not going to use the

08:54:26  5  contract?

6           MR. LANGLEY:  That's correct.

7           THE COURT:  Okay.  So until --

8           MR. BENNETT:  We don't have a copy

9  even if they're going -- we would object --

08:54:34 10           THE COURT:  Well, if they decide

11  to use it, they have to give you a copy

12  beforehand.

13           MR. BENNETT:  Yes, Judge.

14           MR. LANGLEY:  We understand that,

08:54:40 15  Your Honor.

16           THE COURT:  All right.

17           MR. BENNETT:  With that, I expect

18  that the defendant could move to stand up with

19  their trial book, as I will do in a moment with

08:54:50 20  ours, and say, Judge, we move for the admission

21  of these defense exhibits, and we will say we

22  have no objection except 21 and it's done.

23           THE COURT:  Okay.  That's great.

24           MR. LANGLEY:  And then the only

08:55:02 25  remaining issue would be with a couple of the

1    exhibits in their book.  These are objections
2    that we had made, I believe, shortly before the
3    pretrial conference that the Court did not
4    actually reach.  That was the one part of the
08:55:14  5    objections that the Court did not consider that
6    day.  Some of them have been resolved through
7    Your Honor's rulings on the motion in limine.
8    And I will just assume those objections are
9    preserved by virtue --
08:55:28 10              THE COURT:  They are.  They're
11    ruled on by my order.
12              MR. LANGLEY:  I'm going to ignore
13    those completely for now.
14         The two remaining issues -- first of all,
08:55:36 15    Plaintiff's Exhibit 9 and 16 they've agreed to
16    withdraw.  So that's no longer an issue.  Which
17    leaves two documents.
18         Document Number 8, which is an
19    organizational structure chart of the parent
08:55:50 20    company of Midland Credit Management, Inc., a
21    company called Encore Capital Group.  And given
22    that it is now deemed stipulated or undisputed by
23    the Court that Midland Funding, L.L.C., the
24    entity who actually purchases the debts from
08:56:06 25    Dell, is a wholly-owned subsidiary, it would be

                1   unnecessary proof.  We think it is irrelevant in

                2   the first place.  But given that now the Court

                3   has determined that there's no disputed fact

                4   about Midland Funding, L.L.C. being a subsidiary,

08:56:24        5   we think it would be cumulative and, in any

                6   event, to the extent there's other information on

                7   there, the danger of unfair prejudice would

                8   outweigh any probative value.

                9            MR. BENNETT:  Judge, that wouldn't

08:56:36       10   be the use for which we would put it.

               11       If you look at the top above that Encore

               12   Capital, Encore Capital is just the parent.

               13   Midland Credit Management, the defendant in this

               14   case, the evidence will be, handles all the

08:56:50       15   issues.  They're wholly owned.  They operate as a

               16   single component of Encore Capital.  The logos

               17   say Encore Capital, Midland Credit Management.

               18   The description in the annual report, which is

               19   the next exhibit they're adopting an objection

08:57:06       20   for refers to it as a single operating entity.

               21   And the jury is entitled to know that.

               22       This is important because this Encore

               23   Capital is the only publically-traded component

               24   of the defendant.  They have resisted providing

08:57:20       25   any financial information.  And the net worth,

1    the shareholder's net equity is available from

2    their 10-K that they publically -- they operate

3    as Midland.

4                    THE COURT:  All right.  I'm going

08:57:30  5    to overrule that objection.  And the other one?

6    The other document?

7                    MR. LANGLEY:  The other document

8    which ties directly into something Mr. Bennett

9    just said is the 10-K, Encore Capital's 10-K,

08:57:46  10    which contains all the financial information for

11    the parent company.

12                    THE COURT:  Okay.

13                    MR. LANGLEY:  And to the extent

14    that the plaintiffs are arguing that it's all one

08:57:56  15    single entity operating one in the same, there's

16    just not in evidence and there won't be any

17    during trial to essentially pierce the veil which

18    is kind of what Mr. Bennett is arguing.

19                    MR. BENNETT:  Well, Judge, the

08:58:10  20    report itself describes all the operations of

21    Midland.  It doesn't say Encore does something

22    different.  It talks about the resolution of --

23    it talks about their collections dynamic

24    statistics.  Talks about Midland's involvement in

08:58:28  25    various components of Encore's business.  It

1    is -- and it is relevant.  The question is:  Is

2    it the very best evidence in the entire universe?

3    Maybe not.  It would be better to have an annual

4    report from Midland.  But it doesn't issue an

08:58:48   5    annual report.  It doesn't have this information.

6        There's nothing prejudicial in here.

7    There's nothing untrue in here.  It is certainly

8    relevant.  The defendant is able to argue, just

9    as we're able to argue, about all the various

08:59:00  10    components of it.  But it is admissible.  Encore

11    collects, and it collects as Midland.

12             THE COURT:  Well, it is a public

13    document, isn't it, the one filed?

14             MR. BENNETT:  Yes, Your Honor.

08:59:08  15             MR. LANGLEY:  That is the 10-K

16    filed.  We're not going to dispute that.  What

17    we're going to dispute is, first, that it's

18    relevant to any material issue in the case.

19    Because all it contains is Encore's financial

08:59:22  20    information.

21        Second, this is very much a veil-piercing

22    argument that the plaintiffs are making here.

23    And veil piercing is very fact intensive, very

24    rare circumstance.  I mean, absent unusual

08:59:36  25    circumstances, the corporate forms are observed,

1    and we just don't think there's any evidence to

2    support the theory that plaintiffs are arguing.

3              MR. BENNETT:  Judge, this is --

4    this annual report -- we're not attempting to sue

08:59:50  5    Encore Capital.  And if the Court enters

6    judgment, if we're somehow successful, the

7    judgment is not against Encore Capital.  This is

8    evidence about the collection operation of

9    Midland.  And Midland is discussed throughout it.

09:00:06 10   I mean, it's clearly relevant.

11             THE COURT:  Well, there is a claim

12   for punitive damages and willful violation.  And

13   it would certainly be relevant to that.  I'm

14   going to overrule that objection.  It is a public

09:00:20 15   document.  It discusses Midland's financial

16   situation and its business practice as the same

17   as filed and public in the public record.  I'm

18   just going to let it in.

19             MR. BENNETT:  Judge, with that, on

09:00:32 20   those bases, plaintiff would move for the

21   admission of our exhibits.  And Your Honor, the

22   plaintiff's exhibit list -- we have also given

23   the stipulations, attempted to reduce -- the

24   trees are already dead, Your Honor, but we've

09:00:52 25   attempted to reduce the number of exhibits and

1    paper that would confront the jury.

2         You see Ms. Cauley has crossed through a

3    number of exhibits.  We're withdrawing those.

4    Rather than renumber, given the record has

09:01:00  5    already been established, we'll just deal with

6    that issue with the jury.

7         I can tell them in opening that the

8    parties have worked together to reduce the number

9    or if the Court chooses to or if defense wants to

09:01:14  10   to explain why there are certain documents --

11              THE COURT:  The jury usually

12   doesn't get confused about the document numbers

13   skipping.  They get confused if there is another

14   exhibit number from a deposition.  So I hope we

09:01:28  15   just have one exhibit number on the exhibits.

16   Trial exhibit number.

17              MS. CAULEY:  There is a trial

18   exhibit.  On some of them, it does have the

19   deposition exhibit from the deposition, but we've

09:01:38  20   tried to make that very clear.  And we've

21   reduced -- we've taken out even the excess

22   exhibits from those depositions that we don't

23   need.  So they'll just hear the testimony.  But

24   they won't have extra documents.

09:01:50  25              MR. BENNETT:  They're all number

1    tabbed as well as court stickered.

2                    MS. CAULEY:  To that list, Your

3    Honor, we are adding the 82, which is the annual

4    report which you just allowed in.  And that would

09:02:00  5    be -- that's Plaintiff's Exhibit 82.

6                    THE COURT:  You're offering all

7    the ones except for the ones you've marked out?

8                    MR. BENNETT:  Yes.

9                    THE COURT:  And with the objection

09:02:10  10   of the defendant noted to Exhibit Number 8 and

11   82, those are admitted.  And you're offering --

12   do you have a list, too?

13                   MR. LANGLEY:  To make sure I

14   understand, the previous placeholder for Exhibit

09:02:24  15   77 is now going to be empty, and the annual

16   report will be 82?

17                   MR. BENNETT:  Yes.

18                   MR. LANGLEY:  That was the

19   objection the Court had noted and overruled.  Am

09:02:32  20   I correct about that?

21                   MR. BENNETT:  Yes.

22                   MR. LANGLEY:  Thank you.  Then at

23   this time, the defendants will move to admit

24   Exhibits 1 through 22 with the exception of

09:02:48  25   Exhibit 21 as discussed earlier.  I will also

1    note for the Court that Exhibits 23 through 26
2    are the plaintiff's settlement agreements with
3    other defendants whom we contend are source of
4    the same alleged injury.  But the Court has
09:03:06  5    withheld ruling on that.  We don't intend to
6    reference it in opening.  And in fact, we will
7    likely not even seek to admit it during the
8    plaintiff's case.  If at all, it would be more
9    likely in the setoff context in the event there's
09:03:20  10   a verdict for plaintiff.
11              THE COURT:  Okay.  So you just
12   have One through 22, but you're not sure with 21,
13   so you're withholding 21?
14              MR. LANGLEY:  Yes, Your Honor.
09:03:28  15              THE COURT:  And 23 through 26 are
16   the settlements, and you're not offering those,
17   at least not at this time.
18              MR. LANGLEY:  We don't even have
19   them.
09:03:38  20              THE COURT:  Well, how could you
21   number them?
22              MR. LANGLEY:  Because we had
23   subpoenaed them to trial.  I believe they have
24   them, pursuant to Your Honor's order at the
09:03:46  25   pretrial conference.

1                    THE COURT:  All right.

2                    MS. CAULEY:  Your Honor, we do

3         have jury notebooks.  We have them for Your

4         Honor, and then we have them for the jury.  Is

09:03:54  5         there a time --

6                    THE COURT:  Do you have 12?

7                    MS. CAULEY:  We do.  We've already

8         given defense counsel a copy.  We have a copy for

9         Your Honor.

09:04:00 10                    THE COURT:  You can put them on

11        their chairs.

12             I still want to go back.  Do y'all want me

13        to read the undisputed facts before you make

14        opening statements?

09:04:10 15                    MS. CAULEY:  Yes, Your Honor.

16        That would be great.

17                    MR. LANGLEY:  And defendants

18        agree.

19                    THE COURT:  Okay.

09:04:18 20                    MR. LANGLEY:  Your Honor, we do

21        not have 12 copies of our notebook.  I don't

22        think that will be a problem until we get to our

23        case.  And we will make efforts to get 12 of them

24        by tomorrow.

09:04:28 25                    THE COURT:  That's great.

1          MR. BENNETT:  Your Honor, may I

2    ask the Court's courtesy?  What discretion must I

3    show with respect to movement from the podium?

4          THE COURT:  Everyone in here

09:04:42  5    except for the parties can move about like they

6    want to.  I don't care where -- as long as you

7    don't intimidate the witnesses.  Okay?  Don't go

8    right up in their face.  And that applies to

9    everybody.  But you can move about.  You don't

09:04:56 10    have to stand at the podium.  You can stand over

11    there.  You can do whatever you want to.

12        If you're going to use the Elmo, which you

13    probably won't since you have notebooks, but if

14    you are going to use it, somebody needs to sit

09:05:08 15    there.  And it cannot be Tammi.  To run it.

16          MR. BENNETT:  Even though she's

17    the only one who --

18          THE COURT:  She's Elmo's best

19    friend.  I'll put it that way.  I assume you're

09:05:18 20    not going to use it either since you have

21    exhibits in paper form, right?

22          MR. LANGLEY:  I'm sorry.

23          THE COURT:  Are you going to use

24    the Elmo?

09:05:28 25          MR. LANGLEY:  We will be using the

1    Elmo.

2              THE COURT:  Are you going to have

3    one sitting there, running it, while the other

4    one asks questions?

09:05:34  5              MR. LANGLEY:  Yes.  Or someone

6    will sit there and ask the questions.  We'll

7    figure it out.

8              THE COURT:  That's fine.

9              MR. LANGLEY:  Your Honor, there's

09:05:40 10  one more matter we would like to raise.  We were

11   actually talking about this when Court convened.

12   It relates to the deposition testimony of

13   Angelique Ross which we went through yesterday.

14        Procedurally, we're trying to figure out

09:05:56 15  how the testimony comes in.  And what we had

16   proposed is, for example, if it's Penny on the

17   stand, playing the part of Angelique Ross that

18   when it gets to one of our designations, I will

19   just ask the question of her, and she will read

09:06:12 20  it?

21              THE COURT:  I think that's good.

22              MR. LANGLEY:  I don't know if we

23   have agreement from the other side yet.

24              MR. BENNETT:  It's just process.

09:06:22 25  There's no objection in principle.  But the

1    problem is we have gone through -- as Your Honor

2    knows, we designated our deposition parts.  We

3    provided that to the defendant.  And the

4    important part here is that we then highlighted

09:06:40   5    the deposition.  We've had -- I won't say

6    rehearsed, but they've gone through that.

7            The defendant wants to use other parts

8    which we think are insomnia cures and little

9    else.  We don't have any objection on principle

09:06:58   10    to them coming in.  The question is do we have to

11    put their evidence in.

12                    THE COURT:  No.

13                    MR. BENNETT:  Our suggestion is

14    they do that, and that's fine.

09:07:06   15                    THE COURT:  No.  The way I

16    understand it -- the way I've done it is I assume

17    Ms. Cauley is going to read Ms. Ross --

18                    MS. CAULEY:  Actually, I'm going

19    to do the questioning since I took her

09:07:22   20    deposition, and Mr. Sykstus is going to answer.

21                    THE COURT:  I assume you're going

22    to ask the questions that you have highlighted

23    and pointed out that you're going to read from

24    her deposition.

09:07:32   25                    MS. CAULEY:  That's correct.

1              THE COURT:  And then the defendant

2    would then read their questions that they want to

3    read afterwards?

4              MR. LANGLEY:  What we had

09:07:42  5    proposed --

6              THE COURT:  I know what you're

7    proposing is that you read it as you go through

8    it.  No.  You can read your own questions

9    afterwards.

09:07:46 10              MR. LANGLEY:  Fair enough.

11              THE COURT:  All right.  Do you

12    want these two back?

13              MS. CAULEY:  Yes, Your Honor.

14              THE COURT:  Okay.  Now I'm going

09:08:26 15    to go because Cheryl has to work on my computer.

16    It's not working.

17              COURTROOM DEPUTY:  Judge, I need

18    to make sure their sound is going to work, too,

19    anyway before I bring them in.

09:08:38 20              THE COURT:  All right.

21              (Short recess.)

22              (In open court.  Jury present.)

23              THE COURT:  Please be seated.

24    Good morning.  Let the record show this is

09:30:36 25    CV-10-369.  Jamon Brim versus Midland Credit

1    Management, Inc.  And Mr. Brim is present.

2    Mr. Edrozo is present.  Mr. Yang is present.  The

3    lawyers are present.  The jury is present.  And

4    good morning to everybody.

09:31:02  5          I should say that you didn't meet one of

6    the lawyers for the plaintiff yesterday, Len

7    Bennett.  He's seated on my right.  I told you

8    yesterday he was excused yesterday for being in

9    court yesterday.  But he's here today.

09:31:18 10               MR. BENNETT:  Good morning.  Thank

11   you, Judge.

12               THE COURT:  You met all the

13   others.

14          I told you yesterday the first thing

09:31:24 15   you'll hear is the opening statement first by the

16   plaintiff and then by the defendant.  And then

17   we'll actually start hearing the evidence.

18          I want to tell you that certain facts in

19   this case -- and you'll hear more about the case

09:31:36 20   as we go through it.  Certain facts are

21   undisputed.  And that means that they don't need

22   additional evidence to establish their existence.

23   They're undisputed by the parties.  And before

24   the parties actually give you their opening

09:31:52 25   statements, I'm just going to read you those

1    undisputed facts because they're undisputed and

2    stipulated to by the parties.

3            First of all, Midland, which is just short

4    for the defendant, services credit accounts its

09:32:14  5    wholly-owned subsidiary, Midland Funding,

6    purchases from other companies.  Midland Funding

7    purchases debts from unrelated creditors such as

8    credit card companies and financing companies

9    that those entities have charged off.

09:32:32  10    Two, Midland bought, as part of a large

11    portfolio of other consumer credit accounts, an

12    account from Dell Financial that the plaintiff,

13    who is Mr. Brim, had previously owed to Dell.

14            Midland agrees that it is responsible for

09:32:54  15    the accuracy of the information it reports to the

16    credit bureaus.

17            On September the 14th, 2004, the

18    plaintiff; that is Mr. Brim, purchased a Dell

19    computer financed by Dell Financial in an amount

09:33:12  20    of $914.25 and a surge protector in the amount of

21    $20.53.

22            On November the 8th, 2004, plaintiff,

23    Mr. Brim, transferred $954.12 from his bank

24    account at Redstone Federal Credit Union to Dell

09:33:34  25    Financial to pay off the account in full.

1          The plaintiff, Mr. Brim, disputed the

2     attempt by Midland, the defendant, to collect on

3     the Dell account several times, providing it with

4     his bank statement from Redstone Federal Credit

09:33:56   5     Union, listing the November 8th, 2004, payment to

6     Dell.

7          Prior to November of 2008 after it

8     purchased the Dell account, Midland began

9     reporting the account to the plaintiff's credit

09:34:10  10     files with Equifax, Transunion, and Experian, the

11     national consumer reporting agencies, as an

12     unpaid collection account.

13          An ACDV, which stands for automated

14     consumer dispute verification, form is the

09:34:30  15     ordinary manner in which consumer disputes to the

16     credit reporting agencies are forwarded to a

17     credit information furnisher such as Midland.

18          When Midland received the ACDVs; that is

19     the automated consumer dispute verification, from

09:34:50  20     Mr. Brim from Equifax, Transunion, and Experian,

21     it used its automated batch interface system to

22     respond.  Midland receives approximately 8,000

23     ACDVs, disputes, per week.

24          When Midland uses its automated batch

09:35:12  25     interface systems to process consumer disputes

1    received in the ACDVs, no employees of Midland

2    Credit Management, Inc. reviews the dispute until

3    it has been through the interface system one

4    time.

09:35:30  5         In investigating Mr. Brim's ACDV disputes,

6    Midland did not contact him, Dell, the consumer

7    reporting agencies, or any other person or

8    company.

9         Mr. Brim purchased a computer in September

09:35:46 10  of 2004, using a line of credit from Dell

11   Financial Services.

12        In November of 2004, Mr. Brim paid off the

13   account with a payment of $954.12 to Dell

14   Financial Services via an ACH debit.  That is a

09:36:06 15  telephone check.

16        The November, 2004, payment was misapplied

17   to the account of another Dell Financial Services

18   customer.  Thus Dell Financial Service records

19   reflected that Mr. Brim's account was unpaid at

09:36:22 20  the time the account was sold to Midland Funding.

21        On October the 10th, 2007, Dell Financial

22   Services sold the account to Midland Funding as a

23   subsidiary of Midland Credit Management.  And

24   Midland instructed the credit reporting agencies

09:36:40 25  to delete Mr. Brim's account upon being advised

1    by Dell Financial Computer Systems in August of

2    2010 that Mr. Brim's account had been paid off in

3    November of 2004.

4         These are undisputed facts.  Which means

09:36:58  5    that they don't require any additional evidence.

6    They are proven to you.  Okay?

7         And are you going to start?

8              MR. BENNETT:  I am, Your Honor.

9              THE COURT:  Okay.

09:37:12 10              MR. BENNETT:  Good morning.  My

11   name is Leonard Bennett.  The Court has been

12   courteous in allowing me to finish my hearing in

13   Richmond, Virginia yesterday and actually,

14   unbeknownst to the Court, at 11:00 o'clock.

09:37:28 15   Before that, with my three year old who has

16   croup.  So it has been a whirlwind for me.

17         And I appreciate the courtesy that you

18   show and -- as well, certainly, of Mr. Brim, my

19   client, allowing me to appear today and not

09:37:44 20   yesterday.

