FILED
2011 Jul-14 PM 04:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

JAMON T. BRIM, *
Plaintiff, * 10-CV-00369-IPJ
* February 24, 2011
vs. * Florence, Alabama
* 9:15 a.m.
MIDLAND CREDIT MANAGEMENT, *
INC., *
Defendant. *
****************************

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE INGE P. JOHNSON
UNITED STATES DISTRICT JUDGE

**VOLUME III**

FOR THE PLAINTIFF:

MR. LEONARD A. BENNETT, ESQ.
CONSUMER LITIGATION ASSOCIATES
12515 Warwick Blvd
Suite 100
Newport News, VA 23606
757-930-3660

MS. PENNY HAYS CAULEY, ESQ.
HAYS CAULEY
P O Box 509
Darlington, SC 29540
843-393-5200

MR. RONALD C. SYKSTUS, ESQ.
BOND, BOTES, SYKSTUS & LARSEN
415 Church Street
Suite 100
Huntsville, AL 35801
256-539-9899

FOR THE DEFENDANT:

MR. ERIC B. LANGLEY, ESQ.
BALCH & BINGHAM
1710 Sixth Avenue North
P O Box 306
Birmingham, AL 35201-0306
205-251-8100

MR. JASON B. TOMPKINS, ESQ.
BALCH & BINGHAM
1901 Sixth Avenue North
Suite 1500
Birmingham, AL 35203
205-251-8100

# I N D E X

| EXAMINATION | PAGE |
|---|---|
| **MS. BANKS** | |
| CROSS-EXAMINATION BY MR. LANGLEY | 14 |
| REDIRECT EXAMINATION BY MS. CAULEY | 17 |
| **STEVEN NEWNOM** | |
| DIRECT EXAMINATION BY MR. BENNETT | 23 |
| CROSS-EXAMINATION BY MR. LANGLEY | 54 |
| **JAMON BRIM** | |
| DIRECT EXAMINATION BY MS. CAULEY | 63 |
| CROSS-EXAMINATION BY MR. LANGLEY | 124 |
| REDIRECT EXAMINATION BY MS. CAULEY | 168 |
| **GABRIEL EDROZO** | |
| REDIRECT EXAMINATION BY MR. BENNETT | 175 |
| CROSS-EXAMINATION BY MR. LANGLEY | 180 |
| FURTHER REDIRECT EXAMINATION BY MR. BENNETT | 184 |
| RECROSS-EXAMINATION BY MR. LANGLEY | 190 |
| FURTHER REDIRECT EXAMINATION BY MR. BENNETT | 192 |
| **ANTHONY COX** | |
| DIRECT EXAMINATION BY MR. TOMPKINS | 210 |

**P R O C E E D I N G S**

(In open court. Jury not present.)

MR. LANGLEY: We'd like to move to admit 21.

MR. BENNETT: No objection.

THE COURT: It's admitted.

MR. LANGLEY: Your Honor, we also put binders of the defendant's exhibits on the jurors chairs.

THE COURT: Okay. Let the record show this is February 24th, 2011. The parties and lawyers are here. And I don't think you got -- I didn't know we were going to put this on the record. But we are. The defense attorney said that they had discovered that Defendant's Exhibit 21, which was a redacted copy of the purchase contract, was actually put in unredacted. So the issue of whether it should be redacted or unredacted is moot, and it's in the defendant's binder, and it is admitted. And that's okay with the plaintiff, right?

MR. BENNETT: It is, Judge.

THE COURT: Okay. Now, I have something to take up with y'all, which I have

never had happen. And I have been a judge since January of 1979. So I want y'all to look at what one of the jurors gave Tammi. And just read it and let's discuss what to do with it. Because I need some suggestions.

09:17:00

MS. CAULEY: Should we read it out loud?

THE COURT: No. Just read it to yourself. It is from Mr. Bess, who is the heavyset gentleman, sitting on the front row.

09:17:14

MR. LANGLEY: Interesting.

MR. BENNETT: Good questions.

MR. LANGLEY: Yeah. They are.

MS. CAULEY: I read a lot slower than you guys.

09:17:52

THE COURT: Did you see it?

MR. BENNETT: Yes, Judge.

THE COURT: Do we want to make this Court's Exhibit Number 1 for the purpose of this hearing? Do we need to mark it?

09:18:14

MR. BENNETT: I think we should.

MR. LANGLEY: I think we probably should.

THE COURT: Mark it as Court's Exhibit A. Okay. And that's from Mr. Bess,

09:18:22

Tammi?

COURTROOM DEPUTY: Yes, ma'am.

MR. BENNETT: Your Honor, they're good questions. I think these are residual questions from when I examined the defendant's witness. The problem is that he can't -- he's not on the stand right now.

09:18:32

So the Court's position, I believe, should be that these are questions that appear intended for the defendant and if the defendant witness is re-presented or if a defendant witness is re-presented, that would be the appropriate time if the witness believes those questions appropriate for that witness. Unless you would like me to answer them, which I'm -- I suspect --

09:18:48

09:19:06

THE COURT: No. They had a question about whether they could ask you questions. Not you, but could we ask them questions, too, and get answers from them. And I said no.

09:19:20

MR. BENNETT: If they would stipulate, we would be happy to.

THE COURT: What do you say, Eric?

MR. LANGLEY: Well, I think at this point, it might be premature to decide what

09:19:26

to do about this. Those are fair questions. Because what they've done is tried to put the computer system on trial. I guess to preserve the record, we should move to excuss Mr. Bess.

09:19:46 Because he's already demonstrated some outside knowledge about algorithms that may unfairly prejudice the remainder of the jury.

THE COURT: Mr. Bess, I think he was a math person already. So we already knew

09:19:58 that information.

MS. CAULEY: He was an engineer.

THE COURT: Yeah. He's with Navistar. So y'all knew what he did for a living when you didn't strike him. And I'm not going to

09:20:08 excuse him at this point. Okay?

MR. LANGLEY: You're overruling our objection?

THE COURT: Yeah. Your request to excuse him, I am.

09:20:16 Do you have any problems with me saying that at this time, those answers cannot be furnished?

MR. LANGLEY: No. We do not have a problem with that.

09:20:24 THE COURT: If I just say that. I

don't want to say that it's on their -- that it is their duty to answer them, because it's not. If they don't want them answered --

MR. BENNETT: Yes, Your Honor. And that would be fair. But just to lay my cards out, Your Honor has seen, as we served it early this morning and sent to the defendant, we've asked for an adverse inference jury instruction.

We will ask the Court at charging conference to instruct the jury that a party that has control over witnesses or documents and fails to produce them that the jury can fairly conclude that those documents and witnesses would be adverse.

I think that protecting the record, making sure that there isn't -- to date, there's nothing that would be fairly appealable in our instance. And so a conservative take we understand except that it is the defendant's -- the questions are clearly targeted to the defendant. They're asking them --

THE COURT: Well, let me tell you this: I plan to tell the jury when they come back that I have this piece of paper and that they're not allowed to ask questions out of the

09:20:36 09:20:50 09:21:00 09:21:18 09:21:28

clear blue sky; that they were allowed to ask questions of live witnesses immediately after the witness testifies. And at this time, I have no intentions of attempting to get the information that he seeks. That's what I'm going to -- because he doesn't have -- I didn't tell them they could do this. And it's inappropriate at this time to go any further with that. That's my --

09:21:44

09:21:56

MR. BENNETT: Yes, Judge.

THE COURT: And I -- you know, it's not their fault. It's not the defendant's fault that their key witness is on maternity leave.

09:22:08

MR. BENNETT: Yeah. True, Judge. That key witness would have --

THE COURT: That happened I would say approximately ten months ago. 11 months ago.

MR. BENNETT: That witness is just someone -- that is a litigation liaison. I mean, the key witness isn't part of the trial.

09:22:20

THE COURT: You say they failed to produce the witness. I mean, she is there. Her testimony has been taken. That the questions were not asked of her is not to be blamed on the

09:22:30

defendant.

MR. BENNETT: No. Judge, yes, Your Honor.

THE COURT: Okay. All right. Okay.

MR. BENNETT: There is one other housekeeping matter, but it is not urgent. And I would just put it on the Court's agenda whenever the Court wants to consider it. The defendant will be calling Dell by video deposition, and that's okay.

And the -- given how long the deposition went yesterday with Transunion, for example, we're not going to go through the entire deposition; we're going to read it. Just the excerpts that have been disclosed. It should be half an hour instead of three hours.

With Dell, the defendant wants to play the entire video, and that's fine. We would like to not disrupt that process and stop it. And there are -- while there are several objections, there were three that were made by Ms. Cauley that we believe are of significant merit. And we believe that it would be most effective or efficient to address them with the Court given that we have

the transcripts; we already know the questions.

We are not suggesting -- it is okay -- we have engineers and jurors that are giving a fair hearing. We don't mind if they hear the question, hear the objection. But rather than argue it any further in front of Your Honor, pausing it, if Your Honor has already ruled, then --

THE COURT: You want me to rule on those three objections before the video?

MR. BENNETT: Yes, Your Honor. And we can be quiet.

THE COURT: I'll do that. Are you going to call Dell as the first witness?

MR. LANGLEY: Yes.

THE COURT: Well, just take a break before. I mean, we have to take a break anyway because we have motions after the plaintiff rests. So that will be fine. Okay.

Let me see that again before I tell the jury. And you can go get the jury.

MR. BENNETT: Judge, we have two exhibits that we've made the copies of now. When the jury is here, can we give them to the jury?

THE COURT: Yes. That will be

fine.

(Discussion off the record.)

(In open court. Jury present.)

THE COURT: Have a seat everyone.

09:28:52 MR. BENNETT: Your Honor, may we provide the copies we committed to?

THE COURT: Yes.

MR. BENNETT: These are exhibits 42 and 82. They're not in use for the video

09:29:20 deposition this morning.

THE COURT: Let the record show this is February the 24th, 2011. And this is the third day of the trial, CV-10-369, Jamon Brim versus Midland Credit Management, Inc. Let the

09:29:36 record show that the parties are here. The lawyers are here. The jury is here. Good morning to everybody.

And I understand -- and I'm just going to put this on the record to make sure that you all

09:29:50 hear what I have to say. I understand that one or two or some of the jurors asked Tammi if they could ask the lawyers questions. And you cannot.

Secondly, I understand -- I got a question or a list of questions from Mr. Bess; is that

09:30:12 correct?

JUROR 2: Not me.

THE COURT: Well, who was it from? Oh. From you. Hang on just a second. From Mr. Hines, right? Okay. Let me just say this. I have shared those questions with the lawyers. But they really don't have a say-so in what I'm saying to you right now. I have not allowed y'all to ask questions -- just questions. I have allowed y'all to ask questions of a witness while the witness is on the witness stand and under oath. And that is the only thing I have allowed y'all to do.

So at this point, I'm not going to go any further with those questions. Okay?

JUROR 19: This was because of the deposition.

THE COURT: But just I'm not going to go any further with those questions.

JUROR 19: Okay.

THE COURT: All right. Thank you. And we were on the deposition of Equifax representative. And we were on the defendant's questions. And we are on Page 66, right?

MS. CAULEY: Yes, Your Honor. Page 66.

THE COURT: All right. And you may proceed.

(Video played.)

MR. LANGLEY: Your Honor, can we pause it and get the volume straightened out?

09:32:48

THE COURT: Yeah.

COURTROOM DEPUTY: Go ahead.

(Video played.)

MR. LANGLEY: In view of this, can I put my colleague, Jason, on the stand to read the rest of this?

09:34:32

THE COURT: Sure. That will be fine. When Mr. Tompkins is reading the answers, you should consider that as if the person -- obviously the same way the person is testifying on deposition. As if she were here in person, testifying under oath.

09:34:58

MR. LANGLEY: Your Honor, to make sure the context is straight, may I start on the preceding page, Line 19?

09:35:16

THE COURT: Yeah.

**CROSS-EXAMINATION**

**BY MR. LANGLEY:**

Q On the credit report within Exhibit 1, which is Plaintiff's 37, how many negative

09:35:22

accounts are there?

A Give me just a second. I can't see it on the copy. I can't see it on the copy. Yes. This is the one you gave me.

09:35:36 Q I can help you out by pointing you to, I believe, it's the fourth page of Exhibit 1. Plaintiff's 37.

A Thank you. Negative accounts I believe that's the three.

09:35:48 Q From this report, can you tell whether or not Midland was one of those negative accounts?

A Give me just a second. I'm going through the report. Yes. Midland is on the file. And I'm looking at Bates number --

09:36:02 Q And that was one of --

A I was looking at Bates Label 48 to show the Midland account.

Q And that's one of the three listed negative accounts?

09:36:12 A Yes.

Q What are the other two listed negative accounts?

A You're going to have to give me a second to go back through this report.

09:36:20 Q Take as much time as you need.

09:36:34

A There is a collection account for the U.S. Department of Education. And there is another for City Cards. No. I'm sorry. Not City Cards. I actually can't tell what the name of the company is. States charge-off. But you're right. But there are three.

Q And you can't say whether or to what extent the Midland account factored into the overall credit rating, can you?

09:36:46

A No, I can't.

Q Ms. Banks, I believe that's all I have at this time. Thank you.

A Thank you.

MS. CAULEY: We do have some redirect.

09:36:52

THE COURT: Okay.

MR. BENNETT: If opposing counsel would provide me the courtesy, may I borrow your copy, counsel?

09:37:02

THE COURT: Yeah. We actually have a copy of it, too, if you need it.

MR. BENNETT: Thank you.

THE COURT: Just the same thing I've already said. We're going to continue with this witness. And you're going to be her.

09:37:24

MR. BENNETT: I will do my best, Judge.

THE COURT: Okay.

**REDIRECT EXAMINATION**

09:37:28 **BY MS. CAULEY:**

Q Ms. Banks, I have a few more questions. With respect to Plaintiff's Exhibit 1 that Mr. Langley was just referring to, Midland Credit Management was reporting as a collection account

09:37:40 on that credit report that was contained in Plaintiff's Exhibit 1; is that right?

A That's correct.

Q And certainly a collection account does have a negative impact on an individual's credit

09:37:50 and credit score?

A It can.

Q Mr. Langley asked you if it was possible that a credit report that was provided to a potential creditor of Mr. Brim's would not have

09:38:00 included the Midland Credit Management account.

It would also be possible that a credit report provided would have contained the Midland Credit Management report account; is that right?

A That's correct.

09:38:12 Q When Equifax receives documentation from a

consumer, does Equifax ever send those actual documents out to a furnisher of information?

A We do not. We utilize the FCRA relevant information field to notify the creditor specific information that the consumer has noted as part of their dispute.

Q And so Equifax's policy of not sending out the actual documents received from consumer does not indicate whether Equifax used the document -- views the document as sufficient or not on an account; it's just that Equifax never actually sends out the documents?

A That would be --

Q Would that be true?

A That would be correct. And let me just state for the record Equifax does not gather an opinion one way or the other.

Q On documentation received from a consumer?

A Well, on whether the information is accurate or not. As previously testified, if we are able to accept the documents and we have received from the -- excuse me. From the consumer disclosure, we will update the file based on that. If they are not documents that we can use, we will contact the creditor.

Q When Equifax contacted Midland Credit Management in August of 2008, it was done electronically by ACDV; is that right?
A That's correct.
09:39:32 Q It's not actually a form that's sent through the mail that can be lost?
A No. It's not.
Q And I know we've been looking at Plaintiff's Exhibit 1. If you will look at Bates
09:39:42 48 of Plaintiff's Exhibit 1.
A Okay. I have it available.
Q That's 37. As of the date on the credit report, which I believe you testified earlier was July 13th of 2008 -- at that time, was the
09:40:00 Midland account reporting with a past due balance?
A Yes, it was.
Q 16 -- okay. And that balance that it was reporting as past due was $1,617?
09:40:12 A That's correct.
Q And then if you go up to Plaintiff's Exhibit 4, we see that the current balance being reported at that time the ACDV was sent by Equifax was actually $1,692?
09:40:24 A That's correct.

Q Is that right?
A Yes. That's correct.
Q And for the record, that's Plaintiff's Exhibit 40 in the notebook. So would it be true that when we can -- we can gather that from the July of 2008 credit report where Midland's account was reporting with a past due balance of $1,681 and the date that Equifax sent out this ACDV where the balance was $1,692 -- that at some point time in between July of 2008 and March of 2009, Midland re-reported that account with an unpaid balance?
A That's correct.
Q Is it true that Equifax relies on its data furnishers to provide accurate information regarding an account?
A Yes, we do.
Q And in this instance, Equifax relied on Midland Credit Management to provide accurate information regarding Mr. Brim's account?
A Yes.
Q And did Equifax also rely on Midland Credit Management to investigate Mr. Brim's dispute regarding the balance of the account?
A Yes, we did.

09:41:48

Q And on Exhibit 6, which is Exhibit 42 in the notebook --

A Okay.

Q On the last two pages, we have the ACDV that was provided on February 25th of 2010.

A That's correct.

Q And at that time, Midland was continuing to report a balance due for Mr. Brim?

A That's also correct.

09:42:08

Q And that balance was $1,774?

A Yes.

Q That's all I have.

A Okay. Thank you.

THE COURT: Anything else from the defendant?

09:42:16

MR. LANGLEY: No further questions.

THE COURT: Okay. Thank you.

(Witness steps down.)

09:42:26

THE COURT: Do y'all have copies for me of those two exhibits you put in the jurors' exhibit books? Have you gotten them, Tammi?

COURTROOM DEPUTY: No, ma'am.

09:42:44

(Discussion off the record.)

THE COURT: Thank you. All right. Call your next witness, please.

MR. BENNETT: Your Honor, having endured that intimidation already as the witness, I would like to reverse roles. I would like to ask Mr. Sykstus to take the stand on behalf of Transunion.

THE COURT: All right.

MR. BENNETT: Your Honor, this is a deposition I had promised to play by video, but we cut about half or more of it out. And the pace would be more expeditious if we read it, and that's the reason.

THE COURT: That's fine. Actually I think we can hear a little bit better, too.

MR. BENNETT: We have highlighted copies we will, I'm sure with agreement, leave with the court reporter, as well.

THE COURT: That's great. Thank you. And you should consider that as if the Transunion representative were here in person, testifying under oath.

MR. BENNETT: Your Honor, it was a videotaped deposition taken telephonically of Mr. Newnom, held on Tuesday, January 25th, 2011.

                              THE COURT: Okay.

MR. BENNETT: And I will play the role of Ms. Cauley, Judge.

THE COURT: Y'all really do switch roles today.

09:44:18

**DIRECT EXAMINATION**

**BY MR. BENNETT:**

Q Mr. Newnom, will you please state your full name for the record?

09:44:24 A Steven L. Newnom.

Q And if you're here -- and you're here pursuant to a trial subpoena today to give a deposition?

A Yes, I am.

09:44:30 Q By whom are you employed?

A Transunion.

Q And what is your position at Transunion?

A I am a team leader.

Q What do your duties include as a team leader?

09:44:42

A To oversee the daily functions of the department, help train, assist consumers, and do daily activity within -- with the associates.

Q What department are you a team leader for?

09:44:54 A The priority processing department.

Q What is priority processing?
A We handle files for attorneys, government agencies, such as better business bureaus, possibly escalating complaints from our corporate office, any third-party requests.

09:45:08

MR. BENNETT: Your Honor, we have determined the exhibits.

THE COURT: Okay.

MR. BENNETT: And I will -- the pattern that I will use is I will identify the -- just for accuracy the exhibit here, tell the jury, for example, in this instance, Exhibit 1 is going to be Exhibit 43.

09:45:18

THE COURT: Okay.

MR. BENNETT: And then I will substitute in -- counsel has the transcript. I will not replay that explanation every time it's Exhibit 1. I will just substitute 43. Most of these are in sequence, starting at 43.

09:45:30

THE COURT: That's fine.

09:45:46

**BY MR. BENNETT:**

Q And have you had the opportunity to review the document that's been marked as Exhibit 1 through 17 prior to the deposition? And then there will be an Exhibit 19, as well, that was

09:46:00

produced by Transunion this morning.

A Yes, I have.

Q And are these documents all documents that were created by, maintained by Transunion?

09:46:12 A Most of them, yes.

Q Those that weren't created by Transunion, those were documents received from Mr. Brim in response to disputes he filed with Transunion, and those documents were maintained as copies that were received? 09:46:22

A Correct.

Q Can you tell us, please, what is Transunion?

A We are a credit bureau.

09:46:28 Q And as a credit bureau, does Transunion receive information and compile information from various data furnishers on consumers?

A Yes, we do.

Q And then, in turn, does Transunion also provide consumers with copies of their credit report for them to review and correct if necessary? 09:46:44

A Yes. We do provide credit reports.

Q And does Transunion also provide credit reports to potential credit grantors on an 09:46:54

individual consumer?

A Yes, we do.

Q Are you familiar with Midland Credit Management?

09:47:02 A I have seen them before within the credit.

Q Are they a data furnisher for Transunion?

A They provide us information, yes.

Q And when a letter is received from a consumer, what is Transunion policy for handling a letter from a consumer?

09:47:16 A It is to review the letter and basically do what the consumer requests.

Q If that letter contains a dispute, regarding a specific account, how would Transunion handle that dispute?

09:47:28 A We would pull up the consumer's credit report. We would review the actual information, what they were disputing. And we'd initiate an investigation in -- where we would go back to the creditor to verify whatever the consumer was -- had a dispute with.

09:47:40 Q As part of that investigation, how do you actually go back to the original creditor?

A Most of the time, it's done electronically.

09:47:52

Q And is that done pursuant to an ACDV?
A That is correct.
Q And will you tell the jury what an ACDV is?
09:48:00 A That is an automated consumer dispute verification form.
Q And those are all -- all sent electronically to the data furnisher?
A Yes, they are.
09:48:10 Q Does Transunion also maintain the original letter from the consumer disclosure?
A Yes, we do.
Q And how does Transunion do that?
A We scan that into our on-base database.
09:48:22 Q Mr. Newnom, can you identify what Page 1 and 2 are of Plaintiff's Exhibit 43?
A This is an internal copy of our history of our communication with the consumer. It's actually -- the consumer contact is by telephone. 09:48:40 And we pull the copy of the consumer's credit report for review.
Q And Plaintiff's Exhibit 43 indicates that Mr. Brim telephoned Transunion on July 29th, 2008?
09:48:54 A Correct. Requesting a copy of his credit

report.

Q And at that time, did Mr. Brim indicate to Transunion that he had been denied credit?

A No. He did not. He came through the automated telephone system, requesting a copy of his report.

09:49:04

Q And do you see after it has the date and telephone it says consumer states and next to it says denied credit?

09:49:18

A Yes. That was selected.

Q Okay. So Mr. Brim indicated that he called in to the automated system that he had been denied credit?

A Correct.

09:49:28

Q And as a result of Mr. Brim's indication that he had been denied credit, did Transunion provide Mr. Brim with a free copy of his credit disclosure?

