```
 1              IN THE UNITED STATES DISTRICT COURT
 2           FOR THE NORTHERN DISTRICT OF ALABAMA
                       NORTHEASTERN DIVISION
 3

 4

    JAMON T. BRIM,                   *
 5                    Plaintiff,    *   10-CV-00369-IPJ
                                     *   February 25, 2011
 6  vs.                              *   Florence, Alabama
                                     *   9:02 a.m.
 7  MIDLAND CREDIT MANAGEMENT,*
    INC.,                            *
 8                    Defendant. *
                   * * * * * * * * * * * * * * * * * * * * * * * * * *
 9

10              TRANSCRIPT OF JURY TRIAL
         BEFORE THE HONORABLE INGE P. JOHNSON
11           UNITED STATES DISTRICT JUDGE

12                      VOLUME IV

13

           FOR THE PLAINTIFF:
14
           MR. LEONARD A. BENNETT, ESQ.
15         CONSUMER LITIGATION ASSOCIATES
           12515 Warwick Blvd
16         Suite 100
           Newport News, VA 23606
17         757-930-3660

18         MS. PENNY HAYS CAULEY, ESQ.
           HAYS CAULEY
19         P O Box 509
           Darlington, SC 29540
20         843-393-5200

21         MR. RONALD C. SYKSTUS, ESQ.
           BOND, BOTES, SYKSTUS & LARSEN
22         415 Church Street
           Suite 100
23         Huntsville, AL 35801
           256-539-9899

24

25
```

CHERYL K. POWELL, CCR, RPR, FCRR
Federal Official Court Reporter
1729 Fifth Avenue, North
Birmingham, AL 35203
256-508-4050/wrd4wrdrpr@aol.com

1

2          FOR THE DEFENDANT:

3          MR. ERIC B. LANGLEY, ESQ.
           BALCH & BINGHAM
4          1710 Sixth Avenue North
           P O Box 306
5          Birmingham, AL 35201-0306
           205-251-8100

6
           MR. JASON B. TOMPKINS, ESQ.
7          BALCH & BINGHAM
           1901 Sixth Avenue North
8          Suite 1500
           Birmingham, AL 35203
9          205-251-8100

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           **P R O C E E D I N G S**

2                 (In open court.  Jury not

3       present.)

4                 THE COURT:  Good morning.  Have a

09:01:02  5       seat.

6             Let the record show this is CV-10-369,

7       Jamon Brim versus Midland Credit Management, Inc.

8       And all the lawyers and the parties are here.

9       It's outside the presence and hearing of the

09:02:16 10      jury.  And it's February the 25th, 2011.

11            And have you decided whether or not you're

12      going to call anymore witnesses?

13                MR. LANGLEY:  Your Honor, the

14      defense rests.  And we would like to file in our

09:02:26 15      motion for judgment as a matter of law at the

16      close of defendant's case.

17                THE COURT:  That's fine.

18                MR. BENNETT:  We would object for

19      the reasons previously stated.

09:02:38 20                THE COURT:  To them filing it?

21                MR. BENNETT:  No.  No.  To the

22      motion.

23                THE COURT:  Well, let me look at

24      it.  It might not be the same.

09:02:46 25                MR. BENNETT:  Is it the same?

1          MR. LANGLEY:  It's actually not.

2    The only new argument that we make is we address

3    causation in more detail.  And then on the other

4    issues, just adopt and incorporate our

09:03:00  5    previously-filed motion.

6          THE COURT:  I have a copy of it.

7    And I have read it.  And it is denied.  I don't

8    think that comes as a surprise.  Okay.  That

9    means I'm fixing to read the jury charges to the

09:03:48 10    jury.

11        So would you like to put your exception on

12    the record before I charge the jury?  Can you

13    remember what it was?

14          MR. BENNETT:  I can remember that

15    I could -- neither one was sufficient that I

16    would, in good faith, file an appeal to the

17    Eleventh Circuit on, so I won't make an

18    objection.  We asked for instructions.  I don't

19    believe it's reversible for the Court not to give

09:04:14 20    them, though I certainly would prefer it.

21          THE COURT:  You had at least one.

22          MR. LANGLEY:  Your Honor, we have

23    two exceptions.  And then I wanted to just raise

24    one issue for the Court's consideration.

09:04:22 25        Our first exception is to our requested

1    mitigation instruction, which we filed in last

2    night.

3                    THE COURT:  Do you have a copy --

4    a hard copy of that?  Because I have not been on

09:04:32  5    the computer today.  We had computer issues this

6    morning.

7                    MS. CAULEY:  Your Honor, we have

8    one.

9                    MR. LANGLEY:  It's verbatim the

09:04:42 10    instruction --

11                    THE COURT:  I just need it for the

12    record.  I really do need to see it.  I know you

13    gave it to me at the charge conference

14    yesterday -- you gave me what you were going to

09:04:52 15    ask for in the charge conference last night, but

16    I didn't keep it.  I gave it back to you.

17                    MR. LANGLEY:  Understood.

18                    THE COURT:  Well, maybe I can just

19    get back in.  Are you in your computer?

09:05:10 20                    COURTROOM DEPUTY:  Yes, ma'am.

21                    THE COURT:  Can you go to

22    CV-10-369 in CMECF -- oh.  They have it.

23                    MS. CAULEY:  It just got put away.

24                    THE COURT:  Y'all, when was that

09:05:26 25    filed?  This is gibberish --

1          MS. CAULEY:  It sure is.

2          THE COURT:  It doesn't show

3   anything.  Look at this.

4          MR. LANGLEY:  Well, we filed it at

09:05:34  5   about seven -- some time between 7:00 and 8:00

6   last night, I think.

7          THE COURT:  That's weird.

8          COURTROOM DEPUTY:  That is weird.

9          THE COURT:  Anyway, it's

09:05:44  10   unreadable when it was filed.  But anyway, it

11   says --

12          MR. TOMPKINS:  We actually filed

13   it at 10:52 p.m. last night.

14          THE COURT:  Okay.  And I'm going

09:05:58  15   to deny that.  And I think I told you that last

16   night.  So let's see.  --

17          MR. LANGLEY:  We just have one

18   more exception, and it's on Page 9.

19          THE COURT:  Okay.

09:06:10  20          MR. LANGLEY:  And defendant takes

21   exception to including the definition of

22   investigation.  So it would be the two sentences

23   in the second full paragraph on Page 9.

24          THE COURT:  Okay.  And that's

09:06:26  25   overruled.

1                    MR. LANGLEY:  And the one

2      housekeeping matter that we wanted to raise.  I

3      don't know if this is an issue with my copy or if

4      I misunderstood the Court last night on Page 7 in

09:06:42  5      the final paragraph on the page, the second

6      sentence includes the language that was struck

7      from other portions by consent of the parties.

8      The language that says, the plaintiff claims that

9      the defendant willfully failed to follow

09:07:00  10     reasonable procedures to assure maximum possible

11     accuracy.

12                    MR. BENNETT:  I apologize.  We

13     didn't catch that either, Your Honor.

14                    THE COURT:  On the third new

09:07:20  15     paragraph?

16                    MR. LANGLEY:  It's the last full

17     paragraph on Page 7 that begins with the

18     sentence, the plaintiff further claims that the

19     defendant willfully failed to comply with the

09:07:30  20     Fair Credit Reporting Act.

21                    THE COURT:  What was it that was

22     not struck?

23                    MR. LANGLEY:  The next sentence.

24                    THE COURT:  The plaintiff claims

09:07:38  25     the defendant failed to follow reasonable

1  procedures to ensure maximum possible accuracy of

2  the information contained in the report

3  concerning plaintiff?  Yeah.  We didn't strike

4  that, did we?

09:07:48  5           MR. BENNETT:  Nobody asked you to

6  strike it, Judge.

7           THE COURT:  No.  What I can do is

8  mark it off in black -- instead of making 15 more

9  copies.

09:08:00  10           MR. BENNETT:  Yes, Your Honor.

11           THE COURT:  Mark it through with

12  black.

13           MR. LANGLEY:  That's acceptable to

14  defendant.

09:08:10  15           THE COURT:  Okay.  Let me -- okay.

16  I'll do that.

17           MR. BENNETT:  Judge, we could do

18  that, if the Court wants, while you're reading

19  the instructions.

09:08:22  20           THE COURT:  We can do that while

21  y'all think about your jury argument.  And also

22  Cheryl has typed these up.  So you might want to

23  look at them.

24           MR. BENNETT:  Yes, Judge.  Thank

09:08:52  25  you.

1                    (Short recess.)

2                    MR. BENNETT:  Your Honor, I had

3    asked for 45 minutes.  And I've been not putting

4    the math together for having reserved for

09:17:38 5    rebuttal.  Could the parties have an additional

6    ten minutes so it will be 55?

7                    THE COURT:  That's fine.

8                    MR. BENNETT:  I don't know if I

9    will use it --

09:17:48 10                    THE COURT:  You don't care, do

11    you?

12                    MR. LANGLEY:  I'm not going to

13    argue for 55 minutes.

14                    MR. BENNETT:  I probably won't

09:17:54 15    either.

16                    THE COURT:  You're the one who

17    said you were going to speak less than your

18    opening statement.  Your opening was 35 minutes.

19    I timed it.

09:18:04 20                    MR. BENNETT:  It will be about

21    that.

22                    (Short recess.)

23                    (In open court.  Jury present.)

24                    THE COURT:  Please be seated

09:21:54 25    everyone.  Good morning.

1          Let the record show this is CV-10-369,

2     Jamon Brim versus Midland Credit Management, Inc.

3     Let the record show the parties are present.   The

4     attorneys are present.   The jury is present.   I

09:22:12  5     trust you had a good night.

6          The defendant has rested.   That means at

7     this time I'm going to read you the law that you

8     should apply to the facts as you find them to be.

9     And you should have a copy each.   Is there one on

09:22:24 10     the seat for each person?   That's yours.   You can

11     either follow along or listen, or you can use it

12     to make notes.   That's yours to take to the jury

13     room when you deliberate.

14          And if for some reason I start coughing,

09:22:38 15     you just have to bear with me.   Don't continue

16     reading, though.   I do have to read it to you on

17     the record.   Okay?

18          Ladies and gentlemen of the jury, we have

19     now reached that point in the trial where it is

09:22:48 20     the Court's obligation to instruct you with

21     respect to the law that you should apply to the

22     facts as you find them to be.   These various

23     principles of law should be understood in the

24     context of each other.

09:22:58 25          When a judge and a jury sit together as a

1    court of law, it is the duty of the judge to see

2    that the trial progresses in an orderly fashion,

3    to rule upon all legal matters that are

4    presented, to define the issues involved, and

09:23:12  5    instruct the jury as to the law applicable to the

6    particular case.

7         It will be your duty, as jurors, to follow

8    the law as so stated to you by the judge.  You

9    will, therefore, render a verdict in accordance

09:23:22  10   with the facts as you determine them to be from

11   the evidence and the law as given to you by the

12   Court.

13        I charge you that any ruling, statement,

14   or expression that may have been made by me

09:23:38  15   during the course of this trial is not to be

16   considered by you as any effort on my part to

17   convey to you any feeling or opinion about the

18   facts in this case or the credibility of any

19   witness.  I do not have any such opinion.

09:23:52  20        When a person files a lawsuit, the person

21   or entity sued has a right to file an answer.

22   The fact that a lawsuit is filed does not give

23   rise to an inference that the plaintiff is

24   entitled to recover.  When a complaint and answer

09:24:10  25   have been filed, a dispute exists which then is

presented during a trial for your determination.

In this case, the plaintiff is Jamon T. Brim.  The defendant is Midland Credit Management, Inc.  They are the only parties to this lawsuit.

The Court charges you that although the defendant in this case is a corporation, you are not to consider its status as a business in deciding the merits of this case.  The Court charges you that for purposes of this case, the defendant is entitled to the same consideration as an individual such as the plaintiff.

A corporation may only act through natural persons as its agents or employees, and, in general, any agent or employee of a corporation may bind the corporation by his or her acts and declarations made while acting within the scope of his or her duties as an employee of the corporation.

In this case, the plaintiff has the burden of proof; that is, the burden to establish by a preponderance of the evidence that he is entitled to recover.

To establish by a preponderance of the evidence means to prove that something is more

1    likely so than not so.  In other words, a

2    preponderance of the evidence in the case means

3    such evidence, as when considered and compared

4    with that opposed to it, has more convincing

09:25:44  5    force and produces, in your minds, belief that

6    what is sought to be proved is more likely true

7    than not.

8        If the evidence is so evenly balanced that

9    you are unable to say that the evidence on either

09:25:56 10    side of the issue is more convincing, your

11    finding on that issue must be against the

12    plaintiff.

13        The preponderance of the evidence burden

14    does not, of course, require proof to an absolute

09:26:10 15    certainty, since proof to an absolute certainty

16    is seldom possible in any case.

17        In determining whether any fact in issue

18    has been proved by a preponderance of the

19    evidence in the case, the jury may, unless

09:26:22 20    instructed otherwise, consider the testimony of

21    all the witnesses, regardless of who may have

22    called them, and all exhibits received into

23    evidence, regardless of who may have produced

24    them.

09:26:34 25        In this case, the plaintiff, Jamon T.

Brim, claims that he was damaged by defendant,
Midland Credit Management Inc.'s, negligent or
willful violation of the Fair Credit Reporting
Act in 15 U.S. Code, Section 1681.

09:26:54    Specifically, the plaintiff asserts that
the defendant failed to investigate his dispute
in a reasonable fashions; that is, the
defendant's use of the automated batch interface
system was unreasonable and, therefore, a
09:27:06    violation of the plaintiff's rights under the
act.

    The plaintiff claims that the defendant
negligently or willfully failed to comply with
the Fair Credit Reporting Act in failing to
09:27:16    review the information provided to defendant by
Experian, Equifax, and Transunion and in failing
to reasonably investigate his dispute; that is,
the plaintiff claims that the defendant's system
for reviewing a dispute was unreasonable.