21         This case is a consumer protection case.

22   It is a Fair Credit Reporting Act case, which is

23   why I would be here from Virginia, which is why

24   Ms. Cauley, despite her Alabama roots, now

09:37:58 25   practices in Florence, South Carolina -- why she

1    is here.  We are full-time consumer protection

2    Fair Credit Reporting Act attorneys.

3         We are working with Mr. Sykstus, Ron

4    Sykstus, who is a Huntsville attorney.  I learned

09:38:16   5    last night that he actually is from Chicago.  But

6    his Alabama wife convinced him to come down here

7    years ago.  I said I wouldn't tell the jury that,

8    but that's where he's from.  He's not from where

9    we're from, but his wife is.

09:38:28  10         He's practiced here for a long period of

11   time.  He does consumer credit, consumer

12   bankruptcy, and the type of work that an

13   individual like the person that matters to us in

14   this case, Mr. Brim, would need.

09:38:40  15         Mr. Brim was born in Tupelo, Mississippi.

16   And I'm from Virginia.  We don't have SEC teams.

17   I don't know if that's good or bad.  But he is

18   from Mississippi.  Came here 11 years ago to go

19   to college.  Graduated with a bachelor of science

09:38:56  20   degree in business management from Alabama A & M.

21   He is now 33 years old.  Going to turn 34 this

22   year.  Mr. Brim is unmarried.  He works currently

23   with Yellow Book, which is a company that

24   distributes the phonebooks.  He oversees large

09:39:14  25   territories.

1          The facts that you've heard, the facts

2     that were stipulated, from our perspective,

3     resolve the most significant parts of this case.

4     This case is about the Fair Credit Reporting Act.

09:39:28  5     That's all it is.

6          The judge at the end of this trial will

7     instruct you as to the law.  This right now is

8     opening.  This is a point which the lawyers can

9     introduce themselves.  Can provide context and

09:39:40 10     background to their client's claim as well as can

11     outline what we expect the facts to be.

12          The big notebook that we're to blame for

13     is sitting on your lap.  That's the plaintiff's

14     exhibits.  Those that the parties have resolved.

09:39:56 15     The Court has already ruled or admitted.  The

16     defendant has a set of exhibits.  I don't know if

17     they have binders for you.  But we're

18     technologically together here in this courtroom.

19     And you'll be able to see the exhibits for both

09:40:10 20     parties on the screens.

21          This case is about the Fair Credit

22     Reporting Act.  The sequencing of the process,

23     the trial -- the way that it works, if you

24     haven't sat through one before, this is opening

09:40:22 25     statement.  I'm barred from arguing the case.

1    The defendant is barred from arguing the case.
2    We're advocates.
3          The way we tell you these objective facts,
4    of course, assume an outcome that we will ask for
09:40:38  5    in the end in our closing.  But opening is where
6    the parties say, here's what we think the
7    evidence will show.
8          Much of you heard -- I will over the next
9    15, 20 minutes outline what we think the most
09:40:48 10    salient or important parts of that evidence will
11    be.  We will put it up on the screen, and I'll go
12    through some of that.
13          But the Fair Credit Reporting Act.  You
14    heard a bit about this, I guess, yesterday.  The
09:41:00 15    core part, without giving you what the law
16    requires, which is for opening -- the core part
17    of the Fair Credit Reporting Act is a dispute
18    right that you have.  It requires, when a
19    consumer makes disputes to the credit reporting
09:41:12 20    agencies, certain actions by the furnisher of
21    credit information.  It is a fail safe.  Mistakes
22    happen.  Right?
23          This was an account that in 2004 my client
24    paid off within a month of when he bought this
09:41:26 25    Dell computer.  And he did it with an electronic

1   checking account.  And he did it.  And he kept

2   his bank statement, which is far more than I

3   could say for much of my conduct in '04.

4           This is now 2011.  This lawsuit was filed

09:41:40  5   in early 2010.  The stipulation of the defendant,

6   the evidence you've just heard, is that it came

7   off only after August, 2010, with the responding

8   contact between Dell and Midland.

9           And in fact, the evidence will tell you it

09:41:56  10   actually came out of his credit report in

11   September of 2010.  Nine months or so, eight

12   months after this lawsuit was active.  The

13   account at issue was a collection account.

14           May we see the screen for our computer,

09:42:18  15   please?

16           You have these in your books.  And as we

17   go through them, you'll have a copy of all that

18   I'm going to put up here.  But I'd like to walk

19   you through it and tell you why I start with this

09:42:34  20   one here.  This is a Dell document -- I mean, I'm

21   sorry.  A Midland document.

22           Midland is a debt buyer.  It buys or

23   accepts debts that the original creditor couldn't

24   collect.

09:42:48  25           In this case, it bought a portfolio debt

from Dell.  Now, it bought this debt in 2007.  It
bought it on that date in a package or portfolio.
And this was the official paper balance.  We know
why Dell can't collect it now as we look back
09:43:06  because it had been paid off within two months of
when it had been charged.  No interest was
recorded, just as a footnote.  Midland assigns
interest by its own -- it picks that number out
of its own choice.  But it's run out of its San
09:43:26  Diego office.

Midland is a part of a company called
Encore.  It is a collection arm of Encore.
You'll hear just a little bit about that.  But it
bought this debt at this point in time when the
09:43:34  statute of limitations -- everybody has some idea
of when this was -- you are not allowed to sue
past the statute of limitation.  This is when it
knew it was going to expire.

As a footnote, the evidence will show that
09:43:48  later when they couldn't collect, when Midland
could not collect by parking it on a credit
report, it tried to unsuccessfully sue in
collection court and had to dismiss it.

And at this point, this is all the --
09:44:02  basically pretty much all the information that

1    Midland had.  It was charged off on this date.

2    This, by the way, is a trade line.  You'll see my

3    client's credit reports.  You have to.  Amongst

4    the other things the evidence will show, he is

09:44:24  5    before you.  You will see all of his personal

6    credit reports.  Not just his bank statements.

7    You'll see the good, the bad the worse.  But this

8    is what you call a trade line.

9         This is what one of the three credit

09:44:36  10   reporting agencies -- there's three national

11   ones -- had in July of '08.  The text you'll look

12   at will be better.  This is a PDF file that's

13   been copied and blown up.  But it was recorded as

14   Midland's account.  It was recorded as a

09:44:52  15   collection account, which is a major derogatory.

16   Past due as of December of 2007.

17        The balance -- and this is basically --

18   you'll see changes that go through the lifecycle

19   of Midland's reporting where it says, modify

09:45:06  20   account.  The main modification is it just keeps

21   increasing its balance.  But this shows up in

22   everyone of my client's credit reports.  Even

23   ones where they note a technical note that my

24   client has made a dispute as a major derog or

09:45:24  25   derogatory, a negative in his credit report.

1    It's not unremarkable.  Anyone would expect a

2    collection account, which is a statement that

3    consumer has not paid their bill to Dell for

4    $1,600, is a derogatory.

09:45:38 5         Now, there will be evidence the defendant

6    offers and we will talk about that predates the

7    July of 2008 period.  And the reason why I'm not

8    is because -- well, I will at the end of this.

9    But we don't believe it is useful to you, but I

09:45:54 10   will tell you some of that evidence.

11        My client had -- before July of 2008,

12   November, November of '07 when Midland took over

13   the collection efforts, had already been through

14   this with Dell.  And had shown the bank

09:46:10 15   statements.  Had made the dispute letters.  Had

16   made credit reporting items.  And by then, by

17   this date, it was off his credit report at Dell.

18        Now July of '08, my client tries to buy a

19   mortgage.  He now owns a mortgage which he

09:46:26 20   received -- he was able to buy a house in March

21   or so of 2009.  You'll see the two major dispute

22   periods at issue in this case surrounded his

23   efforts to buy a mortgage .  So in July of 2008,

24   he has a credit report.  He sees this account.

09:46:44 25   And he begins the dispute process all over again

1    with this defendant now.

2           This letter he writes and he sends by

3    certified mail.  And he includes a copy of his

4    bank statement as well as social security number.

09:47:00    5    He sends it to Experian.  But you have the same

6    thing for Equifax and Transunion.  He keeps the

7    certified mail cards.  He sends this to Midland.

8    A copy of it, as well.  He keeps the certified

9    mailing card.

09:47:16   10           This is the affidavit to get evidence in,

11    a year later from when this trial started.

12    There's been a lot of litigation between the

13    parties about admissibility of evidence and

14    authenticating.  We have to dot our Is and cross

09:47:32   15    our Ts.

16           This is from the bank.  This is the

17    statement he produced again and again and again.

18    And the relevant part of it is right down here.

19    Right here.  Dell Financial.  You'll see it.  In

09:48:06   20    November, 2004, my client, with a telephone

21    check, because he didn't foresee any of this

22    happening, paid it off.  He provided that

23    statement.

24           Now, there is no evidence at all that the

09:48:18   25    defendant ever contacted Redstone; that it ever

1       asked my client for more information; that it

2       ever said, give us an affidavit or anything. And

3       the reason is -- and I'll talk in a moment about

4       it is because the procedures the defendant

09:48:32    5       follows -- the only proof documents that a

6       consumer could give to Midland to convince an

7       account had been paid before Midland got it is a

8       settlement letter from a creditor with a copy of

9       a cancelled check corresponding to that

09:48:50   10       settlement letter. That is unless my client

11      could have had Dell or Midland agree to -- unless

12      my client had agreed to pay off a settlement with

13      Dell or Midland. And provide a letter for that.

14      There was no possibility that Midland would have

09:49:06   15      removed it, by its own written procedures.

16              He does the same thing in March, 2009.

17      And he still has all his hair. Didn't pull it

18      out with the frustration. But he's now been

19      through this for at least four or so years.

09:49:26   20      You'll see documents.

21              These are plaintiff's interrogatories. We

22      serve them. It's one of the pleadings that

23      lawyers can do. You ask questions. The

24      defendant -- they serve them to us. The

09:49:36   25      plaintiff has to answer them. And in this

instance, a couple of them are useful because
they give you the defendant's own view of this.

We asked Interrogatory 2:  Please list the
communications.  State the date of
communications, the author and the contents.
You'll see from the records we contend on the
list that follows have all the communications our
client had with Midland.  But do you really need
more?  These are the communications our client
had with Midland.

We also asked when my client made disputes
to Midland.  These are what the defendant
acknowledges dates of disputes that it received
from our client, the dispute that's at issue in
this case.  There's a few missing.  The Equifax
dispute is not here.  And the lawsuit was filed
before this.  But after the lawsuit was filed,
Midland again verified this and said, yes.  He
owes the debt.

You'll hear and you've already heard
something about a ACDV.  An ACDV.  And if I could
talk to you briefly about what this is.  You'll
here evidence in this regard.

The credit reporting agencies in this
world of automation -- whether you like it or

1    don't, when consumers make disputes to the credit

2    reporting agencies, whether they take it on line,

3    telephone, written letter, it is then reduced

4    into this system called E-Oscar.

09:51:16  5         The major credit bureaus own this company

6    that administers this dispute system.  And

7    electronically, the consumer's dispute is then

8    transmitted to the furnisher.  The furnisher is

9    the lingo in this statute for the creditor that

09:51:34 10    provided the trade line, the account information.

11         So the ACDV is forwarded, and it conveys

12    the substance of the dispute to the furnisher,

13    the creditor.  And the furnisher and creditor is

14    to then investigate.  The Court will later

09:51:48 15    instruct you as to what an investigation and the

16    law requires.

17         This is what it looks like from one

18    perspective.  But you'll see this coming from

19    different credit reporting agencies.  It can look

09:52:00 20    a little bit different.

21         Let's talk about this one first.  You can

22    see it.  You have it in your exhibit book.  The

23    basic layout, this one is from Transunion .  Has

24    the date.  This was the August, 2008.  And it has

09:52:14 25    the information the credit reporting agency

currently has on file, identifying information.
And then this is the information that the
creditor says we have.

In this instance, Midland didn't have our
09:52:26 client's social or date of birth. But it says
whether the information is different or the same.
This is the dispute: Claims paid original
creditor before collection status or paid before
charge-off.

09:52:42 Experian is saying: Midland, you need to
verify the account status, pay rating, current
balance, amount past due, and pay history.

Then you have Midland puts their response:
Verified as reported. Sometimes they will say,
09:53:02 verified as reported. Sometimes they will say,
modify as shown. Typically the modify as shown
is simply changing the dollar amount when you
look at these.

And this gets sent back. This is the
09:53:12 status. Still reporting as a collection account.
There is a technical note which is not --
shouldn't be any surprise, given the consumer
wrote the letters, that Midland is saying the
account information is disputed by the consumer.
09:53:28 Here they say also: Modify account as shown.

1    And the only change is that they're changing the

2    dollar amounts.

3           This is what it looks like from, in this

4    instance, Equifax.  Same concepts.  In this

09:53:44  5    instance, this top row is what was before the

6    dispute was sent to Midland.  And the bottom row

7    is what Midland responded with.

8           So in this instance, the amount current

9    balance went up by a dollar or by six dollars

09:54:00 10    because it was assigning its six percent

11    interest.  And again, it noted account

12    information disputed by the consumer.  But it

13    continued to note that its past due and assigned

14    to internal or external collection which is a

09:54:16 15    major derogatory.

16           You're going to hear -- let me suggest

17    this.  This is -- Alabama has a history of some

18    really good trial lawyers.  And I'm not going to

19    live up to that standard.  This case isn't going

09:54:28 20    to live up to one of the -- it's not going to

21    make the headlines across the country as the most

22    glamorous and exciting case.

23           My client has had to come into federal

24    court to force his credit report to be fixed.

09:54:44 25    Your job, though, in this case might be even less

glamorous.  Because your job is going to consist
of hearing two live witnesses.  The rest --
you're going to hear three videotape witnesses.
And you're going to hear a read witness of the
09:54:58  defendant who is not here right now.  And let me
tell you why.

The federal rules of civil procedure, they
are the rules we all have to live by.  And there
is a limitation on your subpoena power.  That is,
09:55:12  I cannot bring or Ms. Cauley or Mr. Sykstus could
not subpoena someone from San Diego to come out
here to testify from Midland because they're more
than a hundred miles from the courthouse.

Nor can we subpoena Ms. Banks from
09:55:30  Equifax, Ms. Hughes from Dallas, Texas for
Experian, or Mr. Newnom from Fullerton,
California for Transunion.  We can't subpoena
them.

So we are at the -- more importantly, you
09:55:44  are at the -- up to the task of having to hear
some of the testimony -- major parts of it in
this case -- from videotaped depositions that the
parties through their lawyers already took as
well as to hear the defendant's deposition
09:56:00  testimony.

1          Ms. Ross will testify under rule called

2     Rule 30(b)(6).  When you want to depose a

3     corporation so that you don't ransack their whole

4     company and depose the president all the way down

09:56:14  5     to the clerical worker, the way it works is you

6     serve a notice under Rule 30(b)(6).  You list a

7     bunch of topics that you want to ask about.  And

8     the defendant chooses who they're going to put

9     up.

09:56:24 10          Ms. Ross was the 30(b)(6) witness.  And

11     she will speak not on her behalf but on behalf of

12     Midland.  And you'll hear that with -- my

13     esteemed colleagues will read you that transcript

14     as a back and forth.

09:56:36 15          I apologize in advance because it's not as

16     lively as it might be with live witnesses in the

17     same fashion.  But your job becomes more

18     important -- even more important under those

19     circumstances.

09:56:46 20          Now, there is another live witness.  And I

21     also have to apologize.  This individual's name

22     is Gabriel Edrozo.  I've never met him before

23     this morning.  He is from Midland.  He comes in

24     from their San Diego office.  And I don't know

09:57:06 25     much about him.  I may ask questions because he

1    is filling in, I guess, as the witness of

2    Ms. Ross who isn't here.  I understand she had a

3    baby, so she has a fantastic reason not to be

4    here.  But she's not here.

09:57:20  5         So this witness -- I may stumble through

6    examination of that witness.  I apologize in

7    advance.

8         You're going to see Ms. Banks for Equifax

9    in her video.  And the parties have agreed to

09:57:32 10   just play the depositions without inserting a lot

11   of objections so that you can have it -- one of

12   the many things that she'll say -- much of what

13   she's simply saying is what I've just explained.

14        We have ACDVs.  We send them on.  It is an

09:57:50 15   important thing that we want to continue to focus

16   on in our facts.  Is it true that Equifax relies

17   on its data furnishers to provide accurate

18   information regarding on account?  Yes, we do.

19   And is it true in this instance Equifax relied on

09:58:06 20   Midland to provide accurate information regarding

21   Mr. Brim's account?  Yes.  And did Equifax also

22   rely on Midland to investigate -- the answer

23   would be yes if somebody besides myself was

24   working a PDF file.

09:58:20 25        Add this to the agreed facts that Midland

1    agrees it's responsible for the accuracy of the

2    information it reports to the bureaus.  At the

3    end of my -- we're halfway there.

4         At the end of this opening, I will outline

09:58:34  5    a couple of the facts that the defendant may try

6    to offer.  One of them is going to cast blame on

7    anyone other than Midland.  Dell, for example.

8    And in this instance, Equifax testified Midland

9    is responsible for Midland's reporting.  Not

09:58:52  10   Dell.  Not anyone else.  And the stipulation,

11   Midland itself agrees Midland is responsible for

12   Midland's credit reporting.  Not Dell or anyone

13   else.

14        This you'll see this better.  Don't strain

09:59:06  15   yourself.  My 45-year-old eyes moved up to 2.5s.

16   You'll have a better, cleaner copy.  This is

17   called a UDF or an AUDF.  Everything has an

18   automated now.

19        An AUDF is the way that outside the normal

09:59:20  20   investigation process a creditor says, change my

21   trade line or the trade line for our consumer.

22   So at the end -- and you'll look at this -- you

23   can barely make it out.  It will say a date of

24   September of 2010 that Midland finally deleted

09:59:36  25   this account.

1          I like what I do.  And I do nothing but
2    come to federal court on Fair Credit Reporting
3    Act.  But you should not have to come to a
4    federal courtroom to correct your credit report
09:59:54  5    or wait nine months of a lawsuit to do that.
6          This is what the Experian deposition --
7    Ms. Hughes in Texas will testify similarly to
8    Ms. Banks of Equifax and Mr. Newnom for
9    Transunion.  And they're often witnesses in
10:00:10  10    litigation themselves.
11          This is just a -- it's Page 1 through 3.
12    That's the collection history from Midland.  This
13    is their document.  It's three pages.  But it
14    goes up in chronology.  So the next page is the
10:00:28  15    earliest of these events.  You'll see it was
16    assigned or bought, rather, for pennies by
17    Midland in October of '07.
18          They sent letters, offering settlement
19    offers.  The information -- to find out
10:00:42  20    information about our client's ability to pay.
21    And then moved it to try to recover, checking his
22    new addresses.  They then -- this period of time
23    they sent it to a collection firm, an outside law
24    firm, to sue in collection court in Huntsville
10:01:02  25    where my client resides.  Which ultimately was

1   dismissed.

2          Received certified letter from Mr. Brim

3   with a copy of the dispute.  These are their own

4   notes.  Received certified letter or notice,

10:01:18  5   included copy of bank statement, showing the

6   payment to Dell.  Not proof.

7          I'll show you why because we have their

8   procedures.  It's disputed through the credit

9   bureaus.  It is disputed through the credit

10:01:36 10   bureaus.  They continue to make additional credit

11   reporting.

12          Then they received additional dispute

13   calls from Mr. Brim.  And they said -- he said

14   advised sent proof certified and will call back

10:01:52 15   tomorrow.  Again, bank statement showing the

16   payment not proof.  No settlement or paid in full

17   letter included.  Which means the only proof that

18   Midland would accept was one that operated or

19   arose out of a reality that did not exist.  The

10:02:10 20   reality which the consumer was a debtor.  I won't

21   say a dead beat, but someone who owed a

22   collection account and then settled it.  A

23   reality that didn't exist.  How can my client

24   possibly get a settlement letter from Midland or

10:02:26 25   Dell when he had paid the account?

1          Ostensibly, he could have negotiated and

2     double paid it.  And that's what this procedure

3     would have insisted upon.

4          E-Oscar credit reporting.  Lawsuit

10:02:48 5     filed -- now, it was actually filed before this.