A Yes, we did.

09:49:38

Q If you'll turn to Page 3 of Plaintiff's Exhibit 43, it's actually on the bottom. Bates Number TU69. And following. Is that a copy of the credit disclosure, dated July 29, 2008, that was provided by Transunion to Mr. Brim?

09:50:00

A Yes. It is.

Q If you will turn to Bates Page 72 in that document.
A Yes.
Q There is an account identified as Midland Credit Management reporting on Page 72?
09:50:14
A Yes. There is.
Q Is that account reporting under the adverse account section of Mr. Brim's consumer disclosure?
09:50:28
A Yes, it is.
Q And that Midland Credit Management account is reporting as a collection account; is that correct?
A That is correct.
09:50:36
Q And could you tell us the balance that was reported on July 29, 2008?
A $1,617.
Q And the date place for collection was October of 2007?
09:50:48
A That is correct.
Q When Mr. Brim telephoned Transunion on July 29, 2008, and indicated to the automated system that he had been denied credit, did Transunion undertake any investigation to determine whether Mr. Brim had, in fact, been
09:51:06

denied credit or whether his credit report had been viewed by a potential grantor?

A We would review if there was a recent inquiry and then provide him with an updated report. But that is all we would do.

09:51:20

Q Okay. And if we look at the inquiry on this July 29, 2008 disclosure, there is an inquiry from First Metropolitan, MOR via Credit Plus from July 28, 2008; is that right?

09:51:36

A Correct.

Q And can you tell the jury, please, what a regular inquiry is for a credit transaction?

A They view the credit information on the consumer's credit report. The account information and possibly scores, as well.

09:51:50

Q Would they have had access to view all account information being reported regarding Mr. Brim if they were under the regular inquiry section?

09:52:02

A Yes. They would.

Q Okay. Do you see that Midland Credit Management is showing as an account review inquiry in May of 2008?

A Yes. I do.

09:52:18

MR. BENNETT: And Your Honor, I

believe that's Bates Number 76.

THE COURT: Okay.

MR. BENNETT: And Judge, now we'll be turning to Exhibit 2 in the transcript, which is 44 in the plaintiff's book.

09:52:44

THE COURT: Okay.

**BY MR. BENNETT:**

Q If you look at Plaintiff's Exhibit 44, Page 78 and 79, would that, again, be Transunion computer history of contact by Mr. Brim?

09:52:56

A Correct.

Q And in Plaintiff's Exhibit 44, how did Mr. Brim contact Transunion on that occasion?

A Through the internet.

09:53:08

Q And on what day did he contact Transunion?

A Tuesday, July 29th, 2008.

Q And did he request a copy of his credit report via the internet, as well?

A Yes, he did.

09:53:20

Q And that was at that time through the internet he requested his fact act free disclosure?

A That is correct.

Q Did Transunion also provide him another copy pursuant to that request through the

09:53:30

internet of his consumer disclosure dated July 29, 2008?

A He did view another report on line.

Q And would that have -- that report have been as set forth in Plaintiff's Exhibit 44 as that exact same report as was set forth in Plaintiff's Exhibit 44?

A Yes.

Q I'm sorry. The same report as in Exhibit 43. Yes. Great. Can you please identify what Plaintiff's Exhibit 3, which is 45 -- what Plaintiff's Exhibit 45 is?

A This is a dispute request from the consumer, Mr. Brim -- or I'm sorry. Jamon Brim on 8-4, 2008.

Q Was this actually received in person as an actual document by Transunion as opposed to over the internet?

A We received it by mail, yes.

Q At that time, Mr. Brim provided his social security number, date of birth, and driver's license number for verification of his identity?

A Yes, he did.

Q And which account was Mr. Brim disputing?

A On the first page, Bates 89, Midland

Credit Management.

Q And what did he say was the reason he was disputing the account?

A That he had paid this account in full and that he paid it before it went to collection or before it was charged off.

Q Did Mr. Brim also dispute two other accounts as not being his accounts?

A Yes. He did. On Bates 90, Professional Finance and Texas, I believe, guaranteed student loan.

Q Then I believe the last item that Mr. Brim indicated is incorrect is he provided additional employment information at Target Distribution Center; is that right?

A That is correct.

Q Along with his request for investigation that Mr. Brim filled out, did he also provide Transunion a copy of his driver's license and social security card?

A Yes, he did.

Q And a copy also of the consumer disclosure that he had received from July 29th, 2008, where in he circled the Midland Credit Management account?

A Yes, he did.

Q After Transunion received Plaintiff's Exhibit 45, what action did Transunion take?

A We pull a copy of the consumer's credit report and initiate an investigation into the Midland Credit Management account.

Q Can you identify what Plaintiff's Exhibit 4 is, which is 46? What Plaintiff's Exhibit 46 is?

A This is another correspondence from the consumer, disputing information on his credit report that we received on July -- I'm sorry. August 4, 2008.

Q To your knowledge, was Plaintiff's Exhibit 46 received separately from Plaintiff's Exhibit 45?

A I believe it was.

Q And in this letter, Mr. Brim, again, disputed the Midland Credit Management account as well as the Texas guaranteed student loan and the Professional Finance account?

A Yes, he did.

Q Did Mr. Brim provide any documentation with his letter to Transunion?

A He provided a Redstone Federal Credit

Union printout.

Q And did Transunion also initiate an investigation after receipt of Plaintiff's Exhibit 46?

09:57:00 A I believe it was all done at the same time. The -- the other document was received, as well.

MR. BENNETT: Judge, we have pulled out 47 and 48 for expediency, and the next

09:57:16 exhibit is 49, which is referred to as Exhibit 7.

THE COURT: Okay.

**BY MR. BENNETT:**

Q Can you please identify Plaintiff's Exhibit 49?

09:57:24 A This is an ACDV response from Midland Credit, reporting the consumer's information.

Q Does Transunion maintain a copy of the ACDV when it is sent out to a data furnisher or only once it's received back?

09:57:40 A I do not know if we keep a copy of the original sent out, but it just has the same information as the one received back except for the response from the creditor.

Q And can you tell me, please, what date

09:57:52 Plaintiff's Exhibit 49 was sent out to Midland?

A That would be eight -- I'm sorry. What date was that? It would have been 8-4, 2008.

Q And this would have been ACDV sent in response to Mr. Brim's disputes that were received by Transunion on August 4, 2008?

09:58:08

A Correct.

Q In Plaintiff's Exhibit 49 is an ACDV that was sent to Midland on August 4, 2008; is that correct? Is that right?

09:58:22

A Yes.

Q And it was sent to Midland via electronic transmittal?

A Yes.

Q And the ACDV was sent by Transunion to Midland in response to Plaintiff's Exhibit 45 and 46, which were the disputes received from Mr. Brim?

09:58:30

A Yes.

Q And what information did Transunion provide to Midland Credit Management regarding Mr. Brim's dispute?

09:58:44

A We provided what the consumer stated within his letters; that he claims he paid the original creditor before collection status or paid before charge-off and to verify the account

09:58:56

status, pay rating, current balance, amount past due, and payment history. And also we left a comment stating that the consumer stated he paid it on 11-8, 2004.

09:59:12 Q And what was Midland Credit Management's response to this ACDV?

A That they verified the information as being accurate and they also requested to have the remark changed from the collection status to account in dispute. 09:59:24

Q And as a result of Midland Credit Management's response to the ACDV by Transunion, the Midland Credit Management account remained on Mr. Brim's credit report?

09:59:34 A Correct.

Q And in response to the ACDV, Midland Credit Management indicated that the account was being reported correctly?

A Correct.

09:59:44 Q Now, can you please identify Plaintiff's Exhibit 50, referred to as Eight in your transcript?

A This is just a computer printout of the information regarding the dispute with Midland Credit that the consumer stated. 10:00:00

Q Does this show action taken by Transunion in response to Midland Credit Management's return of the ACDV?

A Yes. The first page prints out what was disputed, what was returned, and the second page is how the account looked before the investigation. And the change section states how it was modified after the investigation.

10:00:14

Q And if you look at Page 112, which is the second page of Exhibit 50, we see that the loan type went from factoring company account to collection agency/attorney.

10:00:34

A Correct.

Q Is that right?

A Yes, it is.

10:00:46

Q And that the account information disputed by consumer remark code was added?

A Yes, it was.

Q Okay. And then the date verified was updated from July of 2008 to August, 2008?

10:00:56

A Correct.

Q And it also is showing now as being verified as the account being verified?

A That verification states that we had communication with the creditor.

10:01:10

Q And that Midland Credit Management had verified the accuracy of the account that they were reporting?
A Based on the ACDV response, yes.
10:01:24 Q Can you tell me, please, what Exhibit 51 is? 51 is referred to as Nine in the transcript. Can you tell me what Exhibit 51 is?
A This is an updated version of the consumer's credit report, based upon the
10:01:38 investigation.
Q And after Transunion initiated its investigation and received an ACDV response from the data furnisher, does Transunion always send out an updated consumer disclosure to the
10:01:54 consumer?
A Yes.
Q And in that consumer disclosure, Plaintiff's Exhibit 51, the employment information has been updated to show Target
10:02:04 Distribution Center; is that correct?
A Yes.
Q And it also continues to show -- it also continues to contain the Midland Credit Management account?
10:02:14 A Yes.

Q Can you identify Plaintiff's Exhibit 10, which is 52?
A Yes. This is another written dispute communication with the consumer with Transunion.
10:02:32 Q What date was it received by Transunion?
A March 16, 2009.
Q What action did Transunion take upon receipt of Mr. Brim's letter?
A We would normally initiate an
10:02:44 investigation into whatever information he was disputing within this document.
Q And along with Mr. Brim's letter, which is dated March 10th, 2009, he also included a copy of the previous letter from July 29th, 2008; is
10:03:00 that right?
A On Bates 124, yes.
Q And a copy of the bank statement from Redstone Federal Credit Union, which is Bates 125?
10:03:10 A Yes.
Q And a copy of the July 29, 2008, consumer disclosure that he had received from Transunion?
A That is correct.
Q Can you identify, please, what Exhibit 11
10:03:26 is, which is 53?

A This is a copy of the consumer's report we pulled to actually view to initiate the investigation into his credit report.

Q Was Plaintiff's Exhibit 53 actually provided to Mr. Brim, or was it just a report that Transunion viewed?

10:03:38

A It's just a report Transunion viewed.

Q And on this March 18th, 2009, report, the Midland Credit Management account is still being reported on Mr. Brim's credit report?

10:03:52

A Yes, it is.

Q After Transunion pulled this credit report on March 18th, 2009, did Transunion also send a new ACDV to Midland Credit Management?

A I believe we did.

10:04:08

Q And if we look in this exhibit at the inquiry section, we can see that on January 15th, 2009, 224 RBC USA obtained a copy of Mr. Brim's credit report.

MR. BENNETT: And I believe, Your Honor, that's on Page TU142.

10:04:34

A Yes. They did.

**BY MR. BENNETT:**

Q And on December 10th, 2008, Platinum Mortgage via Factual Data also obtained a copy of

10:04:48

Mr. Brim's credit report?

A Yes, they did.

Q And on September 19th, 2008, First Metropolitan Mortgage via Credit Plus and also Hometown Lenders via Landsafe Credit both obtained a copy of Mr. Brim's credit report?

A That is correct.

Q And when we looked at the August, 2008, consumer disclosure, the Midland Credit Management account remained on Mr. Brim's credit report and credit disclosure; is that right?

A That is correct.

Q And there's no documentation that the Midland account was removed at any time between August, 2008, and this report dated March 18th, 2009?

A No. I have no documentation stating that.

Q And if Transunion had actually removed the Midland Credit Management account from Mr. Brim's credit report, there would be some type of documentation, evidencing its removal; is that right?

A Yes.

Q All right. So when we are looking at the inquiry, these four inquiries that occurred

between August, 2008 and March 18th, 2009 -- we know that for each of these four inquiries, the Midland Credit Management account was reporting on Mr. Brim's credit report at the time that these reports were obtained?

10:06:04

A Yes.

Q Can you please identify Exhibit 12, which is 54?

A This is an ACDV response received back from Midland Credit regarding the consumer's dispute.

10:06:20

Q And, again, when Transunion sent this ACDV to Midland Credit Management, they indicated Mr. Brim was disputing the balance, the payment amount, amount past due, current balance, and charge-off amount?

10:06:32

A Yes.

Q And did Transunion also indicate to Midland Credit Management that Mr. Brim indicated the account had been paid on November 8th, 2004?

10:06:42

A Yes. We did.

Q And in response, did Midland Credit Management verify the account was reporting as accurate?

10:06:54

A Yes. They did. They also updated the

balance to $1,698.

Q And was that the only change made, to update the balance?

A No. The date of first delinquency was updated to 10 of 2004. And the date verified March of -- of 2009.

Q And can you identify Plaintiff's Exhibit 14, which is 56?

A The first page is an internal copy of the computer system, stating that a -- updated results were sent to the consumer.

Q Then beginning with Bates Pages 149 through 151, is that the updated information that was provided to Mr. Brim?

A Yes. It was.

Q Can you identify, please, Plaintiff's Exhibit 15, which is 57?

A This is an internal copy of the history with the consumer that we pulled a copy of the credit report based on a telephone conversation.

Q So on February 24, 2010, Mr. Brim called in to Transunion?

A I believe so, yes.

Q At that time, was a new consumer disclosure provided to Mr. Brim?

10:08:38 
10:09:02 
10:09:14 
10:09:32 
10:10:02 

A Actually, let me see. I believe it was.
Q If we look at Bates page beginning on Bates Page 154, is that a copy of the consumer disclosure that was mailed to Mr. Brim?
A I believe so.
Q If we look at Page 157, is the Midland Credit account continuing to be reported on Mr. Brim's credit report as of February 24, 2010?
A Yes, it is.
Q And it's being reported as an adverse account?
A Yes, it is.
Q If you will, please turn to Bates 159.
A Yes.
Q We see two new inquiries that were added. We have an American Express inquiry. We have an American Express inquiry that was dated May 14, 2009, and a Wachovia inquiry, dated November 6, 2009, which are now evidenced on this March 24, 2010 disclosure.
A Yes.
Q And if you look at that document on Bates 157, is the Midland Credit Management account still reporting as of February 24, 2010?
A Yes, it is.

Q Is that account reporting with a balance of 17 -- $1,774?
A Yes, it is.
Q And the past due balance is also $1,774?
10:10:18 A Yes, it is.
Q And also an inquiry from American Express from May 14th, 2009?
A Yes.
Q Can you tell me, please, or identify what
10:10:34 Plaintiff's Exhibit 16, which is 58 -- what Plaintiff's Exhibit 58 is?
A Yes. I have it.
Q This -- can you please tell me or identify what Plaintiff's Exhibit 58 is?
10:10:56 MR. BENNETT: Page 54, Line 4.
A This is an ACDV response regarding the Midland Credit account.

**BY MR. BENNETT:**

Q What date was Plaintiff's Exhibit 58
10:11:06 received back from Transunion?
A 2-26, 2010.
Q And at that time that Midland responded to this ACDV, the only change made was to update the balance owing and the past due amount; is that
10:11:22 right?

10:11:32

A Yes.

Q As a result of Transunion receiving the ACDV response from Midland Credit Management, did Midland Credit Management account continue to be reported on Mr. Brim's credit report?

A Yes, it did.

MR. BENNETT: All right. And Plaintiff's Exhibit 59, for the record, which is 17 in the transcript, begins with Bates Page 162 and goes through 170.

10:11:46

**BY MR. BENNETT:**

Q And can you identify the first two pages of Exhibit 59?

A This is the internal copy of the information regarding the dispute with Midland Credit.

10:11:56

Q On Page 2, does that show the changes that were made, that were made by Transunion upon receipt of the ACDV response from Midland Credit Management?

10:12:10

A Yes.

Q And on Bates Page 163, it indicates that the account was verified and the balance was updated to $1,775?

A Correct.

10:12:22

Q And that the past due balance was also updated to $1,775?

A Correct.

Q Upon updating the account by Transunion,

10:12:32 did Transunion then send out a new consumer disclosure to Mr. Brim?

A Yes. They did receive a full updated report.

Q And that report is dated March 1, 2010?

10:12:44 A Yes.

Q And on this March 1, 2010 report, Midland Credit Management continues to be reported as an adverse account; is that right?

A Yes, it is.

10:12:54 Q And the date verified is now showing as February, 2010?

A Yes.

Q When we first looked at Plaintiff's Exhibit 43, it contained a consumer disclosure

10:13:08 for Mr. Brim, dated July 29, 2008. Do you recall that?

A Yes.

Q From July -- from at least July 29, 2008 through September 10 of 2010, did the Midland

10:13:22 Credit Management account remain on Mr. Brim's

Transunion credit report throughout that entire time?

A To my knowledge, I believe it did.

Q Mr. Newnom, does Transunion rely on its credit data furnishers to investigate consumer disputes when they are received regarding a specific account?

A Rely? They're required to look into the information.

Q And -- I'm sorry.

A I'm sorry. Yes. They are relied. To look into the account if the consumer disputes the information, yes.

Q In this particular case, did Transunion provide Midland Credit Management with Mr. Brim's disputes regarding the account?

A We relayed those disputes to Midland, yes.

Q And did Transunion rely on Midland Credit Management to investigate those disputes and respond?

A They were required to respond to the investigation, yes.

MR. BENNETT: And I think, Mr. Sykstus, we're at Page 72.

MR. SYKSTUS: That's what I show.

**BY MR. BENNETT:**

Q Let's go to the inquiry, and we'll come back to that question. If you'll look at Bates 159, which is part of Exhibit 57.

10:14:54 A Yes.

Q Exhibit 57, Page 159.

MR. BENNETT: Mr. Sykstus, actually, I apologize. Would you please go back up to Page 65 at line -- I'm going to read the

10:15:38 question at Line 7.

MR. SYKSTUS: Understood.

**BY MR. BENNETT:**

Q What is the impact in terms of credit score on an account being marked as disputed?

10:15:48 A It does not get factored into the credit score.

Q And so from early August, 2008 through September, 2010, the Midland account wouldn't have been factored into Mr. Brim's credit score?

10:16:02 A That is correct.

Q Page 72, we'll go to the inquiry and we'll come back to that question. If you will look at Bates Page 159, which is part of Plaintiff's exhibit 57.

10:16:16 A Yes.

Q The entities listed under regular inquiry, these entities received information regarding Mr. Brim and his credit from Transunion; is that correct?

10:16:26 A Yes.

Q And the entity would not be listed under the regular inquiry section if Transunion did not provide that entity with some information regarding Mr. Brim?

10:16:38 A Correct.

Q And the inquiries are actually contained on a consumer disclosure to educate and inform the consumer as to which entities have used his credit information?

10:16:50 A Yes.

Q And at the time of the inquiries that we've gone over from July 28, 2008 through November 6, 2009, during that time, the Midland Credit Management account was being reported on

10:17:10 Mr. Brim's credit report?

A Yes, it was.

MR. BENNETT: I don't have any other -- I'm not sure if there are additional sections. The defendant has not designated any.

10:17:18 MR. LANGLEY: There are other

sections. We're going to try the video once. If it doesn't work, we'll do a read-in.

I'm not sure if the jury has been made aware of the white binders in their chair.

10:17:32 THE COURT: The white binders are the defendant's admitted exhibits.

So are you going to -- Mr. Langley, are you going to state when you get to your exhibit numbers in the deposition book what exhibit number they are in the handbook?

10:18:02 MR. LANGLEY: Yes.

THE COURT: Do y'all need a break first? Okay.

MR. BENNETT: We don't have any objection.

10:19:04 THE COURT: Okay.

MR. LANGLEY: Your Honor, some of the exhibits in the cross-examination are references to the plaintiff's exhibits. One of them is to our exhibit notebook.

10:19:18 THE COURT: Okay. Could you give me one?

MR. LANGLEY: Yes.

MR. BENNETT: Your Honor, while the video is loading, our final witness will be

10:19:36

Mr. Brim. And then we will rest. In terms of the Court's scheduling knowledge.

THE COURT: Okay.

MR. LANGLEY: Okay. We gave it one try. We'll read it in.

MR. BENNETT: I'm sure, Judge, both parties will agree at the end of the trial to give DVDs to the jury so they can cure insomnia on their own time.

THE COURT: Do what, now?

MR. BENNETT: I said, we can give the jury copies --

THE COURT: No. We certainly cannot. I told the jury to begin with what they hear in the courtroom is what they hear. I don't repeat. You weren't here. But I did say that. Your co-counsel will verify that. We may not give the jury anything except with my permission.

MR. BENNETT: Yes, Your Honor.

THE COURT: And you may not give them a DVD.

MR. BENNETT: Yes, Your Honor.

THE COURT: All right. Mr. Tompkins, are you ready? Are you going to be Mr. Newnom?

MR. TOMPKINS: I am.

THE COURT: All right.

**CROSS-EXAMINATION**

**BY MR. LANGLEY:**

10:21:18 Q Can you identify, please, what Defendant's Exhibit 19 is?

A 19 is an AUD, an automated update to the consumer's credit report.

Q Is that also known as a universal data

10:21:34 form?

A Yes, it is.

Q And can data furnishers or credit data furnishers provide universal data forms to a credit reporting agency in order to change or

10:21:46 remove an account from a consumer's credit report?

A Yes, they can.

Q And did Transunion actually receive this universal data form from Midland Credit

10:21:54 Management?

A Yes. We did.

Q And if you would, look at Plaintiff's Exhibit 19.

A Yes.

10:22:14 Q Can you identify Plaintiff's Exhibit 19,

please?

A This is an internal copy of the automated universal data form.

Q And what actions did Transunion take upon receipt of the universal data form?

A We removed the Midland Credit account from the consumer's credit report.

Q And what date did Transunion remove the Midland Credit Management account from Mr. Brim's credit report?

A 9-10, 2010.

MR. LANGLEY: Moving to Page 62, Line 15.

**BY MR. LANGLEY:**

Q Thank you. Mr. Newnom, Ms. Cauley asked you some questions about the period of time during which Transunion reported the Midland account and the dates July 29, 2008 through September 10, 2010 were identified. Do you remember those questions?

A Yes.

Q At what point during that time period did the account begin to report as a disputed account?

A I believe it was right after the first

investigation we initiated. So I believe it was still in July or August of 2008.

Q Let me direct your attention to Plaintiff's Exhibit 49. Earlier this document was characterized as the ACDV that was sent to Midland. Do you remember that conversation?

A Yes. I do.

Q Is this the actual document sent to Midland, or is it a summary of the information sent to Midland?

A It is a summary of the information. An actual printout of the computer transaction.

Q Would any information sent to Midland in connection with this dispute be included within Exhibit 7?

A That we --

Q Which is Plaintiff's 49?

A That we -- Midland was sent back to Transunion or we sent to Transunion, I mean -- I'm sorry. What we sent to Midland?