09:27:32    The defendant denies that it negligently
or willfully violated any provision of the Fair
Credit Reporting Act.  The defendant claims that
its procedures when it received notice of a
dispute from a consumer and/or consumer reporting
09:27:46    agency were reasonable, and it claims that the

1    procedures it employed in handling the disputes

2    stemming from Mr. Brim's purchase of his computer

3    from Dell were reasonable.

4         It is for you to determine whether the

09:27:58  5    defendant acted in a reasonable manner.

6         The relevant text of the Fair Credit

7    Reporting Act, which is found in 15 U.S. Code,

8    Section 1681s-2(b) states as follows:  Duties of

9    furnishers of information upon notice of dispute,

09:28:18 10   One, in general, after receiving notice pursuant

11   to Section 1681i(a)(2) of this title of a dispute

12   with regard to the completeness or accuracy of

13   any information provided by a person to a

14   consumer reporting agency, the person shall, A,

09:28:40 15   conduct an investigation with respect to the

16   disputed information; B, review all relevant

17   information provided by the consumer reporting

18   agency pursuant to Section 1681i(a)(2) of the

19   this title; C, report the result of the

09:29:00 20   investigation to the consumer reporting agency;

21   D, if the investigation finds that the

22   information is incomplete or inaccurate, report

23   those results to all other consumer reporting

24   agencies to which the person furnished the

09:29:16 25   information and that compile and maintain files

on consumers on a nationwide basis; and E, if an
item of information disputed by a consumer is
found to be inaccurate or incomplete and cannot
be verified after reinvestigation under Paragraph
09:29:34  (1), for purposes of reporting to a consumer
reporting agency only, as appropriate, based on
the results of the investigation promptly, (i),
modify that item of information, (ii), delete
that item of information, or (iii), permanently
09:29:56  block the reporting of that item of information.

I charge you that, for purposes of this
case, the plaintiff is a consumer entitled to the
protections and benefits of the Fair Credit
Reporting Act.

09:30:08  To prevail on his claim that the defendant
negligently failed to comply with the Fair Credit
Reporting Act, the plaintiff must establish each
of the elements of such a claim by a
preponderance of the evidence.

09:30:22  The first element requires proof of one or
more of the following:  A, that the defendant
failed to conduct a reasonable investigation with
respect to the dispute of credit information; or,
B, that the defendant failed to review and
09:30:38  consider all relevant information provided by the

consumer reporting agencies; and, Two, that the
plaintiff was damaged by the alleged violation or
violations of the act; and Three, that the
negligence of the defendant, Midland Credit
09:30:56  Management, Inc., proximately caused the damage
suffered by the plaintiff.

Your verdict would be for the plaintiff if
you find that the defendant negligently violated
the act; that the plaintiff was injured; and that
09:31:10  defendant's negligent violation of the act was
the proximate cause of the plaintiff's injury.

Your verdict must be for the defendant if
you find that the plaintiff failed to establish
any one of these elements.

09:31:22  In this case, the parties have stipulated
to the facts read to you by the Court at the
beginning of this case.  That means that you must
take these facts as proved.  No further evidence
in this case is required to accept these facts as
09:31:40  true.

The term, "negligence," means the failure
to do something that a reasonably-prudent entity
would do or the doing of something that a
reasonably-prudent entity would not do under the
09:31:54  circumstances you find existed in this case.  You

1    are to decide what a reasonably-prudent entity

2    would do or not do under the circumstances.

3          The term, "proximate cause," means that

4    there must be a causal connection between the

09:32:10  5    conduct of the defendant that the plaintiff

6    claims was negligent and the damage complained of

7    by the plaintiff is the natural, probable result

8    of that conduct.

9          The plaintiff further claims that the

09:32:24 10    defendant willfully failed to comply with the

11    Fair Credit Reporting Act.  The plaintiff has the

12    burden of proving each of the following elements

13    of such a claim by a preponderance of the

14    evidence.  One:  That the defendant willfully

09:32:40 15    failed to comply with the Fair Credit Reporting

16    Act by, A, willfully failing to conduct a

17    reasonable investigation with respect to the

18    dispute of credit information or by willfully

19    failing to review and consider all relevant

09:32:56 20    information provided by the consumer reporting

21    agencies; and Two, that the plaintiff was damaged

22    by the alleged violation or violations of the

23    act; and Three, that the willful failure of

24    Midland Credit Management, Inc. to comply with

09:33:10 25    the act proximately called the damage suffered by

1    the plaintiff.

2            Your verdict will be for the plaintiff if

3    you find that the plaintiff proved that the

4    defendant willfully failed to comply with the

09:33:20  5    act; that the plaintiff was injured; and that

6    defendant's willful violation of the act was the

7    proximate cause of the plaintiff's injury.

8            Your verdict must be for the defendant if

9    you find that the plaintiff failed to establish

09:33:36 10    any one of these elements.

11            To prove a willful violation, a consumer

12    must prove that a consumer reporting agency

13    either knowingly or recklessly violated the

14    requirements of the act.  To prove a reckless

09:33:54 15    violation, a consumer must establish that the

16    action of the agency is not only a violation

17    under a reasonable reading of the statute's terms

18    but shows that the company ran a risk of

19    violating the law substantially greater than the

09:34:08 20    risk associated with a reading that was merely

21    careless.

22            Now, I want to also tell you here that the

23    definition of proximate cause is, for purposes of

24    the plaintiff's claim of willful violation of the

09:34:26 25    act -- that definition that I gave you under the

1    explanation on the previous page with respect to

2    the plaintiff's claim for negligent violation of

3    the act, that term is defined the same way.

4         Defendant, Midland Credit Management,

09:34:40  5    Inc., was required to conduct a reasonable

6    investigation.  Factors to be considered in

7    determining whether the defendant has conducted a

8    reasonable investigation include whether the

9    consumer; that is, Mr. Brim, alerted the

09:34:54  10   defendant that its information was unreliable and

11   whether the credit bureaus alerted the defendant

12   that Mr. Brim contested the debt in question.

13   You may also consider the cost of verifying the

14   accuracy of the information versus the harm of

09:35:08  15   reporting inaccurate information.

16        The standard for such an investigation is

17   what a reasonably-prudent entity would do under

18   the same or similar circumstances.  Evaluating

19   the reasonableness of the defendant's actions

09:35:24  20   involves weighing the potential harm from

21   inaccuracy against the burden of safeguarding

22   against such inaccuracies.

23        An investigation is a detailed inquiry or

24   systematic examination.  The plain meaning of,

09:35:38  25   quote, investigation, unquote, requires some

1    degree of careful inquiry by a furnisher of

2    credit information.

3         The law requires that after receiving

4    notice of a consumer's dispute through a consumer

09:35:52  5    reporting agency, a creditor, such as the

6    defendant, may not furnish any information

7    relating to that consumer if the creditor knows

8    the information is inaccurate.

9         Damages to be recovered are limited to

09:36:04 10    those, if any, arising from a negligent or

11    willful failure to conduct a reasonable

12    investigation.  If your verdict is for the

13    plaintiff on the claim of negligent

14    noncompliance, then you must determine the amount

09:36:18 15    of damages, if any, that reasonably, fairly, and

16    adequately compensate for the injury caused by

17    the defendant's violation of the law.  If you

18    find that the defendant negligently violated the

19    Fair Credit Reporting Act, you may award

09:36:36 20    compensatory or actual damages as I will define

21    that term for you in a moment.

22         If you find that the defendant willfully

23    violated the act, damages recoverable are two

24    kinds.  First, there are damages that are

09:36:48 25    actually suffered by reason of the alleged wrong.

If you find that the defendant willfully violated the Fair Credit Reporting Act by failing to follow reasonable procedures in its investigation of the plaintiff's dispute, you must award the plaintiff the actual damages that you find he sustained as a result of this failure.

If you find that the plaintiff suffered no actual damages or damages of less than $100 as a result of the willful violations, then you must award statutory damages.

Statutory damages are those damages fixed by law.  I instruct you that, under the Fair Credit Reporting Act, statutory damages applicable to the facts of this case are no less than $100 but no more than $1,000.  These are damages fixed by statute and are separate from any actual damages.

As I have stated to you, you may only award statutory damages if you find the plaintiff to have suffered no actual damages or damages of less than $100.

Second, there are punitive damages, which means damages over, above, and different from actual damages.  I will explain punitive damages further in a moment.

1          In considering the issue of the

2     plaintiff's damages, you are instructed that you

3     should assess the amount you find to be justified

4     by a preponderance of the evidence as full, just,

09:38:14  5     and reasonable compensation for all of the

6     respective plaintiff's damages, no more and no

7     less.

8          Whether in regard to negligent or willful

9     violation of the act, compensatory, or actual

09:38:26 10     damages are intended as money compensation to the

11     party wronged to compensate him for the injury

12     and other damages that have been inflicted as the

13     result of or were caused by the wrong complained

14     of.

09:38:40 15          Compensatory or actual damages are allowed

16     and should be awarded where a party satisfied the

17     jury by a preponderance of the evidence that the

18     party has been injured or damaged by the wrongful

19     act or acts of the party charged.

09:38:54 20          The purpose of awarding compensatory

21     damages is to fairly and reasonably compensate

22     the injured party for the loss or injury actually

23     sustained.  Compensatory damages are not allowed

24     as a punishment and must not be imposed or

09:39:08 25     increased to penalize the defendant.

1            Also, compensatory damages must not be

2     based on speculation or guesswork, because it is

3     only actual damages that are recoverable.  Actual

4     damages include recovery for any out-of-pocket

09:39:22  5     expenses and damages for personal humiliation,

6     embarrassment, anguish, and emotional distress.

7            On the other hand, compensatory damages

8     are not restricted to actual loss of time or

9     money.  They cover both the mental and physical

09:39:38 10     aspects of the injury, tangible and intangible.

11     Thus, no evidence of the value of such intangible

12     things as emotional and mental anguish has been

13     or need be introduced.

14            In that respect, it is not value you are

09:39:52 15     trying to determine but an amount that will

16     fairly compensate the plaintiff for those claims

17     of damage.  There is no exact standard to be

18     applied.  Any such award should be fair and just

19     in the light of the evidence.  This element of

09:40:12 20     damages is left to your good sound judgment and

21     discretion as to what amount would reasonably and

22     fairly compensate the plaintiff for such

23     emotional distress you find from the evidence he

24     did suffer.

09:40:22 25            Proof of an outright denial of credit is

not necessary in order for you to award actual
damages under the Fair Credit Reporting Act.

If you are satisfied by a preponderance of
the evidence that the plaintiff sustained mental
or emotional damages as a result of the wrongs in
question, you should award a sum which will
reasonably and fairly compensate him for such
emotional distress.

If you, as a juror, further find that the
acts or omissions of the defendant that
proximately caused the actual injury or damage to
the plaintiff were willfully done, then you may,
if, in the exercise of your discretion, you
unanimously choose to do so, add to the award of
actual damages such amount as you shall
unanimously agree to be proper as punitive
damages.

Whether or not to make any award of
punitive damages in addition to actual damages is
a matter exclusively within your province.  If
you find only negligent violations of the act,
you would not reach the issue of punitive
damages.

Punitive damages are awarded for the
purpose of punishing the defendant for its

1    wrongful conduct and to deter others from

2    engaging in similar wrongful conduct.  You should

3    bear in mind, however, that the law requires that

4    the amount of punitive damages, if any, must be

09:41:40  5    fixed with calm discretion and sound reasoning.

6    Punitive damages must never be awarded due to

7    sympathy, bias, or prejudice with respect to the

8    parties.

9         If you choose to award punitive damages

09:41:52  10    against the defendant, Midland Credit Management,

11    Inc., for willful violation of the Fair Credit

12    Reporting Act, you may consider the following

13    facts in considering such an award:  The stated

14    remedial purpose of the Fair Credit Reporting

09:42:06  15    Act; the harm to the consumer -- the harm the

16    consumer is expected to avoid or have corrected

17    by those requirements; the manner in which the

18    defendant conducted its business; the length of

19    time before the defendant corrected its mistake;

09:42:20  20    the degree of notice provided to the defendant

21    about its mistake, and defendant's awareness of

22    the mistake.

23         If you find that punitive damages should

24    be assessed against the defendant, you may

09:42:32  25    consider the financial resources of the defendant

1    in fixing the amount of such damages.

2            The fact that I have instructed you on the

3    law of damages must not be taken as an indication

4    that you should find for the plaintiff.  It is

09:42:44  5    for you to decide on the evidence presented and

6    the rules of the law I have given you whether the

7    plaintiff is entitled to recover from the

8    defendant.

9            Instructions as to the measure of damages

09:43:00  10   are given for your guidance in the event you

11   should find in favor of the plaintiff, in

12   accordance with the other instructions I have

13   given you.  However, if you return a verdict for

14   the plaintiff, you must decide the issue of

09:43:14  15   damages.

16           I instruct you that the burden is on the

17   plaintiff to prove by a preponderance of the

18   evidence each item of damages he claims and that

19   each item was caused by Midland Credit

09:43:26  20   Management, Inc.  The plaintiff is not required

21   to prove the exact amount of his damages but must

22   show sufficient facts and circumstances to allow

23   you to make a reasonable estimate of each item.

24   If the plaintiff fails to do so, he cannot

09:43:42  25   recover for that item of damage.

1       It is for you, the jury, to decide whether

2  to award compensatory damages and, if so, what

3  amount.  Therefore, if you decide that the

4  plaintiff has proven any or all of his claims,

09:43:56  5  then part of your remedies would be to award him

6  compensatory damages if you see fit to do so.

7       If you find for the plaintiff, you must

8  not take into account any consideration of

9  attorneys' fees or court costs in deciding the

09:44:08 10  amount of plaintiff's damages.  The matter of

11  attorneys' fees and court costs will be decided

12  later by the Court.

13       You are the sole and exclusive judges of

14  the facts.  As such, you must determine which of

09:44:22 15  the witnesses you believe, what portion of their

16  testimony you accept, and what weight you attach

17  to it.