6     But this is apparently when it entered their

7     system.  And note that it was that same day that

8     they were still verifying the information, saying

9     to Transunion, our client owes this debt.

10:03:02 10          And no one is claiming -- there's no

11    factual dispute in this case that our client did

12    anything other than pay it November of '04 on

13    time.  It was financed.  It was a credit line.

14    He could have kept paying it on time.  But he

10:03:18 15    paid it in full at that point.

16          You'll hear something about Encore

17    Capital.  We've talked about the plaintiff's

18    efforts.  This is their San Diego office.  I'm

19    sure it's nice.  Encore Capital Management.  This

10:03:38 20    is from its logo.  Subsidiary, Midland Credit

21    Management.  That is the company that is sued in

22    this case.  This is the organizational structure.

23    Encore owns the Midland entity, and Midland does

24    the collection work.

10:03:56 25          This is from the Encore and Midland web

1    site.  We purchase defaulted consumer loans from

2    major banks, credit unions and utilities.  We're

3    headquartered in San Diego.  We have offices in

4    these other areas.  We have one of the industry's

10:04:16  5    largest distressed consumer accounts with

6    approximately 20 million accounts.  You've

7    already heard 8,000 consumers dispute Midland

8    accounts a week.

9         This is from an annual report you'll have

10:04:28 10    as Exhibit 82.  On overview of our business.  We

11    are leaders in consumer debt buying and recovery.

12    We purchase portfolios of defaulted consumer

13    receivables at deep discounts of face value and

14    use a variety of operational channels to maximize

10:04:48 15    our collections from these portfolios.

16         Let's talk about that.  The evidence in

17    this case will show that the defendant tried

18    three operational channels.  It tried what's

19    called dun the consumer.  Send him letters and

10:05:00 20    call.  You'll see letters, which the consumer

21    pushed back, exercising a right that's not at

22    issue here under a different federal law, that

23    says, do not contact me anymore.  Cease and

24    desist.

10:05:10 25         The second operational channel was trying

1    to sue on a debt that, you know, certainly had it

2    gone through would have found in our client's

3    favor but had to be aborted at that point because

4    it was a -- past the statute of limitation.  So

10:05:26  5    that operational channel fell.

6         You have one operational channel left.

7    The evidence will be the operational channel this

8    defendant used was parking on a credit report.

9    Forcing someone who wants to buy a house, like my

10:05:38 10    client, to go get a settlement letter from Dell

11    or Midland to get it off his credit report.

12         This is from Midland or Encore's annual

13    report.  Cost efficiency is central to our

14    collection and purchasing strategies.  There have

10:05:54 15    a lost of cost advantages.  There isn't, by the

16    way, any evidence that there was any collection

17    calls from India in this case.  So that's not

18    relevant to the case.  But there are other cost

19    efficiencies that are outlined.

10:06:08 20         We acquire and service receivables from

21    obligors that have failed to pay and that the

22    seller has deemed uncollectible and written off.

23    The originating institutions generally make

24    numerous attempts to recover on these

10:06:26 25    nonperforming debts, which means it's true you'll

1    hear evidence by the time that my client got to

2    the point where Midland could inflict its own

3    frustration or embarrassment or humiliation on my

4    client, he had already endured this.  Cleaned it

10:06:42  5    up with Dell.

6         In order to operate profitably over the

7    long term, we must continually purchase and

8    collect on a sufficient volume of receivables to

9    generate revenue that exceed costs.

10:06:52  10        These receivables are difficult to

11   collect, and we may not be successful in

12   collecting amounts sufficient to cover the costs

13   associated with these receivables to fund our

14   operation.  If we're not able to collect on these

10:07:02  15   receivables or collect sufficient amounts to

16   cover our costs, this may materially and

17   adversely affect our results of operation.

18        There are a number of other lawsuits,

19   claims, counterclaims pending or threatened

10:07:12  20   against us.  In general, these lawsuits, claims,

21   or counterclaims have arisen in the ordinary

22   course of business and involve claims for damages

23   arising from a variety of alleged misconduct or

24   improper reporting of credit information by us or

10:07:26  25   our employees or agents.

1           This is a chart that is in their annual
2    report.  The cost per dollar collected.  The
3    relevant part of this, this is the cost per
4    dollar collected inhouse.  That is, for every
10:07:46 5   dollar that Midland collects, it only pays 4.2
6    cents.
7           In this instance, cost efficiency, the
8    evidence will show, overwhelmed any other concern
9    or interest about the obligations to comply with
10:08:00 10  the law or our client's rights.  This -- both
11   sides will offer this.  Theirs is, I saw in the
12   manual, colored.  Ours is not.  This is the title
13   of one of their dispute and warning code manuals.
14          Again, there's this law, the Fair
10:08:22 15  Declaration Practices Act.  It's not at issue in
16   the case.  It does control something called a
17   45-day validation period.  You basically, in a
18   debt collection, under the Fair Dec Practices
19   Act -- the FDCPA has strict liability if you --
10:08:40 20  if a creditor or debt collector, rather, doesn't
21   give the consumer a breather of at least 45 days.
22          If the consumer makes a dispute in that
23   period, Midland acknowledges the burden of
24   obtaining proof regarding the dispute is on
10:08:56 25  Midland.  MCM.  Do not even suggest that the

1    consumer needs to provide documentation for a

2    dispute.  After 45 days -- and of course, my

3    client made disputes in 45 days, after 45 days,

4    or the like.  He made disputes.  Many disputes.

10:09:12  5         But after 45 days, this is what Midland's

6    claiming or instructing its employees.  The

7    burden of proof is on the consumer to validate

8    the dispute claim.  Documentation must be

9    provided to move forward with the dispute.

10:09:26 10         Now, the Court will, in closing, allow us

11   to argue the law as to whether it's ever a

12   consumer's obligation to prove a negative.  But

13   the facts, I think, will show that our client

14   gave his best effort throughout this process.

10:09:44 15         On this very bottom part, it's really hard

16   to see except in your book.  It's easy to read.

17   But these are the types of disputes that Midland

18   might have received.

19         And importantly, under account paid, it

10:09:58 20   says -- it instructs the employee the only two

21   types of documents are documents such as a

22   letter, a settlement letter with a cancelled

23   check or some other written confirmation from the

24   creditor that it's been paid.

10:10:52 25         So that if my client had a letter from

1    Dell, then that would constitute -- other than

2    that, there is no proof that would have been

3    allowed by Midland.

4         My client had absolutely -- it's not as if

10:11:04  5    there was some effort or there's any evidence

6    that he failed to go down far enough down the

7    trail.  You, looking back at this with 20/20

8    hindsight, can see -- the evidence will show

9    there was a dead end.  There was no possibility

10:11:20  10   of getting this off.

11        You have these procedure manuals.  They

12   say much the same thing.  They outline 45-day

13   verbal disputes.  And what they tell the employee

14   is the consumer makes a verbal dispute, tell them

10:11:36  15   give it to us in writing.  Written disputes, if

16   it's within 45 days and they provide a front and

17   back of cancelled check and settlement offer --

18   it's not one or the other.  So the settlement

19   letter plus the cancelled check.  Then there is

10:11:54  20   possible supporting document.

21        We cannot argue the law.  You are allowed

22   to use plain English language in your decisions.

23   Investigation, which the judge will instruct you

24   what that means as a matter of the law under the

10:12:14  25   Fair Credit Reporting Act, but investigate under

1    American Heritage Dictionary is defined as a
2    detailed inquiry or systematic examination.
3    Websters, a searching inquiry.
4         At the end of the case, you're going to
10:12:30  5    hear evidence that you will have to determine
6    whether you think that there was such an
7    investigation.
8         You'll hear a deposition read to you by my
9    esteemed co-counsel of Ms. Ross, who was the
10:12:46  10   person most knowledgeable for Midland.  Some
11   relevant portions:  What if a bank statement was
12   received, showing a payment and they can't
13   determine if that's valid?  Is that also sent to
14   do more subsequent investigation?  That document
10:13:04  15   would be considered invalid.  So they would have
16   made the determination that the bank statement
17   was invalid as a proof document.  So a dispute
18   containing a bank statement showing a payment is
19   automatically deemed invalid?  Yes.  Generally.
10:13:18  20   I would say that is true unless there is
21   something else with it or maybe something else on
22   the account that would add to determination.
23   Something else is the settlement letter from
24   Dell.  Essentially, the bank statement would be
10:13:26  25   the acceptance of a collection settlement offer.

1  Yes.

2          You would agree that Midland is

3  responsible for reporting accurate information to

4  the credit reporting agencies regarding specific

10:13:36  5  accounts?  Midland is responsible for its own.

6  And the facts in this case will show Midland

7  knew, yes, it is so responsible, and is

8  responsible for investigating the accuracy of

9  that information.  Yes.

10:13:48  10          Are you aware that Midland is responsible

11  for investigating?  Yes.  And it has to conduct

12  the investigation within 30 days?  Yes.  And

13  these disputes are received via the ACDV?  Yes.

14  You told me 99 percent -- and actually, in her

10:14:04  15  deposition at one point, the Midland

16  representative says 95 percent.  Let's say 95,

17  even though this she said the 99.  So 95 to 99

18  percent of ACDVs are handled electronically

19  through the batch; is that right?  Yes.

10:14:18  20          Let's talk about what that batch is.  In

21  terms of an effective safety valve of systemic

22  inquiry, using the American Heritage definition.

23  Midland to receive these 8,000 weekly disputes

24  has set up a computer program that receives them

10:14:36  25  and its computer automatically responds.  For 95

1    or, arguably, 99 percent of disputes of these

2    8,000 that -- of consumers that have to make

3    Midland disputes, Midland doesn't have a live

4    person look at them.

10:14:56  5         Computers are great.  We have them here.

6    We have them here.  But you will hear evidence in

7    this case that Midland's version of that

8    automated offers zero safety valve.  Not even

9    after nine months of a lawsuit.

10:15:14  10        So the fact that Mr. Brim sent in a bank

11   statement, showing the payment to Dell, Midland

12   did not consider as proof of payment?  Correct.

13   Didn't consider it proof of at least a partial

14   payment?  Correct.

10:15:28  15        I remind you they were showing you the

16   balance with all the supposed interest.  And

17   Midland never contacted Dell?  That's correct.

18        By the way, you'll hear evidence from the

19   defendant as to Dell.  Dell was saying it was

10:15:42  20   still owed.  No effort made to contact Dell.

21   Until August of 2010, by the way, when finally

22   Dell was contacted.

23        The stipulation you've just heard now it

24   came off.  And then August of '08, there's an

10:15:58  25   entry.  Plaintiff's exhibit .  And by the way,

1    sometimes in these -- and I apologize it just

2    happens in litigation.  You'll see references to

3    some exhibits in the depositions that don't

4    correspond with either party's exhibit numbers.

10:16:10  5    The exhibit numbers that matter are the ones that

6    you have in your book.  Those are the only

7    numbers that matter.

8         And the fact that there are asterisks in

9    the ACDV -- remember the Transunion we showed.

10:16:26 10    There's asterisks under employee ID, that's

11    because it was handled electronically by the

12    batch interface system?  Correct.  No actual

13    documents were reviewed.  It's not even that a

14    person was not involved.  No documents were even

10:16:40 15    considered.

16         Transunion was not contacted.  The bank

17    was not contacted to determine whether or not it

18    was a forged bank statement.  It's not.

19         Next.  This means I'm getting near the

10:16:58 20    end.

21         There will be some evidence offered by the

22    defendant that we will characterize as

23    distractions.  Dell.  And by the way, this wasn't

24    May of 2010.  It was August, 2010.  But Dell,

10:17:12 25    will there be any evidence that Dell should be

1    held accountable for Midland's credit reporting?

2    Never contacted.  The evidence is I've already

3    shown you Midland knows its credit reporting, its

4    trade line is its responsibility.  Dell's came

10:17:26  5    off before my client in August of 2008 tried to

6    apply for mortgages again.  And obviously, it was

7    sold for pennies.

8         Why did Dell sell it?  It is a garage sale

9    of debt that Midland wants to hold to some

10:17:42  10    priceless antique value.  Is Mr. Brim

11    responsible?  Well, his credit report is not

12    perfect.  It's not bad.  It's actually really

13    good.

14         But in July of 2008, he had a couple other

10:17:54  15    blemishes.  Nothing as bad as this one.  But he

16    had a late payment on a credit card to G.E. Money

17    Bank.  At one point with one of the reports, he

18    actually had two reports for his brother who is

19    similarly named.  It came off quickly.  And he

10:18:14  20    also had a student loan that was late pay.  But

21    it wasn't -- it's paid.  It was a 500-dollar

22    deal.

23         And there won't be any evidence that

24    should properly distract you.  Where he worked.

10:18:28  25    In his deposition, you can look at one of the

1       Equifax credit reports and back in 2003, 2004,

2       Mr. Brim was a clerk at an adult video store or a

3       store that sold adult videos.  And it shows in

4       his Equifax report -- it's, like, previous

10:18:44   5    employers, Target, Yellow Book, and adult video.

6              And you may hear the defendant argue

7       because before this occurred, we actually thought

8       whether they're allowed to make a point of that.

9       But you may hear the defendant say he worked in

10:18:58  10   an adult video store.  He might have been denied

11      his mortgages because of that.  There's no

12      evidence of that.  But there is evidence in one

13      of his Equifax reports that in 2003, 2004, he was

14      a clerk at an adult video store.

10:19:12  15          Mr. Brim, he also -- is he responsible?

16      He worked for six-and-a-half years to get this

17      off.  Got it off from Dell, and then Midland

18      started all over again.  And Midland,

19      importantly, there is no evidence that Midland

10:19:26  20   ever made any suggestion to him of an alternative

21      way to get it resolved.  All right?

22              Some identity theft instances, a creditor

23      might say, if you send us an affidavit and a

24      police report, that kind of thing, there's

10:19:40  25   nothing comparable in this case.  There is no

1    evidence our client was ever offered any avenue

2    to succeed.

3         Now, this is a case about credit

4    reporting.  It is not a case about a child losing

10:20:00  5    sight or a worker losing an arm in an accident.

6    That's not the case.  And it would be dishonest,

7    not just disingenuous, of any plaintiff's lawyer

8    to tell you that it is the end of the world to

9    have your credit destroyed.  It isn't the end of

10:20:16 10    the world.

11         But the law that you'll hear at the end of

12    the case asks you, requires you to determine a

13    proper way to compensate.  And you're going to

14    have to listen to the evidence in the context of

10:20:32 15    it is about credit reporting for ways that our

16    client was impacted.  And the law will be

17    provided to you.  The range of types of damages a

18    consumer can recover will be part of your

19    instructions.  And they're broad.  But here's

10:20:46 20    what we think the evidence will highlight.

21         First, his credit damage.  Our client

22    obtained a loan in March, 2009.

23         We do not have a Countrywide Mortgage

24    person to come in and testify about why his

10:21:00 25    interest rate was higher , but the evidence will

1     show that we do have here in Florence, Alabama --

2     we do have evidence that there was this long

3     delay.  There were numerous mortgage attempts,

4     inquiries.

10:21:14  5          My client will testify he applied for

6     these mortgages.  In fact, the two dispute

7     periods of Midland in July of '08 and March of

8     '09 were focused on trying to obtain a house.

9     And he was delayed in having done that.  There's

10:21:30 10    no other reasonable explanation for -- that would

11    explain how Midland would not be a factor, an

12    important factor in that delay.

13         There is evidence that he was denied an

14    American Express credit card.  You actually have

10:21:44 15    an affidavit from American Express,

16    authenticating a credit denial letter.  That

17    credit denial letter says it is denied.  His

18    American Express credit application in '09 was

19    denied because of a collection account in his

10:21:58 20    credit file.  There was only one collection

21    account in his credit file at that time.  This

22    one.  At any time in the Transunion file ever.

23    This is the only collection account.

24         And you'll see a period of time where, as

10:22:10 25    the evidence shows, that our client withdrew from

the credit system.  He had spent now at that
point in 2008 -- he had already spent three
years, trying to get it resolved without success,
not provided any alternative.  He's now 33.  But
he had done what he could.

        And there is a period where you show not
just the Capital One credit card application
denial, the inquiry that's not there -- I mean,
that's there.  But also his entire withdrawal
from the credit system in late '08.

        Other economic impact, we will put on
evidence his time.  He will testify that he makes
$17 an hour.  I mean, he's not Donald Trump.  But
that's his money.  That's his time.  That's his
wage that he had to spend, trying to do what the
law, we think at the end you'll be instructed the
law says the defendant was supposed to do.

        And his expenses.  And they're modest
expenses.  Federal Expressing and having to
Midland copies of these documents, certified
mailings, and the like.

        The broader harms:  Frustration, anger,
helplessness, embarrassment, and the impact of
having this debt collector abuse you, as it did,
through its credit reporting operational channel

1    for this period of time.

2           The best part about damages at the end in

3    argument is I don't have any say.  You're going

4    to have to decide.  You're going to have to

10:23:44  5    listen to the evidence and determine what is a

6    proper amount that had my client maybe

7    pre-negotiated this -- you can destroy my credit

8    for the next couple of years, drag me into

9    federal court, expose my data, and do what you've

10:24:02 10    done with the mortgages -- what is a dollar

11    amount that at the beginning, back in '08 Midland

12    and my client could have worked out.

13           This is what it looked like when the

14    lawsuit was filed.  Transunion collection

10:24:18 15    account.  A remark.  The best that he could earn

16    is a remark that says it's disputed.  Not a

17    surprise.  These are Transunion inquiries during

18    this period of time.  That is every inquiry.  And

19    you'll have these reports to look at.  Every

10:24:38 20    inquiry is an attempt by my client to obtain

21    credit.  And he will testify he didn't get any of

22    this.  Not until he got to Countrywide Mortgage

23    in the spring of '09 at his higher rate.

24           There's also something called promotional

10:24:52 25    inquiries.  These are the things that give you

1    junk mail.  But the account review inquiries,
2    these are existing creditors he already has.
3    Insurance company, for example, or this is his
4    annual free credit report.
10:25:04    5         These are his existing creditors that
6    Midland told, through the credit report, he
7    doesn't pay his bills.  This is the American
8    Express denial letter May, 2009.  The only
9    collection for serious delinquency in May of '09
10:25:26   10   in his report, the only one is this one.
11        The law regarding punitive damages, in
12   voir dire some questions were asked.  You have to
13   determine at the end of this the proper standard.
14   The Court will instruct you the proper standard.
10:25:42   15   You have to determine whether or not the facts in
16   this case support it.
17        But one of the pieces of evidence you will
18   look at is the net worth.  The idea that how do
19   you move a giant?  Small pushes?  Its annual
10:26:00   20   report as of Valentine's Day, last week or so,
21   this is the net worth of this debt collector.
22        That's the end.  You have the hardest job.
23   At the end of this case, you have to take all the
24   facts.  And my colleague is an exceptional
10:26:26   25   lawyer.  The defendant isn't rolling over.  But

1    you will hear both sides.  They're different.

2    You've heard the stipulated facts, the evidence.

3    In the end, the Court will instruct you as to the

4    law.  Thank you.

10:26:40    5         This has been a long opening.  Thank you

6    for your patience.  We're going to do what we can

7    to move the trial.  In the end, this is going to

8    be in your hands.  You all matter.  Thank you.

9              THE COURT:  Are you ready?  Are

10:26:54   10   y'all okay over there?  Okay.

11             MR. TOMPKINS:  Good morning again.

12   You did meet me yesterday.  To remind you, my

13   name is Jason Tompkins.  Along with my colleague,

14   Eric Langley, we represent Midland Credit

10:27:22   15   Management.  With us are Gabe Edrozo and Chris

16   Yang.  Both flew in from San Diego.

17             We, too, are disappointed Angelique Ross

18   couldn't be at this trial.  She did have a baby

19   about two weeks ago.  She's out on maternity

10:27:36   20   leave for the next few months.

21             My opening statement is going to be very

22   different than Mr. Bennett's for several reasons.

23   The first is he is a full-time credit reporting

24   lawyer, and he says all he does is go to federal

10:27:48   25   court.  This is my very first jury trial and my

1    first opening statement ever.

2            But beyond that, we believe the evidence

3    in the case will lead to the exact opposite

4    conclusion that Mr. Bennett reached.  And that

10:28:00  5    is, that Midland performed a reasonable

6    investigation of Mr. Brim's disputes.  And that

7    even if the investigation was unreasonable,

8    Midland's actions did not cause Mr. Brim any

9    injury whatsoever.