Q Is there any information that Transunion sent to Midland that is not reflected in Plaintiff's Exhibit 49?

A No. There is not.

Q I think Ms. Cauley asked you at one point

did you agree that there was a statement in the ACDV reflecting that the consumer claimed the debt was paid on November 8, 2004. Do you remember that?

10:24:38 A Yes, I do.

Q Where is that reflected in exhibit -- Plaintiff's Exhibit 49, if at all?

A It is actually reflected right between the two dotted lines where it says consumer message

10:24:50 on the left-hand side.

Q Is that information that is actually transmitted to Midland or just information that Transunion retains internally?

A It is information that is relayed to

10:25:02 Midland.

Q Do you know if any supporting documentation was sent to Midland in connection with the dispute represented on Plaintiff's Exhibit 49?

10:25:12 A No. It was not.

Q Was it in response to this ACDV that the -- that Mr. Brim's account was updated to report as disputed?

A Yes.

10:25:22 Q And this was in early August, 2008?

A Yes, it was.

Q And at any point prior to the actual deletion of the account in September of 2010, did the account report as anything other than disputed?

10:25:38

A To my knowledge, it did not.

Q What is the impact in terms of credit score on an account being marked as disputed?

A It does not get factored into the credit score.

10:25:48

Q And so from early August, 2008 through September, 2010, the Midland account would not have been factored into Mr. Brim's credit score?

A That is correct.

10:26:02

Q Would you please look at Plaintiff's Exhibit 51? On the second page of Plaintiff's Exhibit 51, there is a cover letter dated August 7, 2008. Is this the cover letter transmitting to Mr. Brim the updated credit report following the investigation of his initial dispute?

10:26:28

A Yes. It is.

Q In the second paragraph of that letter, there is a sentence that reads, if our investigation has not revolved your dispute, you may add a 100-word statement to your report. Do

10:26:40

you see that?

A Yes, I do.

Q Did Mr. Brim ever avail himself of that opportunity?

10:26:50 A I have no knowledge that he did.

Q Is there any document that you're aware of that would suggest that he at any time during this entire process availed himself of that opportunity?

10:27:00 A No. I do not have anything in regards to that.

Q If you would, please, turn to Plaintiff's Exhibit 53.

A Yes. I have it.

10:27:08 Q And specifically -- specifically, would you look at the third-from-the-last page, which bears the Bates Number TU142?

A Yes. I have it.

Q Under the regular, regular inquiry

10:27:32 section, Ms. Cauley had asked you some questions about the top four inquiries underneath that heading. Do you remember those questions?

A Yes. I do.

Q And those inquiries were from RBC Bank,

10:27:44 First Metropolitan, Platinum Mortgage, and

Hometown Lenders. Do you see those inquiries on Plaintiff's Exhibit 53?

A Yes, I do.

Q Do you know why any of these entities were requesting information from Transunion?

10:27:58

A I don't know specifically why. But it was for some credit transaction.

Q Do you know what type of information specifically they requested?

10:28:08

A No. I do not.

Q Do you know what type of information they were seeking?

A No. I do not.

Q Do you know how they used it, if at all, any of the information they may have received from Transunion?

10:28:18

A No. I do not.

Q And if you would, please, turn to Plaintiff's Exhibit 57. And specifically, I want to ask you about the second-from-the-last page, which bears a Bates Label TU159.

10:28:36

A Yes.

Q Under regular inquiries, there is listed an inquiry from Wachovia and American Express at the top. Do you see that?

10:28:52

A Yes, I do.

Q Do you know what information Wachovia or American Express requested?

A No, I do not.

10:29:00 Q Do you know specifically what information Transunion sent, if any, to Wachovia and American Express?

A No. I do not.

Q Do you know why Wachovia or American

10:29:10 Express may have been requesting information from Transunion?

A No. I do not.

Q If Transunion provided any information at all to Wachovia or American Express, do you have

10:29:22 any knowledge of how they used it, if at all?

A No. I do not.

Q Staying with Plaintiff's Exhibit 57 for a moment and looking at the pages bearing Bates Label 156 through 157?

10:29:36 A Yes.

Q How many adverse accounts are reflected in this report marked as Plaintiff's Exhibit 57?

A I'm showing three.

Q And if we go back to Plaintiff's Exhibit

10:29:56 53 for just a moment and look specifically at

Bates Label 139 and 140, how many adverse accounts are reflected in the report marked as Plaintiff's Exhibit 53?

A Three.

10:30:18 Q Mr. Newnom, can you say whether the Midland Credit Management account -- if any creditors saw it at all actually mattered to them?

A What they actually viewed as to what they actually physically saw, no, I cannot. Or how they determined it. 10:30:32

Q And can you -- can you say with any degree of certainty whether it mattered if they saw it?

A No. I cannot.

10:30:44 Q To know whether or not it mattered, we would have to ask the entities making the inquiry?

A Yes. You would.

MR. LANGLEY: That's all I have.

10:30:52 THE COURT: Okay. Anything else?

MR. BENNETT: No, Judge.

THE COURT: Okay. We're going to take a morning break. While you're on break, don't discuss the case among yourselves. And don't let anyone discuss it in your hearing or 10:31:00

your presence. And come back in 20 minutes.

(Jury excused.)

(Short recess.)

(In open court. Jury present.)

10:57:42 THE COURT: Have a seat. You ready for your next witness?

MS. CAULEY: Yes, Your Honor. The plaintiff calls Jamon Brim.

(Witness sworn.)

10:58:04 THE COURT: Good morning.

THE WITNESS: Good morning.

COURTROOM DEPUTY: Will you state your first and last name?

THE WITNESS: My name is Jamon 10:58:24 Brim. J-A-M-O-N B-R-I-M.

COURTROOM DEPUTY: Thank you.

**DIRECT EXAMINATION**

**BY MS. CAULEY:**

Q Mr. Brim, can you tell us, please, your 10:58:38 address?

A My address is 2426 Autumn Ridge Drive, Southwest, Huntsville, Alabama 35803.

Q And how long have you lived in the Huntsville area?

10:58:48 A I have lived in Huntsville for

approximately 11 years.
Q What --
A On my own.
Q What brought you to Huntsville?
10:58:58 A I first came to Huntsville, Alabama in 1996 when I attended -- when I started Alabama A & M. But I left and -- in, I think, '98 or '99 to go back home to work. I think I took two jobs. Because at school, I was broke, basically,
10:59:20 to be honest.
Q And after you went back home, did you come back to the Huntsville area?
A I did come back to go to school. And I think I came back in 2000.
10:59:30 Q Have you been in Huntsville ever since 2000, then?
A I have.
Q Do you consider Huntsville home now?
A I do.
10:59:36 Q When you came back to Huntsville, did you go back to Alabama A & M?
A I did.
Q And did you finish school there?
A I finished school at Alabama A & M.
10:59:46 Q What kind of degree do you have from

Alabama A & M?

A I have a degree in -- I'm sorry. I have a bachelor of science in business administration, concentration in management with a minor in accounting.

10:59:58

Q And while you were attending school at Alabama A & M, did you have to work several part-time jobs at the same time?

A I did. I worked the whole time I was at school, I think. What -- would you like to know each job?

11:00:10

Q No.

A I worked the whole time I was in school.

Q Okay. And what year did you graduate from Alabama A & M?

11:00:20

A I graduated in 2004.

Q Okay. And what did you do when you graduated from school?

A I worked and went to school. I started school at University of Maryland University College after I graduated from Alabama A & M. And I worked at Target Distribution Center.

11:00:34

Q Were you working at Target full time when you started at the University of Maryland University College?

11:00:48

A I was.

Q That's a hard name.

And how were you attending that school?

A It was on line. It was an on line, working on my master's. A dual master's in accounting and information technology.

Q And when you started attending that school on line, is that what prompted you to purchase the computer?

A That was. I needed the computer to attend school on line.

Q And I'm going to come back to the purchasing of the computer. But can you tell us where you're employed now?

A I am now employed with Yellow Book USA.

Q And how long have you been working for Yellow Book?

A I have been working with Yellow Book since June of 2005. June 22nd, actually, 2005.

Q What do you do for them?

A I am a regional distribution manager. Would you like to have a description?

Q Yes.

A I am a regional distribution manager. I just travel around and hire independent

contractors to deliver phone directories. And I recruit, train people how to deliver phone directories. I also am responsible for people who are hired to work inside the warehouse, like, as far as dock workers who hand the people the phonebooks to put in their car. We used to have verification operators who verified that people received their phonebooks. I used to have to train them and were responsible for them.

Q And what is your -- you said you were regional distribution manager. What region do you cover now?

A I am responsible for all of Alabama. Recently, a young lady was promoted in Pensacola, Florida, let's say, a month ago. Now she also covers the lower part of Alabama. So I am responsible from north Alabama to Montgomery, basically.

Q Because you have such a broad territory, does your job require that you travel a good bit?

A I travel 90 percent of the time.

Q And when you travel, how does that work? Do you stay in hotels or --

A I am. I stay in hotels for the duration of the project. We call the markets, which is

the phone directory -- whenever we're delivering, we call that project. So I stay in the project from start to end, finish.

Q And when you travel and you have to stay in those hotels, do you pay for those expenses out of your pocket first or how does that work?

A I do. We have to pay for our expenses first. Say, for instance, I have to rent a hotel or buy food. In the instance, I might have to go to Florida. So I would have to rent a hotel and rent a car because they fly us to Florida or Iowa. And rent everything upfront. And then we submit expense reports, and then they reimburse us.

Q Now, let's go back to the Dell computer.

A Okay.

Q And could you tell us in 2004 -- can you just describe the process about how you went about purchasing the computer?

A I did. In 2004, the only reason I purchased the computer with Dell is because we had a discount -- an employee discount program with Target. So it allowed me to purchase a computer at a discount rate. So when I bought the computer in 2004, I wanted to establish

credit to get my credit on track. So I purchased a computer on credit. But I knew I was going to pay for the whole thing within 30 days before they started charging interest.

11:04:42 So I ordered the computer. And I shortly received it after. And I think -- would you like to know how I paid and everything right now?

Q Well --

A I mean, because I --

11:04:56 THE COURT: It's all right if you just tell us. She will stop you.

A You asked me --

THE COURT: It's fine. Just tell me what you did.

11:05:04 THE WITNESS: I'll go into everything. It comes to me, and I remember.

THE COURT: Just tell us where you ordered the computer and how you went about paying for it.

11:05:12 THE WITNESS: When I ordered the computer, I called in and told them on November that I wanted to pay because I knew that I wanted to pay within 30 days. So I called in. And I spoke with -- it was a lady at the time. And I

11:05:26 called --

THE COURT: At Dell's?

THE WITNESS: Yes. At Dell. And she -- she told me how to -- she told me -- she added in a surge protector and everything. So I bought everything. She told me the price. She told me I could pay by check. And I did not pay by check because I didn't have any checks. I had a bank account, though. So I paid by check over the phone, which was the easiest thing. So I paid by check for the balance over the phone for the computer.

**BY MR. CAULEY:**

Q When the Dell representative told you you could pay by check or check over the phone, did she tell you the exact amount to -- that they were going to transfer as check by phone?

A She did. I think it was -- I might be wrong, but I think it was $954.12. Close to it.

Q And after you sent in the -- that payment by check over the phone, were the funds withdrawn from your bank account?

A They were.

Q Was that in November of 2004?

A That was in November of 2004. Maybe I purchased it on November the 4th, but the funds

didn't come out of the bank until November the 8th.

THE COURT: Of 2004?

THE WITNESS: Of 2004.

11:06:38 **BY MS. CAULEY:**

Q After you made the payment and the funds were withdrawn from your bank, did you receive any communications from Dell on that computer bill?

11:06:44 A After I purchased the computer, I started receiving bills from Dell.

Q What did you do when you started getting bills from Dell?

A At first I was, like, what is this? I 11:06:58 paid for my computer. Then I -- I thought they were wrong. So I called in. And they asked me -- they transferred me to the finance department. I told them that the computer was paid for. And they asked me for a receipt. I 11:07:14 didn't have a receipt. And then they asked me for a check it was, I think. So I told them I didn't pay by check, but I paid by check over the phone. And I said, I can provide my bank statement. So they said that was fine. So that 11:07:28 was the end of that phone call. But I went to

the bank and obtained --

Q Mr. Brim, when they said you could provide a bank statement, did you actually provide a copy of your bank statement to Dell?

11:07:40 A I did.

Q Did you mail that in or fax it in? How did that work?

A I faxed that in at first.

THE COURT: Did you go to the bank

11:07:48 to get it? Is that what you were about to say?

THE WITNESS: I did. I went to the bank to get the bank statement because I didn't have it.

**BY MS. CAULEY:**

11:07:54 Q I'm sorry. So you actually had to go to Redstone to get a copy of the bank statement?

A I did.

Q And after you did that is when you faxed it in to Dell?

11:08:04 A I did.

Q After you faxed in that bank statement to Dell, did you continue to receive bills from Dell?

A I did.

11:08:10 Q Tell us what you did when you continued to

receive bills from Dell.

A I sent them bank statements. I called in again. And they asked me for -- they said -- they asked for a transactional detail report. So at that time, I didn't have a clue what a transactional detail report was.

So I went to the Madison branch of Redstone Federal Credit Union, and I asked for a transactional detail report. I had my bank statement with me. The lady who I spoke with at that branch told me that she didn't know what a transactional detail report was. And then she looked at my bank statement. She said, this is it.

I said, I bought a computer from Dell. And they're saying they never received the funds. She said, this is it right here. She pointed at the specific account and she said, this is a transactional detail report. This shows you that the money came out of the account; that it was paid.

Q And after you had been to Redstone Federal Credit Union and been informed that your bank statement was a transactional detail report, did you contact Dell and tell them that same thing?

A I did contact them. And I let her know that my bank told me -- that lady told me that that was a transactional detail report.

Q And at that time, did Dell ever explain to you that anything else was necessary in order to get this taken care of?

11:09:28

A They did not.

Q Did you continue to receive bills from Dell?

11:09:36

A I did.

Q And did you make any other phone calls to Dell and try to talk to someone about the problem?

A I think I worked with someone in the recovery department, which basically the same thing happened. I sent my bank statement in.

11:09:44

Q Did you have problems getting this matter resolved with Dell?

A I did.

11:09:54

Q And did you end up having to file a complaint with the Better Business Bureau?

A I did.

Q And was the complaint with the Better Business Bureau, was that done on line?

11:10:08

A It was.

Q We're going to take a look at something in the defendant's book.

A Okay.

Q Exhibit 8. Do you have Exhibit 8?

11:10:48 A I do. I do. This is the complaint I filed with the Better Business Bureau.

Q If you will look under the entry for October 29th, 2005 --

A Okay.

11:11:06 Q Can you read -- it's consumer rebuttal to business response. And can you read what you entered on October 29th, 2005?

A Okay. The received business rebuttal response is did -- this statement here? I'm

11:11:28 sorry. This the one you want me to read?

THE COURT: From 11-04, 2005?

**BY MS. CAULEY:**

Q No. 10-29. Do you see it? Middle of the page.

11:11:36 A I see it. Consumer rebuttal to business response. The consumer indicated he/she did not --

Q Right under that is actually your entry. It starts with I have.

11:11:54 A I am writing in response -- right there?

Q No. Right above that. Under October 29th.

A Are we on the same page?

Q Let me show it to you.

11:12:04 THE COURT: There's actually a hole.

THE WITNESS: It is.

THE COURT: You can't see what it says.

11:12:10 THE WITNESS: You can't see.

**BY MS. CAULEY:**

Q I'll give you my copy. It's right here.

A Yes. That's where the hole is.

I have sent several bank statements, and 11:12:22 the problem still has not been resolved. I sent a statement with the bank letterhead and still nothing happened. The bank stated that they did not know what a transactional detail report was but showed the payment on their end. The bank is 11:12:42 Redstone Federal Credit Union in Huntsville, Alabama, and the telephone number is (256) 327-1625.

Q Thank you, Mr. Brim.

A You're welcome.

11:13:04 Q That was actually your response to the

Better Business Bureau in October of 2005?
A Okay.
Q Is that right?
A That is. I mean, that's kind of fuzzy. That is quite a few years ago.
11:13:16
Q After you had sent this in to the Better Business Bureau and notified them that your bank had indicated a transactional detail report was the same as your bank statement?
11:13:30
A Correct.
Q Did you receive any other documentation from Dell where you were able to resolve the dispute?
A No.
11:13:40
Q I'm sorry?
A I just received a bill.
Q Did you ever have any difficulties communicating with Dell with their telephone operators, maybe?
11:13:52
A We did. Every time I called in, it would be foreign guys. I think they were Indian. So we had a language barrier problem.
Q And were you ever able to work out the dispute you had with Dell prior to the account being sold to Midland?
11:14:10

A I did not.

Q How did you learn that Dell had sold your account to Midland?

A I received a bill from Midland -- a letter from Midland, letting me know that they have taken over the account from Dell.

Q Do you recall approximately when you received that first letter from Midland?

A If I -- I think it was maybe October, '07. Maybe.

Q Okay. And in October of 2007, do you recall what that letter from Midland stated?

A It stated that I owed a balance for a computer from Dell, and that I had 30 days to respond to the letter -- to the letter and deny the balance.

Q Did you respond to that letter from Midland in October of 2007?

A I did. Because I actually received a call from Midland. And I spoke to a lady. When she did call, she told me about the balance. We discussed everything about the balance with Dell. And I told her that it was paid. She asked me for a check by phone. I told her that I did not have a check -- a cancelled check, but I could

provide her my bank statement. And she transferred me to a supervisor, a manager. And this was a guy at that time. And I told him that I had a bank statement. So I faxed it in to him because he asked for a bank statement. So I faxed it in.

11:15:48

Q Okay. Now, this call you received, was that, like, a collection call from Midland?

A It was a collection call. It was a collection call from Midland.

11:15:58

Q They were trying to get payment from you?

A They were.

Q And that -- you think that call that you had with Midland or that you received from Midland -- was it within the 30 days of the letter you had gotten from Midland?

11:16:08

MR. LANGLEY: Objection. Leading.

THE COURT: Overruled.

A I received a call in 2007 between -- if it had to be October, I would say maybe in November.

11:16:20

**BY MS. CAULEY:**

Q And at the time that you spoke with the manager from Midland and you faxed in your statement, did you receive any other communication from Midland?

11:16:30

A I did.
Q What's the next communication you received from Midland?
A Another bill.
11:16:38 Q Do you recall when that was?
A I would think maybe another one -- I received one between two calls -- between the call after the first bill. So I think I received another one in either December or January. I
11:17:00 can't remember.
Q That would have been December of 2007, January, 2008?
A Yes.
Q And after you received that letter, did
11:17:08 you take any steps to contact Midland or provide them another bank statement?
A I provided them another bank statement.
Q If you will, look in the black binder that's up there, the plaintiff's exhibits, and
11:17:32 look at Plaintiff's Exhibit 3.
A Which exhibit?
Q Three.
A Okay.
Q Mr. Brim, I told you the wrong number. I
11:17:54 meant Number 2.

A Okay.

Q Mr. Brim, let me ask you this: Have you ever testified in court before?

A I have not.

11:18:08 Q Are you nervous?

A A little bit.

Q I understand. If you'll look at Plaintiff's Exhibit 2 --

A Okay.

11:18:18 Q And turn to Page 2.

A Okay.

Q Is this a copy of the bank statement that you provided to both Dell and to Midland?

A It is.

11:18:34 Q So this is the bank statement we've been referring to?

A This is the bank statement.

Q Now, if you'll turn, please, to Exhibit Number 11 --

11:18:46 THE COURT: Let me ask you something. Is the statement that is on Page 2 of that exhibit where it says 11-08 Dell Financial Payment 041106 $954.12 -- is that what you sent to them?

11:18:58 THE WITNESS: Yes, ma'am. And I

circled it. I actually circled the payment.

THE COURT: All right. So this is just a different copy than the copy you sent?

THE WITNESS: This is the different copy.

MS. CAULEY: Your Honor, this is the actual certified copy from Redstone.

THE COURT: Next exhibit?

MS. CAULEY: Number 11. I'm getting ahead of myself. Number 10.

THE WITNESS: Okay.

MS. CAULEY: Apparently I can't count this morning.

**BY MS. CAULEY:**

Q Exhibit 10 is a letter from Midland, dated January 22nd, 2008. Do you recall if you ever received this letter?

A I did receive this letter.

Q And what happened when you got Plaintiff's Exhibit 10?

A The first thing that I did was thought that how did a 900-dollar computer become $1,600. And then I wondered why am I still receiving a bill for this.

Q At the time that you received Plaintiff's

Exhibit 10, had you already forwarded a bank statement to Midland on two previous occasions?

A I did.

Q And will you read the -- under the current owner section where it sort of is indented, under that, there is a statement.

A Original --

Q Starts with this letter?

A Okay.

Q Can you read that?

A This letter is to inform you that Midland Credit Management, Incorporation is considering forwarding this account to an attorney with the intent to initiate legal action to satisfy the debt.

Q How did you feel when you got this letter that says they were intending to sue you?

A Very upset. Highly upset. I was upset when I received this letter. It felt like talking to a wall, sending bank statements to people who obviously did not do anything with the bank statement. I mean, didn't let me know what else I needed to send.

Q Did you contact Midland after you received this letter?

11:21:40
11:21:50
11:22:12
11:22:34
11:22:46

A After this one, I don't think I did. Because -- after this letter, I think I was traveling at the time.
Q When you're traveling, are you gone for weeks at a time?
A Months. Weeks, months at a time.
Q When you got back from traveling, did you have any other communication regarding Midland or from Midland?
A I did. I think at that time I was gone until maybe midsummer. And I received -- I got home, and it was a card on my door from a sheriff. And after I saw the card, I pulled the card out of my door. And I looked at the -- I checked my mail. And it was a -- I was sued by Midland, represented by a law firm, Schwartz it was, I remember.
Q Let me ask you if you will turn to Plaintiff's Exhibit 17.
A Okay.
Q Did you receive a copy of this letter that's Plaintiff's Exhibit 17?
A This is the letter that I received.
Q When you came back from traveling for work, you had a card on your door from the

sheriff and this letter, as well?

A I did.

Q And what steps did you take after you had the letter from the attorneys and the notice from the sheriff and card from the sheriff to contact Midland?

11:23:06

A At this point, I think this was mid July or when was this? When I received this letter, April, I think I was out of town still. So I didn't respond to this letter.

11:23:28

Q And if you look at Plaintiff's Exhibit 18, that's actually a copy of the lawsuit that was filed against you in May of 2008. Did you ever actually get a copy of that lawsuit personally?

A I didn't because I was out of town.

11:23:50

Q During this same time frame in the summer of 2008, were you applying for credit at all?

A I was.

Q What reasons were you applying for credit?

A I wanted to get a house in 2008.

11:24:04

Q Why were you looking for a house?