18       At times during the trial, I may have

19  sustained objections to questions asked without

09:44:30 20  permitting the witness to answer.  You may not

21  draw any inference from an unanswered question.

22  The law requires that your decision be made

23  solely upon competent evidence before you.

24       Competent evidence is the testimony from

09:44:46 25  the witnesses in person or testimony previously

1    given by deposition and exhibits admitted into

2    evidence by the Court.  Statements, arguments,

3    and comments by the lawyers, objections and

4    rulings on objections and testimony I told you to

09:45:00  5    disregard are not evidence.  Such items as I

6    exclude from your consideration will be excluded

7    because they are not legally admissible.

8         The law does not, however, require you to

9    accept all the evidence I admit, even though it

09:45:16 10    be competent.  In determining what evidence you

11    will accept, you must make your own evaluation of

12    the testimony given by each of the witnesses and

13    determine the degree of weight you choose to give

14    his or her testimony.  The testimony of the

09:45:30 15    witness may fail to conform to the facts as they

16    occurred because he or she is intentionally

17    telling a falsehood; because he or she did not

18    accurately see or hear that about which he or she

19    testified; because his or her recollection of the

09:45:44 20    event is faulty; or because he or she has not

21    expressed himself or herself clearly in giving

22    his or her testimony.

23         I also charge you that during the trial, I

24    may sometimes ask a witness a question.  Please

09:45:56 25    do not assume that I have any opinion about the

1    subject matter of my questions.  I may ask a

2    question simply to clarify a matter, not to help

3    one side of the case or hurt another side.

4         Remember at all times that you, as jurors,

09:46:08  5    are the sole judges of the facts in this case.

6    There is no magical formula by which one may

7    evaluate testimony.  You bring with you to this

8    courtroom all of the experience and background of

9    your lives.  In your everyday affairs, you

09:46:26  10    determine for yourself the reliability or

11    unreliability of statements made to you by

12    others.  The same tests that you use in your

13    dealings are the tests which you apply in your

14    deliberations.

09:46:38  15         The interest or lack of interest of any

16    witness in the outcome of the case, the bias or

17    prejudice of a witness, if there be any, the age,

18    the appearance, the manner in which the witness

19    gives his or her testimony on the stand, the

09:46:52  20    opportunity that the witness had to observe the

21    facts concerning which he or she testifies, the

22    probability or improbability of the witness'

23    testimony, when viewed in light of all the

24    evidence in the case, are all items to be taken

09:47:06  25    into consideration by you in determining the

1    weight, if any, you will assign that witness'

2    testimony.

3          If such consideration makes it appear that

4    there is a discrepancy in the evidence, you will

09:47:16  5    have to consider whether the apparent discrepancy

6    may be reconciled by fitting the two stories

7    together.  If, however, that is not possible, you

8    will then have to determine which of the

9    conflicting versions you will accept.

09:47:32  10    You should ask yourself whether there was

11    evidence tending to prove whether the witness

12    testified falsely concerning some important fact

13    or whether there was evidence at some other time

14    the witness said or did something or failed to

09:47:44  15    say or do something which was different from the

16    testimony the witness gave before you during

17    trial.

18          You should keep in mind, of course, that a

19    simple mistake by a witness does not necessarily

09:47:58  20    mean that the witness was not telling the truth

21    as he or she remembers it.  Because people

22    naturally tend to forget some things and remember

23    other things incorrectly.

24          So if a witness has made a misstatement,

09:48:08  25    you need to consider whether that misstatement

1    was simply an innocent lapse of memory or an

2    intentional falsehood.  And the significance of

3    that may depend on whether it has to do with an

4    important fact or only an unimportant detail.

09:48:22  5        You are to consider only the evidence in

6    the case.  But in your consideration of the

7    evidence, you're not limited to the bald

8    statements of the witnesses.  In other words, you

9    are not limited solely to what you see and hear

09:48:34  10   as the witnesses testify.  You are permitted to

11   draw from facts which you find have been provided

12   such reasonable inferences as seem justified in

13   the light of your experience.

14        Inferences are deductions or conclusions

09:48:50  15   which reason and common sense lead the jury to

16   draw from facts which have been established by

17   the evidence in the case.

18        There are, generally speaking, two types

19   of evidence from which a jury may properly find

09:49:02  20   the truth as to the facts of a case.  One is

21   direct evidence, such as the testimony of an

22   eyewitness, or documents which state

23   uncontroverted matters.  The other is indirect or

24   circumstantial evidence, the proof of a chain of

09:49:18  25   circumstances pointing to the existence or

1    nonexistence of certain facts.  The plaintiff may

2    prove his claims by presenting such indirect

3    evidence.

4           The testimony of a single witness which

09:49:30  5    produces, in your minds, belief in the likelihood

6    of the truth is sufficient for the proof of any

7    facts and would justify a verdict in accordance

8    with such testimony, even though a number of

9    witnesses may have testified to the contrary if,

09:49:44 10    after consideration of all the evidence in the

11    case, you hold greater belief in the accuracy and

12    reliability of the one witness.

13           Also, the number of witnesses testifying

14    regarding any particular issue is not

09:49:56 15    controlling.  You are to decide the facts in this

16    case fairly and impartially, without any

17    sympathy, without any prejudice, without any

18    favoritism, and without any fear as to the

19    consequences of your decision.

09:50:10 20           You are to decide what the facts are based

21    upon the evidence that has been presented in the

22    case, not upon the basis of guesswork or

23    speculation.  That does not mean, however, that

24    you are expected to leave your common sense

09:50:24 25    behind you.  You are expected, instead, to use

1   your common sense in applying and understanding

2   the evidence in this case when you deliberate.

3       In order to return a verdict, it is

4   necessary that each juror agree thereto.  Any

09:50:40  5   verdict that you render in this case must be

6   unanimous.  This means that each of you must

7   agree to the verdict and all be satisfied with

8   the verdict and that the verdict returned is your

9   verdict.

09:50:54  10       Your verdict in the case should not be

11   based upon or influenced by any sympathy for

12   either party nor any prejudice for or against

13   either party.  Your verdict should be based on

14   the evidence in this case that has been presented

09:51:06  15   to you from the witnesses who have testified,

16   whether in person or by deposition, and from the

17   exhibits.  And, of course, your verdict should be

18   based on the law as I explain it to you.

19   Sympathy and prejudice should play no role no

09:51:20  20   your verdict whatsoever.

21       When you go to the jury room, you should

22   first select one of your members to act as your

23   foreperson.  The foreperson will preside over

24   your deliberations and will speak for you here in

09:51:30  25   court.

1          And I will explain the verdict form to you
2     as soon as the attorneys have presented you their
3     closing arguments.
4          And are you ready?
09:51:42    5               MR. BENNETT:  I am, Your Honor.
6               THE COURT:  Tammi, are you ready?
7               COURTROOM DEPUTY:  Yes, ma'am.
8               MR. BENNETT:  Good morning.  There
9     are many things in this country that make it
09:52:06   10     great.  We probably all share that same view.
11     The obligation to vote, the protections we have
12     against government, against harm from one other.
13     But one of the greatest things we have is the
14     system we have for resolving disputes.  Resolving
09:52:26   15     them rationally and to do it with our peers.
16     It's unmatched.  And it's true in South Carolina,
17     Virginia, Alabama.  It's true in California.
18          The jury system is what makes our job
19     possible.  What makes it possible for Mr. Brim
09:52:42   20     and what makes it possible for Midland to come in
21     here and trust for a fair and rational result.
22     That doesn't happen without your public service.
23     A public service that is remarkable.  You have
24     spent -- and as exhausting as it is for us to
09:53:00   25     speak and to prepare, you have had to listen.

1   You've had to endure, and you've had to pay

2   careful attention.  And so for that, I thank you.

3       Our lead counsel, Ms. Cauley, certainly

4   thanks you.  And Mr. Sykstus and Mr. Brim thanks

09:53:16  5   you.

6       We put up on the monitor -- and we'll go

7   through this -- much of what I have here you've

8   heard.  I'm not going to repeat a lot of the

9   evidence.  And much of what I will talk about

09:53:28  10   will be the jury instructions themselves.

11       But we are here, attempting to enforce a

12   federal law.  Something Congress passed.  A law

13   that has punitive damages, as you've heard, a

14   rarity in federal laws.

09:53:44  15       And it's a law that has been in place

16   since the 70s.  Early 70 when one of its

17   congressional supporters -- this is from the

18   congressional record -- explained with more

19   prescience than maybe sometimes Congress,

09:54:06  20   congressional act may deserve.

21       The FCRA is to protect consumers against

22   the trend towards the establishment of all sorts

23   of computerized databanks -- this is in the early

24   70's -- that place the consumer in great danger

09:54:20  25   of having his life and character reduced to

1    impersonal blips and keypunch holes in a stolid

2    and unthinking machine which can literally ruin

3    his reputation without cause.  That's why we're

4    here.

09:54:34  5         This is not a law; this is not a claim

6    where my client was killed.  Thankfully.  This is

7    not a claim in which millions of gallons of oil

8    was dumped into a Gulf, destroying it.  But this

9    is a claim brought under a federal statute.  A

09:54:52 10    federal statute that requires Mr. Brim to come

11    before you and ask your help in avoiding what

12    Congress passed, a very potent and powerful law

13    to protect him with.

14         Now, I have opened, and there are a

09:55:10 15    couple -- two slides from my opening that I'll

16    just flash up.  And I am certainly not good on

17    making future predictions.  But I did suggest to

18    you in opening that defense strategy would be to

19    distract you.

09:55:30 20         You've heard the law and we'll talk about

21    it more.  But the question in this case is simply

22    when the credit bureau disputes these ACDVs, when

23    those disputes were forwarded to Midland, did it

24    do a systematic detail search and inquiry?

09:55:46 25    That's it.  That's all.  If we prove that, we

1    win.  If we prove it was negligent or reckless,

2    we win, period.

3         But there is something that our system

4    accepts.  Not officially.  But it's called jury

09:56:02  5    nullification.  And that's when a party says and

6    they can't say this because they would -- the

7    Court typically would say you can't say that.

8    But what they say is, we understand.

9    Technically, we wrote the law.  But you shouldn't

09:56:16 10    help this person.  He did something wrong.  He's

11    undeserving of your protection.

12         There is an identity theft case where the

13    identity thief was the son of the consumer whose

14    identity was stolen and it was still a close

09:56:38 15    relationship with those.  Jury nullification.

16    Whether you like it or not, it's part of what we

17    do.  Sometimes it is appropriate, maybe.  But not

18    here.

19         This entire trial, from Midland's

09:56:54 20    prospective -- and they called two witnesses,

21    Dell and Redstone.  This entire trial has been

22    about whether my client failed to do something,

23    whether my client failed to provide a

24    transactional detail report.  And I admit, you

09:57:08 25    know, my finance degree was in 1989.  So I don't

1    know what a -- maybe everybody else knows what

2    that was.  But their witness didn't know what

3    that was, and he's been 15 years in this

4    business.

09:57:22  5          Redstone's witness, called by the

6    defendant, says even not all its employees may

7    know.  Is this my client's fault?  If we were

8    presenting you a case where my client in the day

9    that Midland got it -- he wrote a letter.  The

09:57:42  10   credit bureau -- one letter, one dispute, one

11   credit bureau forwarded that dispute to them and

12   Midland verified it and he rushed down to federal

13   court and said, I want a federal lawsuit, that's

14   a different world.  But I would assume you're

09:58:00  15   sick of hearing testimony about all the contacts

16   and all the instances in which my client sent

17   bank statements, faxed them, mailed them, talked

18   about them.  Talked about it to Dell, the

19   industry partner that sold this information to

09:58:16  20   Midland; talked about it to Midland by phone.

21   Talked about it to Midland in letters.  Made

22   disputes through the credit bureaus about it.

23          This isn't that one instance.  And this is

24   not one ACDV.  There are nine of them.  Right?

09:58:34  25   The evidence is the defendant admits they

1  received five, maybe six.  They said they didn't

2  get the Equifax one in August of '08.  But when

3  this lawsuit was filed, the credit bureaus took

4  that as a dispute and forwarded ACDVs.  When this

09:58:50  5  lawsuit was filed, they still verified it.

6       Now, other distractions -- let's talk

7  about what I projected would be a "look over

8  here, not at the law" argument by the defendant.

9       Well, Dell was never contacted at all.

09:59:14  10  Not once.  And we want to talk about Dell?  You

11  now have the defendant's exhibits.  And if you

12  wanted to turn with me to Exhibit 21, Pages 13

13  and 14 first.  This is the contract by which

14  Midland bought for five cents on the dollar --

09:59:46  15  bought this principal balance for 70 bucks,

16  about.

17       Look at 13 and 14.  Remember they receive

18  8,000 disputes a week.  Why didn't Midland send

19  this to acquisitions, ask for copies of documents

10:00:06  20  or anything?  Because they have to pay for it.

21  Past the first 20 percent of their accounts --

22  they have to buy this.  And that can go up to

23  $50.  It will cost them $50 if they have reached

24  those thresholds to research a 70-dollar account.

10:00:28  25       While we're here, if you turn to Page 15,

1    is this Dell's problem; that is, Dell had its own

2    credit-reporting issues.  You saw -- you heard

3    that testimony.  And Dell was responsible for

4    Dell's.  But it isn't Dell's trade line that is

10:00:42  5    disputed in this case, and it's not Dell's credit

6    reporting.  And Dell couldn't have done anything

7    about Midland's credit reporting to the credit

8    bureaus if it tried.

9         The credit bureaus all testified this was

10:00:56  10    Midland's trade line.  Midland was responsible

11    for it.  Midland's employee, Ms. Ross, testified

12    that it knew.  She knew it was responsible for

13    its accuracy.  But you don't need me to argue it.

14         The Dell contract prevents this

10:01:10  15    distraction under compliance with law.  The

16    purchaser represents and warrants that it will

17    comply with all requirements of federal laws.

18    And if you want to turn to 16, well, if Dell is

19    at fault, if Dell is at fault, then Midland could

10:01:30  20    have gone after its industry partner.  Look at

21    16.  They can go back, and they could make some

22    claim against Dell.  Why shove on to my client's

23    back Midland's problems with Dell?