10:28:14  10            Yesterday in the voir dire, Eric talked to

11    you about factoring and told you that that's what

12    Midland does.  And I know that a couple of you

13    were engineers and mathematicians, and factoring

14    may have a slightly different meaning.

10:28:28  15            In the financial context, it's when one

16    company buys the receivables of another company,

17    usually at a discount, in order to get the

18    selling company immediate cash on hand.  And many

19    times, these are charged-off accounts that the

10:28:42  20    seller has tried to collect and been unable to

21    for sometime.  And they would rather have some

22    discounted amount of money than to continue to

23    try to collect those accounts.

24            Midland purchases a lot of accounts since

10:28:54  25    this is its primary business.  In fact, you will

1   likely hear testimony that Mr. Brim's account was

2   part of at least 64,000 accounts purchased from

3   Dell in that single transaction.

4       And you heard about the percentage that

10:29:10  5   some accounts are purchased for.  I think the one

6   that was displayed was 4.2 percent.  But in

7   absolute dollar terms, it's still a

8   multi-million-dollar deal.

9       These are not worthless accounts to

10:29:24 10  Midland.  They're very important to Midland.

11  They don't make money if the accounts are

12  worthless.

13      When Midland purchases accounts from

14  sellers like Dell, those sellers make certain

10:29:34 15  representations about the accounts; that they're

16  valid, unpaid accounts.  They give us data about

17  the account balances, about the debtor's personal

18  information, name, address, all sorts of

19  information about that account.  And Midland

10:29:54 20  imports that data into its system.

21      In this case, Dell sold its account in

22  2007.  You heard that Mr. Brim paid it in 2004.

23  And we know now that that's true.  But in 2007,

24  when it was sold to Midland, no one knew that was

10:30:14 25  the case.  It was represented as a valid,

1    collectible account.  And Midland imported that

2    data into its system.

3            It wasn't until August, 2010, that Dell

4    received the information it needed to track

10:30:28    5    Mr. Brim's payment.  And at that time, it

6    informed Midland of that fact.  And Midland

7    deleted the account.  And is no longer trying to

8    collect the money.

9            Mr. Bennett has talked about a lot of

10:30:40   10    issues this morning.  But in the end, the case

11    boils down to one question.  Was Midland's

12    investigation of Mr. Brim's account reasonable?

13    And if not, did Midland's actions lead to any

14    injury for Mr. Brim?

10:30:58   15            You're going to hear testimony about

16    Midland's system.  And it's very important that

17    you understand the system.

18            You saw the ACDV forms that Midland

19    receives from the consumer reporting agencies.

10:31:14   20    Transunion, Experian, Equifax.  That is all

21    Midland receives.  And that form was created by

22    the consumer reporting agencies.  And it's

23    transmitted electronically through a software

24    system that the consumer reporting agencies

10:31:30   25    developed.

1          Midland purchased another software system

2     from the consumer reporting agencies, the batch

3     interface system.  And it's adapted it over time

4     to its system, but that system was developed to

10:31:40  5     receive the ACDVs that the CRAs are going to send

6     to Midland.

7          These ACDVs include all sorts of disputes.

8     You can imagine.  Wrong address, wrong balance,

9     not mine, inaccurate social security number; it's

10:31:56 10     my brother, everything.  And when the consumer

11     reporting agencies send the ACDVs, they have

12     certain codes on them.  And there are no

13     documents that come with the ACDVs.  You'll hear

14     the consumer reporting agencies tell you that.

10:32:12 15     It's just that single form of mostly coded

16     information.

17          When Midland's batch interface system

18     receives that form, it compares the information

19     to information that's on the system.  And you

10:32:22 20     will hear testimony that there are -- in

21     Midland's collection system, there are codes that

22     can be put on the account.  And the system reads

23     all these codes back and forth and determines

24     whether the dispute can be resolved through the

10:32:40 25     automated system by comparing information, maybe

updating some information, or whether it needs to
be transferred out for a manual review by Midland
employee.

Mr. Brim's disputes came in to the ACDV,
10:32:58 into the batch interface system, and they were
processed in an automated fashion.  There was
nothing on his account with Midland that
triggered for a manual review.  And there was
nothing in the ACDV that triggered it for manual
10:33:12 review.

Given that there's an interaction between
the two systems in Midland, the collection system
and the batch interface system, the information
contained in the collection system is very
10:33:26 important.

And Mr. Bennett indicated that -- he told
you about the 45-day disputes.  And he indicated
that Mr. Brim submitted a dispute within that 45
days.  But that's not the case.  In fact, when
10:33:46 Midland purchased this account, they sent
Mr. Brim a letter, saying that they were now the
creditor, and he didn't dispute it then.  It was
in October of 2007.  They sent him another letter
in December of 2007.  No dispute.  Another letter
10:34:04 in January, 2008.  No dispute.

1          Midland referred it out to its collection

2     firm, as you've heard Mr. Bennett talk about, and

3     the law firm sent him a letter in April of 2008.

4     No dispute.

10:34:18  5          In fact, it wasn't until July of 2008,

6     nearly nine months after Midland's first letter,

7     that it received a dispute.  And it received a

8     dispute shortly from Mr. Brim and it shortly

9     thereafter received a dispute through the

10:34:42  10    consumer reporting agencies.

11          A dispute from the consumer reporting

12    agencies was just that ACDV.  No attached

13    documents.

14          The dispute from Mr. Brim included his

10:34:50  15    bank statement.  Midland -- a person at Midland

16    looked at Mr. Brim's direct dispute.  Determined

17    that that bank statement was not adequate proof

18    of the payment.  That was coded in the system.

19          So when the automated batch interface

10:35:12  20    system processed ACDV disputes, there was nothing

21    indicating that sufficient proof had been

22    submitted.

23          Now, all these facts were reflected in

24    Midland's system.  And you will hear testimony

10:35:24  25    that had any of these facts differed, there would

have been different codes on the account and the
automated system may have processed it
differently.

In addition to showing that Midland's
10:35:38  investigation was unreasonable, Mr. Brim has to
show that he suffered an injury caused by
Midland's actions.  We've heard about credit
injuries.  We've heard about mortgages.

You won't hear from a single mortgage
10:35:52  company, saying that they denied Mr. Brim credit
much less that they denied him credit based on
anything Midland did.  I don't know that you will
even see any evidence that he was actually denied
any credit by a mortgage company.

10:36:10  What you will see is the letter from
American Express that Mr. Bennett showed you,
denying Mr. Brim a credit card.  I'm sorry I
don't have it blown up like Mr. Bennett had.  But
it states we're unable to open an account for you
10:36:36  at this time for the following reasons.  Your
consumer credit bureau score from Transunion is
too low.  And it lists several factors that could
have contributed to the Transunion credit score.

You will hear testimony from Transunion by
10:36:58  video that an account marked as disputed does not

factor into the credit score.  You'll hear

testimony that Mr. Brim's account was marked as

disputed from the time of his very first contact

with Midland until it was deleted in September of

10:37:22    2010.

You'll hear Mr. Brim testify about stress

and anxiety.  But you won't hear any

corroboration for that testimony.  And if you

look at the timing of Mr. Brim's disputes, you'll

10:37:44    see that they happened every six months or so.

The fact that Midland's investigation did

not yield the results that Mr. Brim believes they

should have is not enough to hold them liable in

this case.  Mr. Brim has to show that some injury

10:38:06    was caused by Midland's actions.  Has to show

that the results would have been different had

Midland done something else.

So what did Mr. Bennett indicate Midland

should have done?  Midland should have contacted

10:38:20    Dell, he said.  But the result would have been

the same.  You'll hear testimony from Dell,

Rachel Garlock from Dell Financial says at the

time Dell Financial Services sold Mr. Brim's

account to Midland, they believed it was due and

10:38:46    payable.  They believed it was due and payable

until August of 2010.

Furthermore, she states had Midland contacted Dell Financial in July of 2008 or March of 2009, times that Mr. Brim disputes, they would have told Midland that this account still had a balance and they had received no proof of payment for the account.

Mr. Bennett also says Midland should have contacted Redstone Credit Union.  The result would have been the same.  A representative of Redstone will be here.  And we expect the evidence to be that had anyone other than Mr. Brim or a cosigner on his account contacted Redstone and asked about a particular transaction, they would have refused to speak to them.

We also expect Redstone to tell you that had Mr. Brim at any time told them that the bank statement was not being accepted by Dell or by Midland as proof of his statement, that they would have provided him with something else.  A transactional detail report.  And it is the very document that Mr. Brim obtained in August of 2010 that allowed Dell to track this payment and resulted in Midland deleting the account.  This

1   is what a transaction detail report looks like.

2   This is the very one that allowed Dell to track

3   this payment.

4          Mr. Bennett also said that Midland could

10:40:44  5   have followed up with Mr. Brim.  But they

6   couldn't.  When Mr. Brim wrote Midland about this

7   account, he asked in every letter that Midland

8   not contact him about -- by phone or in writing.

9          Mr. Bennett indicated there's another

10:41:12 10   statute that's not an issue called the Fair Debt

11   Collections Act.  And you'll hear testimony

12   Midland did not contact Mr. Brim because his

13   demand triggered a duty for them not to.  They

14   could have been in jeopardy of violating some

10:41:32 15   other law.

16          You'll hear evidence, as well, that

17   Mr. Brim has tried to solve this for several

18   years.  He contacted Dell many times.  He

19   submitted his bank statement to Dell many times.

10:41:44 20   He submitted his bank statement to Midland a

21   couple of times.  He submitted his bank

22   statements to the consumer reporting agencies.

23   He never submitted anything else.  You'll hear

24   evidence Dell asked him to submit something else.

10:42:00 25   They asked him to submit a transaction detail

1   report years ago.

2          He filed a complaint with the better

3   business bureau through Dell.  Through the better

4   business bureau, he was told we need a

10:42:14  5   transactional detail report.  He never submitted

6   anything other than his bank statement.

7          Mr. Bennett said that Mr. Brim had to come

8   to federal court to fix his credit report; that

9   there was no possibility of getting this off of

10:42:28  10   his credit report without coming to federal

11   court.  But that's simply not the case.  It

12   didn't take a lawsuit to fix this credit report.

13   It took the transactional detail report.  And

14   that's the only document it took.

10:42:44  15          We sympathize with Mr. Brim.  There's no

16   question now that he paid Dell in 2004.  But when

17   Midland purchased the account in 2007, when it

18   received disputes about Mr. Brim's account in

19   2008 and 2009, all the information available to

10:43:04  20   it would not have changed the fact that it

21   believed it was a valid, collectible account.

22          We believe the evidence will show that

23   Midland's investigations were reasonable.  But if

24   you conclude that the investigations were not

10:43:24  25   reasonable, you have to ask whether Midland's

1   actions caused Mr. Brim any injury.

2           With the number of you who indicated that

3   your hobbies were Alabama football or Auburn

4   football, I probably don't have to explain many

10:43:46 5   plays to you, but it's sort of like a pass

6   attempt.  We believe there was no contact here.

7   But even if there was, you don't call pass

8   interference if the ball is uncatchable.

9           Accordingly, at the end of the case, we're

10:44:00 10  going to ask you to return a verdict in Midland's

11  favor.  Thank you.

12                THE COURT:  Ladies and gentlemen

13  of the jury, we're going to take a morning

14  recess.  And while you're on break, don't discuss

10:44:12 15  the case among yourselves.  And please observe

16  the instruction I gave you yesterday.  That is

17  applicable all through this trial.  And come back

18  in 20 minutes.  Thank you.

19                (Jury excused.)

10:44:38 20                (Short recess.)

21                (In open court.  Jury present.)

22                THE COURT:  Would you call your

23  first witness?

24                MR. BENNETT:  Yes, Your Honor.  If

11:06:56 25  the Court please, for our first witness, I think

```
 1    we would like to call Gabriel Edrozo, the

 2    representative for Midland here.

 3                    THE COURT:  All right.

 4                    (Witness sworn.)

 5                    COURTROOM DEPUTY:  Will you state

 6    your first and last name?

 7                    THE WITNESS:  Gabriel Edrozo.

 8                    COURTROOM DEPUTY:  And will you

 9    spell your last name?

10                    THE WITNESS:  E-D-R-O-Z-O.
```

11                    **DIRECT EXAMINATION**

12    **BY MR. BENNETT:**

```
13    Q      Mr. Edrozo, where to you reside?

14    A      In San Diego.

15    Q      Where are you employed?

16    A      By Midland Credit Management.

17    Q      Is that who's on your paycheck?

18    A      Yes.

19    Q      How long have you been so employed?

20    A      For ten months now.

21    Q      Prior to Midland, how were you employed?

22    A      Prior to Midland, I was with Thornton

23    Financial Industries.  It was a debt buyer, as

24    well.  There for four years.  Prior to that with

25    HSBC, Hong Kong Shanghai Banking Corporation.  I
```

1    was with them for nine years.

2    Q       What is your job title with Midland?

3    A       I am a group manager.

4    Q       Now, I apologize.  You and I just met

11:08:18  5    first time this morning, correct?

6    A       Correct.

7    Q       And you are here today as a potential

8    witness for Midland, as well, not simply for my

9    client to call, right?

11:08:30 10    A       Correct.

11    Q       And so I assume that you have done

12    background, and you've researched -- even though

13    you've only been at Midland for ten months, you

14    have prepared for today, prepared for this week,

11:08:44 15    and have researched the issues in this trial?

16    A       Yes.

17    Q       And as a group leader, you would be, in

18    part, responsible for understanding, helping

19    implement the dispute procedures that Midland

11:08:54 20    uses?

21    A       Not within my standard role with the

22    company.  No.

23    Q       But you prepared for that for today?

24    A       Yes.

11:09:02 25    Q       You're familiar with the procedures that

1    are at issue in this case?

2    A       Yes.

3    Q       If we could -- well, let me before I do

4    that, let me ask a few things.

11:09:12  5           Again, as the representative of Midland,

6    are you aware of anything that occurred with

7    respect to how my client was treated by Midland

8    that was contrary to Midland's standard operating

9    procedure?

11:09:26 10   A       Can you repeat the question?

11   Q       Sure.  Are you aware of anything about the

12   way that my client was treated, Mr. Brim was

13   treated, that was contrary to Midland's standard

14   operating procedure?

11:09:36 15   A       Nothing I'm aware of, no.

16   Q       And in fact, everything that Midland did

17   with respect to my client was in accordance with

18   its intended procedures?

19   A       Correct.

11:09:46 20   Q       And those procedures, if my client -- if

21   this happened again, if Dell did the same

22   reporting, if Midland received the same

23   information, and my client went through the same

24   dispute process over another Dell account he had

11:10:02 25   paid off, your procedures, even after this

1  lawsuit, are unchanged, correct?

2  A       As respect to specifically to ACDV?

3  Q       As a way to handle my client's account

4  category of disputes; that is, if the facts were

11:10:18  5  to play out again in 2011 through 2013, Midland

6  would expect the same outcome through Mr. Brim or

7  for other consumers, as well?

8  A       I believe there are changes to that

9  process.

11:10:34 10  Q       Really?  What were those changes?

11  A       I believe there are changes to the process

12  of a written dispute.  But I would have to defer

13  to Angelique's testimony on that.

14  Q       Okay.  Now, in opening, your company spent

11:10:50 15  a little bit of time talking about something

16  called a transactional detail?

17  A       Yes.

18  Q       You're prepared to talk about that?

19  A       Yes.

11:11:06 20  Q       This is the exhibit book that you prepared

21  for -- this is Midland's exhibits.  You have seen

22  this before today?

23  A       I have, yes.

24          MR. BENNETT:  May I offer this?

11:11:20 25          THE COURT:  Did you say -- what

1   did you say?

2                    MR. BENNETT:  Your Honor, may I

3   show just the book to the witness?

4                    THE COURT:  Yes.  For the record,

11:11:32   5   it is admitted.

6   **BY MR. BENNETT:**

7   Q       This is the copy your lawyers gave me.

8   There is some better business bureau discussion

9   in there.  Have you reviewed that before?

11:11:46 10   A       I have not.

11   Q       But it also has the procedures.  All of

12   these procedures.  The ones I've put up here and

13   other procedures for Midland in there.  You've

14   seen those, correct?

11:11:56 15   A       Yes, I have.  Correct.

16   Q       Can you help the jury and we can pull one

17   up on the Elmo -- show us where it discusses this

18   idea if a consumer provides -- I think you said a

19   transactional detail that that's sufficient

11:12:12 20   proof?

21   A       Where it shows --

22   Q       Anywhere.  Any of the procedures that

23   match in the computer?

24   A       Within the training documentation, it

11:12:28 25   indicates the front and back of a check.

```
 1    Q        By itself?  Is that what it says?
 2    A        As well as a copy of a paid letter from
 3    the originator.
 4    Q        As well as a copy -- Ms. Cauley, can you
11:12:38  5    please pull up Plaintiff's Exhibit 35 on the
 6    monitor for the jury?  And you also have it up
 7    there, correct, sir?
 8    A        I don't.  My monitor is blank.
 9    Q        Page 3.  This is the module six disputes
11:12:54 10    and warnings.  That's your procedures, right?
11    A        Yes.
12    Q        All right.  Now, on that bottom left-hand
13    corner where I embarrassed myself in front of the
14    jury trying to read it, you can read it now,
11:13:04 15    right?  Number 3 under proof required for
16    accounts outside the validation period for
17    accounts paid disputes?
18    A        Yes.
19    Q        And, of course, the rhetorical, there is
11:13:20 20    no mention of this idea if a consumer obtains
21    some deeper document from a bank, whether its
22    transactional detail or something else, that's
23    not mentioned in your procedures, right?
24    A        No.  Our procedures are specific to the
11:13:34 25    front and back of a check.
```

1          THE COURT: I'm sorry. Would you

2     speak up? I can't hear you.

3          THE WITNESS: Okay. I will.

4          THE COURT: Okay. You said what,

11:13:40  5     now? Our procedures are specific to the front

6     and back of a check?

7          THE WITNESS: Front and back of a

8     check, yes.

9     **BY MR. BENNETT:**

11:13:46  10    Q      Can you read for me, then, under Number 3

11    if a consumer disputes by saying the account has

12    been paid, what documents does Midland's

13    procedures allow as a means to -- for a consumer

14    to obtain correction of an inaccurate paid item?

11:14:04  15    A      Are you referring to Three?

16    Q      Sure. Unless you have a better idea.

17    A      Which Three? The mouse is moving to the

18    other side of the screen.

19    Q      How about this? Do we have our black

11:14:16  20    volume? The jury already has our black volume.

21    Page 3. They can look at it. Let's be fair to

22    you. So the jury has that same Exhibit 35, Page

23    3. Exhibit 35, Page 3. Bottom left hand. When

24    a consumer says the account is paid on Page 3 of

11:15:06  25    that exhibit -- I think it's the next page. I

1     want to make sure everybody has it.  Bottom

2     left-hand corner, what document does Midland's

3     procedure allow a consumer to use or provide a

4     consumer could use as a means to obtain

11:15:26  5     correction of a paid in full account?

6     A     A copy of a paid letter, a copy of a

7     settlement offer, and front /back of cancelled

8     check.

9     Q     Now, you've been in banking industry for

11:15:40  10    how long?  Finance industry?

11    A     It's been, now, 15 years.

12    Q     And when did you first learn about what a

13    transactional detail is?

14    A     That was more recent within the last five

11:15:56  15    months.

16    Q     As in the litigation in this case?

17    A     Yes.

18    Q     The first time you ever heard of

19    transactional detail, despite your 15 years in

11:16:06  20    the finance industry, was in the litigation in

21    this case, correct?

22    A     Correct.

23    Q     Do you have a bachelor of science in

24    business like my client?