A Because I wanted -- I wanted a yard. I have two children, ages seven and four. I wanted a yard that my kids can play in, to grow up in a house.

11:24:20

Q Have you ever owned your own home before?
A Never.
Q And so in summer of 2008, you had started that process of trying to --
11:24:30 A I did. I wanted to get the financing first because I thought that that would be easier.
Q And where did you go initially to try and get financing for a home?
11:24:38 A I think it was several lenders at that time. I think Lending Tree was one. First Metropolitan was one. Countrywide was one. And Platinum Mortgage was one.
Q And are those places that you had gone at
11:25:02 various times in 2008 to apply for a mortgage?
A It was.
Q In July of 2009, do you recall if you were denied a mortgage?
A I was.
11:25:10 Q I'm sorry. 2008.
A Oh. I'm sorry. I didn't even hear -- did you say another year?
Q I did. In July of 2008, were you denied a mortgage?
11:25:20 A I was.

11:25:28
11:25:48
11:26:00
11:26:14
11:26:30

Q As a result, did you request copies of your credit report?
A I did.
Q Can you tell us about that process, how you went about obtaining copies of your credit reports?
A I did that on line with Equifax. Maybe I paid for one. Equifax. I can't remember. And then I called Transunion. And I did it on line, as well. And I did it on line with Experian.
Q And did you actually receive copies of your credit reports in July of 2008?
A I did.
Q What did you do when you received those copies?
A I looked at the credit report thoroughly. And I had a few disputes.
Q Did you prepare a letter to send to the credit reporting agencies?
A I did. I had to -- I did a little bit of research to find, you know, dispute letters for credit reporting. And I also used a couple of business communication books that I had.
Q Is that how you drafted your dispute letter?

11:26:58
11:27:12
11:27:24
11:27:36
11:27:54

A It is.
Q All right. And if you'll look in your notebook to Plaintiff's Exhibit 37. Do you have that?
A I do. Is it the letter that I sent?
Q Right. Is this -- can you tell us, please, what Plaintiff's Exhibit 37 is?
A This is the dispute -- it looks like the dispute that I sent to Equifax.
Q And in your letter to Equifax, what account did you dispute?
A I disputed the Midland Credit Management account.
Q And did you give a reason of why you were disputing that account?
A I did. Let's see. Because the account was paid on November the 8th, 2004.
Q When you sent -- did you mail this letter to Equifax?
A I did mail this letter.
Q When you sent this letter to Equifax, did you send any other documentation with it?
A I sent along with this my credit report that came with it, and I think I sent my driver's license.

Q Did you include a copy of your bank statement, as well?
A I did.
Q Do you recall how you mailed your dispute letter to Equifax?
11:28:04
A Certified mail.
Q If you'll turn back to Plaintiff's Exhibit 4.
A Okay.
11:28:38
Q Is Plaintiff's Exhibit 4 the green card you got back from your certified mail?
A This is a copy of it.
Q On Page 2, can you tell us what that is?
A Page 2 is the certified receipt that I sent.
11:28:54
Q It looks like it cost $6.41 to mail your letter to Equifax?
A It did cost that.
Q Did you actually pay all these charges yourself to mail these --
11:29:06
A I did pay these charges.
Q In addition to writing Equifax, did you write anyone else a dispute letter in July of 2008?
11:29:18
A I did. I wrote a letter to Transunion,

Experian, and also Midland.

Q All right. Let's look at your letter to Transunion first. And that is page -- Exhibit 46.

11:29:42 A 40 --

Q 46.

A Okay. Okay.

Q When you sent your letter to Transunion, what accounts did you dispute on your Transunion credit report?

11:30:00

A I disputed Midland Credit Management, Texas Guaranteed Student Loan, and Professional Finance.

Q What reason did you give for disputing the Midland account?

11:30:20

A Because the bill was paid on November the 8th, 2004.

Q And what reason was given for the two other accounts that you disputed?

11:30:26 A They were my brother's.

Q Did you include a bank statement with your letter to Transunion?

A I did. I included by bank statement, my social security card, and driver's license.

11:30:44 Q And if you'll look at Plaintiff's Exhibit

45?

11:31:02

A Okay.
Q Do you recognize Exhibit 45?
A I do.
Q Can you tell us what that is?
A This is a letter that came along with my credit report that I filled out.
Q Did Plaintiff's Exhibit 45 go to Transunion, as well?

11:31:16

A I did.
Q On that, what accounts did you dispute?
A Midland Credit Management.
Q What reason did you give for disputing the Midland Credit Management?

11:31:30

A That I paid this account in full, and I paid this before it went to collection or before it was charged off.
Q And then if you'll please turn to Plaintiff's Exhibit 63.

11:31:52

A I have it.
Q Can you tell us what Plaintiff's Exhibit 63 is?
A This is the dispute that I sent to Experian.

11:32:18

Q And with the dispute to Experian, did you

continue to dispute the Midland account?

A I did.

Q Did you include any documentation with your dispute letter to Experian?

11:32:30 A I did. It's transactional detail report from my bank and a copy of my social security card and my driver's license.

Q At the time that you were sending in the disputes to Transunion, Equifax, and Experian,

11:32:46 did you send a dispute letter to any other company?

A I sent a dispute letter to Midland.

Q And that's going to be Plaintiff's Exhibit 11.

11:33:04 A Okay.

Q If you'll turn to that, please.

A Okay.

Q Is Plaintiff's Exhibit 11 a copy of the letter that you sent to Midland in July of 2008?

11:33:40 A It is.

Q Can you read what you put in your letter to Midland, please?

A Dear sir or ma'am, I am writing to you in response to the recent communication I received

11:33:52 from your office regarding this alleged debt. I

refuse to pay this debt. And I will not pay this debt. I dispute this debt. Please do not contact me again by phone or in writing. The reason I dispute this debt is because this debt was paid on November the 8th, 2004. Accompanied is a transactional detail report from my bank, showing the payment and transaction number.

11:34:04

Q At the time that you sent this letter, had you received additional telephone calls from Midland to collect the account?

11:34:22

A I don't think so at that time.

Q And when you sent this letter, did you include anything other than the transactional detail report from Redstone?

A Did I include anything with this? I think it was maybe my driver's license copy.

11:34:36

Q But you at least sent the transactional detail report from Redstone?

A I did send that transactional detail report.

11:34:52

Q After your letter to Midland in July of 2008, did you receive any response back from Midland?

A In 2008?

Q Yes. After your letter of July 29th,

11:35:02

2008.

A Not right offhand, I didn't.

Q Did you receive any telephone calls from Midland?

11:35:10 A I didn't.

Q After you sent in your dispute letters to the credit bureaus, did you receive an updated credit report from each of the three credit reporting agencies?

11:35:22 A I did.

Q And do you recall if in response to your letter to Transunion -- what was the outcome of your dispute regarding the Midland account?

A That they did not take it off; that the

11:35:40 account was valid. Midland reported the account as valid, and they kept it on there.

Q And what about with Equifax? Do you recall what happened with Equifax?

A Equifax -- I think they -- I think they

11:35:54 left it on there. But I think they -- the balance was zero with Equifax.

Q And what about Experian? What was the result of your dispute with Experian?

A It was still on there as collection

11:36:06 account.

Q Were the other two accounts that you disputed with Experian and Transunion, were those off of your credit when you got the results?
A They were off.
11:36:18 Q How did you feel when you got these updated credit reports from Equifax and Transunion and Experian with the Midland account still appearing?
A I felt helpless because I sent bank
11:36:32 statements. No one told me to send anything else. So I sent bank statements over and over and over. I didn't know what else to do. It was just -- I felt like it was a lost cause.
Q After the credit reports came back, did
11:36:48 you continue to apply for a mortgage?
A I did.
Q And at the time that you were applying for the mortgages, were any of those mortgages given to you in 2008?
11:36:58 A No.
Q And when you applied for those mortgages, did you understand the mortgage companies would look at your credit?
A I did.
11:37:08 Q At the time that you were denied those

mortgages, were you aware of any other reason you would have been denied credit?

A No.

Q From August of 2008 until the end of 2008, December 31st, 2008, did you ever receive any letter from Midland, stating they needed some specific item from you in order to clear this up?

A I didn't.

Q In 2009, did you continue to apply for credit?

A I did.

Q And what was the results of your attempts to get credit?

A Denied.

Q Did you take any steps to dispute again with the credit reporting agencies?

A In -- when, now?

Q In 2009.

A I did.

Q And can you tell us when you disputed again with the credit reporting agencies?

A It was at the time that I was looking to purchase a house.

Q Had you actually found a house that you liked?

A I did. I found a house that I wanted. It was a foreclosed home in a nice neighborhood. So I found a house that I wanted.

Q Is that the house that you're currently living in?

11:38:24

A It is.

Q And so what happened when you found that house? Did you take some steps to try and get approved for your mortgage?

11:38:32

A I did. I disputed the account with the credit bureaus, and then I sent dispute letters again. And then I sent dispute letters to Midland.

(Discussion off the record.)

11:39:18

**BY MS. CAULEY:**

Q Let's look at Plaintiff's Exhibit 12.

A Okay.

Q Can you identify Plaintiff's Exhibit 12?

A Looks like the letter that I sent to Midland.

11:39:40

Q And can you tell us what you said to Midland on March 10th of 2009?

A Dear sir, ma'am, I am writing you again to specifically dispute this debt. I do not owe this debt. And I specifically do not owe any

11:39:54

debt to Dell which you are collecting on. I refuse to pay this debt. And I will not pay this debt. I dispute this debt. Please do not contact me again in any manner by phone or in writing. This debt was paid in full on November the 8th, 2004. I have enclosed a copy of my bank statement, showing that this debt was paid -- this debt was for.

Please immediately correct my credit report with all three credit reporting agencies to specifically show a zero balance and no derogatory or negative information at all.

Thank you for your immediate attention to this matter.

11:40:36 Q When you sent Plaintiff's Exhibit 12, did you include another copy of your bank statement from Redstone?

A I did.

Q And do you recall how you actually mailed Plaintiff's Exhibit 12?

A I think I overnighted this.

Q And if you will, look at Plaintiff's Exhibit 6.

A Okay.

11:41:10 Q Can you tell us what Plaintiff's Exhibit 6

is?

A This is the receipt from the overnight that I sent to Midland.

Q That cost you $17.50?

11:41:24 A It did.

Q Why did you overnight your dispute to Midland?

A Because I actually spoke with them at this time. I called in Midland. And I told them that 11:41:34 I needed that off because I found a house. It was March. I was trying to get my house with Platinum Mortgage. And I needed this to come off my account. And I told them that I -- that it was paid. They told me to send a copy of my bank 11:41:54 statement. So I overnighted that to them. And they received it. I called them the next day and asked them did they receive it. They received it.

Q And why were you choosing Platinum to get 11:42:06 your mortgage with?

A Because they were the only ones working with me because I could show them my bank statement and they would understand that it was paid.

11:42:18 Q Platinum was actually trying to work with

you?

A It was. They were.

Q In March of '09, you actually contacted Midland prior to mailing your overnight letter?

11:42:30 A In when?

Q When did you contact Midland with respect to your overnight letter?

THE COURT: He's already testified he contacted them by phone before the letter.

11:42:40 A I did. I contacted them the day before I sent the letter.

**BY MS. CAULEY:**

Q Did you contact them any other times after you had sent the dispute letter in March of 2009?

11:42:50 A I didn't.

Q At the time you spoke with the Midland representative, did the Midland representative request any other documentation from you?

A No. They told me to send my bank

11:43:02 statement. That's why I overnighted my bank statement to them.

Q At the same time that you sent this dispute letter in with Midland, did you send dispute letters to the credit reporting agencies?

11:43:10 A I did.

Q And I believe the first one to Equifax is Plaintiff's Exhibit 39.

A Okay.

Q Can you read what you wrote to Equifax on March 10th, 2009, please?

11:43:38

A To whom it may concern, please immediately correct the dispute information on Page 17 of my credit report under Midland Credit Management, Incorporation collecting for the original creditor, Dell Financial Services. I do not owe this debt. And it should be listed as a zero balance.

11:43:54

I have been disputing this for a long time without success. I have enclosed a copy of the previous letter I have sent to you on this.

11:44:08

Please immediately correct this to show a zero balance and that I do not owe anything and delete any negative comments information on this.

Again, I paid this debt in full on November the 8th, 2004. I have enclosed a copy of my bank statement, showing a payment to Dell Financial. I am sending a copy of this by certified mail return receipt requested to both Midland Credit Management, Incorporation and Dell Financial Service to also request their immediate

11:44:22

11:44:42

attention.

Q Did you mail a copy of your Equifax letter to Midland?

A I did. No. What's that?

11:44:56 Q I'm sorry. You indicated in the letter of March 10th, 2009, to Equifax that you were sending a copy to Midland?

A Yes.

Q Did you actually mail a copy to Midland?

11:45:04 A I did.

Q What response did you receive from Equifax to your dispute letter of March 10th, 2009?

A That it was -- I don't think they took it off right then. Because they reported it as

11:45:28 collection account.

Q So in 2009 when you got your response back to Equifax, was Equifax reporting it with a balance at that time?

A It was a balance then. They returned the

11:45:40 balance.

Q If you'll turn to Plaintiff's Exhibit 52.

A Okay.

Q Is this a copy of the letter you sent to Transunion?

11:46:24 A This is.

Q Is it basically the same letter that you read that you had mailed to Equifax?
A It is.
Q And did you receive any type of response from Transunion to your letter of March 10th, 2009?
11:46:34
A That it was still a collection account.
Q Did you also send a letter to Experian?
A I did.
11:46:44
Q And did you receive any response from Experian?
A That it was a collection account.
Q In July of 2008 when you were preparing your dispute letters and making copies of your credit reports and everything, can you give us your best judgment as to how much time you spent preparing your dispute letters in July of 2008?
11:46:58
THE COURT: Eight?
MS. CAULEY: Eight.
11:47:12
A In 2008, I had spent time researching the -- to draft a template for the disputes. And then I -- I had to drive to my office, actually, to print the documents off because the printer at my office could print front and back side, two-sided page. And let's see. And I had to
11:47:36

mail -- go to the post office. So total in 2008, I'd say about ten hours doing all of that.

**BY MS. CAULEY:**

Q And in March of 2009 when you sent your dispute letters to Midland and the credit reporting agencies, can you give us your best judgment as to how much time you spent then creating these dispute letters?

A I spent a little less time on researching the letters. So I used those as a template. So I think it took about six hours, maybe.

Q And what do you earn an hour?

A $17 at the time.

Q In 2009?

A Yes.

Q In 2008, as well?

A Yes.

Q Now, if you'll turn to Page 57 --

MR. LANGLEY: Exhibit 57?

MS. CAULEY: Yes. Exhibit 57.

**BY MS. CAULEY:**

Q If you'll turn, please, to next-to-the-last page, it's Transunion 159.

A Okay.

Q Do you see the section called regular

inquiries?

A I do.

Q And it indicates in July 28th, 2008, there is an inquiry from First Metropolitan Mortgage. Had you applied for a mortgage with First Metropolitan?

A I did.

Q And on September 19th, 2008, there is an inquiry again from First Metropolitan Mortgage. Did you go back to First Metropolitan Mortgage and apply again?

A Let's see. I might have. I might have called. I might have called.

Q Called by phone and applied?

A The first time, I might have called and then the second time I might have took them some documents, I guess, or vice versa.

Q There's also on September 19th, 2008, an inquiry from Hometown Lenders. Did you apply for a mortgage with Hometown Lenders?

A Maybe Lending Tree. If that's Lending Tree.

Q Did you apply for a mortgage with Lending Tree?

A I think I did.

11:50:48
11:50:56
11:51:16
11:51:26
11:51:46

Q And were you granted a mortgage from First Metropolitan or Lending Tree?
A No.
Q There's also an application for Platinum in December, 2008. Did you apply for a mortgage from Platinum in December, 2008?
A I did.
Q What was the result of that application?
A I didn't get it then.
Q Did you apply for a mortgage with RBC Bank in January of 2009?
A With RBC, not that I can recall. I don't remember RBC.
Q There's also an inquiry from American Express on May 14th of 2009. Did you apply for American Express?
A I did.
Q Can you tell us about that?
A I needed -- at that time, I was in Birmingham, which I'm always in Birmingham in March. But I was trying to get a hotel room because I had a Capital One credit card. I tried to get an increase in limit with them. I couldn't. So I tried to get an American Express to pay for my hotel. And I got declined.

11:52:00
11:52:10
11:52:22
11:52:42
11:52:52

Q All right. I'm going to come back to Capital One, but how did you apply for the American Express account?

A On line.

Q On line? And what was the purpose of that account?

A The purpose to have the American Express?

Q Yes.

A To pay for my hotel room because at the time, I didn't have any money to rent my hotel for the week.

Q How does that work at Yellow Book? Do you have to pay your expenses upfront?

A I have to pay all of my expenses upfront. And then I have two kids I have to take care of. So they come first before a hotel room.

Q In response to your application for American Express account, did you receive a letter from American Express regarding that application?

A Did I receive a letter?

Q From American Express?

A I did. Saying that I didn't get the credit card. Declined.

Q At the time you applied for the American

Express account, did you understand that they would look at your credit report?

A I did.

Q Are you aware of any other reason that you were denied credit other than the credit report with American Express?

A No.

Q If you will, look at Plaintiff's Exhibit 7, Mr. Brim.

A Which one?

Q Seven. If you will go to Page 3, it is the actual document from American Express.

A Okay.

Q Do you see that?

A I do.

Q And how did you feel when you got this letter from American Express?

A I was kind of saddened, because I did need that money at the time. I think my Capital One -- I had reached the limit. So I needed -- and I needed to stay another week. Maybe a couple of weeks, really, before I got my expenses. Because that's in -- well, that's in March. It's -- the way our expense reports come, it depends on the time and manner we get them to

the senior manager when we get our money back. So at that time, I really needed that money.

Q What did you have to do in order to pay for your hotel room?

11:54:44 A Had to borrow money from my mom, which was --

Q How did that make you feel?

A That was rough, because I am a grown man, and I had to depend on my mother.

11:54:54 Q If you look at Plaintiff's Exhibit 7, that American Express letter, and come down to the second paragraph?

A Okay.

Q What were the four reasons that American

11:55:10 Express provided to you for your denial?

MR. LANGLEY: Your Honor, I object. That calls for a mischaracterization of the document. There's one reason stated in the letter.

11:55:34 MS. CAULEY: Your Honor, there are four --

THE COURT: Hang on just a second. Overruled.

**BY MS. CAULEY:**

11:55:46 Q What were the four items listed in the

American Express letter for your credit denial?

A Serious delinquency and public record or collection file, time since derogatory or public record or collection is too short, time since delinquency is too recent or unknown, too many inquiries last 12 months.

Q And on the next page, it tells us American Express looked at all three of your credit reports. Do you see that?

A Yes.

Q In May of 2009, did you have any other collection account on your credit report other than the Midland account?

A In '09, I don't think so.

Q Since March of '09, have you sent in any further disputes to Midland in the mail?

A I have not.

Q And have you disputed with the credit reporting agencies any further since March of '09?

A I have not.

Q Is there some reason that you didn't continue to dispute the Midland account on your credit reports?

A Because I obviously wasn't getting

anywhere with the disputes. It just wasn't working.

Q Since March of '09 when you sent your letter to Midland, have you received any letter from Midland, indicating they needed any other documentation in order to correct this account?

A No.

THE COURT: Are you at a good stopping point?

MS. CAULEY: I am. I can stop.

THE COURT: Let's stop for lunch.

Ladies and gentlemen, please observe the instruction I've given you. And please be back in one hour and 15 minutes. Thank you.

(Jury excused.)

THE COURT: Thank you. You take a break, too.

THE WITNESS: Thank you.

(Witness steps down.)

(Luncheon recess.)

(In open court. Jury not present.)

THE COURT: Do you have more than one witness?

MR. LANGLEY: Yes, we do.

THE COURT: Who do you have besides Dell?

MR. LANGLEY: We will have Dell, Mr. Edrozo.

THE COURT: You're going to call him back?

MR. LANGLEY: Very briefly just for about four points.

THE COURT: Okay.

13:20:20 MR. LANGLEY: Then we'll have Redstone Federal Credit Union.

THE COURT: Live?

MR. LANGLEY: Live.

THE COURT: Okay. I want to have
13:20:34 a charge conference today since you've gotten a copy of it. You know, I charge the jury before argument. I was hoping I could do it tonight before I leave. If I can't, I want to at least have it ready to go. Because we need to make 12
13:20:46 copies. And it takes time. All right?

Are you going to have the lady from Redstone Federal Credit Union that said she didn't know that was a transactional detail report?

13:21:00 MR. LANGLEY: Jason, what's your

gentleman's name?

THE COURT: Oh. That was a lady.

THE WITNESS: It was a lady.

MR. LANGLEY: No. Someone from the ACH department at Redstone Federal Credit Union.

MR. BENNETT: I've offered a stipulation. Whatever it is they were going to say, I'm sure we will stipulate to it.

MR. LANGLEY: I'm pretty sure they would not stipulate to what the witness is going to say.

THE COURT: What's the witness going to say?

MR. LANGLEY: Jason?

MR. TOMPKINS: That had Mr. Brim requested a transactional detail report, he would have been provided with the ACH report that was ultimately obtained in August, 2010.

Had he advised that Dell said the bank statement was not sufficient proof, he would have been supplied with that same report.

THE COURT: Okay.

MR. BENNETT: I mean, we can stipulate that their witness would --

THE COURT: That that's what that witness would say?

MR. BENNETT: Would say.

THE COURT: I don't know why you wouldn't. He didn't talk to that witness. He talked to another witness at Redstone Federal Credit Union who said, this is the transactional detail report.

MR. TOMPKINS: He will also testify that had Midland --

THE COURT: That that person has been fired?

MR. TOMPKINS: I don't know about that. He may. But he will also testify that had Midland contacted Redstone to try to determine either that the bank statement was legitimate or to confirm that transaction, that Redstone would not have talked to Midland at all. Would not give Midland any information whatsoever.

MR. BENNETT: We don't have --

THE COURT: He will also testify that had Midland contacted Redstone -- had Midland contacted Redstone to try to determine either that the bank statement was legitimate or to confirm that transaction --

MR. TOMPKINS: Mr. Bennett had argued Midland should have contacted Redstone as part of the investigation.

THE COURT: Okay. I'm not ruling on objections in advance. We'll see what happens.

MS. CAULEY: I shouldn't be much longer.

THE COURT: Are you calling them here for this afternoon? They better be here this afternoon.

MR. TOMPKINS: Okay.

MR. LANGLEY: Go call them.

THE COURT: We just have Mr. Brim left, right?

MS. CAULEY: I have probably less than 30 minutes.

THE COURT: Then you have cross?

MR. LANGLEY: Yes.

THE COURT: And are you going to read Dell's deposition today?

MR. LANGLEY: We're going to play Dell's deposition today, yes.