24         And I'm just assuming that that

10:01:50  25    distraction would be offered in closing.

1          And if you look at Page 20, now, earlier

2     in this it defines an ineligible account, right?

3     It says Dell will not sell accounts that meet the

4     following criteria, consumer file bankruptcy,

10:02:08  5     other things.  But one of them is it's been paid

6     off.

7          What happens?  Well, the remedy Midland

8     would have had on this Paragraph A is to make

9     Dell buy it back.  Go get its $70 back.  So why

10:02:26 10    is this our client's fault?  Why is Dell and

11    Midland's mistake my client's problem?

12         This is from an economist.  I'm not one.

13    This is a concept of externalities.  Simple

14    definition.  Externalities are costs arising from

10:02:58 15    an economic activity that affects somebody other

16    than the people engaged in that activity and are

17    not reflected in price.  What is going on here?

18         Well, I was born in 1965.  Some of you are

19    older.  Some of you are younger.  We all will

10:03:16 20    share the same just constant amazement about

21    where technology is going.  Powerpoint

22    presentations, the ability to examine microfiche

23    records or any of this information.  And that's

24    all fine.

10:03:34 25         But if you recall, the Fair Credit

1    Reporting Act's purpose is to stop shifting and
2    imposing that automated batch interface machine
3    problem on the consumer.  And that's where the
4    externality problem is.

10:03:52   5        It is okay if Dell wants to save money by
6    using IEnergizer in India.  I'm not -- you know,
7    it's not proper to say you shouldn't send
8    business to India.  If Dell wants to do that to
9    save money, it's fine.  But when its vendor,
10:04:12  10   because of the way that these cost structures
11   have been set up -- and Midland shares the same.
12   I'll go through them at the end.

13        Remember the annual report.  Cost is all
14   their business model.  Cutting costs, reducing
10:04:26  15   costs, that's what they're about.  Well, if you
16   want to save money, do it by efficiencies.
17   Negotiate with your paper vendor.  Work out a
18   five-year contract with your vendor.  Do whatever
19   you need.  But only externalize the cost of doing
10:04:40  20   an investigation, the one that the law says
21   Midland has to do -- don't put it on my client.

22        And here's what happened.  And I came in
23   this case later than my other lawyers.  So a lot
24   of this I'm learning as you learn.  The Dell
10:04:58  25   deposition.  What happens?  Well, this is what

1    happened:  Dell used a vendor, IEnergizer to take

2    the payment.  After that occurred -- and the

3    example that I talked about with my co-counsel

4    over dinner last night is this is like a consumer

10:05:18    5    bringing in a payment in person and giving it to

6    the receptionist in a business.  No one in this

7    case disputes that Dell was paid.  That's not

8    what this dispute has ever been about.

9         The dispute is where is Dell's money?  The

10:05:32   10    money was paid to the receptionist.  Dell is

11    unhappy because the receptionist ran off with it

12    or lost it.  Dell knows, Midland knows that our

13    client paid.  But they don't know where they put

14    the money.  So they're externalizing the research

10:05:50   15    effort on my client.  Want him to be the private

16    investigator.  Want him to do -- go to his bank,

17    which Redstone testified why doesn't Redstone

18    provide these transactional detail reports to

19    Dell?  Because Dell could do it itself from its

10:06:10   20    end.

21         How many $954.12 payments came in from

22    Redstone Credit Union that day at that time?  How

23    hard is that to research or for Midland to have

24    in its investigation demand Dell research?  How

10:06:26   25    hard?  Why is it hard?  Because it's IEnergizer

in India that took the money.  If they want to
save money by using IEnergizer in India, if they
want to save money, that's fine.  But you do not
externalize that on the consumer.  Particularly
in light of a regulatory regime that says it is
not his obligation to do an investigation.

Let's go to transactional detail report.
Let's talk more about this.

It's frustrating to have a trial about
whether or not an investigation occurred when the
ACDV was received turn into this whether my
client should have known what a transactional
detail report is.  It has nothing to do with the
case.  Has nothing.  And it's -- for someone like
a lawyer, maybe someone like yourself, there's a
natural curiosity, we want all T's crossed, I's
dotted.  We want to understand exactly what
happened.  A perfect view.  But it's irrelevant.
It's irrelevant.

There is nothing in the instructions that
suggests my client had any obligation to do an
investigation.  And there is something important,
and I'll go through these instructions in a bit.
But if you could help me and turn to Page 5 of
your instructions.

1    Is it the end of the world if Midland had

2    just said, we don't know what happened; we're

3    just taking it off?  Is Midland's

4    30-million-dollar business going to grind to a

10:08:28  5    halt for that 70-dollar account?  No.

6    And the law contemplates that.  You have

7    already heard and you've already read the Midland

8    procedure that says it's the consumer's burden.

9    Past 45 days, it's his burden to prove he doesn't

10:08:46  10    owe the money.

11    That's not the law.  You have three

12    possible realities that could be the result of an

13    investigation.  One, and this is the bottom

14    section.  But under E, you can find that the

10:09:04  15    information was complete and it was accurate;

16    that is, the investigation required by the Fair

17    Credit Reporting Act when the ACDVs came in,

18    Midland could have actually conclusively

19    determined we are certain that he did not pay the

10:09:18  20    debt.  Two, they could determine we are certain

21    he paid the debt -- and we think that conclusion

22    is self-evident.  But Midland did not.  So what's

23    the third option?  The third option is no one

24    knows; that is, when Midland received the

10:09:36  25    investigation, it was unable to verify that it

1   had been paid or not paid.  It couldn't

2   determine.  It couldn't determine because it

3   didn't want to go to Dell to get Dell to go to

4   IEnergizer.

10:09:52   5        Well, what happens if there's uncertainty?

6   The law is it cannot be verified.  It must come

7   off the credit report.  That's it.  And you

8   shouldn't have to hire lawyers and look at all

9   the lawyers here and come to federal court to get

10:10:08  10   your credit report fixed.  And you shouldn't have

11   to stay in federal litigation nine months before

12   a defendant wakes up and does it.

13        Other issues, why this is a total

14   distraction.  Midland's own witness never even

10:10:24  15   heard of this.  Midland still believes that even

16   if Midland had received a transactional detail

17   report, they testified it wouldn't have mattered

18   unless they had a permission slip from Dell to

19   release this.

10:10:36  20        Midland -- the defense lawyers -- all

21   right.  The defense lawyers issued a subpoena.

22   That was the evidence you've heard -- for the

23   bank statement.  Never issued a subpoena for the

24   transactional detail report -- the supposed

10:10:46  25   really important document.  Never.  In fact, you

1    heard testimony that it was received only when

2    Mr. Brim's lawyers had to go find it.  Figure out

3    what it was.  But it was so important, no

4    subpoena?

10:11:02  5        They still waited a month.  They received

6    it early August.  If it was that earth-shattering

7    news that so conclusively ended this; and that

8    is, more importantly, if Midland is telling the

9    truth that the reason they didn't delete until

10:11:24  10   September had anything to do with this

11   transactional detail report, this is disproven by

12   their own conduct.

13        The irony here at the bottom -- and maybe

14   this is as irrelevant as the whole transactional

10:11:44  15   detail report.  But giving $954 -- and I'm -- and

16   maybe this person in California that received the

17   credit is deserving.  But the irony here is the

18   way that Dell and Midland have set up their shop

19   is to put all of this on my client.

10:12:04  20        The guy who, within a month, to build his

21   credit -- and this is -- Mr. Brim is -- his

22   entire adult life has been struggling to make

23   himself better.  He wanted to buy a house so he

24   could get married to the mother of his daughters

10:12:20  25   and they could now move in.  He has gone to

school.  He is working full-time jobs and is
still trying to get his CPA or his accounting
master's.  He is doing everything that we, as
Americans, would want another American to do.
And he has suffered the blunt.

Another distraction.  You're getting debt
collector calls.  You owe this money.  I don't.
Here's my bank statement.  I've told A, B, and C
this.  You owe this money.  I don't.  So we send
a letter that says, stop harassing me.  Stop
calling me.  Here is the information you would
need.  And now Midland is saying, oh, that's the
reason we never fixed anything.

Well, you have to judge not just the
witness.  You have to judge a party in this case.
Midland is representing to you that the reason it
did not correct his credit report is because he
said, stop calling me.  And that's not true.

The evidence when I recalled their
witness, he testified it wouldn't have matter.
What would they have done?  They would have heard
for the umpteenth time, I paid this debt.  Here's
the information.  And for the umpteenth time,
never mention anything about transactional detail
report.  And to represent to you with a straight

face that that has anything to do with why it
failed to do an investigation when the credit
reporting agencies contacted Midland is
disingenuous.

10:14:00      Let's talk about other -- in Virginia, we
don't -- here, too, I'm sure.  We don't talk
disrespectfully about other people.  But you have
had representations made to you, for example,
that my client lied.

10:14:16      Remember the sequence with the deposition?
And it was insinuated to you that at his
deposition he had claimed, I had no idea about
the transactional detail report, and that was the
end of it.  And one part of the deposition was
10:14:28 taken out of the context of the other.  And a
page or two later, Ms. Cauley read the rest.
That's not what he said.

      You've heard testimony that in a number of
instances that -- the Equifax is a good example.
10:14:44 It's been insinuated that Equifax took -- that
Equifax might have not had any balance showing
for nine months or so.  Right?  You have Exhibit
29, which is from Midland in discovery that shows
every month that they re-reported.  So there's no
10:15:08 mystery.  Yes, maybe in some alternate reality if

1    Midland had not reported after August of '08, in

2    that alternate reality -- not this one -- that it

3    might have shown a zero balance.

4         But you have Midland's own documents.

10:15:28   5    It's audacious to make that argument.  You'll

6    have them in front of you.  You'll have them in

7    the back room that show what they reported every

8    month.

9         Mortgage attempts.  Right?  My client has

10:15:38  10   been involved in this process before with Dell

11   and now with Midland for seven years.  And the

12   insinuation is maybe he never really applied for

13   mortgages.  Remember that?  You don't remember

14   what date you applied.

10:15:54  15        The best part about it is you have written

16   documents.  You've got the credit reports.

17   You've got credit reports that confirm a Capital

18   One credit application in August of '08; a

19   mortgage application with an Equifax report in

10:16:12  20   August of '08.  Another mortgage with First

21   Metropolitan September of '08 and so forth.  I

22   don't -- I can't hide what is in those credit

23   reports.  They can't hide it.

24        The insinuation is, well, that somehow

10:16:32  25   anything else besides this live, painful, unpaid

1    collection account could have harmed my client's

2    credit.  You have a 2002 delinquency history on a

3    student loan.

4           The defendant is asking you to say, well,

10:16:48  5    that is probably why he couldn't get a mortgage

6    in 2009.  You have a late payment on a Sam's Club

7    credit card that was 2007.  Both of them, by the

8    way, the credit report shows, paid off.

9           This is what this case is about.  And you

10:17:10 10   have the annual report, Exhibit 82.  This is what

11   this case is about.  And why do we have -- why

12   does anyone make any pretense otherwise?

13          This is a case about Midland attempting to

14   minimize its costs.  That's what it's about.

10:17:30 15   That's its target in its annual report.  Midland

16   says, to stay on track, it's got to keep its

17   costs below that number.

18          Otherwise, two excerpts, Page 2 -- and you

19   don't have to look, but this is so that if you

10:17:48 20   want to -- Page 2 and explain it -- Page 2 of

21   their annual report, their big strategy is cost

22   efficiency.  And then page -- and in order to

23   survive in this business model, the defendant

24   says we've got to keep our costs especially low.

10:18:22 25   And that's what this case is about.

1    Let's turn to the preponderance of the

2    evidence.  You have the jury instructions.  Let

3    me suggest to you what we think you should do

4    with those instructions.  And there is no way I

10:18:32  5    would represent to you that I'm not bias.  I

6    mean, I drank the Kool-aid.

7    I'm a consumer advocate.  And I represent

8    Mr. Brim.  But these aren't drink the Kool-aid.

9    These aren't consumer advocate.  This is the law.

10:18:50 10    And in order, pretty much, that you would apply

11    them.

12    The burden of proof, preponderance of the

13    evidence, not beyond a reasonable doubt like in a

14    criminal case or even clear and convincing

10:18:58 15    evidence, the standard when you have to prove

16    fraud.

17    In this instance, preponderance.  If you

18    think 51 percent more likely we are right on the

19    point than the other side, we win that point.  If

10:19:12 20    you think at a 51-percent point the defendant was

21    negligent or willfully violated the act or my

22    client suffered damages, then that point is for

23    the plaintiff.

24    There are two kinds of evidence.  And

10:19:30 25    these cases -- nobody contemplated taking the

1    credit reporting dispute process into federal

2    court.  Certainly Mr. Brim didn't.  So your

3    evidence is varied.  Some of it is direct.  Some

4    of it is circumstantial.

10:19:44  5          The direct is a piece of paper in front of

6    you that says there was a mortgage application,

7    credit report on this date in 2008.

8          Circumstantial, he was denied credit.  He

9    didn't get credit.  And there was no other

10:20:00  10   evidence or explanation beyond that it was the

11   Midland denial.  The Midland account.

12          Direct is objectively determinable,

13   expressed in front of you.  Indirect is you have

14   to draw a common sense inference.

10:20:20  15          The Fair Credit Reporting Act.  You've

16   heard the actual text of the statute.  And it's

17   nothing new to Midland.  This is what the law is.

18   1681(1)(a), those are the ACDVs.

19          So let's make a point here.  The question

10:20:38  20   about, well, if Midland was not allowed to

21   contact you or any of the discussions, rather,

22   about what my client and Midland would have had

23   to do as part of an investigation discussion are

24   irrelevant.

10:20:52  25          The only rights my client picks up -- and

1    he picks up a lot of them -- are when the credit

2    reporting agencies send the disputes over.  What

3    does that mean?  Well, to our detriment, it means

4    that until he disputed the account in July and

10:21:08   5    early August of '08, none of his injury is

6    compensable.