11:16:18  25    A     I do not.

```
 1    Q       What's your degree in?

 2    A       I do not have a degree.

 3    Q       Since you're on 35, on that same page, in

 4    fact, Page 3, look at the top right-hand corner.

 5    It says for consumers that -- for any -- all

 6    disputes that occur outside the first 45 days of

 7    your client buying the account, it says burden of

 8    proof equals consumer.  Do you see that very top

 9    heading?  Burden of proof equals consumer?  Do

10    you see that?

11    A       Yes.

12    Q       And could you turn to the page just before

13    it?  Page 2 of this exhibit?  On the top right,

14    it says, again, outside this 45-day period, do

15    you see where it says burden of proof is on the

16    consumer to validate the dispute claim.  Do you

17    see that?

18    A       Yes.

19    Q       Do you have any idea where Midland gets

20    this idea that it's somehow the consumer's burden

21    to proof the validity or invalidity of a debt

22    your client has bought for pennies from Dell

23    Financial?

24    A       I don't know.

25    Q       You don't know?
```

```
         1   A        I don't.
         2                  MR. BENNETT:  I don't have other
         3   questions.  I appreciate your courtesy.  I
         4   understand that I've not had a chance to examine
11:17:54 5   before or you answer.  I thank you.  Answer any
         6   questions that your counsel has.
         7                  THE COURT:  Any questions?
         8                  MR. LANGLEY:  No questions at this
         9   time.
11:18:00 10                 THE COURT:  Thank you so much.
        11   Wait.  Do y'all have any questions?  I forgot to
        12   ask you.  You know, I told you you could ask
        13   questions.  Do you need just a short break to
        14   think about it?  Just write them down.  You can't
11:18:14 15  ask them orally.  Just write them down and give
        16   them to Tammi.  I need to go get my glasses
        17   anyway.  Just remain seated, sir.
        18                  (Short recess.)
        19                  THE COURT:  Do you have the
11:21:58 20  questions?  I need to see the lawyers in
        21   chambers.
        22                  (Bench discussion in chambers out
        23   of presence and hearing of jury.)
        24                  (End of bench discussion.)
11:24:02 25                 (In open court.  Jury present.)
```

1                    THE COURT:  Okay.  One question.
2      It's the first question.
3           The plaintiff's attorney inquired whether
4      the policy or procedures had changed at Midland.
11:24:32 5   Never heard the answer.  Will you repeat your
6      answer, please?
7                    THE WITNESS:  My answer is I
8      believe there had been some changes.  But I would
9      have to defer to Angelique's deposition.
11:24:40 10                  THE COURT:  You talking about
11     Ms. Ross?
12                   THE WITNESS:  Ms. Ross.  Angelique
13     Ross.
14                   THE COURT:  And then the next
11:24:46 15  question is:  Is Exhibit 35 the same today as it
16     was in -- on May the 3rd, 2010?
17                   THE WITNESS:  I am not sure.
18                   THE COURT:  Okay.  After a lawsuit
19     was filed, you stated some changes were made in
11:25:20 20  how disputes were handled within the company.
21     Can you elaborate?
22                   THE WITNESS:  I cannot, no.
23                   THE COURT:  Okay.  Now, did you
24     hear it?  Because I mean, Mr. Edrozo looked at
11:25:30 25  me.  Did you hear the answers?  Okay.  Thank you.

1   You may step down.  Thank you, sir.

2              (Witness steps down.)

3              THE COURT:  Can you call your next

4   witness, please?

11:26:00  5              MS. CAULEY:  We would like to call

6   Angelique Ross by deposition.

7              THE COURT:  Are you going to read

8   the questions?

9              MS. CAULEY:  I am.

11:26:10 10              THE COURT:  And Mr. Sykstus,

11   you're going to be Angelique Ross?

12              MR. SYKSTUS:  Just for today.

13              THE COURT:  You would consider

14   that as if Ms. Ross was here in person,

11:26:20 15  testifying in front of you.

16      And are you making the deposition

17   available for Cheryl?

18              MR. BENNETT:  We are, Your Honor.

19   Yes, Your Honor.

11:26:54 20           (Discussion off the record.)

21              MR. BENNETT:  Your Honor, what

22   we're going to attempt to do because there are

23   different exhibit numbers for the deposition,

24   we're going to do our best to put the correct

11:27:08 25  ones with the Court's exhibit number up on the

1   screen.

2                   THE COURT:  Okay.

3                   **DIRECT EXAMINATION**

4   **BY MS. CAULEY:**

11:27:38  5   Q      Please state your name for the record.

6   A      Angelique Danielle Ross.

7   Q      The reason you've been put up for

8   deposition are the experience and duties you have

9   for the FCRA?

11:27:46 10  A      Yes.

11  Q      Do you understand that you are testifying

12  here on behalf of Midland Credit Management?

13  A      Yes.

14  Q      You're an employee of Midland Credit

11:27:54 15  Management?

16  A      Yes.

17  Q      And, in fact, is it true that Midland

18  Funding has no employees?

19  A      That's true.

11:28:00 20  Q      Midland Funding is the owner of the debt

21  that was purchased with respect to Mr. Brim?

22  A      Yes.

23  Q      And all accounts are actually purchased by

24  Midland Funding, L.L.C.; is that right?

11:28:12 25  A      Yes.

|   |   |   |
|---|---|---|
| | 1 | Q       But all employees who have any |
| | 2 | responsibility with respect to collecting or the |
| | 3 | handling of disputes through the credit bureau |
| | 4 | are employed by Midland Credit Management? |
| 11:28:24 | 5 | A       Yes. |
| | 6 | Q       Can we agree for purposes of the |
| | 7 | deposition that if I use the term, "Midland," I |
| | 8 | am referring to Midland Credit Management? |
| | 9 | A       Yes. |
| 11:28:34 | 10 | Q       You already gave us your name.  Will you |
| | 11 | give us your address, please? |
| | 12 | A       8875 Arrow Drive, Suite 200, San Diego, |
| | 13 | California 92123. |
| | 14 | Q       And what position do you hold at Midland? |
| 11:28:56 | 15 | A       I am the consumer relations manager. |
| | 16 | Q       How long have you held that position? |
| | 17 | A       A little over four years. |
| | 18 | Q       Who is your supervisor at Midland? |
| | 19 | A       Juan Naves. |
| 11:29:08 | 20 | Q       What is his title? |
| | 21 | A       General counsel. |
| | 22 | Q       Besides working at Midland, have you |
| | 23 | worked at any other employer where you had any |
| | 24 | responsibilities with respect to the Fair Credit |
| 11:29:22 | 25 | Reporting Act? |

1    A        No.

2    Q        Prior to being employed by Midland, have

3    you ever had any training regarding the Fair

4    Credit Reporting Act?

11:29:26  5    A        No.

6    Q        When a dispute comes in from a consumer to

7    Midland and it is a dispute regarding whether or

8    not they owe the account or owe the debt, what

9    department would that dispute go to for review?

11:29:44  10    A        Any review of the dispute would come to

11    consumer relations.

12    Q        Are you familiar with the term, "ACDV"?

13    A        Yes.

14    Q        When ACDVs come in to Midland, are those

11:29:58  15    handled by the consumer relations department?

16    A        Yes.

17    Q        No other department at Midland would be

18    responsible for responding to ACDVs?

19    A        No.

11:30:06  20    Q        Tell me what your duties are as the

21    consumer relations manager.

22    A        I manage the consumer relations staff

23    which include managing workload and workload

24    assignments in addition to responding to some

11:30:20  25    escalated consumer issues.

1    Q       What are the duties for the consumer

2    relations supervisors?

3    A       They first have to manage the consumer

4    relations liaisons directly.  They also respond

11:30:32  5    to escalated consumer issues.  They also may

6    answer questions from their team members.

7    Q       The liaisons, are those individuals

8    responsible for handling the ACDVs?

9    A       Yes.

11:30:44 10    Q       Do they have any other duties?

11    A       Yes.

12    Q       What are those?

13    A       They process consumer correspondence and

14    answer consumer phone calls.

11:30:52 15    Q       So any time they're responding or sending

16    out correspondence to a consumer, it would be in

17    response to either a telephone call or a letter

18    from that consumer concerning some type of

19    dispute?

11:31:06 20    A       That's correct.

21    Q       So the liaisons actually answer the

22    telephone calls that come in from consumers?

23    A       Yes.

24    Q       And then they process mail that comes in

11:31:16 25    from consumers?

1    A        Yes.

2    Q        And then they are responsible for sending

3    correspondence out to consumers?

4    A        Yes.

11:31:22  5    Q        And they also handle ACDVs?

6    A        Yes.

7    Q        And there are seven liaisons currently?

8    A        In the San Diego site, there are seven.

9    Q        How many other sites for Midland have

11:31:36 10    consumer relations department?

11    A        One.

12    Q        What is that site?

13    A        St. Cloud, Minnesota.

14    Q        How many do they have?

11:31:42 15    A        There are five full-time liaisons and one

16    liaison that splits her time between consumer

17    relations and another department.

18    Q        Does the St. Cloud site also handle ACDVs

19    that come in?

11:31:54 20    A        Yes.

21    Q        So ACDVs are actually handled at two

22    separate sites, then?

23    A        Yes.  The majority are handled by the St.

24    Cloud team.

11:32:04 25    Q        And in this case, Mr. Brim's account was

1    related to a computer purchase.  So all of his --

2    all his ACDVs would have been handled by the St.

3    Cloud site?

4    A       Either the St. Cloud site or our automated

11:32:20  5    system, yes.

6    Q       And what automated system does Midland

7    use?

8    A       We use a batch interface.

9    Q       How does that work?

11:32:28  10    A       When a ACDV comes in, we use an E-Oscar

11    system, our automated system can look in or look

12    at the ACDV, match it, compare it to our account

13    system information, and respond to the majority

14    of the ACDVs.

11:32:42  15    Q       Can you give me your best judgment on what

16    percentage of ACDVs are handled exclusively by

17    the batch interface?

18    A       I would say maybe 95 percent.

19    Q       So I make sure I understand, when a ACDV

11:32:58  20    comes in, the batch interface system can review

21    the computer codes on the ACDV and compare the

22    information contained on the ACDV with the

23    information in Midland's system, and

24    automatically verify that the information is

11:33:12  25    accurate?

1   A       Yes.

2   Q       If the consumer's letter says cease

3   contact or there is a cease and desist letter as

4   well as a dispute, no request from Midland

11:33:26  5   regarding additional documentation is sent?

6   A       Correct.

7   Q       Is that the same whether it is a general

8   dispute, a paid prior dispute, or a fraud

9   dispute?

11:33:36 10   A       Yes.

11   Q       So that's Midland's policy with respect to

12   any dispute; if it is a writing outside the 45

13   days and it includes a cease and desist contact,

14   then the account is simply marked as disputed and

11:33:50 15   a no-contact code is entered and no letter from

16   Midland is ever sent to the consumer?

17   A       Yes.  As long as the consumer is not --

18   does not mention credit reporting.  As of the

19   time frame of this account, that's what would

11:34:04 20   have happened, yes.

21   Q       During the time that Mr. Brim was sending

22   his letters, that is what would have happened?

23   A       Yes.

24   Q       Is that different now?

11:34:24 25   A       Yeah.  As of July 1st, yes.

1    Q        What is the procedure now?

2    A        Now if the consumer requests a cease and

3    desist and did not provide documentation, a

4    letter will go out, stating that we need more

11:34:38   5    information but also include information that

6    says, per your request, we will not contact you

7    any further.

8    Q        Who is responsible for that change in

9    policy?

11:34:46   10    A        The compliance department.

11    Q        Any changes with respect to the handling

12    of ACDVs?

13    A        No.

14    Q        Going back to 2008 and 2009, if a consumer

11:35:00   15    sent in a written dispute, regardless of what the

16    dispute was, and it did contain some

17    documentation, how was that dispute handled?

18    A        It would depend on the documentation that

19    was received.

11:35:12   20    Q        What about with respect to a paid prior

21    dispute?

22    A        We may receive paid letters.

23    Q        Like a paid-in-full letter?

24    A        Yes.

11:35:24   25    Q        Okay.

1    A        We may receive settlement offer letters

2    with copies of proof of payment.  Sometimes we

3    receive cancelled checks.  We receive bank

4    statements.

11:35:36  5    Q        Who reviews the documentation that is sent

6    in?  Who reviews the documentation that is sent

7    in with respect to a dispute?  Is that the

8    consumer relations department?

9    A        Yes.

11:35:50 10    Q        Does the department open the letter and

11    deal with the letter or is it scanned and sent

12    electronically?

13    A        We get the hard copies of the

14    correspondence so the letters are actually opened

11:36:00 15    and read.  The hard copies.

16    Q        In consumer relations?

17    A        Yes.

18    Q        Regardless of whether it is in San Diego

19    or St. Cloud, a consumer relations employee will

11:36:12 20    actually open the mail and read the letter?

21    A        The mail is opened by our mailroom.  But

22    the consumer relations team, either site, they're

23    responsible for reading the letter.

24    Q        Does the letter go to consumer relations

11:36:24 25    as the actual letter or is it scanned?

1    A       It is the actual letter.

2    Q       What is done with it after consumer

3    relations sees it?

4    A       After it is received and reviewed, any

11:36:36  5   dispute letters will then be scanned after they

6    have been processed.

7              MS. CAULEY:  For the record, Your

8    Honor, we're going to be referring to Pages 168

9    and 169, which is Plaintiff's Exhibit 34.

11:37:12 10            THE COURT:  Okay.

11   **BY MS. CAULEY:**

12   Q       Pages 168 through 169, that's the

13   guidelines for handling written disputes that it

14   has been paid prior; is that correct?

11:37:24 15  A       Correct.

16   Q       The liaison is to review the account and

17   verify that the social, name, and address match?

18   A       Yes.  If they can.  Consumers don't always

19   include all the information on their

11:37:50 20  correspondence.

21   Q       They're also looking for proof.  Here it

22   says it could be the front and back of a

23   cancelled check with a settlement offer letter or

24   paid letter with a matching account number?

11:38:00 25  A       Yes.

1    Q        Are there any other documents that help

2    consumer relations liaisons determine what is

3    sufficient proof with respect to the accounts

4    with a paid prior?

11:38:12    5    A        Say that again.

6    Q        Sure.  It has two examples of what would

7    constitute proof of a paid prior dispute on Page

8    168, right?

9    A        Correct.

11:38:24    10    Q        Is there any other document or memo or

11    guideline that would help a liaison know what

12    other proof would be acceptable with respect to

13    Midland?

14    A        No.

11:38:36    15    Q        There is no list of other documents that

16    would be accepted as proof that an account had

17    been paid prior?

18    A        Not that I am aware of.

19    Q        Is a bank statement showing payment to the

11:38:48    20    original creditor sufficient proof that the

21    account had been paid prior?

22    A        No.

23    Q        Never?

24    A        Not by itself, no.

11:38:56    25    Q        On Number 5, it says if unable to

1    determine if proof is valid, account will be

2    referred to ACQ.

3    A        It stands for acquisitions.

4    Q        Do you have any knowledge what happens

11:39:14  5    when an account is assigned to the acquisitions

6    department?

7    A        Yes.

8    Q        What happens?

9    A        Like in this case, if an account is

11:39:24  10    assigned to them, they may follow up, go back to

11    the seller of the account to ask questions

12    related to whatever the issue is.

13    Q        If the proof is determined sufficient,

14    then a warning code, 286, is entered on the

11:39:36  15    account; is that correct?

16    A        Correct.

17    Q        Then the reporting of the account to the

18    credit bureaus would stop and the account would

19    be deleted?

11:39:46  20    A        Correct.

21    Q        If the proof is determined insufficient,

22    then warning code of 130 is added to the account?

23    A        It is actually the 286, and the 130 would

24    be added at the same time.  So the 130 is added

11:40:00  25    when that consumer is provided documentation and

1    the account is being deleted.

2    Q       If the proof is deemed not sufficient and

3    it is assigned to acquisitions, then neither of

4    those warning codes would be entered on the

11:40:14  5    account?

6    A       That's correct.

7    Q       In the comments on Page 169 for Step 5, it

8    says, assign account to the CPL queue.  What is

9    CPL queue?

11:40:26  10   A       It is a designated location in our system

11   which indicates the account should be deleted.

12   Q       Is the account deleted from Midland's

13   system all together or just from the credit

14   bureaus?

11:40:40  15   A       From the credit bureaus.

16   Q       It would only be assigned to the CPL queue

17   if the proof provided was deemed valid by

18   Midland?

19   A       Correct.

11:40:50  20   Q       Let's go to the next comment.  It says,

21   forward proof to acquisitions for possible put

22   back.  Is that what happens if the proof is not

23   sufficient?

24   A       That actually happens if the proof is

11:41:02  25   sufficient.

1    Q        What does that mean forward proof for

2    possible put back?

3    A        There is a period of time in which the

4    account can be sent back to the seller if Midland

11:41:12  5    received proof that it was valid and no longer

6    collectible.  So the information would be sent to

7    acquisitions to see if they should give that back

8    to the seller.

9    Q        Then the next comment, send the consumer a

11:41:26 10    QCDT letter, which is the deletion letter.

11    That's only done if the proof was determined to

12    be valid?

13    A        Correct.

14    Q        Are there any comments that tell you what

11:41:38 15    happens if the consumer relations liaison is

16    unable to determine if the proof is valid?

17    A        Yes.  If the consumer relations liaison is

18    unable to determine that the proof is valid, then

19    they would go to Step 6 through 9.

11:41:52 20    Q        So the account is not sent to

21    acquisitions, or is it?

22    A        It would be sent to acquisitions.  It is

23    not the actual account itself.  It is more the

24    document is sent to acquisitions.

11:42:04 25    Q        And the account is also assigned to PDPQ?

1    A        Correct.

2    Q        And what does that stand for?

3    A        It is a written dispute outside of the 45

4    days where the consumer has disputed that the

11:42:16  5    account has been paid prior.

6    Q        For any paid prior dispute that is

7    received in writing where the consumer relations

8    department is unable to determine if the proof is

9    valid, the account should be assigned to the

11:42:36 10    PDPQ; is that correct?

11    A        Yes.  If they were unable to determine if

12    it's valid.  For example, if it was missing an

13    account number and it was a paid letter, that is

14    something they would put in that, assign to that.

11:42:48 15    Q        What if it is a bank statement received,

16    showing a payment and they can't determine if

17    that is valid?  Is it also sent to the PDPQ?

18    A        That document would be considered invalid.

19    So they would have made a determination that it

11:43:02 20    was invalid.

21    Q        So a dispute containing a bank statement

22    showing a payment is automatically deemed

23    invalid?

24    A        Yes.  Generally, I would say that is true

11:43:14 25    unless there is something else with it or maybe

1    something else on the account that would add to

2    the determination.

3    Q      So any letters that are received from

4    consumers disputing an account as paid prior that

11:43:26  5    contain a bank statement would not be assigned to

6    the PDPQ?

7    A      Unless there was something else on the

8    account that would make the liaison believe it

9    should be.  I would say 99.9 percent would not be

11:43:42  10    assigned to the PDPQ.

11    Q      If an account is assigned to the PDPQ,

12    then it stays in that queue until the dispute is

13    resolved; is that correct?

14    A      Yes.

11:43:54  15    Q      If the dispute is not resolved in 120

16    days, the account automatically moves through a

17    process into the PDRQ?

18    A      Yes.

19    Q      And all reporting on the account is

11:44:06  20    stopped?

21    A      Yes.

22    Q      That was the policy that existed in 2008

23    and 2009 for Midland?

24    A      Yes.

11:44:14  25    Q      That's the same policy that exists today?

1  A      Yes.

2  Q      Are you familiar with the term,

3  "interrogatories"?

4  A      Yes.

11:44:28  5  Q      As part of your responsibilities as the

6  manager of consumer relations, did you sign the

7  interrogatories on behalf of Midland?

8  A      Yes.

9  Q      Did you review the documents produced by

11:44:42  10  us prior to your deposition today?

11  A      Yes.

12  Q      Page 54.  Your reporting of accounts is

13  done by Midland Credit Management; is that

14  correct?

11:45:20  15  A      Correct.

16  Q      With respect to Midland, Midland does not

17  use any type of outsourced vendors for the

18  handling of ACDV?

19  A      No.

11:45:28  20  Q      You would agree that Midland is

21  responsible for reporting accurate information to

22  the credit reporting agencies regarding specific

23  accounts, correct?

24  A      Correct.

11:45:38  25  Q      Would you agree that Midland is

1    responsible for the accuracy of the information

2    that it reports specifically to the credit

3    bureaus?

4    A      Correct.

11:45:46 5    Q      I believe you told me earlier that you are

6    familiar with the Fair Credit Reporting Act?