THE COURT: And that's how long?

MR. LANGLEY: An hour and five

minutes.

THE COURT: And then you're going to call Edrozo today?

MR. LANGLEY: Very briefly.

13:23:50 THE COURT: We might need that man here today. We might.

MR. LANGLEY: Jason is going to call him.

THE COURT: Tell him to be here by 13:23:58 3:30. Tell him to be here by 3:30.

MR. LANGLEY: And what we can do, Your Honor, if he's going to be here, then we may go ahead and put him up this afternoon before Mr. Edrozo.

13:24:12 THE COURT: I say the latest by 3:30.

MR. TOMPKINS: I think he has a two-hour drive.

THE COURT: From Huntsville? No. 13:24:22 That's not two hours, I can assure you. I drive there all the time.

MR. TOMPKINS: He may not be in Huntsville today.

THE COURT: Well, tell him to get 13:24:30 on the road.

                              (Discussion off the record.)

(In open court. Jury present.)

(Witness resumes stand.)

THE COURT: Okay. Let the record show the jury is back after lunch. The parties are here. Mr. Brim is back on the stand. And you may continue.

MS. CAULEY: Thank you, Your Honor. We are going to try to expedite things just a little bit. We won't go through anything we've already covered, certainly, and we'll try to eliminate some of the duplicates.

**BY MS. CAULEY:**

Q Mr. Brim, you mentioned before we left for lunch and we were talking about your American Express denial -- do you remember that?

A Correct.

Q Other than the mortgages we've already talked about and the American Express denial, did you have any other credit denials during this time between July, 2008, and the present?

A Yes. I tried to get an increase with Capital One.

Q At the time do you recall when you requested a credit limit increase with Capital

One?

A Once in 2008 because I needed that for tuition. I also go to Athens State University on line. So I pay for my tuition. So I needed it to pay tuition for that.

Q Were you approved for the Capital One credit limit increase?

A I was not.

Q And was there another Capital One request for a limit increase?

A It was.

Q And when was that second one?

A That was in 2009.

Q And were you approved for that credit limit increase?

A I was not.

Q Was there a reason that you requested the credit limit increase from Capital One at the time that you -- other than the paying the tuition?

A In 2009?

Q Yes, sir.

A I needed that for -- I was in March in Birmingham. I'm sorry. At the hotel, trying to pay for the hotel.

13:27:22
13:27:32
13:27:48
13:28:00
13:28:08

Q Was that request from Capital One at about the same time as the American Express?

A It was.

Q I want to clarify for the jury in March of 2009, were you actually able to buy your home?

A I was.

Q And who was the mortgage company that --

A With Platinum Mortgage.

Q What did you have to do, if anything, with Platinum Mortgage to get that mortgage approved?

A I had to -- I showed the guy where I was disputing it. I showed him my dispute letters with the credit bureau with Midland. And I also showed him my bank statement.

Q Was Platinum Mortgage just able to disregard the Midland account so you could be approved?

A They were. He had to talk to his boss and show him all the information. And then --

THE COURT: And then did they approve it?

THE WITNESS: They approved it.

THE COURT: Okay.

**BY MS. CAULEY:**

Q Mr. Brim, if you will, turn to Plaintiff's

Exhibit 3, please.

A Yes.

Q After this lawsuit was filed -- and I don't want you to go into anything that your lawyers may have told you. But after this lawsuit was filed, did you ever go back to Redstone Federal Credit Union?

A I did.

Q And when you went back to Redstone Federal Credit Union, what did you request?

A I went in there to -- and I asked them to specifically trace where this money went. And I pointed out that money on that statement.

Q And at the time that you were at Redstone Federal Credit Union, were they able just to provide you a document right then?

A No, they weren't. They told me that they had to do research on this. And I -- that the manager had to do it. And she would call me back when she had it. And they called me a week later.

Q Is Plaintiff's Exhibit 3 the document that you were able to go and pick up from Redstone Federal Credit Union?

A This is.

Q I'm going to talk just a little bit about your damages.

Can you tell us how the Midland account being on your credit report and you being denied credit has affected you?

13:29:46

A It added a lot of stress on me. Especially in -- at the times I was trying to get a house, which is 2008. Basically 2008 through 2009 until March until I finally got my house. It was, like, loss of sleep because worrying about trying to get a loan to get a house -- I mean, if you all have tried to get a house, basically, that's trying -- that's a headache in itself, trying to get a house. So when I couldn't get a loan to get a house, that was a headache in itself.

13:30:04

13:30:20

So it caused a lot of anxiety on me which prevented me from sleeping some nights. So I would take Nyquil basically to kind of relax me and help me sleep.

13:30:36

Q How often was the stress affecting your ability to sleep?

A Oh, out of a month, I would say at least one week, maybe.

Q So it would be more than a couple of times

13:30:48

13:31:04
13:31:18
13:31:28
13:31:36
13:31:50

a week?

A It would. I would say a week straight. Because on top of -- I mean, I have a lot of work, work with my job. Not only worrying about trying to get a house, trying to get my credit cleared. And school. It was a lot on my plate. So it was -- I mean, it was hectic.

Q Other than the -- it affecting your sleep, did the stress have any other impact on you physically?

A Physically, I just had headaches, basically. A lot of headaches.

Q Were you taking any medications or over the counter --

A I took BC.

Q BC?

A BC.

Q And is that a headache medicine?

A That is a headache medicine.

Q How often in a given month would you take BC for your headaches?

A I would at least take that seven days out of the week. BC. Because it -- lack of rest and my workload. So I had headaches. So I would take the BC to kind of ease the pain.

Q Did the Midland account being on your credit report ever affect your ability to focus or actually do your job?

A It did. Because I wanted to get it cleared.

13:32:06

Q Can you tell us in your best judgment from July, 2008, when you first started disputing with the credit reporting agencies up until today a total amount of time that you have expended in correcting your credit report?

13:32:34

A That is quite a bit of time put in. Finding documents, going to deposition, court, mediation, today. Court. I mean, I had to take -- I only get two weeks of vacation out of the year. I'm taking one now. One week this week. I'd say easily a month. Easily.

13:33:04

Q A month of time, total?

A A month of time.

Q And are you still making 17.50 an hour?

A I am making a little bit more now.

13:33:20

Q What do you make now?

A I make at least $22 an hour.

Q When did that change occur?

A It was right after I bought my house.

Q So spring of 2009?

13:33:34

A Yes.

(Discussion off the record.)

MS. CAULEY: Your Honor, that's all the questions I have at this time.

THE COURT: Okay.

**CROSS-EXAMINATION**

**BY MR. LANGLEY:**

Q Mr. Brim, good afternoon.

A Good afternoon.

13:33:58 Q You are aware that this Midland account was deleted from your credit reports in September of 2010?

A September, yes. 2010.

Q And so any stress that you felt as a result of the reporting would have been gone by September, 2010, correct?

A By September of '10? I didn't realize it then because I didn't look at my credit report in September.

13:34:22 Q You weren't told in September of 2010 that this had been deleted?

A September, '10? I don't think around that time -- I wasn't really speaking with anyone.

Q Well, Mr. Brim, you remember when Mr. Tompkins took your deposition in October of

                2010, don't you?

A Uh-huh (indicating yes).

Q You remember meeting him in deposition?

A I do.

13:34:40 Q And at that time, Mr. Brim, you were aware that the item had been deleted from your credit reports, weren't you?

A I think I found out that day, actually. That is true. I found out that day.

13:34:52 Q Was it actually Mr. Tompkins that told you that it had been deleted?

A No. It was not. It was not.

Q Mr. Brim, if I understood you correctly, you were attributing your stress during this

13:35:08 July, 2008, through at some point in 2009 time frame to your inability to get a home mortgage. Did I hear you correctly?

A Correct.

Q And to make sure that I'm perfectly clear

13:35:22 about where you applied for a mortgage, I want to name off what I heard. And you tell me if I've missed something. First Metropolitan?

A Correct.

Q Lending Tree?

13:35:32 A Correct.

Q Platinum Mortgage?

A Correct. I think it was one more.

Q Was it RBC Bank?

A No.

13:35:40 Q Do you remember what the other one was?

A I do not.

Q So right now, the only three that you remember are First Metropolitan, Lending Tree, and Platinum Mortgage?

13:35:50 A Correct.

Q And you actually got a mortgage in March or April, 2009, from Platinum Mortgage, didn't you?

A March.

13:35:56 Q So your stress associated with wondering whether or not you were going to get a home mortgage would have ended in March or April, 2009?

A That's not correct. Because it was still

13:36:06 on my credit.

Q But the stress associated with worrying about whether you were going to get a home mortgage would have ended in March or April, 2009?

13:36:14 A My home, yes. But my credit, no.

Q I understand that. What I was asking about is your home mortgage. All right. First met --

THE COURT: Wait. Was that a question?

13:36:26

MR. LANGLEY: No. It wasn't. I'll withdraw it, then.

THE COURT: Okay.

**BY MR. LANGLEY:**

13:36:30

Q Mr. Brim, did you apply for a mortgage with First Metropolitan?

A I think I did.

Q You think you did?

A I think I did.

13:36:40

Q Do you know when you think you applied for a mortgage with First Metropolitan?

A I do not remember.

Q Do you even remember the year?

A I did not.

13:36:48

Q Could have been 2007?

A I don't think so.

Q Do you remember speaking with anyone from First Metropolitan?

A I think it was a guy by the name of John, I think it was.

13:37:00

Q Do you remember a last name?
A I do not.
Q Do you have any communication with him in writing?
13:37:06 A In writing? I don't think so.
Q Was this all over the telephone?
A I think it was.
Q And you don't remember when this was?
A I do not.
13:37:14 Q Do you ever remember getting a denial letter from First Metropolitan?
A I don't think so.
Q Do you remember ever being told that you were denied a loan from First Metropolitan?
13:37:30 A At that time, I cannot remember, but I didn't get the loan.
Q If I understood you correctly just a second ago, you weren't even sure you had actually applied for a loan with First
13:37:50 Metropolitan?
A I think I just said I did.
Q I thought you said that you weren't sure whether you did or not.
A Then I said I think I did.
13:37:56 Q You think you applied for a loan with

First Metropolitan?

A Uh-huh (indicating yes).

Q But you don't have any documents, evidencing the fact that you applied for a loan, do you?

A I don't.

Q You don't have any documents, evidencing the fact that they denied you a loan?

A I don't.

Q All right. Then the second one you mentioned was Lending Tree. Did you apply for a loan with Lending Tree?

A I did.

Q When was that?

A I do not remember.

Q Do you remember speaking to anyone?

A That was on line.

Q That was on line. So there would have been written communications regarding that application?

A Correct.

Q And do you still have those?

A I didn't print it out.

Q Are they still available on your computer?

A No. They're not. That computer is broke

down. The motherboard went bad on it.

Q When did the motherboard go bad on your computer?

A I do not remember. I've had four computers since.

THE COURT: Since 2004?

THE WITNESS: At least four. Two laptops.

THE COURT: Since 2004?

THE WITNESS: Since 2004.

THE COURT: Okay.

**BY MR. LANGLEY:**

Q Do you remember what year it was that the motherboard --

A I do not.

Q -- went down? But presumably, whenever your motherboard went down, you wouldn't be able to retrieve any other emails from that time period, would you?

A No.

Q Did anyone from Lending Tree or First Metropolitan ever tell you that the reason you didn't get a mortgage --

A No.

Q -- was because of Midland?

13:39:46
13:39:58
13:40:06
13:40:16
13:40:22

A No.
Q And in March or April, 2009, you did get a mortgage from Platinum Mortgage, right?
A In March, 2009? I did.
Q Yes, sir. All right. Have we covered all of the entities to whom you applied for a mortgage?
A I'd say we did.
Q You also mentioned that you were denied credit by American Express?
A Correct.
Q And that was in May of 2009?
A Correct.
Q Mr. Brim, were you seeking to obtain that card for business purposes?
A Correct.
Q And that was not going to be a personal credit card, was it?
A No.

THE COURT: Would it not be issued to you?

THE WITNESS: It would be issued to me. So I guess that would be my personal card.

THE COURT: I mean, well, let me

just ask you this:  Does Yellow Book furnish you

with a credit card?

THE WITNESS:  Oh, no.  No, ma'am.

THE COURT:  So --

13:40:30    THE WITNESS:  I pay for everything

in advance.  And then we submit expense reports.

And then we get our money back.

THE COURT:  But you don't have a

card from Capital One, or anyone else for that

13:40:42   matter, that says this is for business only?

THE WITNESS:  No.

THE COURT:  Okay.

**BY MR. LANGLEY:**

Q      Mr. Brim, your purpose in obtaining the

13:40:48   American Express was for business expenses?

A      Yes.

Q      And your transaction with American Express

was completely on line, correct?

A      It was.

13:40:56   Q      You never talked with anyone from American

Express about this, did you?

A      No.

Q      And if you would, please, turn to

Plaintiff's Exhibit 7.

13:41:16   A      Okay.

Q Mr. Brim, is Plaintiff's Exhibit 7 the only correspondence or writing you received from American Express?

A Wait. Seven?

13:41:30 Q Yes.

A Which page?

Q I'm actually looking at the first page of Plaintiff's Exhibit 7. It's the beginning of the letter from American Express.

13:41:48 MS. CAULEY: Mr. Brim, it's actually in the black notebook. Not the white notebook.

THE WITNESS: Oh, okay. All right. Okay.

13:42:00 **BY MR. LANGLEY:**

Q Let me ask my question again. Is this the only letter or writing of any sort that you received from American Express?

A It is.

13:42:10 Q And this letter doesn't mention Midland Credit Management anywhere in it, does it?

A It doesn't. But that was the only thing on my credit.

Q Mr. Brim, would you please read for me the

13:42:28 first paragraph of the letter? Right underneath

Dear Jamon T. Brim.

A Thank you for your recent application for Blue Sky for American Express. After reviewing your request, regrettably, we were unable to open an account for you at this time for the following reasons.

Q And it actually has the S inside parentheticals, doesn't it?

A Yes.

Q What does it state, Mr. Brim, as the reason that your credit card with American Express was denied?

A All four?

Q Well, Mr. Brim, look at the first line of the second paragraph.

A Of the second -- consumer credit bureau score from Transunion is too low.

Q And Mr. Brim, you understand that the sentence that follows is explaining why the credit score may have been too low, correct?

MS. CAULEY: Object to the form, Your Honor. And calls for speculation by this witness.

THE COURT: Overruled. How did you read it to mean?

THE WITNESS: Read this -- the second sentence?

THE COURT: No. How do you understand where it says see below? Do you see the place where it says see below?

THE WITNESS: Yes.

THE COURT: Below that, there's a sentence and four other sentences. What did you understand them to mean?

13:43:48 THE WITNESS: That my credit score was low.

**BY MR. LANGLEY:**

Q So Mr. Brim, you understood that American Express was denying your credit card because your Transunion score was too low, correct?

A Correct.

Q And that the reasons they listed beneath were the reasons that your credit score with Transunion may have been too low?

A Correct.

Q All right. Capital One -- you actually had a credit card with Capital One, didn't you?

A Yes.

Q And if I understood your testimony correctly earlier, you applied in 2008 and again

in 2009 for an increase?
A Correct.
Q On your credit limit. Are you sure that that first one was in 2008?
13:44:32 A I think it was.
Q Do you know for sure?
A I do not until I maybe look at the credit report.
Q Well, why don't we start by looking at
13:44:44 Plaintiff's Exhibit 44? And if you would, please, look at the page that has the number in the bottom TU85.
A Okay.
Q In the bottom, left corner, you see that
13:45:16 entry for Capital One?
A Yes.
Q You see that date there of 9-25, 2007?
A Correct.
Q Do you think it was actually September of
13:45:22 2007 when you made that first --
A Maybe could have been.
Q Could have been. And Mr. Brim, your second application for increase from Capital One was in 2009, correct?
13:45:34 A Okay.

Q Is that correct?
A Correct.
Q Did you actually speak to someone from Capital One at that time?
13:45:48 A I did.
Q They didn't tell you anything about your denial being related to Midland Credit Management, did they?
A They didn't.
13:45:58 Q Excuse me?
A They didn't.
Q They did not?
A Did not.
Q So you don't know why they denied it?
13:46:06 A No.
Q So you can't say that it was because of Midland Credit Management?
A No.
Q Earlier, your lawyer had asked you some
13:46:18 questions or asked you a question -- and I think I heard it correctly. It went something like the only adverse account on your report at the time of these applications was the Midland Credit Management item. Did I hear that correctly?
13:46:34 A Maybe.

13:46:46

Q Well, let me ask you this question: At the time you were making these applications for mortgages and your application to American Express and for an increase in limits from Capital One, there were other negative items on your credit report, weren't there?

A I'd have to look to see.

Q Okay. Let's do that. Let's start with Plaintiff's Exhibit 37.

13:47:00

A Okay.

Q And if you would, start with the document that has the Number 52 at the bottom.

A Okay.

Q And this is a page from an Equifax report, dated July 28th, 2008, correct?

13:47:32

A Correct.

Q All right. On Page 52 under negative accounts, we see that there's one from Alabama A & M University, correct?

13:47:44

A Correct.

Q And then if we flip the page, we see that there's one from G.E.M.B. Sam's?

A Correct. That is. That was zero balance. And Alabama A & M, I was attending school, that should have been deferred with the other two.

13:48:04

Q I understand. I'm just asking about what was on the credit report at the time.
A Oh, it does, with the zero balance.
Q That's under the negative accounts?
13:48:12 A It is.
Q And then the third one is the Midland Credit Management account?
A Correct.
Q So that was Equifax in July of 2008?
13:48:18 A Correct. With the 1,600, correct.
Q Let's look at Plaintiff's Exhibit 43.
A Okay.
Q And specifically, let's go to Page 71 of that exhibit. The document bears the number, 71.
13:48:40 A Okay.
Q This is a report from Transunion, correct?
A Correct.
Q Dated same day, July 29th, 2008?
A Okay.
13:48:54 Q And do you see where it says adverse accounts on the page marked as TU71?
A I do.
Q And on the Transunion report, we have an adverse account from Direct Loan Service System,
13:49:08 correct?

13:49:18
13:49:28
13:49:36
13:50:02
13:50:18

A Correct.
Q And then we see the G.E.M.B. Sam's Club account, correct?
A Yes. Zero balance.
Q But, Mr. Brim, it's listed under adverse accounts, isn't it?
A Yes. And I was in school for Direct Loan Service, as well.
Q Same thing with that one. It was still listed under adverse accounts?
A That's true.
Q And then the last one we see is the Midland Credit Management account, correct?
A With the 1,600 balance, correct.
Q All right. Let's go now to the 2009 time frame. Let's look at Plaintiff's Exhibit 53.
A Okay.
Q I think it's four pages in. It's the page bearing the number, TU139.
A Bear with me. My book -- you said 54?
Q 53, Mr. Brim.
A Okay.
THE COURT: TU what?
MR. LANGLEY: 139.
A 139. Okay.

**BY MR. LANGLEY:**

Q      This is a Transunion report from March 18, 2009, correct?

A      Correct.

13:50:24  Q      All right.  On Page TU139, under adverse accounts, we again see Direct Loan Service System, G.E.M.B. Sam's Club and Midland Credit Management, correct?

A      Correct.

13:50:40  Q      So the same three accounts in March of 2009 are listing as adverse?

A      With no balance.

Q      But listing as adverse?

A      But -- correct.

13:50:50  Q      Mr. Brim, correct?

A      Correct.

Q      Let's go to Plaintiff's Exhibit 70.  And it is, I believe, the second page of Exhibit 70, which is an Experian credit report, dated

13:51:20  February 18, 2010.  Are you with me on that one?

A      I'm with you.

Q      Then on the second page at the top left, it says, potentially negative items or items for further review.  Do you see that?

13:51:30  A      Potentially negative -- I don't see that.

I think I'm on the right page.

THE COURT: On the very top line.

THE WITNESS: Oh. Okay. I see it.

13:51:44 **BY MR. LANGLEY:**

Q And under potentially negative items, it lists, again, the Sam's Club, G.E. Money Bank and the Midland Credit Management account?

A Correct.

13:51:54 Q So during this entire period of time, there was at least one other adverse account on your credit report and, for most of the time, there were two, correct?

A Without a balance.

13:52:04 Q But listed under negative accounts, Mr. Brim, correct?

A Correct.

Q You're not a credit expert, are you?

A No. Never claimed to be.

13:52:12 Q So you don't know what it is that creditors are looking for or why they're looking at it?

A What's that, now?

Q You don't know what creditors are looking for or why they're looking at it when they look

13:52:22

at your report?

A No.

THE COURT: Did you answer?

THE WITNESS: I did. I said no.

13:52:32 THE COURT: Okay.

**BY MR. LANGLEY:**

Q Ms. Cauley asked you some questions about headaches and loss of sleep. Do you remember those?

13:52:44 A Correct.

Q Mr. Brim, you never saw a doctor for any of those, did you?

A I didn't.

Q And you never saw any other kind of health

13:52:56 professional for those symptoms, did you?

A I didn't.

Q Never had any prescription medication for those?

A Prescribed? No, I didn't.

13:53:06 Q Ms. Cauley also asked you some questions about collection lawsuit that Midland Funding, L.L.C. filed against you. Do you remember those questions?

A Yes. That is a public record that's on.

13:53:22 Q And you were never actually served with a

copy of that complaint, were you?

A I wasn't.

Q And you're aware that that complaint was dismissed?

13:53:30 A But it's still public record. So you could go and see it.

Q You can go and see it today?

A It's public record. So, I mean, I'm pretty sure you can see it. It was a suit filed

13:53:42 against me. You can see that.

Q Do you know when it was dismissed, Mr. Brim?

A I do not.

Q You do know that it was dismissed, though?

13:53:52 A It obviously had to be, because I didn't receive anything else about it. So I assume.

Q You also testified earlier that you had received some letters both directly from Midland and then from a law firm that was representing

13:54:06 Midland Funding?

A I did.

Q Let's talk about those letters very briefly. First, let's look at Plaintiff's Exhibit 10.

13:54:20 But before we get there, there was some

testimony earlier about a letter you may have received in October of 2007. Do you remember that testimony?

A Yes.

13:54:28 Q And I believe you testified that you actually sent something to Midland that was --

A I faxed a bank statement in.

Q Did you retain a copy of that fax cover sheet?

13:54:40 A The fax -- at the time, I was ignorant of the fact that I needed to keep copies.

Q When was it that you started keeping copies?

A When I started certified mail.

13:54:50 Q And the next letter that you received from Midland was in January of 2008, correct?

A Correct.

Q And that's the letter that's marked as Plaintiff's Exhibit 10. Did you receive that

13:55:18 one, Mr. Brim?

A Wait. Wait. Wait.

Q I'm sorry.

A I think I have too many pages. Let's see. Yes.

13:55:34 Q But you didn't send a response to that

letter, did you?

A I didn't.