7         He was sued.  You'll see an affidavit in

8    there where a Midland employee testifies or signs

9    a sworn affidavit, says, I have personal

10:21:24  10    knowledge of this account, and I know he didn't

11    pay it.  All right?  That might offend you -- it

12    may -- for its being disingenuous.  But there's

13    no compensation.

14         But once my client makes a dispute, the

10:21:40  15    ones that come through the credit bureaus, the

16    defendant picks up a world of obligations.

17         Now, there are two types of claims.  And

18    we'll go through -- well, actually, I'm sorry.

19    Go to the Fair Credit Reporting Act with E at the

10:22:04  20    top.

21         We believe there was never an

22    investigation.  You'll see the definition.  It's

23    not a matter of did they do enough of an

24    investigation or even was it reasonable.  An

10:22:18  25    investigation is a deep, searching inquiry.  It's

not an electronic pawn where you just have an
electronic blip you're knocking back and forth.
An investigation, as we'll talk about in the
instructions, is a deep, searching inquiry.  It
is not having a computer say, no.  The roadblock
means no investigation.

But let's assume that there was an
investigation.  Could on the facts before you
Midland have concluded with certainty that our
client owed this debt?  If it could not have
concluded with certainty that our client owed
this debt, then it cannot be verified.  And you
have to do the following, including delete.  The
modified would be if you're disputing the
balance.

Negligence, there are two standards.  And
maybe not entirely accurate, but it might help to
think about negligence as a subset of
willfulness; as negligent is careless.  Careless
indifference or unreasonable or imprudent
conduct.  Doesn't have to prove the same
thresholds as for willfulness.

Next, please.  And willfulness will be
reckless.  Both of them involve balancing tests
that consider the cost of doing more such as

deleting a 70-dollar account versus the potential

impact to my client, potential impact to other

consumers in this country.

Factors to be considered.  And this was

10:24:12 the law before Mr. Brim ever brought a lawsuit.

The factors to be considered in determining

whether the investigation was reasonable -- and

this is if you even find there was an

investigation at all attempted.

10:24:24 Factors to be considered, whether the

consumer alerted the defendant that the

information was unreliable, whether the credit

bureaus alerted the defendant that it was

contested, and the cost of verifying the accuracy

10:24:36 versus the harm of reporting.

I mean, the way that this system is set

up -- the Fair Credit Reporting Act is set up is

to give -- you don't want anybody rushing into

court because they have an inaccurate item on

10:24:50 their credit report.  So you go home, pull up

your credit report.  Wow.  That's inaccurate.

You can't go to court.  You shouldn't be able to

go to court.  We have to give creditors an

opportunity to fix it.  You don't have to give

10:25:02 them ten opportunities or two year's worth.  My

1    client did.  But that's the way it's set up.

2         And those balancing questions shift.  The

3    point where my client has provided them

4    information -- they have the dispute.  Now all of

10:25:20   5    a sudden, they have a much greater obligation to

6    investigate and determine the inaccuracy or

7    accuracy of their account.

8         You saw this in my opening.  These are the

9    definitions.  Courts have accepted definition of

10:25:42   10    investigation from a dictionary.  Same dictionary

11    you can get in San Diego, I'm certain.  An

12    investigation.

13         Whatever you want to think about

14    transactional detail reports or whether my client

10:25:54   15    had three mortgage denials or one or the like,

16    think:  When it received the ACDVs, is there any

17    evidence at all -- at all that a detailed inquiry

18    of systematic examination was done?

19         When the ACDVs came in, was there any

10:26:16   20    evidence that there was a careful inquiry?  No.

21    95 to 99 percent of the time, it is an automated

22    batch interface system.

23         My client -- 100 percent of his disputes

24    were automated batch system.  There was never a

10:26:32   25    systematic or detailed inquiry.

1          And so the defendant is not arguing, we
2      did that.  They're arguing, don't help Mr. Brim.
3      And this is the jury nullification argument we
4      very much are asking you not to buy into.
10:26:46  5          Next.  If it knows it's inaccurate, it
6      can't keep publishing it.  Even if it really
7      wants my client's help at finding the money at
8      IEnergizer, it doesn't have the right to use his
9      credit report, to hold it hostage, to force him
10:27:08 10     to work on behalf of Dell as a cost savings.
11          Next.  These are the ACDVs.  Top ones
12     Midland acknowledges.  The bottom ones it
13     doesn't.  But the evidence shows them.  You've
14     already heard Ms. Ross.  There isn't any contest.
10:27:28 15          The facts you heard the Court read in the
16     beginning of the trial -- they acknowledge that
17     all they do with these disputes is the automatic
18     system.
19          The next.  What is willful?  Reckless.  It
10:27:44 20     shouldn't say agency.  It should say the
21     furnisher.  Must establish the action of the
22     furnisher is reckless.  When is it reckless?
23     It's reckless if you run a risk of violating the
24     law substantially greater than the risk
10:27:58 25     associated with a merely careless reading.

8,000 disputes a day.  And if you had the
misfortune of having me as your plaintiff's
lawyer in a future jury, I cannot imagine you
would ever hear of any creditor -- of Capital One
or MBNA or of anyone who receives 8,000 disputes
a day.  Having a consumer advocate that does FCRA
work -- 8,000 disputes a week, I mean, is a
remarkable number.

Are all of those 8,000 consumers making up
their dispute?  Are they all individuals that
should have known to go get a transactional
detail report?  And are they all -- we don't
know.  We do know all of them are disputing
accounts that were bought for five cents on the
dollar.

Next, please.  Now, the damage structure
is this.  And we're hoping that middle part isn't
your choice.  But it is the law.  If you find
their conduct was merely careless, unreasonable
but not reckless, then you award actual damages.
That's it.  If you find it was reckless, and you
find actual damages that are more than a thousand
dollars, then you award whatever they are, all
the actuals plus you determine a punitive damage
number.

1        On the other hand, it is possible that you
2  say, they did something wrong, reckless.  Doesn't
3  have to be malicious or evil or fraudulent, but
4  reckless.  But we don't think you suffered any
10:29:42  5  harm or you didn't suffer any harm more than a
6  thousand dollars.
7        In that case, it's that bottom one; that
8  is, you would award statutory damages between a
9  hundred and a thousand dollars.  And then you
10:29:54 10  would award punitive damages.
11        The structure of the FCRA actually doesn't
12  require actual damages to recover for a willful
13  violation.  But there are actual damages.  And
14  there was a willful violation.
10:30:06 15        Actual damages, please.  Now, the bottom
16  part, another remarkable thing about the Fair
17  Credit Reporting Act is the types of damage that
18  Congress contemplated that consumers would suffer
19  isn't your "I lost a limb," which we certainly
10:30:24 20  believe is the much greater magnitude.  But still
21  important, out-of-pocket expenses.
22        You've heard testimony as to time spent.
23  A month of this enduring and spending half his
24  year's vacation, just sitting in court alone,
10:30:42 25  plus all the efforts Mr. Brim has made.  His

1    postage bills were -- you've got the exhibits.

2    $30.  Almost half the amount that was paid for

3    this account.

4         And then you have damages for personal

10:30:54  5    humiliation, embarrassment, anguish, and

6    emotional distress.  And the law is, as you see

7    on the next page, that there isn't a way to give

8    a specific dollar number.  And the truth is, this

9    is where the lawyers get to play -- we have a

10:31:16  10    much easier job because we don't get to determine

11    what the value of those are.  What I would

12    believe is immaterial.  You -- it's your job.

13    It's your valuation.

14         Its in the beginning of this process when

10:31:28  15    the dispute started, Midland had sat down with my

16    client and said, we're going to take away your

17    credit for the next year and a half, two years,

18    you're going to have to go to federal court to

19    redeem your credit, you're going to have to

10:31:44  20    borrow money from your mom because you can't pay

21    your hotel bill to do your job because you're at

22    your Capital One credit limit.  You can't extend

23    your Capital credit limit because of this.  You

24    cannot get a new credit card because of this.

10:32:00  25    You can't buy a house sufficient for your -- to

1  get married and have your kids live with you

2  because of this.  The beginning of that, what

3  would have been a number that a reasonable

4  factfinder would say?  That is the number you

10:32:14  5  have to evaluate.  And my valuation doesn't

6  matter.

7      And it's a tough economy for a lot of

8  people.  It is in Virginia.  I'm sure here.  But

9  any amount you give my client is more than he has

10:32:32  10  today.  And he is not asking you for any dollar

11  amount at all.  I am asking you.

12      In this instance, a fair bargain, a fair

13  number -- and it is a lot of money -- should be

14  greater than $100,000 of actual damages.  Nobody

10:32:52  15  died.  Nobody was killed.  He's 32 --

16      PLAINTIFF BRIM:  33.

17      MR. BENNETT:  33.  Been an adult

18  how many years now?  And two of those he has

19  spent trying to redeem his financial life.  A

10:33:08  20  life he had worked hard to build.

21      On this earth, we have one life.  We

22  respect that life.  In his adult life, two of

23  those years have been absorbed with this.  He's

24  in federal court with a bunch of strangers,

10:33:24  25  having you examine his credit, having you --

1    having to sit here and listen to attacks on --

2    not his integrity, but his even knowledge of the

3    banking systems amongst other things.  $100,000

4    is a modest recovery.

10:33:46  5          And I will tell you -- I will represent to

6    you as an officer of the Court I have not -- he

7    has not asked me to say that.  And I have not

8    talked to him about any such numbers.  But that's

9    a number that should be used as a starting point.

10:33:58  10         You have no exact standard to be applied.

11   It's your judgment.

12          Proximate cause.  Now, the defendant has

13   implied in argument that somehow you have to

14   eliminate every other possibility for credit

10:34:16  15  denial for the stress.

16          I mean, he comes at this case -- he was

17   already burdened before they had to throw on the

18   back of that -- his back -- he was already

19   burdened with the challenge of school and of his

10:34:30  20  life, his work life and the stress that he deals

21   with.  And to saddle that, which exponentially

22   could magnify it, with all these additional

23   problems.  There is certainly enough evidence you

24   could find some causal relationship between harm

10:34:48  25  he suffered, credit denials, time lost, out of

1    pocket -- small, the mailings -- humiliation,

2    embarrassment, and distress.  You can find that

3    this was a substantial factor.  And you don't

4    need to find it was the only one.  It is not the

10:35:02  5    law that it has to be the only factor.

6         Damages.  Well, the mortgage applications

7    are the inquiry laws.  There's a bunch of them.

8    There's no evidence.  There's only missiles

9    launched from across the room.  There's no

10:35:22  10    evidence of any explanation for why my client

11    couldn't get those mortgages, despite -- if you

12    look at those credit reports, going back to early

13    2008 -- and we can't recover for that.  Only when

14    he made the FCRA disputes.

10:35:36  15         He was trying to get his house.  And he

16    finally got it.  And if you look at Exhibit 15

17    and 47 -- 15 and 47 has the notes from Midland

18    where Platinum Mortgage -- and I've never heard

19    of them.  But that's a company you might want to

10:35:52  20    look up.  Platinum Mortgage made multiple calls

21    to Midland, trying to get the loan done.  That's

22    the only reason it happened in March of '09.

23    Because of the exemplary efforts made.  And

24    Platinum Mortgage had tried to get the loan

10:36:08  25    through, if you'll look at the credit reports, as

much as a year earlier.

Credit cards.  American Express.  Let's talk about distractions again.  There is an American Express credit denial letter that says you were denied because of your Transunion credit report and the reasons -- and these are called adverse action reasons.

The first one at the top -- the main one is because of a collection account in your file. This was May of '09.  And the second one is recent delinquency.  Then if you look at the Transunion report, it is there is no other collection and no other recent delinquency besides this.

The defendant wants to use three lines of a deposition of a litigation witness from Transunion that has limited knowledge of the case in answering a general question:  If an account is coded as disputed, is it scored?  And that's why the credit card denial is uncertain.  But there's a difference.  And the document shows this.  If you'll take a look at Exhibit 53 --

THE COURT:  Now, you have eight minutes total left.

MR. BENNETT:  Thank you, Judge.

1    Well, actually, I'll tell you this:  If
2    you'll take a look at -- just write these down.
3    How about that?  Exhibit 72 and Exhibit 68.
4    Those are Experian.  And this -- I say Experian
10:37:46  5    because they give you a good contrast of what
6    Mr. Newnom would be talking about.  There's a
7    difference between having a status that is
8    showing as disputed and having a comment or
9    remark that is showing as disputed.
10:37:58  10    In the earliest, Exhibit 68, Experian
11    report, if you look at the Midland trade line --
12    and just to contrast, it shows the difference.
13    They all use the same reporting code.  And it
14    says status, collection.  Remark, disputed.  Then
10:38:14  15    after the lawsuit, Experian changed it.  That's
16    Exhibit 72.  And now the status is showing no
17    collection, no status.  That is when it is not
18    scored.
19    When you look at exhibit -- any of the
10:38:28  20    Transunion reports, Exhibit 53, Page 139, you'll
21    see something different.  You'll see that the
22    status is still reporting as a collection
23    account.  It is not reporting in a disputed
24    status.  There's just a text note that says if
10:38:44  25    somebody in this day and age actually reads

1   credit reports instead of have computer process

2   them, they would have seen the mention of a

3   dispute.

4          Punitive damages.  You have a standard for

10:39:00   5   punitive damages.  There were no FCRA procedures.

6   There's no evidence of training.  The automated

7   batch interface system is 95 to 99 percent of the

8   time.

9          Small amount of money.  Cost is the sole

10:39:18   10   factor.  And there is zero, zero remorse.  As a

11   plaintiff's lawyer, the hardest defense strategy

12   is to come in here and go, look, you know, we

13   screwed up.  Do you know how much data we have?

14   We screwed up.  That's not what you have.  You

10:39:36   15   have endured through three days of trial a theme

16   that my client is at fault.

17          And you have a punitive damage option.

18   The shareholder equity -- this is in the

19   report -- is in 2010, 302 million dollars.