7    A      Yes.

8    Q      Are you aware that Midland is responsible

9    for investigating the disputes received on an

11:46:02 10   account to the credit reporting agents?

11   A      Yes.

12   Q      And Midland is responsible for conducting

13   that investigation within 30 days?

14   A      Yes.

11:46:12 15   Q      Those disputes are all received via the

16   ACDV through the credit bureaus?

17   A      Yes.

18   Q      You told me 99 percent of ACDVs are

19   handled electronically through the batch; is that

11:46:26 20   right?

21   A      Yes.

22   Q      If an ACDV is not handled automatically

23   through the batch system, are there steps

24   contained in any type of manual or policy,

11:46:36 25   whether it is printed or just a note on the

1    system, that tells an individual in consumer

2    relations how to investigate that credit dispute?

3    A      Well, as far as using the actual system,

4    there is a tutorial that is available through the

11:46:50  5    E-Oscar system to show them how to actually put

6    information in.  Other than that, we just have

7    some screen prints that show the screen in order

8    to find the information on our system.

9    Q      Does that E-Oscar tutorial help the

11:47:04  10   employees know how to perform or respond to an

11   ACDV that is received through E-Oscar?

12   A      No.  Well, it shows them the choices they

13   have to respond.  But it is more or less a user

14   guide of how to use and navigate through the

11:47:18  15   E-Oscar system itself.

16   Q      So the tutorial doesn't explain to the

17   consumer relations employee how to actually

18   conduct an investigation with respect to an ACDV,

19   but basically gets them the drop-down menus of

11:47:32  20   what codes are available for responding; would

21   that be fair?

22   A      Yes.

23   Q      Once an ACDV is actually completed and

24   returned to the credit bureau, there is no

11:47:42  25   internal monitoring of whether those responses

1   were correct?

2   A      No.

3   Q      How many disputes does Midland normally

4   get, say, per week of -- for ACDV?

11:47:54  5   A      I would say maybe about 8,000.

6   Q      Would that be the same pretty much every

7   week?

8   A      Yeah.

9   Q      Then if my math is right, five percent of

11:48:02 10   that would be about 400 are actually handled by

11   an individual in the consumer relations

12   department per week?

13   A      Yeah.  I guess that is about right.

14   Q      Have those numbers been the same from 2008

11:48:16 15   to today?

16   A      I would say approximately the same.

17   Q      I understand they might go up slightly.

18   But overall, they've been about the same since

19   January of 2008?

11:48:26 20   A      Yes.

21   Q      And you've actually been the manager of

22   the consumer relations department since January

23   of 2008?

24   A      Yes.

11:48:36 25   Q      If you go to the next letter, which is

1    Page 3, this is actually a letter that Mr. Brim

2    sent in to Midland.  And it is dated July 29th,

3    2008.

4          And for the jury, that is Exhibit 11 in

11:48:58  5    our notebook.

6    A      Correct.

7    Q      It was received on August 5th, 2008 by

8    your department?

9    A      Correct.

11:49:30  10   Q      Attached to that letter was a bank

11   statement from Redstone Federal Credit Union?

12   A      Correct.

13   Q      In this letter, Mr. Brim indicated he

14   disputed the debt; is that right?

11:49:40  15   A      Yes.

16   Q      And he disputed the debt because the debt

17   was paid on November 8th of 2004?

18   A      Yes.

19   Q      And indicated in his letter, he was -- and

11:49:54  20   indicated in his letter, he was included a

21   detailed report from his bank statement, showing

22   the payment and transaction letter?

23   A      Yes.

24   Q      He also requested no further communication

11:50:04  25   by phone or in writing from Midland?

```
 1   A       Yes.

 2   Q       As a result of that cease and desist

 3   request, no additional letters were ever sent to

 4   Mr. Brim?

 5   A       Correct.

 6   Q       Do you know which employee received this

 7   letter?

 8   A       According to the notes, Melanie Bloome.

 9   Q       Still employed?

10   A       Yes.

11   Q       Can you tell from Page 53 what action

12   Ms. Bloome took upon receipt of this letter?

13   A       Well, I know that she noted the account.

14   I believe she would have marked the account as

15   disputed.  And also marked it with a cease and

16   desist which is indicated by DISP for dispute and

17   CND or cease and desist.  And then the letter it

18   says to forward it over to the firm handling it

19   at the time.

20   Q       Page 53 it says included copy of bank

21   statement, showing $954.12 to Dell Financial

22   11-08; is that right?

23   A       Yes.

24   Q       Then it says not proof?

25   A       Yes.
```

1    Q        The next exhibit is Exhibit 12.   Document

2    5.   That is a letter from Mr. Brim, dated March

3    10th, 2009 to Midland; is that right?

4    A        Yes.

11:51:30  5    Q        It is disputing the debt?

6    A        Yes.

7    Q        He states he does not owe this debt and

8    does not owe any debt to Dell; is that right?

9    A        Yes.

11:51:40  10   Q        He puts that the debt was paid in full on

11   November 8th, 2004, and he encloses a copy of his

12   bank statement?

13   A        Yes.

14   Q        Also in this letter, Mr. Brim requests

11:51:52  15   Midland immediately correct his credit report

16   with all three agencies to show a zero balance

17   and no derogatory or negative information,

18   correct?

19   A        Correct.

11:52:04  20   Q        And who handled this letter that was

21   received?

22   A        Melanie Bloome.

23   Q        The only action that would have been taken

24   by Ms. Bloome upon receipt of the second letter

11:52:18  25   is to document the receipt of it and then send it

1    to be scanned?

2    A       Yes.

3    Q       The next exhibit would be 15.  Look at the

4    collection account detail.  It notes that

11:52:48  5    Mr. Brim called in with a dispute, as well.

6    A       Yes.

7    Q       What date was that?

8    A       3-11, 2009.

9    Q       Which consumer relations employee received

11:53:00 10    that call?

11    A       Sydney Barrett.

12    Q       Is that a man or a woman?

13    A       Woman.

14    Q       Is she in San Diego?

11:53:06 15    A       Yes.

16    Q       Looking at Page 53, March 10th, 2009, it

17    has FAC Data called.  Request authorization to

18    release and to have consumer fax cease and

19    desist.  Do you know what that means?

11:53:24 20    A       I believe so.

21    Q       Can you tell us?

22    A       I believe FAC Data is short for Factual

23    Data which is a company.  So Factual Data called

24    in.  Now it is referring to the person who

11:53:38 25    requested the note.  They request information to

```
 1   release.  Basically to release information and
 2   also to have the consumer fax a cease and desist
 3   release.
 4   Q       What kind of company is Factual Data?
 5   A       I believe they are a credit verification
 6   company.  They do something verifying information
 7   on the credit report.
 8   Q       And the employee at Midland told them
 9   Mr. Brim would need to fax a cease and desist
10   release?
11   A       He told them they would need an
12   authorization so they could release information
13   and to have the consumer fax a cease and desist
14   release.
15   Q       Continuing up to the same date, it has CCI
16   from blocked number.  Do you know what that is?
17   A       CCI is customer called in from a blocked
18   number.  Transferred to extension 5034.
19   Q       BC7.  Do you know who that is?
20   A       Sydney Barrett.
21   Q       She is in consumer relations?
22   A       Yes.
23   Q       She took the call on March 11th, the next
24   day?
25   A       Yes.
```

11:53:52  5
11:54:04  10
11:54:16  15
11:54:38  20
11:54:44  25

1    Q        Do you know why the account manager

2    employee indicated that Mr. Brim needed to fax a

3    cease and desist release?

4    A        From what I know, the account managers

11:54:56  5   can't speak with or they don't speak with

6    consumers who have a cease and desist on their

7    account.  So they would request to have something

8    indicating that the consumer basically wanted to

9    have communication again.

11:55:08 10   Q        But that doesn't apply to consumer

11   relations when the consumer is calling in,

12   regarding the dispute?

13   A        That's correct.

14   Q        There is no information that Ms. Barrett

11:55:18 15   told Mr. Brim he needed to fax in a cease and

16   desist release?

17   A        Correct.

18   Q        There is no notation that Ms. Barrett

19   informed Mr. Brim that the documentation he

11:55:28 20   previously provided was insufficient to resolve

21   the dispute?

22   A        Correct.

23   Q        Following receipt of Mr. Brim's two

24   letters and his telephone call, Midland continued

11:55:38 25   to report the account with a past due balance and

1   being owed by Mr. Brim?

2   A      Yes.  It continued to report but was

3   marked as disputed.

4   Q      It was reporting with a balance due of

11:55:52  5   over $1,600.  So we're clear, after March, 2009,

6   Midland continued to report a balance due of over

7   $1,600?

8   A      Yes.

9   Q      That amount changed monthly based on

11:56:04  10   interest?

11   A      Yes.

12   Q      There is no information in the collection

13   detail that Midland ever contacted Dell to

14   question or investigate Mr. Brim's dispute?

11:56:14  15   A      That's correct.

16   Q      On Page 7, it indicates an interest rate

17   of six percent.

18   A      Yes.

19   Q      That Midland is adding to the account?

11:56:40  20   A      Yes.

21   Q      Do you have any information why Midland

22   chose that interest rate?

23   A      No.

24   Q      And also on this document, Seven, on the

11:56:50  25   additional data screen, it indicates that the

```
 1   date of occurrence was October 18th, 2004.
 2   A      Okay.
 3   Q      Do you see that?
 4   A      Yes.
 5   Q      To your knowledge, would that have been
 6   the charge-off date or the delinquency date?
 7   A      It is the delinquency date.
 8   Q      Under that, it has the statute of
 9   limitations expiration date as October 18th,
10   2007?
11   A      Yes.
12   Q      If letters are mailed out on an account,
13   they would be documented in the collection detail
14   unless they've been previously archived?
15   A      Yes.
16   Q      If you look at entry on Page 3 dated
17   January 21st, 2008, about midway down, do you see
18   that?
19   A      Yes.
20   Q      It says, account eligible for recovery.
21   Legal letter mailed?
22   A      Yes.
23   Q      Going up to March 30th, 2008, the account
24   was referred to an attorney's office?
25   A      Yes.
```

1   Q       Going back to Two, if you look at the

2   comments, there is no indication that Mr. Brim

3   was told either in writing or on the phone during

4   his telephone call that he needed to send in

11:58:12   5   additional documentation for his dispute,

6   correct?

7   A       Correct.

8   Q       And the payment of $954.12 was never added

9   to the account or credited to the account?

11:58:22   10   A       No.

11   Q       So the fact that Mr. Brim had sent in a

12   bank statement, showing a payment to Dell

13   Financial in the amount of $954.12 -- Midland,

14   first, did not consider that to be proof of

11:58:36   15   payment in full on the account, correct?

16   A       Correct.

17   Q       And Midland didn't consider it to be proof

18   of at least a partial payment, correct?

19   A       Correct.

11:58:44   20   Q       And Midland never contacted Dell to

21   determine what the status of that payment was?

22   A       That's correct.

23   Q       And then on August 6th, 2008, there's an

24   entry on Plaintiff's Exhibit 2 that an ACDV was

11:59:00   25   received from Transunion; is that correct?

1    A        Correct.

2    Q        And the fact that there are asterisks

3    where employee ID would be contained, does that

4    indicate to you that that ACDV was handled

11:59:14  5    electronically by the batch interface system?

6    A        Yes.

7    Q        No actual documents were reviewed in

8    responding to the ACDV received on August 6th,

9    2008 from Transunion?

11:59:28 10    A        No.

11    Q        Transunion --

12                MR. LANGLEY:  Your Honor, there's

13    actually more to that answer that's not being

14    read.

11:59:38 15                MS. CAULEY:  That's all we

16    designated.

17                MR. LANGLEY:  I don't think you

18    can designate half an answer.

19                THE COURT:  Read the whole answer.

11:59:44 20                MR. SYKSTUS:  Yes, Your Honor.

21    A        No.  The system didn't review that.  But

22    if there were review of the documents happening

23    at that time, there would have been specific

24    codes that the system could have recognized.

11:59:52 25                JUROR 16:  Could you repeat that

1  question?  I got lost in all that.

2                MR. CAULEY:  Certainly.

3  **BY MS. CAULEY:**

4  Q      The question:  No actual documents were

12:00:02 5  reviewed in responding to the ACDV received on

6  August 6th, 2008 from Transunion?

7  A      No.  The system didn't review that.  But

8  if there were review of the documents happening

9  at that time, there would have been specific

12:00:20 10  codes that the system could have recognized.

11  Q      Transunion.  Upon receipt of that ACDV,

12  Dell was not contacted?

13  A      No.

14  Q      Redstone Federal Credit Union, where the

12:00:36 15  bank statement was from, was not contacted to

16  verify whether the bank statement was valid or

17  whether a payment had been made?

18  A      No.

19  Q      There is an entry on August 12th, 2008.

12:00:46 20  An ACDV was received from Experian; is that

21  right?

22  A      Yes.

23  Q      And, again, the batch interface system

24  handled that dispute electronically?

12:00:56 25  A      That's right.

1    Q      Nothing was done differently in the

2    handling of the first ACDV than the first?

3    A      No.

4    Q      On March 19th, 2009, a third ACDV was

12:01:06  5    received from -- this one was from Transunion; is

6    that right?

7    A      Yes.

8    Q      And at that time, it states the dispute

9    type was 109?

12:01:14  10   A      Yes.

11   Q      And, again, the batch interface system

12   responded to that ACDV?

13   A      Yes.

14   Q      It was the same response as to the

12:01:24  15   previous two ACDVs?

16   A      Yes.  It looks like it.

17   Q      No investigation was done by a consumer

18   relations employee into the dispute?

19   A      No.

12:01:34  20   Q      No documents were reviewed by any employee

21   of consumer relations in response to the ACDV?

22   A      No.

23   Q      No letters were sent to Mr. Brim regarding

24   receipt of that ACDV?

12:01:46  25   A      No.  No letters could be sent regarding

       1  that dispute because of the cease and desist.

       2  Q       And Dell was not contacted?

       3  A       That's correct.

       4  Q       On March 20th, 2009, the very next day, an
12:02:00 5  ACDV is received from Equifax?

       6  A       Yes.

       7  Q       This fourth ACDV was also handled by the
       8  batch interface system?

       9  A       That's correct.

12:02:08 10  Q       Nothing new was done in responding to that
      11  ACDV?

      12  A       No.

      13  Q       Then on February 25th, 2010, an ACDV was
      14  received from Transunion?

12:02:18 15  A       Yes.

      16  Q       This fifth ACDV was handled by the batch
      17  interface system?

      18  A       Yes.

      19  Q       With respect to all of the ACDVs that were
12:02:26 20  received by Midland regarding disputes by
      21  Mr. Brim, each and every one of them was handled
      22  electronically by the batch interface system?

      23  A       Yes.

      24  Q       No consumer relations employee ever
12:02:38 25  reviewed the ACDVs?

1    A        That is correct.

2    Q        If you'll look at Page 11 --

3             Actually, this is Plaintiff's Exhibit 29.

4                  THE COURT:  Okay.

12:03:20  5    **BY MS. CAULEY:**

6    Q        If you'll look at Page 11, Midland

7    Document 11, this looks like a summary of when

8    Midland started reporting the account?

9    A        Yes.

12:03:30  10   Q        That would have been November 16th, 2007?

11   A        Correct.

12   Q        Are you aware that Midland Funding sued

13   Mr. Brim to collect this debt?

14   A        I do know that it went to an outside firm.

12:03:46  15   Q        Do you know that a lawsuit was actually

16   filed against Mr. Brim?

17   A        I believe so.

18   Q        Are you aware that the lawsuit was

19   actually dismissed by Midland?

12:03:54  20   A        Yes.

21   Q        Do you know why the lawsuit was dismissed?

22   A        I know I've seen the reason.  But I don't

23   recall specifically.

24   Q        Would that reason have been contained on

12:04:04  25   some screen in Midland's system?

```
 1   A       I believe I saw the reason in the
 2   production notes where it says -- where it says
 3   efforts exhausted.
 4   Q       There's one more line in that answer.
 5   A       That is the only way I knew that it was
 6   closed.
 7   Q       This is actually referring to Plaintiff's
 8   Exhibit 18.  We go back to Page 27.  That's a
 9   copy of the complaint.  Do you see where it says
10   Midland sued to collect the total sum of $1,344?
11   A       Yes.
12   Q       And that is different from the amount that
13   was actually reported by Midland?
14   A       Yes.
15   Q       In fact, even if you look at the very
16   earliest time the account was reported in 2007,
17   it was reported with a balance due in excess of
18   $1,381, right?
19           MR. LANGLEY:  Your Honor, I think
20   there might be a mixup in the documents that were
21   referred to in the deposition versus the
22   plaintiff's exhibit that's on the screen.
23   Because Ms. Cauley is referring to something that
24   refers to a suit for 1,344.  And Plaintiff's
25   Exhibit 18 is not that unless I'm mistaken.
```

Timestamps:
12:04:16 (line 5)
12:05:26 (line 10)
12:05:36 (line 15)
12:05:50 (line 20)
12:06:08 (line 25)

1          MS. CAULEY:  I'm sorry.  It does

2   have a different dollar number, Your Honor.  The

3   exhibit says $1,381.

4          THE COURT:  I can't -- okay.

12:06:24  5          MS. CAULEY:  It may have been a

6   typographical error because on Line 39, it does

7   say 13 --

8          MR. LANGLEY:  What is Document 27?

9   Would that be from the Midland production?

12:06:40  10          (Discussion off the record.)

11          THE COURT:  What's the dispute?

12          MS. CAULEY:  The amount contained

13   within the deposition, Your Honor, is different

14   than the amount -- the first amount that I read

12:07:00  15   is actually -- must be a typographical error,

16   because the amount on the complaint in the

17   plaintiff's exhibit and later on --

18          THE COURT:  1,381 instead of

19   1,344?

12:07:16  20          MS. CAULEY:  Yes.

21          THE COURT:  Okay.

22          MS. CAULEY:  Start back.

23   **BY MS. CAULEY:**

24   Q     Even if you look at the very earliest time

12:07:22  25   the account was reported in 2007, it was reported

1    with a balance due in excess of the $1,381,

2    right?

3    A       That's correct.

4    Q       Then the next stapled group starts on Page

12:07:42  5    43 and goes to 45.  It is account media.

6                   THE COURT:  How close are you to

7    finishing?

8                   MS. CAULEY:  I'm very.  Ten

9    minutes.

12:07:56 10                   THE COURT:  Well, let's recess for

11   lunch, because we can't get to defendant's

12   questions anyway before lunch.

13                   MS. CAULEY:  Okay.

14                   THE COURT:  Ladies and gentlemen

12:08:04 15   of the jury, you're under the same instruction

16   I've given you earlier.  Please be back in an

17   hour and 15 minutes.

18        For your information, I just want you to

19   know we're going to recess at 3:30 this afternoon

12:08:16 20   because I'm sick.  I'm going to the doctor.  And

21   I just made an appointment.  So we're going to

22   recess at 3:30.  Just so you know that.  And the

23   lawyers know it, too.  Be back if an hour and 15

24   minutes.

12:08:34 25                   MR. BENNETT:  Your Honor, we might

1    try to winnow out maybe the credit bureau

2    depositions which might be redundant.  Because

3    each of them now is about an hour.

4              THE COURT:  Well, it's okay.

12:08:44  5    Whatever y'all want to do is fine.  Y'all just

6    stay for just a minute.

7              (Jury excused.)

8              (In open court.  Jury not

9    present.)

12:09:16  10             THE COURT:  I apologize.  I have a

11   relapse.  I was much better.  But I am sick as a

12   dog today.  And I called my doctor and asked if I

13   could see him at -- hopefully he can give me a

14   shot.  Plan to be here tomorrow, just for your

12:09:30  15   information.  I plan to be here Friday.  I'm not

16   going to make anybody hang around because I have

17   the flu.  I think they can work miracles with a

18   Z-pack and shot.  So I'm going to have to stop at

19   3:30.

12:09:44  20             MR. BENNETT:  I think we have

21   Mr. Brim and I don't know -- you know, over

22   lunch, we'll figure out whether we need the

23   credit reporting agencies' depositions.  The main

24   purpose was to authenticate the documents that

12:09:58  25   are now in.  If that's the case and the defendant

1   doesn't have a lot of evidence of its own, I

2   don't think.