Q Now let's look at Plaintiff's Exhibit 17.

A Okay.

13:55:54 Q Did you receive this letter?

A I did.

Q But you didn't respond to it, did you?

A I was out of town, working.

Q When you got back in town, did you respond to it?

13:56:04

A I didn't.

THE COURT: Now, you got the -- you got that letter and the sheriff's note at the same time?

13:56:22 THE WITNESS: Yes, ma'am. When I got home, they were on my door. I read it for a while.

THE COURT: What was it the sheriff's notice said?

13:56:30 THE WITNESS: It said his card with his name and it said call me. So I just put two and two together.

THE COURT: Okay.

**BY MR. LANGLEY:**

13:56:38 Q Mr. Brim, that was all before you sent

your first dispute to the credit reporting agencies regarding the Midland account, correct?

A That is -- when I got back home, that is the same time I sent my dispute.

13:56:48 Q So you got back home. You saw these things. And then after that, you sent your dispute to the credit reporting agencies?

A Correct. And Midland.

Q Right. And we'll get to that in a second.

13:57:00 Mr. Brim, I want to go back and talk a little bit about your Dell purchase when you purchased a Dell computer.

A Okay.

Q And I understood you testified earlier

13:57:10 that you purchased that computer for purposes of taking courses on line?

A Correct.

Q And that you opened up a finance account with Dell Financial Services to purchase it?

13:57:26 A Correct.

Q And that you paid it off via phone check --

A Correct.

Q And that was about 30 days or shortly

13:57:34 thereafter?

A Correct.
Q Was this the first time that you had made a payment by phone check?
A It was.
13:57:42 Q Was that uncomfortable?
A Paying a check -- that was. I mean, I don't really -- didn't really want to give information over like that.
Q Did you ask for a confirmation number?
13:57:54 A A confirmation? I just assumed that it would take care of it. At the time, I was ignorant of the fact.
Q You did not ask for a confirmation number?
A I did not.
13:58:04 Q Did you ask for a receipt?
A I thought they would just email it to me, because I asked her if she had my email at the time. She said yes. Would you email me a receipt. We had that conversation.
13:58:16 THE COURT: Are you talking to Dell?
THE WITNESS: Dell. I thought they would email a receipt. They didn't.

**BY MR. LANGLEY:**

13:58:26 Q This was back in '04?

A '04.

THE COURT: Well, when you made that check by phone, did you give Dell your bank account number?

13:58:36 THE WITNESS: I gave them -- I don't think it was the -- I might have. But I had a blank check -- you know, when you start your account. And then it had the routing number. And I think it was a check number on it.

13:58:50 THE COURT: Okay.

**BY MR. LANGLEY:**

Q Mr. Brim, shortly after you made that payment via phone draft to Dell, you actually continued getting bills from Dell?

13:59:10 A I did.

Q And that's when you knew there was a problem?

A Yes.

Q And was it shortly thereafter that you 13:59:20 first sent a bank statement to Dell Financial Services?

A I did.

Q If you would, please, turn to Plaintiff's Exhibit 2. And I'm looking at the second page. 13:59:52 It's the statement.

A Okay.
Q To be clear, this is not the copy of the statement that you actually sent to Dell, is it?
A No. I circled it.
14:00:04 Q There was some handwriting on the copy that you sent to Dell?
A Yes.
Q Did you just go to the bank one time to get a statement, and did you continue to use the same statement over and over?
14:00:12
A No. The first time, it was another statement that I -- another copy of a bank statement that I got from the bank.
Q Mr. Brim, would you turn to Plaintiff's Exhibit 11, please?
14:00:24
A Okay.
Q And this is a copy of the dispute letter that you sent to Midland in July of 2008, correct?
14:00:42 A Correct.
Q And you included a copy of your bank statement?
A Yes. Transactional detail report.
Q Is the document that is behind the letter, is that the actual copy that you sent to Midland
14:00:54

to --

A That is the transactional detail report.

Q Mr. Brim, is the underlining under $954.12 -- is that your handwriting?

14:01:06 A That could be. That's just a line. I mean, if it was numbers or words, I could tell you better.

Q Okay. Well, let's look at the words actually at the top of the page. Do you see

14:01:18 those?

A I do.

Q Whose handwriting is that?

A Maybe the bank. I didn't -- that's not my writing.

14:01:24 Q Well, it looks like something has been cut off the top of that page. Can you tell us what it was?

A Automated out something.

Q Was it automated operations? Does that

14:01:40 ring a bell?

A I don't remember. I can't read it.

Q The term, "automated operations," doesn't mean anything to you as we sit here today?

A It doesn't, because I don't --

14:01:56 Q Do you know what's written next to

automated operations?

THE COURT: Wait. We haven't established that the second word is operations.

MR. LANGLEY: Let's try that then.

14:02:04 THE COURT: Okay.

MR. LANGLEY: May I approach the witness?

THE COURT: Sure.

MR. LANGLEY: I'll show Your

14:02:20 Honor.

THE COURT: Yes.

**BY MR. LANGLEY:**

Q Mr. Brim, I am showing you what I have marked as Defendant's Exhibit 24.

14:02:36 A Okay.

Q Is that one of the copies of the bank statements you got from Redstone Federal Credit Union?

A This is a copy.

14:02:42 Q Can you now tell from the handwriting at the top of the page that that says automated operations?

A It says automated. I would assume that that's operations. I mean, you really can't see

14:02:56 the word. But I would assume.

Q Did you keep your original copy?
A Of the -- they gave me a copy just like this.
Q Did you keep your original copy of the document that your --
A Maybe I do.

MR. LANGLEY: Your Honor, I'd like to move to admit Defendant's Exhibit 24.

THE COURT: Any objection?

MS. CAULEY: Yes, Your Honor. Just if they're going to try and argue what the words are at the top since Mr. Brim has testified he couldn't read them.

THE COURT: Well, I'll be glad to admit it. It's not been established that the word is what you say it is. Okay? But it's admitted for whatever it is.

JUROR 2: Your Honor, we don't have 24.

THE COURT: Oh. You don't have a copy to --

MR. LANGLEY: No. We have not put it in. I was --

THE COURT: It is admitted. And we can make -- you can make copies of it in your

break.

MR. LANGLEY: Okay.

THE COURT: Unless you're going to ask more questions about it at this point.

MR. LANGLEY: I'm going to ask just a couple more questions.

THE COURT: Okay. Why don't you go make the 12 copies?

MR. LANGLEY: Should we take a short break?

THE COURT: Yeah. We'll wait.

(Short recess.)

MR. LANGLEY: Your Honor, if it's all right with the Court, I'll just come back to that.

THE COURT: Okay.

**BY MR. LANGLEY:**

Q Mr. Brim, in the 2004, late 2004, early 2005 time frame, you were working with Dell to try to resolve this, correct?

A Correct.

Q And you sent them the bank statement at least one time, didn't you?

A Correct.

Q Did you send it two times?

14:05:02
14:05:14
14:05:28
14:06:04
14:06:12

A Yes.
Q And that did not resolve the issue on Dell side, did it?
A It didn't. It did not.
Q They continued to ask you for additional types of proof?
A They asked -- like, in the Better Business Bureau complaint, they asked for a transactional detail report, which I went to the Madison branch and asked for a transactional detail report. The lady that I spoke with said, this is the transactional detail report. And it was basically the statement which is what it was. And that's what I --
Q Do you remember that conversation with Redstone pretty clearly?
A Yes, I do. That was that lady.
MR. LANGLEY: May I approach the witness?
THE COURT: Yes.

**BY MR. LANGLEY:**

Q Mr. Brim, I'm handing you a copy of the deposition Mr. Tompkins took of you in October of 2010. Do you remember that?
A Yes.

14:06:34
14:06:52
14:07:06
14:07:14
14:07:32

Q If you would, please, turn to Page 48.
A Okay.
Q On Line 8, Mr. Tompkins asked you: If you look with me on Defendant's Exhibit 6, Page 2, describing the responses in the Better Business Bureau, the one in the middle appears to be a response from you; is that correct? Answer: Right here? Question: Yes. Answer: Yes. Question: Do you see where it says the bank stated they did not know what a transactional detail report was? Answer: Yes. Question: Do you remember that conversation with your bank? Answer: I do not.
Did I read that correctly?
A You do. But I remember now.
Q You remember now. You didn't remember when Mr. Tompkins took your deposition, though?
A No.
Q It's something that's come to you between October and today?
A Uh-huh (indicating yes).
Q Let's look at Defendant's Exhibit 20. This will be in the white binder. You can keep that up there. We may need it.
A Okay.

Q Defendant's Exhibit 20 is a two-page document that includes a cover letter from the Better Business Bureau and a complaint activity report from the Better Business Bureau, isn't it?
A It is.
Q And these were records that you actually retained?
A Correct.
Q Going back all the way to November of 2005?
A Correct.
Q This is when you were still trying to work things out with Dell Financial Services?
A Correct.
Q And Mr. Brim, if you would, please, look at the entry on October 21st, 2005. It says DSF records indicate Mr. Brim is working with Angela with our recovery department. It shows she is waiting for a transactional detail report from Mr. Brim's bank in order to research the payment. Did I read that correctly?
A You did.
Q And that was information that you had in October, 2005, correct?
A Correct.

Q And by that time, you had already sent the bank statement to Dell on two separate occasions?

A Correct.

Q And so you knew that the bank statement alone was not going to get it done, didn't you?

A I didn't. Because they told me that was a transactional detail report. I took her at her word. I didn't know -- that's what they told me it was.

THE COURT: Now, is Angela the lady you spoke to at Redstone?

THE WITNESS: No. That's Dell. I do not remember her name.

THE COURT: And she didn't speak English?

THE WITNESS: She did. She said -- I said that Dell needs -- saying they need a transactional detail report. She said, I don't know what that is. This is a bank statement. She said, this is it. This is everything we can give you. This explains that it was paid. So I took her at that.

THE COURT: Okay. Well, when you talked to Angela at Dell -- did you talk to somebody named Angela.

THE WITNESS: I did at Dell. And I told her that's what my bank gave me. So she took that at that time. She took that.

THE COURT: Okay. Angela did?

14:10:04 THE WITNESS: Angela took that.

**BY MR. LANGLEY:**

Q Mr. Brim, Redstone told you, though, that if you needed anything other than the bank statement to come back to them, didn't they?

14:10:14 A To call them, yes.

Q And you never did, did you?

A Because she told me it was a transactional detail report.

Q But you never called Redstone back and

14:10:22 said, this document isn't getting it done; I need something else? You never did that, did you?

A I was gone by then. I was traveling.

Q And Mr. Brim, when you disputed this account directly with Midland in late July of

14:10:42 2008 and at the same time with the consumer reporting agencies, you sent the exact same document to Midland, didn't you?

A I did. I actually called Midland. So Midland at that time -- I called them two days in

14:10:58 a row. At that time, I called them to tell them

I was sending that. And then I called them the next day to verify that they received it. So at that time, I would assume that they would have told me that they needed something else. When they told me that they received it.

14:11:12

Q To make sure that it's clear, the document that you sent to Midland in July of 2008 was the same thing that you had been sending to Dell?

A Correct.

14:11:22

Q And the same is true when you wrote letters to Midland and the credit reporting agencies in March of 2009, correct?

A Correct. No one ever told me that they needed anything else.

14:11:36

Q Well, Dell did, didn't they?

A Which my bank told me that was a transactional detail report.

Q But Mr. Brim, you just said nobody told you you needed anything else. And the truth is, Mr. Brim, Dell told you they needed something else.

14:11:48

A And that's what I -- that's what they told me it was.

THE COURT: Wait. Are you talking about the conversation you had with Angela?

14:11:56

THE WITNESS: No. With -- yes. She told me she needed a transactional detail report. And I went to the Madison branch bank. And she told me it was a transactional detail report.

14:12:08

THE COURT: So did you call Angela back?

THE WITNESS: I told her, and I faxed that to her. And I -- after that, I was traveling.

14:12:14

THE COURT: Okay.

THE WITNESS: So I didn't hear back from her.

**BY MR. LANGLEY:**

14:12:18

Q Mr. Brim, let's look at Plaintiff's Exhibit 11 again.

A In the black book?

Q Yes. In the black book. The first page of Defendant's Exhibit 11 -- excuse me. Plaintiff's Exhibit 11. This is a letter that you wrote, isn't it?

14:12:46

A Correct.

Q And so where it says, please do not contact me again by phone or in writing, those are your words?

14:12:54

        A Those are. But I actually called them.
Q You called them?
A I called Midland.
Q But you had asked Midland not to contact you?
A No. I called them to let them know that they need to take this off my account and that I was sending a bank statement. And at that time, they could have told me anything that they needed.
Q How did you know what to say about not contacting you again by phone or in writing? Had you talked to anyone at that point?
A That's common sense. I did not want them -- I mean, that's a simple request. Please don't call me or don't write me.
Q So you expected Midland to heed that?
A Of course. It's a request.
Q Okay. Let's look at Plaintiff's Exhibit 12. The first page of Plaintiff's Exhibit 12, that's a letter that you wrote to Midland in March of 2009, correct?
A Correct.
Q And, again, the middle paragraph, please do not contact me again in any manner by phone or

in writing, those are your words, correct?

A Those are.

Q And it is a simple request?

A Uh-huh (indicating yes).

14:14:02 Q Correct?

A It is.

Q And a request you expected Midland to heed?

A To heed.

14:14:10 Q Mr. Brim, to make sure, you had just mentioned that you actually spoke to someone from Midland.

A I did.

Q How many times did you speak to a person 14:14:20 at Midland?

A It was two times around this time when I was getting my house. I called them, and I told them that I wanted that off of my credit report. And I actually called them to tell them that I 14:14:32 was sending in some proof. I might have even asked them what did they need. I don't remember exact words. And then I sent in a bank statement and a dispute letter. And I mean, we had a discussion. So, I mean, there wasn't a hello, 14:14:48 bye.

14:14:56

14:15:04

14:15:18

14:15:36

14:15:46

Q And that was back in late, 2007, wasn't it?
A No.
THE COURT: He just testified this was around this time.

**BY MR. LANGLEY:**

Q Oh, I'm sorry. Mr. Brim, I thought earlier you had said in response to the first letter you got from Midland --
A Oh, I did. In '07, I did. I spoke with a lady. And she transferred me to the supervisor. And then at that time, I faxed in a bank statement.
Q Mr. Brim, after your first letter to Midland, which was -- excuse me. Your first dispute letter, which was July 29, 2008, how many times did you speak to someone from Midland?
A One time. The first time.
Q And that's until today?
A Until today that what?
Q I mean, you haven't spoken to anyone from Midland at any time since then, have you?
A In 2009?
Q Right. That's the one time.
A You mean since then. All right. I

thought you said since 2008.

Q I may have asked you a bad question. Let me start over and see if I can do it again.

THE COURT: When is the last time you spoke to anyone from Midland?

THE WITNESS: In March of '09.

**BY MR. LANGLEY:**

Q And that was the only occasion after late July of 2008 that you ever actually spoke to anyone from Midland, correct?

A Repeat that.

Q March of 2009 was the only time you actually spoke to someone from Midland after July 29, 2008?

A Correct.

Q And there were only two pieces of written correspondence that you sent to Midland, including the one on July 29, 2008, correct?

A What's that, now?

THE COURT: Were there more than two letters you sent to Midland?

THE WITNESS: No. Disputing -- just disputing --

THE COURT: The correctness of the report.

THE WITNESS: Yes. That's it.

**BY MR. LANGLEY:**

Q So there were two letters, disputing the correctness of the report, correct?

14:16:52 A Correct.

Q And one phone call?

A Total?

Q Total after July of 2008?

A Correct.

14:17:10 Q So when you said earlier that you estimated you had devoted a month to this, you weren't referring to a month of dealing with Midland, were you?

A At least a month dealing with -- I mean, I

14:17:24 put in a lot of time getting my credit reports, getting research for information to dispute it, and write dispute letters, going back to my -- printing everything off. I mean, I did. I spent a lot of time.

14:17:36 Q Let's talk about the credit reports that you've got. I assume you've produced everything, all the credit reports that you had, haven't you?

A That I produced everything?

Q There's none sitting at your home that you

14:17:48 didn't give to your lawyers?

14:17:58

14:18:10

14:18:20

14:18:30

14:18:56

A Oh, credit reports, no.
Q And the credit reports we have are from July, 2008, March of 2009, and February, 2010, correct?
A Maybe. I don't recall getting them February of 2010. Maybe so.
Q I'm just trying to make sure that there aren't other credit reports you were getting during those gaps in time.
A Oh, no.
Q So there were really two, maybe three occasions where you went and got credit reports, correct?
A At the time I was trying to get a house?
Q Well --
THE COURT: Are there anymore credit reports that you worked on other than the ones -- or that you obtained other than the ones that are in these notebooks?
THE WITNESS: No.
THE COURT: Okay.
MR. LANGLEY: Nothing further at this time. Thank you, Mr. Brim.
THE WITNESS: Thank you.
THE COURT: Anything else on

redirect?

MS. CAULEY: Yes, Your Honor.

THE COURT: Okay.

**REDIRECT EXAMINATION**

**BY MS. CAULEY:**

14:19:02

Q Mr. Brim, if you will pick up that deposition that Mr. Langley came up and read to you from, please.

A Okay. I have it.

14:19:10

Q And he was on Page 48. And if you'll just go two more pages to Page 50.

A Page 50.

Q At the very top of the page, can you read the question that Mr. Tompkins asked you?

14:19:30

A Is a transactional detail report different from the bank statement?

Q And what answer did you give Mr. Tompkins?

A No. Because I went into the branch and asked for a transactional detail report. I had a -- I think it was a copy of this. And she said, this is a transactional detail report. This is all we can provide. If you need anything else, call us.

14:19:44

Q And on that same page, did you tell Mr. Tompkins exactly what branch that you went

14:19:56

14:20:14
14:20:28
14:20:40
14:20:46
14:22:58

to?

A I did. I told him I went into the Madison branch.

Q Mr. Langley asked you about your letters to Midland, if you expected Midland to heed your request to not call you and not write you, right? Do you remember that?

A Correct.

Q And in your letter to Midland, Plaintiff's Exhibit 12, did you ask them in that letter to immediately correct your credit report?

A I did.

Q And did you expect that they would honor that request, too?

A I did.

MS. CAULEY: That's all I had.

THE COURT: Anything in re-cross?

MR. LANGLEY: No, Your Honor.

THE COURT: Okay. Thank you, Mr. Brim. Wait. Do y'all have any questions? All right. Let's get the questions first. I need to see y'all in chambers.

(Bench discussion in chambers outside the hearing and presence of jury.)

(End of bench discussion.)

(In open court. Jury present.)

THE COURT: Okay. This is a question from the juror.

Mr. Brim, by your own admission, you stated in writing not to be contacted by phone nor in writing. How did you expect resolution without any correspondence via phone or written communication?

THE WITNESS: Because I called in -- when I called in, they could have at least told me what they needed.

THE COURT: Okay. Did you seek any other alternative resolutions?

THE WITNESS: Besides the bank statement, that's all they told me they needed. Detailed transactional detail report, and that's what I told that's what it was.

THE COURT: Okay. In reference to honoring do not call, what else was expected from -- I guess by you from the dispute letter?

THE WITNESS: To at least let me know when I called in what else did they need. I mean, because if I speak to you, of course, if someone calls me, I would let them know what I want, basically.

14:27:00
14:27:12
14:27:28
14:27:36
14:27:44

THE COURT: Did Midland Credit Management comply with all of what you --

THE WITNESS: Asked for? They didn't. Because it didn't come off my credit report. It did not come off my credit report even when I filed this suit, so --

THE COURT: Okay. What documentation did you have to provide to get your brother's accounts off your credit report?

THE WITNESS: I just provided my social security card and my driver's license, because my brother's name is similar to mine. And our social security numbers are different by one number. So I provided my social security card.

THE COURT: Did you receive any reasons from the mortgage companies, either verbally or by letter, that stated why you were denied?

THE WITNESS: I didn't.

THE COURT: Why is the address different on the bank statement?

THE WITNESS: From the bank that I went in?

THE COURT: I don't know.

THE WITNESS: From the bank that I went in?

THE COURT: No. Let me just see.

THE WITNESS: Wynn Drive, basically?

THE COURT: Did you move?

THE WITNESS: No. The Wynn Drive I would assume is the headquarters because I don't recall going into the Wynn Drive --

THE COURT: What are you reading from right now?

THE WITNESS: Well, I'm looking at the -- I'm assuming the address of Redstone Federal Credit Union.

THE COURT: Okay.

THE WITNESS: Or my address?

THE COURT: Are you looking at Exhibit 24?

THE WITNESS: The one he gave me last. I'm sorry.

THE COURT: Is that what you have right there?

THE WITNESS: Yes, it is.

THE COURT: And it says Wynn Drive?

THE WITNESS: That's the biggest Redstone that I've seen. I'm assuming that's the headquarters because that's the biggest Redstone. It is.

14:28:42 THE COURT: Hang on just a second.

THE WITNESS: This one says Wynn Drive, as well.

JUROR 16: Can I clarify?

THE COURT: Yeah.

14:29:02 JUROR 16: In Exhibit 2 on the plaintiff, his address is listed as 4134 South Memorial. But everything else is the apartment --

THE WITNESS: Golf Road.

14:29:10 JUROR 16: -- Golf Road.

THE WITNESS: Yeah. When I bought the computer, that is where I lived. 4134H South Memorial Parkway.

THE COURT: And then you moved?

14:29:24 THE WITNESS: And then I moved to 2225 Golf Road, Unit 106.

THE COURT: All right. Thank you.

THE WITNESS: You're welcome.

THE COURT: You may have a seat by

14:29:32 your counsel.

THE WITNESS: Thank you.

(Witness steps down.)

THE COURT: Anything else?

MR. BENNETT: Judge, and I apologize. The Court recalls that there was a defense exhibit that was added today. After I had had an opportunity to examine the witness in opening. If the Court would indulge I think, literally, three or four questions solely related to the number in that contract, I would like to recall the defendant's witness. I didn't that document in front of me. They gave it to us today.

THE COURT: Okay.

MR. LANGLEY: Your Honor, they did have that document. It has been in the binder since we handed it to them the first day of trial.

MR. BENNETT: This morning the Court recalls counsel said, I made a mistake. It was actually there and it was provided --

THE COURT: It was admitted this morning. And you may proceed.

MR. BENNETT: Thank you.

THE COURT: And you have not even

14:30:36

14:30:58

14:31:14

14:31:24

14:31:40

rested yet. So you can call any witness you want.

MR. BENNETT: Thank you.

THE COURT: Who are you calling?

MR. BENNETT: I would call the defendant's representative now. Mr. Edrozo.

(Witness sworn.)

COURTROOM DEPUTY: Will you state your name?

THE WITNESS: Gabriel Edrozo.

THE COURT: And you're the same Mr. Edrozo that testified earlier in this case?