10:39:54   20   Punitive damages are designed to deter.  They're

21   not for Mr. Brim.  They're not for his lawyers.

22   They are for everybody else.  Those other 700

23   and -- 7,999 folks who might have disputes or

24   concerns.  This is how you tell Midland in its

10:40:12   25   offices, change your system.

1          I'll argue briefly, hopefully three or

2     four minutes, when I'm done.  Thank you.

3               THE COURT:  Can I see the

4     attorneys on this side right quick?

10:40:24  5               (Bench discussion off the record.)

6               (In open court.  Jury present.)

7               THE COURT:  Let me ask you all:

8     Do you need a break?  Would it be nice to have a

9     break?  Okay.  Before you break your break, I

10:41:10  10    would like for you to go to Page 8 of your

11    charges because I just discovered a mistake.  Let

12    me know when you have it.  Sometimes when you do

13    these, you read it so many times, you don't see

14    it.

10:41:28  15         Do you see in the middle of the page where

16    it says, to prove willful violation -- do you see

17    that?  Okay.  It should say, to prove willful

18    violation, a consumer must prove that defendant.

19    Strike out "a consumer reporting agency" and just

10:41:46  20    write "defendant."

21         And two lines down, to prove a reckless

22    violation, a consumer must establish that the

23    action of -- instead of "the agency," you should

24    write "defendant."  And that's it.

10:42:00  25         And let's take a break until 11:00

1    o'clock.  And while you're on break, don't

2    discuss the case among yourselves or with anyone

3    else.  Okay?  Thank you.

4                    (Jury excused.)

10:42:10   5                    (Short recess.)

6                    (In open court.  Jury present.)

7                    THE COURT:  Have a seat.  You

8    ready?

9                    MR. LANGLEY:  Yes, Your Honor.

11:05:52  10                    THE COURT:  Go ahead.

11                    MR. LANGLEY:  May it please the

12   Court.

13        Like Mr. Bennett, I want to thank you for

14   being here.  I know you actually really didn't

11:06:06  15   have a choice.  You got a federal summons, and

16   you had to show up.  I know many, if not all of

17   you, probably did not want to be on the jury.

18   But I thank you, and Midland Credit Management

19   thanks you.

11:06:18  20        For Mr. Bennett to suggest that Midland is

21   insincere about this case is just disingenuous.

22   We have two people who have come from San Diego

23   to be here for this trial.  This is important to

24   them, or they would not have been here.

11:06:38  25        Mr. Bennett, either through oversight

1    because of a legitimate difference of opinion or

2    because of deliberate neglect, has glossed over

3    our main argument in this case.

4         Make no mistake about this.  Our main

11:06:58  5    argument in this case -- and I'll come back to

6    this -- is that even if we had done the things

7    that the plaintiff says we should have done, the

8    result would have been the same.  And I know that

9    may seem to you kind of insensitive or what's the

11:07:16  10   point?

11        But this is where the law comes into play.

12   The law that you have in your hands.  Because the

13   law requires that they prove proximate cause.  In

14   other words, they have to show that had the

11:07:34  15   investigation been done differently, that the

16   result would have been different.  And if the

17   result would have been different -- would not

18   have been different, then they cannot recover.

19   That is their burden to prove.  And I

11:07:48  20   respectfully submit to you that they have not met

21   their burden in this case.

22        The judge has instructed you on the law.

23   And on Page 2 at the bottom, it says in this

24   case, the plaintiff has the burden of proof; that

11:08:08  25   is, the burden to establish by a preponderance of

the evidence that he is entitled to recover.  And
the instructions go on to say, where they detail
the two particular claims that are raised by
plaintiff, each of the elements that the
11:08:24  plaintiff must prove.  We don't have to prove
anything.

          Now, I think we have proved some things.
I'm going to highlight those later in my closing
remarks.  But the burden of proof is on the
11:08:38  plaintiff.  They are the ones that have to show
you that these things happened and that, had they
happened differently, it would have mattered.
And they did not in this case.

          The real issues that we're here about --
11:08:56  Mr. Bennett talked a lot about congressional
intent from the 1970s and externalities.  But the
real law that matters is the law that you have in
your hands.  It is the law that the judge has
already given you.  That's what matters.

11:09:10          The other thing that matters are not the
suppositions that the plaintiff or their counsel
are making but the evidence that's actually in
the case.  These are not mere technicalities.
These are the premises upon which the justice
11:09:28  system is built; that the decisions are based on

1    the law and the evidence.

2         And so what you will hear from me -- and

3    the only things you will see me show you during

4    my closing remarks -- are going to be the law and

11:09:42  5    the evidence.  Because that's what matters.

6         At the end, the arguments of counsel,

7    plaintiff or defense, are not going to win or

8    lose this case.  This case is going to be decided

9    on the law and facts.  And we believe that the

11:10:02  10   law and facts will lead you to the conclusion,

11   whether you like Midland or not, that Midland is

12   entitled to a defense verdict in this case.

13        We are here because of a Fair Credit

14   Reporting Act case.  But it did not take a

11:10:20  15   federal lawsuit to fix this.  What it took was

16   confirmation from the original creditor that the

17   account was paid off.  You saw our procedures.

18   You saw -- and I'll show it to you in a little

19   bit.  But you saw in the manual where it says

11:10:38  20   that what we're looking for when there is a

21   paid-prior dispute is confirmation from the

22   original creditor.  Why?  We're in the business

23   of buying accounts from other people.  So if

24   someone says, hey.  I already paid this, what we

11:10:50  25   need to see is something from the original

1    creditor's side, showing that that, in fact, is

2    the case.

3        And as soon as Midland received word from

4    Dell this year -- excuse me.  In 2010 -- that

11:11:10  5    Dell had been able to determine what happened and

6    they had determined that, hey, this account is

7    not due and payable, Midland did what?  They sent

8    that UDF form, the universal data form.  You

9    heard testimony about it.  They sent that form to

11:11:22  10    all of the CRAs, the credit reporting agencies,

11    and instructed them to delete this account.

12        It didn't take a federal lawsuit to fix

13    this.  It took confirmation from the original

14    creditor.  Now, we may quibble about how that was

11:11:40  15    supposed to have happened, but it's clear from

16    Midland's policies that that is what is required.

17        There are going to be three main things

18    that I talk to you about over the next few

19    minutes.  And I will guarantee you that I will

11:11:56  20    not talk for as long as Mr. Bennett did.  But

21    we're going to talk about the plaintiff's

22    damages, what they're claiming in damages; we're

23    going to talk about Midland's investigation of

24    this dispute and its processes for investigating

11:12:10  25    disputes; and we're going to talk about

1    causation.

2          First of all, let's start with the damages

3    that the plaintiff is claiming in this case.

4          Mr. Bennett and I each agreed on one

5    thing; and that is, if the plaintiff is entitled

6    to recover damages at all, it's those damages

7    that he's incurred after the first dispute that

8    he makes with the consumer reporting agency.  And

9    there's no dispute that that was in August of

10   2008.

11         There's also no dispute that this account

12   was deleted in its entirety in September, 2010.

13   So the extent we're talking about the damages

14   period at all, we're talking about August of 2008

15   through September of 2010.

16         What are the damages that Mr. Brim is

17   claiming in this case?  Well, principally, what

18   he is seeking are damages related to credit

19   denials and damages for mental anguish or

20   emotional distress.

21         We talked about the credit denials

22   yesterday.  I asked Mr. Brim questions about

23   those.  Some probing questions about those.  And

24   Mr. Bennett said, well, Mr. Langley is just

25   trying to suggest some alternate reality.  We

know these people denied these loans.  No; we
don't actually know they denied the loans.
Mr. Brim himself could not say they actually
denied the loans.  He was ambivalent about
11:13:38  whether he actually applied for the loans or not.
All we really know is that inquiries appear on
the reports.  Nobody testified that that was
because there was an application.  And more
importantly, nobody testified, not even Mr. Brim
11:13:58  himself, that he was denied any of those loans
because of Midland.

You didn't hear testimony from a single
creditor in this case, saying that they denied
Mr. Brim credit because of the Midland account.
11:14:14  Plaintiff took depositions of Transunion.
They took depositions of Experian.  They took
depositions of Equifax.  They could have taken
whatever depositions they wanted.  They didn't
take a single deposition of a creditor in this
11:14:28  case.  What does that tell you?  If a creditor
had actually denied Mr. Brim credit because of
the Midland account, I submit to you you would
have heard testimony on it.  You never saw any
documents from any of those mortgage companies.
11:14:50  The only document that you saw was an American

1    Express denial letter.

2           And this is Plaintiff's Exhibit 7, if you

3    would rather look in your notebook.

4           So for all the credit denials that

11:15:18  5    Mr. Brim is claiming in this case, we have one

6    document to support an actual denial, and it's

7    this American Express letter.

8           And the American Express letter says, we

9    are unable to open an account for you at this

11:15:32  10    time for the following reason:  Your consumer

11    credit bureau score from Transunion is too low.

12           You just heard Mr. Bennett say it was

13    because of the Transunion report.  No.  We can

14    look at the document and know why American

11:15:50  15    Express denied Mr. Brim credit.  Because his

16    consumer credit bureau score from Transunion is

17    too low.  And that's why the testimony from

18    Transunion is so important in this case.  The

19    dots have to be connected here.

11:16:06  20           Let's step back for a minute.  There's

21    nothing in this letter that mentions Midland.

22    They want to draw inferences about what some of

23    the potential reasons for the credit score being

24    too low mean.  They didn't take American Express'

11:16:24  25    deposition.  They could have done that.  The

American Express letter says what it says.  And
Transunion said what they said.  And I asked this
question of Transunion for a very specific
purpose.  Because this is very important.
Because this is -- the American Express letter is
the only document that substantiates an actual
denial of credit during the time period that's at
issue.

What is the impact in terms of credit
score on an account being marked as disputed?
Answer:  It does not get factored into the credit
score.  Question:  And so from early August,
2008, through September, 2010, the Midland
account would not have been factored into
Mr. Brim's credit score?  Answer:  That is
correct.

Mr. Brim wasn't denied credit from
American Express because of Midland.  I don't
know why he was denied credit from American
Express.  Neither do they.  Neither does anyone
in here.  We haven't heard from American Express.

The other category of damages that
plaintiff is claiming are mental anguish,
emotional distress type damages.  And make no
mistake.  We concede this has been an

1    inconvenience for Mr. Brim.

2         Mr. Bennett said he spent the last two

3    years of his life, trying to fix this?  There is

4    something pretty easy he could have done in an

11:18:14   5    afternoon, and that is go to Redstone and get the

6    additional documentation.  Even if he didn't know

7    what a transactional detail report meant, even if

8    Redstone -- whoever he talked to at Redstone,

9    even if they didn't know what that term meant,

11:18:28   10   there's no dispute in this case that Mr. Brim

11   knew the bank statement wasn't getting it done.

12        He had given the bank statement to the

13   original creditor on two different occasions, and

14   it didn't get it done.  But, yet, he's here,

11:18:46   15   saying, that, well, Midland is the purchaser of

16   that account.  Somehow it should be easier for

17   Midland to figure it out from there.  That

18   doesn't make sense.

19        But the mental anguish damages that he's

11:18:58   20   claiming, the stress, the worry, the loss of

21   sleep, I have no doubt that that is stressful.

22   All of us face stressors in our life of varying

23   sorts.  But another thing that you didn't hear in

24   this case -- and the reason you're going to hear

11:19:16   25   me say what you didn't hear in this case is

1   because the proof is important.  The proof is
2   everything here.  You didn't hear from any
3   doctor, from any counselor.  You didn't even hear
4   from a relative come in here and talk about how
5   they had seen what an impact this had on him.
11:19:30

6          And I'm not suggesting that the notion
7   that he was inconvenienced, that he was stressed
8   out is contrived.  He probably was inconvenienced
9   and stressed out, but not to the level that
11:19:48 10  should entitle him to an award of mental anguish
11  damages, especially given that there were things
12  he could have done to avoid this.  That's all I'm
13  going to say about damages for right now.

14         I want to talk about the investigation.
11:20:02 15 Because the duty here -- and it's in your jury
16  instructions -- is that we perform a reasonable
17  investigation.

18         I mean, the real reason that we're here on
19  the duty side is to determine whether Midland's
11:20:22 20 investigation of Mr. Brim's disputes was
21  reasonable.

22         Now, it's hard to figure out exactly what
23  the plaintiffs are arguing.  On the one hand,
24  they're indicting the entire computer system.
11:20:34 25 And if using a computer system itself is

1    fundamentally flawed, then we've all got much
2    bigger problems than this particular case,
3    because no computer system is going to be perfect
4    in every instance.  All computer systems are
11:20:52  5    constantly updated.  The algorithms are being
6    perfected.  These things evolve.
7         Have you ever seen a software program that
8    works perfectly the first time it's installed?  I
9    know every time we get new software at my office,
11:21:10  10    at the law firm, we go through a period of
11    debugging.
12         But computers are important.  And they're
13    necessary.  And the mere fact that we use
14    computers to process the ACDVs in the first
11:21:22  15    instance does not automatically mean that this is
16    unreasonable.
17         Looking in your jury charges on Page 7 at
18    the top, the judge has instructed you that the
19    term, "negligence," means the failure to do
11:21:48  20    something that a reasonably-prudent entity would
21    do or the doing of something that a
22    reasonably-prudent entity would not do under the
23    circumstances you find existed in this case.
24         What is a furnisher of data supposed to
11:22:04  25    do?  What are other people similarly situated to

1    Midland supposed to do?  Let's talk about
2    plaintiff's evidence of that issue.  There's
3    nothing to talk about.  They didn't even ask the
4    CRAs, is this different than other people do it?
11:22:28  5    They didn't ask that question, because they
6    didn't want the answer.  They didn't bring
7    another furnisher in here to say the way Midland
8    does it is just way different than everyone else.
9    They didn't bring that type of evidence to you.
11:22:42  10        It's what a reasonably-prudent entity
11    would do under the same circumstances.  And I
12    submit to you that when you're receiving 8,000
13    disputes per week electronically that it makes
14    sense for those things to be handled in the first
11:22:58  15    instance by the computer.
16        You also heard testimony from Angelique
17    Ross about the manual reviews that are performed
18    on some of those ACDVs.
19        Now, we're at something of a disadvantage
11:23:14  20    because Angelique can't be here.  Trust, me I
21    wish she was.  Nothing against Mr. Edrozo.  I
22    very much appreciate him being here to represent
23    the company.  But there's no getting around the
24    fact that Angelique is the person most
11:23:28  25    knowledgeable about these issues.  And the

plaintiffs took a very lengthy deposition of her

in September in California.  You heard probably a

lot more of it than you wanted to hear.  And

Angelique testified that about five percent of

11:23:48  these ACDVs are flagged for manual review.