3                    MR. LANGLEY:  With respect to the

4   credit reporting agencies?

12:10:08  5          MR. BENNETT:  No.  In general.

6   Hopefully we can be closed tomorrow.

7                    THE COURT:  Oh, I think we will,

8   too.

9                    MR. LANGLEY:  Our evidence will be

12:10:16  10  very short.  If they don't offer the CRA

11  depositions, we may offer very limited portions.

12  But not lengthy.

13                   THE COURT:  That's okay.  See

14  y'all in an hour and 15 minutes.

12:10:26  15                 (Luncheon recess.)

16                   (In open court.  Jury present.)

17                   THE COURT:  Please be seated

18  everyone.  And Mr. Sykstus, if you will start

19  being Angelique Danielle Ross, that would be

13:40:18  20  wonderful.  And if you will read your questions,

21  that would be great.

22                   MS. CAULEY:  Yes.

23  **BY MS. CAULEY:**

24  Q       If you'll go to Midland Document 91, which

13:40:40  25  is Exhibit 29 in the plaintiff's trial notebook,

1    these are the bureau reports by the reporting

2    data screens.

3    A        Yes.

4    Q        Is there a screen for each month that an

13:41:00 5    account is reported to the credit bureaus?

6    A        Yes.

7    Q        Does Midland report to all three of the

8    major credit reporting agencies?

9    A        Yes.

13:41:08 10   Q        This shows that began reporting on

11   November 16th, 2007?

12   A        Yes.

13   Q        It has an amount past due of $1,587?

14   A        Yes.

13:41:20 15   Q        At the top, it looks like a balance of

16   $1,799?

17   A        Yes.

18   Q        Do you know which balance was reporting,

19   or were both reporting to the credit report?

13:41:32 20   A        This screen was printed on 6-7-10.  The

21   information at the top would have been the

22   balance at the time that the screen was printed.

23   Whereas the information underneath, bureau

24   reports by reporting date, would have been

13:41:48 25   information reported to the credit bureaus as of

November.

Q        November 16th, 2007, the balance reported as unpaid and past due was $1,587?

A        Yes.

13:42:00  Q        Then the following month, the balance increased?

A        Yes.

Q        And in 2008, the information remained the same except that the balance increased to $1,602?

13:42:12  A        Yes.

Q        If you will, just review it.  It looks like each month the information remains the same except the balance increases for February to March, 2008, and then to April of 2008; is that

13:42:26  right?

A        Yes.

Q        March of 2008, it looks like there is an address change?

A        Yes.

13:42:40  Q        And the balance increased in May of 2008?

A        Yes.

Q        The June to July balance remained the same but in August, the address goes back to an Alabama address but has the same unpaid balance;

13:42:54  is that right?

```
 1   A       Yes.

 2   Q       For every month after August of 2008, it

 3   looks like everything remains the same except the

 4   balance goes up each month until February, 2010?

13:43:18  5   A       Yes.

 6   Q       And no monthly payments were ever recorded

 7   on the account?

 8   A       That's correct.

 9   Q       Did your name used to be Purvis?

13:43:30 10   A       Yes.

11   Q       And your current last name is Ross?

12   A       Ross.

13   Q       Are you aware of -- you have already told

14   me the records indicate that Midland never

13:43:48 15   communicated with Dell regarding Mr. Brim's

16   dispute, correct?

17   A       Correct.

18   Q       Midland never communicated with Redstone

19   regarding it?

13:43:56 20   A       Correct.

21   Q       And the only communications with respect

22   to Mr. Brim's account with respect to the

23   reporting agencies are the ACDVs and the UDF

24   responses?

13:44:10 25   A       Those and I guess the regular monthly
```

1  reporting.

2  Q        The regular reporting is done monthly and

3  then the ACDVs and the UDFs?

4  A        Yes.

13:44:18  5  Q        There's no indication that telephone calls

6  were made to the reporting agencies, correct?

7  A        Correct.

8  Q        There is no record in Mr. Brim's account

9  notes that indicate Midland contacted any other

13:44:28  10  party regarding Mr. Brim's dispute?

11  A        Correct.

12  Q        Let me hand you -- and it's going to be

13  Plaintiff's Exhibit 36.  Let me hand you that.

14  We're looking at Document Number 206.  Are you

13:45:28  15  familiar with what this document is?

16  A        Yes.

17  Q        Not going to mark it as an exhibit because

18  it does have Mr. Brim's social security number on

19  it.  Is this a universal data form?

13:45:42  20  A        Yes.

21  Q        This is a form Midland sent in to the

22  credit bureaus?

23  A        Yes.

24  Q        Instructing them to delete Midland's

13:45:50  25  reporting of an account?

```
 1   A        Yes.

 2   Q        And what was the date of this universal

 3   data form?

 4   A        9-9-10.

 5   Q        As we sit here today, are you aware that

 6   through documentation from Redstone Federal

 7   Credit Union that Dell did verify it did receive

 8   Mr. Brim's payment?

 9   A        I am aware of that, yes.

10   Q        So there is no longer any dispute that the

11   payment was made by Mr. Brim and he did not owe

12   this debt?

13   A        Correct.

14   Q        Prior to July, 2010, when you told me

15   earlier today some changes may have been made

16   with respect to the Fair Credit Reporting Act

17   from October, 2007, up through July 1st, 2010,

18   were Midland's policies and procedures for

19   handling the ACDV the same?

20   A        I believe so, yes.

21   Q        As far as you are aware, there were no

22   changes in how ACDVs are responded to from

23   October of 2007 to July 1st, 2010?

24   A        No.  Not that I can recall.

25   Q        Are there any type of reports maintained
```

1    on the consumer relations liaisons with respect

2    to the number of ACDVs they review or the number

3    of disputes they review on a weekly or monthly or

4    quarterly basis?

13:47:06    5    A       Yes.

6    Q       What are those reports?

7    A       They are production reports.

8    Q       How are they done?  Monthly, quarterly?

9    A       There's one report that is run daily and

13:47:18    10    another that is, I guess, weekly.

11    Q       Are these production reports done by

12    employee or by department?

13    A       By employee.

14    Q       And what do they contain?  What type of

13:47:28    15    information?

16    A       How many accounts each person worked in a

17    certain time frame.

18    Q       Are there goals for liaisons to meet with

19    respect to how many accounts they work?

13:47:38    20    A       Per day, yes.

21    Q       How many accounts is a liaison expected to

22    work per day?

23    A       About 70 accounts.

24    Q       Is there any type of incentive program or

13:47:48    25    compensation that is provided if they work more

1    than 70?

2    A      No.

3    Q      Is there any type of discipline or do they

4    receive any type of write-up if they do not meet

13:47:58  5    their quota?

6    A      There could be.  But generally, I would

7    say no because, depending on the volume or the

8    circumstances, there may be times when they need

9    to be lower than that number because of whatever

13:48:10  10   is going on at the time.

11   Q      If it is just one day here or there or a

12   couple of days during a particularly busy time,

13   if the employee falls below the 70, there

14   wouldn't be disciplinary action necessarily?

13:48:24  15   A      Correct.

16   Q      Do the liaisons work 8:00 to 5:00, 9:00 to

17   5:00?

18   A      Most of them work somewhere between --

19   some start earlier.  6:00 to 2:30.  7:00 to 3:30,

13:48:42  20   8:00 to 4:30.

21   Q      Did they take a half-hour lunch, an hour

22   lunch?

23   A      Most of the time, they take a half-hour

24   lunch.

13:48:52  25   Q      Do they get any other breaks during the

1  day?

2  A       Yes.   Standard two 15-minute breaks.

3  Q       None of the employees in consumer

4  relations actually ever responded to an ACDV with

13:49:02  5  respect to Mr. Brim?

6  A       Correct.

7  Q       Everything we've looked at with respect to

8  Mr. Brim's account was handled according to

9  Midland's policies and procedures at the time,

13:49:10 10  correct?

11  A       Correct.

12  Q       If ACDVs were received from other

13  consumers, alleging the same thing Mr. Brim was

14  alleging, they would have been handled the same

13:49:22 15  way Mr. Brim's ACDV was handled; is that correct?

16  A       It would depend.

17  Q       If everything were the same as Mr. Brim's

18  response, then the response to the ACDV would be

19  the same?

13:49:34 20  A       That's probably likely.

21              MS. CAULEY:   That's all we have,

22  Your Honor.

23              MR. LANGLEY:   Your Honor, for

24  defendant's cross-examination of Angelique Ross,

13:49:50 25  Mr. Tompkins is going to take over the role of

1        Ms. Ross.

2                        THE COURT:  Okay.  Neither one of

3        you look like you just had a baby.  I'll tell you

4        that.

13:50:18   5        You're asking your own questions that you

6        asked on deposition?

7                        MR. LANGLEY:  Some were Penny's.

8        Some were mine.

9                        **CROSS-EXAMINATION**

13:50:26   10   **BY MR. LANGLEY:**

11       Q        Have you ever held any other positions at

12       Midland?

13       A        Yes.

14       Q        What were they?

13:50:30   15   A        Consumer relations liaison and consumer

16       liaison lead.

17       Q        How long were you the liaison?

18       A        Approximately six months.

19       Q        And then I presume you were promoted to

13:50:42   20   consumer relations manager?

21       A        I was the consumer liaison first.  Then

22       promoted to lead.  Then promoted to manager.

23       Q        How long did you work as the lead?

24       A        About two-and-a-half years.

13:50:52   25   Q        Tell me approximately when you started at

1    Midland.

2    A        It was March 17th, I believe, 2003.

3    Q        As the consumer relations manager, did you

4    supervise other employees?

13:51:06  5    A        Yes.

6    Q        How many?

7    A        I currently supervise, directly supervise

8    two.  I have supervised up to nine.

9    Q        In your position for the past four years,

13:51:16  10    have you always had responsibilities for

11    supervising employees in that position?

12    A        Yes.

13    Q        That would range currently at two.  How

14    many was it in 2009?

13:51:28  15    A        For most of 2009, it was between six and

16    seven employees.

17    Q        Why the reduced number of employees?

18    A        I managed two supervisors.  They managed

19    the rest of that number of people.  So those

13:51:40  20    seven that I previously managed, those two people

21    managed that group.  And I managed the two

22    supervisors.

23    Q        Who were the two supervisors that you

24    managed?

13:51:48  25    A        Roque Faura, R-O-Q-U-E.  The last name is

1   F-A-U-R-A.  And Michelle Lusk.

2   Q       What are their job titles?

3   A       Consumer relations supervisor.

4   Q       Then the two of those consumer relations

13:52:02  5   supervisor managed approximately seven employees?

6   A       Total, yes.

7   Q       What are the positions of those employees?

8   A       Consumer relations liaison one and

9   consumer relations liaison two.

13:52:16 10   Q       Are there still consumer relations leads?

11   A       No.

12   Q       Has that become the consumer relations

13   supervisor position?

14   A       Basically.  There is some difference, but

13:52:26 15   yes.

16   Q       The consumer relations department is the

17   only department at Midland that is responsible

18   for the handling of consumer disputes either

19   directly through Midland or through the credit

13:52:40 20   bureaus?

21   A       I'm not sure what you mean.

22   Q       When a dispute comes in through a consumer

23   to Midland and it is a dispute regarding whether

24   or not they owe the account or owe the debt, what

13:52:50 25   department would that dispute go to for review?

1    A       Any review of the dispute would come to

2    consumer relations.

3    Q       What other duties do you have?

4    A       Basically, the overall overseeing of the

13:53:00  5    operations of consumer relations.

6    Q       Have your duties changed at all during the

7    four years you served as a consumer relations

8    manager?

9    A       Yes.

13:53:08  10   Q       What is different now?

11   A       Initially, there were no consumer

12   relations supervisors.  So I would handle all of

13   the escalated issues.  Now that is split between

14   several people.

13:53:20  15   Q       Would any other employees be responsible

16   other than those three individuals for handling

17   escalated disputes?

18   A       Not responsible.  There may be some that

19   could take an escalated call if the managers and

13:53:32  20   supervisors were not there.

21   Q       Ultimately, it would come to a supervisor

22   or to you?

23   A       Yes.

24   Q       Any other changes in your duties over the

13:53:40  25   past four years?

                1    A        No.

                2    Q        What are the duties for the consumer

                3    relations supervisors?

                4    A        They first have to manage the consumer

13:53:48   5    relations liaisons directly.  They also respond

                6    to escalated consumer issues.  They also may

                7    answer questions from their team members.

                8    Q        And that would be the liaisons?

                9    A        Yes.

13:54:00   10   Q        Anything else?

                11   A        I'm responsible for the whole operation.

                12   They are partly responsible for the day-to-day

                13   operations of consumer relations.

                14   Q        The consumer correspondence that the

13:54:12   15   liaisons process, is that in response to

                16   correspondence received directly from the

                17   consumer?

                18   A        Yes.

                19   Q        And that is how it came to consumer

13:54:22   20   relations department in the first place?

                21   A        Correct.

                22   Q        If an ACDV comes in, claiming an account

                23   has been paid in full, are those ACDVs also

                24   handled by the batch interface system?

13:54:38   25   A        It would depend.

1    Q        What would it depend on?

2    A        It would depend on information on the

3    actual Midland account.  Not the ACDV itself.

4    Q        Tell me what information on the Midland

13:54:48 5   system would cause an ACDV, claiming that its

6    debt had been paid in full, to be handled by an

7    individual versus the batch interface system.

8    A        There may be specific codes on the account

9    or the account may reside in a specific location

13:55:02 10  in our system.

11   Q        What would some of those codes on the

12   account be?

13   A        For instance, if the account had a DIS

14   dispute code, the system could select that ACDV

13:55:14 15  for manual review.

16   Q        What are the other codes where the system

17   can select an ACDV for manual review?

18   A        I don't know off -- I can't think of

19   others offhand.  It may select or move the

13:55:24 20  account for being in a specific location in our

21   system.

22   Q        What would those locations be?

23   A        It could be -- there are several.  45G,

24   45P, 45F.

13:56:06 25  Q        What does 45G mean?

1    A        It means the consumer disputed in writing

2    within 45 days that the validation letter and the

3    account is currently under an investigation.  And

4    it was a general dispute.  Non specific.

13:56:20  5    Q        What about 45P?

6    A        So it means all of the same things except

7    this dispute.  The dispute was that the account

8    was paid prior.

9    Q        Paid prior to Midland purchasing the

13:56:32  10   account?

11   A        Yes.

12   Q        What about F?

13   A        All of the same.  The account or the

14   dispute is that the account is fraudulent.

13:56:38  15   Q        If a consumer sends a letter within 45

16   days of the validation letter, that goes out on

17   the account with a general dispute.  A code of

18   45G is placed on that account; is that right?

19   A        Yes.  Well, that's actually the location

13:56:54  20   it is moved to.  The code would be the DIS code.

21   Q        So the account itself is moved to a 45G

22   location in the system?

23   A        Yes.

24   Q        Meaning the computer system?

13:57:04  25   A        Yes.

```
 1    Q       What happens if a consumer sends in a
 2    dispute in writing but it's not within the 45
 3    days of the validation letter?
 4    A       It would depend on exactly what they sent
 5    in.
 6    Q       Can you tell me what the options are?
 7    A       If the consumer -- I'm sorry.  For general
 8    or just --
 9    Q       Let's start with general.
10    A       Okay.  If the consumer only sends in a
11    letter with their general dispute outside of the
12    45-day period, the consumer would receive a
13    letter, stating that we need additional
14    information related to their dispute.
15    Q       Does that letter have a code that is
16    referred to or refers to it?
17    A       Yes.
18    Q       What is that code?
19    A       QCPP.
20    Q       Does that stand for something?
21    A       QC stands for quality control.  I don't
22    know what the first P is.  But the second P is
23    for proof.  So I think it is provide proof.
24    Q       If a consumer sends a letter, disputing an
25    account, but there's no documentation included
```

13:57:18   (line 5)
13:57:24   (line 10)
13:57:36   (line 15)
13:57:44   (line 20)
13:58:00   (line 25)

1    with the letter and it is outside the 45 days of

2    the first letter from Midland, Midland will send

3    out a form letter which is the QCPP letter,

4    stating to the consumer that additional

13:58:12  5    information is needed?

6    A       That's correct.  As long as the consumer

7    has not requested that we cease contact with

8    them.

9    Q       If a letter contains a dispute and also

13:58:22 10    requests that Midland cease contact, is that same

11    form letter sent out?

12    A       No.

13    Q       Is any form letter sent out?

14    A       No.

13:58:30 15    Q       What happens to the account?

16    A       The account is marked as disputed.

17    Annotated with what was received from the

18    consumer.  And another code is placed on the

19    account to indicate that the consumer wants no

13:58:42 20    further contact.

21    Q       What is that code?

22    A       026.

23    Q       Are there any policies or procedures that

24    instruct the consumer relations employees on how

13:58:54 25    to review the documentation that's supplied with

1    respect to a dispute?

2    A      Yes.

3    Q      Where are those policies maintained?

4    A      That would be in the consumer relations

13:59:04  5    manual.

6              MR. LANGLEY:  Your Honor, may I

7    walk around to use the Elmo?

8              THE COURT:  Sure.

9              (Discussion off the record.)

14:00:34  10             MR. LANGLEY:  This is Plaintiff's

11   34.

12   **BY MR. LANGLEY:**

13   Q      Pages 168 through 169, that's the

14   guidelines for handling written disputes that it

14:00:52  15   has been paid prior; is that correct?

16   A      Correct.

17   Q      The liaison is to review the account and

18   verify that the social, name, and address match?

19   A      Yes.  If they can.  Consumers don't always

14:01:06  20   put all the information on their correspondence.

21   Q      They're also looking for proof.  Here it

22   says it could be the front and back of a

23   cancelled check with a settlement offer letter or

24   paid letter with matching account number?

14:01:16  25   A      Yes.

1    Q        That matching account number matching
2    Midland's account number or the original
3    creditor's account number?
4    A        It should be with the original creditor's
14:01:32  5    account number.
6    Q        If the account is referred to ACQ, then a
7    different warning code, which is 286, is entered
8    on the account; is that right?
9    A        That's actually when the account is
14:01:46  10    deleted.  So that would be where it says if proof
11    is valid, update to delete.  And then that code
12    would be added.
13               THE COURT:  Let me just tell the
14    jury when they refer to page number, it's the
14:02:00  15    number in the bottom right hand of the document.
16    Sometimes it's hard to read because there might
17    be holes punched in it.
18    **BY MR. LANGLEY:**
19    Q        If an ACDV is not handled automatically
14:02:14  20    through the batch interface system, are there
21    steps contained in any type of manual or policy,
22    whether it is printed or just a note on the
23    system, that tells an individual in consumer
24    relations how to investigate that credit dispute?
14:02:28  25    A        Well, as far as using the actual system,

1   there's a tutorial that is available through the

2   E-Oscar system to show them how to actually put

3   information in.  Other than that, we just have

4   some screen prints that show the screen in order

14:02:40 5   to find the information on our system.

6   Q       You lost me just a little bit.  You have

7   screen prints that tell the employees where to

8   find the information on your system.  Can you

9   explain that more for me?

14:02:52 10      Does consumer relations have the same

11  computer system that the collections department

12  might have?

13  A       Yes.

14  Q       They have access -- consumer relations has

14:03:02 15  access to the same screens as the collections

16  department?

17  A       Yes.

18  Q       So the information would be that there

19  might be a screen that would tell them where to

14:03:10 20  find the payment history or previous addresses or

21  something of that nature?

22  A       Yes.

23  Q       There are quite a few screens in the

24  system?

14:03:20 25  A       Right.

1    Q        Judging from the documents that were

2    produced.  To sort of make that easier for the

3    person in consumer relations to actually find

4    which screen to go to?

14:03:28  5    A        Yes.

6    Q        Like a cheat sheet, for lack of a better

7    term?

8    A        Yes.

9    Q        Is the E-Oscar tutorial also something

14:03:36 10    that can be printed?

11    A        Yeah.  You can print it.

12    Q        Do all employees in the consumer relations

13    department take the E-Oscar tutorial?

14    A        Yes.

14:03:46 15    Q        Since January of 2008, you have been in

16    charge of overseeing the handling of ACDVs?

17    A        Yes.

18    Q        Did you or the supervisors that are under

19    you conduct any type of review of responses to

14:03:58 20    ACDVs?