THE WITNESS: I am.

THE COURT: All right.

MR. BENNETT: Your Honor, may I approach the witness to give the defendant this exhibit?

THE COURT: Sure.

MR. BENNETT: And Your Honor, I have Exhibit 21. And I have it opened to Page 32, which is Exhibit D.

**REDIRECT EXAMINATION**

**BY MR. BENNETT:**

Q Sir, you're aware that Midland purchased this account as part of a portfolio of

60-some-thousand other accounts from Dell Financial?

A Correct.

Q And it was pursuant to this contract you provided to us in this litigation, Midland has provided?

A It was part of this contract?

Q Yes.

A Yes.

Q And there are various terms in front of that contract, but this is the page that outlines the actual dollars and cents of the purchase, correct?

A I'm not sure. I couldn't speak to that. I'm not part of purchasing portfolio.

Q I thought you had been in the factoring business for -- I'm sorry. 15 years, you said?

A Correct.

Q And so there is a percentage of the total outstanding balances, and that percentage is the purchase price, correct?

A I have never been part of purchasing.

THE COURT: Well, just look at the document and see if you could tell anything from the document.

**BY MR. BENNETT:**

Q What is the percentage that was paid -- first of all, what is the total value of principal of this portfolio that Midland purchased from Dell?

14:32:46 A This document lists the unpaid -- total unpaid balance of $117,139,081.44.

Q Are you okay at math? I made a joke earlier. I'm a finance undergraduate which means --

14:33:18 A Not as good as you.

Q I'm horrible at math.

A I'm horrible.

Q What is the percentage of total principal that is paid for that amount? Is it .05?

14:33:28 A 32 is what's listed, yes.

Q And the balance on the Midland purchase or the account from Dell related to Mr. Brim when it was sold was $1,600 or $1,300?

14:33:50 A 13. I believe it was 1,354, if I'm not mistaken.

Q Can you help me because of my math limitation? I know we have a lot of engineers. Do the math of .0532 from $1,300?

14:34:02 A I could not.

                              MR. BENNETT: Your Honor, may I get my calculator?

THE COURT: Yes.

**BY MR. BENNETT:**

14:34:30 Q Are you familiar with an IPhone calculator?

A Yes.

MR. BENNETT: Your Honor, may I approach?

14:34:38 THE COURT: Yes.

MR. BENNETT: Okay.

**BY MR. BENNETT:**

Q I have the calculator function. And I'm not a witness, so I can't testify. But if you
14:34:44 could do the math on $1,330 for me and tell me what .0532 -- the amount Midland paid for this account would be.

A That's not right. One more time. It's not calculating right. I'm getting 25,451.
14:35:22 So --

THE COURT: Look. This is very simple. Okay? You can do it in your head.

THE WITNESS: Okay.

THE COURT: If we just rounded off
14:35:30 to $1,300, take one percent, how much -- I mean,

one thousandth --

THE WITNESS: Thousandth of a percent.

THE COURT: How much is that?

14:35:40 THE WITNESS: 13.

THE COURT: No. It's 1.3, isn't it?

THE WITNESS: Thousandths of percent, yes. 1.3.

14:35:46 THE COURT: And you multiply by five, how much is that?

THE WITNESS: Multiply by five?

THE COURT: Is it 6.5?

THE WITNESS: Yes.

14:35:56 THE COURT: $6.50. Round it off.

THE WITNESS: 6.50.

THE COURT: I am a math major.

THE WITNESS: I'm not.

MR. LANGLEY: Your Honor, I hate 14:36:02 to object to that, but the percentage is actually five percent in the contract.

THE COURT: No, it's not. Sorry. You're wrong.

**BY MR. BENNETT:**

14:36:18 Q And did you hear how much my client paid

for postage to make his disputes?

A I do. I don't recall the number.

MR. BENNETT: I don't have any other questions, Judge. Thank you.

14:36:26

**CROSS-EXAMINATION**

**BY MR. LANGLEY:**

Q Mr. Edrozo, would you please turn to Page 5 of the document Mr. Bennett showed you?

A Okay.

14:36:50

Q At the bottom of the page, do you see where it says purchase price as set forth in the closing statement attached hereto as Exhibit D?

A I'm sorry. Exhibit --

Q Exhibit D. See where it says Exhibit D at the bottom of Page 5?

14:37:04

A Okay. I apologize. What exhibit number are you looking at?

Q The same document Mr. Bennett was just asking you.

14:37:16

A I'm sorry. I switched pages. I moved to Exhibit 5.

Q It's Exhibit 21.

A Okay. Okay. I'm on Page 5.

Q Would you please read the parenthetical after the word, Exhibit D?

14:37:52

14:38:06
14:38:22
14:38:32
14:38:42
14:38:52

A Which amount shall be determined by multiplying the total unpaid balance of the charge-off accounts as of the file creation date being sold by .0532.

Q And what's your understanding of .0532?

THE COURT: I'm wrong. I admit. You're absolutely right. It is five percent. And actually -- it's .05, which is five percent. So if you multiply that by 1.3, can you get it? Is it $65?

MR. LANGLEY: Actually I haven't done that math.

THE COURT: Is it $65?

THE WITNESS: I'm not good at math.

THE COURT: You're absolutely right. I'm wrong. Objection is sustained. But it is five percent.

MR. BENNETT: Judge, we would stipulate that they paid $65 for this account.

THE COURT: Okay.

MR. LANGLEY: Your Honor, we're not seeking to reach a stipulation on that. Because I don't know the accounts can be isolated in that way, but I think what is an undisputed

         fact here is that the portfolio was purchased for 5.3-something percent of the face value.

THE COURT: I think you're right. Okay. Anything else from this witness?

14:39:06 MR. BENNETT: No, Your Honor.

THE COURT: Okay.

(Witness steps down.)

THE COURT: Thank you Mr. Edrozo. Wait. Do y'all have any questions? You had some

14:39:16 questions. And if you want to ask any questions of Mr. Edrozo, you have a right to do it now.

JUROR 16: Any questions, even from previous?

THE COURT: Yes.

14:39:30 JUROR 16: Do you want me to write it down or ask it?

THE COURT: I don't know which ones were yours. But if you have any questions, you may ask them.

14:41:22 (Bench discussion in chambers out of the presence and hearing of jury.)

(End of bench discussion.)

(Bench discussion:)

THE COURT: Put in that defense

14:43:14 objects to those two questions. I have told her

14:43:48

that you all have objected to that. And I've overruled the objection. Because the rule was that everybody agreed to that if there were any objections to any of the questions the Court asked, they could follow up to those questions that there were objections to. And I have allowed the defendant to follow up with any questions if they have any after I ask the witness that. Okay?

14:44:02

(End of bench discussion.)

(In open court. Jury present.)

THE COURT: The first question is are there any other training documents prior to the 2010 printing that Midland employees would follow?

14:44:26

THE WITNESS: I would have to refer to Angelique's testimony. I believe the training documents were within that testimony.

THE COURT: What information did Midland Credit Management seek from Dell concerning this dispute?

14:44:40

THE WITNESS: No information.

THE COURT: And why was the greater burden placed on Mr. Brim to produce evidence to close the account?

14:44:56

THE WITNESS: We were unable to contact Mr. Brim based on receiving the cease and desist.

THE COURT: Okay. Any follow-up questions?

MR. LANGLEY: No, Your Honor.

THE COURT: Okay. Thank you.

MR. BENNETT: Your Honor, may I follow up with that one question?

THE COURT: Yeah. Everybody can follow up to these particular two questions.

**FURTHER REDIRECT EXAMINATION**

**BY MR. BENNETT:**

Q Not to be repetitive, but you've heard a lot of about transaction logs and the argument that my client sent a cease and desist. That was your answer. You said the problem Midland had was it couldn't do anything more because my client had locked it out from contacting him with a cease and desist. That's essentially what you just said, right?

A Right.

Q And you heard your counsel make those same kind of arguments when he was talking with my client?

A Correct.

Q Let's put this in the context of the real world.

What would Midland have done differently had there not been a cease and desist letter, had my client not said, quit your harassing debt collector calls or whatever else he was doing? What would you have done differently if this theoretical obstacle didn't exist?

14:46:12

14:46:30

A We would have had a conversation with him our first contact.

Q And that conversation would have done what?

A Would have --

14:46:36

Q It wouldn't have mentioned transactional detail log, right? You've already said there's nothing in your policy that permits that to matter.

A No. But request the front and back of the check.

14:46:46

THE COURT: For the front and back of the check?

THE WITNESS: Of the check.

**BY MR. BENNETT:**

14:46:48

Q But accompanied by a settlement letter

from Dell; that's what the policy is?

A Correct.

Q Not just the front and back of a check?

A Correct.

14:46:56 Q So if he had submitted a transactional detail log or a bank statement or a front and back of a check, they all would have been treated exactly the same; that is, they all would have been dependent on whether Dell had given

14:47:10 permission to release this account through this settlement letter, right?

A I don't know.

Q Well, there's nothing in any of these procedures, 2010, before 2010, after 2010 --

14:47:24 there's nothing in your procedures that would have allowed the deletion of this account, based on any telephone communications that you might have had with my client, unless he had a Dell letter, saying it was okay to release this

14:47:36 account, right?

A Or the copy of the front and back of the check along with the letter, correct.

Q With the paid-in-full letter?

A Uh-huh (indicating yes).

14:47:44 Q Both. Both are necessary conditions,

correct; we already went through that in your first testimony.

A Correct.

THE COURT: I thought you said or. So do you have to have both? A settlement letter and a front and back of a check, paying that amount?

THE WITNESS: Yes.

THE COURT: Okay.

**BY MR. BENNETT:**

Q And a settlement letter and/or a transactional detail log, right?

A Correct.

Q Now, are you aware -- if you could turn to Plaintiff's Exhibit 4. I'm sorry. Not Four. Two. Three. Three. No. Again, my apologizes. Two. Plaintiff's Exhibit 2.

Are you aware, as the representative from Midland, that in this litigation, this exhibit was provided by Redstone in response to your attorney's subpoena?

A I am now, yes.

Q What's the date that Redstone -- the date of their affidavit for this document they provided?

A I believe March 7th, 2011. That's what's stamped on it.

Q I'm sorry. If you look at the date of the sworn to and subscribed before me. That was June 18th, 2010, correct? The affidavit, first page, Exhibit 2.

THE COURT: It's Exhibit 2. That's in defendant's.

THE WITNESS: Oh. I'm sorry. I don't have mine.

THE COURT: Here. You can have mine. That's all right.

**BY MR. BENNETT:**

Q While I'm walking, you are aware, of course, your client didn't delete this until mid September, 2010, correct?

A I believe it's September 9th, 2010.

Q Oh. September 9, 2010. But, again --

THE COURT: Let him answer the question he didn't answer. Can you tell the date of the affidavit of Redstone? And that's Plaintiff's Exhibit 2. That's the question that wasn't answered.

**BY MR. BENNETT:**

Q The first page of it.

14:50:30

14:50:36

14:50:50

14:51:16

14:51:24

A Yeah. I'm trying to make out the month. Looks like 10 of 2010. I'm not sure what month.

THE COURT: No. Exhibit 2. This is Exhibit 3.

THE WITNESS: I'm sorry. I'm getting mixed up here.

THE COURT: Right here.

THE WITNESS: June 18th, 2010?

**BY MR. BENNETT:**

Q Yeah. Do you have an explanation for why after your lawyers had a subpoena response from June that it still took three months before it was taken out?

A I don't, no.

Q If this subpoena response with the affidavit from Redstone had been provided by my client but he did not give you a paid letter from Dell, it would have been treated exactly as an unattested, unauthenticated bank statement, correct?

A I don't know.

Q Well, if you were following your procedures?

A I don't know. There may be other procedures in other departments I'm not aware of.

We're talking about a legal document.

MR. BENNETT: I don't have any other questions, Your Honor.

THE COURT: Do you have followup?

MR. LANGLEY: I do.

**RECROSS-EXAMINATION**

**BY MR. LANGLEY:**

Q Mr. Edrozo, would you look at Plaintiff's Exhibit 3, which is the transactional detail report that Mr. Brim provided in August of 2010? This should be the black binder.

A Okay. I do not have that black binder up here.

THE COURT: Here. You can use mine.

THE WITNESS: Thank you very much, Judge. Thank you.

**BY MR. LANGLEY:**

Q Have you seen that document before today?

A Yes.

Q Now, if you would, please, Mr. Edrozo, look at Defendant's Exhibit 17.

THE COURT: Defendant's. It's in the white book.

THE WITNESS: It's in the white

book? Okay.

**BY MR. LANGLEY:**

Q And look at the very last page of Defendant's Exhibit 17.

14:52:52 A Okay.

Q And you see where it says Box 5?

A Yes.

Q If the consumer provided written dispute with proof -- that's the situation being

14:53:04 addressed, correct?

A Uh-huh (indicating yes). Correct.

Q And it says, if proof is valid, update to delete, correct?

A Correct.

14:53:10 Q Then it says, if unable to determine if proof is valid, account will be referred to ACQ. What is ACQ?

A That is acquisitions.

Q But if Midland determines that proof is

14:53:24 insufficient, you don't reach that step, do you?

THE COURT: What?

**BY MR. LANGLEY:**

Q If Midland -- Mr. Edrozo, there are essentially three options, aren't there? Proof

14:53:42 is valid, invalid, or they can't tell?

A Correct.

Q If Midland had received the transactional detail report marked as Plaintiff's Exhibit 3, would that have been sent to acquisitions?

14:53:56 A It may have, yes.

MR. LANGLEY: Nothing further.

**FURTHER REDIRECT EXAMINATION**

**BY MR. BENNETT:**

Q So the three options were valid, invalid,

14:54:08 and can't tell?

A Correct.

Q And if it's can't tell, that's -- then Midland would send it to acquisitions, correct?

A Correct. Depending on who's looking at it

14:54:20 or what they understand they read.

Q That's not what you said. Because you know the next question, correct, which is, why didn't you send this the acquisitions. And you didn't send it to acquisitions, did you?

14:54:30 A No.

Q So that means that Midland's policy is to find a bank statement, per se, invalid. Not can't tell. Invalid, correct? I don't mean to pick on you. You're put up as their

14:54:44 representative.

A No. Correct. I don't know who received this document. If it was sent to counsel. I don't know how --

THE COURT: No. Wait. We're not talking about what was sent to counsel.

THE WITNESS: Okay.

THE COURT: We're talking about Midland's policy. Mr. Bennett asked you if the bank statement, such as the one that was sent by Mr. Brim to Midland, is deemed invalid, according to Midland's training policies.

THE WITNESS: Yes, it is.

THE COURT: Okay.

MR. BENNETT: Thank you.

MR. LANGLEY: I think there's some confusion on this document. I think the witness was referring to Plaintiff's Exhibit 3. And Mr. Bennett was referring to the bank statement.

MR. BENNETT: I was referring to the procedures that --

THE COURT: He was -- I asked you about the bank statement.

THE WITNESS: And I agree about the bank statement.

THE COURT: So there is no

confusion, I don't think. At least not on my part. If there is on yours, you have an opportunity to clear it up. Clear it up.

MR. LANGLEY: I think it's cleared up. Thank you.

MR. BENNETT: No other questions.

THE COURT: Okay. Thank you.

MR. BENNETT: And plaintiff would rest, Your Honor.

THE COURT: Okay. We're going to take up a matter outside your presence and hearing. So why don't you just enjoy a nice break and be back in here in about 20 minutes. Don't discuss the case while you're on break.

(Jury excused.)

(In open court. Jury not present.)

THE COURT: Okay. Plaintiff has rested.

MR. LANGLEY: I believe Jason has a motion he's going to make and argue and file with the Court.

THE COURT: Okay. Do you have a written motion or just oral?

MR. TOMPKINS: I have a written

motion.

THE COURT: Okay. Let me have it. Let Tammi have it first to mark it filed. And let me read it before I decide whether I want to hear argument on it. Okay?

14:57:14

MR. TOMPKINS: Okay.

THE COURT: Thanks. Okay. You can argue.

MR. TOMPKINS: Thank you, Your Honor. Defendant would move for judgment as a matter of law in whole or in part.

14:58:24

And first, I would say that we move for judgment as a matter of law on the willfulness claim in this case. I've cited to Your Honor in the written motion a number of cases stating the type of evidence that are necessary to rise to the level of willfulness. And I do not believe the plaintiff has offered any evidence that Midland's actions in this case rose to a conscious or reckless disregard of rights under the law.

14:58:38

14:58:54

THE COURT: Okay.

MR. TOMPKINS: And ask for a judgment as a matter of law on all claims, both negligence and willfulness, because the plaintiff

14:59:08

has not presented any evidence of the standard of care for a reasonable investigation, which is, of course, the plaintiff's burden.

14:59:26 In addition, plaintiff has presented insufficient evidence of injury, which is an essential element of the claim under the FCRA.

The only evidence we have heard has been from the plaintiff himself. And in the written motion, we have cited Your Honor a number of 14:59:40 cases requiring corroboration. And I have heard no other evidence that Mr. Brim suffered mental or emotional distress.

Finally, Your Honor, we move for a judgment as a matter of law on the basis the 14:59:56 plaintiff has not presented sufficient evidence of causation for any injuries.

For the economic -- alleged economic injuries, you have the American Express denial. We heard testimony from Transunion, stating that 15:00:10 the Midland account did not affect his credit score. And the American Express denial letter expressly states he was denied when his Transunion score was too low.

THE COURT: No. That's not what 15:00:26 the testimony was. The testimony was the

 15:00:40 disputed account was not counted in his credit score. If it had not been disputed, you can infer that his credit score would have been higher, or at least that's an inference you can have from the evidence.

MR. TOMPKINS: I'm not sure I follow Your Honor.

THE COURT: That's all right.

MR. TOMPKINS: Sorry. In

15:00:46 addition, Mr. Brim testified that the American Express credit card was going to be obtained for use for business purposes, which means that the FCRA would not govern that credit denial. And we have heard absolutely no evidence other than

15:01:08 Mr. Brim's own testimony about other denials. We've seen no denial letters, much less any evidence --

THE COURT: I'm sorry. I can't hear you.

15:01:20 MR. TOMPKINS: We've seen no denial letters or any other credit applications. And Mr. Brim himself was unable to say anyone that told him his credit report, much less the Midland entry on his credit report, caused any of

15:01:28 those denials.

I'll be happy to address any questions you have, Your Honor.

THE COURT: No. I'll let plaintiff respond.

MR. BENNETT: Your Honor, we would respond in order.

Judge, the heading in their first argument, insisting that, I guess, there be a standard of care -- maybe an expert witness -- is not the law.

There is a case which I, by tomorrow morning if the Court needs it, can provide you that you do not need an expert witness to establish standard of care.

The standard in *Johnson V MBNA*, which has been cited without any negative authority since its 2004 adopted in Fourth Circuit, is that it must be reasonable standard.

The Court has already provided its draft of the jury charges that state the reasonableness standard that has been delivered in nearly every furnisher case that it's a -- as in all reasonableness, it is a question of the circumstance and some other factors. But there isn't a standard of care.

          15:02:44

It also suggests, Judge -- and at the end of our evidence we'll make our motion that the -- there is no evidence that any investigation was done at all. So that is, you have two possible violation.

15:02:58

The one violation is that what was done was an inadequate investigation. It didn't go far enough. It wasn't as thorough as it needs to be. But if you imagine a defendant taking a piece of paper and putting it in a trash can and when they received a dispute, that's no investigation. It's not an unreasonable one. It's none at all.

15:03:10

In the case of the Equifax ACDV, there's evidence that Equifax sent an ACDV in August of '08, and there was zero investigation done by Midland. With respect to all the others, there is evidence only that the automated interface, which is not an investigation under -- it's not a

15:03:26

bad investigation or mediocre and unreasonable. It is not investigation.

You have two reasons. First, this isn't the law. And second, they don't even get to argue that their investigation was reasonable on

15:03:40

the evidence if this was the evidence that

existed at the end of the trial. There wasn't an investigation done.

The second -- and by the way, *Chiang* has been cited here. *Chiang* is a bad case for consumers but not on this issue. *Chiang* is bad because it holds the principle that you can't use the Fair Credit Reporting Act as a declaratory judgment method when there's a legal dispute about a debt. And if you look at *Chiang*, this is like the anti-*Chiang*. This is no legal dispute. There never has been.

There's no question in *Chiang* there is an affirmative defense. But then *Chiang* sites another Second Circuit case in which there was an affirmative defense under the Truth in Lending Act and for fraud. And in both of those instances, the Second Circuit said that's a legal defense; not a factual one. That's different than, say, *Cushman* where the consumer said they never signed the account.

And certainly in this case, this is clearly factual. So it's odd to site the case that says exactly the opposite of what you would suggest. But in this instance, certainly we don't have to prove a standard of care. No Court

ever. Not one. I don't need to say take the majority path. I can say no Court has done this. And I can say that with some authority as one of the contributing authors in the FCRA manual.

15:05:14 The second argument is plaintiff has not offered any evidence --

THE COURT: You can skip that one.

MR. BENNETT: I would just note, Judge, we would adopt our omnibus brief, which we

15:05:26 detailed at length on this.

Number 3, plaintiff has presented insufficient evidence of injury. No evidence of economic injury. And Judge, again, we would adopt that.

15:05:34 But the standard for economic injury is more than simply proving a specific higher interest rate. And in fact, both in the jury instruction cites as well as the omnibus memorandum, the -- you can establish the loss of

15:05:52 credit opportunities a deterrent from applying for credit. And you can prove, as I'll address in the last motion in limine, that by circumstantial evidence -- and this is the reason we asked for the circumstantial evidence

15:06:08 instruction. The cites that we offer in our

omnibus memo -- I don't need to repeat it. They're all there -- is if our client can show they applied for -- he applied for credit -- and we know that because there are the inquiries that are uncontested -- he did not get the loan. And there's no other explanation that would defeat that my client's Midland account was a substantial factor.

The jury is entitled to make an inference. A common sense inference that this would have been a substantial factor. And that on the -- uniformly, and I cited all the case, that's been addressed.

The other issue is the American Express argument where they're saying, well, they have one witness from Transunion, a litigation liaison, who was subject to a subpoena who made a comment that says, account that is noted disputed doesn't affect a score. That's what they have. In the face of an authenticated letter from American Express that says, this was denied because of your score which was low because -- and the first one is a collection. The second is a recent derogatory.

If you look at the Transunion credit

report at the time, Exhibit 57, there is no collection but this one. There never was in Transunion's file. There is no recent credit. The two old ones they're talking about was a late credit card payment from 2007. And the student loan issue was 2005. Both were current.

THE COURT: You're talking about the Sam's?

MR. BENNETT: Sam's Club was a late credit card payment, Exhibit 57.

THE COURT: Well, actually it says in the credit report under pay status paid or paid as agreed even if it is shown as a -- and it's shown with a zero balance.