And the way that the ACDV interfaces with

the system is important.  Because the CRA, the

consumer reporting agency, they receive

Mr. Brim's dispute.  They don't just forward

11:24:04  whatever documents they get from Midland.  They

interpret it.  They code the ACDV.

The ACDV comes into Midland's system.

Certain codes on the ACDV side will trigger a

manual review.  Certain codes on Midland's side

11:24:24  will trigger a manual review.  About five percent

are manually reviewed.

That's not all there is to the

investigation.  You heard a lot of testimony

about what happened when Mr. Brim sent his

11:24:34  letters directly to Midland.

Jason, if you would pull up the first

letter.

This is not at all insignificant, because

the information that Midland receives directly

11:24:54  from computers -- excuse me.  Receives directly

1    from consumers is part of the computer system.
2    Because a person -- I know they want to talk
3    about computers.  But a person actually has to
4    open the mail.  A person has to put that
11:25:08  5    received-by stamp on there.  A person has to
6    determine what does this letter say and how are
7    we going to handle it.  And the testimony in this
8    case has been that all of that happened.
9         Now, why didn't Midland contact Mr. Brim
11:25:26 10    in response to this letter?  We've discussed this
11    several times.  But he says, please do not
12    contact me again by phone or in writing.  So
13    Midland was a little hamstrung on that.
14         Now, when I write a letter, trying to fix
11:25:44 15    something, I normally say, please contact me if
16    you have any further questions or need further
17    information.  That's what most people do.  They
18    don't say, fix this, but don't contact me.
19         Go to the March, 2009 letter.  Same thing
11:26:10 20    in March, 2009.  An actual employee of Midland
21    receives this mail, opens it, processes it, codes
22    it into the system.
23         Now, you may still be wondering why isn't
24    the bank statement itself sufficient?  Why can't
11:26:28 25    Midland just accept the bank statement, delete

1    the account, and move on?  Well, what testimony
2    did we hear on that issue?  We heard from Dell on
3    that issue.  Dell was the original creditor.
4    They couldn't even accept the bank statement as
11:26:42  5    proof of payment because the bank statement
6    didn't give any information other than a payment
7    purported to have been made to Dell.
8          Pull up our consumer relations manual.  Go
9    to the second page.
11:27:08  10          The two pages that we have up here -- you
11    just briefly saw the first, and this is the
12    second -- are the pages from Midland's consumer
13    operations manual that talk about how to handle
14    disputes based on prior payment.  And Mr. Bennett
11:27:26  15    has suggested that this sets up an impossible
16    situation; that there is absolutely no chance of
17    success because it's either a paid-in-full letter
18    and the front and back of a check or nothing at
19    all.  And that's just not the case.  The document
11:27:44  20    tells us this.
21          Angelique Ross -- I'm pointing at the
22    witness stand, like she was actually here.  It's
23    instinct.  You heard her by deposition, though.
24    Angelique Ross said when Midland receives
11:28:00  25    something that purports to be proof of payment,

1    there are three options.  Number 1, the proof is

2    deemed invalid; Number 2, the proof is deemed

3    valid; or Number 3 -- and you can see it in the

4    box under Number 5 there -- if unable to

11:28:18  5    determine if proof is valid, account will be

6    referred to ACQ, which is acquisitions.

7         You did hear Mr. Edrozo speak to that very

8    briefly because Mr. Bennett called him for a

9    second time yesterday to extract testimony from

11:28:36 10   him.  And the one question I asked Mr. Edrozo was

11   about this issue.  Because this is important.

12   This is what you need.  This is what shows you

13   that there is a path to success when you're

14   challenging -- when you're challenging a trade

11:28:54 15   line, saying that it's been paid prior.  If you

16   send something novel, if you send something that

17   people aren't used to seeing that's on the edge,

18   it gets sent to acquisitions.

19        Angelique Ross testified by deposition

11:29:12 20   that acquisitions is the department that actually

21   reaches out to the original creditor.  And in

22   this instance -- I guess we'll never know because

23   we didn't get it.  But in this instance, if

24   Mr. Brim had actually sent that additional

11:29:24 25   information that we now know exists from Redstone

1    Federal Credit Union, that would have been sent

2    to Dell or first it would have been sent to

3    acquisitions.  Acquisition would have gone to

4    Dell with it.  That didn't happen.

11:29:44  5          The other thing worth noting about the

6    computer system -- and then I'm going to leave

7    investigations and I'm going to move on to my

8    next point because I do intend to keep my promise

9    to be shorter than Mr. Bennett -- is this is not

11:30:00 10   a computer system -- this is not software that

11   Midland wrote itself.  This is software that

12   Midland purchased from the credit reporting

13   agencies.

14          You heard the term, "E-Oscar," during the

11:30:14 15   trial a time or to two.  That's the system that

16   Midland purchased from the credit reporting

17   agencies.  This isn't something Midland created.

18   And I think it's safe to assume that the CRAs

19   don't develop a software program for one client.

11:30:36 20          It's not our burden to prove anything in

21   this regard.  I submit to you that the reason you

22   didn't hear any testimony on that issue about

23   what other furnishers are using is because

24   they're also using the same system.  And if other

11:30:54 25   furnishers are doing it, it's a good indication

1    that it might be reasonable to process ACDVs that

2    way.

3                   MR. BENNETT:  Judge, I do not want

4    to object during closing.  Counsel is arguing

11:31:10  5    facts not in evidence.

6                   THE COURT:  Sustained.  Disregard

7    this last statement that was made by counsel for

8    the defendant.

9                   MR. LANGLEY:  Let's talk about

11:31:22 10    causation.

11         The best I can tell, the plaintiff's

12    argument about what the investigation should have

13    entailed involves making contact with Dell,

14    making contact with Redstone, making contact with

11:31:42 15    the plaintiff, or making contact with some other

16    undescribed person or entity.  So let's address

17    each of those in turn.

18         And this is where the plaintiff's case

19    really breaks down on the law.  Both for their

11:32:00 20    negligence claim and for their willfulness claim.

21    Because unless they can show that the result

22    would have been different, then it doesn't

23    matter.  Even if you think Midland's system was

24    horrible, it doesn't matter if the results of the

11:32:18 25    investigation would not have been different.

1          So what would have happened if Midland had

2     contacted Dell?  We know, from Dell's testimony,

3     that they believed the account was due and

4     payable until August, 2010.  Look at the bottom

11:32:38  5     entry first.

6          At the time Dell Financial Services sold

7     Mr. Brim's account to Midland, did Dell Financial

8     Services Believe the account was due and payable?

9     Yes.  Sorry.  And did Dell Financial Services, in

11:32:50 10    fact, believe the account was due and payable

11    until August of 2010?  Answer:  Yes, sir.  And

12    then the question above that, so if someone had

13    inquired about the status of Mr. Brim's account

14    prior to August of 2010, what would Dell

11:33:04 15    Financial Services' response have been?  Answer:

16    That the customer still had a balance on the

17    account and it was still owed.  That's what would

18    have happened if Midland had contacted Dell.

19         So what would have happened if Midland had

11:33:20 20    contacted Redstone?  Well, you heard from Anthony

21    Cox, 25 years at Redstone Federal Credit Union,

22    who said that if you had contacted us, we

23    wouldn't have talked to you.  Mr. Cox also said

24    that had a consumer come in and a customer of the

11:33:42 25    bank come in and said, well, this bank statement

1    isn't what I need to show the payment, that that

2    person ultimately would have been referred to the

3    ACH automated transactions -- automated

4    operations department.

11:34:02  5        Yesterday, we introduced into evidence

6    another copy of that bank statement, Defendant's

7    Exhibit 24.  And I think it's been supplemented

8    in your binders.  It is a single page.  And it's

9    a copy of the bank statement that Mr. Brim twice

11:34:18  10   sent to Dell in 2005 and that he twice sent to

11   Midland in 2008 and 2009.  And at the top of that

12   page, there's handwriting.  And we never

13   established precisely what it said, but you're

14   entitled to draw inferences about what that said.

11:34:38  15   You know the first word is automated.  I submit

16   to you that the second word is operations.

17        Mr. Cox, when he came in, said that he was

18   the manager of the automated operations

19   department.  He actually used those terms.  The

11:34:56  20   bank statement that Mr. Brim went and got from

21   Redstone, they may have told him, this is a

22   transactional detail report.  We think that's

23   unlikely, given the facts, but let's assume that

24   that actually happened.  They wrote that entry on

11:35:10  25   the top of the bank statement for a reason.  And

1  it corresponds with some of the testimony that

2  Mr. Brim gave in his deposition that we read into

3  the record yesterday, which is when the bank

4  teller said, if you need anything further, let us

11:35:26  5  know.  And for all we know, that never actually

6  happened here.

7  We know that Redstone Federal Credit Union

8  was able to produce the transactional detail

9  report that Dell had been looking for.  We know

11:35:44  10  that once that was provided to Dell, that it took

11  less than a day to trace the payment and resolve

12  this issue.

13  All right.  So what's the third thing that

14  they suggest Midland should have done to

11:36:02  15  investigate this dispute?  We should have

16  contacted Mr. Brim.  Well, first of all, he had

17  told us on two different occasions in writing not

18  to contact him.  But even if we can look past

19  that, we have to talk about what would have

11:36:18  20  happened had we contacted him.

21  Transactional detail report -- those are

22  not our words.  I mean, those aren't words that

23  Midland owns.  Those are the words that Dell was

24  using when they were asking Mr. Brim for

11:36:34  25  something other than the bank statement.  So

1    Midland wouldn't have said to Mr. Brim, you know,
2    we need a transactional detail report.  They
3    would have followed their procedures and said,
4    what we actually need is a settlement in full or
5    paid-in-full letter from the original creditor
6    and the front and back of a check.  Mr. Brim
7    probably would have said -- because he had no
8    front and back of a check; this was a phone
9    draft -- but ultimately this leads us back to
10   Dell.

11         And this is why I emphasized at the
12   beginning that the information from the original
13   creditor is critical here.  It's case
14   determinative.  And ultimately, it was the
15   information from the original creditor that
16   resolved this entire issue.

17         The next category of, I guess, people or
18   entities that the plaintiff seems to be claiming
19   that the defendant should have contacted are
20   undescribed.  They say should have contacted
21   Dell.  Didn't contact Dell, Redstone, Brim.
22   Didn't contact anybody.  Who is that anybody?
23   Who else is it that Midland should have reached
24   out to, assuming they should have reached out to
25   anyone?  Who and for what reason?  If there's

1    anyone at all that Midland should have gone back

2    to, it's Dell.  And we know what would have

3    happened had they gone back to Dell because we

4    have Dell's testimony to tell us that.

11:38:02    5         But let's talk about Dell for just a

6    moment.

7              Bring up the account notes.  Bring up

8    Dell's notes.  You don't have Dell's notes?  All

9    right.

11:38:18    10         This is Defendant's Exhibit 6.  It's Page

11   17.  On this page, there are two entries from

12   Dell.  You heard the Dell representative, Rachel

13   Garlock testify about these yesterday.  Two

14   entries from September 8th, 2005.  And in the

11:39:10    15   first entry, Mr. Brim had just faxed a copy of

16   his bank statement to Dell.  In the very next

17   entry, it says, customer called in.  He will go

18   to his bank during lunch to get transactional

19   detail report from his bank.

11:39:24    20        Even if Mr. Brim didn't know what the

21   transactional detail report was, and that's very

22   likely -- we're not suggesting he should have

23   known what it was.  What is really beyond

24   reasonable dispute is that he knew he needed

11:39:38    25   something else.  And that something else -- if he

1    had gone to Redstone and asked for something

2    else, you heard from Mr. Cox from Redstone

3    Federal Credit Union what would have happened in

4    that instance.

11:39:54   5         Now, one of the disadvantages of being a

6    defendant in a case is that you don't get to

7    argue last because Mr. Bennett will have eight

8    minutes to come back up here and talk to you.  So

9    I'm not going to get to respond to what he says.

11:40:14  10   And that puts us at something of a disadvantage.

11   But it's their burden of proof.  And so I suppose

12   it's fair that he gets to go last.

13         But I want someone -- I don't know who it

14   is, but I want at least one of you when you're

11:40:28  15   back there in deliberations and there's something

16   that you're thinking about that Mr. Bennett says

17   or Ms. Cauley -- I don't know who's arguing

18   rebuttal -- or Mr. Sykstus.  I want one of you to

19   think:  What would Midland say about this?

11:40:44  20         As you're examining the proof, please,

21   please ask yourself when you're contemplating an

22   argument or a supposed fact presented by the

23   plaintiff in their rebuttal:  What would Midland

24   say about this?

11:41:00  25         We believe that the investigation in this

1  case, under the circumstances, given the amount

2  of disputes that we receive, was reasonable.  We

3  believe that the method of processing direct

4  disputes was reasonable.

11:41:14  5       Even if you don't think it was reasonable,

6  the plaintiff certainly hasn't presented evidence

7  to demonstrate that it rises to the level of

8  willfulness, some kind of reckless disregard for

9  the rights of the plaintiff.

11:41:28  10       But even if you think that, where

11  everything comes off track for the plaintiff is

12  on the causation issue.  And you'll see in your

13  jury instructions, under both negligence and the

14  willfulness claims, there's no mistaking that

11:41:42  15  they have to prove causation.  Proximate cause.