21    A        We may review non-submitted responses.

22    But if there's a question about a response, we

23    review the account and the ACDV to look at the

24    most appropriate response.

14:04:16 25    Q        The next document we're looking at is

1  Plaintiff's 15.  Specifically the second page.

2  Are you at the bottom where it says received

3  certified letter?

4  A     Yes.

14:05:42  5  Q     It is postmarked July 30th.  How do you

6  know who received it?

7  A     There is a code that's three columns over

8  from that notation.

9  Q     Is that the WGC or the BU8?

14:05:54 10  A     It is the BU8.

11  Q     Who is represented by the BU8?

12  A     Melanie Bloome.

13  Q     Is she in the St. Cloud office or San

14  Diego?

14:06:06 15  A     San Diego.

16  Q     Is she a liaison or supervisor?

17  A     Liaison.

18  Q     Still with Plaintiff's Exhibit 15, if you

19  go back to the collection detail, what was the

14:06:18 20  date upon receipt of this letter?

21  A     The account is noted.  It would have

22  already had cease and desist codes on there.  So

23  the information would have been noted and then

24  scanned.

14:06:30 25  Q     Who handled this letter that was received?

1    A       Melanie Bloome.

2    Q       I see it is on the 13th?

3    A       Yes.

4    Q       It has BU8.  Ms. Bloome got this second

14:06:46  5  letter from Mr. Brim?

6    A       Yes.

7    Q       Do you know if Ms. Bloome is the person

8    who has the handwritten notes on Page 5?

9    A       It looks like her handwriting.

14:06:54 10  Q       What does that represent?

11   A       The Midland account number.

12   Q       That was not on the letter; she would have

13   had to look that up in the system?

14   A       Yes.

14:07:10 15  Q       Midland did not consider the payment of

16   $954.12 as even a partial payment on the account?

17   A       Midland didn't.  Well, we don't -- we

18   wouldn't necessarily credit that payment to the

19   account or proof of that payment generally.  The

14:07:30 20  payments made like that, the actual payment would

21   be sent to Midland.

22   Q       Page 79, Line 2.  So basically, the ACDV

23   comes in from Transunion.  The data matches.  And

24   it is verified as accurate by the system?

14:07:46 25  A       It probably would have been verified.

1    Probably modified to show that there was a

2    dispute.  And based on the codes and the queue

3    location, the information compared and then

4    responded to is modified.

14:08:04  5    Q       The notes do say account dispute modified

6    E-Oscar dispute type 12.  What is that?

7    A       I don't remember offhand, but it is

8    dispute type that Mr. Brim would have selected

9    when submitting his dispute through the credit

14:08:26 10    bureau.

11    Q       So it would have been -- the type would

12    come through the credit bureau itself; that's not

13    a type that Midland would have selected?

14    A       Correct.

14:08:34 15    Q       Transunion, upon receipt of that ACDV --

16    Dell was not contacted?

17    A       No.

18    Q       Redstone Federal Credit Union, where the

19    bank statement was from, was not contacted to

14:08:46 20    verify whether that bank statement was valid or

21    whether a payment had been made?

22    A       No.

23    Q       Does Midland not have a copy of that ACDV

24    response?  Do they?

14:08:54 25    A       I don't think so.

```
 1    Q       They can print from the system but only
 2    for a period of time; is that right?
 3    A       Yes.
 4    Q       Is it six months?
 5    A       120 days.
 6    Q       So after 120 days, any ACDV response would
 7    not be available for print by Midland?
 8    A       That's correct.
 9    Q       Skip forward to Page 90, Line 5.  This
10    will be reference to Defendant's 15.
11                 (Discussion off the record.)
12                 MR. BENNETT:  Your Honor,
13    Plaintiff's 57 is the same document.
14                 MS. CAULEY:  It's 58.  I can't
15    read.
16                 MR. BENNETT:  58.  Oh, I'm sorry.
17    It's not.  It is a different screen print.  Your
18    Honor, it looks -- it is just a different print
19    version of the same document, but it isn't
20    exactly the same one.
21                 THE COURT:  Which one?  58 or 59?
22                 MR. BENNETT:  58, Your Honor.  58
23    is the Transunion printout.  And I think what you
24    have is Midland's printout, right?
25                 MR. LANGLEY:  That's correct.
```

14:09:02  (line 5)
14:09:28  (line 10)
14:10:32  (line 15)
14:10:54  (line 20)
14:11:04  (line 25)

**BY MR. LANGLEY:**

Q        Page 38, that is a copy of the actual ACDV response on February 25th, 2010, correct?

A        Correct.

14:11:16  Q        And that was in response to an ACDV from Transunion?

A        Yes.

Q        This was handled by the batch interface system?

14:11:24  A        Yes.

Q        Which is why it is signed by Midland rather than by an individual; is that correct?

A        That's correct.

Q        Next document we'll be referencing is

14:11:34  Plaintiff's 24.  We'll start with Midland Document 49 through 51.  Please tell me what that document is.

A        It is the customer additional data screen.

Q        Is that just another view of the customer

14:12:18  additional data that we looked at earlier?  If you don't remember, it's okay.

A        I believe so.  Yeah.  I believe it is just printed on a different date.

Q        So Page 49, 351 -- through 51 is the same

14:12:34  as what is represented on Page 7 except the date

1    printed?

2    A      Yeah.  It is actually a different view.

3    It is the same information.  But on Page 45, if

4    you see in the middle where it says click to view

14:12:48  5    printable version, if you click on that, you get

6    Page 7.

7    Q      Okay.  Then if you'll go on to Page 55

8    through 57, is the portfolio master information?

9    A      Yes.

14:13:00 10    Q      Do you know what that is?

11    A      Yes.  It is another screen in our system

12    that gives account information.

13    Q      Does this information refer to the

14    portfolio within which Mr. Brim's account was

14:13:14 15    obtained by Midland?

16    A      Yes.

17    Q      And it has a purchase date of October 10,

18    2007?

19    A      Yes.

14:13:20 20    Q      And account type -- do you know what CL

21    represents?

22    A      I don't know.

23    Q      The seller is identified as Dell Financial

24    Services?

14:13:28 25    A      Yes.

1    Q       Number of accounts, 63,346?

2    A       Yes.

3    Q       Mr. Brim's account was purchased in a

4    portfolio that contained 63,346 accounts?

14:13:42   5    A       Yes.

6    Q       August of 2008 is also when the XF dispute

7    code was added?

8    A       Yes.

9    Q       Going back to Plaintiff's 34.  Second

14:14:16  10    page.  Will you look at document 169?  It's

11    within the consumer relations operations manual.

12    Look at Box Number 5, which is on Page 169.

13    A       Okay.

14    Q       In the action column, it says, if unable

14:14:38  15    to determine if proof is valid, account will be

16    reported to ACQ, which is acquisitions; is that

17    right?

18    A       Yes.

19    Q       If consumer relations determines proof is

14:14:50  20    invalid, is the account referred to acquisitions?

21    A       No.

22              MR. LANGLEY:  Nothing further.

23              THE COURT:  Okay.  Thank you.  You

24    can't ask questions because she's not here.  Not

14:15:10  25    this witness.

1          MS. CAULEY:  Your Honor, the

2     plaintiff is going to read from the deposition of

3     Kimberly Hughes from Experian.  Also, Your Honor,

4     this morning we inadvertently pulled out

14:15:34  5     Plaintiff's Exhibit 70, which is a credit report

6     from Experian, which was at the deposition and

7     which is referred to in what we're going the

8     read.  So we will actually get those Exhibit 70s

9     back and provide copies to the jurors.

14:15:50  10          MR. BENNETT:  Move for admission.

11          MS. CAULEY:  We do ask the Court

12     to admit Plaintiff's Exhibit 70.

13          THE COURT:  It is admitted.

14          MS. CAULEY:  Thank you.

14:15:56  15          THE COURT:  And you're now

16     Ms. Hughes?

17          MR. SYKSTUS:  That's correct, Your

18     Honor.

19          THE COURT:  And you should

14:16:00  20     consider this as if she was here in person,

21     testifying under oath today.

22               **DIRECT EXAMINATION**

23     **BY MS. CAULEY:**

24     Q     Will you please state your name for the

14:16:10  25     record?

*CHERYL K. POWELL, CCR, RPR, FCRR*
Federal Official Court Reporter
1729 Fifth Avenue, North
Birmingham, AL 35203
256-508-4050/wrd4wrdrpr@aol.com

1    A        Kimberly Hughes.

2    Q        Ms. Hughes, are you here pursuant today to

3    a trial deposition subpoena that was served on

4    Experian?

14:16:18  5    A        That is my understanding.

6    Q        Are you currently employed by Experian?

7    A        Yes, I am.

8    Q        Can you tell us, please, what your

9    position is there?

14:16:26 10    A        I am a clients and litigation analyst in

11    the regulatory compliance for Experian Solutions,

12    Inc.

13    Q        And can you please tell the jury what your

14    duties in that position include?

14:16:38 15    A        Well, I'm currently transitioning into

16    that role.  For purposes of this deposition and

17    testimony, I am testifying as a corporate

18    representative in my capacity.  My previous

19    capacity as a litigation and compliance

14:16:52 20    specialist in consumer affairs whereby I assisted

21    consumers with questions or concerns they had

22    with information appearing on their Experian

23    credit report and also assist with litigation

24    research for Experian and sometimes providing

14:17:20 25    testimony in litigation matters.

1    Q       And can you tell me, please, what type of

2    business Experian is?

3    A       Experian is a credit reporting agency.

4    Q       And as part of its duties as a credit

14:17:34  5    reporting agency, does Experian compile

6    information from various credit data furnishers

7    on specific consumers?

8    A       Yes.

9    Q       Does Experian also create credit reports

14:17:46 10    on the consumers?

11    A       Experian creates and stores credit

12    information from public records and other

13    subscribers of information.  And when a third

14    party requests the contents of those files, they

14:17:58 15    are compiled in the form of a credit report.

16    Q       Okay.  And those credit reports -- once

17    they're compiled -- can be provided to potential

18    credit grantors?

19    A       Yes.  Yes, ma'am.

14:18:10 20    Q       And are they also provided to potential

21    employers?

22    A       If a potential employer certifies and

23    meets certain requirements, Experian does release

24    credit information for the purposes of employment

14:18:24 25    verification.

1    Q      And as an employee of Experian, are you

2    familiar with a furnisher, Midland Credit

3    Management?

4    A      I know of Midland.  I don't know what I

14:18:34  5    would say that -- I don't know that I would say

6    that I am familiar with Midland.

7    Q      Does Midland Credit Management furnish

8    credit information regarding consumers to

9    Experian?

14:18:44 10    A      Yes, they do.

11            MR. BENNETT:  Your Honor, we cut

12    out huge chunks of this for expediency.

13            THE COURT:  All right.  That's

14    good.

14:19:04 15    **BY MS. CAULEY:**

16    Q      Page 38.  Okay.  From July 29th through

17    February 17th, 2010, did the Midland Credit

18    Management account continue to be reported by

19    Midland Credit Management as a collection account

14:19:18 20    during that time period?

21    A      Based on review of the records Experian

22    has available, I believe that to be correct.

23    Q      If you will go back to Plaintiff's 11,

24    which for purposes of this trial is Plaintiff's

14:19:32 25    Exhibit 70, and please turn to Page 7 of that

1    consumer disclosure, which is Bates Page 136.

2    A      Yes, ma'am.

3    Q      Can you tell the jury, please, what

4    inquiries are that display on a consumer

14:19:48  5    disclosure report?

6              MR. BENNETT:  Judge, again, you

7    don't have a copy of this.  We'll give it to the

8    jury tomorrow.

9              THE COURT:  You will have it with

14:19:58 10    you in the jury room.  But you can see it on the

11    screen.

12    A      Well, inquiries are a record of

13    information about the consumer being shared with

14    a third party.  Specifically, the inquiries that

14:20:10 15    you're looking at on this Bates Label 136, these

16    are inquiries shared with others which means that

17    these are -- were companies who have reviewed

18    credit information about Mr. Brim based on some

19    action he took such as applying for credit or

14:20:26 20    financing.

21    Q      And if we look at those inquiries, we see

22    that American Express obtained information

23    regarding Mr. Brim on May 14th, 2009?

24    A      That's correct.

14:20:40 25    Q      And CBC Innovis obtained information

1   regarding Mr. Brim on January 15th, 2009?

2   A      That's correct.

3   Q      And if you look at the CBC inquiry, does

4   it tell you the reason the inquiry was made?

14:20:56   5   A      Yes.

6   Q      What reason was given?

7   A      Our records indicate that the CBC Innovis

8   inquiry was for a conventional mortgage on behalf

9   of 224 RBC Bank USA.

14:21:12   10   Q      And if you come down to the next entry,

11   there is a Croll Factual Data that had an inquiry

12   December 10th, 2008.  Do you see that?

13   A      Yes, ma'am.

14   Q      What was the reason for that inquiry by

14:21:24   15   Croll Factual Data?

16   A      The document indicates it was for real

17   estate loan on behalf -- the document indicates

18   that it was for real estate loan on behalf of

19   0102 Platinum Mortgage.

14:21:40   20   Q      And when these entities have an inquiry

21   regarding a specific consumer or their credit,

22   are they required under the Fair Credit Reporting

23   Act to provide a reason for that inquiry?

24   A      Experian will not release information to

14:21:54   25   an entity about a consumer unless that entity

1    certifies that they have a permissible purpose.

2    Q        So the reasons provided that are

3    documented by Experian in Plaintiff's Exhibit 70

4    are those reasons that were provided by the

14:22:08  5    entity making the inquiry?

6    A        Yes, ma'am.

7    Q        And if you come down to the fourth entity,

8    it says, Credit Plus.  And that inquiry was made

9    on September 19th, 2008?

14:22:20  10    A        That's correct.

11    Q        And was that also an inquiry for a real

12    estate loan on behalf of First Metropolitan

13    Mortgage?

14    A        That's what the document indicates.

14:22:30  15    Q        And then there was an inquiry by Land Safe

16    Credit also on September 19th, 2008?

17    A        That's correct.

18    Q        And what reason was provided to Experian

19    for that inquiry?

14:22:44  20    A        The document indicates the reason provided

21    was real estate loan on behalf of Hometown

22    Lenders, L.L.C.

23    Q        And the -- if we come down one more to

24    Credit Plus on July 28th, 2008, that inquiry,

14:22:58  25    again, indicates it was for a real estate loan on

1    behalf of First Metropolitan Mortgage?

2    A      Yes, ma'am.  That's what is indicated on

3    the document.

4              MS. CAULEY:  That's all we have of

14:23:18  5    this witness, Your Honor.

6              THE COURT:  Okay.

7              MR. LANGLEY:  Your Honor, could

8    you indulge us a moment?  This is slightly

9    different from what we had discussed yesterday.

14:23:32 10    So we need a moment.

11              THE COURT:  Sure.

12              (Discussion off the record.)

13              MR. LANGLEY:  Your Honor,

14    Mr. Tompkins will again play the role of female

14:25:02 15    this time, Ms. Kimberly Hughes.

16              THE COURT:  All right.  Have a

17    seat Ms. Hughes.

18              MR. LANGLEY:  This is with

19    reference to Plaintiff's Exhibit 70, February,

14:26:02 20    2010, Experian report.  Bates number is cut off

21    on this, but it's Page 8 of 12 in the report that

22    you were just discussing.  Excuse me.  Seven of

23    12.

24                    **CROSS-EXAMINATION**

14:27:04 25    **BY MR. LANGLEY:**

1    Q      If you would turn to Exhibit 11, which

2    is --

3                   THE COURT:  11?

4                   MR. LANGLEY:  This is the way it

14:27:12  5    reads in the deposition transcript.

6    A      What page?

7    Q      Page 55, Line 16.  And what is described

8    in the deposition as Exhibit 11 is actually

9    Plaintiff's Exhibit 70.

14:27:24 10                   THE COURT:  Yeah.

11   **BY MR. LANGLEY:**

12   Q      If you would, turn to Exhibit 11, please.

13   And specifically, look at the page that bears the

14   Bates Number 136.

14:27:32 15   A      Yes, sir.

16   Q      Ms. Cauley asked you some questions about

17   inquiries from American Express, CBC Innovis,

18   Croll Factual Data, Credit Plus, and Land Safe

19   Credit.  Do you remember those questions?

14:27:48 20   A      Generally, yes.

21   Q      Do you know what specific information any

22   of these entities sought from Experian?

23   A      No, sir.  Other than generally credit

24   information about this consumer.

14:27:58 25   Q      But you can't say what specific credit

1    information they sought?

2    A       That's correct.  I cannot.

3    Q       Do you know what specific credit

4    information was provided to these entities by

14:28:12 5    Experian?

6    A       No, sir.

7    Q       And assuming any information was provided,

8    do you have any idea how any of these entities

9    used that information?

14:28:20 10   A       No, sir.

11                   MR. LANGLEY:  That's all I have.

12                   THE COURT:  All right.  Thank you.

13   Are you ready to proceed tomorrow, not today?  Or

14   what do you want to do?

14:28:54 15                  MS. CAULEY:  We have Ms. Banks

16   we're ready to play that will take about 40, 45

17   minutes.

18                   THE COURT:  Okay.  That's good.

19   Y'all need a break?  It is a video deposition.

14:29:02 20   You should consider that as if Ms. Banks was

21   here, testifying under oath.

22                   MR. BENNETT:  Your Honor, we

23   haven't edited anything yet.

24                   THE COURT:  Does Cheryl have to

14:29:12 25   take that down, or will you make that available?

1              MR. BENNETT:  We will make it

2      available.  I think Ms. Cauley already discussed

3      it.

4              THE COURT:  Okay.

14:29:22 5              (Videotape played.)

6              MR. BENNETT:  Judge, we would ask

7      that Exhibit 40 be put in the jury's binders

8      overnight.

9              THE COURT:  Okay.  It is admitted.

15:08:40 10     And it can be put in overnight.

11              MR. BENNETT:  When the jury sees

12     it, it would be 42 in their book.

13              THE COURT:  Right.

14              (Videotape played.)

15:16:50 15              MR. BENNETT:  The remaining of

16     this requires going through documents the jury

17     doesn't have.  It's a list of member numbers and

18     the dates of pulls that are in other documents.

19     We would ask to advance to the end of our

15:17:00 20     examination to Mr. Langley's, which would be at,

21     Eric, at Page 43.  And that will cut some time.

22              THE COURT:  Okay.

23              (Videotape played.)

24              THE COURT:  How much more do you

15:33:26 25     have?  Because I really do have to leave.

1          MR. LANGLEY:  Probably three pages

2     worth.

3          THE COURT:  Okay.

4          (Videotape played.)

15:37:02 5          THE COURT:  We really do have to

6     stop.  Just stop.  We'll continue with this in

7     the morning.  Just remember you are on Page 66,

8     Line 2.

9          MS. CAULEY:  Yes, ma'am.

15:37:12 10          THE COURT:  I hope you'll have a

11    good night.  While you're out, please remember

12    the instruction I've given you about not

13    discussing the case among yourself, not to let

14    anyone discuss in it your presence.  Not to put

15:37:24 15    anything on Facebook or Twitter, or whatever you

16    do on the computer while you're seated on this

17    case about this case.  And I will see you at 9:00

18    o'clock in the morning I hope.  She has your

19    telephone numbers.  And I'm planning on being

15:37:36 20    here at 9:00.  Okay?

21          (Jury excused.)

22          (The Proceedings were recessed at

23    approximately 3:37 p.m. on February 23, 2011.)

24

25

*CHERYL K. POWELL, CCR, RPR, FCRR*
Federal Official Court Reporter
1729 Fifth Avenue, North
Birmingham, AL 35203
256-508-4050/wrd4wrdrpr@aol.com

1

2                    C E R T I F I C A T E

3

4

5         I, the undersigned, hereby certify that

6    the foregoing pages contain a true and correct

7    transcript of the aforementioned proceedings as

8    is hereinabove set out, as the same was taken

9    down by me in stenotype and later transcribed

10   utilizing computer-aided transcription.

11         This is the 12th day of February of 2011.

12

14   _____

15      Cheryl Renae King Powell, CCR, RPR, FCRR

16         Federal Certified Realtime Reporter

17

18

19

20

21

22

23

24

25