MR. BENNETT: Yes, Your Honor. Page 7 of our omnibus, we also cite the Second Circuit decision --

THE COURT: Okay. Wait. Look. Just address theirs. Don't start reading from your brief. That would be helpful. Let me just tell you what else. That deals with the economic injury. And B you don't have to address. Mental anguish. Okay. Talk to me about Three.

MR. BENNETT: Your Honor, the standard in -- the history under *Safeco* reduced

15:09:00 the threshold. The Fourth and the Fifth and the Eleventh had all adopted a conscious disregard knowing standard. The Supreme Court adopted Third Circuit and Ninth Circuits, reckless or knowing. And reckless, you have the case cites.

The jury instruction that we have asked for, which we will argue for, is taken verbatim from those. Recklessness -- and from the *Safeco* decision -- is a balancing test of whether or not 15:09:16 under the circumstances the defendant took an unjustifiable risk of violating the law.

In this instance, they adopted a procedure that for either 95 or 99 percent of the 8,000 disputes they receive a week, they do no 15:09:30 investigation whatsoever. They have a procedure which says they will completely default to the original source, and they will not make any corrections themselves ever. That is reckless.

The other factors for recklessness are how 15:09:44 long it occurred. And to be candid, having done all these, I have never once had a defendant keep a derogatory item on a credit report nine months into litigation. It's audacious. I've never had that.

15:10:00 The reason the credit bureaus reacted the

way they did in this case with the early disputes, they sent ACDVs upon filing to the defendant so they could cover themselves. But that itself is reckless.

15:10:14 You're sued. June 2010, your attorneys obtain an attested document that says this bank statement is accurate. And they continue to keep it on for another three months. That's reckless.

This is -- I just don't think reckless is 15:10:32 available as a matter of summary judgment for a plaintiff because it's such a hard standard. But if any case, this should be it.

THE COURT: Okay. Is that the end of it?

15:10:44 Can you refer me to your exhibit which is the policies and procedures and training manual? What exhibit number is that?

MR. LANGLEY: Talking about Midland's?

15:10:56 THE COURT: Midland's.

MR. LANGLEY: I think it's Exhibit 17. The one I was asking Mr. Edrozo about? That's Exhibit 17.

THE COURT: No. I'm not talking 15:11:06 about that one. It is a thick one.

MR. BENNETT: The Module 6.

MS. CAULEY: It's 35 in the plaintiff's book.

THE COURT: Do you have anything you want to say in response, Mr. Tompkins? This is your motion.

MR. TOMPKINS: Well, I do, Your Honor.

I think the fact that Midland did not delete this as soon as the lawsuit was filed actually slants the other way. Because they still had no evidence until that transactional detail report was provided to Dell and Dell was able to trace the account and determine that they had misapplied Mr. Brim's payment to another customer that this was not an unpaid account. And they did not delete it until they actually found that out. And they weren't going to just delete it because they were sued. I don't think that rises to recklessness.

THE COURT: Okay. Naomi, I need to see you right quick about something.

(Short recess.)

THE COURT: Okay. Have a seat. I'm going to deny the motion. I'm also going to

deny the motion with respect to willful conduct, which I think is a jury question under the facts presented by the plaintiff in this case.

15:17:22 But I did look at Plaintiff's Exhibit 35, which is Midland's procedures for what a consumer must do to validate a dispute claim after the 45 days. And it goes on the burden of proof on the consumer -- it lists what the consumer should do. And under Five over on the left side, it says pay 15:17:52 prior to purchase, ask for method, amount, and date of payment, which he furnished, verify payment was made before accounts purchase date. He did that. If payment made after purchase date, process as a direct pay. And I'm not sure 15:18:08 what that is.

But I do know that by virtue of Midland limiting this to a check, front and back, plus a settlement letter is something that the plaintiff could never have done in this case because he 15:18:24 didn't even have a check.

And the defendant's representative has testified here in open court that he didn't know what a transactional detail report was until five months ago.

15:18:42 I will also say the fact that Midland

wrote Equifax back after Equifax had corrected its credit report to reflect that it was zero and reported it back, as it was, with a higher balance, I think to at least -- well, I think that's willful, but that's up to the jury to decide. I think there's enough to go to the jury on this issue.

And finally, I know that Mr. Brim did not get or did not look at the complaint he was sued with in small claims court. But he did say it worried him that he knew he had gotten sued because he put the letter together with -- the letter from Gloria Schwartz together with the sheriff's note.

But to that suit, which is in evidence, there is an affidavit by Midland. And it's Plaintiff's Exhibit 17 that says, by virtue of her relationship with Midland, I have personal knowledge of all relevant financial information. All relevant financial information concerning Midland Credit Management, Inc.'s Account Number 8525203719, which includes the following information: That the defendant -- that would be Mr. Brim -- did fail to make payments on the account and that demand has been made for

defendant to make payment of the balance owing on the account described above more than 30 days prior to the making of this affidavit.

15:20:56 And then it goes on about the lawyers. And the amount is $1,381. And she states that under oath in April of 2008, which was after Mr. Brim had gotten the -- called them -- after he finally received the letter that was sent within the 45-day period and told them that it was incorrect.

15:21:22 And I find there is sufficient evidence for it to go to the jury on the issue of willfulness, and I'm going to overrule motion.

15:21:32 And you need to call your first witness when you take a break. Do you need a ten-minute break?

MR. LANGLEY: We're going to find out if Redstone is here. If so, we'll put them up first.

15:21:54 (Short recess.)

(In open court. Jury present.)

MR. TOMPKINS: Defendant calls Redstone Federal Credit Union.

THE COURT: Okay.

15:31:08 (Witness sworn.)

COURTROOM DEPUTY: Will you state your first and last name?

THE WITNESS: Anthony Cox.

COURTROOM DEPUTY: Thank you.

**DIRECT EXAMINATION**

**BY MR. TOMPKINS:**

Q Mr. Cox, what is your position at Redstone Federal Credit Union?

A I am manager of automated operations.

15:31:44 Q How long have you held that position?

A Three-and-a-half years.

Q What was your position prior to manager of automated operations?

A Branch manager of Madison branch.

15:31:54 Q And how long did you hold that position?

A I held a manager position -- a branch manager position for 15 years.

Q How long have you been at Redstone Federal Credit Union?

15:32:06 A 25-and-a-half years.

Q Could you tell the jury what the function of the automated operations group is?

A We have several functions. One of the main functions is ACH. Automated clearinghouse.

15:32:20 That's where we receive electronic credits and

debits for our members' accounts. We also do wires. We receive all the mail. We post mail payments. We also do charge-backs on checks. We send out returned checks. We process checks from the branches that come in, and we send those out for collection.

Q You mentioned the ACH or automated clearinghouse. Can you describe what that is?

A It's an electronic payments that we receive from the Federal Reserve. We go out and pick up files that are generated by other financial institutions. And we post those files to our member accounts.

Q Can you explain to me how an ACH transaction is originated?

A It's originated -- the members originate the ACH transactions by -- they could do a tele where they would call the place of business and ask them to generate a transaction on their behalf. They could sign up for a direct deposit through a payroll group. And the company they work for generates a ACH deposit on their behalf. Basically, that's the way that would work.

Q You said a tele where a member provides. Would that be a phone check?

A Yeah. That would be a phone call. They would call the place of business or a place of business could call them. And ask them if they would like to make a payment by phone. And that payment -- that conversation is recorded. And they give them authorization, give the business authorization to make that transaction on behalf of the member.

Q When an ACH transaction occurs, is there any type of record of that transaction created?

THE COURT: Is there any type of what?

**BY MR. TOMPKINS:**

Q Any type of record created of that transaction?

A Yes. There is. We receive the file from the Federal Reserve. And that's the record we have to debit or credit the member's account. And also we give a record to the member by showing the transaction on their statement.

THE COURT: Now, what do you get from Federal Reserve?

THE WITNESS: It is a file that we get from them to --

THE COURT: Over computer?

THE WITNESS: Yes. Electronic file.

THE COURT: What's it say?

THE WITNESS: It has the -- has the financial institutions that we're debiting or we're getting the money from or we're giving money to. And it shows the member's name, their account number, the type of transaction whether it is a debit or credit, how much the transaction is. And it has a trace number on there. And that's how we post that transaction.

THE COURT: Would the same transaction be on the bank statement to the customer?

THE WITNESS: The trace number would not be on the bank statement to the customer, no.

THE COURT: But all the other information would be?

THE WITNESS: It would have the name of the company, the date, and the amount. And it would show it was debit or credit.

**BY MR. TOMPKINS:**

Q How long are the records of ACH transactions maintained?

A We keep those for seven years according to NACHA rules, which is the National Automated Clearinghouse Association. That's the governing body that governs the ACH transactions.

15:35:58 Q Does automated operations have a research function within Redstone?

A Yes, we do.

Q What type of research do you perform?

A When our members go to a branch and

15:36:12 request information that the branch doesn't have, they can call us if it's about an ACH. And we will research that to verify the debit or credit and give that information to the employee. And the employee is free to give that to the member

15:36:30 at that point.

Q Do you ever get direct requests from members?

A No.

Q Are all the employees of the automated

15:36:40 operations group located in a single branch office?

A Yes, they are.

Q Which office is that?

A 220 Wynn Drive, Huntsville, Alabama 35893.

15:36:50 Q And does that group in Huntsville support

all branches credit union wide?

A Yes.

Q When a Redstone Federal Credit Union member comes to a branch to ask for a record of a payment to a merchant, what is that member provided with?

A We give them a copy of the transactional detail report -- or actually, we give it to the employee, and the employee gives it to the member. And the transactional detail report shows the account number, the trace number, the dollar amount, whether it is a debit or credit. It shows the originating routing number for that originating bank. And it shows the date. And I think that's about it.

THE COURT: Shows the trace number?

THE WITNESS: Yes, ma'am. On the transactional detail report.

THE COURT: Okay.

**BY MR. TOMPKINS:**

Q I want to ask you, Mr. Cox: Do you have a black binder in front of you?

A No, sir.

Q These are exhibits that have already been

admitted in this trial. And I want to ask you to look at Tab 2.

A Okay.

Q Looking at the second page of Tab 2?

15:38:48 A Yes, sir.

Q Is that a transactional detail report?

A Actually maybe I'm not looking at the second page. That is a bank statement in here.

Q Does anyone refer to this document as a transactional detail report at Redstone?

15:39:04

A No.

MS. CAULEY: Object, Your Honor. That is awfully overbroad. He can't testify for all employees of Redstone.

15:39:12 THE COURT: Sustained. And that answer is to be stricken and is stricken from the record. And that means that if you cannot erase it from your mind, you may not take that statement in consideration at the time you deliberate.

15:39:24

How many employees does it have total?

THE WITNESS: We have about 800 employees.

THE COURT: Okay.

15:39:34 **BY MR. TOMPKINS:**

15:39:46

Q Mr. Cox, if you look at the fourth entry from the bottom, do you see that?
A Yes, sir.
Q Dell Financial with some letters and numbers that are after?
A Yeah. Payment. And that's the date -- that's the settlement date of the payment.
Q The 041106?
A Yeah. November the 6th, 2004.

15:40:00

THE COURT: 2004?
THE WITNESS: Yes.
THE COURT: Oh, yeah.

**BY MR. TOMPKINS:**

Q What does the P-A-Y-M-T mean?

15:40:06

A Payment. Payment.
Q Does that indicate in any way what type of transaction this is?
A It indicates that it is a payment to Dell Financial for 954.12.

15:40:20

Q Does this provide any tracking or tracing information for that payment?
A No.
Q Now, I want to ask you to look at Exhibit 3 in that same binder. Page 2 of that exhibit.

15:40:50

Do you know what that document is?

A Yes. That's a transactional detail report.

Q What information is contained on this transactional detail report that's not reflected on the bank statement that we just looked at?

A It has the trace number and --

THE COURT: Where is that?

THE WITNESS: It's right below Mr. Brim's name.

THE COURT: Start with --

THE WITNESS: Let me back up. That's -- can I go get my glasses? I left them over there. Thank you.

On here, it has transaction code, which is 27, which would be for the -- debiting the member's account. And it has --

THE COURT: Where do you see that?

THE WITNESS: It has the header at the top. Explains pretty much what all this is.

THE COURT: Oh, I see it.

THE WITNESS: And the TC is transaction code. The debit is the amount. Then it shows a payment. And it shows the date. And it has a credit trace number right there, that 122. And it has Dell Financial. And it has the

settlement date.

THE COURT: The settlement date, the day it was paid? Is that what you call the settlement date?

15:42:36 THE WITNESS: Yes, ma'am.

**BY MR. TOMPKINS:**

Q What is the purpose of the trace number?

A It's a way for us to verify that the -- what the financial institution gives us to post the transaction. 15:42:48 And if we need -- if we need the -- if we give it to the member, then they can give it to the company that they paid. And that company can use that trace number to find it if they misplaced it or posted it to a wrong 15:43:08 transaction.

Q Mr. Cox, does Redstone have any policies concerning its provision of account information to persons other than the accountholder?

A Yes, we do.

15:43:20 Q What are those policies?

A We do not give out any information to anybody other than the account owner.

Q Have those policies been in place for the past ten years?

15:43:32 A Yeah.

Q Can a third party request a transactional detail report?

A No.

THE COURT: Can a customer give permission to the bank in writing that you can furnish somebody else a transactional detail report?

THE WITNESS: We wouldn't. We would give it to the customer. And the customer would give it to the third party.

THE COURT: All right.

**BY MR. TOMPKINS:**

Q Does that include other parties to the transactions, for example, a merchant?

A Yes.

Q If a merchant were to call?

A Yeah. The merchant, we would advise them to go through their financial institution to get that information.

THE COURT: What? I'm not following you.

THE WITNESS: So if --

THE COURT: If Dell had called --

THE WITNESS: If Dell had called me, we would tell them to go to their financial

institution, the one that generated the transaction.

THE COURT: Okay. And they could have gotten the same information from them?

15:44:28 THE WITNESS: Yes. Yes.

THE COURT: Okay. So that would show what account it was deposited to.

THE WITNESS: And the trace number and the amount. Uh-huh (indicating yes).

15:44:36 THE COURT: Okay.

MR. TOMPKINS: That's all I have, Your Honor. Thank you, Mr. Cox.

THE WITNESS: You're welcome.

MS. CAULEY: Your Honor, we have
15:44:44 no questions.

THE COURT: Okay. Thank you so much.

Did the jury have any questions? Okay.

(Bench discussion in chambers out
15:46:46 of the hearing and presence of the jury.)

(End of bench discussion.)

(In open court. Jury present.)

THE COURT: The first question the jury has is: Can a client -- and that would be a
15:48:26 client of yours -- request a detailed report via

telephone or other forms of communication, or is it always in person with verification such as ID or account number provided prior to release of a detailed report?

15:48:40 THE WITNESS: It's always in person with verification of ID.

THE COURT: Okay. Would it be reasonable to assume that a branch employee dealing with public inquiries would know what a transactional detail report is and how to request one? 15:48:56

THE WITNESS: Some employees may know, and some would not know. They would eventually figure out what information they would need to give to the member. And they would request that through us. So I guess the answer -- 15:49:08

THE COURT: Well, I think the assumption is on the part of the client, is it reasonable to assume -- that's the way I read it -- that a branch employee dealing with public inquiries would know what a transactional detail report is and to request one? 15:49:18

THE WITNESS: It would probably be reasonable for somebody to assume that an 15:49:34

employee would know what that is. But all employees wouldn't know.

THE COURT: All right. Thank you. You may be excused.

15:49:44 THE WITNESS: All right. Thank you.

(Witness excused.)

THE COURT: And your next witness is --

15:49:54 MR. LANGLEY: Your Honor, we call Dell Financial Services by video deposition.

THE COURT: Okay. Can you get the video to work?

MR. LANGLEY: I believe we worked

15:50:02 that out earlier today. But --

MR. BENNETT: And Your Honor, there were three of the speculation objections on the record.

THE COURT: Hang on just a second.

15:50:28 Let me see them.

MR. BENNETT: We don't mind the jury hearing.

THE COURT: No. I just want to see them.

15:50:36 MR. LANGLEY: Do you want us to

approach?

THE COURT: If you'll give me the written copy of the deposition and give me page and line, I can read it and rule without going in chambers.

MR. BENNETT: Your Honor, I have bracketed and put tabs on the three.

THE COURT: Okay.

MR. LANGLEY: Your Honor, we have no objection -- we don't contest the objection with respect to Page 31.

THE COURT: So you're going to take that out?

MR. LANGLEY: Yes, Your Honor.

THE COURT: Okay. That is Page 31, Lines 8 through 14?

MR. LANGLEY: Yes. And Your Honor, we will stipulate to remove Page 36, Line 24 through Page 37, Line 25. And the last one, we oppose their objection.

MR. BENNETT: On Page 42, Lines 20 through 24.

THE COURT: Okay.

MR. BENNETT: And we can argue if the Court --

THE COURT: Hang on just a second. Let me just read it.

MR. BENNETT: Your Honor --

THE COURT: Wait. Would you please just let me read it in context?

MR. BENNETT: I'm sorry.

THE COURT: I'm going to sustain the objection to that part.

MR. BENNETT: Thank you, Judge.

Now, logistically, the defendant -- we have a sophisticated jury. We would be -- the plaintiff would accept Your Honor instructing the jury of those objections because of the technical difficulty the defendant would have at redacting them. So they will hear the objected testimony --

THE COURT: I'll instruct --

MR. LANGLEY: Your Honor, may we be heard very briefly on the record on this issue?

THE COURT: No. That's it. I'm sorry. I've ruled.

Okay. This is a deposition taken of a Dell representative while the witness was under oath. And you should consider her testimony as

if she were here in person, testifying in open court in front of you. And I think the only objection that plaintiff has is the objection I've just sustained.

15:53:26 MR. BENNETT: Well, they all are still objections --

THE COURT: But you are withdrawing them?

MR. BENNETT: No. We still

15:53:34 insist, but it's difficult for the defendant to remove it or redact it. We would ask if, at each of those three points, the Court could instruct the jury that you have sustained --

THE COURT: You're

15:53:42 misunderstanding me.

MR. BENNETT: Sorry.

THE COURT: Those three objections, two of which the defendant has stipulated are appropriate, and the third one are

15:53:50 the only objections you have?

MR. BENNETT: Yes, Your Honor. The only ones.

THE COURT: Okay.

(Videotape played.)

16:28:36 MR. BENNETT: Your Honor --

THE COURT: Okay. I sustained the objection to the question as to based on the records that you have reviewed, why would Mr. Brim have asked about auto pay if he was contending the payment had already been made in full. There was an objection to that question. I sustained it. But she also said, I don't know. Disregard both the question and the answer.

(Videotape played.)

THE COURT: The next --

MR. BENNETT: We don't mind if the jury hears it if the judge instructs.

THE COURT: We're just talking about a couple of lines, right? From Line 20 to Line 24?

MR. BENNETT: Yes, Your Honor. That's the question. But then the answer would go on to Page 43, Line 9.

THE COURT: Okay. There is a question that is about to be -- rather than stopping and running and deleting, there's a question that is being asked by -- questions being asked by the defendant, dealing with what Midland -- I mean, what Dell Financial Services' response would have been if Midland had contacted

them in '08 and '09 and '10. And I have -- and there's an answer. And they have objected to that. And I have sustained that objection. That means that that series of questions -- and it goes all the way up to Ms. Cauley's cross-examination.

You are to eliminate from your brain when you go into the jury room to deliberate in this case. It is stricken. And that means even if you cannot erase it, you cannot take it in consideration at the time you go to deliberate.

(Videotape played.)

MR. BENNETT: Your Honor, the rest of the next couple of pages are, I don't think, particularly informative one way or the other. They could advance it.

THE COURT: Hang on just a second.

MR. BENNETT: I believe, Counsel, for substantive stuff again is after Mr. Langley asks questions on Page 60.

THE COURT: Okay.

MR. BENNETT: Maybe 60, Line 9. If you want to skip those couple of pages. That will save us five, ten minutes, at least.

THE COURT: Okay.

MR. BENNETT: Or start with Mr. Langley's questioning on Page 59, Line 21. The first thing he gets an answer to is Page 60, Line 9.

17:04:34 JUROR 24: We really need to use the restroom.

THE COURT: Okay. Just take a restroom break.

(Short recess.)

17:10:56 (In open court. Jury present.)

THE COURT: Let the record show the jurors are back in the courtroom, and everybody is here who is supposed to be here.

Did you find the place, Mr. Tompkins?

17:11:08 MR. TOMPKINS: Yes, Your Honor.

THE COURT: Thank you so much for your effort.

(Videotape played.)

THE COURT: Ladies and gentlemen 17:14:02 of the jury, we're going to recess for the night. I hope you'll have a good night. It's supposed to be stormy tonight. So just be careful. It's not supposed to start until late, I think. But anyway, be careful and observe the instructions 17:14:16 I've given you about not discussing the case.

And please be back at 9:00 o'clock in the morning. I think we only have one witness left. So the case will go to you probably around noon tomorrow. Okay?

17:14:28 I need the lawyers to stay.

(Jury excused.)

(In open court. Jury not present.)

THE COURT: Okay. I need to put 17:15:38 something else on the record about this Exhibit A, which were the questions I attributed to Juror Bess, and then the juror that actually owned up to the questions was Juror Hines. And --

MR. LANGLEY: Do you need me to 17:15:56 speak up?

THE COURT: No. It was mentioned by the defendant when they moved to strike him and excuse him about they didn't know about his math background. But that even -- and I 17:16:10 overruled that objection.

Mr. Hines' background that he noted -- let us all know about when he was answering the question is that he is a retired electronic engineer. He has a BS degree, he has a master's 17:16:26 degree, and he is working on his Ph.D.

MR. LANGLEY: Your Honor, we didn't object on the grounds that we didn't know he had a math background. But he was the one that raised his hand and asked about factoring in the mathematic context. That wasn't the basis of our objection.

17:16:34

THE COURT: Okay. Well, he didn't write it. So it's moot. It's Mr. Hines that wrote it. Anyway, since that has been cleared up, I just want to put that on the record.

17:16:46

And let's go talk about the -- have the jury charge conference now. Because I need Tammi to make the copies in the morning before we start. Just come in the office.

17:17:10

(The Proceedings were recessed at approximately 5:17 p.m. on February 24, 2011.)

232

C E R T I F I C A T E

I, the undersigned, hereby certify that the foregoing pages contain a true and correct transcript of the aforementioned proceedings as is hereinabove set out, as the same was taken down by me in stenotype and later transcribed utilizing computer-aided transcription.

This is the 16th day of March of 2011.

Cheryl K Powell

Cheryl Renae King Powell, CCR, RPR, FCRR
Federal Certified Realtime Reporter

***CHERYL K. POWELL, CCR, RPR, FCRR***
Federal Official Court Reporter
1729 Fifth Avenue, North
Birmingham, AL 35203
256-508-4050/wrd4wrdrpr@aol.com