16  And in this case, they cannot and did not prove

17  that the results would have been different had

18  Midland done a different type of investigation.

19       So I'm going to ask you when you go back

11:42:00  20  there to deliberate to return a verdict for

21  defendant, Midland Credit Management.  Thank you.

22            MR. BENNETT:  I'm confident I

23  don't have eight minutes.

24            THE COURT:  You have five.

11:42:18  25            MR. BENNETT:  Thank you, Judge.

1        Let me just talk briefly about one

2   overarching disagreement that we have in the two

3   sides.

4        The defendant is operating under this view

11:42:32  5   that it is entitled in the law or in fairness or

6   for some other reason besides internal procedures

7   to rely on Dell.  Dell is the ultimate,

8   omniscient source of knowledge.  And we know the

9   reality is that's not true.  The problem is Dell

11:42:52  10   didn't want to pull its IEnergizer to make it get

11   its own transactional detail report.

12        When the defendant is saying, what more

13   could we do, it is not saying, what more could we

14   investigate.  What it's saying is we don't have

11:43:06  15   anymore means than you do to convince Dell to

16   change its opinion.  We, Midland, we're not going

17   to be anymore effective in convincing Dell that

18   it's paid.  But that's not what the FCRA says.

19        And let's talk about if the business model

11:43:22  20   cannot accommodate a detailed inquiry -- for

21   example, Midland sending someone to Texas, Dell

22   flying someone to India and getting to the bottom

23   of this, putting a special Midland agent on it.

24   Right?  Expensive, difficult, not worthy of the

11:43:40  25   70-dollar account.

1    But it wants my client to do -- not quite

2    go to India, but wants him to do all that.

3    Midland doesn't have to.  Just delete the

4    account.  Because there are three possibilities.

11:43:54  5    We know that it is owed; we know it's not owed;

6    and we just aren't sure.  And the law doesn't

7    allow Midland to presume my client saying I paid

8    it is any more credible than Dell, a stranger to

9    it technically, telling it it hasn't been paid.

11:44:16  10    Why is Midland entitled to rely on Dell and

11    completely disregard my client?  And they can't.

12    They can't.

13    Credit denial depositions, most of them

14    are on line.  They're automated.  And you have --

11:44:32  15    through great effort in this litigation, we were

16    able to wrench a credit denial letter from

17    American Express and after noticing a deposition

18    to get the affidavit.  And even that's

19    challenged.  But there's no evidence of any

11:44:46  20    alternate explanation.  And you have my client

21    apply.  The denial for -- the inquiries were for

22    mortgages that he didn't get.  Circumstantial

23    evidence instruction is there for a reason.

24    Now, at the end of this, remember one last

11:45:00  25    thing.  Mr. Langley says computers are imperfect.

1      They're evolving all the time.  You have to debug

2      them.  Work them out.  Well, have they?  No.

3      There's no evidence that any procedures were

4      changed; that if my client or his neighbor or

11:45:20  5  anyone else in Alabama or anyone else in the

6      country went through the same process today it

7      would happen all the same.

8           And that is why punitive damages are

9      there.  To deter companies from doing this same

11:45:36  10  thing again and again and again.  It doesn't have

11     to be malicious, mean.  It could just be

12     reckless.

13          300 million dollars is what their annual

14     report says.  In excess of that.  That's a lot of

11:45:48  15  money.  How do you make a 300-million-dollar

16     company change its procedures?  And obviously,

17     suing them a year and whatever later isn't

18     enough.

19          And that's where you come in.  Not for

11:46:02  20  Mr. Brim.  That's not what punitive damages are

21     for.  You need to make sure that it doesn't

22     happen in Alabama; doesn't happen in Virginia;

23     doesn't happen in California or anywhere in the

24     country this federal law governs.  It's why the

11:46:16  25  law has been there 30-something years.

1       We don't just need your help.  Other

2    consumers need your help.  Make this policy

3    different.  If they don't want to do the detailed

4    investigation, don't do it.  But you can't keep

11:46:30  5    reporting it as verified, definitely owed.

6          Thank you for your time.

7              THE COURT:  You will have one

8    verdict form with you.  It has different lines on

9    it.  And I'd just like to read it to you.  And

11:46:44  10   the reason you only have one is because you only

11   return one verdict.

12         On the claim of plaintiff against the

13   defendant for violation of the Fair Credit

14   Reporting Act, we, the undersigned jurors, find

11:46:54  15   in favor of -- and there's a line for the

16   plaintiff and there's a line for the defendant.

17   And you would mark the one with an X, whoever you

18   find in favor of.

19         The following paragraphs should only be

11:47:10  20   completed if you find in favor of the plaintiff.

21         The next paragraph simply says,

22   plaintiff's claim on negligence, noncompliance,

23   we, the undersigned jurors, assess actual damages

24   of plaintiff at -- and there's a blank line for

11:47:26  25   negligence, noncompliance with the act.  And you

1    would fill in the amount of actual damages that

2    you arrive at.

3         And B, plaintiff's claim for willful

4    noncompliance -- there is a form that says, we,

11:47:36  5    the undersigned jurors, assess actual damages for

6    plaintiff at blank.  And you would fill in the

7    amount of actual damages or damages of not less

8    than 100, no more than $1,000 for willful

9    noncompliance with the act.

11:47:52  10    And Two, we, the undersigned jurors,

11    assess punitive damages in the amount of blank.

12    And you would fill in that blank if you award it.

13         And then the foreperson that you pick

14    should sign it and date it.  And then that would

11:48:06  15    be the form that you would return to me.

16         Now, I want to just tell you you will have

17    all the exhibits with you in the jury room that

18    have been admitted in the two books.  And you

19    will have the stipulated facts with you.  You

11:48:20  20    will have your jury charges.  You can take your

21    notes with you.  You will have lunch brought to

22    you.  And I think you've already ordered those?

23    Okay.  Will they be delivered?

24              COURTROOM DEPUTY:  They should be

11:48:30  25    here at 12:00.

1           THE COURT:  Okay.  As long as you

2    stay together, you can deliberate.  If you

3    separate, like, if you want a break and just get

4    away and get a soft drink or walk across the

11:48:44  5    street and get a cup of coffee or whatever, you

6    have to come into court and tell me you want a

7    break.  And then while you're on break, you can't

8    obviously talk about the case.  But as long as

9    you're together, all 12 of you, you can start

11:48:56 10    your deliberations.  And I'm going to tell you

11    that you can do that now.

12           So here's the verdict form.  And just let

13    Tammi help you upstairs.  And we'll go from

14    there.  We'll be here, waiting on you.

11:49:08 15           If you have a question about anything, you

16    would need to reduce it to writing and all come

17    into the court and ask me the question so I can

18    look at it.  Or you can give it to Tammi and she

19    can bring it to me.  And then I'll take it up

11:49:20 20    with the lawyers and bring you back into the

21    courtroom.  Okay?  All right.

22                     (Jury excused.)

23                     (In open court.  Jury not

24    present.)

11:50:18 25           THE COURT:  All right.  Guys and

1          girls, are y'all going to lunch?  If you are, I

2          need your cell numbers.  Just one cell number per

3          side.  Are y'all going to lunch?

4                          MR. LANGLEY:  I think we are going

11:50:52  5     to go get a bite.  We'll be nearby.

6                          THE COURT:  An hour?

7                          MR. BENNETT:  We're going to try

8          to get the case settled.

9                          THE COURT:  You do what you want

11:51:04 10     to.  No skin off my nose.

11                          MR. BENNETT:  We have been trying.

12          Both sides.

13                          THE COURT:  Take an hour.

14                          (Luncheon recess.)

16:54:34 15                  (In open court.  Jury present.)

16                          THE COURT:  Please be seated

17          everyone.  Let the record show that the jury has

18          returned to the courtroom.  And Mr. Bess, I see

19          you have some white paper in your hand.

16:55:10 20                  JUROR 2:  Yes, ma'am.

21                          THE COURT:  Has the jury reached a

22          verdict?

23                          JUROR 2:  Yes, Your Honor.

24                          THE COURT:  Are you the foreperson

16:55:16 25     of the jury?

1              JUROR 2:  Yes, Your Honor.

2              THE COURT:  Would you please hand

3     it to Tammi, my courtroom deputy?

4              (Juror complies.)

16:55:28  5              THE COURT:  Is this your verdict:

6     On the plaintiff's claim against defendant for

7     violation of the Fair Credit Reporting Act, we,

8     the undersigned jurors, find in favor of the

9     plaintiff.

16:55:42 10         Further, we, the undersigned jurors,

11    assess the actual damages -- well, excuse me.

12         On the plaintiff's claim of willful

13    noncompliance, we, the undersigned jurors, assess

14    actual damages of the plaintiff at $100,000.

16:56:00 15         Two, we, the undersigned jurors, assess

16    punitive damages in the amount of $623,180.

17         All right.

18         And it's signed by you, Mr. Bess.

19         And is there anyone who wants the jury

16:56:16 20    polled?

21              MR. LANGLEY:  Your Honor, we would

22    like the jury polled.

23              THE COURT:  Okay.  Would you

24    please poll the jury?

16:56:22 25         And I want the parties to know that there

```
 1    was nothing on the plaintiff's claim on

 2    negligence.

 3                    MR. BENNETT:  Yes, Your Honor.

 4                    COURTROOM DEPUTY:  If this is your

 5    true verdict, answer yes.  If it is not, answer

 6    no.

 7          Phillip Bess?

 8                    JUROR 2:  Yes.

 9                    COURTROOM DEPUTY:  Jeffrey Bibbee?

10                    JUROR 5:  Yes.

11                    COURTROOM DEPUTY:  Melissa

12    Dobbins?

13                    JUROR 10:  Yes.

14                    COURTROOM DEPUTY:  Stephen

15    Drzycimski?

16                    JUROR 12:  Yes.

17                    COURTROOM DEPUTY:  Monica Gregory?

18                    JUROR 16:  Yes.

19                    COURTROOM DEPUTY:  Charles Hines?

20                    JUROR 19:  Yes.

21                    COURTROOM DEPUTY:  Chris Matthews?

22                    JUROR 24:  Yes.

23                    COURTROOM DEPUTY:  Carl McGrady?

24                    JUROR 25:  Yes.

25                    COURTROOM DEPUTY:  Donna
```

16:56:30 (line 5)
16:56:38 (line 20)
16:56:44 (line 25)

1    Missildine?

2                        JUROR 27:  Yes.

3                        COURTROOM DEPUTY:  Deborah Moody?

4                        JUROR 29:  Yes.

16:56:48  5              COURTROOM DEPUTY:  Stacey Moseley?

6                        JUROR 31:  Yes.

7                        COURTROOM DEPUTY:  Jane Wylie?

8                        JUROR 40:  Yes.

9                        COURTROOM DEPUTY:  Thank you.

16:56:54  10             THE COURT:  All right.  In

11   accordance with the verdict of the jury, judgment

12   is rendered in favor of the plaintiff, Jamon

13   Brim, and against Midland Credit Management,

14   Inc., on the plaintiff's claim of willful

16:57:08  15  noncompliance in the amount of $100,000 actual

16   damages and $623,180 punitive damages.

17          And I'm going to get Tammi to make copies

18   of the verdict for you.  But first of all, I

19   would really like to thank you for your -- first

16:57:22  20  of all, for putting up with me being sick.  I'm

21   sorry about that.  I appreciate that.  I mean, I

22   had to recess early.  And I've not been in the

23   best of shape.  But I appreciate y'all putting up

24   with it.

16:57:38  25          I thank you for your kindness and your

attention.  There's a lot put at you in this
week.  There was a lot of numbers and a lot of
interesting issues.  And I just want to tell you
thank you for being here.  We can't work without
you.

16:57:52

         And every time I try a jury case, I am so
impressed with what 12 people can come up with.
I mean, that is a great system, and you proved
it.  It is a great system.  And we're one of the
few countries in the world that has that system.

16:58:06

         I used to practice law in Denmark where
I'm from originally.  They don't have the jury
system like we have here in the United States.
And it is a totally different form of
administration of justice.  And I am much more
impressed with what we have in this country.

16:58:18

         So thank you so much.  I hope you'll have
a lovely weekend and a good spring.

         And we have a rule in federal court that
you're free to discuss your experience as a juror
if you want to.  You don't have to.  But you
can't do it until 24 hours after the term is --
is it 24 or 48?

16:58:34

                    COURTROOM DEPUTY:  48.

                    THE COURT:  48 hours after the

16:58:48

1    term is over.  So it's over today.  But that

2    means if you should get any calls about

3    anything -- first of all, you should know that

4    you do not have to answer any questions.

16:58:58  5    Secondly, you should know that you can't, even if

6    you choose to answer questions -- you can't do it

7    until 48 hours after this minute.  Okay?

8          Have a nice weekend and thank you.  Make

9    sure to get all your excuses from work and all

16:59:10  10   that stuff.

11          Y'all just have to wait a minute if you

12   want a copy of the verdict.  Thank you.  Thank

13   you so much.

14                    (Jury excused.)

17:13:00  15                   (The Proceedings were concluded at

16   approximately 5:13 p.m. on February 25, 2011.)

17

18

19

20

21

22

23

24

25

1
2                        C E R T I F I C A T E
3
4
5              I, the undersigned, hereby certify that
6     the foregoing pages contain a true and correct
7     transcript of the aforementioned proceedings as
8     is hereinabove set out, as the same was taken
9     down by me in stenotype and later transcribed
10    utilizing computer-aided transcription.
11             This is the 17th day of March of 2011.
12

                    *Cheryl K Powell*

14    _____
15         Cheryl Renae King Powell, CCR, RPR, FCRR
16            Federal Certified Realtime Reporter
17
18
19
20
21
22
23
24
25

**CHERYL K. POWELL, CCR, RPR, FCRR**
Federal Official Court Reporter
1729 Fifth Avenue, North
Birmingham, AL 35203
256-508-4050/wrd4wrdrpr@aol.com